# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OCA – ASIAN PACIFIC AMERICAN
ADVOCATES,

        *Plaintiff*,

        v.

MARCO RUBIO, U.S. Secretary of State, in
his official capacity; U.S. DEPARTMENT OF
STATE; JAMES McHENRY, Acting Attorney
General, in his official capacity; U.S.
DEPARTMENT OF JUSTICE, KRISTI
NOEM, Secretary of Homeland Security, in her
official capacity, U.S. DEPARTMENT OF
HOMELAND SECURITY; MICHELLE
KING, Acting Commissioner of the Social
Security Administration, in her official
capacity; U.S. SOCIAL SECURITY
ADMINISTRATION; and DONALD J.
TRUMP, President of the United States, in his
official capacity,

        *Defendants*.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     One hundred and thirty years ago, Wong Kim Ark, then a 21-year-old cook who was born in San Francisco and had lived his entire life in California, returned home by sea from a trip to China.  He was refused reentry, arrested, and detained aboard the ship on which he had traveled home.  In opposition to Wong's petition for *habeas corpus*, the United States attorney claimed that, despite having been born in the United States, Wong was not a U.S. citizen because Wong "had been at all times, by reason of his race, language, color, and dress, a Chinese person … ."

1

2.     The Supreme Court disagreed.  In 1898, the Court issued a landmark opinion that confirmed beyond doubt what, by then, was already the law of the land: "*All persons* born in the United States and subject to the jurisdiction thereof, are citizens of the United States."  *United States v. Wong Kim Ark*, 169 U.S. 649. 704 (1898) (emphasis added).

3.     The Court so held even in the face of virulent hostility to Chinese immigrants.  Just six years prior, Congress extended the Chinese Exclusion Act to bar Chinese laborers from the United States and further amended the Act to require Chinese residents of the United States to carry certificates of residency, or be arrested and deported.

4.     Yet even this anti-immigrant animus could not overshadow "the fundamental principle of citizenship by birth within the dominion." *Id.* at 688.  The Supreme Court recognized that (subject to rare and narrow exceptions) the Fourteenth Amendment, "in clear words and in manifest intent, includes the children born within the territory of the United States of all … persons, of whatever race or color, domiciled within the United States." *Id.* at 693.  Congress subsequently re-codified this principle in the United States Code. 8 U.S.C. § 1401(a).

5.     Birthright citizenship has thus been well-settled law in the United States for over a century.  During that time, generations of children born on American soil have enjoyed the privileges of U.S. citizenship.  The principle that every child born in the United States is automatically a citizen is part of the fabric of American society.

6.     On his first day in office, Defendant President Trump moved to unilaterally end birthright citizenship by edict, eviscerating the rights of children and more than a century of settled law.  His Executive Order entitled "Protecting the Meaning and Value of American Citizenship" (the "Order") directs every department and agency of the United States to refuse to recognize as an American citizen any child born on American soil whose mother is "unlawfully present" or

temporarily present and whose father who is not a U.S. citizen or lawful permanent resident (hereinafter, "Targeted Children"). President Trump's unilateral directive is flagrantly unlawful: it violates the Constitution's Citizenship Clause, as well as the birthright citizenship statute.

7.      But apart from being unconstitutional on its face, the Order stands to inflict profound and lasting injury on countless immigrant families in the United States, whose children, though born on U.S. soil, will be deprived of the benefits of American citizenship.

8.      Plaintiff OCA – Asian Pacific American Advocates ("OCA") is a nonprofit, membership-based organization with over 35 chapters and affiliates across the United States. Founded in 1973 as the Organization of Chinese Americans with the purpose—like many membership associations before it—of providing a unified voice for Chinese Americans in the civil rights movement, in 2013 OCA renamed itself "OCA-Asian Pacific American Advocates" to reflect its work on behalf of all Asian Americans, Native Hawaiians, and Pacific Islanders.

9.      OCA's members include at least two pregnant women on lawful temporary visas whose children will be born after the Order's effective date and will be denied birthright citizenship pursuant to the Order.  OCA brings this lawsuit to forestall the grave and irreparable harm that the Order will impose on its members and countless other families in the United States.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, and 28 U.S.C. § 2201.

11.      Venue is proper in this District because Defendants Departments of State, Justice, and Homeland Security, as well as Defendants Marco Rubio, James McHenry, Benjamine Huffman, and Donald Trump, who are "officer[s] or employee[s] of the United States or a[n] agency thereof acting in their official capacity or color of legal authority," reside in this District; a "substantial part of the events or omissions giving rise to the claim occurred" in this District;

Plaintiff OCA is based in this District; and the District is a site of the injuries at issue.  28 U.S.C. § 1391(b)(2); *Id.* at §  (e)(1).

## PARTIES

### A.    Plaintiff

12.    Plaintiff OCA  is a nonprofit, membership-based organization with over 35 chapters and affiliates across the United States. It is headquartered in Washington, District of Columbia. OCA's mission is to advance the social, political, and economic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders ("AANHPIs").

13.    OCA was founded in 1973 as the Organization of Chinese Americans with the purpose—like many membership associations before it—of providing a unified voice for Chinese Americans in the civil rights movement.  As the AANHPI population of the United States continued to grow and diversify following the elimination of most race-based restrictions on immigration, the Organization of Chinese Americans also changed to reflect that growing diversity.  In 2013, it renamed itself "OCA-Asian Pacific American Advocates" to reflect its work on behalf of all AANHPIs. OCA is headquartered in Washington, D.C.

14.    OCA is a membership-based organization. Members pay annual dues to OCA and choose to affiliate with a local chapter or be an "at large" member. Fifty percent of each member's dues are sent by OCA to the member's affiliated local chapter.

15.    Current dues-paying members, known as voting members, have the right to vote for local chapter leadership, hold office within OCA and its chapters, and serve on committees or task forces. OCA currently has over 1700 voting members.

16.    Voting members of OCA elect local chapter leadership, including but not limited to a board of directors, officers, including president and treasurer. A chapter may designate a separate Director to OCA's National Board or have the chapter President be its designee.  The National

4

Board is comprised of leadership from the local chapters, with larger chapters having additional representation, and elects the Executive Council of OCA, including its President.  OCA's National Board, *inter alia*, conducts, manages, and sets the mission, national policies and resolutions, and strategic plan and affairs of OCA.  Each chapter must comply with policies, resolutions, and procedures set forth by the National Board.

17.    OCA's national headquarters provides subgrants to its individual chapters, and the national board includes each OCA chapter's board president.

18.    Today, OCA chapters serve as their local communities' trusted voice and resource. They host cultural events; hold food and clothing drives conduct community clean-ups; provide programming for AANHPI youth, professionals, and elders; conduct voter outreach and undertake other civic engagement work; and provide other resources to their communities, including information about COVID-19, small business support, and naturalization and citizenship application support.

19.    OCA was founded by and its membership includes those who have grown their families and thrived as a result of birthright citizenship as interpreted by *Wong Kim Ark* and its progeny. Without *Wong Kim Ark*, many Asian Americans—on behalf of whose rights OCA advocates—including members of OCA itself, would not be citizens of the United States today.

20.    OCA has members that include, but are not limited to, noncitizens who are in the United States on temporary visas, and whose expected children will be deprived of citizenship under the Order.

21.    Among these OCA members affected by the Order are two individuals who are affiliated with OCA's D.C. chapter, which has members in the District of Columbia, Maryland, and Virginia. These individuals are pregnant and are present in the United States on nonimmigrant

visas. Their children are expected to be born after the Order goes into effect. One of those women holds a J visa (a visa for individuals approved to participate in exchange programs in the United States). The other holds an F visa (a student visa).

22.     Neither of the fathers of either expected child is a U.S. citizen or legal permanent resident.

23.     The expected children of both of these individuals would have been born and recognized as U.S. citizens but for the actions of Defendants. OCA is capable of presenting the claims asserted in this complaint, and the Court is able to provide complete relief without the participation of these two women or any other individual OCA members.

**B.      Defendants**

24.     Defendant Marco Rubio is the Secretary of the U.S. Department of State ("State Department").  In that role, Defendant Rubio is responsible for overseeing all Sate Department operations, including reviewing passport applications, making eligibility determinations thereon, and issuing passports to Americans with birthright citizenship.  As head of the State Department, Defendant Rubio is responsible for implementing the dictates of the Order at the State Department. Defendant Rubio is sued in his official capacity only.

25.     Defendant State Department is a cabinet-level department of the United States federal government.   The State Department's responsibilities include reviewing passport applications and issuing passports to U.S. citizens.  The State Department will be responsible for implementing the dictates of the Order.  The State Department is headquartered in Washington, D.C.

26.     Defendant James McHenry is the Acting Attorney General of the U.S. Department of Justice (DOJ).  In that role, Defendant McHenry is responsible for overseeing all Department of Justice operations.  As head of the Department of Justice, Defendant McHenry is responsible

for implementing the dictates of the Order at the Department of Justice. Defendant McHenry is sued in his official capacity only.

27.     Defendant the U.S. Department of Justice (DOJ) is a cabinet-level department of the United States federal government. DOJ's responsibilities include upholding the rule of law and protecting civil rights. DOJ was founded during Reconstruction to protect the civil rights promised by the Thirteenth, Fourteenth, and Fifteenth Amendments. DOJ is tasked with implementing the dictates of the Order. DOJ is headquartered in Washington, D.C.

28.     Defendant Kristi Noem is the Secretary of the Department of Homeland Security (DHS). In that role, Defendant Noem is responsible for overseeing all DHS operations. As head of DHS, Defendant Noem is responsible for implementation of the dictates of the Order at DHS. Defendant Noem is sued in her official capacity only.

29.     Defendant DHS is a cabinet-level department of the United States federal government. DHS is tasked with implementing the dictates of the Order. DHS and its components are headquartered in Washington, D.C.

30.     Defendant Michelle King is the Acting Commissioner of the Social Security Administration ("SSA"). In that role, Defendant King is responsible for overseeing all SSA operations, including the assignment of Social Security numbers and the issuance of Social Security cards to American citizens. As head of SSA, Defendant King is responsible for implementing the dictates of the Order at SSA. Defendant King is sued in her official capacity only.

31.     Defendant SSA is an independent agency within the Executive Branch of the United States Government. SSA is responsible for, inter alia, assigning Social Security numbers and

issuing Social Security cards to American citizens.  SSA is tasked with implementing the dictates

of the Order.

32.     Defendant Donald J. Trump is the President of the United States.  He is sued in his

official capacity.  In that capacity, he signed, issued, and will oversee the implementation of the

Order challenged in this lawsuit.

## STATEMENT OF FACTS

**A.**     **Birthright Citizenship in the United States Prior to and in the Fourteenth Amendment**

33.     *Jus soli* is "the ancient and fundamental" principle of "citizenship by birth within

the [country's] territory"—as relevant here, the United States.  *Wong Kim Ark*, 169 U.S. at 693.

34.     The principle of *jus soli* has its roots in English common law, *see Calvin v. Smith*,

77 Eng. Rep. 377 (K.B. 1608), where it was "held in practice "long before . . . [it] was made

explicit in 1368."   James H. Ketter, THE DEVELOPMENT OF AMERICAN CITIZENSHIP,

1608-1870, at 13 (1978).  It was "never successfully challenged."  *Id*.

35.     Drawing on English common law, early American courts in both the colonial era

and early years of the American republic applied the doctrine of *jus soli*.  *See Wong Kim Ark*, 169

U.S. at 658; *Lynch v. Clarke*, 1 Sand. Ch. 583, 3 N.Y. Leg. Obs. 236 (N.Y. 1844) ("It was thus the

law of each and all of the states at the Declaration of Independence, and so remained until the

National Constitution went into effect, that a child born within their territory and liegeance

respectively, though of alien parents, who were abiding temporarily, thereby became a citizen of

the state of which he was a native.").

36.     Yet, as with so many other laudable principles of the American Revolution, the idea

of *jus soli* did not square with the reality of slavery: If *jus soli* were the rule without exception, any

enslaved person born in the United States was, by right, a citizen and definitionally could not be

enslaved. And, in fact, until the conclusion of the Civil War, enslaved people and others were routinely deprived of their rights under this doctrine.

37.    Aware of the tension between the principle of *jus soli* and the practice of chattel slavery, supporters of slavery sought to carve out an exception to *jus soli* or do away with it entirely. They achieved this result in *Dred Scott v. Sandford*, wherein the Supreme Court abandoned the idea of territorial birthright citizenship and held that, despite their birth in the United States, the descendants of enslaved people were "not included, and were not intended to be included, under the word 'citizens' in the Constitution." 60 U.S. 393, 404-05 (1857). Rather, the *Dred Scott* Court held that only those descended from people considered "citizens" by the framers were entitled to citizenship at birth. 60 U.S. at 404. This conception of citizenship excluded the descendants of enslaved people who had been "subjugated by the dominant race" and were considered "subordinate." *Id*. at 404.

38.    The *Dred Scott* decision, however, did not end the debate over American citizenship.

39.    During the Civil War, Attorney General Edward Bates issued a formal opinion on the citizenship of African Americans and enslaved people, rejecting the reasoning in *Dred Scott.* He explained that it was the Department of Justice's view that all persons born within the United States were citizens: "We have *natural born* citizens …not made by law or otherwise, but *born* . . . . And they became citizens in the natural way, *by birth*,  so they remain citizens during their natural lives unless, by virtue of their own voluntary act, they expatriate themselves and become citizens or subjects of another nation … If this be a true principle, and I do not doubt it, it follows that every person born in the country is, at the moment of their birth, *prima facie* a citizen; and he who would deny it must take upon himself the burden of providing some great disenfranchisement

strong enough to override the '*natural born*' right as recognized by the Constitution in terms of the most simple and comprehensive, and without reference to race or color, or any other accidental circumstances."  Attorney General Edward Bates, *On Citizenship* (Nov. 29, 1862) in 1 THE RECONSTRUCTION AMENDMENTS: THE ESSENTIAL DOCUMENTS 361-363 (Kurt T. Lash, ed., 2021) (emphasis in original).

40.     After the Civil War, and following this same principle, Congress and the rest of the nation formally repudiated *Dred Scott*. Congress began by enacting the Civil Rights Act of 1866 pursuant to the Thirteenth Amendment.  That law, among other things, contained its own birthright citizenship provision, proclaiming that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States[.]"  14 Stat. 27-30 § 1 (Apr. 9, 1866).

41.     The Civil Rights Act's birthright citizenship provision was intended—and broadly understood—to confer broad birthright citizenship regardless of parental alienage.

42.     During debate, Representative James Wilson cited approvingly to Attorney General Bates' opinion, in support of the birthright citizenship provision of the Act.  Cong. Globe, 39th Cong., 1st Sess. at 1115 (1866).  Representative Wilson also quoted a myriad of other sources in support of his position, including Blackstone's *Commentaries on the Laws of England* ("Natural-born subjects are such as are born within the dominions of the Crown of England[.]"), *id*. at 1116, Justice Kent's *Commentaries on American Law* ("Citizens, under our Constitution and laws, means free inhabitants, born within the United States or naturalized under the laws of Congress"), *id*. at 1117, and William Rawle's *View of the Constitution* ("Every person born within the United States . . . whether the parents are citizens or aliens, is a natural-born citizen in the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity."). *Id*.

43.     Representative Burton Cook summarized the meaning of the Act's citizenship provision by saying: "This bill provides that all persons born within the United States, excepting those who do not owe allegiance to the United States Government, as children of embassadors [sic] of foreign Powers, and such as are not subject to our laws . . . shall be citizens of the United States. I think this is the law now."  *Id.*. at 1124.

44.     Likewise, when an opponent of the Act asked Senator Lyman Trumbull, the author and sponsor of the Act, "whether it will have the effect of naturalizing the children of [non-citizen] Chinese and Gypsies born in this country," Senator Trumbull responded, simply: "Undoubtedly." *Id.* at 498.

45.     The Civil Rights Act's birthright citizenship provision encompassed virtually all persons born in the United States.  That is what its plain text indicates, how it was understood at the time of its enactment, and the way it was intended to operate.

46.     To remove any possible remaining doubt about the Civil Rights Act's citizenship guarantee, and to protect it against subsequent infringement, Congress then enacted, and the states ratified, the Fourteenth Amendment, which constitutionalized the birthright citizenship rule with even broader language.

47.     The Fourteenth Amendment's Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1.

48.     The Citizenship Clause was enacted with full knowledge among both proponents and opponents that it would guarantee the citizenship of children of virtually all noncitizens.  *E.g.*, Cong. Globe, 39th Cong., 1st Sess.at 2890-91 (1866).

49.    Opponents invoked racism and xenophobia in opposition to the Citizenship Clause, to no avail.  For example, during debate, Senator Edgar Cowan demanded to know: "[i]s the child of the Chinese immigrant in California a citizen? Is the child of a Gypsy born in Pennsylvania a citizen?"  He feared that the answer would be in the affirmative, prognosticating that California would be "overrun by a flood of the Mongol race."  As a result, he objected to the Clause on the ground that the states would "give up the right" to "expel" immigrants "who owe her no allegiance; who pretend to owe none; who recognize no authority in her government."  *Id.* at 2890-91.

50.    Fears of Chinese immigration did nothing to dissuade proponents of the Clause, however.  Senator John Conness affirmed that "the children begotten of Chinese parents in California" would "be citizens" under it.  *Id.* at 2891.

51.    Moreover, Senator Conness had no objection to giving citizenship to the children of Chinese immigrants who would work in the United States temporarily only to return to China. *Id.* at 2891.

52.    Throughout Reconstruction, members of Congress reiterated their understanding of the Citizenship Clause to include virtually anyone born in the United States, apart from those who fell within a handful of narrow categories, such as the children of diplomats.

53.    For example, during debate over the qualifications of Senator Hiram Revels, the first Black U.S. Senator, Senator Jacob Howard—who helped drafted the Thirteenth Amendment and who served on the Joint Committee on Reconstruction—rebutted the charge that, because Senator Revels was Black, Senator Revels was "not therefore a citizen of the United States" or "has not been … for nine years past" as required by the Constitution.  Senator Howard explained that "in the sense of the Constitution every person born free within the limits of a State, not connected with a foreign minister's family, is born a citizen of the United States, whether he be

black or white." Cong. Globe, 41st Cong, 2d Sess. 1543 (1870). The Senate ultimately seated Senator Revels in a vote of 48 in favor and only eight against.

**B.      Reaffirmance of the Citizenship Clause During Periods of Anti-Immigration Backlash**

54.      Following the collapse of the political majority underpinning Reconstruction, the federal government attempted to bypass the constitutional guarantees enshrined during that time.

55.      In 1882, Congress enacted the Chinese Exclusion Act, 22 Stat. 58 (1882), which effectively banned Chinese immigration to the United States and barred Chinese immigrants already in the United States from citizenship, either through naturalization or by birthright citizenship pursuant to the Fourteenth Amendment.

56.      Subsequent legislation (*e.g.*, the Geary Act, 27 Stat. 25 (1892)), further restricted the rights of Chinese immigrants, requiring them to obtain and carry "a certificate of residence" while "within the jurisdiction of the United States" or else face deportation or "imprison[ment] at hard labor" for one year.

57.      Later, the Immigration Act of 1924 expanded the scope of the Chinese Exclusion Act to bar virtually *all* Asian immigration to the United States. Pub. L. 68-139, 43 Stat. 153 (1924). It remained in effect until its repeal in 1943. Magnuson Act, Pub. L. 78-199, 57 Stat. 600 (1943).

58.      Drawing support from federal anti-Asian immigration laws, states began enacting Alien Land Laws—statutes restricting Asian immigrants from owning property. To evade the requirements of the Equal Protection Clause of the Fourteenth Amendment, these state laws did not mention Asian immigrants or residents explicitly; rather, they barred persons "ineligible for citizenship" from owning property because Asian immigrants were virtually the only class of individuals "ineligible for citizenship." *See, e.g.*, *In re Admin. Order 2017-05-17*, 217 Cal. Rptr. 3d 730 (Cal. 2017).

59. Despite continued virulent anti-Asian prejudice and hostility, the text and intent of the Citizenship Clause was clear enough that federal courts repeatedly affirmed its broad application.

60. For example, in 1884, Justice Field, sitting as a circuit judge, held in *In re Look Tin Sing* that the phrase "subject to the jurisdiction thereof" only excluded "from citizenship children born in the United States of persons engaged in the diplomatic service of foreign governments" and "[p]ersons born on a public vessel of a foreign country, whilst within the waters of the United States," because while those individuals might be physically within the territory of the United States, they were not subject to American law. 21 F. 905, 906, 10 Sawy. 353 (C.C.D. Cal. 1884).

61. Similarly, in *Gee Fook Sing v. United States*, 49 F. 146 (9th Cir. 1892), the Ninth Circuit ordered that a man born on American soil to two Chinese immigrants be permitted entry into the United States because the man was a United States Citizen. It explained that "the laws excluding immigrants who are Chinese laborers are inapplicable to a person born in this country, and subject to the jurisdiction of its government, even though his parents were not citizens, nor entitled to become citizens, under the laws providing for the naturalization of aliens[.]" *Id.* at 148.

62. Finally, in *Wong Kim Ark*, 169 U.S. 649 (1898), the Supreme Court was presented with the question whether a person born in California to two Chinese nationals residing in the United States, qualified for U.S. citizenship. The Supreme Court rightly answered in the affirmative. Even though the parents themselves were barred from citizenship, the Court was led "irresistibly" to the conclusion that "[t]he fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens," apart from children of foreign diplomats and children "of enemies within and during a hostile occupation of part of

[the United States]." Other than these limited exceptions, "[t]he [fourteenth] amendment, in clear words and in manifest intent, includes the children born within the territory of the United States … of whatever race or color, domiciled within the United States … ." *Id.* at 693.

63.    The Supreme Court confirmed this understanding more recently in *Plyler v. Doe*, 457 U.S. 202 (1982), when it held that the Equal Protection Clause of the Fourteenth Amendment applies to undocumented immigrants.  In so holding, the Court squarely rejected the notion that undocumented immigrants were not "within the jurisdiction" of a state, explaining that there was "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction'" that could "be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id*. at 211 n.10.

64.    In *Plyler*, interpreting the meaning of the phrase "within the jurisdiction"—which the Court found carried the same meaning for Fourteenth Amendment purposes as "subject to the jurisdiction"—the Court quoted with approval *Wong Kim Ark* and again rejected the argument that "persons who have entered the United States illegally are not 'within the jurisdiction' of a State even if they are present within a State's boundaries and subject to its laws." *Id*.

65.    Pursuant to *Plyler*, both undocumented non-citizens and non-citizens legally present under nonimmigrant visas are "subject to the jurisdiction" of the United States; children of such individuals therefore fall squarely within the Citizenship Clause, in keeping with the Court's holding in *Wong Kim Ark* and hundreds of years of the doctrine of *jus soli*.  *Id*.

C.    **Congressional Codification of *Wong Kim Ark***

66.    Congress has codified these interpretations of the Citizenship Clause's broad grant of birthright citizenship.

67.    Through the Nationality Act of 1940, Pub. L. 76-853; 54 Stat. 1137, Congress amended the Civil Rights Act of 1866's citizenship provision to more closely mirror the Fourteenth

Amendment's Citizenship Clause. The new birthright citizenship statute provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen of the United State. 8 U.S.C. § 1401(a); *see also id.* §§ 1402, 1406(b), 1407(b). This language "[wa]s taken . . . from the fourteenth amendment to the Constitution." *To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess., at 38 (1940).

68.    In 1952, the birthright citizenship statute was reenacted as part of the Immigration and Nationality Act (INA). 8 U.S.C. § 1401 ("The following shall be nationals and citizens of the United States at birth: a) a person born in the United States, and subject to the jurisdiction thereof ….").

69.    At all times during the process of enacting and, subsequently, re-enacting what is now 8 U.S.C. § 1401, Congress was aware of the Supreme Court's interpretation in *Wong Kim Ark* of the Fourteenth Amendment's Citizenship Clause, including specifically of the words "subject to the jurisdiction thereof."

70.    Moreover, Congress intended its codification of 8 U.S.C. § 1401 to reflect its understanding of the Fourteenth Amendment at the time of the statute's enactment, which was that virtually all persons in the United States—including those covered by the Order—were "subject to the jurisdiction" of the United States.

71.    Congress codified the long-settled interpretation of the Fourteenth Amendment that all children born in the United States are citizens, subject only to narrow exceptions. And Congress has re-enacted this legislation in light of the interpretation of the language by federal courts, including in *Wong Kim Ark*.

72.    Congress's intent to codify the settled principle of birthright citizenship is also reflected in the legislative history of the Nationality Act.

73.    During a May 13, 1940, hearing by the House of Representatives Committee on Immigration and Naturalization, Representative Austin inquired whether the language that "[a] person born in the United States, and subject to the jurisdiction thereof" applied "[r]egardless of the nationality of the parents"; Representative Rees suggested an affirmative answer, replying that this was "because the Constitution provides that all persons born in the United States are citizens." *Hearings before the Committee on Immigration and Naturalization* 298, 76th Cong., 1st Sess. (1940).

74.    A report submitted to Congress by the President on the meaning of the law expressly quoted approvingly language from *Wong Kim Ark*, making obvious that by "subject to the jurisdiction thereof" the statute intended only to "bar[] certain classes of persons, including children born in the United States to parents in the diplomatic service of foreign states[.]" *Id*. at 418.

75.    The President's report also noted that under the law, citizenship would extend to "a child born in the United States of parents residing therein temporarily." It then further explained that "it is the fact of birth within the territory and jurisdiction, and not the domicile of the parents, which determines the nationality of the child." *Id*.

**D.    The Federal Agency Defendants' Acknowledgments of Birthright Citizenship**

76.    In accordance with their statutory and constitutional duties, federal agencies have consistently adhered to an inclusive conception of birthright citizenship as directed by both the Fourteenth Amendment's plain language and the Supreme Court's holding in *Wong Kim Ark*.

77.    For example, SSA has long accepted birth certificates issued by state agencies as sufficient proof of U.S. citizenship for issuance of a Social Security number and card.

78.     Through the Enumeration at Birth program, SSA works in concert with hospitals, which electronically send birth registration information to SSA.  SSA uses this information to assign newborns a Social Security number and issue a Social Security card.

79.     DHS regulations provide that "[a] birth certificate that was issued by a civil authority and that establishes the petitioner's birth in the United States" constitutes sufficient primary evidence of U.S. citizenship. 8 C.F.R. § 204(g)(1)(i). Other evidence, such as baptismal certificates "showing the date and place of birth in the United States and the date of baptism," affidavits testifying to personal knowledge of the petitioner's date and place of birth, school records showing the child's date and place of birth, or census records showing the name, place of birth, and date of birth of the petitioner, may serve as secondary evidence of U.S. citizenship. *See id.* § 204(g)(2).

80.     The U.S. Citizenship and Immigration Services ("USCIS"), a component of Defendant DHS, advises U.S. citizens that "[if] you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship.  Your birth certificate issued where you were born is proof of your citizenship."  *See I am a U.S. citizen—How do I get proof of my U.S. citizenship*, U.S. Citizenship and Immigration Services (M-560B (October 2013)), https://www.uscis.gov/sites/default/files/document/guides/A4en.pdf.  USCIS further advises that a "[b]irth certificate, issued by a U.S. State (if the person was born in the United States)" is a document that establishes U.S. citizenship.  *Id.*

81.     The State Department's Foreign Affairs Manual provides that "U.S. citizenship may be acquired at birth or through naturalization subsequent to birth," and explains that "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S.

citizenship at birth even if their parents were in the United States illegally at the time of birth." 8 FAM 301.1(d).

82.    The Foreign Affairs Manual specifically states that, as the Supreme Court concluded in *Wong Kim Ark*, "[a]cquisition of U.S. citizenship generally is not affected by the fact that the parents may be in the United States temporarily or illegally." *Id.* at 301.1-1(d)(2).  Indeed, "a child born in an immigration detention center physically located in the United States is considered to have been born in the United States and be subject to its jurisdiction." *Id.*  This is so even if the child's parents have not been legally admitted to the United States and, for immigration purposes, may be viewed as not being in the United States." *Id.*

83.    The Foreign Affairs Manual and its associated Handbooks are "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service, and, when applicable, other federal agencies."   Foreign Affairs Manual, U.S. Department of State, https://fam.state.gov (last accessed January 28, 2025).

84.    For decades, the Board of Immigration Appeals—an administrative body within DOJ's Executive Office for Immigration Review—has similarly consistently adhered to the principle of birthright citizenship, including in adjudicating assertions of U.S. citizenship as a defense in removal proceedings. *See, e.g.*, *Matter of Cantu*, 17 I. & N. Dec. 190 (1978); *Matter of S- M-*, 9 I. & N. Dec. 664, 665 (1962) ("Briefly, the applicant was born in Texas on March 19, 1923, to parents who are natives and citizens of Mexico. At birth he acquired the nationality both of the United States and Mexico."); *In the Matter of F—*, 21 I. & N. Dec. 427, 427 (1946) ("The appellant was born in Bridgeport, Conn., on October 28, 1917, and by reason of her birth in this country she acquired American citizenship.") (citing *Wong Kim Ark*, 169 U.S. 649).

E.    **The Executive Order**

85.    On January 20, 2025, President Trump issued the Order.

86.    The Order provides that "the privilege of United States citizenship does not automatically extend" to a child born in the United States if, at the time of their birth, their father was neither a U.S. citizen nor a lawful permanent resident and either (i) their mother was either "unlawfully present in the United States" or (ii) their "mother's presence in the United States was lawful but temporary."

87.    The Order declares it to be the policy of the United States that no department or agency of the U.S. government shall issue documents recognizing U.S. citizenship or "accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" of persons born in the circumstances described in paragraph 86 above. Order § 2(a).

88.    The Order specifies that this policy will apply to persons born after 30 days from the date of the Order's issuance. Order § 2(b).

89.    The Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take all appropriate measures to implement and enforce the Order. Order § 3(a).

90.    The Order also directs all other agency heads to issue guidance regarding implementation of the Order with respect to their operations and activities. Order § 3(b).

91.    Pursuant to federal law and the Fourteenth Amendment, the children targeted by the Order are U.S. citizens.

92.    Birthright citizenship is a right defined and guaranteed by Congress and the Fourteenth Amendment. The President lacks the power to revoke it.

93.    The Order exceeds the President's authority and runs afoul of the Constitution and federal statutory law. Federal law comprehensively sets forth the conditions for citizenship. Neither the Constitution nor any federal statute confers any authority on the President to redefine American citizenship.

94.    Unless enjoined, the Order will not only result in federal agencies denying citizenship benefits to many thousands of American citizens, but will also veer the country dangerously back to the reprehensible conception of hereditary birthright citizenship espoused in *Dred Scott*.

**F.    Injuries Caused by the Order**

95.    Because of a legacy of anti-Asian discrimination in immigration policy, Asian adults in the United States are overwhelmingly (68 percent) foreign-born. Ruiz, Noe-Bustamente, and Shah, Pew Research Center, *Appendix: Demographic profile of Asian American adults*, available at https://www.pewresearch.org/race-and-ethnicity/2023/05/08/asian-american-identity-appendix-demographic-profile-of-asian-american-adults/.

96.    For example, though the 1943 Magnuson Act finally repealed the Chinese Exclusion Act, it continued to limit immigration from China and left in place restrictions on immigration from elsewhere in Asia. Under the new law, the permitted number of new Chinese immigrants was to be determined by the quota system established for other immigrants under the Immigration Act of 1924, Pub .L. 68-139, 43 Stat. 153, based on the number of persons already in the United States of the country's national origin. Because immigration from China had been prohibited for a half-century, few Chinese immigrants were permitted entry into the United States each year. "Immigration, Emigration, and Citizenship," *Statistical Abstract of the United States: 1944-45* (66th ed.). Washington, D.C.; U.S. Department of Commerce, Bureau of the Census: 107-120 (Oct. 1945).

97.     Not until the enactment of the Immigration and Nationality Act of 1965, Pub.L. 89-236, 79 Stat. 911, did the United States finally abolish the discriminatory quota systems that excluded Asian immigrants and others from the United States.

98.     Following the elimination of most race-based restrictions on immigration in 1965, Asians grew from only five percent of all immigrants in the United States to 26 percent of all U.S. immigrants in 2015.  Pew Research Center, *Modern Immigration Wave Brings 59 Million to U.S.* (Sept. 28, 2015), https://www.pewresearch.org/race-and-ethnicity/2015/09/28/modern-immigration-wave-brings-59-million-to-u-s-driving-population-growth-and-change-through-2065/. That figure is likely even higher today.

99.     As a result, about 68 percent of Asian adults in the United States in 2021 were foreign-born; about half of those arrived within the past 20 years. Pew Research Center, *Appendix: Demographic profile of Asian American adults* (May 8, 2023), https://www.pewresearch.org/race-and-ethnicity/2023/05/08/asian-american-identity-appendix-demographic-profile-of-asian-american-adults/

100.     Moreover, Asian immigrants comprise about 14 percent of the undocumented immigrant population in the United States. Per Research Center, *Key facts about Asian Americans* (Apr. 29, 2011), https://www.pewresearch.org/short-reads/2021/04/29/key-facts-about-asian-americans/

101.     Of the approximately 11 million undocumented immigrants in the United States, and whose children born in the United States after the Order goes into effect will be denied U.S. citizenship, only around 855,000 arrived from either Europe, Canada, or Oceania; by contrast, around 7.9 million arrived from Latin American countries and 1.7 million arrived from countries in Asia.

102.    Individuals in the United States on nonimmigrant visas, and whose children will be born in the United States after the Order goes into effect, will be denied the benefits of U.S. citizenship.    They are also disproportionately nonwhite.    In 2019, Asians comprised 60% (approximately 1.9 million) of all persons in the United States on nonimmigrant visas, for example. Individuals arriving from Mexico constituted another 9% (approximately 280,000) of persons with nonimmigrant visas.

103.    Plaintiff's members, and other immigrants across the country, are expecting children that will be born in the United States to parents who have neither lawful permanent resident status nor United States citizenship at the time of the child's birth.    Under the Order , these Targeted Children will be denied the benefits of U.S. citizenship, thereby injuring them and their families.

104.    American citizenship carries with it "priceless" privileges that are unavailable to noncitizens. *Schneiderman v. United States*, 320 U.S. 118, 122 (1943).    Those privileges, among countless others, include eligibility to participate in myriad federal and state government programs designed to support a healthy, educated, and prosperous citizenry, the right to vote in federal elections, the right to run for and be appointed to certain high elective offices, and the right to serve on federal and state juries.    The Order would strip the Targeted Children of these privileges.

105.    If allowed to stand, the Order would "promot[e] the creation and perpetuation of a subclass" of children who were born in the United States but lack fundamental legal recognition, and will face stigma as a result of their status.    *Plyler v. Doe*, 457 U.S. 202, 230 (1982).

106.    The Order will invite the cruel treatment and persistent questioning of children of immigrants—particularly children of color—both inside and outside the United States by attacking the principle that essentially all children born in this county are citizens.

107.    The Order's denial of the Targeted Children's citizenship will also have numerous other consequences for them and their families—including Plaintiff's members and other families of Targeted Children.

108.    Without their citizenship status being recognized by federal agencies, including those that enforce immigration laws like DHS, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement, the Targeted Children and their families will have to live with the pervasive uncertainty, anxiety, and fear that comes along with this marginalization, and the risk of arrest, detention, and deportation.  At any moment, their government may choose to exile them from their country of birth to countries they have never lived in or even visited.

109.    Targeted Children and their families will experience constant psychological harm because of the threat of impending arrest, detention, and deportation.  Targeted Children would not face this threat but for the offending Order.

110.    Targeted Children will be ineligible for U.S. passports under the Order.  For many of these families, passports are one of the only forms of government identification they can obtain for the Targeted Children.  This identification can be essential for practical reasons in daily life, as well as in the event of interactions with law enforcement or other government agencies.

111.    Targeted Children also would not be eligible for a REAL ID and therefore may face travel restrictions even within the United States.

112.    Only individuals who are U.S. citizens or lawful permanent residents are eligible for a REAL ID-compliant driver's license or identification card.

113.    Either a passport, or a REAL ID compliant driver's license or identification card, will be required for all air travel in the United States, including domestic flights, as of May 7,

2025.  *See* 49 U.S.C. § 30301, Sec. 202(c)(2)(B); Dep't of Homeland Sec., *REAL ID Frequently*

*Asked Questions*, https://www.dhs.gov/real-id/real-id-faqs.

114.    The imminent loss of access to air travel will not only inflict hardship and injury

on Targeted Children by depriving them of travel and social opportunities, but it will also injure

the families of Targeted Children—including Plaintiff's members and other immigrant families of

Targeted Children—who are forced to stay home with children that are ineligible for air travel.

115.    Not only will the Targeted Children lose their access to essential documents such

as U.S. passports and social security cards—which would serve to demonstrate their citizenship

and bestow myriad everyday benefits—but their ability to obtain many benefits programs that

require applicants to have U.S. citizenship or other qualifying immigration status will be thrown

in doubt. That is particularly so because the Order purports to announce a U.S.-government-wide

policy of refusing to recognize the Targeted Children's birthright citizenship and directs

implementation of this policy by all executive departments and agencies.

116.    Lack of access to federal benefits harms the Targeted Children as soon as they are

born and will continue to affect them throughout their lives.

117.    Medicaid is among the largest of federal programs to which the Targeted Children

would lose access.  Medicaid is a federally-funded program that provides health insurance for

individuals, including children, whose household incomes fall below certain eligibility thresholds.

The threshold for Medicaid qualification varies state to state.  CHIP is a health insurance program

administered by the United States Department of Health and Human Services that provides

matching funds to states for health insurance to families that exceed the household income to

qualify for Medicaid in their state, but whose household income still falls below a separate

threshold.  Medicaid and CHIP are administered by states, but the United States federal

government covers a substantial portion of the costs, reimbursing states for between 50 and 75 percent of expenditures on eligible children.

118.    Individuals who are not U.S. citizens and lack qualifying immigration status are not eligible for Medicaid or CHIP, save for certain medical emergencies.  *See* 8 U.S.C. § 1611(a), (c)(1)(B); 8 U.S.C. § 1612(b)(3)(C); 42 U.S.C. § 1396b(v); 42 C.F.R. § 435.406.

119.    Targeted Children who are denied birthright citizenship because of the Order therefore will likely be denied access to Medicaid or CHIP.  The inability to utilize these federal programs will cause hardship and financial injury not only to the Targeted Children but also their families—including Plaintiff's members and other immigrant families of Targeted Children.

120.    Depriving the Targeted Children of citizenship may also prevent them from accessing critical early-life nutritional resources.  *See* 8 U.S.C. § 1611, 1612.

121.    The Supplemental Nutrition Assistance Program ("SNAP") provides access to critically important groceries for low-income households.  These groceries and household products afforded by SNAP help the recipient and their families maintain adequate nutrition and health. Ensuring access to nutritious food during early childhood is vital for children's physical and mental development, laying a foundation for future well-being.

122.    However, with limited exceptions, only U.S. citizen children are eligible for SNAP. Because the Order denies their birthright citizenship, the Targeted Children risk being refused access to nutrition under SNAP. *See* 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4.  This loss of access to SNAP would cause tangible, physical harm to Targeted Children, and imminent financial injury to their families—including Plaintiff's members and other immigrant families of Targeted Children. And even a brief loss of access to SNAP—such as a loss of access while litigants challenge the

Order in court—could cause lifelong injury to Targeted Children that are deprived of nutrients during their early development.

123.    Individuals who are not U.S. citizens and lack qualifying immigration status are also ineligible for Temporary Assistance for Needy Families ("TANF") in most states.  *See* NAT'L. IMM. LAW CTR., *State-Funded TANF Replacement Programs* (Jun. 1, 2024), https://www.nilc.org/resources/guide_tanf/.  By refusing to recognize Targeted Children's U.S. citizenship, the Order would deprive them of the financial benefits of federally- and state-funded TANF programs across the country, causing hardship and financial injury to the Targeted Children and their families.

124.    The Social Security Administration administers the Supplemental Security Income ("SSI") program, which provides cash payments to disabled children, disabled adults, and individuals aged 65 or older who are citizens or nationals of the United States.  Noncitizens must be a "qualified alien" in order to be eligible for benefits through the SSI program.  *See* SOCIAL SECURITY ADMIN., *SSI Spotlight on SSI Benefits for Noncitizens* (2024 Ed.) https://www.ssa.gov/ssi/spotlights/spot-non-citizens.htm.

125.    Targeted Children that would qualify for SSI funds but do not otherwise meet the definition of "qualified alien" will imminently experience financial injury by losing access to SSI program funds.  This loss of eligibility for SSI funds will also cause financial hardship and injury for the families of these otherwise qualified Targeted Children—including certain Plaintiff's members and other immigrant families of Targeted Children.

126.    Eligibility to receive federal student financial aid, including grants, loans, or work assistance, is generally limited to U.S. citizens.  *See* 20 U.S.C. § 1091(a)(5).

127.    Children also must be citizens or qualified non-citizens in order to receive federal public benefits, such as Child Care Development Funds (CCDF).  U.S. DEP'T. HEALTH & HUMAN SERVS., *Understanding federal eligibility requirements* (Sept. 22, 2023), https://childcareta.acf.hhs.gov/understanding-federal-eligibility-requirements.    By denying Targeted Children birthright citizenship, the Order will injure the Targeted Children and their families by depriving them of access to CCDF program benefits.

128.    By depriving covered individuals of birthright citizenship, the Order, at a minimum, imposes vast uncertainty over the lives of such individuals and would deprive them of citizenship for many years or, potentially, forever.

129.    In fact, most, if not all, of the individuals deprived of U.S. citizenship under the Order may also be unable to qualify for citizenship through naturalization.

130.    Because of the longstanding reading of the Citizenship Clause as guaranteeing birthright citizenship to children born to undocumented individuals and persons on temporary visas, there is no federal statute providing for naturalization of persons born within the United States to such individuals.

131.    Furthermore, even if the existing naturalization statutes could be construed to apply to covered individuals, the process would be uncertain and would likely take years, during which time they would suffer the harms delineated.

132.    The Order declares that the Targeted Children are not citizens in the eyes of the current administration and directs federal agencies to treat them accordingly. This denies them their rightful status as American citizens in both form and substance.

133.    The Order stigmatizes the Targeted Children by imposing a federally-sanctioned lesser status than other citizens; this injures their reputations and impugns their dignity.

134.    The psychological harm arising from the Order will be traumatizing and destabilizing for the Targeted Children.

135.    The Targeted Children's loss of citizenship as a result of the Order  is a loss that is unconscionable and immeasurable in its breadth and scale.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Fourteenth Amendment to the United States Constitution: Citizenship Clause**
**(All Defendants)**

136.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

137.    The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."

138.    The Citizenship Clause enshrined in the Constitution the fundamental common law rule of birth by citizenship, whereby all people born in the United States are citizens.

139.    The term "subject to the jurisdiction" excludes only a few inapplicable categories— today, just the children of foreign diplomats. All other children born in the United States are citizens, no matter the immigration status of their parents.

140.    The Supreme Court has held that "the protection afforded to the citizen by the Citizenship Clause … is a limitation on the powers of the National Government as well as the States." *Saenz v. Roe*, 526 U.S. 489, 507-08 (1999).

141.    The Order violates the Fourteenth Amendment's Citizenship Clause because it denies citizenship to the children of noncitizens who are born in the United States and subject to the jurisdiction of the United States, and causes Plaintiff direct and proximate harm as described herein.

## SECOND CLAIM FOR RELIEF
### *Ultra vires* in violation of 8 U.S.C. § 1401 *et seq.* and U.S. Const. Amend. XIV
### (All Defendants)

142.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

143.    8 U.S.C. § 1401(a) provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen of the United States. *See also id.* §§ 1402, 1406(b), 1407(b).

144.    This language codified the existing interpretation of the Citizenship Clause, which established citizenship for children regardless of the immigration status of their parents.

145.    The Executive Order is *ultra vires* because it is in conflict with 8 U.S.C. § 1401 *et seq.:* the Executive Order denies citizenship to the children of noncitizens who are born in the United States and subject to the jurisdiction of the United States, while section 1401(a) requires it.

146.    The Executive Order is also *ultra vires* because it is in conflict with the Citizenship Clause of the Fourteenth Amendment, as set forth *supra*.

147.    By purporting to deny citizenship to Targeted Children, the Order violates the command of the Fourteenth Amendment and concomitant statutory protections, and causes Plaintiff direct and proximate harm as described herein.

## THIRD CLAIM FOR RELIEF
### Administrative Procedure Act
### (All Defendants except Defendant Trump)

148.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

149.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are contrary to constitutional right, power, privilege, or immunity, including rights protected by the Fourteenth Amendment to the U.S. Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

**FOURTH CLAIM FOR RELIEF**
**Administrative Procedure Act**
**(All Defendants except Defendant Trump)**

150.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

151.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, violate 8 U.S.C. § 1401 *et seq.* and are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

**FIFTH CLAIM FOR RELIEF**
**Declaratory Judgment, 28 U.S.C. §§ 2201, 2202**
**(All Defendants)**

152.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

153.    For the reasons stated above, Defendants have violated the rights of Plaintiff under the Citizenship Clause of the Fourteenth Amendment. Defendants have also, as pleaded above, have acted contrary to 8 U.S.C. § 1401 and the in violation of the APA.

154.    Plaintiffs seek a declaration to that effect.

155.    Defendants' illegal actions have injured, and will continue to injure, Plaintiff in numerous ways as described herein.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff requests that the Court grant the following relief:

a.    Declare that the Executive Order is unconstitutional and unlawful in its entirety;

b.    Enjoin Defendants, their officials, agents, employees, and all persons acting in concert or participating with them from enforcing the Executive Order or carrying out its directive;

c.    Require Defendants to pay reasonable attorneys' fees and costs;

d.      Grant any other and further relief that this Court may deem just and proper.

Dated: January 30, 2025                          Respectfully submitted,

/s/ *John A. Freedman*                            John C. Yang (D.C. Bar No. 438672)
John A. Freedman (D.C. Bar No. 453075)           Niyati Shah (D.C. Bar No. 1659560)*
Sally Pei (D.C. Bar No. 1030194)                 Noah Baron (D.C. Bar No. 1048319)
Jonathan L. Stern (D.C. Bar No. 375713)          ASIAN AMERICANS
Ronald D. Lee (D.C. Bar No. 411516)                ADVANCING JUSTICE-AAJC
ARNOLD & PORTER KAYE SCHOLER LLP                 1620 L Street, NW, Suite 1050
601 Massachusetts Avenue, N.W.                   Washington, D.C. 200036
Washington, D.C. 20001                           (202) 296-2300
(202) 942-5000                                   jcyang@advancingjustice-aajc.org
John.Freedman@arnoldporter.com                   nshah@advancingjustice-aajc.org
Sally.Pei@arnoldporter.com                       nbaron@advancingjustice-aajc.org
Jonathan.Stern@arnoldporter.com
Ronald.Lee@arnoldporter.com
                                                 Kaitlin Banner (D.C. Bar No. 1000436)
                                                 Sarah Bessell (D.C. Bar No. 219254)
                                                 Madeleine Gates (D.C. Bar No. 90024645)
                                                 WASHINGTON LAWYERS' COMMITTEE
                                                 FOR CIVIL RIGHTS AND URBAN
                                                 AFFAIRS
                                                 700 14th Street, NW, Suite 400
                                                 Washington, D.C. 20005
                                                 (202) 319-1000
                                                 kaitlin_banner@washlaw.org
                                                 sarah_bessell@washlaw.org
                                                 madeleine_gates@washlaw.org

                                                 * *Application for admission to D.D.C. pending*

                          *Counsel for Plaintiff*