EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES, 900 19th Street, N.W., 6th Floor Washington, D.C. 20006, and | |
| JANE DOE #1, c/o Arnold & Porter Kaye Scholer LLP 601 Massachusetts Ave., N.W. Washington, D.C. 20001 | |
| BABY DOE #1, through his mother JANE DOE #1, c/o Arnold & Porter Kaye Scholer LLP 601 Massachusetts Ave., NW Washington, D.C. 20001 | Civil Action No. 1:25-cv-00287 (TJK) |
| And JANE DOE #2, c/o Arnold & Porter Kaye Scholer LLP 601 Massachusetts Ave., N.W. Washington, D.C. 20001 *Plaintiffs*, | |
| v. | |
| MARCO RUBIO, U.S. Secretary of State, in his official capacity; 2201 C. Street, N.W. Washington, D.C. 20451 | |
| U.S. DEPARTMENT OF STATE; 2201 C. Street,  N.W. Washington, D.C. 20451 | |
| PAMELA J. BONDI, Attorney General, in her official capacity; 950 Pennsylvania Ave., N.W. Washington, D.C. 20530 | |
| U.S. DEPARTMENT OF JUSTICE, 950 Pennsylvania Ave., N.W. Washington, D.C. 20530 | |
| KRISTI NOEM, Secretary of Homeland Security, in her official capacity, 2707 Martin Luther King Jr. Ave, S.E. | |

Washington, D.C. 20528

U.S. DEPARTMENT OF HOMELAND
SECURITY;
2707 Martin Luther King Jr. Ave, S.E.
Washington, D.C. 20528

FRANK BISIGNANO, Commissioner of the
Social Security Administration, in his official
capacity;
6401 Security Blvd.
Baltimore, MD 21235

U.S. SOCIAL SECURITY
ADMINISTRATION;
6401 Security Blvd.
Baltimore, MD 21235

and

DONALD J. TRUMP, President of the United
States, in his official capacity,
1600 Pennsylvania Ave., N.W.
Washington, D.C. 20500

                    *Defendants*.

## CLASS ACTION AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

1.     One hundred and thirty years ago, Wong Kim Ark, then a 21-year-old cook who

was born in San Francisco and had lived his entire life in California, returned home by sea from a

trip to China. He was refused reentry, arrested, and detained aboard the ship on which he had

traveled home. In opposition to Wong's petition for *habeas corpus*, the United States attorney

claimed that, despite having been born in the United States, Wong was not a U.S. citizen because

Wong "had been at all times, by reason of his race, language, color, and dress, a Chinese

person … ."

2.      The Supreme Court disagreed. In 1898, the Court issued a landmark opinion that confirmed beyond doubt what, by then, was already the law of the land: "*All persons* born in the United States and subject to the jurisdiction thereof, are citizens of the United States." *United States v. Wong Kim Ark*, 169 U.S. 649. 704 (1898) (emphasis added).

3.      The Court so held even in the face of virulent hostility to Chinese immigrants. Just six years prior, Congress extended the Chinese Exclusion Act to bar Chinese laborers from the United States and further amended the Act to require Chinese residents of the United States to carry certificates of residency, or be arrested and deported.

4.      Yet even this anti-immigrant animus could not overshadow "the fundamental principle of citizenship by birth within the dominion." *Id.* at 688. The Supreme Court recognized that (subject to rare and narrow exceptions) the Fourteenth Amendment, "in clear words and in manifest intent, includes the children born within the territory of the United States of all … persons, of whatever race or color, domiciled within the United States." *Id.* at 693. Congress subsequently re-codified this principle in the United States Code. 8 U.S.C. § 1401(a).

5.      Birthright citizenship has thus been well-settled law in the United States for over a century. During that time, generations of children born on American soil have enjoyed the privileges of U.S. citizenship. The principle that every child born in the United States is automatically a citizen is part of the fabric of American society.

6.      On his first day in office, Defendant President Trump moved to unilaterally end birthright citizenship by edict, eviscerating the rights of children and more than a century of settled law. His Executive Order No. 14160 entitled "Protecting the Meaning and Value of American Citizenship" (the "Order") directs every department and agency of the United States to refuse to recognize as an American citizen any child born on American soil whose mother is "unlawfully

3

present" or temporarily present and whose father who is not a U.S. citizen or lawful permanent resident (hereinafter, "Targeted Children"). President Trump's unilateral directive is flagrantly unlawful: it violates the Constitution's Citizenship Clause, as well as the birthright citizenship statute.

7.      Apart from being unconstitutional on its face, the Order stands to inflict profound and lasting injury on countless immigrant families in the United States, whose children, though born on U.S. soil, will be deprived of the benefits of American citizenship.

8.      To vindicate their rights, and the rights of all those similarly situated, Plaintiffs file this class action suit.

9.      Plaintiff OCA – Asian Pacific American Advocates ("OCA") is a nonprofit, membership-based organization with over 35 chapters and affiliates across the United States. Founded in 1973 as the Organization of Chinese Americans with the purpose—like many membership associations before it—of providing a unified voice for Chinese Americans in the civil rights movement, in 2013 OCA renamed itself "OCA-Asian Pacific American Advocates" to reflect its work on behalf of all Asian Americans, Native Hawaiians, and Pacific Islanders.

10.     OCA's members include pregnant women, and women who have given birth during the effective date of the Order, who are in the United States on lawful temporary visas, including at least one whose child was born in the United States after the Order's effective date and will be denied birthright citizenship pursuant to the Order even though the child meets all the requirements for citizenship as it was understood prior to the Order and has been understood for the past century.. The father of that member's child is not a U.S. citizen or lawful permanent resident.

11.    OCA brings this lawsuit to forestall the grave and irreparable harm that the Order will impose on its members and countless other families in the United States, and to preserve its own ability to provide essential services to its members and others in furtherance of its mission.

12.    Plaintiff Does are individuals residing in the United States who will be harmed by the Order, absent relief.

13.    Baby Doe #1 is an infant, born after February 19, 2025, in the state of California, who, like thousands of other babies, under the terms of the Order will not be treated as a United States citizen—even though he meets all requirements for citizenship, except under Defendants' disregard of the Citizenship Clause, federal law, and over a century of Supreme Court precedent.

14.    Plaintiff Jane Doe #1 is Baby Doe #1's mother. She has lived in the United States for years and has built a life here with her husband. Together, they reside in California, where they have had and are raising three children. Neither Jane Doe #1 nor her husband are legal permanent residents nor citizens of the United States; rather, they are present in the United States on temporary visas. Her first and second child are indisputably citizens of the United States, which they obtained via birthright citizenship. The citizenship of her third child, Baby Doe #1, meets all the requirements for citizenship as it was understood prior to the Order and has been understood for the past century.

15.    Plaintiff Jane Doe #2 is the mother of one child and pregnant with another. She has lived in the United States for years and much of her life is here. She gave birth to her first child in the United States, and she intends to do the same for her second child. Jane Doe #2 currently resides in the state of New Jersey with her husband and current child. Neither Jane Doe #2 nor her husband are legal permanent residents or citizens of the United States; rather, they are present in the United States under legal Temporary Protected Status (Jane Doe #2) and as an asylum seeker

(her husband). Their first child, however, is a citizen of the United States, which he obtained via birthright citizenship. Upon his birth, her second child would meet all the requirements for citizenship as it was understood prior to the Order and has been for the past century.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, and 28 U.S.C. § 2201.

17.     Venue is proper in this District because Defendants Departments of State, Justice, and Homeland Security, as well as Defendants Marco Rubio, Pamela J. Bondi, Kristi Noem, and Donald Trump, who are "officer[s] or employee[s] of the United States or a[n] agency thereof acting in their official capacity or color of legal authority," reside in this District; a "substantial part of the events or omissions giving rise to the claim occurred" in this District; Plaintiff OCA is based in this District; and the District is a site of the injuries at issue. 28 U.S.C. § 1391(b)(2); *Id.* at § (e)(1).

## PARTIES

### A.     Plaintiffs

18.     Plaintiff OCA is a nonprofit, membership-based organization with over 35 chapters and affiliates across the United States. It is headquartered in Washington, District of Columbia. OCA's mission is to advance the social, political, and economic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders ("AANHPIs"). OCA was founded in 1973 as the Organization of Chinese Americans with the purpose—like many membership associations before it—of providing a unified voice for Chinese Americans in the civil rights movement. As the AANHPI population of the United States continued to grow and diversify following the elimination of most race-based restrictions on immigration, the Organization of Chinese Americans also changed to reflect that growing diversity. In 2013, it renamed itself "OCA-Asian

Pacific American Advocates" to reflect its work on behalf of all AANHPIs. OCA is headquartered in Washington, D.C. OCA provides services to and advocates for the immigration rights of its members and the broader AANHPI community.

19.    OCA is a membership-based organization. Members pay annual dues to OCA and choose to affiliate with a local chapter or be an "at large" member. Fifty percent of each member's dues are sent by OCA to the member's affiliated local chapter.

20.    Current dues-paying members, known as voting members, have the right to vote for local chapter leadership, hold office within OCA and its chapters, and serve on committees or task forces. OCA currently has over 1700 voting members.

21.    Voting members of OCA elect local chapter leadership, including but not limited to a board of directors, officers, including president and treasurer. A chapter may designate a separate Director to OCA's National Board or have the chapter President be its designee. The National Board is comprised of leadership from the local chapters, with larger chapters having additional representation, and elects the Executive Council of OCA, including its President. OCA's National Board, *inter alia*, conducts, manages, and sets the mission, national policies and resolutions, and strategic plan and affairs of OCA. Each chapter must comply with policies, resolutions, and procedures set forth by the National Board.

22.    OCA's national headquarters provides subgrants to its individual chapters, and the national board includes each OCA chapter's board president.

23.    Today, OCA chapters serve as their local communities' trusted voice and resource. They host cultural events; hold food and clothing drives conduct community clean-ups; provide programming for AANHPI youth, professionals, and elders; conduct voter outreach and undertake other civic engagement work; and provide other resources to their communities, including public

health information, small business support, and naturalization and citizenship application counseling and support.

24.    Many of OCA's chapters provide naturalization and citizenship application counseling and support, which furthers OCA's mission by allowing our members to gain access to the important political, social, and financial benefits of U.S. citizenship.

25.    OCA was founded by and its membership includes those who have grown their families and thrived as a result of birthright citizenship as interpreted by *Wong Kim Ark* and its progeny. Without *Wong Kim Ark*, many Asian Americans—on behalf of whose rights OCA advocates—including members of OCA itself, would not be citizens of the United States today.

26.    OCA has members that include, but are not limited to, noncitizens who are in the United States on temporary or nonimmigrant visas, including work or student status, and whose expected children will be deprived of citizenship under the Order.

Among these OCA members affected by the Order are two individuals, Member A and Member B (a married couple), who are affiliated with OCA's D.C. chapter, which has members in the District of Columbia, Maryland, and Virginia. This couple had a baby after February 19, 2025. Both parents are present in the United States on nonimmigrant visas, specifically under the "J" category. Prior to the Order, Member A and Member B's newborn would have received U.S. citizenship under the Citizenship Clause and would have been treated as such by the federal government. However, because of Defendant's actions, absent relief, their child will be denied U.S. citizenship.

27.    Because of its long history and experience advocating for the needs of its members, and because this case raises pure questions of law to be resolved by declaratory and injunctive

relief, OCA is capable of presenting the claims asserted in this complaint on behalf of its members and without the participation of any individual OCA member.

28.    OCA itself will also be adversely affected by the Order, should it take effect. If the Order takes effect, OCA's local chapters would face a massive increase in demand for their naturalization and citizenship application services, overwhelming the capabilities of OCA and its chapters. OCA would be compelled to dedicate more resources to helping its chapters with policy guidance including guidance at the state and local level (because the Order has ramifications for naturalization and citizenship applications) , as well as additional grants and national staff support. OCA's ability to provide such resources would be hampered by the fact that funding for immigration-related work is limited, particularly in the current environment and in light of the federal government's termination of existing immigration-related grants.   Supporting OCA's chapters and members to address the Order would require it to pull staff who are working on other initiatives, such as mental health and caregiving access or digital literacy.

29.    Even if the influx of demand for OCA's naturalization and citizenship application services is temporary, the ramifications would not be so limited. The demand will require a fast mobilization by OCA and its chapters, which will in turn divert resources from activities OCA would otherwise pursue during the rest of the year. For example, OCA would need to create guidance about how the Order affects obtaining birth certificates or other documents for U.S.-born children, which children are subject to the Order, or how the Order affects naturalization and applications for citizenship. Undertaking that effort will require OCA to redirect funding and staffing from other areas of its work.

30.     OCA's services will also be frustrated by the increased complexity the Order introduces into how citizenship is treated. For example, OCA will need to become familiar with a variety of new regulations the Order instructs Defendants to create and implement.

31.     Should OCA and its chapters be unable to meet the increased demand for naturalization and citizenship application services, it would struggle to fulfill its mission, which includes advancing the rights of immigrants, particularly of AANHPI individuals. That mission is especially important to OCA—an organization founded by Chinese immigrants—as discrimination against AANHPI individuals has been so entangled with American immigration policy.

32.     Plaintiff Baby Doe #1 is an infant child born after February 19, 2025, in the state of California. Baby Doe #1's mother is Jane Doe #1, who is neither a United States citizen nor lawful permanent resident. Baby Doe #1's father is neither a United States citizen nor lawful permanent resident. Baby Doe #1 satisfies all requirements for birthright citizenship in the United States, but for the restrictions imposed by the Order, and would be treated as a United States citizen but for the Order and Defendants' actions. Baby Doe currently has no other citizenship. He is eligible for citizenship in his mother's country of origin but does not currently have the passport of any country. Without any documented status, Baby Doe #1 faces the risk of arrest, detention, and deportation by the government of the United States. Baby Doe #1 has siblings who are United States citizens because they were born in the United States before February 19, 2025. As such, Baby Doe #1 is at risk of being separated from his family due to his lack of immigration status and the attendant risks of arrest, detention, and deportation.

33.     Plaintiff Jane Doe #1 is the mother of Baby Doe #1. She lives in the state of California with her husband, Baby Doe #1, and two other sons, who are both U.S. citizens. Jane

Doe #1 has "U" nonimmigrant status. She is neither a U.S. citizen nor lawful permanent resident. Her husband, the father of Baby Doe #1, is also neither a U.S. citizen nor lawful permanent resident. Jane Doe's son was born after February 19, 2025, and is therefore subject to the Order. Without relief, Jane Doe's son faces the risk of being undocumented in the United States

34.     Plaintiff Jane Doe #2 is pregnant with her second child. She maintains a residence with her husband in the state of New Jersey and expects to give birth to her child in that same state in approximately August 2025. Neither Jane Doe #2 nor her husband is either a citizen of the United States or a lawful permanent resident of the United States. Rather, Jane Doe #2 is in the United States on lawful Temporary Protected Status; her husband and father of the expected child is seeking asylum. Absent relief, Jane Doe's expected child will be denied citizenship and left without status in the United States, even though he would satisfy all requirements for birthright citizenship in the United States, but for the restrictions imposed by the Order, and would be  a United States citizen but for the Order and Defendants' actions. As a result, Jane Doe #2's expected child faces the possibility of being made stateless in violation of international law: their ability to secure any other citizenship, including that of Jane Doe #2's home country, is uncertain and likely to be complicated by the father's asylum claim.  Jane Doe #2's first child was born before the Order and is a United States citizen. Without relief, Jane Doe #2's family faces the risk of being separated due to the different statuses – and therefore different rights to remain in the United States – that her two children will have.

**B.    Defendants**

35.     Defendant Marco Rubio is the Secretary of the U.S. Department of State ("State Department"). In that role, Defendant Rubio is responsible for overseeing all State Department operations, including reviewing passport applications, making eligibility determinations thereon, and issuing passports to Americans with birthright citizenship. As head of the State Department,

Defendant Rubio is responsible for implementing the dictates of the Order at the State Department. Defendant Rubio is sued in his official capacity only.

36.     Defendant State Department is a cabinet-level department of the United States federal government. The State Department's responsibilities include reviewing passport applications and issuing passports to U.S. citizens. The State Department will be responsible for implementing the dictates of the Order. The State Department is headquartered in Washington, D.C.

37.     Defendant Pamela J. Bondi is the Attorney General of the U.S. Department of Justice (DOJ). In that role, Defendant Bondi is responsible for overseeing all Department of Justice operations. As head of the Department of Justice, Defendant Bondi is responsible for implementing the dictates of the Order at the Department of Justice. Defendant Bondi is sued in her official capacity only.

38.     Defendant the DOJ is a cabinet-level department of the United States federal government. DOJ's responsibilities include upholding the rule of law and protecting civil rights. DOJ was founded during Reconstruction to protect the civil rights promised by the Thirteenth, Fourteenth, and Fifteenth Amendments. DOJ is tasked with implementing the dictates of the Order. DOJ is headquartered in Washington, D.C.

39.     Defendant Kristi Noem is the Secretary of the Department of Homeland Security (DHS). In that role, Defendant Noem is responsible for overseeing all DHS operations. As head of DHS, Defendant Noem is responsible for implementation of the dictates of the Order at DHS. Defendant Noem is sued in her official capacity only.

40.     Defendant DHS is a cabinet-level department of the United States federal government. DHS is tasked with implementing the dictates of the Order. DHS and its components

are headquartered in Washington, D.C.

41.    Defendant Frank Bisignano is the Commissioner of the Social Security Administration (SSA). In that role, Defendant Bisignano is responsible for overseeing all SSA operations, including the assignment of Social Security numbers and the issuance of Social Security cards to American citizens. As head of SSA, Defendant Bisignano is responsible for implementing the dictates of the Order at SSA. Defendant Bisignano is sued in his official capacity only.

42.    Defendant SSA is an independent agency within the Executive Branch of the United States Government. SSA is responsible for, inter alia, assigning Social Security numbers and issuing Social Security cards to American citizens. SSA is tasked with implementing the dictates of the Order.

43.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. In that capacity, he signed, issued, and will oversee the implementation of the Order challenged in this lawsuit.

## STATEMENT OF FACTS

**A.    Birthright Citizenship in the United States Prior to and in the Fourteenth Amendment**

44.    *Jus soli* is "the ancient and fundamental" principle of "citizenship by birth within the [country's] territory"—as relevant here, the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898).

45.    The principle of *jus soli* has its roots in English common law, *see Calvin v. Smith*, 77 Eng. Rep. 377 (K.B. 1608), where it was "held in practice" "long before . . . [it] was made explicit in 1368." James H. Ketter, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608-1870, at 13 (1978). It was "never successfully challenged." *Id*.

46.     Drawing on English common law, early American courts in both the colonial era and early years of the American republic applied the doctrine of *jus soli. See Wong Kim Ark*, 169 U.S. at 658; *Lynch v. Clarke*, 1 Sand. Ch. 583, 583 (N.Y. Ch. 1844) ("It was thus the law of each and all of the states at the Declaration of Independence, and so remained until the national constitution went into effect, that a child born within their territory and ligeance respectively, though of alien parents who were abiding temporarily; thereby became a citizen of the state of which he was a native.").

47.     Yet, as with so many other laudable principles of the American Revolution, the idea of *jus soli* did not square with the reality of slavery: If *jus soli* were the rule without exception, any enslaved person born in the United States was, by right, a citizen and definitionally could not be enslaved. And, in fact, until the conclusion of the Civil War, enslaved people and others were routinely deprived of their rights under this doctrine.

48.     Aware of the tension between the principle of *jus soli* and the practice of chattel slavery, supporters of slavery sought to carve out an exception to *jus soli* or do away with it entirely. They achieved this result in *Dred Scott v. Sandford*, wherein the Supreme Court abandoned the idea of territorial birthright citizenship and held that, despite their birth in the United States, the descendants of enslaved people were "not included, and were not intended to be included, under the word 'citizens' in the Constitution." 60 U.S. 393, 404–05 (1857). Rather, the *Dred Scott* Court held that only those descended from people considered "citizens" by the framers were entitled to citizenship at birth. *Id.* at 404. This conception of citizenship excluded the descendants of enslaved people who had been "subjugated by the dominant race" and were considered "subordinate." *Id.* at 404–05.

49.     The *Dred Scott* decision, however, did not end the debate over American citizenship.

50.     During the Civil War, Attorney General Edward Bates issued a formal opinion on the citizenship of African Americans and enslaved people, rejecting the reasoning in *Dred Scott.* He explained that it was the Department of Justice's view that all persons born within the United States were citizens: "We have *natural born* citizens ... not made by law or otherwise, but *born*. ... As they became citizens in the natural way, *by birth*, so they remain citizens during their natural lives, unless, by virtue of their own voluntary act, they expatriate themselves and become citizens or subjects of another nation … If this be a true principle, and I do not doubt it, it follows that every person born in the country is, at the moment of birth, *prima facie* a citizen; and he who would deny it must take upon himself the burden of proving some great disenfranchisement strong enough to override the '*natural born*' right as recognized by the Constitution in terms of the most simple and comprehensive, and without any reference to race or color, or any other accidental circumstance." Attorney General Edward Bates, *On Citizenship* (Nov. 29, 1862) in 1 The Reconstruction Amendments: The Essential Documents 361-363 (Kurt T. Lash, ed., 2021) (emphases in original).

51.     After the Civil War, and following this same principle, Congress and the rest of the nation formally repudiated *Dred Scott*. Congress began by enacting the Civil Rights Act of 1866 pursuant to the Thirteenth Amendment. That law, among other things, contained its own birthright citizenship provision, proclaiming that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States[.]" Ch. 31, 14 Stat. 27 § 1 (Apr. 9, 1866).

52. The Civil Rights Act's birthright citizenship provision was intended—and broadly understood—to confer broad birthright citizenship regardless of parental alienage.

53. During debate, Representative James Wilson cited approvingly to Attorney General Bates' opinion, in support of the birthright citizenship provision of the Act. Cong. Globe, 39th Cong., 1st Sess. 1117 (1866). Representative Wilson also quoted a myriad of other sources in support of his position, including Blackstone's *Commentaries on the Laws of England* ("Natural-born subjects are such as are born within the dominions of the Crown of England[.]"), *id*. at 1116, Justice Kent's *Commentaries on American Law* ("Citizens, under our Constitution and laws, means free inhabitants, born within the United States or naturalized under the law of Congress"), *id*. at 1116, and William Rawle's *View of the Constitution* ("Every person born within the United States . . . whether the parents are citizens or aliens, is a natural-born citizen in the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity."). *Id*. at 1117.

54. Representative Burton Cook summarized the meaning of the Act's citizenship provision by saying: "This bill provides that all persons born within the United States, excepting those who do not owe allegiance to the United States Government, as children of embassadors [sic] of foreign Powers, and such as are not subject to our laws . . . shall be citizens of the United States. I think this is the law now." *Id.* at 1124.

55. Likewise, when an opponent of the Act asked Senator Lyman Trumbull, the author and sponsor of the Act, whether it would grant citizenship to "the children of [non-citizen] Chinese and Gypsies born in this country," Senator Trumbull responded, simply: "Undoubtedly." *Id.* at 498.

56.     The Civil Rights Act's birthright citizenship provision encompassed virtually all persons born in the United States. That is what its plain text indicates, how it was understood at the time of its enactment, and the way it was intended to operate.

57.     To remove any possible remaining doubt about the Civil Rights Act's citizenship guarantee, and to protect it against subsequent infringement, Congress then enacted, and the states ratified, the Fourteenth Amendment, which constitutionalized the birthright citizenship rule with even broader language.

58.     The Fourteenth Amendment's Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."

59.     The Citizenship Clause was enacted with full knowledge among both proponents and opponents that it would guarantee the citizenship of children of virtually all noncitizens. *E.g.*, Cong. Globe, 39th Cong., 1st Sess. 2890–91 (1866).

60.     Opponents invoked racism and xenophobia in opposition to the Citizenship Clause, to no avail. For example, during debate, Senator Edgar Cowan demanded to know: "[i]s the child of the Chinese immigrant in California a citizen? Is the child of a Gypsy born in Pennsylvania a citizen?" *Id.* at 2890. He feared that the answer would be in the affirmative, prognosticating that California would be "overrun by a flood of immigration of the Mongol race." *Id.* at 2891 As a result, he objected to the Clause on the ground that the states would "give up the right" to "expel" immigrants "who owe to her no allegiance; who pretend to owe none; who recognize no authority in her government." *Id.* at 2890–91.

61.     Fears of Chinese immigration did nothing to dissuade proponents of the Clause, however. Senator John Conness affirmed that "the children begotten of Chinese parents in California" would "be citizens" under it. *Id.* at 2891.

62.     Moreover, Senator Conness had no objection to giving citizenship to the children of Chinese immigrants who would work in the United States temporarily only to return to China. *Id.* at 2891.

63.     Throughout Reconstruction, members of Congress reiterated their understanding of the Citizenship Clause to include virtually anyone born in the United States, apart from those who fell within a handful of narrow categories, such as the children of diplomats.

64.     For example, during debate over the qualifications of Senator Hiram Revels, the first Black U.S. Senator, Senator Jacob Howard—who helped drafted the Thirteenth Amendment and who served on the Joint Committee on Reconstruction—rebutted the charge that, because Senator Revels was Black, Senator Revels was "not therefore a citizen of the United States" or "has not been … for nine years past, as required by the Constitution." Cong. Globe, 41st Cong., 2d Sess. 1543 (1870). Senator Howard explained that "in the sense of the Constitution every person born free within the limits of a State, not connected with a foreign minister's family, is born a citizen of the United States, whether he be white or black." *Id.* The Senate ultimately seated Senator Revels in a vote of 48 in favor and only eight against.

**B.      Reaffirmance of the Citizenship Clause During Periods of Anti-Immigration Backlash**

65.     Following the collapse of the political majority underpinning Reconstruction, the federal government attempted to bypass the constitutional guarantees enshrined during that time.

66.     In 1882, Congress enacted the Chinese Exclusion Act, ch. 126, 22 Stat. 58 (1882), which effectively banned Chinese immigration to the United States and barred Chinese immigrants

already in the United States from citizenship, either through naturalization or by birthright citizenship pursuant to the Fourteenth Amendment.

67.    Subsequent legislation (*e.g.*, Geary Act, ch. 60, 27 Stat. 25 (1892)), further restricted the rights of Chinese immigrants, requiring them to obtain and carry "a certificate of residence" while "within the jurisdiction of the United States" or else face deportation or "imprison[ment] at hard labor" for one year.

68.    Later, the Immigration Act of 1924 expanded the scope of the Chinese Exclusion Act to bar virtually *all* Asian immigration to the United States. Pub. L. 68-139, 43 Stat. 153 (1924). It remained in effect until its repeal in 1943. Magnuson Act, Pub. L. 78-199, 57 Stat. 600 (1943).

69.    Drawing support from federal anti-Asian immigration laws, states began enacting Alien Land Laws—statutes restricting Asian immigrants from owning property. To evade the requirements of the Equal Protection Clause of the Fourteenth Amendment, these state laws did not mention Asian immigrants or residents explicitly; rather, they barred persons "ineligible for citizenship" from owning property because Asian immigrants were virtually the only class of individuals "ineligible for citizenship." *See, e.g.*, *In re Admin. Order 2017-05-17*, 394 P.3d 488, 488 (Cal. 2017).

70.    Despite continued virulent anti-Asian prejudice and hostility, the text and intent of the Citizenship Clause was clear enough that federal courts repeatedly affirmed its broad application.

71.    For example, in 1884, Justice Field, sitting as a circuit judge, held in *In re Look Tin Sing* that the phrase "subject to the jurisdiction thereof" only excluded "from citizenship children born in the United States of persons engaged in the diplomatic service of foreign governments" and "[p]ersons born on a public vessel of a foreign country, while within the waters of the United

States," because while those individuals might be physically within the territory of the United States, they were not subject to American law. 21 F. 905, 906 (C.C.D. Cal. 1884).

72.     Similarly, in *Gee Fook Sing v. United States*, 49 F. 146 (9th Cir. 1892), the Ninth Circuit ordered that a man born on American soil to two Chinese immigrants be permitted entry into the United States because the man was a United States Citizen. It explained that "the laws excluding immigrants who are Chinese laborers are inapplicable to a person born in this country, and subject to the jurisdiction of its government, even though his parents were not citizens, nor entitled to become citizens, under the laws providing for the naturalization of aliens." *Id*. at 148.

73.     Finally, in *Wong Kim Ark*, the Supreme Court was presented with the question whether a person born in California to two Chinese nationals residing in the United States, qualified for U.S. citizenship. 169 U.S. 649 (1898). The Supreme Court rightly answered in the affirmative. Even though the parents themselves were barred from citizenship, the Court was led "irresistibly" to the conclusion that "[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens," apart from children of foreign diplomats and children "of enemies within and during a hostile occupation of part of [the United States]." *Id.* at 693. Other than these limited exceptions, "[t]he [Fourteenth] Amendment, in clear words and in manifest intent, includes the children born, within the territory of the United States . . . of whatever race or color, domiciled within the United States ." *Id.*

74.     The Supreme Court confirmed this understanding more recently in *Plyler v. Doe*, 457 U.S. 202 (1982), when it held that the Equal Protection Clause of the Fourteenth Amendment applies to undocumented immigrants. In so holding, the Court squarely rejected the notion that undocumented immigrants were not "within the jurisdiction" of a state, explaining that there was

"no plausible distinction with respect to Fourteenth Amendment 'jurisdiction'" that could "be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id*. at 211 n.10.

75.    In *Plyler*, interpreting the meaning of the phrase "within the jurisdiction"—which the Court found carried the same meaning for Fourteenth Amendment purposes as "subject to the jurisdiction"—the Court quoted with approval *Wong Kim Ark* and again rejected the argument that "persons who have entered the United States illegally are not 'within the jurisdiction' of a State even if they are present within a State's boundaries and subject to its laws." *Id*. at 211 & n.10.

76.    Pursuant to *Plyler*, both undocumented non-citizens and non-citizens legally present under nonimmigrant visas are "subject to the jurisdiction" of the United States; children of such individuals therefore fall squarely within the Citizenship Clause, in keeping with the Court's holding in *Wong Kim Ark* and hundreds of years of the doctrine of *jus soli*. *Id*.

C.    **Congressional Codification of *Wong Kim Ark***

77.    Congress has codified these interpretations of the Citizenship Clause's broad grant of birthright citizenship.

78.    Through the Nationality Act of 1940, Pub. L. No. 76-853, 54 Stat. 1137, Congress amended the Civil Rights Act of 1866's citizenship provision to more closely mirror the Fourteenth Amendment's Citizenship Clause. The new birthright citizenship statute provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen of the United States. 8 U.S.C. § 1401(a); *see also id.* §§ 1402, 1406(b), 1407(b). This language "[wa]s taken ... from the fourteenth amendment to the Constitution." *To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess. 38 (1940).

79.     In 1952, the birthright citizenship statute was reenacted as part of the Immigration and Nationality Act (INA). 8 U.S.C. § 1401 ("The following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof.").

80.     At all times during the process of enacting and, subsequently, re-enacting what is now 8 U.S.C. § 1401, Congress was aware of the Supreme Court's interpretation in *Wong Kim Ark* of the Fourteenth Amendment's Citizenship Clause, including specifically of the words "subject to the jurisdiction thereof."

81.     Moreover, Congress intended its codification of 8 U.S.C. § 1401 to reflect its understanding of the Fourteenth Amendment at the time of the statute's enactment, which was that virtually all persons in the United States—including those covered by the Order—were "subject to the jurisdiction" of the United States.

82.     Congress codified the long-settled interpretation of the Fourteenth Amendment that all children born in the United States are citizens, subject only to narrow exceptions. And Congress has re-enacted this legislation in light of the interpretation of the language by federal courts, including in *Wong Kim Ark*.

83.     Congress's intent to codify the settled principle of birthright citizenship is also reflected in the legislative history of the Nationality Act.

84.     During a May 13, 1940, hearing by the House of Representatives Committee on Immigration and Naturalization, Representative Austin inquired whether the language that "[a] person born in the United States, and subject to the jurisdiction thereof" applied "[r]egardless of the nationality of the parents"; Representative Rees suggested an affirmative answer, replying that this was "because the Constitution provides that all persons born in the United States are citizens."

*Hearings before the Committee on Immigration and Naturalization*, 76th Cong., 1st Sess. 298 (1940).

85.    A report submitted to Congress by the President on the meaning of the law expressly quoted approvingly language from *Wong Kim Ark*, making obvious that by "subject to the jurisdiction thereof" the statute intended only to "bar[] certain classes of persons, including children born in the United States to parents in the diplomatic service of foreign states . . . [.]" *Id*. at 418.

86.    The President's report also noted that under the law, citizenship would extend to "a child born in the United States of parents residing therein temporarily." *Id*. It then further explained that "it is the fact of birth within the territory and jurisdiction, and not the domicile of the parents, which determines the nationality of the child." *Id*.

### D.    The Federal Agency Defendants' Acknowledgments of Birthright Citizenship

87.    In accordance with their statutory and constitutional duties, federal agencies have consistently adhered to an inclusive conception of birthright citizenship as directed by both the Fourteenth Amendment's plain language and the Supreme Court's holding in *Wong Kim Ark*.

88.    For example, SSA has long accepted birth certificates issued by state agencies as sufficient proof of U.S. citizenship for issuance of a Social Security number and card.

89.    Through the Enumeration at Birth program, SSA works in concert with hospitals, which electronically send birth registration information to SSA. SSA uses this information to assign newborns a Social Security number and issue a Social Security card.

90.    DHS regulations provide that "[a] birth certificate that was issued by a civil authority and that establishes the petitioner's birth in the United States" constitutes sufficient primary evidence of U.S. citizenship. 8 C.F.R. § 204(g)(1)(i). Other evidence, such as baptismal

certificates "showing the date and place of birth in the United States and the date of baptism," affidavits testifying to personal knowledge of the petitioner's date and place of birth, school records showing the child's date and place of birth, or census records showing the name, place of birth, and date of birth of the petitioner, may serve as secondary evidence of U.S. citizenship. *See id.* § 204(g)(2).

91.    The U.S. Citizenship and Immigration Services ("USCIS"), a component of Defendant DHS, advises U.S. citizens that "[if] you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship." *See I am a U.S. citizen—How do I get proof of my U.S. citizenship*, U.S. Citizenship and Immigration Services (October 2013), https://www.uscis.gov/sites/default/files/document/guides/A4en.pdf. USCIS further advises that a "[b]irth certificate, issued by a U.S. State (if the person was born in the United States)" is a document that establishes U.S. citizenship. *Id.*

92.    The State Department's Foreign Affairs Manual provides that "U.S. citizenship may be acquired at birth or through naturalization subsequent to birth," and explains that "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth." 8 FAM 301.1(d).

93.    The Foreign Affairs Manual specifically states that, as the Supreme Court concluded in *Wong Kim Ark*, "[a]cquisition of U.S. citizenship generally is not affected by the fact that the parents may be in the United States temporarily or illegally." *Id.* at 301.1-1(d)(2). Indeed, "a child born in an immigration detention center physically located in the United States is considered to have been born in the United States and subject to its jurisdiction." *Id.* This is so

even if the child's parents have not been legally admitted to the United States and, for immigration purposes, may be viewed as not being in the United States." *Id.*

94.     The Foreign Affairs Manual and its associated Handbooks are "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service, and, when applicable, other federal agencies." Foreign Affairs Manual, U.S. Department of State, https://fam.state.gov (last visited Jun. 27, 2025 at 7:50 am ET).

95.     For decades, the Board of Immigration Appeals—an administrative body within DOJ's Executive Office for Immigration Review—has similarly consistently adhered to the principle of birthright citizenship, including in adjudicating assertions of U.S. citizenship as a defense in removal proceedings. *See, e.g.*, *Matter of Cantu*, 17 I. & N. Dec. 190, 190 (1978); *Matter of S- M-*, 9 I. & N. Dec. 664, 665 (1962) ("Briefly, the applicant was born in Texas on March 19, 1923, to parents who are natives and citizens of Mexico. At birth he acquired the nationality both of the United States and Mexico."); *In the Matter of F.*, 21 I. & N. Dec. 427, 427 (1946) ("The appellant was born in Bridgeport, Conn., on October 28, 1917, and by reason of her birth in this country she acquired American citizenship.") (citing *Wong Kim Ark*, 169 U.S. 649).

E.     **Defendant Trump's Contemporary and Historical Demonization of and Discrimination Against Noncitizens of Color**

96.     In the decades, years, months, and days leading up to signing the Order, Defendant Trump has expressed significant animus specifically against noncitizens of color in the United States, using nativist and white supremacist language. Defendant Trump has refused to condemn the ideology of white supremacy and nativism, which seek to remake the composition of the United States on the basis of race, and therefore explicitly oppose the presence of racial minorities in the United States, whether they are born or immigrate here. *White Supremacy*, Encyclopedia

Brittanica, https://www.britannica.com/topic/white-supremacy. The history of Defendant Trump's comments and his official actions as President make clear his intentions in passing this Order : to exclude nonwhite people from the citizenship of the United States.

97.     In the period of time leading up to the Order, Defendant Trump, both as a private citizen—including his time as a candidate for office—and during his first term in office, repeatedly expressed significant animus against immigrants of color and took official action to exclude them. Defendant Trump has relied on ugly stereotypes about nonwhite immigrants' countries of origin, calling Afghanistan a "terrorist haven," lamenting that immigrants from Nigeria "would never 'go back to their huts' in Africa," and asserting that migrants from Haiti "all have AIDS." Michael D. Schear and Julia Hirschfield Davis, *Stoking fears, Trump Defied Bureaucracy to Advance Immigration Agenda,* N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?_r=1.

98.     In January 2018, Defendant Trump referred to African and Latin American countries as "sh[]thole" countries, and "add[ed] that the U.S. should want immigrants from countries such as Norway rather than from Haiti or El Salvador." Colin Dwyer, *'Racist' and 'Shameful': How Other Countries Are Responding To Trump's Slur*, NPR (Jan 12, 2018), https://www.npr.org/sections/thetwo-way/2018/01/12/577599691/racist-and-shameful-how-other-countries-are-responding-to-trumps-slur.[1]

99.     Defendant Trump's immigration actions in his second term continue to show a preference for white immigrants at the expense of noncitizens of color. Even as Defendant Trump has sought to end temporary legal status for migrants from Venezuela, Haiti, Cameroon, Nepal, and Afghanistan, end humanitarian parole processes for migrants from Cuba, Haiti, Nicaragua,

---

[1] Norway's population is nearly racially homogeneous, comprised of over 90% people of European ethnicity. *Norway Factsheet,* CIA World Factbook, https://www.cia.gov/the-world-factbook/countries/norway/factsheets/.

and Venezuela, and to suspend the refugee resettlement program, he has announced a policy of "promot[ing] the resettlement of Afrikaner refugees" from South Africa. *See* Exec. Order. No. 14204, 90 Fed. Reg. 9,497 (Feb. 12, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/addressing-egregious-actions-of-the-republic-of-south-africa/; *see also* Joe Walsh, *Trump administration to end deportation protections for Afghans*, CBS News (May 13, 2025), https://www.cbsnews.com/news/afghans-deportation-protections-ending/; Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511 (Feb. 24, 2025); Gene Johnson, *Federal judge blocks Trump effort to suspend nation's refugee admissions system*, PBS News (Feb. 25, 2025), https://www.pbs.org/newshour/politics/federal-judge-blocks-trump-effort-to-suspend-nations-refugee-admissions-system; Zolan Kanno-Youngs, et al., *Trump Officials Seek to Bring First White Afrikaners to U.S. as Refugees Next Week*, N.Y. Times (May 9, 2025), https://www.nytimes.com/2025/05/09/world/africa/trump-afrikaner-refugees.html.        These admissions are fast-tracked despite a lack of evidence supporting Defendant Trump's justification for granting refugee status to white South Africans. Nicole Narea, *Are white South Africans really refugees? A historian who grew up under apartheid explains,* Vox (May 14, 2025), https://www.vox.com/politics/413093/trump-south-africa-afrikaner-refugees-apartheid.

100.    Defendant Trump has focused on immigration from the "third world" by resharing several comments which supported banning "third world immigration, *legal or illegal*." (emphasis added) because migration from such countries is causing, *inter alia*, a "cultural" problem in the United States. Donald J. Trump, Truth Social, (Jun. 14, 2025 11:10 am), https://truthsocial.com/@realDonaldTrump/posts/114738976567176291.

101.    Defendant Trump has disparaged multiple groups of noncitizens of color. For example, Defendant Trump has targeted foreign-born members of Congress with racist and anti-

immigrant language. He said that female lawmakers who are (or whose parents are) originally from foreign countries should "go back and help fix the totally broken and crime infested places from which they came." Bianca Quilatan and David Cohen, *Trump tells Dem Congresswomen: Go back where you came from,* Politico (Jul. 14, 2019), https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692. This group includes Rep. Ilhan Omar, originally from Somalia, and Rep. Rashida Tlaib, who is Palestinian-American. *Id.*

102.    Speaking about migrants during his first election campaign, President Trump said Mexico is "not sending their best," characterizing migrants as "rapists" who are "bringing crime." *Here's Donald Trump's Presidential Announcement* Speech, TIME (Jun. 16, 2015), https://time.com/3923128/donald-trump-announcement-speech/.

103.    In another instance, Defendant Trump characterized a group of Central American migrants as "[c]riminals and unknown Middle Easterners," based upon apparently nothing more than a photo depicting brown-skinned men. Donald J. Trump, X (Oct 22, 2018), https://x.com/realDonaldTrump/status/1054351078328885248; Christopher Sherman, *AP Fact Check: Trump implies terrorists mixed with migrants,* Associated Press (Oct. 22, 2018)—Defendant Trump offered no supporting evidence for this assertion, Miriam Valverde, *PolitiFact Fact Sheet: What we know about the caravan heading to the United States,* PolitiFact, (Oct. 22, 2018), https://www.politifact.com/article/2018/oct/22/politifact-sheet-what-we-know-about-caravan-headin/. He later admitted "[t]here's no proof of anything." Maegan Vasquez, *Trump admits 'there's no proof' of his 'unknown Middle Easterners' caravan claim,* CNN (Oct 23, 2018) https://www.cnn.com/2018/10/23/politics/donald-trump-proof-unknown-middle-easterners-migrant-caravan/index.html.

104.    Defendant Trump's anti-immigrant animus was not always tied to *lawful* immigration status, but rather to noncitizen status generally. In September 2024, speaking of "mostly legal immigrants" in Springfield, Ohio, Defendant Trump claimed "[t]hey've destroyed it," saying "you have to get them the hell out." *Former President Trump Holds News Conference Near Los Angeles,* C-SPAN (Sept. 13, 2024), https://www.c-span.org/program/campaign-2024/former-president-trump-holds-news-conference-near-los-angeles/648784. Defendant Trump promoted misinformation about the same community of immigrants in Springfield, Ohio, claiming that "they're eating the dogs, the people that came in, they're eating the cats, they're eating the pets of people that live there." *Eating pets, inflation, abortion – key debate claims fact-checked*, BBC (Sept. 11, 2024), https://www.bbc.com/news/articles/cgjv3gdxv7go. Defendant Trump's Vice-Presidential candidate and current Vice President, J.D. Vance said, when asked about the claims, "[i]f I have to create stories so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do." Merilyn Thomas and Mike Wendling, *Trump repeats baseless claims about Haitian immigrants eating pets,* BBC (Sept. 15, 2024), https://www.bbc.com/news/articles/c77l28myezko.

105.    Defendant Trump continued to "demonize[] minority groups" by using "increasingly dark, graphic imagery to talk about migrants" in his speeches. Myah Ward, *We watched 20 Trump rallies. His racist, anti-immigrant messaging is getting darker*, Politico (Oct. 12, 2024), https://www.politico.com/news/2024/10/12/trump-racist-rhetoric-immigrants-00183537. In March 2024, Defendant Trump shared a video of migrants crossing the U.S.-Mexico border, alleging that men from Asian countries including China and Afghanistan are "coming by he thousands." Will Weissert and Jill Colvin, *Why Trump's alarmist message on immigration may be resonating beyond his base,* Associated Press (Apr. 1, 2024),

https://apnews.com/article/border-immigration-trump-biden-rhetoric-2024-election-327c08045edcc200f850d893de6a79d6.

106.    In October 2024, Defendant Trump asserted a connection between propensity for crime to genetics and immigrant status. He falsely claimed that over 13,000 murderers had come "through an open border," leading to "a lot of bad genes in our country right now." *Former President Trump On The Anniversary Of The 10/7 Massacre In Israel*, Hugh Hewitt & Duane Patterson, (Oct. 7, 2024), https://hughhewitt.com/former-president-trump-on-the-anniversary-of-the-10-7-massacre-in-israel.

107.    Defendant Trump has repeatedly refused to condemn multiple different nativist and white supremacist groups. When Defendant Trump was asked directly if he was willing to "condemn white supremacists and militia groups and to say that they need to stand down," Defendant Trump instead called on the "Proud Boys" to "stand back and stand by."  Melissa Macaya et al., *First 2020 Presidential Debate*, CNN (Sept. 30, 2020), https://www.cnn.com/politics/live-news/presidential-debate-coverage-fact-check-09-29-20/index.html. The Proud Boys are a "neofascist white nationalist organization," a designated hate group and designated terrorist group in Canada and New Zealand. Proud Boys, Encyclopedia Britannica (Jun. 6, 2025), https://www.britannica.com/topic/Proud-Boys. The Proud Boys explicitly "appeal[] to what they perceive as the erosion of Western culture by . . . immigrants . . ." using "the coded term western chauvinism as code for white." The Proud Boys, George Washington University Program on Extremism, https://extremism.gwu.edu/proud-boys (Last Visited Jun. 26, 2025, at 6:49 pm ET). They also treat multicultural diversity as "White genocide," demonstrating a white supremacist ideology. *Id.* Similarly, after a violent rally by neo-Nazis in Charlottesville in 2017, Defendant Trump stated there were "very fine people" in that group. *Full text: Trump's comments on white*

*supremacists, 'alt-left' in Charlottesville,* Politico (Aug. 16, 2017), https://www.politico.eu/
article/full-text-trumps-comments-on-white-supremacists-alt-left-in-charlottesville/. Members of
the various neo-Nazi and white nationalist groups present at the rally had clearly targeted people
of color based on the idea that they did not belong in the United States, with one shouting at Black
women, "[y]ou'll be on the first f*****g boat home." *A reckoning in Charlottesville,* BBC (Aug.
13, 2017), https://www.bbc.com/news/world-us-canada-40914748 The white nationalists at this
rally specifically "shouted anti-immigrant … slogans," in line with their nativist ideology. *Id;*
*2017: The Year in Hate and Extremism*, Southern Poverty Law Center (Feb. 11, 2018),
https://www.splcenter.org/resources/reports/2017-year-hate-and-extremism/.

108.    Defendant Trump himself has also used white nationalist rhetoric  calling for
"remigration" of undocumented immigrants to their home countries, a white nationalist slogan.
Donald        J.        Trump,        Truth        Social,        (Sept.        14,        2024)
https://truthsocial.com/@realDonaldTrump/posts/113138961076118979; Reed McMaster, *Trump*
*called for "remigration," a form of ethnic cleansing. Major outlets failed to cover it*, Media
Matters for America (Oct. 1, 2024), https://www.mediamatters.org/donald-trump/trump-called-
remigration-form-ethnic-cleansing-major-outlets-failed-cover-it. Defendant Trump recently
reiterated this "focus[]" on "remigration" of noncitizens. Donald J. Trump, Truth Social, (Jun. 15,
2025)  https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

### ***Discrimination Against South Asian, Muslim, and Arab Americans and Immigrants***

109.    Defendant Trump, both as a private citizen – including during his time as a
candidate for office–and during his first term in office, repeatedly expressed significant animus
specifically against South Asian, Muslim, and Arab Americans and immigrants from those ethnic
backgrounds. People of South Asian and Arab descent make up over 50% of the Muslim
population in the United States. *American Muslims 2025: A Profile,* Justice For All (Jan. 27, 2025),

https://www.justiceforall.org/resources/reports/american-muslims-2025-a-brief-profile/.

110.    Defendant Trump has specifically sought to exclude people from these ethnic backgrounds from the population of the United States. In 2015, then-Candidate Trump called for a "total and complete shutdown of Muslims entering the United States." Tessa Berenson Rogers, *Donald Trump Calls For 'Complete Shutdown' of Muslim Entry to U.S.*, TIME (Dec. 7, 2015), https://time.com/4139476/donald-trump-shutdown-muslim-immigration/.    Defendant    Trump initially planned to include American Muslims trying to return home in his proposed travel ban. Ben Kamisar, *Trump calls for 'shutdown' of Muslims entering US,* The Hill (Dec. 7, 2015), https://thehill.com/blogs/ballot-box/presidential-races/262348-trump-calls-for-shutdown-of-muslims-entering-us/.

111.    During that same period of time, Defendant Trump made false accusations against the Arab community in New Jersey, perpetuating the myth that Muslims or Arab Americans are disloyal to the United States. Defendant Trump asserted they had "cheer[ed] as the buildings [the Twin Towers in the World Trade Center] came down" during the terrorist attacks on September 11, 2001. There was no evidence to support such an assertion. Lauren Carroll, *Fact-checking Trump's claim that thousands in New Jersey cheered when World Trade Center tumbled,* PolitiFact    (Nov.    22,    2015),    https://www.politifact.com/factchecks/2015/nov/22/donald-trump/fact-checking-trumps-claim-thousands-new-jersey-ch/.

112.    In 2016, Defendant Trump perpetuated another ugly stereotype about Muslims when he criticized the Muslim family of a slain servicemember, falsely claiming that the servicemember's mother  "wasn't allowed to have anything to say," suggesting she was oppressed as a woman by the family's Muslim religion. *Donald Trump to Father of Fallen Soldier: 'I've Made a Lot of Sacrifices'*, ABC News (Jul. 30, 2016), https://abcnews.go.com/Politics/donald-

trump-father-fallen-soldier-ive-made-lot/story?id=41015051.

113.    While in office, Defendant Trump continued to express anti-Muslim animus.  He has long used his social media presence to highlight and endorse anti-Muslim sentiment, including "retweeting" multiple anti-Muslim videos, Guy Faulconbridge and Michael Holden, *Trump angers UK with truculent tweet to May after sharing far-right videos*, Reuters (Nov. 30, 2017), https://www.reuters.com/article/world/trump-angers-uk-with-truculent-tweet-to-may-after-sharing-far-right-videos-idUSKBN1DU0QC/. The videos themselves were captioned with slogans making accusations such as "Muslim Destroys a Statute of Virgin Mary!", "Muslim migrants beats up Dutch boy on crutches!", and "Islamist mob pushes teenage boy off roof and beats him to death!" Tara John, *3 Things to Know About Britain First, the Far-Right Group President Trump,* TIME (Nov. 29, 2017), https://time.com/5040627/britain-first-trump-tweet/.   The videos were initially shared by "Jayda Fransen, deputy-leader of the ultranationalist Britain First." *Id.* Britain First is a political party in the UK which explicitly "claims to be an anti-immigration group" and Fransen "was convicted in 2016 of religiously aggravated harassment." *Id.*

114.    Defendant Trump took official action during his first term to exclude the populations against which he held animus. He signed multiple versions of his promised travel ban, each of which he himself referred to as a "Muslim ban." Rebecca Savransky, *Giuliani: Trump asked me how to do a Muslim ban 'legally'*, The Hill (Jan. 29, 2017), https://thehill.com/homenews/administration/316726-giuliani-trump-asked-me-how-to-do-a-muslim-ban-legally.  The Fourth Circuit found that the second version of the ban "drips with religious intolerance, animus, and discrimination" against Muslims. *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 572 (4th Cir.), as amended (May 31, 2017), as amended (June 15, 2017), vacated and remanded sub nom. *Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017).

**Defendant Trump's Animus Against East Asian Americans and East Asian**
**Immigrants**

115.    Over the decades, years, and monthsleading up to the Executive Order, Defendant

Trump expressed significant animus against East Asians—and especially East Asian immigrants—

as well, seeking to exclude them from the United States.

116.    Defendant Trump announced plans to focus his deportation efforts on people from

China, saying: "[U]ndocumented Chinese immigrants who are deemed to be of military age will

be among the first groups targeted" for deportation, even though many had left China based on

political persecution.  Kimmy Yam and Aarne Heikkila, *Undocumented Chinese men say they're*

*baffled by Trump's reported plans to deport them first*, NBC News (Dec. 19, 2024),

https://www.nbcnews.com/news/asian-america/trumps-reported-plans-deport-undocumented-

chinese-men-first-rcna183824.

117.    Within the first six months of his second term, Defendant Trump instituted a policy

that goes well beyond targeting undocumented Chinese people. Defendant Rubio and the U.S.

State Department instituted a policy – under the "leadership" of Defendant Trump - to

"aggressively revoke visas for Chinese students," including those who are already lawfully present

in the United States on such visas. The policy also promised to "enhance scrutiny of all future visa

applications" from China, regardless of the type of visa. The statement provided no rationale for

the announced policies. Marco Rubio, *New Visa Policies Put America First, Not China*, U.S. Dep't

of State (May 28, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/05/new-

visa-policies-put-america-first-not-china/.https://www.state.gov/releases/office-of-the-

spokesperson/2025/05/new-visa-policies-put-america-first-not-

china/https://time.com/vault/issue/1989-01-16/page/68/.

118.    Defendant Trump has repeatedly tried to connect a public figure's Chinese ancestry with disloyalty, perpetuating an ugly stereotype against Chinese people. On September 30, 2022, in a post on X (formerly Twitter), then-Candidate Trump criticized Senator Mitch McConnell for allegedly working with Democrats, concluding his statement by saying Senator McConnell "[m]ust immediately seek help and advise [sic] from his China loving wife, Coco Chow!" Chris Hayes, X (Sept. 30, 2022), https://x.com/chrislhayes/status/1575998066280501248.   Defendant Trump was referring to Senator McConnell's wife, Elaine Chao, who was Defendant Trump's former Secretary of Labor and the most prominent Asian American in his cabinet.

119.    Defendant Trump repeated his accusation, including referring to his former Labor Secretary as "Coco Chow" several times. Meridith McGraw, *The private angst over Donald Trump's racist attacks on Elaine Chao goes public,* Politico (Jan. 25, 2023), https://www.politico.com/news/2023/01/25/elaine-chao-donald-trump-racist-attacks-00079478; Donald      J.      Trump,      Truth      Social      (Jan.      3,      2023), https://truthsocial.com/@realDonaldTrump/posts/109628095735391441.

120.    Even members of Defendant Trump's party denounced his attacks on Ms. Chao, characterizing them as racist.  Devan Cole, *'It's never, ever OK to be a racist,' Rick Scott says when asked about Trump's personal attack on Elaine Chao,* CNN (Oct. 3, 2022), https://edition.cnn.com/2022/10/02/politics/rick-scott-trump-mcconnell-elaine-chao-cnntv/index.html.

121.    Defendant Trump also repeatedly impugned Ms. Chao's character and cast aspersions on her character solely on the basis of her race.

122.    In one instance, Defendant Trump referred to Ms. Chao as a "sellout to China." The accusation was made without any basis in evidence. Donald J. Trump, Truth Social (Jan. 23, 2023), https://truthsocial.com/@realDonaldTrump/posts/109739690490019072.

123.    Defendant Trump also accused Ms. Chao of being involved with President Biden allegedly improperly storing confidential documents, solely because the documents were found in Chinatown. There was no other reason to believe that Ms. Chao had any involvement. *Id.*.

124.    Defendant Trump also made clear his animus toward Asian Americans and Asian immigrants throughout the COVID-19 pandemic.

125.    In 2020, Defendant Trump was in office as President of the United States when the coronavirus ("COVID-19") began to spread in the United States.

126.    During his time as President, he made racially discriminatory comments against Chinese people and Chinese Americans, blaming them for the virus. Defendant Trump frequently referred to the SARS-CoV-2 virus, which causes COVID-19, as the "Chinese virus" or "China virus". Both President Trump and his White House officials repeatedly used the term "Kung flu" to refer to the virus. Weijia Jang, X (Mar. 17, 2020); https://x.com/weijia/status/1239923246801334283?s=20; Alana Wise, *White House Defends Trump's Use of Racist Term To Describe Coronavirus*, NPR (Jun. 22, 2020), https://www.npr.org/2020/06/22/881810671/white-house-defends-trumps-use-of-racist-term-to-describe-coronavirus. State and federal policymakers, as well as city-level politicians criticized President Trump's use of the term "Chinese virus" as "identifying the illness by ethnicity," warning that it was "fueling ... xenophobia" against Asian Americans. Kimmy Yam, *Trump doubles down that he's not fueling racism, but experts say he is*, NBC News (Mar. 18, 2020), https://www.nbcnews.com/news/asian-america/trump-doubles-down-he-s-not-fueling-racism-

experts-say-n1163341;        Ted        Lieu,        X        (Mar.        18,        2020)

https://x.com/tedlieu/status/1240313471423483905; Mayor Eric Adams, X (Mar. 16, 2020),

https://x.com/NYCMayor/status/1239717504727035904.

127.    The international community, including the United Nations Special Rapporteur on

Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance,

specifically expressed concern over the "contribution of the President of the United States in

seemingly legitimizing" the racist and xenophobic attacks, "including incitement to hatred and

racial discrimination in public places." Charles R. Davis, Trump 'seemingly legitimizing' the rise

in hate crimes against Asian Americans, according to a UN report, Business Insider (Oct. 14 2020),

https://www.businessinsider.com/un-report-trump-seemingly-legitimizing-hate-crimes-against-

asian-americans-2020-10.

### Defendant Trump's Attacks on Citizenship on the Basis of Race

128.    Defendant Trump has previously questioned birthright citizenship on the basis of

race. Starting in 2011, Defendant Trump repeatedly questioned whether President Barack Obama

was born in the United States or in Kenya, and therefore ineligible to run for President. Zolan

Kanno-Youngs, *For Trump, Citizenship Has Long Served As a Political Tool*, N.Y. Times (May

15,      2015),      https://www.nytimes.com/2025/05/15/us/politics/trump-birthright-citizenship-

politics.html. Defendant Trump continued to spread this rumor for years, even after President

Obama produced his birth certificate showing he was born in Hawai'i. Gregory Krieg, *14 of

Trump's  outrageous 'birther' claims - half from after 2011,* CNN (Sept. 16, 2016),

https://www.cnn.com/2016/09/09/politics/donald-trump-birther. As part of that rumor, Defendant

Trump further falsely claimed that President Obama was secretly a Muslim, which Defendant

Trump suggested would be listed on President Obama's birth certificate. *The Laura Ingraham*

*Show - Donald Trump "proud" to be a birther*, The Laura Ingraham Show (Mar 30, 2011), https://www.youtube.com/watch?v=WqaS9OCoTZs.

129.    In 2020, during his second Presidential campaign, Defendant Trump repeated his "birtherism" accusations, this time against Vice President Kamala Harris, claiming that he "heard" she "doesn't qualify" for the office because of her birth and her parents' status at the time. Vice President Harris was the first woman of color to be named a running mate on a presidential ticket in the US. *Trump stokes 'birther' conspiracy theory about Kamala Harris*, BBC (Aug. 14, 2020), https://www.bbc.com/news/world-us-canada-53774289.

130.    Also in 2020, during Defendant Trump's first term in office, the U.S. Census Bureau attempted to add a citizenship question to the decennial census for the first time. One explicit consideration was fears about counting immigrants who do not "reside" in the United States, despite being physically present here. Hansi Lo Wang, *How The 2020 Census Citizenship Question Ended Up In Court*, NPR (Nov. 4, 2018), https://www.npr.org/ 2018/11/04/661932989/how-the-2020-census-citizenship-question-ended-up-in-court. A district court found plaintiffs' "allegations of discriminatory effect" against "Latinos, Asian Americans, Arab Americans, and other immigrant communities of color" were sufficiently pled at the motion to dismiss stage. Opinion and Order, at 61, *New York v. U.S. Dep't of Com.*, 315 F. Supp. 3d 766, 806 (S.D.N.Y. 2018)..

131.    During one rally in November 2018, Defendant Trump said "[m]any [people who obtain birthright citizenship] come from China," that "we're not talking *just* South America, Latin America, we're talking about China, parts of Asia, it's crazy." Donald Trump, Presidential Candidate, Campaign Speech in Columbia, Missouri (Nov. 1, 2018), https://www.c-span.org/program/campaign-2018/president-trump-rally-in-columbia-missouri/515091 (emphasis

added). Defendant Trump proceeded to falsely claim that birthright citizenship could be used by "an enemy of this country ... a dictator who we hate and who's against us" because their child could be a U.S. citizen. *Id.* But "[a] foreign leader has never had a child become a U.S. citizen through such a method." Tal Axelrod, *Trump suggests foreign dictators take advantage of birthright citizenship*, The Hill (Nov. 1, 2018), https://thehill.com/homenews/administration/ 414451-trump-suggests-foreign-dictators-take-advantage-of-birthright/.

132.    While criticizing birthright citizenship as a "crazy, lunatic policy" Defendant Trump compounded his accusations against children with birthright citizenship by inaccurately saying that they can then "bring their entire extended family into" the US "through chain migration." *President Trump Rally in Columbia, Missouri,* C-SPAN (Nov. 1, 2018) https://www.c-span.org/program/campaign-2018/president-trump-rally-in-columbia-missouri/515091.

133.    In 2023, then-Candidate Trump promised to "sign an Executive Order ending automatic citizenship for the children of illegal aliens." Donald Trump, Truth Social (May 30, 2023) https://truthsocial.com/@realDonaldTrump/posts/110458013844263019. In that same statement, Defendant Trump repeatedly referred to the children of undocumented immigrants as products of "birth tourism" whose "illegal alien parents" will "profit" from the rights of their U.S. citizen children. *Id.* He also accused the parents of such children of "birtherism" simply by being present in the U.S. when their children are born. *Id.* And, again in the context of promising an executive order limiting birthright citizenship, Defendant Trump further characterized migrants who follow the law to obtain green cards sponsored by their U.S. citizen children as those who "jump the line" by "illegitimately … obtain[ing] US citizenship for the child." *Id.*

134.    On June 27, 2025, Defendant Trump referred to birthright citizenship as a "Hoax" which has allowed the "SCAMMING of our Immigration Process," denigrating people who benefit

from birthright citizenship. Donald J. Trump, Truth Social (Jun. 27, 2025 10:52 am), https://truthsocial.com/@realDonaldTrump/posts/114755893176827573.

135.    In 2024, Defendant Trump renewed his birtherism attacks against a political opponent of color. Jonathan Weisman, *Trump Promoted False Birther Conspiracy About Nikki Haley*, N.Y. Times (Jan. 10, 2024), https://www.nytimes.com/2024/01/10/us/politics/trump-birther-nikki-haley.html. This time, Defendant Trump reshared an accusation that Nikki Haley was ineligible for Vice President because of her parents' immigration status at the time of her birth. Image posted by Donald J. Trump (@realDonaldTrump), Truth Social, (Jan. 8, 2024 12:22 PM), https://truthsocial.com/@realDonaldTrump/posts/11721484609384209..

### *Post-Executive Order Statements*

136.    Following signing the Executive Order, President Trump has continued to make derogatory and disparaging statements about non-citizens of color in his public statements and official acts.

137.    On April 3, 2025, Defendant Trump issued a proclamation declaring April to be National Sexual Assault Awareness and Prevention Month. Proclamation 10913, 90 FR 15207 (Apr. 3, 2025). In the proclamation, Defendant Trump portrayed immigrants as "[o]ne of the leading causes of sexual violence", "an army of gangs", and "criminal aliens". *Id*. He also disparaged immigrants as coming from "the darkest and most dangerous corners of the world." *Id*.

138.    Defendant Trump has repeatedly characterized the entrance and presence of migrants in the United States as an "invasion." On January 20, 2025, Defendant Trump issued an Executive Order titled "Protecting the American People Against Invasion." In that Order he claimed – without citation or reference to specific examples – that noncitizens are "committing vile and heinous acts against innocent Americans," are "engaged in hostile activities" and "have abused the generosity of the American people."

139.    On April 28, 2025, Defendant Trump issued an Executive Order entitled "Protecting American Communities from Criminal Aliens" that once against characterized the migration of noncitizens as "an invasion at the Southern Border." Executive Order 14287 90 FR 18761; *see also* Executive Order 14165 Securing Our Borders ("Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level.").

140.    On June 8, 2025, Defendant Trump falsely asserted in a social media post that Los Angeles "has been invaded and occupied by Illegal Aliens and Criminals [sic]", and that "the Illegals [sic] will be expelled." Donald J. Trump (@realDonaldTrump), Truth Social (Jun. 8, 2025), https://truthsocial.com/@realDonaldTrump/posts/114649780431129598.

141.    On June 15, 2025, Defendant Trump claimed that his administration's "mass deportation" efforts were intended to "reverse the tide of Mass Destruction Migration," which he claimed "has turned once idyllic Towns into scenes of Third World Dystopia." Donald J Trump, Truth Social (Jun. 24, 2025 8:43 pm). He did not cite any examples or proof of this alleged impact.

### *The Executive Order*

142.    On January 20, 2025, President Trump issued the Order.

143.    The Order provides that "the privilege of United States citizenship does not automatically extend" to a child born in the United States if, at the time of their birth, their father was neither a U.S. citizen nor a lawful permanent resident and either (i) their mother was "unlawfully present in the United States" or (ii) their "mother's presence in the United States … was lawful but temporary." Order § 1.

144.    The Order declares it to be the policy of the United States that no department or agency of the U.S. government shall issue documents recognizing U.S. citizenship or "accept documents issued by State, local, or other governments or authorities purporting to recognize

United States citizenship" of persons born in the circumstances described in paragraph 86 above. Order § 2(a).

145.    The Order specifies that this policy will apply to persons born after 30 days from the date of the Order's issuance. Order § 2(b).

146.    The Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take all appropriate measures to implement and enforce the Order. Order § 3(a).

147.    The Order also directs all other agency heads to issue guidance regarding implementation of the Order with respect to their operations and activities within 30 days of the Order. Order § 3(b).

148.    Pursuant to federal law and the Fourteenth Amendment, the children targeted by the Order are U.S. citizens.

149.    Birthright citizenship is a right defined and guaranteed by Congress and the Fourteenth Amendment. The President lacks the power to revoke it.

150.    The Order exceeds the President's authority and runs afoul of the Constitution and federal statutory law. Federal law comprehensively sets forth the conditions for citizenship. Neither the Constitution nor any federal statute confers any authority on the President to redefine American citizenship.

151.    Unless enjoined, the Order will not only result in federal agencies denying citizenship benefits to many thousands of American citizens, but will also veer the country dangerously back to the reprehensible conception of hereditary birthright citizenship espoused in *Dred Scott*.

F.    **The Order Departs from Established Procedures**

152.    Prior to the Order, history demonstrates a continuing understanding across partisan lines and across the branches of government that birthright citizenship is guaranteed by the Constitution and that ending it would require constitutional amendment. *See, e.g.*, *supra* ¶¶ 44-95.

153.    For example, in 1995, Representative Brian Bilbray introduced H.R. 1363, a bill which would amend the INA to deny citizenship to children born in the U.S. to parents who are not citizens or legal permanent residents. Citizenship Reform Act of 1995, H.R. 1363, 104th Cong. (1995). The Office of Legal Counsel issued a memo regarding the constitutionality of the bill, and others like it, to the Subcommittees on Immigration and Claims and on the Constitution of the House Committee on the Judiciary. Legislation Denying Citizenship at Birth to Certain Children Born in the United States, 19 Op. O.L.C. 340 (1995). The memo concluded that the bill would be "unconstitutional on its face," and that even a constitutional amendment, while "not technically unlawful, would flatly contradict the Nation's constitutional history and constitutional traditions." *Id.* at 341.

154.    Leaders across the political spectrum have voiced this same understanding. In 1997, Acting Assistant Attorney General for the Office of Legal Counsel, Dawn Johnsen, testified before the House of Representatives that a similar bill, H.R. 7, 105th Cong. (1997-1998), was unconstitutional because "[t]o have citizenship in one's own right, by birth upon this soil, save by one's own renunciation of it, is a fundamental principle enshrined in our Constitution." *Citizenship Reform Act of 1997; and Voter Eligibility Verification Act: Hearing on H.R. 7 and H.R. 1428 Before the Subcomm. On Immigr. And Claims of the Comm. On the Judiciary*, 105th Cong. 26 (1997).

155.    In 2018, President Trump announced that he planned to issue an executive order ending birthright citizenship. Jonathan Swan & Stef W. Kight, *Exclusive: Trump targeting*

*birthright   citizenship   with   executive   order*,   Axios   (Oct.   30,   2018), https://www.axios.com/2018/10/30/trump-birthright-citizenship-executive-order.   In   response, House Speaker Paul Ryan stated, "You cannot end birthright citizenship with an executive order. As a conservative, I'm a believer in following the plain text of the Constitution, and I think in this case the 14th Amendment is pretty clear, and that would involve a very, very lengthy constitutional process." Burgess   Everett   &   Caitlin   Oprysko,   Speaker   Ryan:   'You   cannot   end   birthright citizenship   with   an   executive   order',   Politico   (Oct.   30,   2018), https://www.politico.com/story/2018/10/30/breaking-news-speaker-ryan-you-cannot-end-birthright-citizenship-with-an-executive-order-949387.

156.    House Minority Leader Nancy Pelosi also said that such an executive order would be unconstitutional, noting that President Trump's statements about issuing one had "no relationship to what his authority is." Karma Allen, *Trump birthright threat 'just more of the same,' Pelosi says*, ABC News (Oct. 31, 2018), https://abcnews.go.com/Politics/trump-birthright-threat-pelosi/story?id=58867579.

157.    Defendant Trump has said that he believes amending the Constitution "would take too long." Reena Flores, *Donald Trump: "Anchor babies" aren't American citizens*, CBS News (Aug.   19,   2015),   https://www.cbsnews.com/news/donald-trump-anchor-babies-arent-american-citizens/. He has further stated that he would "much rather find out whether or not anchor babies are citizens because a lot of people don't think they are. We're going to test it out." *Id.* He accordingly issued the Order on the first day of his second presidency.

158.    In the face of a historical and current consensus that a constitutional amendment is necessary to alter or end birthright citizenship, President Trump's rushed use of an illegitimate and

unusual procedure in order to accomplish his goal "signals discriminatory intent." *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 227 (4th Cir. 2016).

### *Class Action Allegations*

159.    Plaintiffs Jane Doe #1, Baby Doe #1, and Jane Doe #2 (the "Putative Class Representatives") bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2) on behalf of themselves and all similarly situated persons for whom the Order strips citizenship from their children and future children.

160.    The Putative Class Representatives seek certification of a class (the "Plaintiff Class") consisting of two subclasses:

   a.    All individuals who are 'unlawfully present' or temporarily present and have given or will give birth after February 19, 2025 to a child (i) on American soil, (ii) whose father is not a U.S. citizen or lawful permanent resident.

   b.    All individual children who have been born on American soil after February 19, 2025 (i) whose mother is 'unlawfully present' or temporarily present and (ii) whose father is not a U.S. citizen or lawful permanent resident.

161.    This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

162.    The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1).  This is because there are approximately 15 million of women of child-bearing age who reside in the United States but who are temporarily present or not lawfully present.

163.    The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' adoption or implementation of the Executive Order are not in accordance with the law and whether these actions violate class members' rights under the Constitution or the APA.

164.    The claims of the Plaintiff Class members share common issues of fact, including, but not limited to: whether, in issuing and implementing the Order, Defendants acted contrary to law or violated class members' rights under the Constitution or the APA.

165.    Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff and satisfy Rule 23(a)(2).

166.    The claims or defenses of the Putative Class Representatives are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Putative Class Representatives have been harmed by, among other things, Defendants' failure to abide by the plain text of the Constitution and the Immigration and Nationality Act.  These actions, independently and collectively, have caused harm to the Putative Class Representatives and Plaintiff Class members.

167.    The Putative Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). The Putative Class Representatives will defend the rights of all proposed class members fairly and adequately and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Putative Class Representatives include experienced civil rights and immigration attorneys who are considered able practitioners in federal litigation, including constitutional and administrative law litigation. These attorneys should be appointed as class counsel.

168.    Through implementation and enforcement of the Order at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief

appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

169.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

### *Discriminatory Effects of the Order*

170.    Because of a legacy of anti-Asian discrimination in immigration policy, Asian adults in the United States are overwhelmingly (68 percent) foreign-born. Neil G. Ruiz, et al., *Appendix: Demographic profile of Asian American adults*, Pew Research Center (May 8, 2023), https://www.pewresearch.org/race-and-ethnicity/2023/05/08/asian-american-identity-appendix-demographic-profile-of-asian-american-adults/.

171.    For example, though the 1943 Magnuson Act finally repealed the Chinese Exclusion Act, the United States continued to limit immigration from China and left in place restrictions on immigration from elsewhere in Asia. Under the new law, the permitted number of new Chinese immigrants was to be determined by the quota system established for other immigrants under the Immigration Act of 1924, Pub. L. No. 68–139, 43 Stat. 153, based on the number of persons already in the United States of the country's national origin. Because immigration from China had been prohibited for a half-century, few Chinese immigrants were permitted entry into the United States each year. "Immigration, Emigration, and Citizenship," *Statistical Abstract of the United States: 1944-45*, U.S. Department of Commerce, Bureau of the Census, 107- 120 (Oct. 1945) (6th ed.).

172.    Not until the enactment of the Immigration and Nationality Act of 1965, Pub. L. No. 89–236, 79 Stat. 911, did the United States finally abolish the discriminatory quota systems that excluded Asian immigrants and others from the United States.

173.    Following the elimination of most race-based restrictions on immigration in 1965, Asians grew from only five percent of all immigrants in the United States to 26 percent of all U.S. immigrants in 2015. *Modern Immigration Wave Brings 59 Million to U.S.*, Pew Research Center (Sept. 28, 2015), https://www.pewresearch.org/race-and-ethnicity/2015/09/28/modern-immigration-wave-brings-59-million-to-u-s-driving-population-growth-and-change-through-2065/. That figure is likely even higher today.

174.    As a result, about 68 percent of Asian adults in the United States in 2021 were foreign-born; about half of those arrived within the past 20 years. *See supra* ¶ 169.

175.    Moreover, Asian immigrants comprise about 14 percent of the undocumented immigrant population in the United States. Abby Budiman & Neil Ruiz, *Key facts about Asian Americans*, Pew Research Center, (Apr. 29, 2011), https://www.pewresearch.org/short-reads/2021/04/29/key-facts-about-asian-americans/.

176.    Other non-white immigrant groups are also disproportionately impacted by the Order as compared to white immigrant groups. In 2022, 37% of unauthorized immigrants in the United States were from Mexico and 19% were from Central America. Jefrey S. Passel & Jens Manuel Krogstad, *What we know about unauthorized immigrants living in the U.S.*, Pew Research Center, (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/.

177.    Non-white immigrants are also disproportionately represented in forms of temporary legal status that are impacted by the Order. As of September 23, 2024, the three most

common countries of origin for holders of Temporary Protected Status, a temporary immigration status for nationals of countries with unsafe conditions, were Venezuela, El Salvador, and Haiti. *Temporary Protected Status (TPS): Fact Sheet*, National Immigration Forum, (Mar. 14, 2025), https://immigrationforum.org/article/temporary-protected-status-fact-sheet/. Afghanistan and Nepal are the sixth and seventh most common countries of origin, respectively. *Id.*

178.    According to U.S. State Department data, in fiscal year 2023, roughly 71% of F1 visas – student visas – were issued to students from Asia. *FY 2023 Nonimmigrant Visas Issued*, U.S. Dep't of State, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY23NIVDetailTable.pdf. These data also show that nearly 35% of B1/B2 visas (visitor visas issued for a combination of business and tourism) were issued to individuals from Asia. *Id.*

179.    Of the approximately 11 million undocumented immigrants in the United States, and whose children born in the United States after the Order goes into effect will be denied U.S. citizenship, only around 855,000 arrived from either Europe, Canada, or Oceania; by contrast, around 7.9 million arrived from Latin American countries and 1.7 million arrived from countries in Asia.

180.    Individuals in the United States on nonimmigrant visas, and whose children will be born in the United States after the Order goes into effect, will be denied the benefits of U.S. citizenship. They are also disproportionately nonwhite. In 2019, Asians comprised 60% (approximately 1.9 million) of all persons in the United States on nonimmigrant visas, for example. Individuals arriving from Mexico constituted another 9% (approximately 280,000) of persons with nonimmigrant visas.

181.    Asian children are disproportionately affected by the Order by a factor of at least 14. The percentage of Asian children who would be Targeted is between 1.4 and up to 5%. By comparison, less than 1%, and as low as 0.08%, of non-Hispanic White children would be affected.

### *Harms Caused by the Order*

182.    Plaintiff Class members are expecting children that will be born in the United States to parents who have neither lawful permanent resident status nor United States citizenship at the time of the child's birth. Under the Order, these Targeted Children will be denied the benefits of U.S. citizenship, thereby injuring them and their families.

183.    American citizenship carries with it "priceless" privileges that are unavailable to noncitizens. *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Those privileges, among countless others, include eligibility to participate in myriad federal and state government programs designed to support a healthy, educated, and prosperous citizenry, the right to vote in federal elections, the right to run for and be appointed to certain high elective offices, and the right to serve on federal and state juries. The Order would strip the Targeted Children of these privileges.

184.    If allowed to stand, the Order would "promot[e] the creation and perpetuation of a subclass" of children who were born in the United States but lack fundamental legal recognition, and will face stigma as a result of their status. *Plyler v. Doe*, 457 U.S. 202, 230 (1982).

185.    The Order will invite the cruel treatment and persistent questioning of children of immigrants—particularly children of color—both inside and outside the United States by attacking the principle that essentially all children born in this county are citizens.

186.    The Order's denial of the Targeted Children's citizenship will also have numerous other consequences for them and their families—including Plaintiff's members and other families of Targeted Children.

187.    Without their citizenship status being recognized by federal agencies, including those that enforce immigration laws like DHS, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement, the Targeted Children and their families will have to live with the pervasive uncertainty, anxiety, and fear that comes along with this marginalization, and the risk of arrest, detention, and deportation. At any moment, their government may choose to exile them from their country of birth to countries they have never lived in or even visited.

188.    Targeted Children and their families will experience constant psychological harm because of the threat of impending arrest, detention, and deportation. Targeted Children would not face this threat but for the offending Order.

189.    Targeted Children will be ineligible for U.S. passports under the Order. For many of these families, passports are one of the only forms of government identification they can obtain for the Targeted Children. This identification can be essential for practical reasons in daily life, as well as in the event of interactions with law enforcement or other government agencies.

190.    Targeted Children also would not be eligible for a REAL ID and therefore may face travel restrictions even within the United States.

191.    Only individuals who are U.S. citizens or lawful permanent residents are eligible for a REAL ID-compliant driver's license or identification card.

192.    Either a passport, or a REAL ID compliant driver's license or identification card, will be required for all air travel in the United States, including domestic flights, as of May 7, 2025. *See* 49 U.S.C. § 30301 (note), Sec. 202(c)(2)(B); Dep't of Homeland Sec., *REAL ID Frequently Asked Questions*, https://www.dhs.gov/real-id/real-id-faqs.

193.    The imminent loss of access to air travel will not only inflict hardship and injury on Targeted Children by depriving them of travel and social opportunities, but it will also injure

the families of Targeted Children—including Plaintiff's members, Plaintiff Jane Doe and her family, and other immigrant families of Targeted Children—who are forced to stay home with children that are ineligible for air travel.

194.    Not only will the Targeted Children lose their access to essential documents such as U.S. passports and social security cards—which would serve to demonstrate their citizenship and bestow myriad everyday benefits—but their ability to obtain many benefits programs that require applicants to have U.S. citizenship or other qualifying immigration status will be thrown in doubt. That is particularly so because the Order purports to announce a U.S.-government-wide policy of refusing to recognize the Targeted Children's birthright citizenship and directs implementation of this policy by all executive departments and agencies.

195.    Lack of access to federal benefits harms the Targeted Children as soon as they are born and will continue to affect them throughout their lives.

196.    Medicaid is among the largest of federal programs to which the Targeted Children would lose access. Medicaid is a federally-funded program that provides health insurance for individuals, including children, whose household incomes fall below certain eligibility thresholds. The threshold for Medicaid qualification varies state to state. The Children's Health Insurance Program ("CHIP") is a health insurance program administered by the United States Department of Health and Human Services that provides matching funds to states for health insurance to families that exceed the household income to qualify for Medicaid in their state, but whose household income still falls below a separate threshold. Medicaid and CHIP are administered by states, but the United States federal government covers a substantial portion of the costs, reimbursing states for between 50 and 75 percent of expenditures on eligible children.

197.    Individuals who are not U.S. citizens and lack qualifying immigration status are not eligible for Medicaid or CHIP, save for certain medical emergencies. *See* 8 U.S.C. § 1611(a), (c)(1)(B); 8 U.S.C. § 1612(b)(3)(C); 42 U.S.C. § 1396b(v); 42 C.F.R. § 435.406.

198.    Targeted Children who are denied birthright citizenship because of the Order therefore will likely be denied access to Medicaid or CHIP. The inability to utilize these federal programs will cause hardship and financial injury not only to the Targeted Children but also their families—including Plaintiff's members and other immigrant families of Targeted Children.

199.    Depriving the Targeted Children of citizenship may also prevent them from accessing critical early-life nutritional resources. *See* 8 U.S.C. §§ 1611, 1612.

200.    The Supplemental Nutrition Assistance Program ("SNAP") provides access to critically important groceries for low-income households. These groceries and household products afforded by SNAP help the recipient and their families maintain adequate nutrition and health. Ensuring access to nutritious food during early childhood is vital for children's physical and mental development, laying a foundation for future well-being.

201.    However, with limited exceptions, only U.S. citizen children are eligible for SNAP. Because the Order denies their birthright citizenship, the Targeted Children risk being refused access to nutrition under SNAP. *See* 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4. This loss of access to SNAP would cause tangible, physical harm to Targeted Children, and imminent financial injury to their families—including Plaintiff's members and other immigrant families of Targeted Children. And even a brief loss of access to SNAP—such as a loss of access while litigants challenge the Order in court—could cause lifelong injury to Targeted Children that are deprived of nutrients during their early development.

202.    Individuals who are not U.S. citizens and lack qualifying immigration status are also ineligible for Temporary Assistance for Needy Families ("TANF") in most states. *See* Nat'l Imm. Law Ctr., *State-Funded TANF Replacement Programs* (Jun. 1, 2024), https://www.nilc.org/resources/guide_tanf/. By refusing to recognize Targeted Children's U.S. citizenship, the Order would deprive them of the financial benefits of federally- and state-funded TANF programs across the country, causing hardship and financial injury to the Targeted Children and their families.

203.    The Social Security Administration administers the Supplemental Security Income ("SSI") program, which provides cash payments to disabled children, disabled adults, and individuals aged 65 or older who are citizens or nationals of the United States. Noncitizens must be a "qualified alien" in order to be eligible for benefits through the SSI program. *See* Soc. Sec. Admin., *SSI Spotlight on SSI Benefits for Noncitizens* (2024 Ed.) https://www.ssa.gov/ssi/spotlights/spot-non-citizens.htm.

204.    Targeted Children that would qualify for SSI funds but do not otherwise meet the definition of "qualified alien" will imminently experience financial injury by losing access to SSI program funds. This loss of eligibility for SSI funds will also cause financial hardship and injury for the families of these otherwise qualified Targeted Children—including certain Plaintiff's members and other immigrant families of Targeted Children.

205.    Eligibility to receive federal student financial aid, including grants, loans, or work assistance, is generally limited to U.S. citizens. *See* 20 U.S.C. § 1091(a)(5).

206.    Children also must be citizens or qualified non-citizens in order to receive federal public benefits, such as Child Care Development Funds (CCDF). U.S. Dep't of Health & Human Servs., *Understanding federal eligibility requirements* (Sept. 22, 2023),

https://childcareta.acf.hhs.gov/understanding-federal-eligibility-requirements. By denying Targeted Children birthright citizenship, the Order will injure the Targeted Children and their families by depriving them of access to CCDF program benefits.

207. By depriving covered individuals of birthright citizenship, the Order, at a minimum, imposes vast uncertainty over the lives of such individuals and would deprive them of citizenship for many years or, potentially, forever.

208. In fact, most, if not all, of the individuals deprived of U.S. citizenship under the Order may also be unable to qualify for citizenship through naturalization.

209. Because of the longstanding reading of the Citizenship Clause as guaranteeing birthright citizenship to children born to undocumented individuals and persons on temporary visas, there is no federal statute providing for naturalization of persons born within the United States to such individuals.

210. Furthermore, even if the existing naturalization statutes could be construed to apply to covered individuals, the process would be uncertain and would likely take years, during which time they would suffer the harms delineated.

211. The Order declares that the Targeted Children are not citizens in the eyes of the current administration and directs federal agencies to treat them accordingly. This denies them their rightful status as American citizens in both form and substance.

212. The Order stigmatizes the Targeted Children by imposing a federally-sanctioned lesser status than other citizens; this injures their reputations and impugns their dignity.

213. The psychological harm arising from the Order will be traumatizing and destabilizing for the Targeted Children.

214.    The Targeted Children's loss of citizenship as a result of the Order is a loss that is unconscionable and immeasurable in its breadth and scale.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Fourteenth Amendment to the United States Constitution: Citizenship Clause
(All Defendants)**

215.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

216.    The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."

217.    The Citizenship Clause enshrined in the Constitution the fundamental common law rule of birthright citizenship, whereby all people born in the United States are citizens.

218.    The term "subject to the jurisdiction" excludes only a few extremely narrow categories—today, the children of foreign diplomats. All other children born in the United States are citizens, no matter the immigration status of their parents.

219.    The Supreme Court has held that "the protection afforded to the citizen by the Citizenship Clause … is a limitation on the powers of the National Government as well as the States." *Saenz v. Roe*, 526 U.S. 489, 507-08 (1999).

220.    The Order violates the Fourteenth Amendment's Citizenship Clause because it denies citizenship to the children of noncitizens who are born in the United States and subject to the jurisdiction of the United States and causes Plaintiffs direct and proximate harm as described herein.

## SECOND CLAIM FOR RELIEF
### *Ultra vires* in violation of 8 U.S.C. § 1401 *et seq.,*
### U.S. Const. Art. I, and U.S. Const. Amend. XIV
### (All Defendants)

221.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

222.    8 U.S.C. § 1401(a) provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen of the United States. *See also id.* §§ 1402, 1406(b), 1407(b).

223.    This language codified the existing interpretation of the Citizenship Clause, which established citizenship for children regardless of the immigration status of their parents.

224.    The Executive Order is *ultra vires* because it is in conflict with 8 U.S.C. § 1401 *et seq.:* the Executive Order denies citizenship to the children of noncitizens who are born in the United States and subject to the jurisdiction of the United States, while section 1401(a) requires it.

225.    The Executive Order is also *ultra vires* because it is in conflict with the Citizenship Clause of the Fourteenth Amendment, as set forth *Supra* ¶¶ 44-95.

226.    The Executive Order is also *ultra vires* because under the Constitution, the President lacks authority to unilaterally determine qualifications for citizenship. *See, e.g.*, U.S. Const. Art. I, § 8 ("The Congress shall have Power ... To establish a uniform Rule of Naturalization[.]"); U.S. Const. Amend XIV § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.").

227.    By purporting to deny citizenship to Targeted Children, the Order violates the command of the Fourteenth Amendment and concomitant statutory protections, and causes the Plaintiffs and the Plaintiff Class direct and proximate harm as described herein.

## THIRD CLAIM FOR RELIEF
### Administrative Procedure Act
### (All Defendants except Defendant Trump)

228.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

229.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, are contrary to constitutional right, power, privilege, or immunity, including rights protected by the Fifth and Fourteenth Amendment to the U.S. Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

## FOURTH CLAIM FOR RELIEF
### Administrative Procedure Act
### (All Defendants except Defendant Trump)

230.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

231.    The actions of Defendants that are required or permitted by the Executive Order, as set forth above, violate 8 U.S.C. § 1401 *et seq.* and are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

## FIFTH CLAIM FOR RELIEF
### Fifth Amendment to the United States Constitution: Equal Protection
### (All Defendants)

232.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

233.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.  *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

234.    The Executive Order was motivated by animus and a nativist desire to discriminate against noncitizens of color on the basis of race, alienage, and national origin.  It differentiates between people based on each of these considerations, and is accordingly subject to strict scrutiny.

235.    Under the test set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), there is sufficient evidence demonstrating that the Order constitutes impermissible intentional discrimination.

236.    *First*, direct evidence of discriminatory motive is plentiful.  For example:

237.    Defendants, including Defendant Trump, repeatedly indicated that they relied on improper classifications in determining their desired policy and promulgating the Order.  *Supra* ¶¶ 127-140.

238.    Defendant Trump referred to the children of undocumented immigrants by the pejorative term "anchor babies," and claimed that relatives of U.S. citizen children who benefit from birthright citizenship are "illegitimately obtaining it."  *Supra* ¶ 132, 156.

239.    Defendant Trump derided birthright citizenship because he claimed it enabled "chain migration" for U.S. citizen children to "bring their entire extended family" into the United States.  *Supra* ¶ 131.

240.    Defendant Trump criticized the fact that some people who obtain birthright citizenship "come from China … not just South America."  *Supra* ¶ 130.

241.    In discussing his deportation policy, Defendant Trump announced that his efforts would focus on "Chinese immigrants."  *Supra* ¶ 116.

242.    *Second*, statistical evidence demonstrates  the discriminatory effect of the Order. *See supra*  ¶¶ 169-213**.**

243.    *Third*, the historical background of the Order and other executive decisions on comparable matters suggest discriminatory intent because Defendants have engaged in a pattern of actions that impose much greater harm on nonwhite immigrants than white immigrants. *See supra* ¶¶ 96-140.

244.    For example, Defendant Trump's executive actions on immigration during his first term disproportionately affected nonwhite immigrants, *see supra* ¶¶ 96-98, 129, including Middle Eastern and South Asian Americans, *see supra* ¶¶ 109-126. In particular, Defendant Trump signed an Executive Order for a travel ban that, as the Fourth Circuit found, "drip[ped] with religious intolerance, animus, and discrimination." *Supra* ¶ 114. Defendant Trump's first administration also attempted to add a citizenship question to the decennial census which disproportionately affect immigrant communities, including immigrant communities of color. *Supra* ¶ 129.

245.    In his second term, Defendant Trump is focusing his deportation efforts on nonwhite immigrants from the so-called "third world," including China, regardless of any individual's political opinions about their governments, while simultaneously fast-tracking admission for white South Africans. S*upra* ¶ 99-100.

246.    *Fourth*, the sequence of events leading up to the Order, as compared to other decisions on comparable matters, suggests discriminatory intent. *See supra* ¶¶ 127-135.

247.    *Fifth*, the Executive Order departs from normal procedures and substantive conclusions, further suggesting discriminatory intent. *See supra* at ¶¶ 151-157.

248.    With regard to procedure, the historical and scholarly consensus is that a constitutional amendment would be necessary to alter or end birthright citizenship. *Id.* But Defendant Trump stated that he believed a constitutional amendment on birthright citizenship

would "take too long" and issued the Order instead, despite repeated insistence from lawmakers that the constitution could not be amended by Executive Order. *See supra* ¶¶ 154-156.

249.    The Order also departs from normal substantive conclusions: it represents a radical change in national policy in direct contradiction to over a century and a half of precedent as recognized by the States and every branch of the federal government. *See supra* ¶¶ 44-95; *see also CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *2 (4th Cir. Feb. 28, 2025) ("For well over a century, the federal government has recognized the birthright citizenship of children born in this country to undocumented or non-permanent immigrants.").

250.    *Sixth*, the relevant administrative history of the Order suggests discriminatory intent.

For example, Defendant Trump's negative perceptions of birthright citizenship are well-known and have been targeted at his political opponents of color.  *See supra* ¶¶ 118-124. Similarly, Defendant Trump has characterized migrants as "rapists" and accused them of being criminals based on nothing more than their immigrant status.  *Supra* ¶ 102.  And Defendant Trump has stoked fears about immigrants from certain countries "coming by the thousands." *Supra* ¶ 105.

251.    Statements by President Trump and other government officials, in addition to the circumstances and context surrounding the Order, show that the Order was made with discriminatory intent. Even if the Order were not subject to strict scrutiny, it would still be impermissible because it is not rationally related to a legitimate government interest.

252.    The Order discriminates against individuals based on race, national origin, and alienage—and of necessity, so too will Defendants' anticipated actions to implement the Order—in violation of the Equal Protection guarantees of the Fifth Amendment.

253.    Accordingly, the Order must be narrowly tailored to advance a compelling government interest.

254.    The Order is not narrowly tailored to advance a compelling government interest.

255.    The Order does not identify any government interest that it is intended to advance.

256.    To the extent the Order does identify any interest it was intended to advance, that interest is not a compelling one. Nor is there any meaningful evidentiary basis for asserting that the Order seeks to solve a *bona fide* problem.

257.    To  the extent the Order identifies any compelling government interest, the Order is not narrowly tailored to advance that interest.

## SIXTH CLAIM FOR RELIEF
### Declaratory Judgment, 28 U.S.C. §§ 2201, 2202
### (All Defendants)

258.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

259.    For the reasons stated above, Defendants have violated the rights of Plaintiffs and the Plaintiff Class under the Citizenship Clause of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment. Defendants have also, as pleaded above, acted contrary to 8 U.S.C. § 1401 *et seq*., the separation of powers, and in violation of the Administrative Procedure Act.

260.    Plaintiffs seek a declaration to that effect.

261.    Defendants' illegal actions have injured, and will continue to injure, Plaintiffs in numerous ways as described herein.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

a. Issue an Order certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and 23(b)(2) in the manner described herein, with Plaintiff Doe as Class Representative;

b. Declare that the Executive Order is unconstitutional and unlawful in its entirety;

c. Enjoin Defendants, their officials, agents, employees, and all persons acting in concert or participating with them from enforcing the Executive Order or take any steps in furtherance of carrying out its directive against any member of the Plaintiff Class;

d. In the alternative, enjoin Defendants, their officials, agents, employees, and all persons acting in concert or participating with them from enforcing the Executive Order or taking any steps in furtherance of carrying out its directive (i) in this district; (ii) against Plaintiff OCA or any of its members; and/or (iii) against Plaintiff Does;

262.    Require Defendants to pay Plaintiffs' reasonable attorneys' fees and costs; and

e. Grant any other and further relief that this Court may deem just and proper.

Dated: June 30, 2025                                Respectfully submitted,


/s/ *John A. Freedman*
John A. Freedman (D.C. Bar No. 453075)
Sally Pei (D.C. Bar No. 1030194)
Jonathan L. Stern (D.C. Bar No. 375713)
Ronald D. Lee (D.C. Bar No. 411516)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Sally.Pei@arnoldporter.com
Jonathan.Stern@arnoldporter.com
Ronald.Lee@arnoldporter.com

John C. Yang (D.C. Bar No. 438672)
Niyati Shah (D.C. Bar No. 1659560)
Noah Baron (D.C. Bar No. 1048319)
ASIAN AMERICANS ADVANCING
   JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, D.C. 200036
(202) 296-2300
jcyang@advancingjustice-aajc.org
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Sarah Bessell (D.C. Bar No. 219254)
Madeleine Gates (D.C. Bar No. 90024645)
WASHINGTON LAWYERS' COMMITTEE
   FOR CIVIL RIGHTS AND URBAN
   AFFAIRS
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org
sarah_bessell@washlaw.org
madeleine_gates@washlaw.org