# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES, JANE DOE #1, BABY DOE #1, and JANE DOE #2<br><br>   *Plaintiffs*,<br><br>    v.<br><br>MARCO RUBIO, U.S. Secretary of State, in his official capacity; U.S. DEPARTMENT OF STATE; PAMELA BONDI, Attorney General, in her official capacity; U.S. DEPARTMENT OF JUSTICE; KRISTI NOEM, Secretary of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; FRANK BISIGNANO, Commissioner of the Social Security Administration, in his official capacity; U.S. SOCIAL SECURITY ADMINISTRATION; and DONALD J. TRUMP, President of the United States, in his official capacity,<br><br>   *Defendants*. | Civil Action No. 1:25-cv-00287 (TJK) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS .........................................................................................1

STANDARD OF REVIEW ........................................................................................3

RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT............................3

ARGUMENT FOR PARTIAL SUMMARY JUDGMENT ....................................................5

A.     The Order Violates the Citizenship Clause of the Fourteenth Amendment. .......................6

    1.     The Order violates the clear text of the Citizenship Clause....................................6

    2.     The Order contradicts the original meaning of the Citizenship Clause. ................8

        a.     The Plain Meaning of the Citizenship Clause is Consistent with the Principle of *Jus Soli* and Understanding of "Subject to the Jurisdiction" Prior to the Civil War................................................................9

        b.     The Broad Sweep of the Citizenship Clause is Consistent with Legislative History of the Fourteenth Amendment ......................................................14

        c.     The Plain Meaning is Consistent with Immediate Post-Enactment and Subsequent Interpretations of the Citizenship Clause ..............................21

    3.     Beyond *Wong Kim Ark*, the Order contravenes a well-established line of Supreme Court precedent...........................................................................................26

B.     The Order Violates the INA, 8 U.S.C. § 1401.........................................................28

C.     The Order is ultra vires and must be struck down. ......................................................31

D.     Plaintiffs Have Standing. .................................................................................34

    1.     Jane Doe #1 and Jane Doe #2 have standing to bring this challenge. ..................35

    2.     Baby Doe #1 has standing to bring this challenge.................................................36

    3.     OCA has associational standing on behalf of its individual members..................37

    4.     OCA has organizational standing. ........................................................................41

    5.     Plaintiffs' claims are ripe for judicial adjudication...............................................43

CONCLUSION..........................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Abbott Laboratories v. Gardner*,
  387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)..........................................43, 44

*Abuhajeb v. Pompeo*,
  531 F. Supp. 3d 447 (D. Mass. 2021) .................................................................43

*Afroyim v. Rusk*,
  387 U.S. 253 (1967)...........................................................................................10, 36

*Ah How v. United States*,
  193 U.S. 65 (1904)..............................................................................................27

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  2025 WL 752378 (D.D.C. Mar. 10, 2025)...........................................................42

*Am. Anti-Vivisection Soc'y v. USDA*,
  946 F.3d 615 (D.C. Cir. 2020) ....................................................................41, 42, 43

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  318 F. Supp. 3d 370 (D.D.C. 2018) ......................................................................3

*Arizona v. United States*,
  567 U.S. 387 (2012).............................................................................................32

*Baby M v. Pompeo*,
  453 F. Supp. 3d 291 (D.D.C. 2020) ......................................................................36

*Biden v. Nebraska*,
  600 U.S. 477 (2023).............................................................................................34

*Borda v. Exec. Office for the United States Atty.*,
  125 F. Supp. 3d 196 (D.D.C. 2015) ......................................................................3

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020).............................................................................................30

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988).............................................................................................43

*Bragdon v. Abbott*,
  524 U.S. 624 (1998).............................................................................................30

*Browder v. Wormuth*,
Civil Action No. 18-2411 (TJK), 2024 U.S. Dist. LEXIS 229365 (D.D.C. Dec. 19, 2024) .................................................................................................................5

*Cap. Area Immigrs. Rights Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) .......................................................................41

*CASA, Inc. v. Trump*,
2025 WL 408636 (D. Md. Feb. 5, 2025) ..............................................................44

*Chamber of Commerce v. Reich*,
74 F. 3d 1322 (D.C. Cir. 1996) ............................................................................31

*Cherokee Nation v. Georgia*,
30 U.S. 1 (1831) ...................................................................................................23

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ..........................................................................................6, 31

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) .............................................................................31

*Doe 1 v. Trump*,
275 F. Supp. 3d 167 (D.D.C. 2017) .....................................................................44

*Doe v. Trump*,
766 F. Supp. 3d 266, 278 (D. Mass. 2025) ...........................................................7

*Dred Scott v. Sandford*,
60 U.S. 393 (1857)......................................................................................... *passim*

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*,396 F.3d 1265 (D.C. Cir. 2005) ...............................................................43

*Elk v. Wilkins*,
112 U.S. 94 (1884)................................................................................................23

*Equal Rights Ctr. v. Uber Techs.*,
525 F. Supp. 3d 62 (D.D.C. 2021) .......................................................................42

*Ex parte Chin King*,
35 F. 354 (D. Or. 1888)......................................................................................8, 23

*Frank v. Rogers*,
253 F.2d 889 (1958)..............................................................................................43

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)..............................................................................................31

*Garcia v. Vilsack,*
    563 F.3d 519 (D.C. Cir. 2009) ...................................................................43

*Gee Fook Sing v. United States,*
    49 F. 146 (9th Cir. 1892) ....................................................................9, 23

*George v. McDonough,*
    596 U.S. 740 (2022)..............................................................................30

*Geter v. United States Gov't Publ'g Office,*
    268 F. Supp. 3d 34 (D.D.C. 2017) ..............................................................3

*Gonzales Boisson v. Pompeo,*
    459 F. Supp. 3d 7 (D.D.C. 2020) ...............................................................43

*Harmon v. Brucker,*
    355 U.S. 579 (1958)..............................................................................31

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)..........................................................................41, 42

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977)....................................................................37, 38, 41

*In re Look Tin Sing,*
    21 F. 905 ...........................................................................................22

*INS v. Errico,*
    385 U.S. 214 (1966)..............................................................................27

*INS v. Rios-Pineda,*
    471 U.S. 444 (1985)..............................................................................27

*Int'l Dark-Sky Ass'n v. FCC,*
    106 F.4th 1206 (D.C. Cir. 2024) ...........................................................37, 39

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,*
    101 F.3d 145 (D.C. Cir. 1996)....................................................................4

*Jasperson v. Fed. Bureau of Prisons,*
    460 F. Supp. 2d 76 (D.D.C. 2006) ..............................................................31

*Joint Anti-Fascist Comm. v. McGrath,*
    341 U.S. 123 (1951)................................................................................6

*Kawakita v. United States,*
    343 U.S. 717 (1952)..............................................................................28

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
　No. CV 25-0946 (CKK), 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ...................................44

*League of Women Voters of US v. Newby*,
　838 F.3d 1 (D.C. Cir. 2016) ........................................................................................42

*Ludlam v. Ludlam*,
　26 N.Y. 356 (1863) ....................................................................................................11

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) .......................................................................................34, 35, 38

*McCreery's Lessee v. Somerville*,
　22 U.S. 354 (1824) ....................................................................................................11

*McKay v. Campbell*,
　16 F. Cas. 161 (D. Or. 1871) ......................................................................................22

*Miller v. American Export Lines, Inc.*
　313 F.2d 218 (2d Cir. 1963) .........................................................................................3

*Monsanto Co. v. Geertson Seed Farms*,
　561 U.S. 139 (2010) ..................................................................................................34

*Morrison v. California*,
　291 U.S. 82 (1934) ....................................................................................................28

*Munro v. Merch.*,
　26 Barb. 383, 1858 N.Y. App. Div. LEXIS 22 ............................................................11

*Murray v. Schooner Charming Betsy*,
　6 U.S. 64 (1804) ........................................................................................................11

*N.H. Indonesian Cmty. Support v. Trump*,
　765 F. Supp. 3d 102 (D.N.H. 2025) .........................................................................6, 30

*Nat'l Ass'n of Consumer Advocates v. RentGrow, Inc.*,
　2025 WL 1429172 (D.D.C. May 16, 2025) ..................................................................37

*Nat'l Lifeline Ass'n v. FCC*,
　983 F.3d 498 (D.C. Cir. 2020) ....................................................................................41

*New Hartford v. Canaan*,
　54 Conn. 39, 5 A. 360 (1886) .....................................................................................23

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
　597 U.S. 1 (2022) ........................................................................................................9

*Nishikawa v. Dulles,*
356 U.S. 129 (1958)................................................................27

*NTEU v. Nixon,*
492 F.2d 587 (D.C. Cir. 1974).........................................31

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1964)..............................................................34

*Perkins Coie LLP v. U.S. Dep't of Just.,*
No. CV 25-716 (BAH), 2025 WL 1276857 (D.D.C. May 2, 2025)...............44

*Perkins v. Elg,*
307 U.S. 325 (1939)............................................................28

*PETA v. USDA,*
797 F.3d 1087 (D.C. Cir. 2015).........................................41, 43

*Ramos v. Louisiana,*
590 U.S. 83 (2020)..............................................................19

*Robertson v. District of Columbia,*
762 F. Supp. 3d 34 (D.D.C. 2025)....................................37, 38

*Rogers v. Bellei,*
401 U.S. 815 (1971)............................................................27

*Rumsfeld v. Forum for Academic and Institutional Rights,*
547 U.S. 47 (2006)..............................................................34

*Rusk v. Cort,*
369 U.S. 367 (1962)............................................................43

*Schneiderman v. United States,*
320 U.S. 118 (1943)..............................................................2

*Schooner Exchange v. McFaddon,*
11 U.S. (7 Cranch) 116 (1812).....................................12, 13 ,24, 25

*Singh v. Berger,*
56 F.4th 88 (D.C. Cir. 2022)............................................44

*Sorenson Commc'ns v. FCC,*
897 F.3d 214 (D.C. Cir. 2018).........................................37

*Students for Fair Admissions, Inc. v. President Fellows of Harvard Coll.,*
600 U.S. 181 (2023)............................................................37

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ..........................................................................33

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ..........................................................................................32

*United States ex rel. Hintopoulos v. Shaughnessy*,
    353 U.S. 72 (1957) ............................................................................................26

*United States v. Crawley*,
    837 F.2d 291 (7th Cir. 1988) ............................................................................26

*United States v. Rhodes*,
    27 F. Cas. 785 (C.C.D. Ky. 1866)....................................................................13

***United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ................................................................................. *passim*

*Vance v. Terrazas*,
    444 U.S. 252 (1980) ..........................................................................................27

*Viasat, Inc. v. FCC*,
    47 F.4th 769 (D.C. Cir. 2022) ..........................................................................37

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..........................................................................................41

*Washington v. Trump*,
    765 F. Supp. 3d 1142 (W.D. Wash. 2025) ........................................................7

*Weedin v. Chin Bow*,
    274 U.S. 657 (1927) ..........................................................................................27

***Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................. *passim*

**<u>Statutes, Regulations, and Constitutional Provisions</u>**

8 U.S.C. § 1401 ........................................................................................... *passim*

8 U.S.C. § 1503 ....................................................................................................43

Administrative Procedure Act........................................................................ *passim*

Chinese Exclusion Act....................................................................................22, 23

Civil Right Act of 1866, ch. 31, 14 Stat. 27 .................................................. *passim*

U.S. CONST. art. I, § 8 .........................................................................................32

Expatriation Act of 1868...................................................................................10

Fourteenth Amendment ............................................................................... *passim*

Immigration and Nationality Act of 1952.................................................. *passim*

Nationality Act of 1940 .................................................................................1, 28

**<u>Other Authorities</u>**

Black's Law Dictionary (12th ed. 2024)........................................................7

John Bouvier, 1 *A Law Dictionary: Adapted to the Constitution and Laws of the
    United States of America*  (1860)......................................................8, 13

Archibald Brown, *A Law Dictionary for the Use of Students and the Legal
    Profession,*  (1875)...................................................................................13

Alexander M. Burrill, 1 *A Law Dictionary and Glossary* (1860, 2d. ed.) ....................13

*Case of François A. Heinrich,*
    14 U.S. Op. Atty. Gen. 154 (1872) ......................................................22

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade
    Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C
    Davis L. Rev. 2215 (2021)......................................................................10

Congressional Globe, 39th  Cong.1st Sess. (1866).................................. *passim*

Congressional Globe, 40th Cong. 2d Sess. (1868) ........................................10

Congressional Globe, 41st Cong. 2d Sess. (1870)........................................22

*Constitution of the United States of America* (P.H. Nicklin, 1829)............11

Emer de Vattel's *The Law of Nations* ........................................................12

Garrett Epps, *The Citizenship Clause: A 'Legislative History'* ............14, 16

Exec. Order, No. 14,160, "Protecting the Meaning and Value of American
    Citizenship," 90 Fed. Reg. at 8449 ................................................. *passim*

Fed. R. Civ. P. 12 .........................................................................................34

Fed. R. Civ. P. 56 ................................................................................... *passim*

James C. Ho, *Defining "American:" Birthright Citizenship and the Original
    Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006)..................7, 14

Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 Akron L. Rev. 719 (2012) ............................................11

*Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340 (1995) ............................................................15

Local Rule 7(h) ..........................................................................................................1, 4

Citizenship of Children Born in the United States of Alien Parents, 10 Op. Atty. Gen. 328 (1862) ............................................................................................15

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, (2020) ........................................................................................................13, 14, 23

S. Rep. No. 1515 (1950) ..............................................................................................30

Staff of President's Comm. On Imm. and Nauralization, Whom We Shall Welcome 235 (1953) .........................................................................................30

To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980, 76th Cong. 298 (1940) ....................................................................................................................29, 33

Noah Webster, *A Dictionary of the English Language Exhibiting the Origin, Orthography, Pronunciation and Definitions of Words* (George Routledge & Company, 1856), ...................................................................................................13

6 Wright & Miller, Fed. Prac. & Proc. Civ. § 1476 (3d ed.) ....................................3, 4

## INTRODUCTION

In 28 simple words, the Fourteenth Amendment's Citizenship Clause exemplifies the promise of the Declaration of Independence that in this country "all . . . are created equal" and endowed with "unalienable Rights." As the Citizenship Clause's sponsor Senator Jacob Howard explained, the Citizenship Clause extends citizenship to the children of every "class of person" except "the families of embassadors." Lew-Williams Decl. ¶35 (quoting Cong. Globe, 39th Cong. 1st Sess. 2890 (1868)). And in the House, Representative Thadeus Stevens explained that the purpose of the clause was that the "great privilege" of citizenship "belong[s] to every person born or naturalized in the United States." Lew-Williams Decl. ¶30 (quoting Cong. Globe, 39th Cong. 1st Sess. 3148 (1868)). As a matter of constitutional interpretation, birthright citizenship has been established since the 1898 *Wong Kim Ark* decision. 169 U.S. 649 (1898). As a matter of statutory law, birthright citizenship has been enshrined in the federal code since the Nationality Act of 1940. Pub. L. 76-953, 54 Stat. 1137.

On January 20, President Trump directed his administration to abandon this bedrock constitutional principle and ignore federal law. His subordinates are now actively working to implement the particulars while ignoring the Constitution and federal statutes that protect birthright citizenship. Absent relief, Defendants' actions will cause grievous injury to Plaintiffs, whose citizenship or that of their children or their members' children will be stripped. As the 249th anniversary of the Declaration of Independence approaches, this Court should exercise its power to declare the Defendants' actions illegal and to enjoin their implementation.

## STATEMENT OF FACTS

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7(h)(1), Plaintiffs are filing herewith a Statement of Undisputed Material Facts. For purposes of this motion, certain points bear emphasis:

1. The January 20, 2025 Executive Order "Protecting the Meaning and Value of American Citizenship" (the "Order") purports to overturn over 130 years of previously undisputed constitutional law, as well as clear language in the Fourteenth Amendment and the Immigration and Nationality Act (INA). During this time, generations of children born on American soil have enjoyed the privileges of United States citizenship. Freedman Decl. Ex. 1 § 1.

2. The Order upends these principles by directing every department and agency of the United States to refuse to recognize as a U.S. citizen any child born on American soil whose mother is "unlawfully present" or temporarily present and whose father who is not a U.S. citizen or lawful permanent resident. Freedman Decl. Ex. 1 §§ 2 & 3.

3. If implemented, the Order stands to inflict profound and lasting injury on countless immigrant families in the United States, whose children, though born on U.S. soil, will be deprived of the benefits of American citizenship.

4. Pregnant members of Organizational Plaintiff OCA and Individual Plaintiffs Jane Doe #1, Baby Doe #1, and Jane Doe #2 (and her expected child)—face imminent harm from the Order. In particular, their children (including Baby Doe #1) will be denied American citizenship, and with it, the "priceless" privileges that are unavailable to non-citizens. *Schneiderman v. United States*, 320 U.S. 118, 122 (1943).

5. The Order will force OCA to divert resources from other critical activities to address the disruption caused to OCA's pre-existing and mission-critical work providing counseling and support to individuals applying for naturalization and citizenship. The Order will induce many additional individuals to seek those services, including children affected by the Order, who will need assistance should the Order take effect. OCA will also need to navigate a novel regulatory

environment and develop new guidance addressing situations that could not previously exist because, for the first time, U.S.-born children are now being excluded from citizenship.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants the President the power to act in a certain way is a pure question of law." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 394 (D.D.C. 2018), *rev'd and vacated on other grounds*, 929 F.3d 748 (D.C. Cir. 2019).

## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' motion to dismiss, and in the alternative, for summary judgment (ECF 22) should be summarily denied for the following reasons:

1. Defendants' motion has been mooted by Plaintiffs' filing as of right, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), of an amended class action complaint (ECF 29-1). Accordingly, Defendants' motion is directed to an inoperative pleading and is moot. *See, e.g.*, *Geter v. United States Gov't Publ'g Office*, 268 F. Supp. 3d 34, 40-41 (D.D.C. 2017) ("Because the Court grants Mr. Geter's motion to file a second amended complaint, the GPO's motion to dismiss or, in the alternative, for summary judgment is moot."); *Borda v. Exec. Office for the United States Atty.*, 125 F. Supp. 3d 196, 198 (D.D.C. 2015) ("Had Plaintiff been entitled to amend his complaint as of right when he sought to, his amended complaint would have mooted the summary judgment motion, obviating the need to respond."); *Miller v. American Export Lines, Inc.* 313 F.2d 218, 218-19 (2d Cir. 1963) (reversing grant of summary judgment because complaint had been amended before ruling). *See generally* 6 Wright & Miller, Fed. Prac. & Proc. Civ. § 1476

(3d ed.) ("once an amended pleading is interposed, the original pleading no longer performs any function in the case").

2. Defendants' motion failed to comply with Federal Rule of Procedure 56(c)(1)(A), Local Rule 7(h)(1) and the Court's January 31, 2025 Standing Order (ECF 6) ¶12 in the following ways:

- Defendants' statement of material facts (ECF 23-1) fails to cite to "particular parts of materials in the record, including depositions, documents . . . affidavits or declarations . . . or other materials," as required by Rule 56(c)(1)(A).

- Defendants' statement does not include "references" or "specific citations to those portions of the record upon which the party relies," as required by Local Rule 7(h)(1) and the Standing Order.

- Defendants' statement suffers from the same defects as described in *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145 (D.C. Cir. 1996), in that it does not reflect extensive factual contentions in the body of its brief at pages 20-36. These sections, in turn, flout what the D.C. Circuit noted was Rule 7(h)'s "requirement that statement of genuine disputed material issues be 'concise,'" and not "blend[] factual assertions with legal argument." 101 F.3d at 153. Defendants' failure to comply with *Jackson* reflects their failure to comply with Local Rule 7(h) or Paragraphs 12 and 12(a) of this Court's January 31 Standing Order which, *inter alia*, expressly "encourage[s litigants] to carefully review" *Jackson*.

- Defendants' statement does not follow the Court's prescribed format "as a two-column table," with each row presenting "only one undisputed factual assertion per numbered row." ECF 6 ¶12(a) & Att. 1.

- Defendants failed to "promptly provide an electronic copy in editable format." *Id.*

4

Pursuant to the Court's Standing Order, the Defendants' statement of material facts should be stricken for non-compliance and the motion should be summarily denied for failure to submit a compliant Rule 56(c) statement.

3. While several of Plaintiffs' claims raise pure questions of law, Plaintiffs' Fifth Claim (for violation of the Equal Protection Clause) raises factual issues where certain facts essential to the opposition are in the Defendants' possession and are not available to Plaintiffs. Moreover, Defendants have improperly moved for summary judgment on Plaintiffs' Administrative Procedure Act claims despite not having produced any administrative record(s). *See, e.g.*, *Browder v. Wormuth*, No. 1:18-cv-2411 (TJK), 2024 WL 5168281, at *16 (D.D.C. Dec. 19, 2024) (denying motion to for summary judgment as "premature" because a court "cannot review a decision under the APA without having the entire administrative record before it") (citation omitted). Pursuant to Rule 56(d), the Court should deny the Defendants' motion under Rule 56(d). *See generally* Freedman Decl.¶¶8-17.

4. As discussed in conjunction with Plaintiffs' affirmative motion for summary judgment, Defendants' legal arguments concerning Article III standing and the merits are incorrect and would warrant denial of Defendants' motion even if the motion were not moot, procedurally defective, and premature. To the extent the Court concludes that Defendants' motion is not moot, procedurally defective, or premature, Plaintiffs incorporate by reference their arguments for Partial Summary Judgment in opposition to Defendants' motion.

## ARGUMENT FOR PARTIAL SUMMARY JUDGMENT

The Court should enter summary judgment for Plaintiffs on the First, Second, and Sixth Claims of the Amended Class Action Complaint because (A) the Order violates the Citizenship Clause of the Fourteenth Amendment; (B) the Order violates the INA, 8 U.S.C. § 1401; and (C) the Order is *ultra vires*. As Defendants have acknowledged, "the question of the Order's validity

is a pure question of law that almost certainly will not turn on witness testimony or other evidence."
ECF 18 at 3. Finally, Plaintiffs have established the justiciability of this challenge, and have
standing to challenge the Order.

### A.    The Order Violates the Citizenship Clause of the Fourteenth Amendment

The Court should enter summary judgment for Plaintiffs on their First and Sixth Claims
for Relief because the Order violates the Citizenship Clause.[1]

### 1.    The Order violates the clear text of the Citizenship Clause

The Citizenship Clause of the Fourteenth Amendment provides: "All persons born or
naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United
States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. By its plain text,
the Clause bestows citizenship on *anyone* born in the United States and subject to the jurisdiction
of the United States. Because the Order plainly contradicts the clear text of the Fourteenth
Amendment, it should fall on that basis alone. *E.g.*, *N.H. Indonesian Cmty. Support v. Trump*, 765
F. Supp. 3d 102, 110 (D.N.H. 2025) (finding "subject to the jurisdiction thereof" to
"unambiguously" "refer[] to all babies born on U.S. soil, aside from the numerated exceptions").

In addressing "[a]ll persons born or naturalized," the Clause includes no hereditary
prerequisite to citizenship, nor does it contain qualifiers based on the citizenship, allegiance,
domicile, immigration status, or country of origin of one's parents. Indeed, the Fourteenth
Amendment's text does not mention the person's parents at all, let alone condition its grant of

---

[1] In their motion, Defendants assert that "constitutional rights" do not "come with a built-in cause of action to allow private enforcement." ECF 22 at 13. The Supreme Court has repeatedly reached the opposite conclusion. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) (finding President's seizure order was unauthorized); *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 141 (1951) ("We long have granted relief to parties whose legal rights have been violated by unlawful public action[.]"); *Dames & Moore v. Regan*, 453 U.S. 654, 669-78 (1981) (reviewing whether order exceeded the President's statutory authority).

citizenship on their immigration status. *See, e.g.*, *Doe v. Trump*, 766 F. Supp. 3d 266, 278 (D. Mass. 2025) ("The text [of the Citizenship Clause] is directed at the person born (or naturalized).");  *Washington v. Trump*, 765 F. Supp. 3d 1142, 1150 (W.D. Wash. 2025) ("[N]owhere in the text [of the Citizenship Clause] does it refer to a person's parentage."). Nor does the text authorize the Executive Branch to create exceptions to the longstanding common law principle of *jus soli* embodied in the Fourteenth Amendment. The Citizenship Clause's only requirements are that a person be born "in the United States" and "subject to the jurisdiction thereof."

Similarly, the ordinary meaning of the phrase "subject to the jurisdiction thereof" refers to anyone within the authority or sovereign power of the United States. *See Jurisdiction*, Black's Law Dictionary (12th ed. 2024) (defining "jurisdiction" as "government's general power to exercise authority over all persons and things within its territory"); *see also Washington*, 765 F. Supp. 3d at 1150 ("[A]nyone who answers to the political or judicial authority of the United States is 'subject to [its] jurisdiction.'"). As a matter of text, history, and precedent, the group of U.S.-born individuals *not* subject to the jurisdiction of the United States is extraordinarily small, well-defined, and limited to U.S.-born children born to diplomats (who have diplomatic immunity), people born on foreign public ships, and members of foreign armies at war against the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898).

Conversely, children born in the territory of the United States to undocumented immigrants and persons on temporary visas fall within the authority and sovereign power of the United States and are "subject to the jurisdiction thereof."  *See United States v. Wong Kim Ark*, 169 U.S. 649, 694 (1898) (all "aliens residing in the United States" are "entitled to the protection of and owe allegiance to the United States . . . and are 'subject to the jurisdiction thereof"). *See generally* James C. Ho, *Defining "American:" Birthright Citizenship and the Original Understanding of the*

*14th Amendment*, 9 Green Bag 2d 367, 368-69 (2006) ("Common usage confirms this understanding. When we speak of a business that is subject to the jurisdiction of a regulatory agency, it must follow the laws of that agency, whether it likes it or not. . . . Of course, when we speak of a person who is subject to our jurisdiction, we do not limit ourselves to only those who have sworn allegiance to the U.S.").[2]

Children born in the United States are protected by the Citizenship Clause. By refusing to recognize the birthright citizenship of these children, the Order violates the Fourteenth Amendment's plain language and is therefore unlawful.

> **2.    The Order contradicts the original meaning of the Citizenship Clause**

Even if the language of the Citizenship Clause left any ambiguity, the original meaning of the Clause would remove it. The Order rests on the premise that children born to undocumented immigrants and persons on visas are not "subject to the jurisdiction" of the United States. That is inconsistent with the meaning of the Citizenship Clause as understood at the time of its ratification: that all persons born in the United States and "subject to the jurisdiction thereof" would be American citizens—subject to narrow exceptions, none of which are relevant here.

The immigration status of the child's parents was, and is, irrelevant to determining whether someone is "subject to the jurisdiction" of the United States. *See, e.g.*, *Ex parte Chin King*, 35 F. 354, 355 (C.C.D. Or. 1888) ("By the common law, a child born within the allegiance—the

---

[2] Defendants assert that the Citizenship Clause only extends to those with "lawful domicile." ECF 22 at 21. That term is not found in the Clause. Defendants' argument that "domicile" is incorporated into the clause because it is purportedly synonymous with "residence," ignores that the term "reside" applies only to State, not federal, citizenship. *See* U.S. Const. Amend. XIV § 1 (individuals "shall be citizens of the United States *and of the State wherein they reside*"). And "residence" and "domicile" are not synonymous: as today, the terms had different meanings at the time of the Fourteenth Amendment's ratification. *See Residence*, A Law Dictionary: Adapted to the Constitution and Laws of the United States of America (ed. John Bouvier 1860) ("There is a difference between a man's residence and his domicil. . . . A residence is usually transient in nature, it becomes a domicil when it is taken up *animo manendi*.").

jurisdiction—of the United States, is born a subject or citizen thereof, without reference to the political *status* or condition of its parents.") (emphasis in original); *Gee Fook Sing v. United States*, 49 F. 146, 148 (9th Cir. 1892) (explaining the "laws excluding immigrants who are Chinese laborers are inapplicable to a person born in this country, and subject to the jurisdiction of its government, even though his parents were not citizens, nor entitled to become citizens, under the laws providing for the naturalization of aliens[.]"). Accordingly, the newborn child of OCA Member A, Baby Doe #1, and the expected child of Jane Doe #2 will be within the "jurisdiction" of the United States as understood at the time of the framing of the Amendment: they will be physically present in the country and subject to the law and power of the United States.

This interpretation is supported by three different types of contemporaneous or proximate sources, which confirm that (1) the Citizenship Clause was intended to restore *ex ante* the principle of *jus soli* as it was understood prior to the *Dred Scott* decision and that "subject to the jurisdiction" referred to the government's ability to exercise legal authority over the person in question; (2) the legislative history of the Clause and its statutory predecessor are consistent with the plain meaning of the Citizenship Clause; and (3) early interpretations of the Clause held it extended citizenship to all children born in the United States and subject to its jurisdiction. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2127–28 (2022) ("[E]xamination of a variety of legal and other sources," including pre-enactment and post-enactment history, is "a critical tool of constitutional interpretation") (quotation marks omitted).

    a.    **The Plain Meaning of the Citizenship Clause is Consistent with the Principle of *Jus Soli* and Understanding of "Subject to the Jurisdiction" Prior to the Civil War**

The context leading to adoption of the Fourteenth Amendment confirms the plain meaning of the Citizenship Clause. This is true for two discrete reasons. *First*, granting citizenship to children born on U.S. soil follows the principle of *jus soli*, which was widely recognized from the

colonial era and the early history of the United States leading up to the *Dred Scott* decision. As discussed below, the Fourteenth Amendment's Citizenship Clause was repeatedly recognized during ratification debates as overturning *Dred Scott* and restoring principles of *jus soli ex ante*. *Second*, at the time of ratification, the term "subject to the jurisdiction" was broadly understood to include everyone within the sovereign's territory, with only narrow, well-cabined exceptions, such as for children of diplomats and children of occupying forces.

1. *Jus Soli*: Long before enactment of the Fourteenth Amendment, American law embraced the common law principle of *jus soli*: that citizenship is determined by the place of birth, regardless of parental citizenship.[3]  Lew-Williams Decl. ¶10. Applying the doctrine and following English common law, early American courts recognized the citizenship of persons born in the United States

---

[3] Defendants' contention in their motion that the Fourteenth Amendment did not codify *jus soli*, ECF 22 at 35, lacks support in the historical record. *See infra* at A.2.c (discussing *Wong Kim Ark*) and at A.2.b (discussing history of Fourteenth Amendment). Instead of citing to the 1866 congressional debate over the Fourteenth Amendment, Defendants cite to debates over the Expatriation Act of 1868, regarding the "rights of American citizens abroad," primarily naturalized citizens. ECF 22 at 35 (citing Cong. Globe, 40th Cong. 2d Sess. 967 (1868)). That debate concerned the *obligations* of the government to its citizens, not the question of who is a citizen.

The "depart[ures] from English common law" that Defendants assert, ECF 22 at 35, do not change this analysis. The exception for members of Native American tribes were discussed during the debates over the Civil Rights Act and the Fourteenth Amendment and arose from the recognition that the tribes were sovereigns whose populace was not "subject to the jurisdiction" of the United States. *See* Lew-Williams Decl. ¶¶25, 36. The ability to voluntarily renounce one's citizenship as an adult, ECF 22 at 35, is wholly unrelated to birthright citizenship. *Afroyim v. Rusk*, 387 U.S. 253 (1967) recognized voluntary renunciation of citizenship by individuals did not entail a reciprocal relationship that empowered the government to redefine citizenship at will. *Id.* at 257 ("the Government cannot sever its relationship to the people by taking away their citizenship."). That reasoning is entirely at odds with Defendants' "mutual consent" theory of citizenship. ECF 22 at 35. Defendants' "mutual consent" theory of citizenship, *id.*, is also irreconcilable with Congress's undisputed aim of granting citizenship to former slaves, who had not "consented" to being present in the United States, yet there can be no dispute that both the Civil Rights Act and the Citizenship Clause were intended to grant them citizenship. *See, e.g.*, Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2250 (2021) (slaves "were clearly 'illegal aliens,' . . ., in the United States before and during the consideration of the Fourteenth Amendment.").

to aliens, even when the parents were visiting only temporarily. *See, e.g.*, *McCreery's Lessee v. Somerville*, 22 U.S. 354, 356-357 (1824) (children born in the United States of Irish father were citizens); *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 119-20 (1804) (presuming that all persons born in the United States were citizens thereof); *Munro v. Merch.*, 26 Barb. 383, 384 (N.Y. Gen. Term 1858) ("A child born in this state of alien parents, during its mother's temporary sojourn here, is a native born citizen."); *Ludlam v. Ludlam*, 26 N.Y. 356, 371 (N.Y. 1863) ("[B]y the law of England the children of alien parents, born within the kingdom, are held to be citizens."); *see also* Lew-Williams Decl. ¶13; Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 Akron L. Rev. 719, 725 nn. 26 & 27 (2012) (collecting cases). Antebellum treatises reached the same conclusion. Lew-Williams Decl. ¶13 (discussing 2 James Kent, *Of Aliens and Natives*, *in* Commentaries on American Law, 39, 51 (O. W. Holmes, Jr. 12th ed. 1873) ("inhabitants of every country" can be divided into two categories: "aliens and natives. . . . Natives are all persons born within the jurisdiction of the United States . . . an alien is a person born out of the jurisdiction . . . of the United States."); ¶40 & n.73 (discussing William Rawle, *A View of the Constitution of the United States of America* (P.H. Nicklin, 1829)) ("every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution....")).[4]

---

[4] Defendants cite international law treatises to suggest that *jus soli* was not accepted law. ECF 22 at 25, 31. This analysis is an irrelevant distraction: *jus soli* is a common law principle recognized in English common law, not an international legal concept. This distinction is clear when one contrasts Defendants' citation to Justice Joseph Story's international law treatise (*Commentaries on the Conflict of Laws, Foreign and Domestic*) (cited by Defendants at ECF 22 at 25) with his judicial opinions concerning U.S. law. Contrary to Defendants' summary (ECF 22 at 32), in *Inglis*, Story wrote, "Nothing is better settled at the common law than the doctrine that the children even of aliens born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth." 28 U.S. 99, 164 (1830) (Story, J., dissenting). Similarly, in *McCreery's Lessee v. Somerville*, 22 U.S. 354, 356

These principles were widely recognized until the *Dred Scott* decision, which—in sustaining the institution of slavery by holding that Black persons descended from slaves, even if born in the United States, were not U.S. citizens—upended U.S. courts' consistent recognition of the *jus soli* principle. The *Dred Scott* dissenters noted that the majority engaged in flawed reasoning and historiography and failed to recognize that "[b]eing born under our Constitution and laws, no naturalization is required, as one of foreign birth, to make him a citizen." *Dred Scott v. Sanford*, 60 U.S. 393, 531 (McLean, J., dissenting); *cf. id.* at 501 (Campbell, J., concurring) (quoting Pennsylvania 1774 resolution that "the inhabitants of these colonies are entitled to the same rights and liberties, within the colonies, that the subjects born in England are entitled within the realm"). As discussed in more detail below, the Fourteenth Amendment overturned the *Dred Scott* decision.

2. "Subject to the Jurisdiction": Well before the Civil War, the Supreme Court recognized that the "jurisdiction of the nation within its own territory is necessarily exclusive and absolute," with practical exceptions for "peculiar circumstances." *Schooner Exchange v. McFaddon*, 11 U.S. 116, 136 (1812). Under longstanding law, foreign visitors to the United States—"private

---

(1824), which Defendants do not discuss at all, Story described the claimants in an inheritance dispute as "natural born subjects" because they were born on U.S. soil, even though their father was not a citizen. Lew-Williams Decl. ¶14.

Defendants are further afield in their discussion of Emer de Vattel. ECF 22 at 25, 31. Vattel, a Prussian, was not writing about U.S. law (he died in 1767), and wrote a prescriptive treatise focusing on principles that "ought to regulate" actions. *The Law of Nations*, 3 § 7, 4 § 8. Vattel posited a patrilineal view of citizenship—citizenship flowed *only* to those "born of a father who is a citizen," *id.* at 167 § 212, which did not extend even to children of "perpetual inhabitants," *id.* at 167 § 213—views incompatible with concepts of common and American law. It is not surprising that Defendants are unable to cite anyone during the Fourteenth Amendment ratification debates who cited Vattel's views on citizenship or birthright. Nor do Defendants acknowledge that *Wong Kim Ark* expressly rejected the position of international legal scholars. *Compare* 169 U.S. at 666 (rejecting "the rule of the Roman law, by which the citizenship of the child followed that of the parent") *with* 169 U.S. at 708 (Fuller, C.J., dissenting) (citing Vattel).

individuals" and "merchants"—were within the country's jurisdiction and "owe[d] temporary and local allegiance." *Id.* at 144.[5]

Contemporary law dictionaries confirm this understanding. "Jurisdiction" referred to the sovereign's "power to make law; power to legislate or govern; power or right to exercise authority." Lew-Williams Decl. ¶32 (discussing Alexander M. Burrill, 1 A Law Dictionary and Glossary: Containing Full Definitions of the Principal Terms of the Common and Civil Law 113 (1860, 2d. ed.)). Similarly, Webster's Dictionary of 1865 offered four definitions of "jurisdiction": (1) "The legal power or authority of doing justice in cases of complaint; the power of executing the laws and distributing justice;" (2) "Power of governing or with legislating;" (3) "The power or right of exercising authority;" (4) "The limit within which power may be exercised." Lew-Williams Decl. ¶32 (discussing Noah Webster, *A Dictionary of the English Language Exhibiting the Origin, Orthography, Pronunciation and Definitions of Words* (George Routledge & Company, 1856), 571).[6] *Accord* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109

---

[5] When legislators debating the Civil Rights Act and the Fourteenth Amendment used the term "allegiance," they referred to a duty to follow law, and enjoyment of the protection of the law. *See* Lew-Williams Decl. ¶¶33-34, 41. All persons "resident in the United States," even temporarily— owed an "allegiance" of some kind. *See, e.g.*, Lew-Williams Decl. ¶¶33-34 (discussing *Schooner Exchange*, 11 U.S. at 144); John Bouvier, 1 A Law Dictionary: Adapted to the Constitution and Laws of the United States of America 93 (1860) ("[Allegiance] is natural, acquired, or local. Natural allegiance is such as is due from all men born within the United States; acquired allegiance is that which is due by a naturalized citizen. . . . Local allegiance is that which is due from an alien, while resident in the United States, for the protection which the government affords him.").

It was also understood that birth within the United States itself created allegiance. *See generally* Lew-Williams Decl. ¶¶13-14, 33-34. *See also United States v. Rhodes*, 27 F. Cas. 785, 789 (C.C.D. Ky. 1866) ("Birth and allegiance go together"); Cong. Globe, 39th Cong. 1st Sess. 1262 (statement of Rep. Broomall) ("[All] who by reason of [their] being born within the jurisdiction of a Government owe[] allegiance to that Government"); Archibald Brown, A Law Dictionary for the Use of Students and the Legal Profession 20-21 (1875) ("According to the law of England, and also that of America, locality of birth determines the primary allegiance").

[6] Defendants contend that "jurisdiction" has "too many[] meanings," ECF 22 at 18, but fail to address the well-established meaning at time of ratification (as evident from the ratification

13

Geo. L.J. 405, 437-38 (2020) (collecting contemporary dictionary entries); *see also* Ing, *supra* at 726 (collecting discussions by antebellum legal commentators).

The conception of "jurisdiction" excluded only discrete categories of persons—typically identified specifically as diplomats and their families, who were generally "entitled to an entire exemption from the local jurisdiction," *i.e.*, were not subject to the sovereign's legal authority. Ramsey, *supra* at 439 (quoting Henry Wheaton, *Elements of International Law: With a Sketch of the History of the Science* 176 (1836)). *See also* Lew-Williams Decl. ¶34 (discussing Wheaton's treatise).

      **b.**      **The Broad Sweep of the Citizenship Clause is Consistent with Legislative History of the Fourteenth Amendment**

The Congress that framed the Fourteenth Amendment was clear that it intended to (1) extend birthright citizenship even to children of parents who were not citizens or were ineligible for citizenship and (2) limit the exceptions to birthright citizenship to narrow categories. *See, e.g.*, *Wong Kim Ark*, 169 U.S. at 697-700 (reviewing legislative history); Ramsey, *supra* at 444-45; Garrett Epps, *The Citizenship Clause: A 'Legislative History'*, 60 Am. Univ. L. Rev. 331, 349-62 (2010); James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 374-76 (2006).

In the years immediately preceding enactment of the Fourteenth Amendment, President Abraham Lincoln's administration repeatedly affirmed the principle of birthright citizenship. Notably, during the Civil War, Attorney General Edward Bates issued a formal opinion on the citizenship of African Americans and enslaved people, rejecting the reasoning in *Dred Scott*. He

---

debates, court cases, and contemporary dictionary definitions), opting instead to cite cases from 1983 and focusing on jurisdiction as applied to Native Americans and diplomats. Both Native Americans and diplomats were well-recognized exceptions to the principle of *jus soli* at common law. Lew-Williams Decl. ¶¶10, 13, 16 & n.17, 25, 31, 33-36, 39.

explained that "every person born in the country is, at the moment of their birth, *prima facie* a citizen," regardless of "race or color, or any other accidental circumstance." Citizenship of Children Born in the United States of Alien Parents, 10 Op. Atty. Gen. 328 (1862) (emphases in original). Bates further wrote that "children born in the United States of alien parents, who have never been naturalized, are native-born citizens of the United States." Lew-Williams Decl. ¶15 (quoting Citizenship of Children Born in the United States of Alien Parents, 10 Op. Atty. Gen. 328 (1862)).

The legislative debate over the Fourteenth Amendment's Citizenship Clause confirms an intent to extend citizenship to children of persons ineligible for citizenship and to construe exceptions to birthright citizenship narrowly. *See generally* Lew-Williams Decl. ¶¶35-37 (summarizing views of Senator Howard, the sponsor of the Citizenship Clause, and other leading proponents of the Fourteenth Amendment). As the U.S. Department of Justice acknowledged much later, "Congress and the States adopted the Fourteenth Amendment in order to place the right to citizenship based on birth within the jurisdiction of the United States beyond question." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340 (1995). Three points from the legislative debate deserve emphasis.

*First*, members of Congress repeatedly equated "jurisdiction" with the ability to exercise authority over an individual—encompassing virtually all persons present within the United States. Senator Lyman Trumbull, for example, had contended that members of Native American tribes were not "subject to the jurisdiction" of the United States because there was (at the time) no "means of trying" them for "a criminal offense" under federal law. Lew-Williams Decl. ¶36 (discussing Cong. Globe, 39th Cong. 1st Sess. 2893-94). Senator Howard later made the same point, noting that "United States courts have no power to punish an Indian who is connected with a tribe for a

crime committed by him upon another member of the same tribe." *Id.* (discussing Cong. Globe, 39th Cong. 1st Sess. 2895). Other statements in the record offered similar views. *E.g.*, Cong. Globe, 39th Cong. 1st Sess. 2894 (remarks of Sen. Trumbull) (noting Congress has the "same power [to extend its laws to the tribes] that it has to extend the laws of the United States over Mexico"); *id.* at 2893 (remarks of Sen. Trumbull) ("What do we mean by 'subject to the jurisdiction of the United States?' . . . Can you sue a Navajoe [sic] Indian in court? . . . We make treaties with them, and therefore they are not subject to our jurisdiction."); *see also* Epps, *supra* at 356-59 (summarizing legislative debate); Ing, *supra* at 734 ("Because Indians and diplomatic families were immune from federal judicial jurisdiction, they were not 'fully and completely subject to the jurisdiction of the United States.'").

As a result, members of Congress recognized that the children of people temporarily in the United States would be citizens because they were subject to its "jurisdiction."  Most notably, Senator Edgar Cowan recognized that "[i]f a traveler comes here . . . he is entitled, to a certain extent, to the protection of the laws. . . . So far as the courts and the administration of the laws are concerned, I have supposed that every human being within their jurisdiction was in one sense of the word a citizen, that is, a person entitled to protection." Lew-Williams Decl. ¶¶39-40 (discussing Cong. Globe, 39th Cong. 1st Sess. 2890 (statement of Sen. Cowan)). Senator Cowan's view, in other words, was that even "traveler[s]" are within the "jurisdiction" of the United States because they were "entitled . . . to the protection of the laws" and likewise obliged to obey them. *Id.* In debating whether the bill covered such unwanted "trespassers" (in Senator Cowan's phrase "Gypsies,") drafters of the Amendment made clear "the children of all parentage whatever, born in [the United States], should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States.'"  Lew-Williams Decl. ¶37, 39-40. Thus,

Senator Conness noted that Chinese immigrants "[a]ll return to their own country at some time or other," but that he was "entirely ready to accept" that their children would be citizens. Lew-Williams Decl. ¶38 (discussing Cong. Globe, 39th Cong. 1st Sess. 2891).

And, in a debate prior to the addition of the Citizenship Clause to the Amendment, Senator Benjamin Wade suggested altering the Privileges and Immunities Clause to apply not to "citizens" but to all "persons born in the United States or naturalized by the laws thereof." Lew-Williams ¶39 (discussing Cong. Globe, 39th Cong. 1st Sess. 2769). During debate over this suggestion, Senator William Fessenden asked Senator Wade whether "a person born here of parents from abroad temporarily in this country" would be a citizen under the amendment under consideration. *Id.* (remarks of Sen. Fessenden). Senator Wade replied that he knew of only "one instance" under which "a person may be born here and not be a citizen" under existing law: "the children of foreign ministers." *Id.* (remarks of Sen. Wade). Senator Wade conceded that his amendment, as worded, might include such children, but asserted it "could hardly be applicable to more than two or three or four persons." *Id.*[7]

*Second*, the legislative record indicates that the Citizenship Clause was not intended to limit citizenship based on the immigration status of a child's parents. During the debates over the Fourteenth Amendment, Congress specifically identified and discussed diplomats (and their families) as the primary group of persons outside of the "jurisdiction" of the United States. Had Congress intended to exclude other significant groups from the scope of the Clause, it surely would

---

[7] In their motion, Defendants miscast the proposed Wade Amendment, ECF 22 at 26-27, failing to note (i) the amendment was to change the reference in the Privileges and Immunities Clause from "citizens" to a more general reference to "anyone born in the County, and (ii) "infrequency" referred to "children of foreign ministers." *See generally* Lew-Williams Decl. ¶39. The context for Senator Wade's statement was, besides the children of ambassadors, other children (including those born to "parents from abroad temporarily in this country") born on U.S. soil had long been recognized to be U.S. citizens. *Id.*

have identified them at some point during debate as well. Shortly after Senator Wade withdrew his proposed alteration to the Privileges and Immunities clause, Senator Jacob Howard introduced what is today the Citizenship Clause, explaining that it was "simply declaratory" of existing law, which did not extend citizenship to "foreigners, [*i.e.*,] aliens, who belong to the families of" diplomats, but "will include every other class of persons"—in other words, everyone but children of non-American diplomats. Lew-Williams Decl. ¶35 (discussing Congressional Globe, 39th Cong. 1st Sess. 2890). Senator George Williams expressed a similar view, noting that the "child of an embassador [sic]" is not subject to American jurisdiction and so excluded from citizenship. *Id*. at ¶35 & n.61 (discussing Cong. Globe, 39th Cong. 1st Sess. 2897).

Conversely, legislators repeatedly *affirmed* their intent to extend birthright citizenship to children of aliens. For example, Senator John Conness asserted that "the children begotten of Chinese parents in California" would "be citizens" under the Clause, embracing Senator Edgar Cowan's assertion—made in opposition to the Clause—that, if the "mere fact of being born in the country confers" citizenship, then the children of parents "who owe no allegiance, who pretend to owe none; who recognize no authority in her government" and who would "settle as trespassers" would also be citizens. Lew-Williams Decl. ¶37 (discussing Cong. Globe, 39th Cong. 1st Sess. 2890-91). All agreed that Senator Cowan properly understood the Citizenship Clause's broad scope, and the Senate adopted the broad language to which he objected. *Id.*

*Third*, the debate over the Fourteenth Amendment followed Congressional efforts in the immediate aftermath of the Civil War, through the Civil Rights Act of 1866, to codify a non-discriminatory, pre-*Dred Scott jus soli* principle as Congress understood that principle. Debate over the Civil Rights Act of 1866—which contained a citizenship provision with similar but slightly narrower language to the Fourteenth Amendment's Citizenship Clause—is instructive on

both the intended broad scope of birthright citizenship and the intended narrowness of exceptions to it. Lew-Williams Decl. ¶23.[8] When discussing the scope of the Act's citizenship language, legislators framed it broadly; references to exceptions were almost exclusively limited to children of ambassadors.

For example, the lead sponsor of the Civil Rights Act, Senator Trumbull, stated that "all these persons born in the United States and under its authority . . . are citizens without any act of Congress." Cong. Globe, 39th Cong. 1st Sess. 527. And later in the debate, Senator Trumbull stated it was "the prevailing opinion in the United States that all native-born persons not subject to a foreign power are by virtue of their birth citizens of the United States." *Id.* at 1756 (1866). Senator Trumbull also noted that President Lincoln's administration had endorsed the view that "all native born-persons since the abolition of slavery were citizens of the United States." *Id.*[9]

---

[8] The Civil Rights Act of 1866 provides "[t]hat all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Right Act of 1866, ch. 31, 14 Stat. 27. The Fourteenth Amendment makes no reference to being "subject" to any "foreign power"—providing "[a]ll persons born or naturalized in the United States, and *subject to the jurisdiction thereof* are citizens of the United States." U.S. Const. amend. XIV, § 1, cl. 1.

[9] In their motion, Defendants ignore almost every statement made by Senator Trumbull concerning the Civil Rights Act or the Citizenship Clause (discussed above), instead focusing on a statement where he described citizenship as extending to people "owing allegiance solely to the United States." ECF 22 at 21. Defendants ignore the context: the preceding sentence make clear that Senator Trumbull referred to the exception for diplomats. *See* Lew-Williams Decl. ¶24 (discussing Cong. Globe, 39th Cong. 1st Sess. 572 ("We cannot make a citizen of the child of a foreign minister who is temporarily residing here" because they do not "owe allegiance").

Defendants' only other reference to Senator Trumbull is a private letter he sent to President Johnson attempting to dissuade him from vetoing the Civil Rights Act. ECF 22 at 26. Private correspondence is not material as a matter of constitutional interpretation. *Cf. Ramos v. Louisiana*, 590 U.S. 83, 98 & n.40 (finding James Madison's "private writings" provided "little help"). As Dr. Lew-Williams notes, President Johnson clearly understood the Civil Rights Act extended citizenship broadly, and President Johnson's veto led the sponsors of the Citizenship Clause to make changes to the language to make it less conciliatory. Lew-Williams Decl. ¶¶28 31.

Other legislators made similar statements about the breadth of the Act. *See, e.g.*, *id*. at 2765 (statement of Sen. Howard) ("A citizen of the United States is held by the courts to be a person who was born within the limits of the United States and subject to their laws."); *id.* at 570 (1866) (statement of Sen. Morrill) ("[E]very man, by his birth, is entitled to citizenship, and that upon the general principle that he owes allegiance to the country of his birth, and that country owes him protection. That is the foundation, as I understand it, of all citizenship . . . ."); *id.* at 741 (statement of Sen. Lane) ("The freedmen are citizens of the United States; not [by] the naturalization law, [or] any treaty, but citizens because they are born natives to the soil. That makes them citizens."); *id.* at 1124 (statement of Rep. Burton Cook) ("This bill provides that all persons born within the United States, excepting those who do not owe allegiance to the United States Government, as children of embassadors [sic] of foreign powers, and such as are not subject to our laws . . . shall be citizens of the United States. I think this is the law now."); *id.* at 1152 (Rep. Thayer) ("[T]hey who are born upon the soil are citizens of the State. They owe allegiance to the State.").[10]

In marked contrast to the repeated and explicit identification of children of diplomats as exceptions, members of Congress specifically stated their intent to extend birthright citizenship in the Civil Rights Act to children of aliens. One exchange between Senator Trumbull and Senator

---

[10] In their motion, the Defendants misleadingly cite Representative James Wilson during the debate over the Civil Rights Act of 1866 as suggesting that "children born on our soil to temporary sojourners" are not "natural-born citizen[s]." ECF 22 at 26. Notably, neither Representative Wilson nor any other legislator made a similar statement during the Citizenship Clause ratification debate. Lew-Williams Decl. ¶¶38, 40-41. The language Defendants cite is best understood as *dicta* -- it is a partial quote from a single sentence of Wilson's extended speech which has nothing to do with his overall point that Black people could be citizens under the original constitution, refuting *Dred Scott*; in this context, he observed that the Constitution did not define "citizen" and speculated that "it may be" the case in international law ("general law"), rather than the law of the United States. Lew-Williams Decl. ¶40. Notably, each of the sources Wilson cited in his speech— former Attorney General Bates, William Rawle, and Sir William Blackstone all recognized that citizenship would extend to the children of "aliens." Lew-Williams Decl. ¶40. & n.73.

Cowan, an opponent of the Act, left no room for doubt: when Senator Cowan asked "whether it will not have the effect of naturalizing the children of [non-citizen] Chinese and Gypsies [sic] born in this country," Senator Trumbull responded: "Undoubtedly." Lew-Williams Decl. ¶26 & n. 47 (quoting Cong. Globe, 39th Cong. 1st Sess. 498). Meanwhile, one representative specifically cited *Lynch v. Clarke*—a New York case holding that children of even temporary aliens became American citizens by birthright—as evidence that "children born here are citizens without any regard to the political condition or allegiance of their parents." Cong. Globe, 39th Cong. 1st Sess. 1832 (statement of Rep. Lawrence). During floor debates, "no Senator disputed the effect of the bill, namely, that it would make the U.S.-born children of non-diplomatic aliens U.S. citizens— including the children of Chinese immigrants—regardless of their parentage." Lew-Williams Decl. ¶27.

Notably, President Andrew Johnson's administration held a similar view of the breadth of the Act's citizenship clause. In vetoing the 1866 Act, President Johnson challenged the "policy" to extend citizenship to "our *entire* colored population" as well as to "the Chinese of the Pacific States, Indians subject to taxation, the people called Gypsies, as well as the entire race designated as blacks, people of color, negroes, mulattoes, and persons of African blood." Lew-Williams Decl. ¶28 (citing Cong. Globe, 39th Cong. 1st Sess. 1679). Two days later, Congress overrode the President Johnson's veto. Lew-Williams Decl. ¶28.

### c. The Plain Meaning is Consistent with Immediate Post-Enactment and Subsequent Interpretations of the Citizenship Clause

Soon after enactment of the Fourteenth Amendment, all three branches of government confirmed the plain meaning of the Citizenship Clause: that those born in the United States were citizens. Congress, for example, made this clear in the session following ratification. During debate over the qualifications of Senator Hiram Revels, the first Black U.S. Senator, Senator Jacob

Howard rebutted the charge that, because Senator Revels was Black, he was "not therefore a citizen of the United States" "for nine years past" as required under the Constitution, as citizenship had not been extended to Black Americans until the Civil Rights Act of 1866. But Senator Howard explained that "in the sense of the Constitution every person born free within the limits of a State, not connected with a foreign minister's family, is born a citizen of the United States, whether he be white or black." Cong. Globe, 41st Cong. 2d Sess. 1543 (1870). No Senator rebutted this argument, and Senator Revels was ultimately seated in a vote of 48 in favor and only eight against.

Similarly, President Grant's Attorney General, George Henry Williams, opined shortly after the Fourteenth Amendment's ratification, that "[a]s a general rule, a person born in this country, though of alien parents who have never been naturalized, is, under our law, deemed a citizen of the United States by reason of the place of his birth." *Case of François A. Heinrich*, 14 U.S. Op. Atty. Gen. 154, 155 (1872) (citation omitted).

With respect to the courts, within three years of ratification, a federal district court interpreted the words "subject to the jurisdiction" to mean "in fact born within the power, protection and obedience of the United States." *McKay v. Campbell*, 16 F. Cas. 161, 164 (D. Or. 1871). Subsequent cases reflected a similar understanding. For example, Justice Field, sitting as a circuit judge, held in *In re Look Tin Sing*, 21 F. 905 (C.C.D. Cal. 1884) that "subject to the jurisdiction" excluded from citizenship only children of diplomats and those "born on a public vessel of a foreign country" in American waters. *Id*. at 906. Justice Field went on to reject as irrelevant that Chinese migrants were legally barred from citizenship (under the Chinese Exclusion Act), explaining their status "in no respect impair[ed] the effect of their birth, or of the birth of their children, upon the status of either as citizens under the amendment in question." *Id*. at 909.

Other cases, holding similarly, followed. *See, e.g.*, *Chin King*, 35 F. at 355; *Gee Fook Sing*, 49 F. at 147; *New Hartford v. Canaan*, 54 Conn. 39, 45, (1886) (concluding individual born to parents visiting United States was citizen of Massachusetts and United States).[11]

The Supreme Court ultimately confirmed the reasoning of these court decisions in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). In that case, plaintiff Wong Kim Ark, who was born in San Francisco to parents who were Chinese citizens, traveled to China for a temporary visit and was denied re-entry into the United States "upon the sole ground that he was not a citizen of the United States." *Id.* at 653. Wong Kim Ark insisted he was a U.S. citizen because he was born in California. *Id.* If he was a U.S. citizen, the "Chinese Exclusion Acts," which prohibited "persons

---

[11] The primary post-enactment case that Defendants focus on in their brief, *Elk v. Wilkins*, 112 U.S. 94 (1884) (discussed at ECF 22 at 2, 19-24, 33-35), does no more than reflect Congress and the Supreme Court's understanding at the time of the ratification of the Fourteenth Amendment that Indian tribes were not within the "jurisdiction" of the United States because they were generally not subject to federal authority. *See generally* Lew-Williams Decl. ¶¶16, 25, 36. In *Elk*, the Court held that a Native American man "born a member of one of the Indian tribes" could not claim birthright citizenship. 112 U.S. at 99. The Court reasoned that the plaintiff was not "subject to the jurisdiction" of the United States because at birth he owed "allegiance" to his tribe. *Id.* at 99, 102. That was so because the tribes were "alien nations, distinct political communities" and "[g]eneral acts of Congress did not apply" to them unless explicitly stated otherwise. *Id.* at 99-100; *see also* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 441-44 (2020) (discussing at time of ratification Native Americans were not "subject to the jurisdiction" of the United States due to "degree of self-government and independence from U.S. interference in internal tribal matters" ). Ultimately, Elk was not a birthright citizen because his situation was comparable to that of "children born within the United States of ambassadors, or other public ministers of foreign nations." *Elk*, 112 U.S. at 102 (emphasis added). This reasoning is hardly compatible with excluding from citizenship the children of "subjects of [a] foreign government" who are born *within the United States* and subject to its authority.

As was widely recognized at the time of the ratification of the Fourteenth Amendment, the relationship between the tribes and the federal government is unique. Lew-Williams Decl.¶36. *See Cherokee Nation v. Georgia*, 30 U.S. 1, 16 (1831) ("[T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else."). The Supreme Court in *Wong Kim Ark* recognized as much. 169 U.S. at 682 ("The decision in *Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents . . . not in the diplomatic service of a foreign country.").

of the Chinese race, and especially Chinese laborers, from coming into the United States," would not apply to him. *Id.* The question before the Supreme Court was whether Wong Kim Ark acquired the U.S. citizenship by being born on the U.S. soil to immigrant parents. *Id.*

In answering the question presented, the *Wong Kim Ark* Court focused on the Civil Rights Act and the Fourteenth Amendment. The Court concluded that the Fourteenth Amendment "finally put at rest" any "doubt" that before their enactment, "all white persons, at least, born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States." *Id.* at 674-75. The "main purpose [of the Citizenship Clause] doubtless was . . . to establish the citizenship of free negroes, which had been denied" in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), and "to put it beyond all doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States, are citizens of the United States." *Id.* at 676. The amendment's "opening words, 'All persons born,' are general, not to say universal, restricted only by place and jurisdiction, and not by color or race." *Id.*

The Court then turned to the text of the Citizenship Clause, and specifically the phrase "subject to the jurisdiction thereof." *Id.* The Court noted that the term jurisdiction meant the state's sovereign power over its territory. *Id.* at 684. Specifically, the Court explained that "subject to the jurisdiction thereof" was understood as "*the equivalent* of the words '*within the limits* and under the jurisdiction of the United States,' and *the converse* of the words '*out of the limits* and jurisdiction of the United States.'" *Id. at* 687 (citing *The Schooner Exchange*, 11 U.S. 116). As such, "[t]he real object" of the phrase "subject to the jurisdiction thereof" "would appear to have been to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two

classes of cases . . . recognized [as] exceptions to the fundamental rule of citizenship by birth within the country." *Id.* at 469. Those two exceptions are "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state." *Id.* In line with these common law exceptions, the Court noted that the Clause also excluded children born aboard "foreign public ships" and those born to "members of the Indian tribes owing direct allegiance to their several tribes"—groups considered to be under the power of separate sovereigns. *Id.* at 693.

The Court further explained how in each of these cases, the United States' exercise of sovereign power was limited either in fact, as a matter of common law and practice, or in the case of Native American tribes, as a result of their tribal sovereignty. *Id.* at 683. For example, the Court explained that "children of foreign sovereigns or their ministers" are beyond the United States' jurisdiction because "[a] sovereign committing the interests of his nation with a foreign power, to the care of a person whom he has selected for that purpose, cannot intend to subject his minister in any degree to that power," and thus the receiving state must be understood to "assent … to the very important and extensive exemptions from territorial jurisdiction, which are admitted to attach to foreign ministers." *Id.* at 685 (quoting *The Schooner Exchange*, 11 U.S. at 138). Similarly, children born "of enemies within and during a hostile occupation of part of our territory" are excluded from the Citizenship Clause because United States cannot exercise its authority over occupied territories. *Wong Kim Ark*, 169 U.S. at 693.[12]

_____

[12] In their motion, Defendants argue that *Wong Kim Ark*'s holding—i.e., that "[e]very person born . . . in the United States" is "subject to the jurisdiction thereof" and thus a citizen by birth, *id.* at 702—is actually *dicta* and that the real holding was limited to the specific facts of the case under which Wong Kim Ark's parents were "domiciled" in the United States at the time of his birth. ECF 22 at 31-34. But *Wong Kim Ark* cannot reasonably be read that narrowly. *Wong Kim Ark*'s statement that the "fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth" with certain recognized exceptions, 169 U.S. at 693, could not "have been deleted without seriously impairing the analytical foundations of the holding," *United States v. Crawley*, 837 F.2d

Wong Kim Ark did not fall within the established narrow exceptions and thus was "subject to the jurisdiction" of the United States. Accordingly, the Supreme Court concluded that Wong Kim Ark was a U.S. citizen. And as discussed below, the *Wong Kim Ark* holding has been repeatedly affirmed in subsequent Supreme Court cases, *infra* Argument III.A.3, and has been codified into federal statutes, *infra* Argument III.B.

### 3. Beyond *Wong Kim Ark*, the Order contravenes a well-established line of Supreme Court precedent

More than a century of judicial interpretations since *Wong Kim Ark* confirm the breadth of the Citizenship Clause and definitively foreclose the Order's interpretation.

Since *Wong Kim Ark*, the Supreme Court has never questioned, and has repeatedly affirmed, when presented with a wide variety of contexts involving the birth of children to non-citizens, that children born on U.S. soil are citizens, apart from the narrow exceptions the Court recognized. For example, in *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957), the petitioners, who were married to each other, worked as crew members on foreign ships that came into port in the United States. The parents entered the United States lawfully and remained in the country after their 29-day visas expired, and the wife subsequently gave birth  *Id.* Half a year later, deportation proceedings were instituted against both parents, and they asked to suspend deportation "on the ground of the economic detriment that would befall their minor son in the event they were deported." *Id.* at 74. The Court remarked that their child was, "of course, an American citizen by birth." *Id.* at 73.

---

291, 292 (7th Cir. 1988) (Posner, J.). This and similar statements were central to *Wong Kim Ark*'s ruling. Moreover, the fact that Wong Kim Ark's parents were domiciled and resided in the United States was not essential to the holding or outcome. And it bears emphasis that the word "domicile" does not even appear in the Fourteenth Amendment.

Similarly, in *INS v. Errico*, 385 U.S. 214, 215-216 (1966), both petitioners entered the United States by making fraudulent misrepresentations to immigration officials, and after entry, each had a child in the United States. Even though the parents had procured entry into the country by fraud, the Court did not question that the children were American citizens by virtue of their birth in the United States. *Id.* at 215 ("A child was born to the couple in 1960 and acquired United States citizenship at birth."). And in *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985), undocumented immigrants entered the country without permission on several occasions and then petitioned the government for suspension of deportation. Although the Court affirmed respondents' deportation, *see id.* at 449, the Court acknowledged that their children born in the United States were "citizen[s] of this country." *Id.* at 446.

In *Vance v. Terrazas*, 444 U.S. 252, 255 (1980), the Court considered the standard of proof for surrendering U.S. citizenship. The Court noted the petitioner, was "born in this country . . . the son of a Mexican citizen" who "acquired [the U.S. citizenship] at birth." *Id. See also Ah How v. United States*, 193 U.S. 65 (1904) (stating petitioners offered evidence that they were born in the United States "and therefore each was a citizen"); *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927) (discussing *Wong Kim Ark* and noting that a child born in the United States "was nevertheless, under the language of the Fourteenth Amendment, a citizen of the United States by virtue of the jus soli embodied in the amendment"); *Rogers v. Bellei*, 401 U.S. 815, 828 (1971) (acknowledging that American citizenship law "follows English concepts with an acceptance of the jus soli []"); *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958) ("Petitioner was born in Artesia, California, in 1916. By reason of that fact, he was a citizen of the United States, and because of the citizenship of his parents, he was also considered by Japan to be a citizen of that country.").

27

In *Kawakita v. United States*, 343 U.S. 717, 719 (1952), the petitioner was indicted for treason relating to his treatment of American prisoners of war, and argued that he had surrendered his U.S. citizenship. *Id.* at 721. The Court acknowledged that because petitioner "was born in this country in 1921 [to] Japanese parents who were citizens of Japan," he "was a citizen of the United States by birth." *Id.* at 720; *see also Morrison v. California*, 291 U.S. 82, 85 (1934) ("A person of the Japanese race is a citizen of the United States if he was born within the United States.").

In *Perkins v. Elg*, 307 U.S. 325, 327 (1939), the Court considered whether the petitioner who was born in the United States to Swedish parents lost her citizenship and was subject to deportation because of her removal during minority to Sweden. Relying on *Wong Kim Ark*, the Court held that "[o]n her birth in New York, the plaintiff became a citizen of the United States" and "that citizenship must be deemed to continue. . . . ." *Id.* at 328-29.

In sum, the Order violates the plain language of the Citizenship Clause, as well as over a century of clear precedent. This Court should enter summary judgment for Plaintiffs on their First and Sixth Claims because the Order violates the Fourteenth Amendment.

**B.      The Order Violates the INA, 8 U.S.C. § 1401**

The Court should enter summary judgment for Plaintiffs on their Second and Sixth Claims because the Order violates the INA, 8 U.S.C. § 1401.

Congress has twice codified the Supreme Court's interpretation of the Citizenship Clause in *Wong Kim Ark.* In 1940, Congress, through the Nationality Act, formally amended the citizenship clause of the 1866 Civil Rights Act to follow and incorporate the language of the Fourteenth Amendment, providing that "a person born in the United States, and subject to the jurisdiction thereof" "shall be [a] national[] and citizen[] of the United States at birth." *See* Pub. L. 76-853; *see also To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on*

*H.R. 6127 Superseded by H.R. 9980*, 76th Cong. 38 (1940) (Section 201 language regarding citizenship at birth "is taken of course from the fourteenth amendment to the Constitution"); *id.* at 418 ("It accords with the provision in the fourteenth amendment to the Constitution [] ").

Legislative debate confirmed that Congress codified a broad understanding of birthright citizenship. In a May 13, 1940 meeting of the Committee on Immigration and Naturalization to consider the bill, Representative William Austin asked whether the birthright citizenship would apply "[r]egardless of the nationality of the parents." *To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong. 298 (1940). Representative Edward Rees answered in the affirmative, "because the Constitution provides that all persons born in the United States are citizens." *Id.* And during congressional debates, the Roosevelt Administration made clear that it understood that the Constitution guarantees that all persons born in the United States are citizens; the Committee did not view its proposals as changing the Constitution in any way. *Id.* at 37-38 (statement of Assistant Legal Adviser for the State Department Richard Flournoy). Similarly, a report submitted by the President to Congress regarding the bill's meaning further supports this interpretation, stating that birthright citizenship "is also applicable to a child born in the United States of parents residing therein temporarily"; explaining that "it is the fact of birth within the territory and jurisdiction, and not the domicile of the parents, which determines the nationality of the child"; and approvingly citing *Wong Kim Ark*'s interpretation of "subject to the jurisdiction thereof" as having "the effect of barring certain classes of persons, including children born in the United States to parents in the diplomatic service of foreign states and persons born in the United States to members of Indian tribes." *Id.* at 418.

Congress then re-codified the birthright citizenship provision in 1952 as part of the INA. *See* 8 U.S.C. § 1401 ("The following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof . . . ."). During these debates, both Congress and the Executive Branch understood that all persons born in the United States were citizens. The Committee on the Judiciary affirmed that a child born in the United States is a U.S. citizen and that "it is immaterial whether the parents are citizens or aliens." S. Rep. No. 1515, at 685 (1950). President Truman's Commission on Immigration and Naturalization's report concluded that all children born in the United States are United States citizens, making no mention of the parents' legal status. Staff of President's Comm. on Imm. and Naturalization, Whom We Shall Welcome 235, 240 (1953).

Section 1401 is properly interpreted, in accordance with the text's ordinary public meaning at the time of enactment, to codify *Wong Kim Ark*'s explication of birthright citizenship. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020) (the "Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment"). The ordinary public meaning at enactment of "[a]ll persons born … in the United States, and subject to the jurisdiction thereof" was informed by the then-and-now controlling interpretation set forth in *Wong Kim Ark*. *See N.H. Indonesian Cmty.*, 765 F. Supp. 3d at 110. Moreover, Congress's choice to "employ a term of art obviously transplanted from another legal source," in paralleling the language of the Citizenship Clause in Section 1401, indicates its intent to "bring[] the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").

In sum, the Order violates 8 U.S.C. § 1401. This Court should enter summary judgment for Plaintiffs on their Second and Sixth Claims because the Order violates the Immigration and Nationality Act of 1952, 8 U.S.C. § 1401.

### C.    The Order is ultra vires and must be struck down

The Court should enter summary judgment for Plaintiffs on the First, Second, and Sixth Claims because no statute, constitutional provision, or other source of law authorizes Defendants to reject birthright citizenship. On the contrary, the Order directly contravenes the text of the Constitution and the INA, without citing any authority justifying the Executive's action.[13]

"The President's power, if any, to issue [this Order] must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 586. And presidential power is at its "lowest ebb" when it "takes measures incompatible with the expressed or implied will of

---

[13] Defendants incorrectly contend that the viability of an *ultra vires* claim is "questionable," arguing that it is incompatible with the APA. ECF 22 at 14-16. Numerous courts have found that the APA does not foreclose an ultra vires claim, and plaintiffs can simultaneously assert both APA and *ultra vires* claims. *E.g., Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("[T]he APA's own guarantee of judicial review . . . does not repeal the review of ultra vires actions."); *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 85 (D.D.C. 2006) (recognizing right to bring both *ultra vires* and APA claims).

For similar reasons, Defendants are wrong in contending the President has absolute immunity from suit for declaratory or injunctive relief. ECF 22 at 13, 15. The case Defendants cite does not hold that the President is immune from injunctive relief. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[W]e have left open the question whether the President might be subject to a judicial injunction . . . [and] need not decide whether injunctive relief against the President was appropriate. . . the President's actions may still be reviewed for constitutionality.") (cited at ECF 22 at 13). "[J]udicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers," *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958), and such relief extends to the President where the President has exceeded his legal authority, *see, e.g., Youngstown*, 343 U.S. at 589 (finding President's seizure order was unauthorized); *Dames & Moore v. Regan*, 453 U.S. 654, 668-78 (1981) (reviewing whether order exceeded the President's statutory authority); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996) ("we think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides those that run afoul of the Constitution or which contravene direct statutory prohibitions . . . ."); *NTEU v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) (there is "no immunity established under any case known to this Court [that] bars every suit against the President for injunctive, declaratory or mandamus relief").

Congress[.]" *Id.* at 637. In *Youngstown*, the Supreme Court determined that a presidential action absent authority from Congress or the Constitution—not unlike the Order before this Court today—was patently unconstitutional and struck it down. *See Youngstown*, 343 U.S. at 586. Concerned about the national impact of an impending steelworker strike, President Truman issued an executive order to seize many of the nation's steel mills. *Id.* at 584. Because there was no statute authorizing this action (and, in fact, Congress had *explicitly* rejected a law that would have authorized such seizures) and neither Article II nor the president's implied, aggregate constitutional powers conferred upon him the authority for the seizure, the *Youngstown* Court found the action unconstitutional. The Court held that such executive action would "submit to no legal restraint" and was "a step in that wrong direction" toward "dictatorship[.]" *Id.* at 653.

Here, as in *Youngstown*, "[i]t is clear that if the President had authority to issue the order he did, it must be found in some provisions of the Constitution." *Id.* at 587. And at least from the face of the Order, "it is not claimed that express constitutional language grants this power to the President." *Id.*; *see generally* Order 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) (not claiming any authority for presidential action more specific than "the Constitution and the laws of the United States of America."). The Order is not grounded in any core Article II power of the President. Rather the Constitution expressly places naturalization within the purview of Congress, U.S. Const. art. I, § 8, and courts have also recognized Congress's authority over immigration through the Article I powers lodged with Congress. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). And while the "admission and exclusion of foreign nationals" may be in the purview of "the Government's political departments," *Trump v. Hawaii*, 585 U.S. 667, 702 (2018), the Order does not deal with admission or exclusion but rather the citizenship of persons born already

inside the borders of this country. Therefore, it can hardly be argued that the Order falls within the President's authority to enforce immigration laws or conduct foreign relations.

Meanwhile, the Order squarely contradicts settled law established by both the Constitution and Congress. As discussed above, rejecting birthright citizenship directly contravenes the text of the Fourteenth Amendment, the interpretation of which has been settled for well over a century, and the Immigration and Nationality Act of 1952, 8 U.S.C. § 1401. *Supra* Section A, Section B; *see generally U.S. v. Wong Kim Ark*, 169 U.S. 649 (1898). The Order is at best tangential to an authority the Constitution vests in the President—though no such authority is clarified on the face of the Order—while encroaching on authorities both explicitly and implicitly granted to Congress.

Therefore, because the President's authority to enact such an order does not clearly derive from the Constitution itself, the power to reject birthright citizenship "must stem from [] an act of Congress." *See Youngstown*, 343 U.S. at 586. And while the President may have broad authority to act where Congress has not spoken, Congress has been abundantly clear on the issue of birthright citizenship. *See To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong. 298 (1940) ("[T]he Constitution provides that all persons born in the United States are citizens."). In passing the INA, Congress intended to codify the Supreme Court's interpretation of the Fourteenth Amendment in *Wong Kim Ark*. *See supra* Section B; *see also* 8 U.S.C. § 1401. Because the INA confers citizenship on all children born in the United States, with only certain narrow exceptions, Plaintiffs properly challenge the Order's broad denial of citizenship to the children of non-citizens and non-permanent residents as *ultra vires*. *See Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) ("[T]he Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions

in excess of jurisdiction. Pursuant to this case law, judicial review is available when an agency acts *ultra vires*, even if a statutory cause of action is lacking." *See id.* (citation modified).

There can be no doubt, then, that the Order was adopted without any authority, and encroaches on a space where Congress has authority and has already spoken. This Court should therefore find that the Order is beyond the scope of the President's powers and that judicial review is available. *See id.; see Youngstown*, 343 U.S. at 587-589. The Court should also find that judicial review is not only available, but that it requires the Order be struck down and any agency action taken pursuant to the Order be vacated. Even the most narrow approach to *ultra vires* review, limited to when the President acts without any authority whatsoever, demands that the Order be struck down. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1964); *Youngstown*, 343 U.S. at 585, 587–89 (striking down executive action when it did not "stem" from an act of Congress or from the Constitution). Accordingly, the Court should enter summary judgment for Plaintiffs on their First, Second, and Sixth Claims for Relief because the Order is *ultra vires*.

### D.    Plaintiffs Have Standing

To plead standing sufficiently for purposes of Article III, a plaintiff must plead an injury which is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47, 52 n.2 (2006). *See also Biden v. Nebraska*, 600 U.S. 477, 489 (2023). Here, each Plaintiff has standing. Defendants' Rule 12(b)(1) motion—if it is not mooted by the filing of the Amended Complaint—should be denied because Defendants fail to address the standing of individual Plaintiffs Baby Doe #1, Jane Doe #1, or Jane

34

Doe #2, and organizational Plaintiff OCA's detailed proffer about its member, "Member A," or its organizational activities.

### 1.    Jane Doe #1 and Jane Doe #2 have standing to bring this challenge

As an individual that has given birth to a child affected by this Order, Jane Doe #1 has standing to sue. Jane Doe #1 Supp. Decl. ¶¶5, 6. An individual has standing when they have suffered an injury-in-fact, the injury was caused by the disputed action, and it is "likely" that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61, 575 (citation modified).

Plaintiff Jane Doe #1 will suffer injury-in-fact due to the Order because her child will be deprived of U.S. citizenship and/or not be treated as a U.S. citizen because of the Order: Jane Doe #1 lives in the United States, but neither she nor her husband is a lawful permanent resident or U.S. citizen, and she gave birth to their child, Baby Doe #1, in the United States after February 19, 2025. Jane Doe #1 Supp. Decl. ¶¶3, 4, 5. Depriving her child of U.S. citizenship will actually and imminently harm Jane Doe #1 in numerous ways. It will cause her psychological distress, as she fears what will happen to Baby Doe #1 and her family if Baby Doe #1 is deprived of citizenship. Jane Doe #1 Decl. ¶¶6, 7, 12. The deprivation will also cause Jane Doe #1 financial loss and loss of opportunity, as she will need to take steps to determine her son's legal status in the United States (if any) and to obtain some status for him. *See* Jane Doe #1 Supp. Decl. ¶6. The psychological distress, financial loss, and loss of opportunity will flow directly from the government's enactment and enforcement of the Order. Jane Doe #1's injuries are readily redressable by striking down the Order and recognizing Baby Doe #1's birthright citizenship, as has been the policy of this country for over a century.

Plaintiff Jane Doe #2 will also suffer injury-in-fact arising from the fact that her expected child will be denied U.S. citizenship and/or not be treated as a U.S. citizen because of the Order.

Jane Doe #2 is pregnant with a child she expects to deliver in the state of New Jersey. Jane Doe #2 Decl. ¶¶2, 4. Neither Jane Doe #2 nor her husband, the father of the expected child, is either a U.S. citizen or a lawful permanent resident. *Id*. ¶¶3, 6. Jane Doe #2 is in the United States with Temporary Protected Status and her husband is seeking asylum in the United States. Depriving her expected child of U.S. citizenship will actually and imminently harm Jane Doe #2 in numerous ways. It will cause her psychological distress, as she fears what will happen to her expected child and her family if her expected child is deprived of citizenship. *Id*. ¶¶7, 8. It will also cause Jane Doe #2 financial loss, as she would be denied access to various government benefits, including the Supplemental Nutrition Assistance Program or Temporary Assistance for Needy Families on behalf of her expected child. *Id*. ¶7. Jane Doe #2 also faces financial loss and loss of opportunity because she will need to determine what legal status (if any) her child has in the United States and obtain status for her child from the government of Nepal, processes that will be costly, difficult, and time-consuming. *Id*. ¶8. The psychological distress, financial loss, and loss of opportunity will be directly caused by the government's enactment and enforcement of this Order. These injuries are readily redressable by striking down the Order and recognizing the birthright citizenship of Jane Doe #2's expected child, as has been the policy of this country for over a century.

### 2. Baby Doe #1 has standing to bring this challenge

Baby Doe #1 has standing to bring this challenge because pursuant to the terms of the Order he will be deprived of his rights as a United States citizen. Baby Doe is an infant child who was born in California after February 19, 2025. Jane Doe #1 Supp. Decl. ¶5. But for the Order, Baby Doe #1 would be a U.S. citizen by birth and would be treated as such by the federal government. This deprivation of citizenship is a constitutional injury sufficient to satisfy Article III standing. *See, e.g.*, *Afroyim*, 387 U.S. at 268 (finding constitutional injury due to deprivation of citizenship); *Sabra as next friend of Baby M v. Pompeo*, 453 F. Supp. 3d 291, 313 (D.D.C. 2020) (finding

standing where plaintiff sought declaratory judgment against federal agency action denying child citizenship recognition and documentation).

### 3.    OCA has associational standing on behalf of its individual members

An organization may assert standing on behalf of its individual members when: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977); *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (citations omitted). Plaintiff OCA is a membership organization that may assert associational standing and it satisfies all three elements of the test.

To assert associational standing on behalf of its members, an organization must show that it qualifies as a membership association—either because it is a voluntary membership organization, or because it has the indicia of a traditional membership organization. *Nat'l Ass'n of Consumer Advocates v. RentGrow, Inc.*, 2025 WL 1429172, *3 (D.D.C. May 16, 2025). "A voluntary membership organization with identifiable members that represents its members in good faith may assert associational standing on behalf of its members." *Id.* (cleaned up) (citing *Students for Fair Admissions, Inc. v. President Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023)).

OCA is a membership organization, with more than 1,700 voting members, whom it is representing here in good faith. Nguyen Decl. ¶6. OCA also has the "indicia of a traditional membership association." *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (quoting *Sorenson Commc'ns v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018)). Courts have found such indicia in the many ways that the organization and its members interact, including financing the organization, guiding the organization's activities, or member involvement in the organization's leadership selection. *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022); *Robertson v. District*

*of Columbia*, 762 F. Supp. 3d 34, 60-61 (D.D.C. 2025). OCA has all of these indicia. Its operations and structure are typical of a traditional membership organization. In particular, OCA members pay dues and vote for their local chapter leadership. Nguyen Decl. ¶6. Local chapter leadership in turn determines the OCA national board, which sets OCA's mission and policies. Nguyen Decl. ¶6; *cf. Robertson*, 762 F.Supp.3d at 60 (finding a similar member chapter electoral structure sufficient to demonstrate indicia of a traditional membership organization). Beyond paying dues and participating in OCA's governance, OCA's members actively engage in a vibrant array of OCA's programs, services, and initiatives. Nguyen Decl. ¶¶7, 8. These activities include: educational services designed to foster legal literacy, financial literacy, and personal wellness; mentorship programs; internship programs; civic advocacy trainings; and convening at national conferences and summits. Nguyen Decl. ¶7. OCA also provides subgrants to individual chapters, which conduct specific projects or initiatives that are important to OCA members that are part of those specific chapters, including naturalization and citizenship application counseling and support. Nguyen Decl. ¶¶8-9.

OCA's relationship with its members is quintessential of a typical membership organization, and, because it satisfies the requirements set out in *Hunt,* 432 U.S. at 342–43, it has standing to  bring these claims on behalf of its members.

1. Injury in Fact**:** OCA is able to show that at least one of its members suffered an injury-in-fact, the injury was caused by the disputed action. *Lujan*, 504 U.S. at 560–61, 575.

*First*, OCA has non-citizen members whose children will be deprived of birthright citizenship, *see* Nguyen Decl. ¶6; OCA has specifically identified two of its members—a married couple—who have suffered a concrete injury-in-fact as they are present in the United States on nonimmigrant visas and had a child after February 19, 2025 who will thus be deprived of U.S.

38

citizenship. Nguyen Decl. ¶13-14. This is a real and immediate threat of injury: children born in the United States without the privileges of citizenship will be deprived of multiple legally protected interests including eligibility for a U.S. passport, federal student financial aid, and federal public benefits like Medicaid, Children's Health Insurance Program (CHIP), or Supplemental Nutrition Assistance Program (SNAP). *See* Rathod Decl. ¶¶62-69. Moreover, these children would join a subclass of individuals born in the United States that lack fundamental legal recognition and will face stigma as a result of their status. *See* Rathod Decl. ¶¶75-76. These harms are imminent (they will be incurred as soon as the Order takes effect), concrete, and particularized (they will result in deprivation of entitlement to numerous benefits).

*Second*, it is indisputable that, but for Defendants' actions, the children of these members would have been recognized as U.S. citizens at birth. These members have built their lives in the United States and are likely to give birth to their children here, as some already have. Nguyen Decl. ¶¶6, 14. The Order, however, denies U.S. citizenship to the members' children.

*Third*, by declaring the Order unconstitutional and enjoining Defendants from enforcing the Order, the Court would prevent the application of the Order and redress Plaintiff OCA's members' aforementioned injuries. As such, Plaintiff OCA's members have standing to bring suit in their own right and on behalf of their expected children.

2. Organizational Purpose**:**  Plaintiff OCA readily meets the requirement of "pertinence between [the] litigation subject and organizational purpose." *Int'l Dark-Sky*, 106 F.4th at 1218 (citation omitted). Plaintiff OCA's core organizational mission of "advanc[ing] the social, political, and economic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders ("AANHPIs")," which includes advocating for the rights of its members and the broader AANHPI community. Nguyen Decl. ¶¶5, 6, 11. OCA was founded by Chinese immigrants, and many of

OCA's members are non-citizens who have lived in the United States for years on temporary or nonimmigrant visas. Nguyen Decl. ¶¶6, 11. Reflecting OCA's mission and its membership, a core activity of OCA's chapters in providing "naturalization and citizenship application support". Nguyen Decl. ¶9. That work is likely to be disrupted by the Order, if it is allowed to take effect, because OCA's chapters will see a surge in demand for naturalization and citizenship application support services, and OCA will need to develop guidance to address the Order. Nguyen Decl. ¶¶9-12. This will require OCA to divert resources, money, and staff time from other activities. Nguyen Decl. ¶12. All of this work ties to this litigation's goal of defending the constitutional right to birthright citizenship and protecting immigrant families and their U.S.-born children from physical, financial, psychological, and civic harms caused by denial of citizenship. Nguyen Decl. ¶¶4, 9-11.

This litigation is also pertinent to OCA's mission because it addresses discrimination against AANHPIs, which is essential to their social, political, and economic well-being. Nguyen Decl. ¶5. Asians comprise approximately 14 percent of the undocumented immigrant population and 32 percent of all persons on nonimmigrant visas in the United States, but account for a much higher percentage of visas that have lengthy periods of authorized stay—49% of E-2 visas, 71% of F-1 student visas (71%), and 92% of H-1B specialty worker visas—precisely the visa holders most likely to have children during a years-long stay in the United States. Rathod Decl. ¶¶25-26, 41-42. The Order thus has a disproportionate impact on Asian non-citizens, including Members A and B, whose child was born after the Order's effective date. Nguyen Decl. ¶¶13-14. The Order's disproportionate impact on Asian non-citizen families, including some of OCA's members, establishes that OCA's challenge of the Order is germane to OCA's mission and purpose.

3. <u>No Participation of Individual Members</u>:  Neither the claims asserted nor the relief sought by OCA require the participation of its individual members. The D.C. Circuit has held that "[m]ember participation is not required where a 'suit raises a pure question of law' and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 508 (D.C. Cir. 2020). That is the case here. OCA's claims raise "pure question[s] of law" regarding the constitutionality of the Order, and whether it is *ultra vires* in violation of 8 U.S.C. § 1401 *et seq.* and the Fourteenth Amendment. *See id.*; *see generally* ECF 29-1 (Am. Compl.) ¶¶215-227. OCA also seeks declaratory and injunctive relief, which the Supreme Court has clarified does not require "individualized proof." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977); *Warth v. Seldin,* 422 U.S. 490, 515 (1975). Because the Complaint seeks only declaratory and injunctive relief, and because this challenge to the Order is abstracted from individualized circumstances, it does not require the participation of OCA's individual members. Accordingly, OCA has associational standing to bring this challenge on behalf of its members.

### 4.    OCA has organizational standing

To support a claim of organizational standing, the organization must, "like an individual plaintiff, [. . .] show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (cleaned up); *see Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020). An organization has standing where a defendant's actions directly conflict with the organization's mission and inhibit core activities. *Cap. Area Immigrs. Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 38-39 (D.D.C. 2020) (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). Standing is established where the government's actions result in a "consequent drain

41

on the organization's resources." *Am. Anti-Vivisection Soc'y*, 946 F.3d at 619 (quoting *Havens Realty*, 455 U.S. at 379). These factors are met here.

Plaintiff OCA has established that it has "suffered a concrete and demonstrable injury to its activities." *Equal Rights Ctr. v. Uber Techs.*, 525 F. Supp. 3d 62, 74 (D.D.C. 2021). The Order will "unquestionably make it more difficult for [OCA] to accomplish" its mission of advancing the social, political, and economic well-being of Asian-American families and this fact "provide[s] injury for purposes [] of standing." *League of Women Voters of US v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016). Specifically, the Order will disrupt OCA's pre-existing mission-critical programing, forcing it to develop and dedicate additional resources to those programs a result— the "prototypical form of injury in fact." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *6–7 (D.D.C. Mar. 10, 2025).

For example, to advance its mission, OCA, through its chapters, funds and provides extensive services and programming to support and counsel people with regard to naturalization and citizenship applications. Nguyen Decl. ¶9-11. As discussed *supra*, demand for those services will increase significantly should the Order take effect. Nguyen. Decl. ¶¶9, 10. That is both because of the significant fear within the community OCA serves of family separation by the administration and because the immigration services offered by OCA will now need to be extended, at minimum, to the American-born children of Asian immigrants, where OCA previously only provided such services to the parents. *See* Nguyen Decl. ¶¶10, 13.

OCA's work on naturalization and citizenship application assistance will also become more complicated, as it will have to navigate new regulations issued pursuant to the Order and develop guidance for those its serves about the status of children affected by the Order, determining which children are affected, and how an affected child's status may affect an application. Nguyen Decl.

¶¶10, 12. OCA likely could not address this surge in demand simply by hiring additional staff, given the limited availability of funding for such programming. Nguyen Decl. ¶10. This will require the dedication of significant resources OCA would spend on other mission-critical work. Nguyen Decl. ¶¶10, 12. This expenditure of resources "in response to, and to counteract, the effects of [the Order] . . . [is a] 'concrete and demonstrable injury' that suffices for purposes of standing." *PETA*, 797 F.3d at 1097. The time commitment and expense of expanding these resources would be an unavoidable "drain on [OCA's] resources." *Am. Anti-Vivisection Soc'y*, 946 F.3d at 619.

### 5.    Plaintiffs' claims are ripe for judicial adjudication

In determining whether a case is ripe for review, the Supreme Court has set out a twofold analysis, requiring courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano*, 430 U.S. 99. Here, adjudication is timely and appropriate because Plaintiffs' claims are fit for review and Plaintiffs would face irreparable harm if immediate judicial consideration is withheld.[14]

---

[14] Defendants' argument that 8 U.S.C. § 1503 is an "exclusive remedy," ECF 22 at 16-17, is wrong. The Supreme Court has squarely held that the text and legislative history of section 1503 "shows no intention to provide an exclusive remedy." *Rusk v. Cort*, 369 U.S. 367 (1962), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). *See also Gonzales Boisson v. Pompeo*, 459 F. Supp. 3d 7, 14-16 (D.D.C. 2020) (rejecting argument that *Cort* is no longer good law). Moreover, there has been no "showing of clear and convincing evidence" of legislative intent to "restrict access to judicial review," as is required to bar Plaintiffs' claims. *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005) (cleaned up). In the case of section 1503, both its text and its legislative history indicate that it was *not* intended to be the exclusive remedy when the government seeks to deny a plaintiff's citizenship. *Frank v. Rogers*, 253 F.2d 889, 892 (1958) ("Neither [section 1503] nor its predecessor recites that the remedy there given is to be exclusive, or that when the issue of citizenship is necessarily involved in another proceeding, it may not be there considered, or that existing remedies are to be denied: in fact, the legislative history of the predecessor statute indicates the contrary."). And section 1503 does not offer relief "of the 'same genre'" that Plaintiffs seek under the APA, including injunctive and declaratory relief, *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) and would provide only "doubtful and limited relief." *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 455 (D. Mass. 2021) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988)).

The Order goes beyond mere "guidance" or a "general statement of policy" but creates a "binding [] prohibition." *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. CV 25-0946 (CKK), 2025 WL 1187730, at *18 (D.D.C. Apr. 24, 2025). The Order is self-executing and indicates that it will apply to "persons who are born within the United States after 30 days from the date of this order." The language of the Order makes clear that there is "no uncertainty regarding" the President's "directives" and "the Court must assume they will be faithfully executed." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 204-05 (D.D.C. 2017) (finding challenge to Presidential directive ripe); *Perkins Coie LLP v. U.S. Dep't of Just.*, No. CV 25-716 (BAH), 2025 WL 1276857 (D.D.C. May 2, 2025) (same). In addition, the issues presented by this dispute are "purely legal one[s]" and accordingly are presumptively "appropriate for judicial resolution at this time." *Abbott Lab*, 387 U.S. at 149.

Plaintiffs would face cognizable adverse consequences without timely judicial review. Defendants' actions represent a drastic break from the extensive and established history of birthright citizenship in the United States. *See* ECF 29-1 ¶¶2, 4–5, 35, 39–40, 45–46, 52, 59–63, 66–68, 71–84. If enforcement of the Order is not enjoined, it will inflict irreparable harm on Plaintiffs and OCA's members. A violation of one's constitutional right to citizenship constitutes irreparable injury. *See CASA, Inc. v. Trump*, 763 F.Supp.3d 723, 744 (D. Md. Feb. 5, 2025) (holding infringement of citizenship clause as irreparable harm); *cf. Singh v. Berger,* 56 F.4th 88, 110 (D.C. Cir. 2022) (finding loss of constitutional right to be irreparable harm); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 216 (D.D.C. 2017) ("A prospective violation of a constitutional right constitutes irreparable injury." (cleaned up) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998))). Even temporary enforcement of the Order would result in long-term injuries for Plaintiffs and OCA's members. *See* Jane Doe #1 Decl. ¶¶6-7; Jane Doe #1 Suppl. Decl.

¶6; Jane Doe #2 Decl. ¶7, Decl. Nguyen Decl. ¶12. Judicial intervention, in the form of an injunction preventing the enforcement of this Order, is appropriate and essential to remedy this hardship to Plaintiff Jane Doe and the members of OCA. Accordingly, Plaintiffs' claims are ripe for adjudication.

## CONCLUSION

For the foregoing reasons, the Court should enter partial summary judgment for Plaintiffs on Claims 1, 2 and 6, and should deny Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment.

Dated: July 2, 2025                                  Respectfully submitted,


/s/ John A. Freedman                               John C. Yang (D.C. Bar No. 438672)
John A. Freedman (D.C. Bar No. 453075)             Niyati Shah (D.C. Bar No. 1659560)
Sally Pei (D.C. Bar No. 1030194)                   Noah Baron (D.C. Bar No. 1048319)
Jonathan L. Stern (D.C. Bar No. 375713)            ASIAN AMERICANS
Ronald D. Lee (D.C. Bar No. 411516)                ADVANCING JUSTICE-AAJC
ARNOLD & PORTER KAYE SCHOLER LLP                   1620 L Street, NW, Suite 1050
601 Massachusetts Avenue, N.W.                     Washington, D.C. 200036
Washington, D.C. 20001                             (202) 296-2300
(202) 942-5000                                     jcyang@advancingjustice-aajc.org
John.Freedman@arnoldporter.com                     nshah@advancingjustice-aajc.org
Sally.Pei@arnoldporter.com                         nbaron@advancingjustice-aajc.org
Jonathan.Stern@arnoldporter.com
Ronald.Lee@arnoldporter.com                        Kaitlin Banner (D.C. Bar No. 1000436)
                                                   Sarah Bessell (D.C. Bar No. 219254)
                                                   Madeleine Gates (D.C. Bar No. 90024645)
                                                   WASHINGTON LAWYERS'
                                                   COMMITTEE FOR CIVIL RIGHTS
                                                   AND URBAN AFFAIRS
                                                   700 14th Street, NW, Suite 400
                                                   Washington, D.C. 20005
                                                   (202) 319-1000
                                                   kaitlin_banner@washlaw.org
                                                   sarah_bessell@washlaw.org
                                                   madeleine_gates@washlaw.org

*Counsel for Plaintiffs*

45