**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, *et al.*,<br><br>*Defendants.* | Civil Action No. 1:25-cv-00287 (TJK) |

<u>**PLAINTIFFS' RULE 56 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7(h) of the Local Rules of Civil Procedure for the United States District Court for the District of Columbia, and Paragraph 12 of the January 31, 2025 Standing Order (ECF 6), Plaintiffs, by and through their undersigned counsel, hereby submit this statement of undisputed material facts in support of their Motion for Summary Judgment.

| | | |
|---|---|---|
| **Plaintiffs' Statement of Material Facts Not in Dispute** | | |
| | <u>The Executive Order</u> | |
| 1. | On January 20, 2025, President Trump signed an Executive Order ("EO") called "Protecting the Meaning and Value of American Citizenship." (**Freedman Decl. ¶4, Ex. 1**) | |
| 2. | The EO purports to interpret the clause "subject to the jurisdiction thereof" in the Citizenship Clause of the Fourteenth Amendment. (***See* Freedman Decl. ¶4, Ex. 1**) | |
| 3. | Section 1 of the EO, titled "Purpose," states that "[t]he Fourteenth Amendment has always excluded | |

| | | |
|---|---|---|
| | from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof.'" (**Freedman Decl. ¶4, Ex. 1**) | |
| 4. | Section 1 further states that "the privilege of United States citizenship does not automatically extend" to a child born in the United States if, at the time of their birth, their father was neither a U.S. citizen nor a lawful permanent resident and either (i) their mother was either "unlawfully present in the United States" or (ii) their "mother's presence in the United States was lawful but temporary." (**Freedman Decl. ¶4, Ex. 1**) | |
| 5. | Section 2 declares the policy of the United States government. (***See* Freedman Decl. ¶4, Ex. 1.**) | |
| 6. | Section 2 states that no federal department or agency "shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to a person whose mother was unlawfully present or lawfully present with only temporary status and whose father was neither a United States citizen nor lawful permanent resident at the time of that person's birth. (**Freedman Decl. ¶4, Ex. 1**) | |
| 7. | Section 2(b) provides that Section 2 applies only to persons who are born in the United States on or after 30 days from the date of the order, *i.e.,* February 19, 2025. (**Freedman Decl. ¶4, Ex. 1.**) | |
| 8. | Section 3 of the EO addresses enforcement. (***See* Freedman Decl. ¶4, Ex. 1.**) | |
| 9. | Section 3(a) of the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and that "no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with" the EO. (**Freedman Decl. ¶4, Ex. 1.**) | |

| 10. | Section 3(b) of the EO directs the heads of all executive departments and agencies to issue public guidance regarding implementation of the EO with respect to their operations and activities. (**Freedman Decl. ¶4, Ex. 1**.) | |
|---|---|---|
| | <p style="text-align:center">Plaintiff OCA</p> | |
| 11. | OCA is a membership-based organization with both national headquarters and local chapters. (**Nguyen Decl. ¶3.**) | |
| 12. | OCA's mission is to advance the social, political, and economic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders ("AANHPIs"). (**Nguyen Decl. ¶4.**) | |
| 13. | OCA has over 1,700 voting members who all pay dues. These members either join at large or join their local chapter, in which case their dues are split 50-50 between their local chapter and our national headquarters. These voting members also have the right to vote for their local chapter leadership, such as a board of directors and certain officers such as the President and Treasurer. The local chapter leadership in turn determines the composition of the National Board, which sets the mission and policies of the organization. (**Nguyen Decl. ¶5.**) | |
| 14. | In return for OCA members' active and robust participation through votes and dues, OCA provides services and programming, including education programs to further financial and legal literacy and personal wellness; mentorship and internship programs; and trainings around civic advocacy. OCA also convenes its membership at national conferences and summits where members have an opportunity to make social and professional connections across its 35 local chapters and affiliates. (**Nguyen Decl. ¶7.**) | |
| 15. | OCA provides subgrants to individual chapters and the heads of each local chapter serve on our national board. These subgrants are one of OCA's most | |

| | | |
|---|---|---|
| | important relationships with their local chapters as OCA funds specific projects or initiatives that are important for the social and political development of that specific AANHPI community. (**Nguyen Decl. ¶8.**) | |
| 16. | For instance, many of OCA's chapters provide naturalization and citizenship application support. This furthers OCA's mission by allowing its members to gain access to the important political, social, and financial benefits of U.S. citizenship. (**Nguyen Decl. ¶9.**) | |
| 17. | Reflecting the mission of OCA, its membership includes noncitizens who are in the United States on many forms of temporary and nonimmigrant visas. Their future children would be deprived of birthright citizenship if this Order is allowed to stand. (**Nguyen Decl. ¶10.**) | |
| 18. | Allowing the Order to take effect would affect OCA itself. OCA's local chapters would face a massive increase in demand for their naturalization and application services. In part, that is because OCA chapters would need to provide assistance for immigration services for U.S.-born children of their members, who would have otherwise received birthright citizenship. (**Nguyen Decl. ¶¶10, 12.**) | |
| 19. | The increase in demand for OCA chapters' naturalization and citizenship application services will require greater support from the national OCA organization. To adequately support its chapters, OCA would need to develop guidance for these services, such how to approach getting birth certificates or other documents for U.S.-born children who are subject to the Order. Providing this support will require OCA to divert staff time from other important work—such as mental health and caregiving access, or digital literacy—to creating and distributing the guidance. OCA would not be able to hire additional staff dedicated to developing or distributing the guidance in light of the limited funding available for this type of work. As a result, | |

| | | |
|---|---|---|
| | OCA would need to do more work with the same amount of limited funds. (**Nguyen Decl. ¶¶10, 12.**) | |
| 20. | If OCA's chapters cannot meet this increased demand, that harms OCA's ability to fulfill its mission, which OCA sets at the national level and which chapters agree to work towards. Advancing the immigrant rights of AANHPI individuals is a core part of OCA's mission, especially given the history of Asian migration to the United States and OCA's beginnings as an organization founded by Chinese immigrants. (**Nguyen Decl. ¶14.**) | |
| 21. | Even if these consequences are short-lived or temporary, they will require a fast mobilization of OCA's services, which drains OCA's resources. It is impossible to know whether the affected members will ultimately have their legal status rectified and OCA currently has no guidance for either its chapters or members on how they should approach getting birth certificates or other documents for their U.S.-born children who are subject to the Order. (**Nguyen Decl. ¶14.**) | |
| 22. | OCA has identified two members, Member A and her husband, willing to have their circumstances discussed in the lawsuit. Member A gave birth to a child in the United States after February 19, 2025. Member A has nonimmigrant visa (J visa) status in the United States and is here for educational purposes. Member A's husband, who is also the father of Member A's child, is neither a U.S. citizen nor lawful permanent resident. (**Nguyen Decl. ¶14.**) | |
| | Plaintiffs  Jane Doe #1 and Baby Doe #1 | |
| 23. | Jane Doe #1 is not a U.S. citizen or Legal Permanent Resident. (**Jane Doe #1 Decl. ¶3**). | |
| 24. | Jane Doe #1 is present in the United States with "U" nonimmigrant status, which she has held since 2021. (**Jane Doe #1 Decl. ¶3.**) | |
| 25. | Jane Doe #1 gave birth to her third child, Baby Doe #1, after February 19, 2025. (**Jane Doe #1 Decl. ¶4**). | |

| 26. | Jane Doe #1 gave birth to Baby Doe #1 in the state of California. (**Jane Doe #1 Supp. Decl. ¶5.**) | |
|---|---|---|
| 27. | Jane Doe #1 is the mother of two other children with her husband, both of whom were born in the United States prior to February 19, 2025, and therefore are U.S. citizens. (**Jane Doe #1 Decl. ¶4.**) | |
| 28. | Jane Doe #1's husband is the father of Baby Doe #1. Jane Doe #1's husband is neither U.S. citizen nor a Legal Permanent Resident. (**Jane Doe #1 Decl. ¶5.**) | |
| 29. | As a result of the Executive Order, Jane Doe #1 has experienced significant fear about what may happen if Baby Doe #1 is deprived of citizenship, including concern that her son or family may be subject to immigration enforcement and that her son will have fewer opportunities in the United States. (**Jane Doe #1 Decl. ¶¶6, 7.**) | |
| 30. | Jane Doe #1 is also concerned that, should the Executive Order take effect, she and her husband will need to take steps to secure legal status for Baby Doe #1 in the United States, which she believes will entail a substantial time commitment and financial cost. (**Jane Doe #1 Supp. Decl. ¶6.**) | |
| | <u>Plaintiff Jane Doe #2</u> | |
| 31. | Jane Doe #2 is not a U.S. citizen or Legal Permanent Resident. (**Jane Doe #2 Decl. ¶3.**) Jane Doe #2 is in the United States with Temporary Protected Status, which she has held for approximately 10 years. (**Jane Doe #2 Decl. ¶3.**) | |
| 32. | Jane Doe #2 is the mother of one older child, apart from her expected child. That older child was born in the United States prior to February 19, 2025, and therefore is a U.S. citizen. (**Jane Doe #2 Decl. ¶5.**) | |
| 33. | Jane Doe #2 is pregnant with her second child, who is due later this year. She intends to give birth in the United States. (**Jane Doe #2 Decl. ¶4.**). Jane Doe #2 does not currently have any plans to leave the United States. (**Jane Doe #2 Decl. ¶8.**) | |

| 34. | Jane Doe #1's husband, the father of both of her children, is neither a U.S. citizen nor a Legal Permanent Resident ("LPR"). He is seeking asylum in the U.S. (**Jane Doe #2 Decl. ¶6.**) | |
|---|---|---|
| 35. | Jane Doe #2 is worried about what will happen to her second child once he is born if he is not a U.S. citizen. Jane Doe #2 is afraid that he will be treated differently from her first child even though they were both born in the U.S. He will not have a U.S. social security card upon birth, and Jane Doe #2 is not sure how they would identify him for any government purpose. (**Jane Doe #2 Decl. ¶7.**) | |
| 36. | Jane Doe #1 is concerned that her children would be separated by status. Her first son, as a U.S. citizen, would hopefully be more protected from immigration officials, but her second son could end up being arrested by immigration officials without any documentation of his identity or his immigration status. (**Jane Doe #2 Decl. ¶7.**) | |
| 37. | Jane Doe #2 does not know if her second child would be granted Nepali citizenship or how she would go about trying to get him a Nepali passport. She is concerned that doing so would be very difficult and costly. (**Jane Doe #2 Decl. ¶8.**). | |
| 38. | Currently, Jane Doe #2 and her husband are income-eligible for various benefits—such as the Supplemental Nutrition Assistance Program or Temporary Assistance for Needy Families—for their older child, who is a United States citizen. Jane Doe #2 would not be able to receive these benefits for their expected child if that child is deprived of citizenship pursuant to the Executive Order. (**Jane Doe #2 Decl. ¶7.**) | |
| | The Executive Order's impact on the noncitizen population | |
| 39. | The United States immigration system divides noncitizens into different categories, each with distinct privileges and conditions. One broad division is between those who are lawfully present | |

| | |
|---|---|
| and those who are unlawfully present. In simple terms, individuals who hold a recognized, valid status in the United States—including citizenship, lawful permanent residence, and a range of temporary statuses—are lawfully present. By contrast, individuals who lack a formal status—including those who entered without inspection, or who overstayed their visas—are generally considered to lack lawful presence. **(Rathod Decl. ¶12.)** | |
| 40. | Noncitizens who are lawfully present in the United States can be further divided into certain key categories: (1) lawful permanent residents, also known as "green card" holders or "immigrants"; (2) nonimmigrants, or those holding temporary visas; (3) holders of certain humanitarian statuses, including asylees, refugees, parolees, and beneficiaries of Temporary Protected Status; and (4) holders of certain liminal statuses, such as DACA beneficiaries. **(Rathod Decl. ¶14.)** | |
| 41. | Although nonimmigrant visas are often referred to temporary visas, the period of authorized stay in the United States can be quite lengthy in some instances. For example, investors who are admitted to the United States on E-2 visas are permitted a maximum initial stay of two years, but they may then seek an unlimited number of two-year extensions. **(Rathod Decl. ¶25.)** | |
| 42. | An H-1B specialty occupation worker is permitted to remain in the United States for up to six years, and sometimes even longer when applying for adjustment of status. **(Rathod Decl. ¶25.)** | |
| 43. | Noncitizens admitted as L-1A Intracompany Transferee Executives or Managers can potentially remain in the United States for up to seven years. **(Rathod Decl. ¶25.)** | |
| 44. | Nonimmigrants on student visas are typically admitted not for a specific period of time, but rather for duration of status – defined as "the time during which an F-1 student is pursuing a full course of | |

| | |
|---|---|
| | study at an [approved] education institution . . . or engaging in authorized practical training following the completion of studies[.]"    In other words, duration of status depends on the nature of the degree program, but can routinely last upwards of five years. **(Rathod Decl. ¶25.)** |
| 45. | When one considers the possibility of change of status on top of a lengthy period of authorized stay, the amount of time that a nonimmigrant may be residing in the United States continuously can easily reach upwards of a decade. For example, if a nonimmigrant student changes status from an F-1 visa to an H-1B visa, he could easily spend five years as a nonimmigrant F-1 student, followed by up to six years or more as an H-1B specialty occupation worker, resulting in a total "temporary" stay of over a decade. **(Rathod Decl. ¶26.)** |
| 46. | Of the nonimmigrant I-94 admissions in Fiscal Year 2023, DHS recorded nearly 5 million admissions of temporary workers and their families, over 1.7 million admissions of students, and over 543,000 admissions of exchange visitors. **(Rathod Decl. ¶30.)** |
| 47. | In its publicly available data on nonimmigrant admissions, DHS also reports the countries of citizenship that are most heavily represented in these I-94 admissions. The top countries represented in Fiscal Year 2023 were Mexico (19.7 million nonimmigrant admissions, or 28.9 percent of the total);  Canada (13.6 million nonimmigrant admissions, or 19.9 percent);  United Kingdom (4.3 million nonimmigrant admissions, or 6.2 percent); India (2.6 million nonimmigrant admissions, or 3.8 percent);  Germany (1.99 million nonimmigrant admissions, or 2.9 percent); France (1.96 million nonimmigrant admissions, or 2.9 percent); South Korea, 1.69 million nonimmigrant admissions, or 2.5 percent); Brazil (1.65 million nonimmigrant admissions, or 2.4 percent); Japan (1.43 million nonimmigrant admissions, or 2.1 percent); and Italy |

| | | |
|---|---|---|
| | (1.26 million nonimmigrant admissions, or 1.8 percent). **(Rathod Decl. ¶31.)** | |
| 48. | DHS's FY 2023 report also notes that I-94 admissions among citizens from South Korea and Japan increased 114 and 194 percent respectively from the prior fiscal year, causing the two countries to place among the top ten countries of nationality for I-94 admissions. **(Rathod Decl. ¶31.)** | |
| 49. | DHS also provides some insight into the age and sex of individuals admitted as nonimmigrants, as recorded by Form I-94. Of the total I-94 admissions in FY 2023, 15.38 million, or about 22.5 percent, were of females between the ages of 18 and 44. **Rathod Decl. ¶32.)** | |
| 50. | In FY 2024, DOS issued a significant number of nonimmigrant visas in visa categories that permit a relatively lengthy period of authorized stay. For example, DOS issued over 400,000 F-1 visas to students; nearly 220,000 H-1B visas to skilled workers; and nearly 140,000 H-4 visas to the spouses and children of temporary workers. **(Rathod Decl. ¶35.)** | |
| 51. | The countries of nationality receiving the largest numbers of nonimmigrant visas in FY 2023 were Mexico, India, Brazil, Colombia, China, Argentina, Philippines, Ecuador, Israel, and Vietnam. **(Rathod Decl. ¶40.)** | |
| 52. | In FY 2023, persons with nationality in Asian countries received the largest number of nonimmigrant visas: 3.369 million of the total 10.438 million visas issued that year, or about 32 percent of the total. **(Rathod Decl. ¶41.)** | |
| 53. | Nationals of certain Asian countries, including China, India, the Philippines, and South Korea, receive relatively high numbers of certain visas that have lengthy periods of authorized stay. Of the 54,812 E-2 visas issued in FY 2023 to treaty investors, 26,975, or 49 percent, were issued to nationals of Asian countries. **(Rathod Decl. ¶42.)** | |

| | | |
|---|---|---|
| 54. | Of the 445,418 F-1 student visas issued in FY 2023, 315,693, or nearly 71 percent, were issued to nationals of Asian countries. **(Rathod Decl. ¶42.)** | |
| 55. | Of the 265,777 H-1B specialty worker visas issued in FY 2023, 245,085, or 92 percent, were issued to nationals of Asian countries. **(Rathod Decl. ¶42.)** | |
| 56. | These numbers are significant because individuals who are permitted to remain in the United States for lengthy periods of time, often with their spouses alongside them on family member visas, may understandably have children during a years-long stay in the United States. When looking at this handful of nonimmigrant visa categories with lengthy periods of authorized stay, persons with nationality in Asia predominate. **(Rathod Decl. ¶42.)** | |
| 57. | Persons of Asian nationality account for nearly one third of all of the nonimmigrant visas issued in FY 2023. **(Rathod Decl. ¶43.)** | |
| 58. | In addition to the many nonimmigrant visa categories that exist in the U.S. immigration system, noncitizens may be residing lawfully in the United States pursuant to a range of humanitarian protections. **(Rathod Decl. ¶44.)** | |
| 59. | According to data compiled by the Congressional Research Service, "[a]s of September 30, 2024, approximately 1,095,115 foreign nationals residing in the United States from . . . 16 countries were protected by TPS[.]" The sixteen countries with then-active TPS designations were Afghanistan, Burma, Cameroon, El Salvador, Ethiopia, Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, Ukraine, Venezuela, and Yemen. **(Rathod Decl. ¶45.)** | |
| 60. | As of March 2025, 532,000 individuals have been granted humanitarian parole under the CHNV (Cuba, Haiti, Nicaragua, Venezuela) Parole Program. **(Rathod Decl. ¶47.)** | |
| 61. | Other humanitarian parole programs initiated under the Biden Administration include Operation Allies | |

| | | |
|---|---|---|
| | Welcome (OAW) for certain Afghan nationals, and Uniting for Ukraine (U4U), for Ukrainians displaced by the Russian invasion. **(Rathod Decl. ¶48)** | |
| 62. | In FY 2023, DHS granted over 1.3 million paroles in total. **(Rathod Decl. ¶48)** | |
| 63. | DHS has approved around the statutory maximum of 10,000 U visas each fiscal year since 2010. **(Rathod Decl. ¶49.)** | |
| 64. | DHS has approved several thousand T visas each year in recent years. **(Rathod Decl. ¶49.)** | |
| 65. | Given that these forms of humanitarian protection are explicitly structured as nonimmigrant visas, there is a reasonable probability that the federal government would assert that T and U visa holders fall within the subcategory of "lawful, but temporary" noncitizens subject to EO 14160. **(Rathod Decl. ¶49.)** | |
| 66. | DHS data confirms that in FY 2023, a total of 60,050 refugees arrived in the United States, with the largest numbers with nationality in Democratic Republic of Congo (18,080), Syria (10,780), Afghanistan (6,590), and Burma (6,130). Of this total of 60,050, nearly half (29,800, or 49.63 percent) were female, and 25,860 (about 43 percent) were between the ages of 18 to 44. **(Rathod Decl. ¶51.)** | |
| 67. | In the same fiscal year (2023), DHS reported that 54,350 individuals were granted asylum in the United States. The top countries of nationality among these individuals were Afghanistan (14,470), China (4,870), Venezuela (3,760), El Salvador (2,990), India (2,710), Guatemala (2,580), and Honduras (2,120). **(Rathod Decl. ¶52.)** | |
| 68. | DHS and the leading research institutes all estimate that there are over 10 million individuals residing in the United States without lawful immigration status. **(Rathod Decl. ¶54.)** | |
| 69. | According to data from DHS, there were nearly 11 million people living without documentation in the United States in 2022. The top ten countries of birth for the unauthorized immigrant population estimated | |

| | | |
|---|---|---|
| | to be residing in the United States in 2022 were the following: Mexico (4.8 million), Guatemala (750,000), El Salvador (710,000), Honduras (560,000), Philippines (350,000), Venezuela (320,000), Colombia (240,000), Brazil (230,000), India (220,000), and China (210,000). **(Rathod Decl. ¶55.)** | |
| 70. | Of the nearly 11 million individuals estimated by DHS to be living without documentation in the United States in 2022, slightly less than half, or 45.77 percent, were estimated to be female. Approximately 57 percent of the same population of 11 million was estimated to be between the ages of 18 and 44. **(Rathod Decl. ¶56.)** | |
| 71. | The overwhelming majority of the unauthorized immigrant population in the United States comprises persons who would be classified as Hispanic/Latino (including persons of mixed indigenous ancestry from Central and South America) or Asian. **(Rathod Decl. ¶59.)** | |
| 72. | For a parent who entered the United States without inspection, there is no direct pathway for them to obtain permanent residence via their child while remaining in the United States. **(Rathod Decl. ¶60.)** | |
| 73. | For a parent who was inspected and admitted on a nonimmigrant visa, but who overstayed that visa, there is a potential pathway via a U.S.-born child, but it is lengthy and not guaranteed. **(Rathod Decl. ¶60.)** | |
| 74. | A threshold requirement for a U.S. citizen to sponsor their parent is that the U.S. citizen who wishes to sponsor their parent must be at least 21 years of age. In other words, under any circumstance when a noncitizen parent seeks to derive status from their U.S. citizen child, they must wait at least 21 years from the time of that child's birth. **(Rathod Decl. ¶61.)** | |
| 75. | For a parent who entered without inspection to obtain a green card via their U.S. citizen son or daughter, they must wait until the child is 21, depart the country, and further establish their eligibility for | |

|  | a hardship waiver. Depending on the applicant's specific circumstances, they may require additional waivers before they are granted a visa permitting their return to the United States and admission as a lawful permanent resident. **(Rathod Decl. ¶62.)** |  |
|---|---|---|
| 76. | For a noncitizen parent who was initially inspected and admitted by an immigration officer and overstayed their visa, their U.S. born child would need to wait until they are 21 years of age in order to file the paperwork to "sponsor" their parent for lawful permanent residence. During this period of time, a parent who lacks a formal immigration status would be susceptible to being placed in removal proceedings. **(Rathod Decl. ¶63.)** |  |
| 77. | Certain federal benefits are only extended to U.S. citizens and/or certain classes of lawfully present immigrants. **(Rathod Decl. ¶64.)** |  |
| 78. | If EO 14160 were implemented, the noncitizen parents of a U.S-born child who does not acquire birthright citizenship, and who would otherwise be income eligible for federal benefits, would lose access to these important and basic benefits. **(Rathod Decl. ¶64.)** |  |
| 79. | A U.S. citizen child who meets certain income eligibility requirements would be eligible for SNAP (Supplemental Nutrition Assistance Program) benefits. **(Rathod Decl. ¶65.)** |  |
| 80. | If EO 14160 were implemented, SNAP benefits could not be extended a child was born without any formal status in the United States. **(Rathod Decl. ¶65.)** |  |
| 81. | Medicaid and the Children's Health Insurance Program provides extensive health benefits to children who are U.S. citizens, but not to undocumented children. **(Rathod Decl. ¶66.)** |  |
| 82. | Supplemental Security Income (SSI), Temporary Assistance for Needy Families, and Affordable Care Act subsidies are available only to U.S. citizens and certain "qualified immigrants." **(Rathod Decl. ¶67)** |  |

| | | |
|---|---|---|
| 83. | U.S.-born children and their parents may be concerned in the future about the cost of higher education. In order to be eligible for federal financial aid, one must either be a U.S. citizen or an "eligible noncitizen." The latter category includes permanent residents, refugees, asylees, and a few select other groups. Accordingly, a U.S.-born child who does not acquire birthright citizenship, and is not able to obtain a lawful status that renders them eligible for federal financial aid, may encounter difficulty in accessing higher education. As one comprehensive review of the literature found, "Financial concerns are the greatest obstacle facing undocumented students as they transition to and persist in higher education. **(Rathod Decl. ¶68.)** | |
| 84. | Another future benefit of U.S. citizenship is the ability to seek employment in the federal sector. Most jobs in the federal government are open only to U.S. citizens or nationals. **(Rathod Decl. ¶69.)** | |
| 85. | Some classes of noncitizens are eligible for certain federal benefits, but their eligibility for those benefits can be changed by legislation. Congress is actively considering further restrictions on noncitizens' access to benefits. **(Rathod Decl. ¶70.)** | |
| 86. | Children born without U.S. citizenship pursuant to EO 14160 would also lose access to certain state-level benefits that are available only to U.S. citizens (or to U.S. citizens and a limited subset of lawfully present noncitizens). For example, several states offer reduced, "in-state" tuition only to U.S citizens. In some states, health-related programs and benefits are limited to citizens and select others. **(Rathod Decl. ¶71.)** | |
| 87. | If EO 14160 were implemented, those U.S.-born children of noncitizen parents who would not acquire U.S. citizenship at birth would lose access to important privileges of citizenship. One such privilege is the ability to apply for a U.S. passport. The U.S. passport is one of the most coveted passports in the world, as it permits U.S. citizens to | |

| | | |
|---|---|---|
| | travel to 182 destinations without securing a visa in advance. **(Rathod Decl. ¶72.)** | |
| 88. | U.S. citizens traveling overseas have the benefit of receiving assistance from the U.S. Department of State should they encounter difficulties abroad. **(Rathod Decl. ¶72.)** | |
| 89. | Unlike lawful permanent residents, who must spend certain amounts of time in the United States to avoid a claim that they have abandoned their status, U.S. citizens are permitted to travel overseas as frequently as they wish, and for as long as they wish, without risking loss of their status. **(Rathod Decl. ¶72.)** | |
| 90. | U.S. citizens can also pass along their citizenship to their children who are born in the United States and in many cases, when those children are born abroad. Further, U.S. citizens can sponsor their spouses, parents, minor children, adult children (both married and unmarried), and siblings for lawful permanent residence in the United States. **(Rathod Decl. ¶73.)** | |
| 91. | If EO 14160 is allowed to go into effect, U.S.-born children who do not acquire citizenship at birth will lack formal status in the United States. There is scant precedent for how such a child would be treated from a U.S. immigration law standpoint. **(Rathod Decl. ¶74.)** | |
| 92. | A child born in the U.S. to noncitizen parents and who does not acquire birthright citizenship might also be born stateless. **(Rathod Decl. ¶75.)** | |
| 93. | A noncitizen residing without authorization in the United States, the child would technically be susceptible to being placed in removal proceedings. **(Rathod Decl. ¶75.)** | |
| 94. | Those U.S.-born children who may find themselves undocumented as a result of EO 14160 are likely to face pervasive stigma that significantly impacts their psychological development and social identity. This stigma stems from societal narratives that frame undocumented status as deviant or criminal, leading many children to internalize shame and experience | |

| | |
|---|---|
| | social withdrawal. The fear of disclosing their legal status can result in secrecy, anxiety, and a fragmented sense of self, particularly as they transition into adulthood and confront barriers to employment, education, and civic participation. **(Rathod Decl. ¶80.)** |
| 95. | In educational settings, undocumented children frequently encounter discrimination, structural exclusion, and lowered expectations. Despite academic potential, they may be tracked into remedial programs or discouraged from higher education due to their status. These institutional barriers, combined with fear of deportation or family separation, contribute to chronic stress and disengagement from school environments. **(Rathod Decl. ¶81.)** |
| 96. | The cumulative psychological effects of stigma have been well-documented. Children in these circumstances are at elevated risk for depression, anxiety, and trauma-related disorders due to constant legal precarity and social exclusion. **(Rathod Decl. ¶82.)** |
| | <u>History of the Fourteenth Amendment and the Principle of *Jus Soli* in America</u> |
| 97. | The Fourteenth Amendment was adopted by Congress in June 1866. **(Lew-Williams Decl. ¶9.)** |
| 98. | The Fourteenth Amendment was ratified by the States in July 1868. **(Lew-Williams Decl. ¶9.)** |
| 99. | The Fourteenth Amendment begins with a statement on citizenship. The Citizenship Clause states, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." (U.S. Const. amend. XIV, § 1; **Lew-Williams Decl. ¶9.**) |
| 100. | The Citizenship Clause was derived from seventeenth-century English common law, which held that all persons born within royal dominions were natural-born subjects of the Crown, except the |

| | | |
|---|---|---|
| | children of foreign diplomats or wartime enemies. Since the nineteenth century, jurists have referred to this English common law rule as *jus soli*, or the right of the soil. (**Lew-Williams Decl. ¶10**.) | |
| 101. | The American colonies adopted many aspects of English common law, including the principle of *jus soli*. (**Lew-Williams Decl. ¶10**.) | |
| 102. | Article II, Section I of the U.S. Constitution states that "the President must be a 'natural born Citizen.' It was widely believed at the time, and continues to be the prevailing scholarly view today, that this phrase reflected a presumption that *jus soli* would apply for the purposes of determining U.S. citizenship. That is, all those born under the Republic would automatically acquire membership and be eligible for the Presidency (subject to the narrow exceptions for the children of foreign diplomats and invading armies, as described under common law)." (**Lew-Williams Decl. ¶11**.) | |
| 103. | The Naturalization Act of 1790, the first federal statute regarding naturalization, outlines the process of naturalization for all aliens, namely '[t]hat any Alien being a free white person, who shall have resided within the limits and under the jurisdiction of the United States for the term of two years, may be admitted to become a citizen thereof....' The Act further outlines the status of 1) a minor child born abroad to U.S. citizen parents and 2) a minor child 'dwelling within the United States' with alien parents in the process of naturalization. The fact that the Act does not address a child born within the 'limits and jurisdiction' of the United States reflects that such a child was presumed to be a natural-born citizen. (**Lew-Williams Decl. ¶12**.) | |
| 104. | In the years after independence, U.S. courts and jurists generally agreed that the English common law principle of *jus soli* constituted the basis of citizenship law in the new republic, at least for free white persons. (**Lew-Williams Decl. ¶13**.) | |

| | | |
|---|---|---|
| 105. | Leading American jurist James Kent delivered a lecture "On Aliens and Natives," which he later published in *Commentaries on American Law* (1827), which states that "inhabitants of every country" can be divided into two categories: "aliens and natives." He explained, "Natives are all persons born within the jurisdiction of the United States" whereas "an alien is a person born out of the jurisdiction of the United States." (**Lew-Williams Decl. ¶13**.) | |
| 106. | In the Antebellum Period, members of the executive branch also referred to the *jus soli* rule as common knowledge. (**Lew-Williams Decl. ¶15**.) | |
| 107. | Secretary of State William Marcy, in a letter to the U.S. ambassador to France in 1854, wrote, "it is presumed that, according to the common law, any person born in the United States, unless he be born in one of the foreign legations therein, may be considered a citizens thereof until he formally renounces his citizenship." (**Lew-Williams Decl. ¶15**.) | |
| 108. | In 1859, Attorney General J. S. Black stated, "a free white person born in this country, of foreign parents, is a citizen of the United States." (**Lew-Williams Decl. ¶15**.) | |
| 109. | In an 1862 opinion, Attorney General Edward Bates wrote, "I am quite clear in the opinion that children born in the United States of alien parents, who have never been naturalized, are native-born citizens of the United Sates…." (**Lew-Williams Decl. ¶15**.) | |
| | The Civil Rights Act of 1866 | |
| 110. | The Civil Rights Act of 1866 is the first federal statute in the United States that explicitly declared the principle of *jus soli*. (**Lew-Williams Decl. ¶23**.) | |
| 111. | Senator Lyman Trumbull drafted and introduced the Civil Rights Act of 1866. (**Lew-Williams Decl. ¶23**.) | |

| 112. | As amended the Civil Rights Act of 1866 stated, "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." (Civil Rights Act of 1866, 14 Stat. 27 (1866).) (**Lew-Williams Decl. ¶23**.) | |
|------|------|------|
| 113. | During floor debates, Senator Trumbull explained that the birthright citizenship provision was added "for the purpose of removing doubts, not because I suppose it necessary, for I believe that the native-born person of African descent now who is a freeman in this land is as much a citizen as any of us.'" (**Lew-Williams Decl. ¶23**.) | |
| 114. | The birthright citizenship provision merely codified the existing *jus soli* common law rule for children of non-diplomat aliens. (**Lew-Williams Decl. ¶23.**) | |
| 115. | The drafters of the 1866 Civil Rights Bill excluded the children of foreign ministers by using the phrase "and not subject to foreign power." Senator Trumbull explained, **"**we cannot make a citizen of the child of a foreign minister who is temporarily residing here' because they do not 'owe allegiance' to the United States." (**Lew-Williams Decl. ¶24.**) | |
| 116. | The drafters of the Civil Rights Act also excluded members of Indian tribes, by "excluding Indians not taxed." Senator Trumbull stated, "Our dealings with Indians are with them as foreigners, as separate nations, except in reference to those who are incorporated into the United States as some are, and are taxable and become citizens, and then it would be desirable that it should apply to the Indians so far as those who are domesticated and pay taxes and live in civilized society are concerned." (**Lew-Williams Decl. ¶25.**) | |
| 117. | The drafters of the 1866 Civil Rights Act intended the Act to reaffirm that the children of aliens (other than foreign diplomats) were citizens. Senator Trumbull made clear his expectation to the Senate. When asked if the Act would affirm citizenship for "the children of Chinese and Gypsies born in this | |

| | |
|---|---|
| | country," Trumbull answered, "undoubtedly." He stated, "the child of an Asiatic is just as much a citizen as the child of a European." (**Lew-Williams Decl. ¶26**.) | |
| 118. | During floor debates, no Senator disputed the effect of the bill would make the U.S.-born children of non-diplomatic aliens U.S. citizens –including the children of Chinese immigrants--regardless of their parentage. (**Lew-Williams Decl.** ¶27.) | |
| 119. | President Andrew Johnson vetoed the Civil Rights Act of 1866 because it would extend citizenship to the U.S.-born children of all non-diplomatic aliens. In his veto message to Congress, President Johnson complained that the citizenship provision "comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the entire race designated as blacks, people of color, negroes, mulattoes, and persons of African blood. Every individual of these races born in the United States is by the bill made a citizen of the United States." In recognizing that the Civil Rights Bill would extend citizenship to the children of Chinese and other immigrants, President Johnson acknowledged that the *jus soli* rule applied to all non-diplomatic aliens, even those he found objectionable. (**Lew-Williams Decl. ¶28**.) | |
| 120. | On April 9, 1866, Congress overrode President Johnson's veto and enacted the Civil Rights Act. (**Lew-Williams Decl. ¶28**.) | |
| | The Citizenship Clause of the Fourteenth Amendment | |
| 121. | On April 30, 1866, the Joint Committee of Fifteen on Reconstruction introduced a draft of the Fourteenth Amendment. (**Lew-Williams Decl. ¶29**.) | |
| 122. | The original draft of the Fourteenth Amendment did not include a clause affirming birthright citizenship, because most Republicans did not believe such language was necessary. They believed that the | |

| | | |
|---|---|---|
| | English common law principle of *jus soli* had always applied in the United States and *Dred Scott* had been wrongly decided. (**Lew-Williams Decl. ¶30.**) | |
| 123. | In order to invalidate the *Dred Scott* decision and silence its supporters, Senate Republican Jacob Howard of Michigan introduced a provision, which came to be known as the Citizenship Clause: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." (**Lew-Williams Decl. ¶30.**) | |
| 124. | Senator Howard employed bolder and broader language in the Citizenship Clause than had been used in the Civil Rights Act of 1866. (**Lew-Williams Decl. ¶30.**) | |
| 125. | The Citizenship Clause does not include language "subject to any foreign power" which had been used in the Civil Rights Act of 1866. (**Lew-Williams Decl. ¶30.**) | |
| 126. | The Citizenship Clause does not include language "Indians not taxed" which had been used in the Civil Rights Act of 1866. (**Lew-Williams Decl. ¶30.**) | |
| 127. | The Citizenship Clause does not mention the parents of "persons born or naturalized" in the United States. (**U.S. Const. amend. XIV, § 1, cl. 1.**) | |
| 128. | The Citizenship Clause does not mention the citizenship, allegiance, domicile, immigration status, or country of origin of parents of "persons born or naturalized" in the United States. (**U.S. Const. amend. XIV, § 1, cl. 1.**) | |
| 129. | Webster's Dictionary of 1865 offered four definitions of "jurisdiction:" 1) "The legal power or authority of doing justice in cases of complaint; the power of executing the laws and distributing justice;" 2) "Power of governing or with legislating;" 3) "The power or right of exercising authority;" 4) "The limit within which power may be exercised." (**Lew-Williams Decl. ¶32.**) | |

| | | |
|---|---|---|
| 130. | Burrill's 1860 Law Dictionary defined "jurisdiction" referred to the sovereign's "power to make law; power to legislate or govern; power or right to exercise authority." (**Lew-Williams Decl. ¶32**.) | |
| 131. | The Fourteenth Amendment's drafters would have also understood the meaning of "jurisdiction" relative to aliens from previous court decisions, the most prominent of which is Chief Justice Marshall's decision in *Schooner Exchange v. McFaddon* (1812). (**Lew-Williams Decl. ¶32**.) | |
| 132. | Henry Wheaton, one of the most prominent American scholars in the Antebellum Period, endorsed Chief Justice Marshall's decision in *Exchange v. McFaddon* and elaborated on the nature of jurisdiction in *Elements of International Law* (1836). He stated, "all persons and property within the territorial jurisdiction of a sovereign [are] amenable to the jurisdiction of himself and his courts." He described this "general rule" as "beyond dispute," but allowed that there were several exceptions "in order to preserve the peace and harmony of nations." These exceptions to "territorial jurisdiction" included "a foreign sovereign," "an ambassador, or other public minister," and "a foreign army or fleet." (**Lew-Williams Decl. ¶34**.) | |
| 133. | Senator Howard, who introduced the citizenship provision, explained that he sought to constitutionalize existing law. (**Lew-Williams Decl. ¶35**.) | |
| 134. | In introducing the Citizenship Clause, Senator Howard stated, "[T]he question of citizenship has been so fully discussed in this body as to not need any further elucidation, in my opinion. This amendment which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States." (**Lew-Williams Decl. ¶35**.) | |

| | | |
|---|---|---|
| 135. | Senator Howard then stated that *jus soli* did not apply to foreign ministers, but did apply to all others: "This [provision] will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors [sic] or foreign ministers accredited to the Government of the United States, but will include every other class of persons. It settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States." (**Lew-Williams Decl. ¶35.**) | |
| 136. | The drafters of the Fourteenth Amendment's Citizenship Clause also intended to exclude members of Indian tribes because they believed that Indian tribes held their own sovereignty. Senator Howard explained, "Indians born within the limits of the United States and who maintain their tribal relations, are not, in the sense of this amendment, born subject to the jurisdiction of the United States. They are regarded, and always have been in our legislation and jurisprudence, as being *quasi* foreign nations." Senator Trumbull agreed that Indian tribes acted similarly to foreign nations; for example, they entered into treaties with the United States. (**Lew-Williams Decl. ¶36.**) | |
| 137. | As detailed in the next eight rows, it is clear from the congressional debates over the Fourteenth Amendment that Congress understood the Citizenship Clause to apply to the children of non-diplomatic aliens, including those aliens considered undesirable at the time. (**Lew-Williams Decl. ¶37.**). | |
| 138. | During the congressional debate over the Fourteenth Amendment, Senator Howard stated that the Citizenship Clause provided that "every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States . . . .This [provision] will not, of course, include persons born in the United States who are foreigners, [that is] aliens, who belong to the families of embassadors | |

| | |
|---|---|
| | [sic] or foreign ministers accredited to the Government of the United States, but will include every other class of persons. It settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States." (**Lew-Williams Decl. ¶35**.) | |
| 139. | During the congressional debate over the Fourteenth Amendment, Senators Cowan and Conness had an exchange in which Cowan asked, "Is the child of the Chinese immigrant in California a citizen? Is the child of a Gypsy born in Pennsylvania a citizen?" Senator Conness responded, "the children begotten of Chinese parents in California and it is proposed to declare that they shall be citizens. We have declared that by law; now it is proposed to incorporate the same provision in the fundamental instrument of the nation," which he indicated he supported. (**Lew-Williams Decl. ¶37**.) | |
| 140. | During the same exchange referred to in row 139, Senator Conness acknowledged that while Chinese immigrants "all return to their own country at some time or other, either alive or dead" and that he was "fully aware of the nature of that class of people," he was "entirely ready to accept the provision proposed in this constitutional amendment" that the children of such immigrants would be citizens. (**Lew-Williams Decl. ¶38**.) | |
| 141. | During the same exchange referred to in rows 139 & 140, Senator Conness asserted that the Citizenship Clause provision declared, "the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States." (**Lew-Williams Decl. ¶37**.) | |
| 142. | During the same exchange referred to in rows 139-141, Senator Cowan complained that the Citizenship Clause would extend citizenship to "Gypsies" whom he described as "people who invade [America's] borders; who owe to her no allegiance; who pretend to owe none; who recognize no authority in her | |

| | | |
|---|---|---|
| | government; who have a distinct, independent government of their own—an *imperium in imperio*; who pay no taxes; who never perform military service; who do nothing in fact, which becomes a citizen, and perform none of the duties which devolve upon him, but, on the other hand, have no homes, pretend to own no land, live nowhere, settle as trespassers wherever they go, and whose sole merit is a universal swindle; who delight in it, who boast of it, and whose adroitness and cunning is of such a transcendent character that no skill can serve to correct it or punish it" and proposed excluding them. Senator Conness affirmed that the Citizenship Clause would extend to the children of Gypsies, who "were characterized as unwanted 'trespassers' in the United States." (**Lew-Williams Decl. ¶¶41-42**.) | |
| 143. | During the congressional debate over the Fourteenth Amendment, none of the drafters of the Amendment objected to Senator Conness's characterization and summaries of his response received widespread national attention in the news. (**Lew-Williams Decl. ¶37**). | |
| 144. | During the congressional debate over the Fourteenth Amendment. Senators Wade and Fessenden had an exchange regarding an amendment proposed by Senator Wade concerning the Privileges and Immunities Clause, Senator Fessenden asked, "Suppose a person is born here of parents from abroad temporarily in this country," were they to be citizens?  Senator Wade responded that there was only "one instance" in which such a person would not be a citizen: the children of foreign diplomats. (**Lew-Williams Decl. ¶39**). | |
| 145. | In introducing the Citizenship Clause in the House, Representative Thadeus Stevens explained that it "defin[es] who are citizens of the United States and of the States . . . It declares this great privilege to belong to every person born or naturalized in the United States." (**Lew-Williams Decl. ¶30**) | |

| | | |
|---|---|---|
| 146. | Beyond Representative Stevens' introductory statement, the Congressional Record does not otherwise include discussion of children of aliens in the House debates of the Fourteenth Amendment (**Lew-Williams Decl. ¶40.**) | |

Dated: July 2, 2025                                    Respectfully submitted,


/s/ John A. Freedman                          John C. Yang (D.C. Bar No. 438672)
John A. Freedman (D.C. Bar No. 453075)        Niyati Shah (D.C. Bar No. 1659560)
Sally Pei (D.C. Bar No. 1030194)              Noah Baron (D.C. Bar No. 1048319)
Jonathan L. Stern (D.C. Bar No. 375713)       ASIAN AMERICANS
Ronald D. Lee (D.C. Bar No. 411516)            ADVANCING JUSTICE-AAJC
ARNOLD & PORTER KAYE SCHOLER LLP              1620 L Street, NW, Suite 1050
601 Massachusetts Avenue, N.W.                Washington, D.C. 200036
Washington, D.C. 20001                        (202) 296-2300
(202) 942-5000                                jcyang@advancingjustice-aajc.org
John.Freedman@arnoldporter.com                nshah@advancingjustice-aajc.org
Sally.Pei@arnoldporter.com                    nbaron@advancingjustice-aajc.org
Jonathan.Stern@arnoldporter.com
Ronald.Lee@arnoldporter.com                   Kaitlin Banner (D.C. Bar No. 1000436)
                                              Sarah Bessell (D.C. Bar No. 219254)
                                              Madeleine Gates (D.C. Bar No. 90024645)
                                              WASHINGTON LAWYERS'
                                              COMMITTEE FOR CIVIL RIGHTS
                                              AND URBAN AFFAIRS
                                              700 14th Street, NW, Suite 400
                                              Washington, D.C. 20005
                                              (202) 319-1000
                                              kaitlin_banner@washlaw.org
                                              sarah_bessell@washlaw.org
                                              madeleine_gates@washlaw.org


*Counsel for Plaintiff*