# EXHIBIT 5

Ohio [Mr. SCHENCK] in an independent bill. At all events let us give the soldiers the benefit of the provisions of this bill.

Mr. SCHENCK. I must insist on my motion to recommit. I know that in all business relating to public affairs, when we fix a limit to compensation or to salary, in every case the charge goes up to that limit; and to pass this bill would be equivalent to passing a bill allowing ten dollars to claim agents in every case; at least I feel very sure that it would operate in that way.

I will still further modify the instructions which I have moved so as to instruct the committee to amend the bill by introducing a system of agencies in the several States. The committee can then preserve the features of this bill if they think proper to do so, so that the soldier shall have his option to employ either the agent of the United States or the agent that he himself may select. But I do wish to advertise all the soldiers of all the United States that the Government of the United States will treat them just as some of the States have treated the soldiers within their particular limits, and will look to the collection of their claims against the Government without cost to them, and without any deduction for the expense of collection.

Mr. WILSON, of Iowa. The same difficulty will occur in relation to the modified instructions that attach to the original instructions; that of getting an opportunity to report the bill back again.

Mr. SCHENCK. I have great faith in the diligence, industry, and capacity of that committee, and I have no doubt that with a little extra application they can produce a bill thus amended, by the time the committee is again called.

Mr. WILSON, of Iowa. There will be no meeting of the committee before that time.

Mr. SCHENCK. A meeting of the committee can be called for that purpose.

Mr. WILSON, of Iowa. I now call the previous question.

Mr. ELDRIDGE. Will the gentleman from Iowa [Mr. WILSON] yield to me for a moment?

Mr. WILSON, of Iowa. If I yield, the morning hour will expire.

The SPEAKER. The morning hour will expire in about a minute.

The previous question was seconded, and the main question ordered; which was upon the motion of Mr. SCHENCK to recommit the bill with instructions.

The House divided; and there were—ayes 44, noes 52.

Before the result of the vote was announced, Mr. SCHENCK called for the yeas and nays.

The question was upon ordering the yeas and nays, and was taken; but before the result was announced,

Mr. SCHENCK called for tellers on ordering the yeas and nays.

Mr. ELDRIDGE. Has not the morning hour expired?

The SPEAKER. It has; but before it expired the House seconded the call for the previous question, and ordered the main question to be now put, and the House is now engaged in executing that order.

Tellers were ordered upon the call for the yeas and nays; and Messrs. SCHENCK and COOK were appointed.

The House again divided; and the tellers reported—ayes thirty-two.

That number being more than one fifth of the number present, the yeas and nays were accordingly ordered.

The question was then taken; and it was decided in the affirmative—yeas 70, nays 68, not voting 45; as follows:

YEAS—Messrs. Anderson, Baker, Baxter, Bingham, Blow, Brooks, Buckland, Bundy, Sidney Clarke, Coffroth, Cullom, Defrees, Delano, Deming, Denison, Donnelly, Eldridge, Farquhar, Finck, Glossbrenner, Hayes, Henderson, Higby, Hill, Hooper, Asahel W. Hubbard, John H. Hubbard, James R. Hubbell, Ingersoll, Kelley, Kelso, Kerr, Ketcham, Kuykendall, Latham, William Lawrence, Le Blond, Loan, Lynch, Marshall, Marston, McClurg, Miller, Newell, Niblack, Nicholson, O'Neill, Orth, Plants, Raymond, Rogers, Ross, Rousseau, Schenck, Shellabarger, Sitgreaves, Spalding, Starr, Stilwell, Strouse, Taylor, John L. Thomas, Thornton, Robert T. Van Horn, Ward, Henry D. Washburn, Welker, Whaley, Stephen F. Wilson, and Winfield—70.

NAYS—Messrs. Alley, Allison, Delos R. Ashley, James M. Ashley, Baldwin, Banks, Beaman, Bergen, Bidwell, Boutwell, Boyer, Bromwell, Broomall, Chanler, Cobb, Conkling, Cook, Darling, Davis, Dawson, Dixon, Driggs, Eliot, Farnsworth, Ferry, Goodyear, Aaron Harding, Harris, Holmes, Chester D. Hubbard, Demas Hubbard, Edwin N. Hubbell, Hulburd, James Humphrey, Jenckes, Julian, Longyear, McKee, Mercur, Morrill, Morris, Paine, Patterson, Perham, Phelps, Pike, Price, William H. Randall, Alexander H. Rice, John H. Rice, Ritter, Rollins, Sawyer, Scofield, Shanklin, Sloan, Stevens, Thayer, Francis Thomas, Trowbridge, Upson, Van Aernam, Burt Van Horn, Warner, William B. Washburn, Wentworth, Williams, and James F. Wilson—68.

NOT VOTING—Messrs. Ames, Ancona, Barker, Benjamin, Blaine, Brandegee, Reader W. Clarke, Culver, Dawes, Dumont, Eckley, Eggleston, Garfield, Grider, Grinnell, Griswold, Hale, Abner C. Harding, Hart, Hogan, Hotchkiss, James M. Humphrey, Johnson, Jones, Kasson, Laflin, George V. Lawrence, Marvin, McCullough, McIndoe, McRuer, Moorhead, Moulton, Myers, Noell, Pomeroy, Radford, Samuel J. Randall, Smith, Taber, Trimble, Elihu B. Washburne, Windom, Woodbridge, and Wright—45.

So the motion to refer the bill with instructions was agreed to.

Mr. SCHENCK moved to reconsider the vote by which the bill was referred; and also moved that the motion to reconsider be laid upon the table.

The latter motion was agreed to.

POST ROUTE.

Mr. DEFREES, by unanimous consent, introduced a bill to establish a post route; which was read a first and second time, and referred to the Committee on the Post Office and Post Roads.

LEAVE OF ABSENCE.

Mr. LE BLOND. I ask leave of absence for my colleague, Mr. FINCK, for two weeks.

Leave was accordingly granted.

WILLIAM A. WEST.

Mr. STROUSE. I ask leave to report from the Committee on Territories a joint resolution (H. R. No. 79) authorizing the Secretary of the Interior to settle the accounts of William A. West, as marshal of the Territory of Nevada.

The joint resolution was read. It authorizes the Secretary of the Interior to settle the accounts of William A. West, as late marshal of the Territory of Nevada, on the basis of allowing and crediting him the expenditures which are certified to be correct, by the chief justice or either one of the associate judges of that Territory at the time such expenditures are stated to have been made, and to pay him the amount found to be due, provided that it shall not exceed the sum of $4,400.

Mr. HUBBARD, of Iowa. I object.

RIGHTS OF CITIZENS.

The House, agreeably to order, resumed the consideration of the bill (S. No. 61) entitled "An act to protect all persons in the United States in their civil rights and furnish the means of their vindication;" on which Mr. BROOMALL was entitled to the floor.

Mr. BROOMALL. Mr. Speaker, in some remarks which I had the honor to offer in the House a few weeks ago I said that "the Government of the United States above all other duties owes it to itself and to humanity to guard the rights of those who in the midst of rebellion periled their lives and fortunes for its honor, of whatever caste or lineage they be," and "that no system of reconstruction ought to be considered unless it shall effectually guaranty the rights of the Union men of the South."

Everything that has transpired since then, from all departments of the Government, satisfies me that these, our southern allies in the war waged to preserve the existence of the nation, have nothing to trust to except the integrity and firmness of the Union majority in the two Houses of Congress. That majority, through its appropriate committees, presents the bill under consideration as one of the measures on which it relies to carry out its great and patriotic purpose.

The object of the bill is twofold—to declare who are citizens of the United States, and to secure them the protection which every Government owes to its citizens. It will hardly be said that these are not proper subjects of legislation, and especially the latter one. If the same thing has not been attempted before, it was partly because there never before was the same necessity, and partly because of the long continued and remarkable forbearance of those for whom what necessity there was existed.

The first provision of the bill declares that all persons born in the United States and not subject to any foreign Power are citizens of the United States. As a positive enactment this would hardly seem necessary. Even as a declaration of existing law, a proposition that at most can only be said to embrace the true meaning of the word "citizen" would seem to find its more appropriate place in the elementary treatises upon law rather than upon the statute-books. What is a citizen but a human being who by reason of his being born within the jurisdiction of a Government owes allegiance to that Government?

But modern Democratic political science discovered and promulgated the dogma that this is the country of the white man, and that no other man has rights here which the white man is bound to respect. When, therefore, this peculiar science culminated in an attempt to overthrow the Government, and was itself overthrown, it is as well that a return to the principles of the founders of the Government should be made manifest to future generations by a declaration upon the statute-books.

The objection to this part of the bill is that it calls the negro a citizen. And why should it not? Civilized man must of necessity be a citizen somewhere. He must owe allegiance to some Government. There is some spot upon the earth's surface upon which it is possible for him to commit treason. Now, the negro in America is civilized. Ask the minister of religion where he finds the most sincere devotion, the school-teacher where he finds the greatest desire to learn. Ask the very southern rebel, whose representatives are most earnest against the bill, where he found the most implicit and unquestioning obedience to law and order under circumstances hardly justifying the hope of obedience to law and order.

The American negro is civilized, and of necessity must owe allegiance somewhere. And until the opponents of this measure can point to the foreign Power to which he is subject, the African potentate to whom after five generations of absence he still owes allegiance, I will assume him to be, what the bill calls him, a citizen of the country in which he was born.

Let those who say with the air of such omnipotent authority that this is the country of the white man, explain how it happened that the Ruler of the universe suffered it to be occupied by the red man for countless ages of the past. And then let them say, if they know, whether it may not be His purpose to suffer some small portion of it to be occupied by the black man for countless ages of the future. No, our country is the country of its inhabitants. Our Government the Government of the governed.

But there is another class of persons born within the limits of the United States whose *status* requires fixing by legislation. I allude to those who took upon themselves the responsibilities and duties of allegiance to another power; who forswore their citizenship and allegiance. There is nothing in our form of government, nothing in our institutions that contradicts the right of expatriation. True, that right is not anywhere expressly granted, but our naturalization laws are founded upon the idea that such right is inherent in men, and I believe this is true.

Most certainly if the confederation had sustained itself its citizens would have ceased to be citizens of the United States, and by a process that would have related back to the very commencement of the rebellion. Now, the fact that it did not sustain itself was the result of no merit of these men. They did all they could to succeed. As far as intention is con-

cerned their condition of expatriation is complete. Why may not the Government take them at their word and assume that the position they took upon themselves is their true one, that they are no longer entitled to the benefits of the allegiance they forswore? Why may they not be estopped from contradicting their own oaths, from pleading their own crimes? If they are citizens they have forfeited their lives to the outraged laws of their country; out of humanity, then, why may we not hold them to have lost that dangerous characteristic?

Look at the question in another point of view. By the doctrine laid down by all the writers upon public law, so clearly expressed by the Supreme Court in the prize cases, 2 Black, 673, in civil wars the belligerent that claims sovereign rights may in all cases elect between the civil law and the laws of war, may treat its opponents either as citizens or public enemies, may hang for treason or hold as prisoners of war. The unavoidable consequence of this doctrine is that if that belligerent shall be the victor, the question of the citizenship of its opponents is for it to decide.

If I am right in all this, then it is for the Government to elect whether or not it will hereafter treat the rebels as citizens or banish them as alien enemies. Now, if this were the mere decision of a right, it would be within the province of the courts of justice; if it were the announcement of a great fact, the Executive might do it; but being the exercise of a discretion, and the granting or withholding of a favor, nothing but the supreme law-making power can perform the function.

A question might naturally arise whether we ought again to trust those who have once betrayed us; whether we ought to give them the benefits of a compact they have once repudiated. Yet the spirit of forgiveness is so inherent in the American bosom that no party in the country proposes to withhold from these people the advantages of citizenship; and this is saying much. With a debt that may require centuries to pay, with so many living and mutilated witnesses of the horrors of war, with so many saddened homes, so many of the widowed and fatherless pleading for justice, for retribution, if not revenge, it speaks well for the cause of Christian civilization in America that no party in the country proposes to deprive the authors of such immeasurable calamity of the advantages of citizenship.

But the election must be made. Some public legislative act is necessary to show the world that those who have forfeited all claims upon the Government are not to be held to the strict rigor of the law of their own invoking, the decision of the tribunal of their own choosing; that they are to be welcomed back as the prodigal son whenever they are ready to return as the prodigal son.

The act under consideration makes that election. Its terms embrace the late rebels, and it gives them the rights, privileges, and immunities of citizens of the United States, though it does not propose to exempt them from punishment for their past crimes.

But it is said by the minority in this body that we have no right under the Constitution to pass the law; that the General Government was never intended to be intrusted with the power to protect individual persons; that that was to be left to the States. What, then, does the preamble mean? An ordinary reader would look there for the object and intent of the document:

"We the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America."

This certainly has the appearance of being designed to protect the rights of individuals within as well as beyond the jurisdiction of the Government. Yet, strange as it may seem, while the Government has been always held competent to protect its meanest citizen within the domain of any European potentate, it has been considered powerless to guard the citizen of Pennsylvania against the illegal arrest, under color of State law, of the most subordinate officer of the most obscure municipality in Virginia. Strange as it may seem, while the Government of the United States has been held competent to protect the lowest menial of the minister of the most obscure prince in Europe, anywhere between the two oceans, and from the Lakes to the Gulf, it had no power to protect the personal liberty of the agent of the State of Massachusetts in the city of Charleston, or enable him to sue in the State courts.

If the Government has not the power, by appropriate legislation, to protect its citizens within as well as without its jurisdiction, I would like to know what the eighth section of the first article of the Constitution means when it empowers Congress to provide for the general welfare of the United States, and when it empowers Congress to pass all laws necessary for that purpose. Does it not pertain to the "general welfare" that "the citizens of each State," in the language of the second section of the fourth article of that instrument, "shall be entitled to all privileges and immunities of citizens in the several States?"

But throwing aside the letter of the Constitution, there are characteristics of Governments that belong to them as such, without which they would cease to be Governments. The rights and duties of allegiance and protection are corresponding rights and duties. Upon whatever square foot of the earth's surface I owe allegiance to my country, there it owes me protection, and wherever my Government owes me no protection I owe it no allegiance and can commit no treason. In the very nature of things this position is incapable of being overthrown, and while it stands it demonstrates not only the right but the duty to protect American citizens by appropriate legislation.

An unexpected argument has been adduced by the leader of the Opposition in this body, [Mr. ROGERS,] that this bill will permit the negro to vote in the several States of the Union. It is rather ludicrous than otherwise that the committee having it in charge have agreed to put in a provision to quiet the alarm of the opposite party. I am willing to concede of late that if the Democrats are to be kept above the negroes in the social scale there must be some discriminating legislation in their favor. I used to think the white man a better man than the negro, but an experience of three winters south of Mason and Dixon's line has partly satisfied me that this depends somewhat upon the white man's politics.

Does not the gentleman from New Jersey [Mr. ROGERS] know that the Constitution of the United States fixes the qualification of voters among its citizens? Does he not know that without a change of that instrument Congress cannot extend the right of suffrage in the States? The bill declares women and children citizens, yet it did not occur to the gentleman that this might make them electors.

Let me now ask our opponents upon this floor, and in other departments of the Government, how they propose to protect the citizens of the United States within the domain of the United States. They will surely not deny the duty. They will not say that we have a Government for the purpose of allegiance and for the punishment of treason, but none for the protection of the citizen.

Will they say that the rights of citizens of the United States can be safely intrusted to the governments of the several States? If this were true it might afford some excuse for neglecting to provide the appropriate legislation, but none for refusing it. But it is not true. For thirty years prior to 1860 everybody knows that the rights and immunities of citizens were habitually and systematically denied in certain States to the citizens of other States: the right of speech, the right of transit, the right of domicil, the right to sue, the writ of *habeas corpus*, and the right of petition. It will be said that this state of things was owing to the existence of what we politely called "the peculiar institution," but will it be said that with the disappearance of the peculiar institution this state of things also disappeared?

Within the jurisdiction of the United States there never was a time when more black freemen, citizens of the United States, were enslaved without even the color of law, and denied the right to process of law to test the validity of the claim of those who pretend to own them. There never was a time when more black freemen, citizens of the United States, were kidnapped and sold into other countries against positive law, and yet denied the process of law to enforce the right and to avenge the wrong.

But the opponents of this bill have one answer to all appeals for justice against this species of wrong—an answer furnished from the political speeches of the judges of the Supreme Court of the United States on the occasion of their assembling to celebrate the election of James Buchanan, called in mockery their decision in the Dred Scott case: "A negro has no rights which a white man is bound to respect."

As my object is to satisfy our political opponents of the necessity of the pending measure, I choose to admit the force of this answer. Yet I might say with truth that American statesmanship could go no further in that direction; that even Democracy could assume no meaner position. But are the evils complained of limited to the black man? While I would blush if I could admit that that fact, if acknowledged, would in any degree lessen the necessity for the passage of this law, I nevertheless maintain and hold myself ready to prove that white men, citizens of the United States, have been, and are now being punished under color of State laws for refusing to commit treason against the United States at the bidding of Democratic candidates for the Presidency; that white men, soldiers of the Republic, have been arraigned in State courts, under State laws, for the crime of shooting down traitors on the field of battle by the command of their military superiors, and only saved from being hanged, on conviction of murder, by the interposition of that branch of the military forces of the Government known as the Freedmen's Bureau. I maintain further, that white men, citizens of the United States, have been driven from their homes, and have had their lands confiscated in State courts, under State laws, for the crime of loyalty to their country, and that now they are begging in vain for a redress of wrongs in the courts of the reconstructed South.

Our political opponents will not deny these allegations. They are fully conscious of the state of things existing at the South. They know that there loyalty is the crime and treason the virtue; not throughout the entire country, because there are honorable exceptions, but throughout more than half of the eleven States lately in rebellion. The very fact that the President of the United States, armed with the war power, is now annulling legislative enactments in those States, quashing the decrees of courts, and standing guard over the rights of the loyal people, is conclusive proof, binding upon the entire Democratic party, that citizens of the United States need the protection of their Government in the several States of the Union.

Mr. WRIGHT. I rise to a question of order. I believe that the subject under discussion is, "An act to protect all persons in the United States in their civil rights, and furnish the means of their vindication." I have looked over the bill carefully and have failed to find in it one word about either the Democratic party or the Republican party—"copperheads" or "niggerheads"—and the gentleman is talking wide of the mark if he means to apply his epithets to the constituency I have the honor to represent.

The SPEAKER. The last part of the remarks of the gentleman from New Jersey [Mr. WRIGHT] are certainly not in order. The Chair overrules the point of order. The Chair thinks that the gentleman from Pennsylvania is con-