# EXPERT DECLARATION OF
# PROFESSOR BETH LEW-WILLIAMS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OCA – ASIAN PACIFIC AMERICAN ADVOCATES ET AL.,

      Plaintiffs,

v.

MARCO RUBIO ET AL.,

      Defendants.

Case No. 1:25-cv-00287

The Hon. Timothy J. Kelly

## EXPERT DECLARATION OF PROFESSOR BETH LEW-WILLIAMS

I, Beth Lew-Williams, am Professor of History at Princeton University. If called to testify, I could and would do so as follows:

1. I have been asked to provide my expert opinion on the historical meaning of the Citizenship Clause of the Fourteenth Amendment at the time it was adopted. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. If additional information becomes available, or if I believe it would be appropriate to respond to any critique or contrary theories, I will advise Plaintiffs' counsel that I intend to do so and will seek their help in following the appropriate judicial procedures. The opinions in this declaration are my own.

**Professional Background and Qualifications**

2. I earned an A.B. degree in History from Brown University in 2004 and a Ph.D. in History from Stanford University in 2011. I was a Visiting Assistant Professor in History at Northwestern University from 2012-2014. Since 2014, I have held positions as Assistant

1

Professor, Associate Professor, and Professor of History at Princeton University. I have received honors and awards for my research in U.S. history, including the internationally recognized Dan David Prize for the study of the human past (2025) and election to the Society of American Historians (2024). I have received individual fellowships from the National Endowment for the Humanities, the Harry Frank Guggenheim Foundation, the American Council for Learned Societies, and the Andrew W. Mellon Foundation. Appendix A is a true and correct copy of my complete curriculum vitae, which includes a list of all publications I authored in the last 10 years.

3.     I have not previously testified as an expert at trial or by deposition. I am being compensated at the rate of $200 per hour.

4.     I have published two books with Harvard University Press. *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* (2018) examines the Reconstruction-Era transformation of citizenship and alienage, as well as the origins of U.S. immigration control. *John Doe Chinaman: A Forgotten History of Chinese Life under American Racial Law* (2025) uncovers thousands of discriminatory local laws and describes Chinese legal challenges under the Fourteenth Amendment. In addition, I have published articles on immigration in the Reconstruction Era in *The Journal of American History*, *The Journal of the Civil War Era*, *Modern American History, The American Historian, The American Historical Review,* and *Pacific Historical Review.* My books and articles have been recognized by prizes from the Organization of American Historians, the Western History Association, the Society for Historians of the Gilded Age and Progressive Era, and the Society for the History of the Federal Government. I have given lectures at historical conferences, history departments of universities, and law schools on

the history of U.S. immigration law, the Fourteenth Amendment, and citizenship in the nineteenth century. I was named a Distinguished Lecturer by the Organization of American Historians.

5. My research focuses on the history of immigration in the nineteenth-century United States. Many of my research studies focus specifically on issues related to immigration law, the Reconstruction Amendments, citizenship status, and Chinese immigration.

6. I was asked to provide a survey and my views of key historical evidence as to the meaning of the Fourteenth Amendment as it was understood at the time of its adoption.

7. In conducting this analysis, I used standard historical methods, drawing from approaches typically used by legal historians and political historians. I reviewed contemporaneous sources (including relevant texts, legislative history, contemporaneous legal scholarship, newspaper accounts, dictionary definitions, and judicial decisions) and the rich secondary literature concerning citizenship and the Constitution, the Antebellum period, the Civil Rights Act of 1866, the Reconstruction Amendments, and related court decisions. By reading these historical documents and reviewing existing scholarship, I was able to examine the historical context of the Citizenship Clause of the Fourteenth Amendment. Standard historical methods emphasize the importance of understanding historical texts within their original context.

8. Based on my research, I conclude that there is overwhelming evidence that at the time of its enactment the Fourteenth Amendment was understood to guarantee birthright citizenship to persons born on United States soil, including the children of all non-diplomatic aliens, subject to the narrow exceptions discuss below. In reaching this opinion, I consider the following to be particularly significant evidence:

a. Since the founding of the United States, there has been widespread acceptance of the common law principle of *jus soli*, which holds that all persons born within the United States are natural-born citizens of the Republic, with very narrow exceptions, such as the children of foreign diplomats and of invading armies.

b. The Civil Rights Act of 1866 formalized through legislation the existing common law principle of *jus soli*, applying the rule to all persons born within the territorial limits of the United States, subject to very narrow exceptions, such as those indicated above and the children of tribal Indians.

c. Congressional debates regarding the Civil Rights Act of 1866 explicitly describe the drafters' intent and expectation, namely that the citizenship provision would apply to the children of all aliens, subject to very narrow exceptions, such as the children of tribal Indians and of foreign diplomats. (The Senate did not directly discuss the children of invading armies.) These exceptions were explained on the grounds that the individuals in question were not subject to the sovereign authority of the federal government.

d. The drafters of the Fourteenth Amendment intended the Amendment's Citizenship Clause to apply to all persons born within the territorial limits of the United States, subject to very narrow exceptions, such as for the children of tribal Indians, of foreign diplomats, and of invading armies.

e. Congressional debates regarding the Fourteenth Amendment confirm that lawmakers intended and fully expected the Citizenship Clause to apply to the children of all aliens, subject to very narrow exceptions, such as the children of tribal Indians and of

foreign diplomats. (The Senate did not directly discuss the children of invading armies.)

f.   In the years immediately following the ratification of the Fourteenth Amendment, courts affirmed that the Citizenship Clause applied to the children of all aliens, subject to very narrow exceptions, such as the children of tribal Indians, of foreign diplomats, and of invading armies. Courts considering the Citizenship Clause provide important evidence as to the contemporaneous understanding of the Amendment.

**Background on the Legal Principle of *Jus Soli***

9.   The Fourteenth Amendment, which was adopted by Congress in June 1866 and ratified by the states in July 1868, begins with a statement on citizenship. The Citizenship Clause states, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."[1]

10.  It is well accepted by historians that the Fourteenth Amendment's Citizenship Clause was derived from seventeenth-century English common law, which held that all persons born within royal dominions were natural-born subjects of the Crown, except the children of foreign diplomats or invading armies.[2] Since the nineteenth century, jurists have referred

---

[1] U.S. Const., amend. XIV, § 1.

[2] James H. Kettner, *The Development of American Citizenship, 1608-1870* (Omohundro Institute and UNC Press, 2014), 3, 7-10, 13-17; Kunal M. Parker, *Making Foreigners: Immigration and Citizenship Law in America, 1600–2000* (Cambridge University Press, 2015), 25-27; Carol Nackenoff and Julie Novkov, *American by Birth: Wong Kim Ark and the Battle for Citizenship* (University Press of Kansas, 2021), 6-7. *Calvin's Case* (1608) provided the basis for this English common law principle. While establishing the rule of birthright subjecthood, Sir Edward Coke noted specific, narrow exceptions for the children of foreign ministers and invading hostile armies. In regard to invading armies, he wrote, "But if enemies should come into any of the King's dominions, and surprise any castle or fort, and possess the same by hostility, and have issue there, that issue is no subject to the King, though he be born within his dominions, for that

to this English common law rule as *jus soli*, or the right of the soil.[3] The American

colonies adopted many aspects of English common law, including the principle of *jus*

*soli*.[4]

11.   The U.S. Constitution, as drafted in 1787, did not an include an explicit *jus soli* rule, but

the prevalence of the principle is still evident. The clearest example is Article II Section I,

which stated that the President must be a "natural born Citizen."[5] It was widely believed

at the time, and continues to be the prevailing scholarly view today, that this phrase

reflected a presumption that *jus soli* would apply for the purposes of determining U.S.

citizenship. That is, all those born under the Republic would automatically acquire

---

he was not born under the King's ligeance or obedience." In regard to diplomats, he discussed the reverse scenario: "And therefore if any of the King's ambassadors in foreign nations, have children there of their wives, being English women, by the common laws of England they are natural-born subjects, and yet they are born out-of the King's dominions." Calvin's Case 7 Coke Report 1a, 77 ER 377 (K.B.); see also, Polly Price, "Natural Law and Birthright Citizenship in *Calvin's Case* (1608), *Yale Journal of Law and the Humanities* 9 (1997), 183 n. 54.

[3] Nathan Perl-Rosenthal and Sam Erman, "Inventing Birthright: The Nineteenth-Century Fabrication of jus soli and jus sanguinis," *Law and History Review* 42 (2024): 422.

[4] Kettner, *The Development of American Citizenship,* 3-5.

[5] U.S. Const., art. II, § 1. *Compare* U.S. Const., art. I, § 2, 3, which address eligibility for the House of Representatives and the Senate, respectively, and do not use the phrase "natural born Citizen." The latter states, "No person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States…." The structure of this eligibility rule distinguishes between a Senator (who may have only acquired citizenship nine years previous) and the President (who must be a "natural born Citizen"). The contrast between these two eligibility clauses implies the recognition of citizenship by birth. Furthermore, U.S. Const., art I, § 4 grants Congress the power "to establish a uniform Rule of Naturalization," but does not mention the establishment of a rule regarding natural born citizens. This omission implies that *jus soli* was assumed to apply for the purposes of defining citizenship. (At the time, "naturalization" was defined by Jacob Giles' Law Dictionary (1739) as "where a Person who is an Alien, is made the King's natural Subject" and Webster's Dictionary (1828) as "the act of investing an alien with the rights and privileges of a native subject or citizen.") Jacob Giles, *A New Law-Dictionary: Containing, the Interpretation and Definitions of Words and Terms used in the Law* (London: E. and R Nutt, and Gosling, 1739), [497]; Noah Webster, *An American Dictionary of the English Language* (1828) *Webster's Dictionary 1828,* https://websters1828.com/

membership and be eligible for the Presidency (subject to the narrow exceptions for the children of foreign diplomats and invading armies, as described under common law).[6]

12. The first federal statute regarding naturalization also implied a presumption that *jus soli* would apply for the purposes of determining native-born citizenship. The Naturalization Act of 1790 outlines the process of naturalization for all aliens, namely "[t]hat any Alien being a free white person, who shall have resided within the limits and under the jurisdiction of the United States for the term of two years, may be admitted to become a citizen thereof…." The Act further outlines the status of 1) a minor child born abroad to U.S. citizen parents and 2) a minor child "dwelling within the United States" with alien parents in the process of naturalization. The fact that the Act does not address a child born

---

[6] For example, Parker, *Making Foreigners*, 59-60. Parker states, "Although the U.S. Constitution did not explicitly mention a *jus soli* rule for the United States, there was an assumption that *jus soli* would apply for purposes of determining who counted as a U.S. citizen. The U.S. constitution required, for example, that the president be a "natural born Citizen." This assumption is also evidenced in the Antebellum Period. In *Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. 1844), the opinion stated, "And the Constitution itself contains a direct recognition of the subsisting common law principle, in the section which defines the qualification of the President. 'No person except a *natural born citizen, or* a citizen of the United States at the time of the adoption of this Constitution, shall be eligible to the office of President,' &c. The only standard which then existed, *of a natural born citizen,* was the rule of the common law, and no different standard has been adopted since. -Suppose a person should be elected president who was native born, but of alien parents, could there be any reasonable doubt that he was eligible under the Constitution? I think not. The position would be decisive in his favor, that by the rule of the common law, in force when the Constitution was adopted, he is a citizen." When debating the 1866 Civil Rights Act, members of the Senate endorsed this view, including Senator Lot Morill, who stated, "As a matter of law, does anybody deny here or anywhere that the native born is a citizen, and a citizen by virtue of his birth alone?... This is the fundamental principle running through all modern politics both in this country and in Europe. Everywhere where the principles of law have been recognized at all, birth by its inherent energy and force gives citizenship. Therefore the founders of this Government made no provision—of course they made none—for the naturalization of natural-born citizens. The Constitution speaks of "natural born," and speak of them as citizens in contradistinction from those who are alien to us." *Congressional Globe*, 39th Cong., 1st sess., (1866), 570.

within the "limits and jurisdiction" of the United States reflects that such a child was presumed to be a natural-born citizen.[7]

13. In the years after independence, U.S. courts and jurists generally agreed that the English common law principle of *jus soli* constituted the basis of citizenship law in the new republic, at least for free white persons. For example, leading American jurist James Kent delivered a lecture "On Aliens and Natives," which he later published in *Commentaries on American Law* (1827). Kent stated that "inhabitants of every country" can be divided into two categories: "aliens and natives." He explained, "Natives are all persons born within the jurisdiction of the United States" whereas "an alien is a person born out of the jurisdiction of the United States." Under this rule, he explained, "there are some exceptions, however, to this rule [of birthright citizenship], by the ancient English law, as in the case of the children of public ministers abroad, (provided their wives be English women,) for they owe not even a local allegiance to any foreign power."[8] (Local allegiance, Webster's dictionary of 1828 noted, was a duty "due from an alien to the government or state in which he resides." An 1860 law dictionary further explained, "in the United States, during the residence of aliens amongst us, they owe a local allegiance, and are equally bound with natives to obey all general laws for the maintenance of peace and the preservation of order…."[9]) Kent wished to distinguish the status of diplomats

---

[7] "An Act to Establish and Uniform Rule of Naturalization," 1 stat. 103 (1790). See also, Kettner, *The Development of American Citizenship,* 236-238.

[8] James Kent, *Commentaries on American Law,* O.W. Holmes, Jr. ed., vol. 2, [1827], (Little, Brown and Company, 1873), 39, 65.

[9] Noah Webster, *An American Dictionary of the English Language* (1828) *Webster's Dictionary 1828, https://websters1828.com/*; Alexander M. Burrill, *A Law Dictionary and Glossary: Containing Full Definitions of the Principal Terms of the Common and Civil Law* (1860, 2d. ed.), 86, 164.

from those of all other aliens, because diplomats did not owe local allegiance and were not, in his words, "equally bound with natives to obey all general laws."[10] Similarly, Kent distinguished the status of invading armies from other aliens: "If a portion of the country be taken and held by conquest in war, the conqueror acquires the rights of the conquered as to its dominion and government, and children born in the armies of a state, while abroad, and occupying a foreign country, are deemed to be born in the allegiance of the sovereign to whom the army belongs."[11] In short, the children of diplomats and invading armies did not fall under the jurisdiction of the United States, but the children of all other aliens did and, therefore, were citizens by birth.

14.   Important Antebellum Era judicial decisions also show the application of a *jus soli* principle. In the Supreme Court case *McCreery's Lessee v. Somerville*, Justice Joseph Story described the claimants in an inheritance dispute as "natural born subjects" of the United States, even though their father was not a citizen, because they were born on U.S. soil.[12]  A New York State court affirmed this view in *Lynch v. Clarke* (1844). In this case concerning the status of a white child whose parents were temporary resident aliens, the court explained the common law *jus soli* rule. The decision stated, "Upon principle… I can entertain no doubt, but that by the law of the United States, every person born within the dominions and allegiance of the United States, whatever were the situation of the parents, is a natural-born citizen." The opinion mentioned only one exception to the *jus soli* rule: "the children of ambassadors, (who are deemed to be born within the allegiance

---

[10] James Kent, *Commentaries on American Law,* O.W. Holmes, Jr. ed., vol. 2, [1827], (Little, Brown and Company, 1873), 39, 65.
[11] Kent, *Commentaries on American Law,* 43.
[12] *McCreery's Lessee v. Somerville*, 22 U.S. 354, 356 (1824).

of the sovereign represented).” The *Lynch* court affirmed that all children born within U.S. territory were natural-born citizens, except those whose parents were foreign ministers.[13]

15.   In the Antebellum Period, members of the executive branch also referred to the *jus soli* rule as common knowledge. For example, Secretary of State William Marcy, in a letter to the U.S. ambassador to France in 1854, wrote “it is presumed that, according to the common law, any person born in the United States, unless he be born in one of the foreign legations therein, may be considered a citizens thereof until he formally renounces his citizenship.”[14] Other officials made explicit that foreign parentage did not affect the *jus soli* principle. Citing *Lynch v. Clarke* in an 1859 opinion, Attorney General J. S. Black stated, “a free white person born in this country, of foreign parents, is a citizen of the United States.”[15] In an 1862 opinion, Attorney General Edward Bates wrote, “I am quite clear in the opinion that children born in the United States of alien parents, who have never been naturalized, are native-born citizens of the United Sates….”[16] These

---

[13] *Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. 1844). The opinion further stated, “The entire silence of the Constitution in regard to [a rule applicable to citizenship], furnishes a strong confirmation, not only that the existing law of the states was entirely uniform, but that there was no intention to abrogate or change it. The term citizen, was used in the Constitution as a word, the meaning of which was already established and well understood.” Reviewing state statutes, the court concluded “that the universal understanding of the representatives of the people of the states in establishing their fundamental and statutory laws, was that every person born within their territory, was by that circumstance alone, a citizen….” *See also supra* n. 6 (summarizing *Lynch* court’s analysis of the meaning of the constitutional term “natural born citizen”).

[14] Note that Marcy excluded from the *jus soli* rule only the children of diplomats. William Marcy to John Mason (June 6, 1854) in John Bassett Moore, *A Digest of International Law* vol. 3 (1906), 276. See also M. Scott Heerman, “Sources and U.S. Citizenship in Antebellum United States: A View from Abroad,” *Law and History Review* 42 (2024): 646-658.

[15] 9 Op. Att’y Gen. (1858), 373-374. See also, Catherine Y. Kim, “Citizenship Outside the Courts,” *UC Davis Law Review,* vol. 57, no. 1 (2023): 272.

[16] 10 Opt. Att’y Gen (1862), 328; See also, Moore, *A Digest of International Law* vol. 3 (1906), 277.

writings from members of the executive branch suggest a commonly held belief that the *jus soli* principle applied to citizenship in the United States.

16.    American lawmakers and jurists regularly excepted the children of diplomats and occupying armies from the *jus soli* rule, and some believed that additional limits applied during the Antebellum Period. Specifically, prominent legal thinkers questioned whether the principle of *jus soli* applied to certain Native Americans and Black slaves.[17] The prevailing belief was that members of Indian tribes were not U.S. citizens, even when born on U.S. territory, because they owed allegiance to their tribes (that is, they held a duty to their tribal leaders and were subject to their tribe's rules).[18] Most American jurists agreed that slaves were not citizens, even if born on U.S. soil, because the condition of slavery was antithetical to citizenship.[19]

17.    When it came to free Black people, the common understanding of their status shifted over time. Historian Don E. Fehrenbacher, a Pulitzer-prize winning authority on the Civil War Era, found, "[at] times, free Negroes were… recognized in the language of the law as falling within the circle of citizenship, broadly defined, and this was especially true during the early decades of the national independence." For evidence of the founders' understanding, he cited the fact that the Articles of Confederation (1778), "treated the word 'citizens' as interchangeable with the word 'inhabitants." It declared that the 'free inhabitants' of each state would be entitled to 'all the privileges and immunities of free

---

[17] Kettner, *The Development of American Citizenship*, 318, 299; Parker, *Making Foreigners*, 60-62; Nackenoff and Novkov, *American by Birth,*16-19.
[18] On "allegiance," see Burrill, *A Law Dictionary and Glossary*, 86.
[19] Robert G. Parkinson, *The Common Cause: Creating Race and Nation in the American Revolution* (Omohundro Institute and UNC Press: 2016): 361. Instead enslaved Black people were described as property, see Kettner, *The Development of American Citizenship*, 294-295, 311.

citizens in the several states.'"[20] A proposed amendment to add the word "white" to this

clause was defeated. In addition, Fehrenbacher concluded that a proposed amendment on

apportionment of taxes, which was considered five years later, also offers important

evidence that the founders assumed the existence of Black citizenship. In the proposed

amendment, Congress referred to "white and other free citizens and inhabitants."[21] And

when Congress passed an 1803 Act prohibiting the importation of Black people in

violation of state law, the law barred only a "negro" who was not "a native, a citizen, or

registered seaman of the United States."[22] Near the time of the founding, federal

lawmakers implicitly recognized the possibility of natural-born Black citizens.

18.    During the Revolutionary Era, some state legislatures passed statutes that recognized the

citizenship of all free people. For example, North Carolina's Constitution of 1776 did not

limit citizenship by race.[23] The Virginia legislature initially limited citizenship to white

people in 1779, but it amended the law in 1783 and 1786 to extend citizenship to all

individuals who were free.[24] In these and other states, state judicial decisions also

explicitly extended citizenship to all free people.[25]

---

[20] Don E. Fehrenbacher, *The Dred Scott Case: Its Significance in American Law and Politics* (Oxford University Press, 1978), 65.
[21] "Amendment to Share Expenses According to Population" (April 18, 1783) in John P. Kaminski et al., eds., *The Documentary History of the Ratification of the Constitution*, vol. I: Constitutional Documents and Records, 1776–1787 (Wisconsin Historical Society Press, 1976), 148–150.
[22] An Act to Prevent the Importation of Certain Persons into Certain States (ch. 10, 2 stat. 205, 28 February 1803).
[23] N. C. Const. of 1776, art. II, § 40; Kim, "Citizenship Outside the Courts," 275, 279.
[24] Act of May 1779, ch. 55, in *The Statues at Large: Being a Collection of all the Laws of Virginia*, vol. 10, 129-30; Kim, "Citizenship Outside the Courts," 275 n. 85; Kettner, *Development of American Citizenship,* 215.
[25] *Colchester v. Town of Lyme*, 13, Conn. 274 (1839); *State v. Manuel*, 20 N.C. 144 (18 38). See also, Kim, "Citizenship Outside the Courts," 278-279.

19.   During the Antebellum Period, however, free Black people were sometimes excepted from the general rule of *jus soli*. Some lawmakers and jurists, especially those from slave states, rejected the notion that any Black person could be a citizen.[26] Several state courts concluded that free Black Americans were excluded from the privileges of citizenship.[27] Arguments against Black citizenship can be found in congressional debates over Missouri's admission to statehood in 1820. Missouri proposed a constitution that would bar "free negroes and mulattoes" from entering the state. Proponents of Missouri's statehood argued that free Blacks could not be citizens and therefore must be understood as aliens or denizens.[28] Opponents argued that free Blacks were "not aliens or slaves, … [they] were of consequence free citizens."[29] The Missouri debates provide evidence that Black citizenship was deeply contested at the time.

20.   The Supreme Court weighed into this debate in *Dred Scott v. Sandford* (1857). The majority opinion, authored by Chief Justice Roger B. Taney, denied that Scott or any Black person could be a citizen of the United States. The ruling stated that Black people had never been citizens of the United States, because the founders had never meant the Declaration of Independence or Constitution to apply to them.[30] Taney stated that "negroes"  ("whether free or not") had "for more than a century before been regarded as

---

[26] For example, David Ramsay, *A Dissertation on the Manner of Acquiring the Character and Privileges of a Citizen of the United States* (Charleston, S.C., 1789), [3], in the digital collection *Evans Early American Imprint Collection.*
https://name.umdl.umich.edu/N17114.0001.001; Parkinson, *The Common Cause,* 631; Kettner, *The Development of American Citizenship*, 312-314.
[27] For example, *State v. Claiborne*, 19 Tenn. 331 (1838); *Pendleton v. State*, 6 Ark. 509 (1846).
[28] Missouri Constitution of 1820, art. 3, § 26; Annals of Congress, 16th Cong. 2d. sess., 557.
[29] Annals of Congress, 16th Cong. 2d. sess., 93.
[30] Kate Masur, *Until Justice Be Done: America's First Civil Rights Movement, from the Revolution to Reconstruction* (WW Norton, 2021), 259.

13

beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect; and that the negro might justly and lawfully be reduced to slavery for his benefit. He was bought and sold, and treated as an ordinary article of merchandise and traffic, whenever a profit could be made by it. This opinion was at that time fixed and universal in the civilized portion of the white race." On this basis, Chief Justice Taney maintained that the founders could not have understood free Black people to be citizens.[31] In separate dissents, Justice John McLean and Justice Benjamin Robbins Curtis rebutted this assertation, affirming Dred Scott's citizenship and describing the broader historical record of Black citizenship in the United States.[32]

21. The *Dred Scott* ruling was immediately controversial among the legal community and the public.[33] For example, in 1857, prominent jurist (and future Supreme Court Justice) Horace Gray published a pamphlet, *A Legal Review of the Case of Dred Scott*, which concluded that *Dred Scott* had been wrongly decided. He argued, "the court have not, and could not have, consistently and with sound principles, decided that a free negro could

---

[31] *Dred Scott v. Sandford*, 60 U.S. 393 (1856).

[32] *Dred Scott v. Sandford*. Both dissenting justices contested Taney's historical account and provided evidence that there were Black citizens at the time of the Founding. (Their arguments align with my own assessment of citizenship during the Revolutionary Era). Justice McLean observed that "many of them [the negroes] were citizens of the New England States, and exercised, the rights of suffrage when the Constitution was adopted." Justice Curtis explained, "At the time of the ratification of the Articles of Confederation, all free native-born inhabitants of the States of New Hampshire, Massachusetts, New York, New Jersey, and North Carolina, though descended from African slaves, were not only citizens of those States, but such of them as had the other necessary qualifications possessed the franchise of electors, on equal terms with other citizens." See also, Lucas E. Moral, "The Dred Scott Dissents: McLean, Curtis, Lincoln and the Public Mind," *Journal of Supreme Court History* 32, no. 2 (2007):133-151.

[33] Fehrenbacher, *The Dred Scott Case*, 417-428. Masur, *Until Justice Be Done,* 260.

not be a citizen of the United States."[34] Some northern state and federal courts rejected

the premise of Taney's opinion, affirmed the longstanding existence of Black citizenship,

and limited the scope of the *Dred Scott* ruling.[35] When Maine's legislature requested

clarification, for example, Maine's Supreme Court offered the opinion that "our

constitution does not discriminate between the different races of people which constitute

the inhabitants of our state; but that the term, 'citizens of the United States,' as used in

that instrument, applies as well to free colored persons of African descent as to persons

descended from white ancestors."[36] Justice Taney's denial of Black citizenship, and the

public and legal outcry that ensued, helped to heighten the sectional tensions that

eventually culminated in the Civil War (1861-1865).[37]

22.    During the Antebellum Era, the protracted debate regarding extending citizenship to free

Black persons stands in contrast to the widespread consensus that *jus soli* extended to

children of non-diplomat aliens. As previously discussed, this consensus is evidenced by

the contemporaneous writings of legal thinkers, legislators, judges, and executive branch

officials.

---

[34] Horace Gray, "A Legal Review of the Case of Dred Scott, as Decided by the Supreme Court of the United States (Boston: Crosby, Nichols, and Company, 1857), 57. For other examples, see Martha S. Jones, "Hughes v. Jackson: Race and the Rights beyond Dred Scott," *North Carolina Law Review* 91 (2013): 1770.

[35] For examples see *Hughes v. Jackson*, 12 Md. 450 (1858); *Important Decision in the U.S. Circuit Court: James C. Mitchell vs. Charles Lamar*, July 15, 1857, *Chicago Daily Tribune*, 1; Jones, "Hughes v. Jackson," 1771-1774;

[36] *Opinions of the Justices of S. J. Court on the Question Propounded by the Senate,* in Acts and Resolves passed by the Thirty-Sixth Legislature of the State of Maine (1857), 121; Jones, "Hughes v. Jackson," 1772-1773; Fehrenbacher, *The Dred Scott Case,* 445.

[37] Masur, *Until Justice Be Done,* 256-260; Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (Harper, 2011), 28; Kettner, *The Development of American Citizenship*, 312-314.

**The Citizenship Provision of the Civil Rights Act of 1866**

23.    After the Civil War, Congress drafted the first federal statute in the United States that explicitly declared the principle of *jus soli*: the Civil Rights Act of 1866. Drafted and introduced by Senator Lyman Trumbull, chairman of the Senate Judicial Committee, the Act repudiated the *Dred Scott* decision with a clear affirmation of birthright citizenship. As amended, the Act stated, "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States."[38] Congressional debate confirms both that the children of non-diplomat aliens were citizens and that this provision was intended to end the debate over whether native-born Black people were citizens of the United States.[39] The Act's author, Senator Trumbull, believed that native-born Black people were already natural-born citizens without any act of Congress (and *Dred Scott* had been wrongly decided). But he added a birthright citizenship provision to the Civil Rights Bill for additional clarity. He explained, "I hope [this provision] may be adopted for the purpose of removing doubts, not because I suppose it necessary, for I believe that the native-born person of African descent now who is a freeman in this land is as much a citizen as any of us." As to the children of non-diplomat aliens, the provision merely codified the existing *jus soli* common law rule.[40]

24.    The drafters of the 1866 Civil Rights Bill excluded two groups from birthright citizenship. First, using the phrase, "and not subject to foreign power," they excluded the children of foreign ministers. Senator Trumbull explained, "we cannot make a citizen of

---

[38] Civil Rights Act of 1866, 14 Stat. 27 (1866).
[39] Masur, *Until Justice Be Done*, 314.
[40] *Congressional Globe*, 39th Cong., 1st sess., (1866), 527-528.

the child of a foreign minister who is temporarily residing here" because they do not "owe allegiance" to the United States. This exception was in keeping with common law tradition.[41]

25.  Second, the drafters sought to exclude members of Indian tribes (who were sometimes described as "tribal Indians") and eventually settled upon the phrase, "excluding Indians not taxed."[42] "Our dealings with Indians are with them as foreigners, as separate nations," Senator Trumbull explained, "except in reference to those who are incorporated into the United States as some are, and are taxable and become citizens, and then it would be desirable that it should apply to the Indians so far as those who are domesticated and pay taxes and live in civilized society are concerned."[43] Reverdy Johnson, another member of the Senate Judiciary Committee, agreed that "Indians not taxed" were "considered virtually as foreigners."[44] All others who lived within American society and were taxed clearly fell under the jurisdiction of the United States and their children were citizens; those who lived as part of Indian tribes did not. Although English common law had not explicitly addressed the status of members of Indian tribes, it was generally understood that the *jus soli* principle excluded those who were in some way immune to the sovereign

---

[41] Senate discussions did not directly address the question of invading armies, but given the common law *jus soli* rule, it seems likely that the phrase "and not subject to foreign power" also referred to them. *Congressional Globe*, 39th Cong., 1st sess., (1866), 572. Senator Trumbull, as chairman of the Senate Judicial Committee that drafted the bill, addressed the citizenship provision at length. Other members of the committee did not contradict Trumbull's characterization of the provision.

[42] The original Constitution used the phrase "Indians not taxed" in order to distinguish between Indians who were incorporated into American society and those who lived under the authority of their tribes. U.S. Const., art. I, § 2.

[43] *Congressional Globe*, 39th Cong., 1st sess., (1866), 498.

[44] *Congressional Globe*, 39th Cong., 1st sess., (1866), 572.

authority of the U.S. government.[45] Trumbull's provision excluded children of foreign diplomats and the children of "Indians not taxed" from birthright citizenship, because he believed that both groups belonged to a foreign government.[46]

26. The drafters of the 1866 Civil Rights Act intended the Act to reaffirm that the children of aliens (other than foreign diplomats) were citizens. Senator Trumbull made clear his expectation to the Senate. When asked if the Act would affirm citizenship for "the children of Chinese and Gypsies born in this country," Trumbull answered, "undoubtedly." He stated, "the child of an Asiatic is just as much a citizen as the child of a European."[47]

27. In the discussion that followed, members of the Senate debated the wisdom of the common law granting citizenship to the children of aliens, especially aliens ineligible to naturalization like the Chinese. A few Senators also disagreed as to whether preexisting *jus soli* common law had already made the children of Chinese immigrants natural-born

---

[45] Calvin's Case 7 Coke Report 1a, 77 ER 377 (K.B.). For interpretations of English common law, see Kent, *Commentaries on American Law,* 39, 65.

[46] Trumbull stated, "I have no objection to the amendment in the form in which it was first proposed by the Senator from Kansas, to exclude from naturalization all Indians who owe allegiance to any tribal authority." He further explained that "Indians not taxed" were "considered virtually as foreigners, [the phrase is] a description of person connected with those tribes with whom we make treaties." While Trumbull expressed the "desire" to "make citizens of everybody born in the United States who owe allegiance to the United States," he stated, "We cannot make citizens of the child of a foreign minister who is temporarily residing here." *Congressional Globe*, 39th Cong., 1st sess., (1866), 572, 525, 527.

[47] *Congressional Globe*, 39th Cong., 1st sess., (1866), 498. This discussion was widely reported in national newspapers. For example, *The Chicago Daily Tribune* summarized the exchange as follows: "Mr. COWAN, of Pa., called attention to the fact that this amendment would naturalize a great number of Chinese children in California. Mr. TRUMBULL said the children of Chinese parents born in this country were citizens. If this were not true, there were many counties in Pennsylvania so thickly inhabited by Germans that there must be very few citizens in them." "Proceedings of Congress," January 31, 1866, *Chicago Daily Tribune,* 1. See also, "From Yesterday's Evening Papers," February 1, 1866, *New Orleans Daily Crescent*, 1.

citizens. But no Senator disputed the effect of the bill, namely, that it would make the U.S.-born children of non-diplomatic aliens U.S. citizens—including the children of Chinese immigrants—regardless of their parentage. Senator Trumbull explained later, "I have already said that in my opinion birth entitles a person to citizenship, that every free-born person in this land is, by virtue of being born here, a citizen of the United States, and that the bill now under consideration is but declaratory of what the law now is; but, inasmuch as some persons deny this, I thought it advisable to declare it in terms in the statute itself." The Act merely declared the existing common law principle.[48]

28. President Andrew Johnson shared the assumption that the Civil Rights Act of 1866 would extend citizenship to the U.S.-born children of all non-diplomatic aliens. This understanding formed the basis of one of his major objections to the bill, which he vetoed. In his veto message to Congress, President Johnson complained that the citizenship provision "comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the entire race designated as blacks, people of color, negroes, mulattoes, and persons of African blood. Every individual of these races born in the United States is by the bill made a citizen of the United States."[49] In recognizing that the Civil Rights Bill would extend citizenship to the children of Chinese and other immigrants, he acknowledged that the *jus soli* rule applied to all non-diplomatic aliens, even those he found objectionable. On April 9, 1866, Congress overrode President Johnson's veto and enacted the Civil Rights Act.

---

[48] *Congressional Globe*, 39th Cong., 1st sess., (1866), 600.
[49] Andrew Johnson, Veto Message, (March 27, 1866), in *Congressional Globe*, 39th Cong., 1st sess., 1835-1837.

**The Citizenship Clause of the Fourteenth Amendment**

29.   Congress sought a more permanent guarantee that national birthright citizenship would

endure in the United States and, on April 30, 1866, the Joint Committee of Fifteen on

Reconstruction introduced a draft of the Fourteenth Amendment.[50]

30.   The original draft of the Fourteenth Amendment did not include a clause affirming

birthright citizenship, because most Republicans did not believe such language was

necessary. They believed that the English common law principle of *jus soli* had always

applied in the United States and *Dred Scott* had been wrongly decided.[51] But some

lawmakers continued to claim that the *Dred Scott* decision remained binding precedent.[52]

In order to invalidate the *Dred Scott* decision and silence its supporters, Senate

Republican Jacob Howard of Michigan introduced a provision, which came to be known

as the Citizenship Clause: "All persons born or naturalized in the United States, and

subject to the jurisdiction thereof, are citizens of the United States and of the State

wherein they reside." In the House, Representative Thadeus Stevens explained the intent

of the added provision: "The first section is altered by defining who are citizens of the

United State and of the States…. It declares this great privilege to belong to every person

---

[50] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2896; Kettner, *The Development of American Citizenship*, 342.

[51] As historian Kate Masur explains, "The principle of birthright citizenship—that all person born in the United States were citizens of the United States—arrived in the Fourteenth Amendment only at the end of deliberations. The House passed the Amendment without that language, not because Republicans did not support the idea but because so many took it for granted. African Americans and their allies had long argued that in both Roman and English legal tradition, states had two basic classes of free inhabitants: citizens and aliens. If you were not one, then you were the other. … Most Republicans, however, had never wavered from the view that Dred Scott was wrongly decided and that the weight of historical evidence and political theory was in favor of free African American's status as citizens." Masur, *Until Justice Be Done,* 336.

[52] Masur, *Until Justice Be Done*, 336-367.

born or naturalized in the United States."[53] The provision made clear that, in addition to the children of non-diplomat aliens, free African Americans were U.S. citizens and citizens of the state in which they lived.[54]

31. While the Civil Rights Act of 1866 and the Citizenship Clause of the Fourteenth Amendment share some of the same language, the Amendment *extends* birthright citizenship to all those "subject to the jurisdiction" of the United States while the Act *excludes* those "subject to any foreign power" and "Indians not taxed." Although both the Act and the Amendment were approved by the Thirty-Ninth Congress, historians have explained that circumstances had shifted within a few short weeks. While Senator Trumbull had taken a conciliatory and moderate approach to try to win President Johnson's signature on the Act, the President's veto convinced many Senate Republicans that this was not a viable path. This circumstance may explain why Senator Howard employed bolder and broader language in the Amendment.[55]

32. At the time the Fourteenth Amendment was drafted, the meaning of the term "jurisdiction" was well-established. Webster's Dictionary of 1865 offered four definitions of "jurisdiction:" 1) "The legal power or authority of doing justice in cases of complaint; the power of executing the laws and distributing justice;" 2) "Power of governing or with legislating;" 3) "The power or right of exercising authority;" 4) "The limit within which

---

[53] *Congressional Globe*, 39th Cong., 1st sess., (1866), 3148. At the time, *The Congressional Globe* reported far more extensively on the Senate than the House, therefore less is known about the nature of House discussions on this and other issues.

[54] This common understanding was affirmed in subsequent Supreme Court opinions, including *Slaughter House Cases*, 83 US (16 Wall.) 26, 73 (1873); *In re Look Tin Sing*, 21 F. 905, 909 (1884).

[55] Foner, *Reconstruction,* 257, 260; Garrett Epps, *The Citizenship Clause: A 'Legislative History'*, 60 *Am. Univ. L. Rev.* 331 (2010), 350.

power may be exercised."[56] Burrill's 1860 Law Dictionary offers a similar definition: in a "general sense," "jurisdiction" referred to the sovereign's "power to make law; power to legislate or govern; power or right to exercise authority."[57] These definitions refer to the judicial, congressional, and executive power to govern; they describe the government's sovereign authority to set and enforce rules for a person or territory.

33.    The Fourteenth Amendment drafters would have also understood the meaning of "jurisdiction" relative to aliens from previous court decisions. The most prominent case is *Schooner Exchange v. McFaddon* (1812), which regarded a foreign war ship in a U.S. harbor. In his opinion, Chief Justice Marshall spoke at length about the meaning of "jurisdiction." He stated, "The jurisdiction of a nation within its own territory, is exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction deriving validity from an external source would imply a diminution of its sovereignty…." Justice Marshall equated "jurisdiction" with the sovereign authority to govern.[58] And importantly, in *Schooner Exchange v. McFaddon*, Justice Marshall further clarified that aliens within U.S. territory fall under the "jurisdiction" or "sovereignty" of the United States. He stated that foreign "private individuals" were subject to U.S. jurisdiction and owed "temporary and local allegiance," because any other interpretation would be "dangerous to society."[59] Therefore, Justice Marshall found that foreign visitors

---

[56] Noah Webster, *A Dictionary of the English Language Exhibiting the Origin, Orthography, Pronunciation and Definitions of Words* (George Routledge & Company, 1856), 571.
[57] Burrill, *A Law Dictionary and Glossary*,112-113.
[58] *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812).
[59] *Schooner Exchange v. McFaddon*. The full passage is as follows: "When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction and the government to degradation, if such individuals or

to a country are subject to U.S. laws and courts while within U.S. territory. He identified only three exceptions: foreign rulers, foreign diplomats and their staff, and foreign military forces were not subject to U.S. jurisdiction even when within U.S. territory.

34. Other leading legal scholars, who were widely read at the time the Fourteenth Amendment was adopted, agreed that the United States held "jurisdiction" over both U.S. citizens and non-diplomatic aliens within its territory. For example, Henry Wheaton, one of the most prominent American scholars in the Antebellum Period, endorsed Chief Justice Marshall's decision in *Exchange v. McFaddon* and elaborated on the nature of jurisdiction in *Elements of International Law* (1836). He stated, "all persons and property within the territorial jurisdiction of a sovereign [are] amenable to the jurisdiction of himself and his courts." He described this "general rule" as "beyond dispute," but allowed that there were several exceptions "in order to preserve the peace and harmony of nations." These exceptions to "territorial jurisdiction" included "a foreign sovereign," "an ambassador, or other public minister," and "a foreign army or fleet."[60] For Wheaton, to be "subject to the jurisdiction of the U.S," was to be subject to U.S. governance and sovereign authority. The only persons not completely subject to U.S. jurisdiction, therefore, were those who were immune to U.S. sovereignty, including foreign sovereigns, ministers, and invading armies.

35. The congressional debates over the Fourteenth Amendment reflected and affirmed this common understanding of who is subject to a nation's jurisdiction. Senator Howard, who

---

merchants did not owe temporary and local allegiance and were not amenable to the jurisdiction of the country."

[60] Henry Wheaton, *Elements of International Law* [1836], Fourth English Edition, (Stevens and Sons, Limited, 1904), 150, 161.

introduced the citizenship provision, explained that he sought to constitutionalize existing law. He stated, "[T]he question of citizenship has been so fully discussed in this body as to not need any further elucidation, in my opinion. This amendment which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States." He then clarified that *jus soli* did not apply to foreign ministers, but did apply to all others: "This [provision] will not, of course, include persons born in the United States who are foreigners, [that is] aliens, who belong to the families of embassadors [sic] or foreign ministers accredited to the Government of the United States, but will include every other class of persons. It settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States."[61] In other words, the children of non-diplomatic aliens who are born within the United States are subject to U.S. jurisdiction and, by this provision, natural-born U.S. citizens.

36.    In addition to excluding the children of diplomats from birthright citizenship, drafters of the Fourteenth Amendment's Citizenship Clause also intended to exclude members of Indian tribes. They did so on a related rationale, believing that Indian tribes held their own sovereignty.[62] Senator Howard explained, "Indians born within the limits of the

---

[61] I have added a parenthetical phrase for clarity. Based on the grammatical structure of the sentence, I believe that Trumbull was adding clarification (that by "foreigners" he meant "aliens") before proceeding to describe which aliens would be excluded. *Congressional Globe*, 39th Cong., 1st sess., (1866), 2890. Senator Williams also referenced the exclusion of the "child of an embassador" from the clause. *Congressional Globe*, 39th Cong., 1st sess., (1866), 2897.
[62] According to Senator Howard, "We have always recognized in an Indian tribe the same sovereignty over the soil which it occupied as we recognize in a foreign nation of a power in itself over its national domains." *Congressional Globe*, 39th Cong., 1st sess., (1866), 2895; Masur, *Until Justice Be Done*, 338.

United States and who maintain their tribal relations, are not, in the sense of this amendment, born subject to the jurisdiction of the United States. They are regarded, and always have been in our legislation and jurisprudence, as being *quasi* foreign nations."[63] Senator Trumbull agreed that Indian tribes acted similarly to foreign nations; for example they entered into treaties with the United States.[64] In consequence, members of Indian tribes were not subject to the "complete jurisdiction" of the United States and, as Trumbull made clear, "[i]t is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens." Trumbull went on to explain, "We have in this country, and have to-day, a large region of the country within the territorial limits of the United Sates, unorganized, over which we do not pretend to exercise any civil or criminal jurisdiction, where wild tribes of Indians roam at pleasure, subject to their own laws and regulations, and we do not pretend to interfere with them. They would not be embraced by this provision." [65] According to Trumbull, unlike other persons residing within the United States, these tribal Indians did not fall under the U.S. government's "civil or criminal jurisdiction."

37.  In contrast, it is clear from the congressional debates over the Fourteenth Amendment that Congress understood the Citizenship Clause to apply to the children of non-diplomatic aliens, including those aliens considered undesirable at the time. During the congressional debate, Senator Edgar Cowan of Pennsylvania asked, "Is the child of the

---

[63] Senator Howard expanded on this point: "The Government of the United States have always regarded and treated the Indian tribes within our limits as foreign Powers, so far as the treaty-making power is concerned, and so far especially as the commercial power is concerned." *Congressional Globe*, 39th Cong., 1st sess., (1866), 2890, 2895.
[64] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2893.
[65] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2893-2894.

Chinese immigrant in California a citizen? Is the child of a Gypsy born in Pennsylvania a citizen?"[66] In response Senator John Conness of California clarified, "the proposition before us… relates simply in that respect to the children begotten of Chinese parents in California and it is proposed to declare that they shall be citizens. We have declared that by law; now it is proposed to incorporate the same provision in the fundamental instrument of the nation." Despite his trepidations about Chinese immigrants in California, Senator Conness made clear that he was "in favor" of this provision, as he had been for the 1866 Civil Rights Act. Senator Conness asserted that the provision declared, "the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States."[67] None of the drafters of the Amendment objected to Conness's characterization and summaries of his response received widespread national attention in the news.[68] While the Senate continued to debate the wisdom of making the children of non-diplomatic aliens U.S. citizens, no Senator questioned whether this would be the effect of the provision.

---

[66] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2890.

[67] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2891.

[68] Newspapers reported the exchange without commentary. For example, the *Daily Morning Chronicle* summarized Conness's response: "Mr. Conness did not anticipate any great danger from this [the children of Chinese and gypsies]. It [the Amendment] only declared as citizens children born in the United States. He had already voted for a law to do this, and was not willing to make it the fundamental law of the land. … There were not as many Chinese children now in California as gypsy children in Pennsylvania, and the danger to be apprehended from them existed only in the imagination of the Senator and others who deprecated so much the effect of this amendment." "Senate," May 31, 1866, *Daily Morning Chronicle* (Washington, DC), 1. See also, "Reconstruction," May 31, 1866, *Philadelphia Inquirer*, 1; "Senator Conness on Reconstruction," July 25, 1866, *Sacramento Daily Union,* 2.

38.   Senator Conness understood that that the children of Chinese immigrants fell under the jurisdiction of the United States and would be U.S. citizens under this provision, even though many of the Chinese were temporary immigrants. In response to Senator Cowan, Senator Conness stated that Chinese immigrants "all return to their own country at some time or other, either alive or dead… Those persons return invariably, while others take their places."[69] While "fully aware of the nature of that class of people," Senator Conness was "entirely ready to accept the provision proposed in this constitutional amendment…." Despite the fact that many Chinese immigrants were only temporary residents within the United States, Senator Conness asserted that their U.S.-born children would be U.S. citizens.[70] None of the drafters of the Amendment objected to Conness's characterization.

39.   In a separate discussion regarding an amendment proposed by Senator Benjamin Wade, the Senator was asked whether a person could be born in the United States and *not* be a citizen. Senator William Fessenden specifically raised the question of temporary immigrants: "Suppose a person is born here of parents from abroad temporarily in this country," were they to be citizens?  In response, Senator Wade acknowledged only "one instance" in which such a person would *not* be a citizen: the children of foreign diplomats. It is worth quoting Senator Wade at length: "The senator [Fessenden] says a person may be born here and not be a citizen. I know that is so in one instance, in the case of the children of foreign ministers who reside 'near' the United States, in the diplomatic

---

[69] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2891.
[70] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2892. This statement reflected a widely held belief that Chinese immigrants were temporary "sojourners" in the United States. Beth Lew-Williams, *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* (Harvard University Press, 2018), 22, 27.

language. By a fiction of law such person are not supposed to be residing here, and under the fiction of law their children would not be citizens of the United States, although born in Washington. I agree with that, but my answer to the suggestion is that that is a simple matter, for it could hardly be applicable to more than two or three or four persons; and it would be best not to alter the law for that case."[71] In keeping with the *jus soli* principle, Senator Wade only recognized a very narrow exception for the children of foreign diplomats.

40.    The congressional record does not include equivalent discussion of the children of aliens in the House debates of the Fourteenth Amendment. In the House, the only mention of temporary immigrants in regard to birthright citizenship comes from the discussion of the Civil Rights Act. Representative James Wilson delivered a speech that principally concerned race and citizenship, in which he argued that Black people could be citizens under the *original* Constitution. As he reviewed the history of Black citizenship, he made an aside that had no direct bearing on his point. He stated that the original Constitution had no definition of the term "citizen" and, therefore, "[w]e must depend on the general law related to subjects and citizens recognized by all nations for a definition, and that must lead us to the conclusion that every person born in the United States is a natural-born citizen of such States, except it may be that children born on our soil to temporary sojourners or representatives of foreign Governments, are native-born citizens of the United States."[72] Here, Representative Wilson was referring to "general law… recognized by all nations," rather than the specific circumstances of the United States. During the

---

[71] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2769.
[72] *Congressional Globe*, 39th Cong., 1st sess., (1866), 1115-1117.

speech, Wilson cited the writings of Sir William Blackstone (a British jurist), William

Rawle (an American jurist), and Attorney General Edward Bates. However, none of these

writers made an exception to the *jus soli* rule for the children of temporary sojourners.[73]

Wilson's comment appears to be a speculative aside (he states, "it *may be* that…") about

international law (rather than U.S. law), which is unsubstantiated by his citations and

irrelevant to his point about race and citizenship. Moreover, his aside is made during

debates surrounding the Civil Rights Act. During the discussion of the Fourteenth

Amendment, the congressional record contains no equivalent comments by

Representative Wilson or other members of the House.

41.   The Senate debates, which include extended discussion about the children of immigrants,

is more pertinent because it directly addresses the meaning of the proposed Citizenship

Clause. In those discussions, Senators make clear that they expected the Clause to apply

to the children of non-diplomat aliens. In addition to discussing the case of Chinese

immigrants, Senator Cowan and Senator Conness discussed another group of aliens who

---

[73] To the contrary, Blackstone, Rawle and Bates's interpretations of the *jus soli* principle aligned with commonly held beliefs at the time, as well as my previous observations. In writing about British subjecthood, Blackstone wrote, "The children of aliens, born here in England, are, generally speaking, natural-born subjects, and entitled to all the privileges of such." Blackstone acknowledged a narrow exception for the children of ambassadors, as well as the possibility of exceptions by British statute. William Blackstone, *Commentaries on the Laws of England in Four Books*, vol. 1 (J.B. Lippincott Company, 1893), 374-375. Rawle wrote, "every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution…." William Rawle, *A View of the Constitution of the United States of America* (P.H. Nicklin, 1829), 86. Attorney General Bates, explained, "…I have no better title to the citizenship which we enjoy than 'the accident of birth'—the fact that we happen to be born in the United States. And our Constitution, in speaking of *natural born citizens,* uses no affirmative language to make them such, but only recognizes and reaffirms the universal principle, common to all nations, and as old as political society, that the people born in a country do constitute the nation, and, as individuals, are *natural* members of the body politic." Edward Bates, *Opinion of Attorney General Bates on Citizenship* (U.S. Government Printing Office, 1862), 12.

were considered undesirable: "Gypsies."[74]  Senator Cowan complained of "a certain number of people who invade [America's] borders; who owe to her no allegiance; who pretend to owe none; who recognize no authority in her government; who have a distinct, independent government of their own—an *imperium in imperio*; who pay no taxes; who never perform military service; who do nothing in fact, which becomes a citizen, and perform none of the duties which devolve upon him, but, on the other hand, have no homes, pretend to own no land, live nowhere, settle as trespassers wherever they go, and whose sole merit is a universal swindle; who delight in it, who boast of it, and whose adroitness and cunning is of such a transcendent character that no skill can serve to correct it or punish it; I mean the Gypsies. They wander in gangs in my State."[75] In this speech, Senator Cowan characterized Gypsies as an "invad[ing]," "wander[ing]" "gang" of "trespassers" with "no allegiance" to the United States and expressed fear about extending birthright citizenship to a group that failed to recognize the "authority" of the U.S. government. Therefore, he wished to modify the provision: "I think, before we assert broadly that everybody who shall be born in the United State shall be taken to be a citizen of the United States, we ought to exclude others besides Indians not taxed, because I look upon Indians not taxed as being much less dangerous and much less

---

[74] The term "gypsy" was widely applied to the Roma people in the 19th century. In 1856, Webster's Dictionary defined "gipsy" as "a race of vagabonds which infest Europe, Africa and Asia, strolling about and subsisting mostly by theft, robbery and fortune-telling…." Webster, *A Dictionary of the English Language* (1856), 449. In popular speech, "gypsy" could occasionally be used as a generic term to describe undesirable, itinerant people. Reports from Pennsylvania in 1866 mentioned occasional incidents of Gypsy wagons that would temporary settle outside of towns or cities. Some members of these "gypsy" "bands" of "migratory intruders," reporters noted, appeared to be of Roma descent, but others were believed to be "English" immigrants. "Local Intelligence," July 28, 1866, *Evening Star* (Philadelphia), 2; "More Gypsies Coming," Aug. 25, 1886, Harrisburg Telegraph (Harrisburg, PA), 3.
[75] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2891.

pestiferous to society than I look upon Gypsies."[76] Senator Cowan's opposition to the

provision as drafted makes clear that he expected it to include the children of Gypsies.

42.    Senator Conness's response suggests he held the same assumption that the provision

would include the children of Gypsies, even as he poked fun at the threatened Gypsy

"invasion." Senator Conness stated, "I had never heard myself of the invasion of

Pennsylvania by Gypsies. I do not know, and I do not know that the honorable Senator

can tell us, how many Gypsies the census shows to be within the State of Pennsylvania."

Senator Conness suggested that the immigration of Gypsies did not constitute an actual

invasion by a foreign army, and instead the choice to use the term "invasion" was mere

nativist rhetoric. He noted, "The only invasion of Pennsylvania within my recollection

was an invasion very much worse and more disastrous to the state," that of the

Confederate "rebels."[77] None of the drafters of the Amendment objected to Cowan and

Conness's statements, which suggests a widely held assumption that the Citizenship

Clause would apply to Gypsies. Although Gypsies were characterized as unwanted

"trespassers" in the United States, the Senate deliberations indicate that their children

born on U.S. soil would be included under the Citizenship Clause.

**Early Court Interpretations of the Citizenship Clause**

43.    In the period immediately following Reconstruction, courts that ruled on the question of

birthright citizenship found the Fourteenth Amendment's language to extend citizenship

---

[76] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2891.

[77] *Congressional Globe*, 39th Cong., 1st sess., (1866), 2892. At no point did the Senate discuss the children of actual invading armies. But this statement from Senator Conness clarifies that he did not regard immigrants –even those deemed undesirable like the Gypsies and Chinese—as equivalent to a hostile army during wartime. None of the drafters of the Amendment objected to his characterization.

to the children of all non-diplomatic aliens, subject to a few narrow exceptions. These rulings provide important evidence as to contemporaneous understanding of the Amendment and, notably, they align with my assessment of the historical meaning of the Citizenship Clause at the time it was adopted.

44.  The first case to directly consider birthright citizenship and the children of aliens was *In re Look Tin Sing* (1884). The U.S. circuit court case concerned the child of Chinese immigrants, who was born in California in 1870. The court found for the petitioner. In the opinion, Justice Stephen Field (a Supreme Court Justice riding circuit in San Francisco) wrote that the language of the Citizenship Clause "would seem to be sufficiently broad to cover the case of the petitioner. He is a person born in the United States."  He allowed that "[a]ny doubt on the subject, if there can be any, must arise out of the words 'subject to the jurisdiction thereof.'" Justice Field's wrote that persons "subject to the jurisdiction of the United States … are within their dominions and under the protection of their laws, and with the consequent obligation to obey them when obedience can be rendered; and only those thus subject by their birth or naturalization are within the terms of the amendment." Field found that the petitioner was subject to U.S. law upon his birth on U.S. soil and, therefore, he was subject to its jurisdiction. The phrase, "subject to the jurisdiction," Field explained, excluded "persons engaged in the diplomatic service of foreign governments" and "children born in the armies" of a conquering state.[78]

45.  To reach this conclusion, Field reviewed the common law tradition known as *jus soli*, cited *Lynch v. Clark*, and consulted the 1866 congressional record. He found, "The clause as to citizenship was inserted in the amendment not merely as an authoritative declaration

---

[78] *In re Look Tin Sing*, 21 F. 905, 909 (1884).

of the generally recognized law of the country, so far as the white race is concerned, but also to overrule the doctrine of the *Dred Scott* Case, affirming that persons of the African race brought to this country and sold as slaves, and their descendants, were not citizens of the United States, nor capable of becoming such." After reviewing this history, Field concluded, "the meaning of the words in the fourteenth amendment, 'subject to the jurisdiction thereof,' … do not exclude the petitioner from being a citizen." Field's decision rested on the status of the child, rather than the status of the parents. He found that Look Tin Sing "is not within any of the classes of persons excepted from citizenship, and the jurisdiction of the United States over him at the time of his birth was exclusive of that of any other country."[79] As the child of a non-diplomatic alien born in California, he was born under the jurisdiction of the United States.

46. The Supreme Court directly considered birthright citizenship and the children of aliens in *U.S. v. Wong Kim Ark* (1898).[80] The ruling reaffirmed that the U.S.-born children of non-diplomatic aliens are natural-born citizens. In the words of Justice Horace Gray, "[a] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but have a permanent domicil and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the Fourteenth Amendment of the Constitution."[81]

---

[79] *In re Look Tin Sing*.
[80] The Supreme Court questioned birthright citizenship and its limits in dicta in previous decisions, but did not rule directly on the subject. See *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1874); *Slaughter House Cases*, 83 US (16 Wall.) 26, 73 (1873).
[81] *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

47. To reach this conclusion, the Court reviewed the English common law tradition of *jus soli*, as well as previous case law and congressional debates. The Court began by explaining the English common law principle and why it applied to the children of aliens. Justice Gray stated, "The fundamental principle of the common law with regard to English nationality was birth within the allegiance, also called "ligealty," "obedience," "faith," or "power," of the King. The principle embraces all person born within the King's allegiance and subject to his protection. Such allegiance and protection were mutual… and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; but were predicable of aliens in amity, as long as they were within the kingdom."[82] The Court explained that all children of aliens were born within the allegiance of the King, subject to extremely narrow exceptions for the children of foreign diplomats and of invading armies.

48. Although the parents of Wong Kim Ark had a "permanent domicil and residence in the United States," Justice Gray clarifies that the common law principle also included the children of temporary sojourners. The Court quotes Lord Chief Justice Cockburn, who states: "By the common law of England, every person born within the dominion of the Crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject, save only the children of foreign ambassadors (who were excepted

---

[82] Justice Gray continued with extremely narrow and specific exceptions: "Children, born in England, of such aliens, were therefore natural-born subjects. But the children born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the King's dominions, were not natural-born subjects, because [they were] not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction of the King. *United States v. Wong Kim Ark.*

because their fathers carried their own nationality with them), or a child born to a foreigner during the hostile occupation of any part of the territories of England." The Court found that this common law rule "was in force in all the English Colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the Constitution as originally established."[83]

49. Justice Gray concluded that, even before the ratification of the Fourteenth Amendment, "all white persons, at least, born within the sovereignty of the United States, whether the children of citizens of foreigners… were native-born citizens," with the exception of the children of foreign diplomats or invading armies. The Court found that the Citizenship Clause "was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States who would thereby have become citizens according to the law existing before its adoption. It is declaratory in form, and enabling and extending in effect." The clause's purpose was to "put it beyond doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States are citizens of the United States."[84]

50. In *Wong Kim Ark*, the Court considered the phrase "under the jurisdiction thereof" at length. It concluded, "The real object of the Fourteenth Amendment of the Constitution, in qualifying the words, 'All persons born in the United States' by the addition 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the National Government, unknown to the common law), the two classes of

---

[83] *United States v. Wong Kim Ark*.
[84] *United States v. Wong Kim Ark*.

cases—children born of alien enemies in hostile occupation and children of diplomatic representatives of a foreign State—both of which, as has already been shown, by the law of England and by our own law from the time of the first settlement of the English colonies in America, had been recognized exceptions to the fundamental rule of citizenship by birth within the country." For the three named exceptions—"members of Indian tribes," "children born to enemy aliens in a hostile occupation," and "children of diplomatic representatives of a foreign State"—the children in question were not born completely within the jurisdiction of the United States; they were to some degree immune to U.S. sovereignty.[85] In contrast, the children of aliens born on U.S. soil were within the complete jurisdiction of the United States.[86] The Supreme Court found that Citizenship Clause was intended to constitutionalize "the ancient and fundamental rule of citizenship by birth within the territory."[87]

---

[85] *United States v. Wong Kim Ark*. In debates regarding the Fourteenth Amendment's Citizenship Clause, the Senate addressed two of these exceptions (the children of diplomats and tribal Indians), but did not explicitly discuss the third (the children of armies during a hostile invasion). For the third exception, Justice Gray cited English common law (e.g. *Calvin's Case*), legal thinkers (e.g. James Kent), and previous court rulings (e.g. *Schooner Exchange v. McFaddon*). These sources did not equate unwanted aliens with invading armies, and neither did Justice Gray. Notably, when listing the exceptions to *jus soli*, the Court did not include the children of temporary sojourners or those without permeant domicile.

[86] *United States v. Wong Kim Ark*. As the court explained, "Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate,… although but local and temporary, continuing only so long as he remains within our territory." Alien parents owed local allegiance to the United States—that is, they were "equally bound with natives to obey all general laws for the maintenance of peace and the preservation of order"—and the children of alien parents born in the United States owed allegiance as well. On "local allegiance," see Burrill, *A Law Dictionary and Glossary*, 164.

[87] *United States v. Wong Kim Ark*.

**Summary of Conclusions**

51.  Based on my research, I conclude that there is overwhelming evidence that at the time of its enactment the Fourteenth Amendment was understood to guarantee birthright citizenship to persons born on U.S. soil, including the children of all non-diplomatic aliens, subject to the few narrow exceptions I have discussed. Among the more important evidence I considered in reaching this conclusion, I am relying specifically on the following:

   a.  Since the founding of the United States, there has been widespread acceptance of the common law principle of *jus soli*. The legal principle held that all persons born within the United States were natural-born subjects of the Republic, subject to very narrow exceptions, such as the children of foreign diplomats and wartime invading armies. This commonly held belief is reflected in the Constitution's requirement that a president must be a "natural born citizen," as well as prominent legal treatises, relevant case law, and records from the executive branch. Before the Civil War, however, the principle of *jus soli* was only consistently applied to white persons.

   b.  The Civil Rights Act of 1866 formalized through legislation the existing common law principle of *jus soli*. The drafters of the Act intended it to apply to all persons born within the territorial limits of the United States, subject to very narrow exceptions, such as the children of tribal Indians, of foreign diplomats, and of invading armies.

   c.  Congressional debates regarding the Civil Rights Act of 1866 explicitly describe the drafters' intent and expectation, namely that the citizenship provision would apply to the children of all aliens born within the territorial limits of the United States, subject to very narrow exceptions, such as the children of tribal Indians and of foreign

diplomats. (Senate debates did not directly address the children of invading armies.) Even lawmakers who questioned the wisdom of this provision, including President Andrew Johnson, agreed that it would apply to the children of all non-diplomatic aliens, including those aliens considered undesirable.

d. The drafters of the Fourteenth Amendment intended to enact the same interpretation of *jus soli* that underpins the Civil Rights Act of 1866 in the Fourteenth Amendment, specifically the drafters of the Amendment's Citizenship Clause intended it to apply to all persons born within the territorial limits of the United States, subject to very narrow exceptions, such as the children of tribal Indians and foreign diplomats. These narrow exceptions fall under the phrase "subject to the jurisdiction." At the time, Congress, jurists, and the courts did not believe that United States held jurisdiction— that is, the judicial, congressional, and executive power to govern—over foreign ministers, the "quasi foreign nations" of Indian tribes, or actual invading armies.

e. Congressional debates regarding the Fourteenth Amendment clarify that lawmakers intended and fully expected the Citizenship Clause to apply to the children of all aliens, subject to very narrow exceptions, such as the children of tribal Indians and of foreign diplomats. (Senate debates did not directly address the children of invading armies.) Even Senators who questioned the wisdom of the Citizenship Clause agreed that it would apply to the children of all non-diplomatic aliens. Furthermore, Senators agreed that the Citizenship Clause applied to longtime resident aliens, as well as those considered to be temporary immigrants (such as Chinese immigrants) and undesirable "trespassers" (such as Gypsy immigrants).

f.  In the years immediately following the ratification of the Fourteenth Amendment, courts considering the Amendment provide important evidence as to the contemporaneous understanding of the Amendment.  A U.S. circuit court ruled in *In re Look Tin Sing* (1884) that the child of Chinese immigrants born in the United States was subject to U.S. jurisdiction and a natural born U.S. citizen. The Supreme Court ruled in *United States v. Wong Kim Ark* (1898) that the child of Chinese immigrants born in the United States was subject to U.S. jurisdiction and a natural born U.S. citizen. In both cases, the court reviewed the history of the common law principle of *jus soli*, the congressional record, and the writing of leading jurists in order to clarify the drafters' intent. The courts found that Congress intended and expected the Citizenship Clause to apply to the children of virtually all aliens, subject to very narrow exceptions for the children of tribal Indians, of foreign ministers, and of invading armies. These findings align with my assessment of the historical meaning of the Citizenship Clause at the time it was adopted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.



DATED: June 26, 2025                          Beth Lew-Williams

## Works Cited

### Cases

*Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812)

*McCreery's Lessee v. Somerville*, 22 U.S. 354, 356 (1824)

*State v. Manuel*, 20 N.C. 144 (1838)

*State v. Claiborne*, 19 Tenn. 331 (1838)

*Colchester v. Town of Lyme*, 13, Conn. 274 (1839)

*Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. *1844*)

*Pendleton v. State*, 6 Ark. 509 (1846)

Dred Scott v. Sandford, 60 U.S. 393 (1856)

*Hughes v. Jackson*, 12 Md. 450 (1858)

*Slaughter House Cases*, 83 US (16 Wall.) 26, 73 (1873)

*Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1874)

*In re Look Tin Sing*, 21 F. 905, 909 (1884)

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898)


### U.S. and State Constitutions

Missouri Const. of 1820, art. III, § 26

North Carolina Const. of 1776, art. II, § 40

U.S. Const., art. I, § 2, 3, 4

U.S. Const., art. II, § 1

U.S. Const., amend. XIV, § 1

**Statutes**

Act of May 1779, ch. 55, in *The Statues at Large: Being a Collection of all the Laws of Virginia*, vol. 10, 129-130.

"An Act to Establish and Uniform Rule of Naturalization," 1 Stat. 103 (1790).

Civil Rights Act of 1866, 14 Stat. 27 (1866).


**Legislative and Executive Materials**

9 Opinion of the Attorney General (1858), 373-374.

10 Opinion of the Attorney General (1862), 328.

Amendment to Share Expenses According to Population" (April 18, 1783) in John P. Kaminski et al., eds., *The Documentary History of the Ratification of the Constitution*, vol. I: Constitutional Documents and Records, 1776-1787 (Wisconsin Historical Society Press, 1976), 148-150.

An Act to Prevent the Importation of Certain Persons into Certain States (ch. 10, 2 stat. 205, 28 February 1803).

Annals of Congress, 16th Cong. 2d. sess., 93, 557.

Bates, Edward, *Opinion of Attorney General Bates on Citizenship* (U.S. Government Printing Office, 1862).

*Congressional Globe*, 39th Cong., 1st sess., (1866), 498.

*Congressional Globe*, 39th Cong., 1st sess., (1866), 525-528.

*Congressional Globe*, 39th Cong., 1st sess., (1866), 570-572.

*Congressional Globe*, 39th Cong., 1st sess., (1866), 600.

*Congressional Globe*, 39th Cong., 1st sess., (1866), 1835-1837.

*Congressional Globe*, 39th Cong., 1st sess., (1866), 2890-2895.


**Other Historical Sources**

*Calvin's Case* 7 Coke Report 1a, 77 ER 377 (King's Bench, 1608).

*Opinions of the Justices of S. J. Court on the Question Propounded by the Senate,* in Acts and Resolves passed by the Thirty-Sixth Legislature of the State of Maine (1857).

"Proceedings of Congress," January 31, 1866, *Chicago Daily Tribune,* 1.

"From Yesterday's Evening Papers," February 1, 1866, New Orleans Daily Crescent, 1.

"Reconstruction," May 31, 1866, *Philadelphia Inquirer*, 1.

"Senate," May 31, 1866, *Daily Morning Chronicle* (Washington, DC), 1.

"Senator Conness on Reconstruction," July 25, 1866, *Sacramento Daily Union,* 2.

"Local Intelligence," July 28, 1866, *Evening Star* (Philadelphia), 2.

"More Gypsies Coming," Aug. 25, 1886, Harrisburg Telegraph (Harrisburg, PA), 3.

Blackstone, William, *Commentaries on the Laws of England in Four Books*, vol. 1 (J.B. Lippincott Company, 1893).

Burrill, Alexander M., *A Law Dictionary and Glossary: Containing Full Definitions of the Principal Terms of the Common and Civil Law* (1860, 2d. ed.).

Gray, Horace, "A Legal Review of the Case of Dred Scott, as Decided by the Supreme Court of the United States (Boston: Crosby, Nichols, and Company, 1857).

Marcy, William, to John Mason (June 6, 1854) in John Bassett Moore, *A Digest of International Law* vol. 3 (1906).

Ramsay, David, *A Dissertation on the Manner of Acquiring the Character and Privileges of a Citizen of the United States* (Charleston, S.C., 1789), [3], in the digital collection *Evans Early American Imprint Collection.* https://name.umdl.umich.edu/N17114.0001.001.

Rawle, William, *A View of the Constitution of the United States of America* (P. H. Nicklin, 1829).

Webster, Noah, *An American Dictionary of the English Language* (1828) *Webster's Dictionary 1828,* https://websters1828.com/.

Webster, Noah, *A Dictionary of the English Language Exhibiting the Origin, Orthography, Pronunciation and Definitions of Words* (George Routledge & Company, 1856).

Wheaton, Henry, *Elements of International Law* [1836], Fourth English Edition, (Stevens and Sons, Limited, 1904).


**Secondary Sources**

Epps, Garrett, *The Citizenship Clause: A 'Legislative History'*, 60 *Am. Univ. L. Rev.* 331 (2010).

Fehrenbacher, Don E., *The Dred Scott Case: Its Significance in American Law and Politics* (Oxford University Press, 1978).

Foner, Eric, *Reconstruction: America's Unfinished Revolution, 1863-1877* (Harper, 2011).

Jones, Martha S., "Hughes v. Jackson: Race and the Rights beyond Dred Scott," *North Carolina Law Review* 91 (2013).

Heerman, M. Scott, "Sources and U.S. Citizenship in Antebellum United States: A View from Abroad," *Law and History Review* 42 (2024).

Kettner, James H., *The Development of American Citizenship, 1608-1870* (Omohundro Institute and UNC Press, 2014).

Kim, Catherine Y., "Citizenship Outside the Courts," *UC Davis Law Review,* vol. 57, no. 1 (2023).

Lew-Williams, Beth, *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* (Harvard University Press, 2018).

Masur, Kate, *Until Justice Be Done: America's First Civil Rights Movement, from the Revolution to Reconstruction* (WW Norton, 2021).

Moral, Lucas E., "The Dred Scott Dissents: McLean, Curtis, Lincoln and the Public Mind," *Journal of Supreme Court History 32, no. 2 (2007).*

Nackenoff, Carol, and Novkov, Jullie, *American by Birth: Wong Kim Ark and the Battle for Citizenship* (University Press of Kansas, 2021).

Parker, Kunal M., *Making Foreigners: Immigration and Citizenship Law in America,1600–2000* (Cambridge University Press, 2015).

Parkinson, Robert G., *The Common Cause: Creating Race and Nation in the American Revolution* (Omohundro Institute and UNC Press: 2016).

Perl-Rosenthal, Nathan, and Erman, Sam, "Inventing Birthright: The Nineteenth-Century Fabrication of jus soli and jus sanguinis," *Law and History Review* 42 (2024).

Prince, Polly, "Natural Law and Birthright Citizenship in *Calvin's Case* (1608), *Yale Journal of Law and the Humanities* 9 (1997).

**Additional Works Consulted**

Allen, Austin, *Origins of the Dred Scott Case: Jacksonian Jurisprudence and the Supreme Court, 1837-1857* (University of Georgia Press, 2006).

Bond, James E., *No Easy Walk to Freedom: Reconstruction and the Ratification of the Fourteenth Amendme*nt (Bloomsbury Academic, 1997).

Eisgruber, Christopher L., *Birthright Citizenship and the Constitution*, 72 NYU L. Rev. 54 (1997).

Ho, James C., *Defining 'American': Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006).

Hyman, Harold Melvin, *A More Perfect Union: The Impact of the Civil War and Reconstruction on the Constitution* (Knopf, 1973).

Ing, Matthew, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 Akron L. Rev. 719 (2012).

James, Joseph Bliss, *The Framing of the Fourteenth Amendment* (University of Illinois Press, 1956).

James, Joseph Bliss. *The Ratification of the Fourteenth Amendment* (Mercer University Press, 1984).

Jones, Martha S., *Birthright Citizens: A History of Race and Rights in Antebellum America* (Cambridge University Press, 2018).

Maltz, Earl M., *Dred Scott and the Politics of Slavery* (University Press of Kansas, 2007).

Novak, William J., "The Legal Transformation of Citizenship in Nineteenth-Century America," in Meg Jacobs, William J. Novak, and Julian Zelizer, eds., *The Democratic Experiment: New Directions in American Political History* (Princeton University Press, 2003).

Ramsey, Michael D., *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405 (2020)

Samito, Christian G., ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Toda*y (Southern Illinois University Press, 2018).

Sinha, Manisha, *The Rise and Fall of the Second American Republic: Reconstruction, 1860-192*0 (Liveright, 2024).

Torok, John Hayakawa, "Reconstruction and Racial Nativism: Chinese Immigrants and the Debates on the Thirteenth, Fourteenth, and Fifteenth Amendments and Civil Rights Laws," *Asian Law Journal* (1996).

# APPENDIX A

# BETH LEW-WILLIAMS

Department of History
Princeton University
222 Dickinson Hall
Princeton, NJ 08544-1017
bethlw@princeton.edu
https://history.princeton.edu/people/beth-lew-williams
(609) 258-6962

## ACADEMIC APPOINTMENTS

2023-        Professor, Department of History, Princeton University
                  Program Director, Asian American Studies (2023-)
                  Director of Graduate Studies, History (2021-)
2019-2023    Associate Professor, Department of History, Princeton University
2014-2019    Assistant Professor, Department of History, Princeton University
                  Philip and Beulah Rollins Bicentennial Preceptor (2017-2020)
2012-2014    ACLS New Faculty Fellow / Visiting Assistant Professor
                  Department of History & Program in Asian American Studies
                  Northwestern University

## EDUCATION

2011    Ph.D. in History, Stanford University
2006    M.A. in History, Stanford University
2004    A.B. in History with Honors, *Magna cum laude*, Brown University

## PUBLICATIONS

### BOOKS

*John Doe Chinaman: A Forgotten History of Chinese Life under American Racial Law* (Harvard
        University Press, forthcoming September 2025)
*The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America,* Cambridge,
        MA: Harvard University Press (2018). *Winner:* OAH Ellis W. Hawley Prize; OAH Ray
        Allen Billington Prize; WHA Sally and Ken Owens Prize; SHGPE Vincent P. DeSantis
        Prize; *Finalist:* Berkshire Conference of Women Historians Book Prize.

### ARTICLES

"Meaning of Alienage before *Wong Kim Ark*," *Modern American History* (conditionally
        accepted).
"Beyond Exclusion: The Anti-Chinese Legal Regime in the American West" with Hannah Postel
        (in preparation).
"Why Chinese Exclusion Matters (and Why it Doesn't)," *American Historian* (Winter 2025).

"Chinese Naturalization, Voting, and Other Impossible Acts," *The Journal of the Civil War Era* 13, no. 4 (2023): 515-536.

"Paper Lives of Chinese Migrants and the History of the Undocumented in America," *Modern American History* 4, no. 2 (July 2021): 109-130.

"'Chinamen' and 'Delinquent Girls': Intimacy, Exclusion, and a Search for California's Color Line," *Journal of American History* (December 2017): 632-655. *Winner*: WHA Ray Allen Billington Prize, WHA Jensen-Miller Prize, & WHA Vicki Ruiz Prize

"Before Restriction Became Exclusion: America's Experiment in Diplomatic Immigration Control," *Pacific Historical Review* 83, no. 1 (February 2014): 24-56. *Winner*: SHFG James Madison Prize.

## BOOK CHAPTERS

"Apologies for an Anti-Chinese Past," in Thavolia Glymph and Ari Kelman, *Contested Commemorations: Public Memory in the South and West* (in preparation).

"Chinese Migrants and 'Alien' Politics," in Maggie Blackhawk, Laura Edwards, and Naomi Lamoreaux, eds., *Deciphering Democracy: Institutional Change and Political Practice in the Nineteenth-Century United States* (in preparation).

"Richard White," with Jay Taylor, Philip Deloria, and Jared Farmer, Key Thinkers Series (Bloomsbury, forthcoming).

"Global Narratives of 'the Immigrant'" with Megan Armknecht and Markus Bierkoch, in Jeremy Adelman and Andreas Eckert eds., *Nations, Empires and Other World Products: Making Narratives Across Borders* (Bloomsbury, 2024).

*The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America,* excerpted in Annette Gordon-Reed ed., *Racism in America: A Reader* (Cambridge, Massachusetts: Harvard University Press, 2020).

"The Remarkable Life of a Sometime Railroad Worker: Chin Gee Hee, 1844-1929" in Gordon H. Chang and Shelley Fisher Fishkin, *The Chinese and the Iron Road: Building the Transcontinental Railroad in North America* (Stanford University Press, 2019), 329-345.

"Before Restriction Became Exclusion: America's Experiment in Diplomatic Immigration Control," excerpted in Lon Kurashige and Alice Yang ed., *Major Problems in Asian American History,* 2nd ed. (Boston: Cengage Learning, 2016): 79-85.

"Angel Island" in ed. Mary Yu Danico, *Asian American Society.* Sage Publications, Inc. (2014).

"Chinese Immigration," in Kathleen Arnold ed., *Anti-Immigration in the United States: A Historical Encyclopedia*. California, ABC-CLIO (2011).

## BOOK & FILM REVIEWS

"The Downfall of Asian Exclusion" a review of Jane H. Hong, *Opening the Gates to Asia: A Transpacific History of How America Repealed Asian Exclusion* in *Diplomatic History* (September, 2021): 826–829.

John R. Wunder, *Gold Mountain Turned to Dust: Essays on the Legal History of the Chinese in the Nineteenth-Century American West* in *Journal of Arizona History* (Summer 2019): 229-231.

Ric Burns and Li-Shin Yu dir., "The Chinese Exclusion Act," *American Historical Review* (February 2019): 178-180.

"Racism, Egalitarianism and Asian Exclusion," *Reviews in American History* (December 2017): 627-633.

Richard Jean So, *Transpacific Community: America, China, and the Rise and Fall of a Cultural Network* in *Journal of Chinese Overseas* 13 (2017): 143-158.

Elliott Young, *Alien Nation: Chinese Migration in the Americas From the Coolie Era Through World War II* in *The Pacific Historical Review* 85, no. 2 (May 2016): 298-299.

Huping Ling, *Chinese Chicago: Race, Transnational Migration, and Community since 1870.* in *The Journal of American Ethnic History* 33, no. 3 (Spring 2014): 88-89.

Kornel Chang, *Pacific Connections: The Making of the U.S.-Canadian Borderlands.* in H-Diplo XV., no. 24 (2014): 7-10.

Emma Teng, *Eurasian: Mixed Identities in the United States, China and Hong Kong, 1842-1943* in *Modern Chinese Literature and Culture* (November 2013).

Sue Fawn Chung, *In Pursuit of Gold: Chinese American Miners and Merchants in the American West.* In *Labour / Le Travail* 17 (Spring 2013): 271-273.

## PUBLIC WRITING

"Florida Revives an 1850s Strategy to Exclude Chinese Immigrants," 3 May 2023, *Los Angeles Times.*

"Memorializing African American Lynching Victims is Past Due. But it Must be Only the Start," *Washington Post*, May 13, 2018.

"For a Child Migrant, days feel like a Lifetime when you're Imprisoned and Alone," *Public Radio International: The World*, June 20, 2018.

## AWARDS, HONORS & FELLOWSHIPS

### EXTERNAL

| | |
|---|---|
| 2025 | Dan David Prize (for the study of the human past) |
| 2024 | Elected Member, Society of American Historians |
| 2020 | Individual Fellowship, National Endowment for the Humanities |
| 2019 | Ray Allen Billington Prize (biennial award for best book on the frontier, border, or borderlands), Organization of American Historians |
| 2019 | Ellis W. Hawley Prize (best book on the political economy, politics, or institutions of the United States), Organization of American Historians |
| 2019 | Sally and Ken Owens Prize (best book on the Pacific West), Western History Association |
| 2019 | Vincent P. DeSantis Book Prize (biennial award for best first book on US history between 1865-1920), Society for Historians of the Gilded Age & Progressive Era |
| 2019 | Caroline Bancroft History Prize (American West), Denver Public Library |
| 2019 | Finalist, Berkshire Conference of Women Historians Book Prize (first book in any field of history) |
| 2018 | Ray Allen Billington Prize (best article in the field of Western history in any journal other than the *Western Historical Quarterly*), Western History Association |

| | |
|---|---|
| 2018 | Jensen-Miller Award (best article in the field of women and gender in the North American West), Western History Association |
| 2018 | Vicki L. Ruiz Award (best article on race in the North American West), Western History Association |
| 2017-2018 | Mellon Foundation Sawyer Seminar: "Global Migration: The Humanities and Social Sciences in Dialogue," with Sandra Bermann (PI), Patricia Fernandez-Kelly, Stephen Macedo, Douglas Massey, Joe Stephens, and Michael Wood |
| 2015-2016 | Harry Frank Guggenheim Grant |
| 2015-2016 | Visitor, School of Social Science, Institute for Advanced Study, Princeton, NJ |
| 2015 | James Madison Prize (best article on the history of the federal government), Society for History in the Federal Government |
| 2012-2014 | ACLS New Faculty Fellowship |
| 2010-2011 | Andrew W. Mellon Foundation/ACLS Dissertation Completion Fellowship |
| 2004-2005 | Woodrow Wilson Fellowship Foundation / Andrew W. Mellon Foundation Fellowship in Humanistic Studies |

**PRINCETON**

| | |
|---|---|
| 2024 | Phi Beta Kapa Teaching Award |
| 2024 | Elected Honorary Member, Asian American Alumni Association |
| 2018 | University Committee on Research in the Humanities and Social Sciences Grant |
| 2017-2020 | Philip and Beulah Rollins Bicentennial Preceptorship |
| 2017-2018 | Humboldt-Princeton Strategic Partnership Grant: "Contesting and Converging Stories of Global Order: Regional and National Narratives," co-PI with Jeremy Adelman, Andreas Eckert, and Vincent Houben |

# SELECTED PRESENTATIONS

## INVITED PRESENTATIONS

| | |
|---|---|
| March 2025 | "John Doe Chinaman," University of Michigan Law School |
| Oct 2024 | "John Doe Chinaman," University of Pennsylvania Carey Law School |
| Oct 2024 | "Disenfranchisement and the Fight for Chinese Suffrage," University of Pennsylvania |
| April 2024 | "The Anonymous Chinamen: Unruly Approaches to Legal History," Brown University |
| April 2024 | "John Doe China Man: Race and Law in the American West," California State University, San Bernardino |
| Nov. 2023 | "Race Laws and Chinese Segregation in the American West," Boston University |
| Sept. 2023 | "John Doe China Man," New York University |
| April 2023 | "John Doe Chinaman: Life Under the Color Line," Cheng Family Foundation Lecture, The Huntington Library |
| March 2023 | "John Doe Chinaman: Life Under the Color Line," Smith College |
| March 2023 | "John Doe Chinaman: Life Under the Color Line," Dartmouth University |
| Feb. 2023 | "John Doe Chinaman: Life Under the Color Line," Wake Forest University |

| March 2022 | "Mary Chinaman: Trafficking, Runaways and the Law," Tangney Lecture, Bates College |
| Feb. 2022 | "Mary Chinaman: Trafficking, Runaways and the Law," University of Delaware |
| Nov. 2021 | "The Long History of Anti-Asian Violence in the US," Knowledge Against Violence Speaker Series, Harry Frank Guggenheim Foundation |
| Sept. 2021 | "The Chinese Must Go: A History of Anti-Asian Violence," Lowell Humanities Series, Boston College |
| Sept. 2021 | "The Chinese Must Go: A History of Anti-Asian Violence," University of Tennessee, Chattanooga |
| April 2021 | Roundtable on Anti-Asian Hate, Georgetown University |
| April 2021 | "The Chinese Must Go: A History of Anti-Asian Violence in the United States," Kay Johnson Lecture, Hampshire College |
| March 2021 | "John Doe Chinaman: Race and Law in the American West," Society of Fellows, Princeton University |
| Feb. 2021 | "Mary Chinaman: Trafficking, Runaways and the Law in the American West," UC Davis |
| Oct. 2020 | "Mary Chinaman: Trafficking, Runaways and the Law in the American West," Michigan Law School |
| Sept. 2020 | "An Epidemic of Anti-Asian Hate," University of California, Berkeley |
| Sept. 2020 | "Reconstructing the Polity" (Roundtable), Voting Matters: Gender, Citizenship and the Long 19th Amendment, Radcliff Virtual Conference, Harvard University |
| Feb. 2020 | Tacoma and The Chinese Must Go, University of Puget Sound |
| Dec. 2019 | "Chinese Exclusion and the Making of the Alien in America," Southern Methodist University |
| Oct. 2019 | Immigration and the American State Seminar, Yale Law School |
| May 2019 | "Paper Lives of Chinese Migrants and the History of the Undocumented in America," University of New Orleans |
| March 2019 | "Paper Lives of Chinese Migrants and the History of the Undocumented in America," Newberry Seminar in Borderlands and Latino Studies, IL |
| March 2019 | Roundtable on Reconstruction and Citizenship, Duke Law School |
| Jan. 2019 | "Mary Chinaman: Trafficking, Runaways and the Law in the American West," Stanford University |
| Jan. 2019 | "The Violence of Chinese Exclusion," Bullock Museum of Texas History |

## CONFERENCE PRESENTATIONS

| Jan. 2025 | Chair, "A Roundtable on the Comparative Emergence of Migration Regulation in 19th-Century Brazil and the United States," American Historical Association, New York |
| Nov. 2024 | "Apologies for an Anti-Chinese Past," Western History Association, Kansas City |
| Oct. 2023 | "Apologies for an Anti-Chinese Past," Contested Commemorations Workshop, Southern Methodist University, Taos |
| Nov. 2022 | "Citizenship, Alienage and the Space Between," American Society for Legal History, Chicago |
| Oct. 2022 | "The 1848 Problem: A Roundtable," Western History Association, San Antonio |
| April 2021 | "Race, Alienage, and the Terms of Chinese Inclusion," Organization of American |

| | Historians, Chicago (remote) |
|---|---|
| April 2021 | Chair, The Practice and Politics of Historical Analogy, Association for Asian American Studies (remote) |
| Oct. 2020 | Commentator, Contesting Immigration Policy and Citizenship in California, Western History Association |
| April 2019 | Chair, "How to Construct Narratives: History Section Roundtable," Association for Asian American Studies, Madison, WI |

## PUBLIC PRESENTATIONS

| | |
|---|---|
| April 2025 | The Page Act at 150 (Roundtable), Immigration and Ethnic History Society Webinar |
| May 2025 | The 150 Anniversary of the Page Act (Roundtable), NY Historical Webinar |
| June 2025 | Immigration, Industry, and Empire (Roundtable), OAH Webinar |
| Oct. 2024 | "Teaching Black and Asian Segregation," Black-Asian Solidarity Professional Development for K-12 Teachers, Princeton |
| Oct. 2024 | In Conversation with Anne Cheng on *Ordinary Disasters*, Princeton University |
| Feb. 2024 | In Conversation with Chris Suh on *The Allure of Empire,* Emory University |
| Oct. 2023 | "Teaching the Fourteenth Amendment," Black-Asian Solidarity Professional Development for K-12 Teachers, Princeton |
| March 2022 | In Conversation with Mae Ngai on *The Chinese Question,* Museum of Chinese in America |
| May 2021 | Webinar on Ending the Erasure of AAPI Stories in K-12 Education, Makes Us Visible NJ and Hopewell Valley Public Schools |
| April 2021 | Talk back on "The Chinese Lady," Lewis Center for the Arts, Princeton University |
| April 2021 | Teach in on Anti-Asian Hate, Carl A. Field Center, Princeton University |
| March 2021 | Stop Asian Hate Rally, Princeton, NJ |
| March 2021 | Teach in on Anti-Asian Hate, Psychology Department, Princeton University |
| Jan. 2021 | To Be Known and Heard Roundtable, Wintersession, Princeton University |
| Dec. 2020 | "The Chinese Must Go," National Humanities Center Webinar |
| June 2020 | Race in the COVID Era (Roundtable), Princeton University |
| Feb. 2020 | Discussion of *The Fortunes* by Peter Ho Davies, Historical Society of Princeton |
| April 2019 | Screening and Talk back on "The Chinese Exclusion Act (2017)," Princeton Public Library |
| March 2019 | "The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America," Museum of Chinese in America, NY |
| Jan. 2019 | "The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America," California Historical Society |

## Public Interviews

| | |
|---|---|
| May 2024 | "How the 1924 Immigration Act changed the course of history," Morning Edition, NPR |
| May 2022 | "L.A. Chinatown: What is Chinatown," Western Edition Podcast. |

| Nov. 2021 | "California Cities Apologize for Historical Wrongs Against Chinese Community," The Forum, KQED radio |
| Sept. 2021 | "Violence against Asian Americans," The Red Record Lynching Sites Podcast, Memphis |
| March 2021 | "The Deep History of Anti-Asian Violence in the US," The Takeaway, WNYC radio |
| June 2018 | "Family Separation," The World, Public Radio International |
| Nov. 2018 | Interview, Politics and Polls Podcast |

## SERVICE

### THE FIELD

| 2024-2027 | Kenneth N. & Sally Owens Prize Committee, Western History Association |
| 2023- | Editorial Board Member, *Journal of the Civil War Era* |
| 2023 | Kayne Prize Committee, *Journal of the Civil War Era* |
| 2021- | Faculty Affiliate, Western History Dissertation Workshop |
| 2020-2021 | Ellis W. Hawley Prize Committee, Organization of American Historians |
| 2019-2021 | Ray Allen Billington Award Committee, Western History Association |
| 2018-2021 | Executive Board Member, Immigration and Ethnic History Society |
| 2018-2022 | Editorial Board Member, *Journal of the Gilded Age and Progressive Era* |
| 2018-2022 | History Section Chair, Association for Asian American Studies |
| | Ad Hoc Reviewer: *Amerasia, American Historical Review, American Quarterly, Columbia University Press, Journal for Immigration and Ethnic History, Journal of the Gilded Age and Progressive Era, Journal of Overseas Chinese, Journal of Policy History, Modern American History, Oxford University Press, Pacific Historical Review* |

### PRINCETON

| 2023- | Director, Asian American Studies Program |
| 2023- | Member, Policy Committee, Graduate School |
| 2021- | Director of Graduate Studies, Department of History |
| 2021-2024 | Member, Faculty Advisory Committee on Diversity |
| 2020-2024 | Member, Committee on Naming (Chair, 2021-2022, 2023-2024) |
| 2020-2022 | Faculty Fellow, Society of Fellows, Princeton University |
| 2018- | Associated Faculty, Asian American Studies Program |
| 2017-2018 | Executive Subcommittee on Asian American/Diasporic Studies |
| 2017-2018 | Executive Secretary, Shelby Cullom Davis Center |
| 2016-2017 | Core Member, Migration Lab, Sawyer Seminar & Princeton Institute for International and Regional Studies Research Group |
| 2016-2018 | Member, Committee on Undergraduate Admissions and Financial Aid |
| 2015- | Executive Committee, Effron Center for the Study of America |
| 2015- | Associated Faculty, Program in Gender and Sexuality |

## THE PUBLIC

| | |
|---|---|
| June 2025 | Participant, NEH Institutes for K-12 Teachers: Bridging Histories: Angel Island and Asian American Immigration |
| June 2022 | Participant, NEH Landmarks of American History Workshop: Building Community in California: The Chinese American Experience, dir. by Stacey Greer |
| 2021- | Scholarly Advisory Committee, AAPI Multimedia Textbook, UCLA Asian American Studies Center |
| 2021-2024 | Academic Council, Immigrant Histories Initiative |
| 2021-2023 | Consultant, Make Us Visible New Jersey |
| 2020- | Participant, Tobin Project: Deciphering Democracy: Institutional Change and Political Practice in the Nineteenth-Century United States, dir. by Maggie Blackhawk, Laura Edwards and Naomi Lamoreaux |
| 2020- | Advisor, Chinatown Los Angeles Project, dir. by Bill Deverell and Greg Hise |
| 2020- | Advisory Council, Gilder Lehrman Institute |
| 2014-2020 | Participant, Chinese Railroad Workers in North America Project, Stanford University (https://www.stanford.edu/group/chineserailroad/cgi-bin/wordpress/) |

## MEMBERSHIPS

American Historical Association
American Society for Legal History
Association for Asian Americans Studies
Immigration and Ethnic History Society
Organization of American Historians
Society for Historians of the Gilded Age and Progressive Era
Society of American Historians
Western History Association