# EXPERT DECLARATION OF

# PROFESSOR JAYESH RATHOD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:25-cv-00287 |
| v. | ) ) | The Hon. Timothy J. Kelly |
| MARCO RUBIO ET AL., | ) ) | |
| Defendants. | ) | |

## EXPERT DECLARATION OF PROFESSOR JAYESH RATHOD

I, Jayesh Rathod, am a Professor of Law at American University. If called to testify, I could and would do so as follows:

## I.    INTRODUCTION

1.    I was retained by Plaintiffs' counsel to provide testimony as an expert witness on behalf of Plaintiffs in the above-captioned case. I have been asked to render opinions on the nature and scope of the noncitizen population that would be affected by the implementation of Executive Order 14160, "Protecting the Meaning and Value of American Citizenship," signed by President Donald Trump on January 20, 2025 (hereinafter, "EO 14160"). Further, this declaration describes the circumstances under which a U.S.-born child of a noncitizen might sponsor their noncitizen parent(s) for permanent residence. Finally, I have been asked to render opinions on the impact EO 14160 would have on the noncitizen parents of U.S.-born children, and on those U.S.-born children themselves. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. If additional information becomes available, or if I believe it would be appropriate to respond

1

to any critique or contrary theories, I will advise Plaintiffs' counsel that I intend to do so and will seek their help in following the appropriate judicial procedures. The opinions in this declaration are my own. This declaration complies with the requirements of Federal Rule of Civil Procedure 26(a)(2).

## II.    QUALIFICATIONS OF THE EXPERT WITNESS

2 .    My general qualifications as an expert in the area of U.S. immigration and citizenship law, and in the rights of noncitizens in the United States, are set forth in my Curriculum Vitae, attached hereto as Appendix A. I am presently Professor of Law at the American University Washington College of Law. I have been employed full-time as a member of the Washington College of Law faculty since July 2006.

3 .    I am a recognized teacher and scholar in the areas of U.S. immigration and citizenship law and the rights of noncitizens in the United States. I have taught various iterations of the introductory survey course on U.S. immigration and citizenship law about twenty different times, from 2008 to the present. I have also taught courses on the workplace rights and constitutional rights of noncitizens.

4 .    I have published and spoken widely on these issues. My Curriculum Vitae attached as Appendix A lists all of my publications. My scholarship has been selected for publication by the *Columbia Law Review*, *Yale Law Journal Forum*, *UCLA Law Review*, *Tulane Law Review*, *Arizona Law Review*, and other prominent journals. Both the U.S. Court of Appeals for the Fourth Circuit and the U.S. Court of Appeals for the Ninth Circuit have cited my work.[1] On two occasions, the *Immigration and Nationality Law Review*, which "antholizes a yearly collection of exceptional immigration scholarship published in other law journals

---

[1] *Ledezma-Cosino v. Lynch*, 819 F.3d 1070, 1078 (9th Cir. 2016), *rev'd en banc*, 857 F.3d 1042 (9th Cir. 2017); *Manning v. Caldwell*, 900 F.3d 139, 157 (4th Cir. 2018) (Motz, J., concurring), *vacated en banc*, 930 F.3d 264 (4th Cir. 2019).

around the country,"[2] has reprinted my scholarship.[3]

5 . I have developed and provided training and materials relating to U.S. immigration and citizenship law and the rights of noncitizens in the United States. Over the course of my career, I have delivered hundreds of presentations, across academic and community-based settings, regarding the content of U.S. immigration and citizenship law and the rights of noncitizens in this country. Although I have provided informal guidance to fellow attorneys regarding immigration legal issues and have delivered trainings to judges, I have not previously testified as an expert.

6 . I have received honors for my work, including a Fulbright Scholar Award in 2016 and receipt of the 2023 Great Teacher Award from the Society of American Law Teachers. I have twice received the Pauline Ruyle Moore Scholar Award for Outstanding Scholarship in the Area of Public Law.

7 . In addition to my teaching and scholarship in U.S. immigration law and related fields, I have been practicing U.S. immigration law for over twenty years, representing clients applying for different benefits and forms of relief. Through this work, I have deepened and broadened my knowledge of U.S. immigration law, and I have become familiar with how U.S. immigration law operates in practice.

## III.    COMPENSATION

7. I am compensated at a rate of $200.00 per hour for preparation of this declaration and all other work in this matter.

## IV.    DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS

8. The materials I have consulted in preparation of this declaration are set forth in the text,

---

[2] *Immigration and Nationality Law Review*, U.C. Davis Sch. of Law, https://inlr.law.ucdavis.edu/ (Feb. 12, 2024).
[3] *Distilling Americans: The Legacy of Prohibition on U.S. Immigration Law*, 51 Hous. L. Rev. 781 (2014), *reprinted in* 35 Immigr. & Nat'y L. Rev.171 (2014); *Transformative Immigration Lawyering*, 132 Yale L.J. F. 632 (2022), *reprinted in* 43 Immigr. & Nat'y L. Rev. (2023).

the footnotes, and Appendix B, and include the following:

a. Relevant policy manuals and memoranda from the U.S. Department of Homeland Security, clarifying aspects of U.S. immigration and citizenship law.
b. Relevant, current content from websites maintained by the U.S. Department of Homeland Security and the U.S. Department of State.
c. Statistical information captured by the U.S. Department of Homeland Security and the U.S. Department of State.
d. Statistical information and analyses prepared by non-governmental sources that tend to be relied upon by experts for their accuracy and impartiality.
e. Scholarly articles on U.S. immigration law and the rights and experiences of noncitizens.

9.   In preparing this expert declaration, I employed a multi-pronged methodology that combined analysis of legal materials with data-informed assessment. I reviewed relevant statutes, regulations, administrative guidance, and key judicial decisions to present the framework governing the issues addressed. To contextualize this framework, I analyzed quantitative data sets from governmental sources and reputable nonprofit organizations engaged in research. I also consulted peer-reviewed academic literature to further contextualize my findings and identify broader implications. My analysis is also informed by my professional experience in the area of U.S. immigration and citizenship law, including direct engagement with affected communities and legal practitioners. The conclusions offered in this declaration represent my independent expert judgment based on a comprehensive synthesis of legal authorities, empirical data, and secondary sources.

## V.   OPINIONS AND BASIS FOR OPINIONS

### Framework for Discussion and Opinions

10.  EO 14160 purports to deny birthright citizenship to children born in the U.S. in the following circumstances:

> (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary,

and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.[4]

11. Accordingly, this declaration examines the classes of noncitizens who hold "lawful but temporary" status, including the different categories implicated, and the numbers and backgrounds of individuals in each category. The declaration also describes certain categories of humanitarian protection that may be affected by EO 14160, as well as the estimated size and composition of the population of persons who are unlawfully present in the United States whose children might be impacted by EO 14160. The report further examines the actual pathways by which a U.S. citizen born to noncitizen parents might sponsor their parent(s) for permanent residence in the United States. Finally, the declaration describes the impact on U.S.-born children and their families, should EO 14160 be implemented.

12. The United States immigration system divides noncitizens into different categories, each with distinct privileges and conditions. An initial, broad subdivision in the U.S. immigration system is between those who are *lawfully present* and those who are *unlawfully present*. In simple terms, individuals who hold a recognized, valid status in the United States – including citizenship, lawful permanent residence, and a range of temporary statuses – are lawfully present. By contrast, individuals who lack a formal status – including those who entered without inspection, or who overstayed their visas – are generally considered to lack lawful presence.

13. The aforementioned distinction is not absolute, however: some individuals may lack a formal, lawful status in the United States, but are treated as lawfully present. For example, beneficiaries of the Deferred Action for Childhood Arrivals (DACA) program lack lawful

---

[4] Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship/.

status in the United States, but receive a benefit in the form of forbearance of removal

proceedings as an act of prosecutorial discretion, and access to employment authorization.[5]

While receiving this benefit, they are considered to be lawfully present.[6]

14. Noncitizens who are lawfully present in the United States can be further divided into certain

key categories: (1) lawful permanent residents, also known as "green card" holders or

"immigrants"; (2) nonimmigrants, or those holding temporary visas; (3) recipients of certain

types of humanitarian protection, including asylees, refugees, parolees, and beneficiaries of

Temporary Protected Status; and (4) holders of certain liminal statuses, such as DACA

beneficiaries.

**Nonimmigrant (Temporary) Visa Categories**

15. U.S. immigration law permits noncitizens to apply for a range of nonimmigrant or temporary

visas that permit them to enter the United States and reside in the country for a limited

duration and purpose.[7] Recipients of nonimmigrant visas generally must demonstrate to

consular and immigration officers that their stay in the United States is intended to be limited

in nature, and that they plan to return to their country of residence at the conclusion of their

stay.[8]

16. Section 101(a)(15) of the Immigration and Nationality Act provides the foundational

architecture for the majority of the nonimmigrant visa categories.[9] Additional detail

---

[5] *DACA FAQ*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions (Jan. 24, 2025).

[6] *See id.* at Q6.

[7] *See e.g.*, *Definition of Nonimmigrant*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/glossary-term/50717 (last visited June 15, 2025); *Requirements for Immigrant and Nonimmigrant Visas*, U.S. Customs & Border Prot., https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas (Mar. 14, 2024).

[8] Some nonimmigrant visa categories specifically require proof of maintenance of a residence abroad. *See* U.S. Dep't of State, *Foreign Affairs Manual*, 9 FAM 401.1.3(E), https://fam.state.gov/fam/09FAM/09FAM040101.html. Some nonimmigrant visa categories, referred to as "dual-intent visas," are designed for a limited duration and purpose, but simultaneously contemplate the possibility that the visa holder may pursue a pathway to permanent residence in the United States. *See* 9 FAM 401.1-3(C); *Matter of Hosseinpour*, 15 I&N Dec. 191 (B.I.A. 1975).

[9] Immigration and Nationality Act, Pub. L. No. 82-414, § 101(a)(15), 66 Stat. 163, 167 (1952) (codified as amended at 8 U.S.C. § 1101(a)(15)). A handful of nonimmigrant visa categories are authorized by other federal laws, and are not listed

regarding these categories is laid out in the Code of Federal Regulations, at Part 214 of Title 8.[10] These detailed requirements are mirrored in the Foreign Affairs Manual maintained by the U.S. Department of State, designed to guide the decision-making of consular officers charged with issuing visas overseas.[11]

17.     Section 101(a)(15) contains multiple subsections, currently lettered (A) to (V).[12]  Each of these lettered provisions corresponds to a general category of nonimmigrant visas, known by the associated letter in Section 101(a)(15). For example, section 101(a)(15)(A) corresponds to diplomatic and related visas, known as "A" visas; section 101(a)(15)(B) details the types of temporary visitor visas, known as "B" visas; and so on. Many of these subsections contain multiple, discrete provisions, each corresponding to a different subtype of visa. For example, section 101(a)(15)(H) contains multiple sub-provisions, each corresponding to a different subtype of temporary worker visa, including: one for specialty occupation workers (the H-1B visa), another for temporary agricultural workers (the H-2A visa), yet another for temporary non-agricultural workers (the H-2B visa), and a category for spouses and minor children accompanying the aforementioned nonimmigrants (the H-4 visa).[13]

18.     The nonimmigrant visa categories are commonly referred to as an "alphabet soup" because of their alphabetical designations and the variety of purposes for which one may enter the United States temporarily. Among the categories of individuals who may enter on nonimmigrant visas are the following: ambassadors, diplomats, and other foreign

---

at INA 101(a)(15). *See* U.S. Citizenship & Immigr. Servs., *Policy Manual*, 2 USCIS-PM A.4 Appendix, https://www.uscis.gov/sites/default/files/document/policy-manual-resources/Appendix-NonimmigrantCategoriesandEligibilitytoApplyforEOSandCOS.pdf (listing nonimmigrant visa categories and their statutory bases, including some, such as the CW and NATO visas, which are not codified in the INA).
[9] *E-2 Treaty Investors*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors (Apr. 8, 2025).
[10] *See* 8 C.F.R § 214 et seq.
[11] *See generally* 9 FAM 402.
[12] *See generally* Immigration and Nationality Act § 101(a)(15), 8 USC § 1101(a)(15).
[13] *See generally id* § 101(a)(15)(H), 8 U.S.C. § 1101(a)(15)(H).

government officials and employees; visitors for business and pleasure; crew members; investors; students; temporary workers of various types; members of the foreign media; exchange visitors; fiancé(e)s of U.S. citizens; intracompany transferees; persons of extraordinary ability; athletes and entertainers; and religious workers.[14]

19. As noted above, nonimmigrant visas are designed to permit noncitizens to enter the United States for a limited duration and purpose. When a nonimmigrant visa holder presents themselves for admission at a port of entry in the United States, the U.S. Customs and Border Protection (CBP) officer will assign to them a period of authorized stay.[15] This period of authorized stay is the amount of time they are permitted to remain lawfully in the United States before they must depart.[16] The Code of Federal Regulations specifies the period of authorized stay for most nonimmigrant visa categories.[17]

20. In some instances, noncitizens can request an extension of the period of authorized stay, up to a maximum time period specified in the regulations.[18] Nonimmigrants are not considered to be unlawfully present while a bona fide request for an extension is pending, even if their initial period of authorized stay has expired.[19]

---

[14] *See generally Overview of NIV Classifications*, 9 FAM 402.1, https://fam.state.gov/fam/09FAM/09FAM040201.html.
[15] *What the Visa Expiration Date Means*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visa-expiration-date.html (last visited June 15, 2025).
[16] *Id.*
[17] *See, e.g.*, 8 C.F.R § 214.2(b) ("Any B-1 visitor for business or B-2 visitor for pleasure may be admitted for not more than one year and may be granted extensions of temporary stay in increments of not more than six months each[.]"); 8 C.F.R § 214.2(e)(19)(i) ("A treaty trader or treaty investor may be admitted for an initial period of not more than 2 years."); 8 C.F.R § 214.2(k)(8) ("Aliens entering the United States as a K-3 shall be admitted for a period of 2 years.").
[18] *See, e.g.*, 8 C.F.R § 214.2(e)(20) ("Requests for extensions of stay may be granted in increments of not more than 2 years. A treaty trader or treaty investor in valid E status may apply for an extension of stay by filing an application for extension of stay on the form prescribed by USCIS, with required accompanying documents, in accordance with § 214.1 and the instructions on that form."); 8 C.F.R § 214.2(h)(15)(ii)(B)(1) ("An extension of stay may be authorized for a period of up to three years for a beneficiary of an H-1B petition in a specialty occupation or an alien of distinguished merit and ability. The alien's total period of stay may not exceed six years.").
[19] Immigration and Nationality Act § 212(a)(9)(B)(iv), 8 U.S.C. § 1182(a)(9)(B)(iv); Memorandum from Donald Neufeld, Acting Assoc. Dir., Domestic Operations Directorate, U.S. Citizenship & Immigr. Servs., Lori Scialabba, Assoc. Dir., Refugee Asylum & Int'l Operations Directorate, U.S. Citizenship & Immigr. Servs., and Pearl Chang, Acting Chief, Off. of Pol'y & Strategy, U.S. Citizenship & Immigr. Servs. to Field Leadership 33 (May 6, 2009) [hereinafter USCIS Unlawful Presence Consolidated Memo], https://www.uscis.gov/sites/default/files/document/memos/revision_redesign_AFM.PDF.

21. The period of *authorized stay* is distinct from the period of the *validity of the visa*. For most nonimmigrants, the "visa" is a document (technically, a sticker) issued by a U.S. embassy overseas and placed in the noncitizen's passport. It contains the noncitizen's photo and basic identifying information, along with details regarding the nonimmigrant visa category for which they have been approved. During the period of time the nonimmigrant visa is valid, a noncitizen may travel to the United States and present themselves for admission at a U.S. port of entry.[20] At the port of entry, a CBP officer will decide whether the noncitizen should be admitted and assign a specific period of authorized stay. For example, some holders of B1/B2 nonimmigrant visitor visas have visas in their passports that are valid for ten years. This does not mean that they can remain in the United States as a visitor for a ten-year period. Rather, the holder of such a visa may present themselves to be admitted for multiple, short-term stays over the course of that ten-year period.

22. Additionally, nonimmigrants who have already been admitted may request a change of status. A request for change of status, governed by INA Section 248, permits noncitizens under certain circumstances to change from one nonimmigrant status to another.[21] For example, a nonimmigrant student who initially entered on an F-1 visa might, upon graduation from their degree program and receipt of a job offer, seek to change their status to a temporary work visa category, such as an H-1B specialty occupation visa. As with requests for extension of status, a nonimmigrant is not considered to be unlawfully present while a bona fide request for change of status is pending.[22]

23. Additionally, in certain circumstances, nonimmigrant visa holders can apply for lawful

---

[20] *See What the Visa Expiration Date Means*, *supra* note 15.
[21] *See generally* Immigration and Nationality Act § 248, 8 U.S.C. § 1258.
[22] *Id.* § 212(a)(9)(B)(iv), 8 U.S.C. § 1182(a)(9)(B)(iv); USCIS Unlawful Presence Consolidated Memo, *supra* note 19, at 33.

permanent residence, pursuant to INA Section 245.[23] This process, called adjustment of status, allows nonimmigrants to obtain their lawful permanent residence while remaining in the United States. A noncitizen with a properly filed application for adjustment of status is not considered to be unlawfully present, and is considered to be in a period of authorized stay in the United States.[24]

24. These various features of nonimmigrant visas – periods of authorized stay, and the possibility of extension of status, change of status, or adjustment of status – are significant for understanding the possible impact of EO 14160.

25. Although nonimmigrant visas are often referred to temporary visas, the period of authorized stay in the United States can be quite lengthy in some instances. For example, investors who are admitted to the United States on E-2 visas are permitted a maximum initial stay of two years, but they may then seek an unlimited number of two-year extensions.[25] An H-1B specialty occupation worker is permitted to remain in the United States for up to six years, and sometimes even longer when applying for adjustment of status.[26] Noncitizens admitted as L-1A Intracompany Transferee Executives or Managers can potentially remain in the United States for up to seven years.[27] Nonimmigrants on student visas are typically admitted *not* for a specific period of time, but rather for *duration of status* – defined as "the time during which an F-1 student is pursuing a full course of study at an [approved] education institution . . . . or engaging in authorized practical training following the completion of

---

[23] *See generally* Immigration and Nationality Act § 245(a), 8 U.S.C. § 1255(a) (outlining the basic requirements for adjustment of status to lawful permanent residence).

[24] *See* 8 C.F.R. § 245.2(a)(4)(ii)(A); *Matter of L-K-*, 23 I&N Dec. 677 (B.I.A. 2004); U.S. Citizenship & Immigr. Servs., *Policy Manual*, 8 USCIS-PM B.3, https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3.

[25] *E-2 Treaty Investors*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors (Apr. 8, 2025).

[26] *H-1B Specialty Occupation*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (May 20, 2025); 8 C.F.R. § 214.2(h)(15)(ii)(B)(1).

[27] *L-1A Intracompany Transferee Executive or Manager*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager (July 29, 2024).

studies[.]"[28] In other words, duration of status depends on the nature of the degree program, but can routinely last upwards of five years.

26.    When one considers the possibility of *change of status* on top of a lengthy period of authorized stay, the amount of time that a nonimmigrant may be residing in the United States continuously can easily reach upwards of a decade. Consider, once again, the aforementioned example of a nonimmigrant student who changes status from an F-1 visa to an H-1B visa. One could easily spend five years as a nonimmigrant F-1 student, followed by a period of time during which the bona fide change of status application is pending (and the applicant is deemed to be lawfully present), followed by up to six years or more as an H-1B specialty occupation worker – all resulting in a total "temporary" stay of well over a decade.

**Nonimmigrants: Numbers and Characteristics**

27.    Tens of millions of nonimmigrants arrive in the United States each year. Both the U.S. Department of Homeland Security and the U.S. Department of State track and publish statistics relating to nonimmigrants. Throughout this section of my declaration, I am presenting the latest aggregate statistical information available – for fiscal year 2024 (FY 2024) when it has been finalized and published, and for fiscal year 2023 (FY 2023) when more recent, finalized data sets have not yet been released.

28.    DHS publishes statistics relating to the numbers of nonimmigrants admitted to the United States in each fiscal year. In Fiscal Year 2023, "DHS granted an estimated 132 million nonimmigrant admissions to the United States."[29] Note that this figure does not signify that 132 million separate individuals were admitted as nonimmigrants during the fiscal year. Rather, the figure represents the total number of admissions, including multiple admissions

---

[28] 8 C.F.R. § 214.2(f)(5).
[29] Aneer Rukh-Kamaa, U.S. Dep't of Homeland Sec., *U.S. Nonimmigrant Admissions: 2023* 1 (Aug. 2024), https://ohss.dhs.gov/sites/default/files/2024-09/2024_0906_ohss_nonimmigrant_fy2023_0.pdf.

by the same individual during the fiscal year.

29.   DHS publishes more detailed information regarding nonimmigrant admissions, using data

from Form I-94, which is an electronic arrival and departure record.[30] These I-94

nonimmigrant admissions represent just a subset of all nonimmigrant admissions.[31] In FY

2023, DHS recorded 68 million nonimmigrant "I-94" admissions.[32]

30.   Of these 68 million nonimmigrant I-94 admissions in FY 2023, DHS recorded nearly 5

million admissions of temporary workers and their families, over 1.7 million admissions of

students, and over 543,000 admissions of exchange visitors.[33] The vast majority of the

admissions (nearly 53 million) were of temporary visitors for pleasure.[34] DHS also recorded

over 6.8 million business visitor admissions.[35]

31.   In its publicly available data on nonimmigrant admissions, DHS also reports the countries of

citizenship that are most heavily represented in these I-94 admissions. The top countries

represented in FY 2023 were Mexico (19.7 million nonimmigrant admissions, or 28.9

percent of the total); Canada (13.6 million nonimmigrant admissions, or 19.9 percent);

United Kingdom (4.3 million nonimmigrant admissions, or 6.2 percent); India (2.6 million

nonimmigrant admissions, or 3.8 percent); Germany (1.99 million nonimmigrant admissions,

or 2.9 percent); France (1.96 million nonimmigrant admissions, or 2.9 percent); South Korea

(1.69 million nonimmigrant admissions, or 2.5 percent); Brazil (1.65 million nonimmigrant

admissions, or 2.4 percent); Japan (1.43 million nonimmigrant admissions, or 2.1 percent);

---

[30] *Arrival/Departure Forms: I-94 and I-94W*, U.S. Customs & Border Prot., https://www.cbp.gov/travel/international-visitors/i-94 (Feb. 24, 2025).

[31] Certain classes of nonimmigrants, including air and sea crew (on D1 and D2 visas), and most visitors for business and pleasure from Canada and Mexico, were not treated as I-94 admissions when this data was captured.  Rukh-Kamaa, *supra*, note 29, at 1 n.4.

[32] *Id*. at 1.

[33] *Id*. at 2-3.

[34] *Id*. at 3.

[35] *Id*.

and Italy (1.26 million nonimmigrant admissions, or 1.8 percent).[36] The FY 2023 report also notes that I-94 admissions among citizens from South Korea and Japan increased 114 and 194 percent respectively from the prior fiscal year, causing the two countries to place among the top ten countries of nationality for I-94 admissions.[37] Of the over 68 million I-94 admissions in FY 2023, 9.69 million, or about 14.2 percent were of individuals with citizenship in Asian countries, as classified by DHS.[38]

32.    DHS also provides some insight into the age and sex of individuals admitted as nonimmigrants, as recorded by Form I-94. In FY 2023, "58 percent of I-94 admissions (40 million) were individuals between the ages of 25 and 54 . . . . Forty-eight percent of I-94 admissions were female in 2023[.]"[39] Of the over 68 million total I-94 admissions in FY 2023, 15.38 million, or about 22.5 percent, were of females between the ages of 18 and 44.[40]

33.    While the DHS statistics provide an overall annual total of nonimmigrant *admissions*, data tracked and published by DOS detail the total number of *individual nonimmigrant visas* issued each month (and each fiscal year) by U.S. embassies overseas. According to this DOS data, the agency issued over 10.4 million total nonimmigrant visas in FY2023.[41] For FY2024, the total number of nonimmigrant visas issued by DOS was over 10.9 million.[42]

34.    The data from FY 2024 further indicate that the sizeable majority of the nonimmigrant visas issued were temporary visitors for business or pleasure. Approximately 8.42 million of the 10.9 million nonimmigrant visas issued in FY 2024 were temporary visitor visas for work

---

[36] *Id. at* 7 tbl.2.

[37] *Id.* at 7.

[38] *Yearbook of Immigration Statistics 2023, Table 26*, U.S. Dep't of Homeland Sec., https://ohss.dhs.gov/topics/immigration/yearbook/2023/table26.

[39] Rukh-Kamaa, *supra*, note 29, at 8.

[40] *Id.* at 9 tbl.5.

[41] *Nonimmigrant Visa Issuances by Visa Class and by Nationality – FY 2023 NIV Detail Table*, U.S. Dep't of State, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY23NIVDetailTable.pdf.

[42] *Worldwide NIV Workload by Visa Category FY 2024*, U.S. Dep't of State, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVWorkload/FY%202024NIVWorkloadbyVisaCategory.pdf.

and/or pleasure, or for visitor visas combined with Border Crossing Cards.[43] It is important to note, however, that this figure does not capture all temporary, lawful visitors to the United States. Citizens or nationals of 42 designated countries may enter as short-term visitors pursuant to the Visa Waiver Program, and they are not required to obtain formal visas from DOS before traveling to the United States.[44] These Visa Waiver Program admissions are substantial in number: in Fiscal Year 2023, DHS recorded 15.36 million visa waiver admissions for visitors for pleasure, and 1.96 million visa waiver admissions for business visitors.[45]

35.    In FY 2024, DOS issued a significant number of nonimmigrant visas in visa categories that permit a relatively lengthy period of authorized stay. For example, DOS issued over 400,000 F-1 visas to students; nearly 220,000 H-1B visas to specialty occupation workers; nearly 140,000 H-4 visas to the spouses and children of temporary workers; over 55,000 E-2 investor visas; and nearly 72,000 L-1 intracompany transferee visas.[46]

36.    DOS also publishes data regarding the country of nationality associated with the nonimmigrant visas issued in each fiscal year. The finalized data sets for FY 2024 with this information are not yet available, so the paragraphs that follow rely on FY 2023 data. For FY 2023, the countries of nationality receiving the largest numbers of nonimmigrant visas were the following:[47]

---

[43] *Id.* A Border Crossing Card is a laminated document issued to certain citizens of Mexico who make frequent trips across the U.S.-Mexico border. *Border Crossing Card*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/border-crossing-card.html (last visited June 15, 2025).

[44] *Visa Waiver Program*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visa-waiver-program.html (last visited June 15, 2025). Countries whose citizens or nationals may travel to the United States under the Visa Waiver Program are the following: Andorra, Australia, Austria, Belgium, Brunei, Chile, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Israel, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, Netherlands, New Zealand, Norway, Poland, Portugal, Qatar, San Marino, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Taiwan, and the United Kingdom. *Id.*

[45] Rukh-Kamaa, *supra*, note 29, at 3.

[46] *Worldwide NIV Workload by Visa Category FY 2024*, *supra* note 42.

[47] *Nonimmigrant Visa Issuances by Visa Class and by Nationality – FY 2023 NIV Detail Table, supra* note 41.

| Country | Number of Nonimmigrant Visas Issued in FY 2023 |
|---------|------------------------------------------------|
| Mexico | 2,328,664 |
| India | 1,387,940 |
| Brazil | 1,067,287 |
| Colombia | 476,293 |
| China | 417,008 |
| Argentina | 291,892 |
| Philippines | 285,860 |
| Ecuador | 274,799 |
| Israel | 190,415 |
| Vietnam | 133,781 |

37. When one sorts the nonimmigrant visa data to look at specific visa categories that permit relatively lengthy periods of authorized stay, the represented countries shift. In FY 2023, DOS issued the largest numbers of F-1 student visas to nationals of the following countries:[48]

| Country | Number of F-1 Nonimmigrant Visas Issued in FY 2023 |
|---------|----------------------------------------------------|
| India | 130,730 |
| China | 85,950 |
| South Korea | 16,105 |
| Vietnam | 14,575 |
| Japan | 9.692 |
| Brazil | 8,310 |
| Taiwan | 7,883 |
| Bangladesh | 7,653 |
| Nigeria | 7,466 |
| Mexico | 7,234 |

38. In FY 2023, DOS issued the largest number of H-1B specialty worker visas to nationals of the following countries: [49]

| Country | Number of H-1B Nonimmigrant Visas Issued in FY 23 |
|---------|---------------------------------------------------|
| India | 206,591 |
| China | 23,482 |
| Philippines | 3,070 |
| South Korea | 2,243 |

[48] *Id.*
[49] *Id.*

15

| | |
|---|---|
| Taiwan | 2,136 |
| Mexico | 1,934 |
| Great Britain & Northern Ireland | 1,540 |
| Brazil | 1,430 |
| Pakistan | 1,420 |
| Colombia | 999 |

39. In FY 2023, DOS issued the largest number of H-4 visas, for the dependents of temporary workers, to nationals of the following countries: [50]

| Country | Number of H-4 Nonimmigrant Visas Issued in FY 23 |
|---|---|
| India | 160,141 |
| Mexico | 4,639 |
| China | 3,585 |
| Chile | 2,193 |
| Philippines | 1,781 |
| Pakistan | 1,275 |
| Brazil | 850 |
| South Korea | 782 |
| Great Britain & Northern Ireland | 673 |
| South Africa | 642 |

**Regional and Racial Background of Nonimmigrant Visa Holders**

40. As noted in paragraph 36 above, the countries of nationality receiving the largest numbers of nonimmigrant visas in FY 2023 were Mexico, India, Brazil, Colombia, China, Argentina, the Philippines, Ecuador, Israel, and Vietnam.[51]

41. In presenting its data for each fiscal year, DOS groups countries by region. In FY 2023, persons with nationality in Asian countries received the largest number of nonimmigrant visas: 3.369 million of the total 10.438 million visas issued that year,[52] or about 32 percent of the total. The breakdown of nonimmigrant visas issued in FY 2023 to nationals of countries

---

[50] *Id.*
[51] *Id.*
[52] *Id.*

in other regions of the world was as follows: North America (3.061 million), South America (2.399 million), Europe (951,775), Africa (597,570), and Oceania (57,373).[53]

42. As noted in paragraphs 37-39 above, nationals of certain Asian countries, including China, India, the Philippines, and South Korea, receive relatively high numbers of certain visas that have lengthy periods of authorized stay.[54] Looking at the overall numbers in specific visa categories reveals the sizeable proportions of visas issued to nationals of Asian countries. Of the 54,812 E-2 visas issued in FY 2023 to treaty investors, 26,975, or 49 percent, were issued to nationals of Asian countries.[55] Of the 445,418 F-1 student visas issued in FY 2023, 315,693, or nearly 71 percent, were issued to nationals of Asian countries.[56] Of the 265,777 H-1B specialty worker visas issued in FY 2023, 245,085, or 92 percent, were issued to nationals of Asian countries.[57] These numbers are significant because individuals who are permitted to remain in the United States for lengthy periods of time, often with their spouses alongside them on family member visas, may understandably have children during a years-long stay in the United States. When looking at this handful of nonimmigrant visa categories with lengthy periods of authorized stay, persons with nationality in Asia predominate.

43. Neither DHS nor DOS tracks the racial background of nonimmigrant visa holders. However, if one overlays the nonimmigrant visa statistics with information regarding the ethnic and racial composition of countries, one can begin to acquire a general sense of the racial background of nonimmigrant visa holders. As noted above in paragraph 41, persons of Asian nationality account for nearly one-third of all of the nonimmigrant visas issued in FY 2023. If one reviews the list of countries and regions listed under "Asia" in the DOS nonimmigrant

---

[53] *Id.*
[54] *Supra* para. 37–39.
[55] *Nonimmigrant Visa Issuances by Visa Class and by Nationality – FY 2023 NIV Detail Table, supra* note 41.
[56] *Id.*
[57] *Id.*

visa statistics, and cross-references the approximate racial and ethnic composition of these countries as presented in the CIA World Factbook, one can readily conclude that the vast majority of the visa recipients of Asian country nationalities are very likely nonwhite, of various Asian and Middle Eastern ethnicities and backgrounds.[58] Following this same logic, one can conclude that the majority of the visa recipients for the aforementioned nonimmigrant visa categories (with long periods of authorized stay, and where persons of Asian country nationalities predominate) would likely be classified as of the "Asian" race or ethnicity for federal statistical purposes, as outlined by the U.S. Office of Management & Budget in Statistical Policy Directive No. 15.[59]

**Humanitarian Protection**

44. In addition to the many nonimmigrant visa categories that exist in the U.S. immigration system, noncitizens may be residing lawfully in the United States pursuant to a range of humanitarian protections. Notably, the INA Section 244 authorizes the Secretary of the Department of Homeland Security to designate nationals of certain countries residing in the United States eligible for Temporary Protected Status (TPS), when conditions in their country of origin make a safe return unfeasible.[60] TPS designations can last anywhere from 6 to 18 months, and may be extended.[61]

45. According to data compiled by the Congressional Research Service, "[a]s of September 30,

---

[58] *Compare id.*, *with Field Listing– Ethnic Groups*, CIA World Factbook, https://www.cia.gov/the-world-factbook/field/ethnic-groups (last visited June 15, 2025). Note that the "Asia" grouping by DOS includes Middle Eastern countries, including several with significant Arab populations. In the United States, guidance from the U.S. Office of Management and Budget provides that individuals who trace their heritage from those parts of the world may identify as "Asian" or "Middle Eastern or North African." *OMB Statistical Policy Directive No. 15 on Race and Ethnicity Data Standards – Categories and Definitions*, U.S. Off. Mgmt. & Budget, https://spd15revision.gov/content/spd15revision/en/2024-spd15/categories-definitions.html (Dec. 20, 2024). Even accounting for this, the majority of the nonimmigrant visa holders of with nationality in Asia (per DOS) would be considered to be of the "Asian" race or ethnicity for federal statistical purposes.
[59] *OMB Statistical Policy Directive No. 15 on Race and Ethnicity Data Standards – Categories and Definitions*, *supra* note 58.
[60] *See generally* Immigration & Nationality Act § 244, 8 U.S.C. § 1254a.
[61] Immigration & Nationality Act § 244(b)(2)–(3), 8 U.S.C. § 1254a(b)(2)–(3).

2024, approximately 1,095,115 foreign nationals residing in the United States from . . . 16 countries were protected by TPS[.]"[62] The sixteen countries with then-active TPS designations were Afghanistan, Burma, Cameroon, El Salvador, Ethiopia, Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, Ukraine, Venezuela, and Yemen.[63] Since the start of the Trump Administration in January 2025, DHS has announced decisions to restrict or terminate TPS for Afghanistan, Cameroon, Haiti, Nepal, and Venezuela,[64] suggesting that the numbers of TPS beneficiaries will likely decline in the coming months and years. Nevertheless, TPS beneficiaries constitute a significant category of humanitarian status-holders who would be impacted by the implementation of EO 14160.

46.   Another group of individuals who would be affected by EO 14160 are those present in the United States pursuant to a grant of humanitarian parole. INA Section 212(a)(5) provides the statutory basis for humanitarian parole, giving discretionary authority to the Secretary of Homeland Security to permit, on a case-by-case basis, the entry and temporary stay of certain noncitizens "for urgent humanitarian reasons or significant public benefit."[65] A grant of parole does not constitute a formal admission to the United States, nor does it confer immigration status.[66] Parolees are, however, generally considered to be lawfully present.[67]

47.   Over the years, DHS has established distinct humanitarian parole programs, creating more streamlined mechanisms for certain groups of individuals to be considered for a grant of

---

[62] Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 6 (2024), https://www.congress.gov/crs-product/RS20844.
[63] *Id.*
[64] Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309 (May 13, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025); Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511 (Feb. 24, 2025); Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025); Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status 90 Fed. Reg. 9,040 (Feb. 5, 2025).
[65] Immigration and Nationality Act § 212(a)(5), 8 U.S.C. § 1182(a)(5).
[66] *Humanitarian or Significant Public Benefit Parole for Aliens Outside of the United States*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/humanitarian_parole (Jan. 24, 2025).
[67] "An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year" is considered to be lawfully present for purposes of receiving federal Social Security benefits. 8 C.F.R. § 1.3(a)(3).

parole. In early 2023, the Biden Administration announced the CHNV (Cuba, Haiti,

Nicaragua, Venezuela) Parole Program, authorizing nationals of those countries with

supporters in the United States to seek a grant of humanitarian parole.[68] In March 2025, the

Trump Administration announced that it would terminate the program.[69] Prior to that

announcement, 532,000 individuals had been granted advance permission under the program

to travel and request parole at a port of entry.[70]

48. Other humanitarian parole programs initiated under the Biden Administration include

Operation Allies Welcome (OAW) for certain Afghan nationals,[71] and Uniting for Ukraine

(U4U), for Ukrainians displaced by the Russian invasion.[72] The overall parolee numbers are

quite substantial: in FY 2023, DHS granted over 1.3 million paroles in total, determining in

each case that either an urgent humanitarian reason or a significant public benefit justified

the grant.[73]

49. Another group of humanitarian migrants, who *do* fall within the "alphabet soup" of

nonimmigrant visas, are victims of a severe form of trafficking in persons, victims of certain

other crimes, as well as family members for both. These individuals may apply for T or U

nonimmigrant visas, which are temporary visas with built-in pathways to lawful permanent

residence.[74] DHS has approved around the statutory maximum of 10,000 U visas each fiscal

---

[68] *DHS Implements New Processes for Cubans, Haitians, and Nicaraguans and Eliminates Cap for Venezuelans*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/newsroom/alerts/dhs-implements-new-processes-for-cubans-haitians-and-nicaraguans-and-eliminates-cap-for-venezuelans (Jan. 6, 2023).
[69] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611 (March 25, 2025).
[70] *Id.* at 13,612.
[71] *Operation Allies Welcome*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/archive/operation-allies-welcome (Jan. 22, 2025).
[72] Under Secretary for Management, U.S. Dep't of Homeland Sec., *Parole Requests – Fiscal Year 2023, Fourth Quarter* 3 (Apr. 3, 2024), https://www.dhs.gov/sites/default/files/2024-07/2024_0403_dmo_plcy_parole_requests_q4.pdf.
[73] *Id.* at 5.
[74] *See Victims of Human Trafficking: T Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (May 16, 2025); *Victims of Criminal Activity, U Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status (May 16, 2025); 8 C.F.R. § 245.23 (regulation outlining the process of adjustment of status for T nonimmigrants); 8 C.F.R § 245.24 (regulation

year since 2010,[75] and has approved several thousand T visas each year in recent years.[76] Given that these forms of humanitarian protection are explicitly structured as nonimmigrant visas, there is a reasonable probability that the federal government would assert that T and U visa holders fall within the subcategory of "lawful, but temporary" noncitizens subject to EO 14160.

50.  Beyond those with Temporary Protected Status, recipients of humanitarian parole, and T and U visa holders, it is unclear whether certain others with humanitarian protection in the United States would be affected by EO 14160. Asylees and refugees for example, are neither permanent residents nor nonimmigrants. While they are potentially subject to being placed in removal proceedings, their status does not have an expiration date.[77] The plain language of EO 14160, which refers to a "lawful, but temporary" status, suggests that their U.S.-born children would *not* be deprived of birthright citizenship.

51.  However, should the federal government attempt to include refugees and asylees within the fold of EO 14160, DHS data helps illuminate the numbers and backgrounds of individuals who would be affected. DHS data confirms that in FY 2023, a total of 60,050 refugees arrived in the United States, with the largest numbers with nationality in Democratic Republic of Congo (18,080), Syria (10,780), Afghanistan (6,590), and Burma (6,130).[78] Of this total of 60,050, nearly half (29,800, or 49.6 percent) were female, and 25,860 (about 43

outlining the process of adjustment of status for U nonimmigrants).

[75] *Form I-918, Petition for U Nonimmigrant Status, by Fiscal Year, Quarter, and Case Status and Form I-918, Petition for U Nonimmigrant Status, Bona Fide Determination Review (Fiscal Year 2025, Quarter 1)*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/sites/default/files/document/data/i918u_visastatistics_fy2025_q1.xlsx (Apr. 30, 2025).

[76] *Characteristics of T Nonimmigrant Status (T Visa) Applicant Fact Sheet*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/sites/default/files/document/fact-sheets/Characteristics_of_T_Nonimmigrant_Status_TVisa_Applicants_FactSheet_FY08_FY22.pdf.

[77] *Handbook for Employers M-274, 7.3 Refugees and Asylees*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/70-evidence-of-employment-authorization-for-certain-categories/73-refugees-and-asylees (Apr. 2, 2025).

[78] Noah Schofield & Amanda Yap, U.S. Dep't of Homeland Sec., *Refugees: 2023* 6 (Nov. 2024), https://ohss.dhs.gov/sites/default/files/2024-11/2024_1108_ohss_refugee_annual_flow_report_2023.pdf.

percent) were between the ages of 18 to 44.[79]

52.    In the same fiscal year (2023), DHS reported that 54,350 individuals were granted asylum in the United States. The top countries of nationality among these individuals were Afghanistan (14,470), China (4,870), Venezuela (3,760), El Salvador (2,990), India (2,710), Guatemala (2,580), and Honduras (2,120).[80]

53.    Refugees and asylees in the United States may apply for lawful permanent residence after residing in the United States with that status of refugee or asylee for one year.[81] In Fiscal Year 2023, DHS granted adjustment of status to 99,360 refugees and asylees.[82] While this data suggests that many refugees and asylees move relatively rapidly along the pathway to permanent residence, at any given time there are likely to be tens of thousands of individuals in the United States holding either refugee or asylee status.

**Population of Individuals Residing in the United States Without Lawful Immigration Status**

54.    DHS and various research institutes periodically publish estimates of the number of individuals residing in the United States without lawful immigration status. These entities typically use the term "unauthorized" to refer to this population, and include within that category persons who entered without inspection, as well as those who entered lawfully but then overstayed their visas.[83] DHS and leading research institutes all estimate that there are over 10 million such individuals residing in the United States.

55.    According to data from DHS, there were nearly 11 million people living without

---

[79] *Id.* at 7.

[80] Noah Schofield & Amanda Yap, U.S. Dep't of Homeland Sec., *Asylees: 2023* 8 (Oct. 2024), https://ohss.dhs.gov/sites/default/files/2024-10/2024_1002_ohss_asylees_fy2023.pdf.

[81] *See* Immigration & Nationality Act § 209, 8 U.S.C. § 1159.

[82] *Yearbook of Immigration Statistics 2023, Table 10*, U.S. Dep't of Homeland Sec., https://ohss.dhs.gov/topics/immigration/yearbook/2023/table10.

[83] Bryan Baker & Robert Warren, U.S. Dep't of Homeland Sec., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022* 1 (Apr. 2024), https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates_of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf.

documentation in the United States in 2022. The top ten countries of birth for the

unauthorized immigrant population estimated to be residing in the United States in 2022

were the following: Mexico (4.8 million), Guatemala (750,000), El Salvador (710,000),

Honduras (560,000), the Philippines (350,000), Venezuela (320,000), Colombia (240,000),

Brazil (230,000), India (220,000), and China (210,000).[84]

56. Of the nearly 11 million individuals estimated by DHS to be living without documentation in

the United States in 2022, slightly less than half, or 45.7 percent, were estimated to be

female.[85] Approximately 57 percent of the same population of 11 million was estimated to be

between the ages of 18 and 44.[86]

57. The Pew Research Center has also published estimates of the unauthorized immigrant

population residing in the United States in 2022. Pew, like DHS, estimated that about 11

million authorized noncitizens were residing in the U.S. as of 2022.[87] According to Pew, the

top countries of origin for the unauthorized population in 2022 were the following: Mexico

(4.05 million), El Salvador (750,000), India (725,000), Guatemala (675,000), Honduras

(525,000), China (375,000), Venezuela (275,000), Brazil (230,000), Dominican Republic

(230,000), and Colombia (190,000).[88] Of the 6.95 million estimated unauthorized individuals

*not* from Mexico, Pew estimated the breakdown of their region of origin as follows:[89]

| Central America | 2,100,000 |
| --- | --- |
| Asia | 1,700,000 |
| South America | 1,000,000 |
| Europe & Canada | 775,000 |
| Caribbean | 725,000 |

---

[84] *Id*. at 5.

[85] *Id*. at 7.

[86] *Id*.

[87] Jeffrey S. Passel & Jens Manuel Krogstad, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Rsch. Ctr. (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/.

[88] Pew Rsch. Ctr., *Unauthorized Immigrant Population by Region and Selected Country of Birth, 1990-2022*, https://www.pewresearch.org/wp-content/uploads/sites/20/2024/07/SR_24.07.22_unauthorized-immigrants_table-1.xlsx.

[89] *Id.*

| Africa (sub-Saharan) | 375,000 |
|---|---|
| Middle East | 180,000 |

58. Data from the Migration Policy Institute (MPI) estimate an unauthorized noncitizen population of 13,738,000 residing in the United States in 2023. The top 10 countries of origin listed by MPI for its 2023 estimate were the following: Mexico (5.5 million), Guatemala (1.4 million), Honduras (1.1 million), El Salvador (1.1 million), Venezuela (486,000), Colombia (351,000), the Philippines (294,000), Brazil (286,000), Ecuador (225,000), and India (199,000).[90]

59. When the top countries listed in these various data sets are cross-referenced with the country-specific racial and ethnic breakdowns presented in the CIA World Factbook, one can readily conclude that the overwhelming majority of the unauthorized immigrant population in the United States comprises persons who would be classified as Hispanic/Latino (including persons of mixed indigenous ancestry from Central and South America) or Asian.[91]

**Ability of U.S.-Born Children to Sponsor Their Parents for Green Cards in the United States**

60. In popular discourse in the United States, there is a common misperception that the U.S.-born children of noncitizen parents can readily "sponsor" their parents for lawful status – specifically, green cards – in the United States. These U.S.-born children are sometimes referred to as "anchor babies," implying they can anchor their parent or parents to the United States, and offer a pathway for them to remain in the country. Under U.S. immigration law, however, the reality is far more complex. For a parent who entered the United States without inspection, there is no direct pathway for them to obtain permanent residence via their child

---

[90] Jennifer Van Hook, Ariel G. Ruiz Soto & Julia Gelatt, *The Unauthorized Immigrant Population Expands amid Record U.S.–Mexico Border Arrivals*, Migration Pol'y Inst. (Feb. 2025), https://www.migrationpolicy.org/news/unauthorized-immigrant-population-mid-2023.
[91] *Field Listing– Ethnic Groups*, *supra* note 58.

while remaining in the United States. For a parent who was inspected and admitted on a nonimmigrant visa, but who overstayed that visa, there is a potential pathway via a U.S.-born child, but it is lengthy and not guaranteed.

61.    A threshold requirement for a U.S. citizen to sponsor their parent is that the U.S. citizen who wishes to sponsor their parent must be at least 21 years of age.[92] In other words, under any circumstance when a noncitizen parent seeks to derive status from their U.S. citizen child, they must wait at least 21 years from the time of that child's birth. There is no mechanism for the parent to apply for or derive status from their child based on the familial relationship before the child is 21. Accordingly, the very premise that a baby will automatically "anchor" their noncitizen parent is false.

62.    As mentioned above, the process of "upgrading" one's status to that of a permanent resident while still in the United States is called adjustment of status. Pursuant to INA Section 245, a threshold requirement for adjustment of status is that the noncitizen must have been inspected and admitted or paroled into the United States.[93] This creates an immediate barrier for that noncitizen parent who entered without authorization to obtain a green card via their U.S.-born daughter or son. In theory, the parent could depart the United States and seek to obtain an immigrant visa overseas. In this scenario, however, many individuals who had entered without inspection (and then remained in the United States) will trigger a three- or ten-year bar to reentry linked to the unlawful presence they had accrued in the United States prior to their departure.[94] One can theoretically seek a waiver of this unlawful presence bar, but it would require a showing of extreme hardship to the applicant's spouse or parent.[95] Hardship to the U.S. citizen child alone would not suffice. In short, for a parent who entered

---

[92] Immigration & Nationality Act § 201(b)(2)(A)(i); 8 U.S.C. § 1151(b)(2)(A)(i).
[93] *Id.* § 245(a); 8 U.S.C. § 1255(a).
[94] *Id.* § 212(a)(9)(B); 8 U.S.C. § 1182(a)(9)(B).
[95] *Id.* § 212(a)(9)(B)(v); 8 U.S.C. § 1182(a)(9)(B)(v).

without inspection to obtain a green card via their U.S. citizen son or daughter, they must wait until the child is 21, depart the country, and further establish their eligibility for a hardship waiver. Depending on the applicant's specific circumstances, they may require additional waivers before they are granted a visa permitting their return to the United States and admission as a lawful permanent resident.

63. The scenario is different for a noncitizen parent who *was* initially inspected and admitted by an immigration officer. Given this inspection and admission, the parent meets a threshold criterion for adjustment of status.[96] Even though the parent has overstayed their visa, the fact of the overstay is forgiven because they are seeking to derive status as the parent of a U.S. citizen.[97] However, as noted above, the U.S. born child would need to wait until they are 21 years of age in order to file the paperwork to "sponsor" their parent for lawful permanent residence. During this period of time, a parent who lacks a formal immigration status would be susceptible to being placed in removal proceedings. In the case of a noncitizen parent who was initially inspected and admitted, and who does remain in the United States for 21 years following the birth of a child in the United States, they must overcome additional hurdles in order to receive a green card in the United States. First, they must demonstrate to the U.S. Department of Homeland Security that they are "admissible" to the United States.[98] This means that they do not trigger any of the lengthy exclusion grounds listed in INA Section 212, relating to health status, criminal behavior, immigration-related conduct, and more.[99] Further, they must convince the adjudicator that they are worthy of a favorable exercise of discretion.[100]

---

[96] *Id.* § 245(a); 8 U.S.C. § 1255(a).
[97] *Id.* § 245(c)(2); 8 U.S.C. § 1255(c)(2) (creating an exception to the bar to adjustment of status for persons who fail to maintain lawful status, applicable to the immediate relatives of U.S. citizens, including parents).
[98] *Id.* § 245(a); 8 U.S.C. § 1255(a).
[99] *Id.* § 212; 8 U.S.C. § 1182.
[100] U.S. Citizenship & Immigr. Servs., *Policy Manual*, 7 USCIS-PM A.10(B), https://www.uscis.gov/policy-

**Impact of the EO on Noncitizen Parents of U.S.-Born Children and on the U.S. Born Children Themselves**

*Access to Benefits*

64.    Certain federal benefits are extended only to U.S. citizens and/or certain classes of lawfully present immigrants.  Consequently, the noncitizen parents of a U.S-born child who does not acquire birthright citizenship, and who would otherwise be income eligible for federal benefits, would lose access to these important and basic benefits.

65.    For example, a U.S. citizen child who meets certain income eligibility requirements would be eligible for SNAP (Supplemental Nutrition Assistance Program) benefits. But if EO 14160 were implemented and the child was born without any formal status in the United States, SNAP benefits could not be extended to that child.[101]

66.    Similarly, Medicaid and the Children's Health Insurance Program provide health benefits to children who are U.S. citizens and certain others with lawful status, but not to undocumented children.[102]

67.    Several other benefits are available only to U.S. citizens and certain "qualified immigrants." Among these benefits are Supplemental Security Income (SSI), Temporary Assistance for Needy Families, and Affordable Care Act subsidies.[103] Accordingly, an individual born without status pursuant to EO 14160 would not be eligible for these benefits, unless they somehow identify a pathway to a status that allows them to qualify for the benefit.

68.    The U.S.-born children and their parents may be concerned in the future about the cost of higher education. In order to be eligible for federal financial aid, including Pell Grants, one

---

manual/volume-7-part-a-chapter-10 (June 13, 2025).

[101] *SNAP Eligibility*, U.S. Dep't of Agric., Food & Nutrition Servs., https://www.fns.usda.gov/snap/recipient/eligibility (June 2, 2025).

[102] National Immigration Law Center, *Immigrants and the Affordable Care Act (ACA)*, https://www.nilc.org/wp-content/uploads/2015/11/Immigrants-and-the-ACA-2024.pdf (May 2024).

[103] *Id.*; National Immigration Law Center, *Overview of Immigrant Eligibility for Federal Programs*, https://www.nilc.org/wp-content/uploads/2024/04/tbl1_ovrvw-fed-pgms-rev-2024-04-1.pdf (Apr. 25, 2024).

must either be a U.S. citizen or an "eligible noncitizen."[104] The latter category includes

permanent residents, refugees, asylees, and a few select other groups.[105] Accordingly, a U.S.-

born child who does not acquire birthright citizenship, and is not able to obtain a lawful status

that renders them eligible for federal financial aid, may encounter difficulty in accessing

higher education. As one comprehensive review of the literature found, "Financial concerns

are the greatest obstacle facing undocumented students as they transition to and persist in

higher education."[106]

69.    Another future benefit of U.S. citizenship is the ability to seek employment in the federal

sector. Most jobs in the federal government are open only to U.S. citizens or nationals.[107]

70.    As noted above, some classes of noncitizens are eligible for certain federal benefits, but their

eligibility for those benefits can be changed by legislation. Congress is actively considering

further restrictions on noncitizens' access to benefits.[108]

71.    Children born without U.S. citizenship pursuant to EO 14160 would also lose access to certain

state-level benefits that are available only to U.S. citizens (or to U.S. citizens and a limited

subset of lawfully present noncitizens). For example, several states offer reduced, "in-state"

tuition only to U.S citizens.[109] In some states, health-related programs and benefits are limited

to citizens and select others.[110]

*Loss of Access to the Privileges of Citizenship*

---

[104] *Financial Aid Eligibility*, U.S. Dep't of Educ., Fed. Student Aid, https://studentaid.gov/understand-aid/eligibility (last visited June 15, 2025).
[105] *Id*.
[106] Peter Bjorklund, Jr., *Undocumented Students in Higher Education: A Review of the Literature, 2001 to 2016*, 88 Rev. Educ. Rsch. 631, 639 (2018).
[107] *Employment FAQ*, Off. of Pers. Mgmt., https://www.opm.gov/faq/employment/Do-I-have-to-be-a-US-citizen-to-apply.ashx (last visited June 15, 2025).
[108] One Big Beautiful Bill Act, H.R. 1, 119th Cong. §§ 10012, 44110, 112101 (2025) (as introduced).
[109] *States*, Higher Ed Immigration Portal, Presidents' Alliance on Higher Education and Immigration, https://www.higheredimmigrationportal.org/states/ (last visited June 15, 2025).
[110] *See, e.g.*, State of Tennessee, TennCare, Policy Manual No. 005.015, https://www.tn.gov/content/dam/tn/tenncare/documents/QualifiedNon-Citizens.pdf (listing classes of noncitizens, including many who are lawfully present, who are ineligible for state Medicaid benefits).

72.   If EO 14160 were implemented, those U.S.-born children of noncitizen parents who would not
      acquire U.S. citizenship at birth would lose access to important privileges of citizenship. One
      such privilege is the ability to apply for a U.S. passport. The U.S. passport is one of the most
      coveted passports in the world, as it permits U.S. citizens to travel to 182 destinations without
      securing a visa in advance.[111] Further, U.S. citizens traveling overseas have the benefit of
      receiving assistance from the U.S. Department of State should they encounter difficulties
      abroad.[112] Finally, unlike lawful permanent residents, who must spend certain amounts of time
      in the United States to avoid a claim that they have abandoned their status,[113] U.S. citizens are
      permitted to travel overseas as frequently as they wish, and for as long as they wish, without
      risking loss of their status.

73.   U.S. citizens can also pass along their citizenship to their children who are born in the United
      States and in many cases, when those children are born abroad.[114] Further, U.S. citizens can
      sponsor their spouses, parents, minor children, adult children (both married and unmarried),
      and siblings for lawful permanent residence in the United States.[115] As described above,
      however, these processes can often be quite complicated and lengthy.

      ***Status-Related Uncertainty and Risk of Deportation***

74.   If EO 14160 is allowed to go into effect, the U.S.-born children who do not acquire citizenship
      at birth will be placed in a precarious position with regard to their own immigration status.
      Perhaps most importantly, they will lack formal status in the United States. Given the long-

---

[111] *The Henley Passport Index*, Henley & Partners (2025), https://www.henleyglobal.com/passport-index/ranking.

[112] *Emergency Help for Americans Abroad*, USA.gov, https://www.usa.gov/emergency-abroad (last visited June 15, 2025).

[113] *See* U.S. Citizenship & Immigr. Servs., *Policy Manual*, 2 USCIS-PM B, https://www.uscis.gov/policy-manual/volume-12-part-d-chapter-2.

[114] *Obtaining U.S. Citizenship for a Child Born Abroad*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/us-citizenship/Acquisition-US-Citizenship-Child-Born-Abroad.html (Nov. 26, 2024).

[115] Immigration & Nationality Act §§ 201(b)(2)(A)(i), 203(a); 8 U.S.C. §§ 1151(b)(2)(A)(i), 1153(a).

standing adherence to unconditional birthright citizenship in the United States, there is scant precedent for how such a child would be treated from a U.S. immigration law standpoint.[116]

75. A U.S.-born child who does not acquire U.S. citizenship may, in many cases, acquire the citizenship of their parents under principles of *jus sanguinis*. It is theoretically possible, however, that a child born in the U.S. to noncitizen parents and who does not acquire birthright citizenship might also be born stateless. In either scenario, as a noncitizen residing without authorization in the United States, the child would technically be susceptible to being placed in removal proceedings.

76. It might be possible for the U.S.-born (but non-U.S. citizen) child to ultimately obtain a nonimmigrant visa linked to that of their parent. Imagine, for example, that an individual on an F-1 student visa gives birth to a child in the United States, and the child does not acquire U.S. citizenship pursuant to EO 14160. There is a nonimmigrant visa category for the dependents of an F-1 visa holder: the F-2 nonimmigrant visa.[117] But there is no mechanism for a noncitizen who lacks status to obtain an F-2 visa while in the United States. They would need to depart the country and obtain a visa from a consulate overseas. Whether or how this could be done would depend, of course, on the circumstances of a given family.

77. In other scenarios, there may not be an obvious nonimmigrant visa category or other status for which the U.S.-born child would be eligible. Consider the case of a TPS beneficiary who gives birth to a child in the United States. Even assuming that child acquired the citizenship of their parent at birth, they would not be eligible for TPS as they would not have been present in the United States on the TPS designation date for that country – a core requirement for all TPS

---

[116] A possible analog might be the children of diplomats born in the U.S., who do not acquire U.S. citizenship at birth under the Fourteenth Amendment. These children are, however, considered lawful permanent residents at birth. 8 C.F.R. § 101.3(a).

[117] Immigration & Nationality Act § 101(a)(15)(F); 8 U.S.C. § 1101(a)(15)(F).

applicants.[118] There may be no other obvious pathway to a nonimmigrant visa or other status for that child, once again leaving them susceptible to removal from the United States.

78. Another scenario involves a noncitizen parent on a temporary visa who is pursuing permanent residence in the United States. Consider, for example, a noncitizen parent on an H-1B visa who is in the process of applying for a green card in the United States. For nationals of India, wait times for certain employment-based green cards are currently around 12 years.[119] Imagine further that the H-1B nonimmigrant gives birth to a child in the United States who does not acquire U.S. citizenship at birth. Normally, as in the case of the F-2 visa, an H-4 dependent of an H-1B would need to pursue their visa from overseas, and could not apply for it from inside the United States. Further, because, the U.S.-born child was never inspected and admitted, they would technically be ineligible for adjustment of status under existing law.[120] This would prevent them from joining the existing green card application. Even if the parent waited until their own green card application were approved, and then sought to sponsor their U.S.-born child for a green card, the same challenge would arise, potentially blocking this alternate pathway to adjustment of status.

### Social Stigma and Psychological Harm

79. The opinions presented in this subsection are based upon my review of published research from various social scientific disciplines and from the field of psychology.

80. My review of this literature suggests that those U.S.-born children who may find themselves undocumented as a result of EO 14160 are likely to face pervasive stigma that significantly impacts their psychological development and social identity.[121] This stigma stems from

---

[118] Immigration & Nationality Act § 244(c)(1)(A)(i); 8 U.S.C. § 1254a(c)(1)(A)(i).
[119] U.S. Dep't of State, Bureau of Consular Affs., *Immigrant Numbers for June 2025*, Visa Bulletin, May 2, 2025, at 4–5, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2025/visa-bulletin-for-june-2025.html.
[120] Immigration & Nationality Act § 245(a); 8 U.S.C. § 1255(a).
[121] *See* Roberto G. Gonzales, *Learning to Be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76 Am. Soc. Rev. 602 (2011).

societal narratives that link undocumented status with criminality, leading many youth to internalize shame and experience social withdrawal.[122] The fear of disclosing their legal status can result in secrecy, anxiety, and a fragmented sense of self, particularly as they transition into adulthood and confront barriers to employment, education, and civic participation.[123]

81.   In educational settings, undocumented youth frequently encounter isolation, discrimination, and structural exclusion.[124] Despite academic success in secondary school, they may be unable to pursue higher education due to financial barriers and their ineligibility to receive federal financial aid.[125] These various challenges, combined with fear of deportation or family separation, contribute to chronic stress and disengagement from school environments.[126]

82.   The cumulative psychological effects of stigma have been well-documented. Children in these circumstances are at elevated risk for depression, anxiety, and trauma-related disorders due to constant legal precarity and social exclusion.[127]

### Increased Need for Legal and Social Services

83.   All of these scenarios suggest that the implementation of EO 14160 will pose additional hardships to noncitizen families, requiring the increased provision of social services to help these families, along with comprehensive immigration legal services to resolve the complicated immigration-status-related questions that would inevitably arise. These demands

---

[122] *See* Carolina Valdivia, Marisol Clark-Ibáñez, Isabel Patten, Jose Ruiz Escutia & Josefina Espino, *Fear and Stigma: How Undocumented Students Navigate Disclosure Amid Heightened Immigration Enforcement and Rising Anti-Immigrant Sentiment*, Sociological Perspectives (2025).
[123] *See* Gonzales, *supra* note 121.
[124] *See* Jean Calterone Williams, *"It's Always with You, That You're Different": Undocumented Students and Social Exclusion*, 4 Latino Stud. 212 (2006).
[125] *See* Leisy J. Abrego, *'I Can't Go to College Because I Don't Have Papers': Incorporation Patterns of Latino Undocumented Youth*, 20 J. Poverty 168 (2015).
[126] *See* Karina Chavarria, Monica Cornejo, Cecilia Ayón & Laura E. Enriquez, *Disrupted Education?: A Latent Profile Analysis of Immigration-Related Distractions and Academic Engagement among Undocumented College Students*, 20 J. Latinos & Educ. 232 (2021); Laura E. Enriquez, Martha Morales Hernandez & Annie Ro, *Deconstructing Immigrant Illegality: A Mixed-Methods Investigation of Stress and Health Among Undocumented College Students*, 10 Race & Soc. Problems 193 (2018).
[127] Carola Suárez-Orozco, Hirokazu Yoshikawa, Robert T. Teranishi & Marcelo M. Suárez-Orozco, *Growing Up in the Shadows: The Developmental Implications of Unauthorized Status*, 81 Harv. Educ. Rev. 438 (2011).

would be placed atop an already sizeable access-to-justice gap for immigration legal services,[128] and would exacerbate the barriers that noncitizens already face in accessing critical social services.[129]

## SUMMARY AND CONCLUSIONS

For the reasons discussed above, I summarize and conclude this expert declaration as follows:

84.  If allowed to go into effect, EO 14160 will affect the children of tens of millions of noncitizens, including nonimmigrant visa holders, certain recipients of humanitarian protection, persons who lack lawful status in the United States, and others.

85.  In recent years, DOS issued between 10 and 11 million nonimmigrant visas each fiscal year. This figure does not account for visitors who travel pursuant to the Visa Waiver Program, and short-term visitors from Canada. Nevertheless, among nonimmigrant visas that were formally issued in FY 2023, the region with the largest representation was Asia. This is one reason why persons whose race or ethnicity is Asian would be significantly impacted by the implementation of EO 14160.

86.  While holders of nonimmigrant visas are technically in the United States on a temporary basis, several nonimmigrant visa categories permit lengthy periods of authorized stay. The possibility of an extension of status or change of status further lengthens the period of lawful stay that many nonimmigrants will have in the United States. When examining nonimmigrant visa categories that permit lengthy periods of authorized stay, such as the H-1B specialty occupation visa or the F-1 student visa, nationals of countries in Asia – and

---

[128] *See, e.g.*, Elinor Jordan, *What We Know and Need to Know about Immigrant Access to Justice*, 67 S.C. L. Rev. 295 (2016).
[129] *See, e.g.*, *Immigrants Faced Multiple Barriers to Safety Net Programs in 2021*, Urban Inst. (Nov. 2022), https://www.urban.org/sites/default/files/2022-11/Immigrant%20Families%20Faced%20Multiple%20Barriers%20to%20Safety%20Net%20Programs%20in%202021.pdf

correspondingly, persons whose race or ethnicity is "Asian" – predominate among the visa holders. This is yet another reason why EO 14160 would have a significant adverse effect on persons whose race or ethnicity is Asian.

87. Data from DHS and reputable research organizations estimate the unauthorized population in the United States to be between 11-14 million individuals. This population is overwhelmingly from Latin America and Asia, and therefore comprises persons whose race or ethnicity is overwhelmingly either Hispanic/Latino or Asian. Accordingly, the population of persons who are unlawfully present who will be adversely affected by EO 14160 will be overwhelmingly persons who are Hispanic/Latino or Asian.

88. Notwithstanding conventional popular discourse regarding "anchor babies," the ability of a U.S. citizen child to sponsor their parent for lawful permanent residence is often complicated and in some cases, impossible. In all cases, the U.S.-born child must reach the age of 21 before being able to file a petition for their parent. For parents who entered without inspection, there is no pathway to permanent residence while remaining in the United States, and overseas visa processing often presents insurmountable barriers.

89. The implementation of EO 14160 would impose significant financial, legal, and psychological hardship upon the U.S.-born children who are deprived of citizenship, and upon their parents. During the child's infancy, their parent(s) would lose access to key services and benefits. Later in life, if the U.S.-born individual cannot identify a pathway to U.S. citizenship, they would lack potential access to other privileges and benefits of U.S. citizenship, including access to a passport and the ability to transmit U.S. citizenship to their own children. If left in undocumented status, the U.S.-born children who are denied birthright citizenship will likely experience significant social stigma and related psychological harm.

The opinions expressed in this declaration are based on the currently available data and my education, experience, and research. I reserve the right to modify my opinions if further data becomes available for review and assessment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

DATED: June 16, 2025                    Jayesh Rathod

APPENDIX A

**JAYESH M. RATHOD**

4300 Nebraska Avenue NW • Washington, DC 20016 • (202) 274-4459 • jrathod@wcl.american.edu

**PROFESSIONAL EXPERIENCE**

**AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW** (2006 - present)                    Washington, DC
*Professor of Law* (2015-present)*; Assistant and Associate Professor of Law* (2009-15).  Founding Director of the Immigrant Justice Clinic, a live-client, in-house clinic focusing on individual immigrant and migrants, and their communities, in the D.C. metropolitan area and overseas. Teach doctrinal classes in areas of immigration and workplace law, often with a bilingual instructional component. In the Clinic, supervise cases and projects involving deportation and removal (including criminal-immigration intersections), asylum, other humanitarian relief (VAWA, U visas, Special Immigrant Juvenile Status), immigrant workers' rights, transnational worker issues, human trafficking, language access, and civil rights. Litigate cases before state and federal courts, administrative agencies and tribunals, as well as international bodies, and lead non-litigation projects. Co-teach a weekly seminar on lawyering skills. Developed and taught successful online certificate course on U.S. immigration law. Faculty committee service includes WCL Dean Search Committee (2015-16); University Faculty Awards Committee (2021); Chair, Assistant Dean for OCPD Search Committee (2018); Appointments Committee (2012-13, 2014-15, 2020-21, 2023-25); Career Development Committee (2013-14, 2019-20); Curriculum Committee (2018-21); Diversity, Equity & Inclusion Committee (2021-22); Public Interest Committee (2009-10); Special Projects Committee (2011-12); Standards & Evaluation Committee (2019-20); Strategic Planning Committee (2010-11); Teaching & Pedagogy Committee (2021-22); and Technology Committee (Chair, 2015-16). Faculty, WCL Summer Law Program in the Hague and WCL Summer Law Program in Chile/Argentina. Faculty mentor for Public Interest/Public Service (PIPS) Scholars and Humphrey Fellows. Chair SJD dissertation committees and supervise independent studies and externships.

*Director, Program on Technology in Legal Practice* (2019-present). Launched new program designed to train law students on technology-related legal skills and to promote the use of technology to enhance the delivery of legal services. Collaborate with colleagues to develop and offer informal and credit-bearing courses relating to key software and other dimensions of legal technology. Introduce students to emerging technologies that are transforming the practice of law.

*Associate Dean for Experiential Education and Director of the Clinical Program* (2018-2021). Oversaw nationally recognized clinical, externship, and trial advocacy programs and directly supervised program staff.  Ensured institutional compliance with ABA and other norms relating to experiential education. Promoted the development of new experiential offerings including clinics, simulation courses, and practicums. Served on law school leadership team and collaborated with core offices, including finance, registrar, career services, student affairs, academic excellence, development, and alumni relations. Developed and managed annual Clinical Program budget, and streamlined financial and administrative procedures. Articulated a strategic vision for the Clinical Program. Facilitated weekly meetings of clinical faculty, and oversaw six program committees. Managed core aspects of clinic operations, including student recruitment, compliance with student practice rules, records management, website and social media, and language access protocols. Oversaw transition to remote clinical work during COVID-19 pandemic, including establishment of case management, technology, and front office protocols. Conceived of the Defending the AU Dream Initiative to provide immigration legal services to students at AU and nearby institutions, and helped secure founding gift from alumnus. Led redesign of clinic student space.

*Interim Director, American University Center for Latin American and Latino Studies* (2017). Appointed Interim Director of prominent, university-wide research center for fall 2017 semester.  Supervised four full-time staff. Oversaw programs and initiatives relating to migration, anti-corruption, regional collaboration, climate change, and more. Successfully obtained new funding source for research and publication of two reports relating to Temporary Protected Status. Convened faculty colloquium on current topics in U.S.-Latin America relations. Oversaw redesign of center website. Represented center at university and public events. Addressed budgetary, operational, and human resources matters as they arose.

*Practitioner-in-Residence* (2006-09).  Taught and supervised students enrolled in the Immigrants' Rights Section of the International Human Rights Law Clinic. Taught survey course on Immigration & Naturalization (spring 2008).

**JAYESH M. RATHOD**
Page 2

**UNIVERSIDADE DE BRASÍLIA** (2016)                                                                                  Brasília, Brazil
**UNIVERSIDADE ESTADUAL DA PARAIBA** (2016)                                                             João Pessoa, Brazil
*Fulbright Scholar & Visiting Professor.*  Awarded Fulbright Scholarship to teach courses and perform research at two institutions in Brazil.  Taught undergraduate, graduate, and public courses in Portuguese relating to comparative migration policy, international refugee protection, and U.S. immigration law.  Delivered guest lectures on migration-related topics at universities and research institutions throughout Brazil.  Trained Brazilian asylum officers on U.S. laws and procedures relating to child migrants.  Participated in master's thesis review panel and advised students on writing projects.  Conducted theoretical and empirical research relating to the criminalization of migration in Brazil and the experiences of humanitarian migrants with immigration-related legal processes and social integration.

**CASA OF MARYLAND** (2003-2006)                                                                                   Silver Spring, MD
*Staff Attorney.*  Represented scores of low-wage immigrant workers on employment law claims from initial investigation, through litigation and post-judgment collection and related matters. Responsibilities ranged from weekly intakes in Spanish and English to negotiation, court-supervised mediation, and full case preparation and litigation in state and federal court.  Conducted and defended depositions, and undertook post-judgment collection efforts, including imposition of liens, wage garnishments, and oral examinations. In addition to direct client representation, responsibilities included weekly outreach to day laborers to educate about basic workplace and immigrants' rights; organizing protests and press conferences; and coordinating the intake process for wage claims, overseeing cases from the initial intake to pre-litigation.

*Ironworker Attorney.*  Represented clients on a range of immigration legal matters, including applications for lawful permanent residence and Temporary Protected Status (TPS), labor certification applications, renewals of employment authorization documents, administrative appeals, and removal proceedings. Responsibilities included preparing and filing Unfair Labor Practice (ULP) charges; testifying before the D.C. City Council and D.C. Apprenticeship Council; participating in organizing campaigns across the D.C. metropolitan area in collaboration with union organizers; conducting on-site outreach to non-union workers; preparing bilingual materials for organizing campaigns; and advising Ironworker Union locals and members across the country on matters related to employment, labor, and immigration law.

**HON. LOUIS F. OBERDORFER, U.S. DISTRICT COURT - DISTRICT OF COLUMBIA** (2002-2003)      Washington, DC
*Judicial Law Clerk.*  Prepared bench memoranda for and attended motions hearings, oral argument, pre-trial conferences, jury trials, settlement conferences, and sentencings.  Prepared for and attended sittings by designation with the Third, Sixth, Ninth, and Tenth Circuit Courts of Appeals.  Drafted opinions and orders for District Court and Court of Appeals cases.

**WILMER, CUTLER & PICKERING** (2001-2002)                                                                Washington, DC
*Litigation Associate.*  Staffed on various civil and regulatory matters, as well as several *pro bono* cases.  Drafted legal briefs, motions, discovery requests and responses, witness questions, and legal memoranda for internal and client use.  Interviewed clients, material witnesses, and potential expert witnesses.

**COLUMBIA LAW SCHOOL PRISONERS & FAMILIES CLINIC** (2000-2001)                                   New York, NY
*Student Advocate.*  Developed materials for and taught parental rights workshops to inmates at Bedford Hills Correctional Facility and Sing Sing Correctional Facility in New York.  Represented inmate in appealing the denial of parole.

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON** (2000)                                                    Washington, DC
*Summer Associate.* Prepared memoranda for litigation, regulatory, and *pro bono* immigration matters.

**HON. SONIA SOTOMAYOR, U.S. COURT OF APPEALS FOR THE SECOND CIRCUIT** (2000)               New York, NY
*Judicial Intern.*  Prepared bench memoranda and summary orders. Edited and cite-checked court documents.

**CENTRO DE ASESORÍA LABORAL DEL PERÚ** (1999)                                                           Lima, Peru
*Human Rights Intern.* Researched the international and national legal norms defining the right to health in Peru. Prepared, in collaboration with local universities and NGOs, a report elaborating government obligations related to that right. Developed a set of quantitative and qualitative indicators to measure Peru's compliance with its legal commitments in the area of economic, social, and cultural rights.

**WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS** (1997-1998)            Washington, DC
*Equal Employment Opportunity Project Intern.* Assessed employment discrimination claims through interviews with complainants and witnesses, as well as evaluation of documents and evidence.  Drafted memoranda for staff attorneys.

**JAYESH M. RATHOD**
**Page 3**

## EDUCATION

**COLUMBIA UNIVERSITY SCHOOL OF LAW**, JD, June 2001                                      New York, NY

- Honors:        Jane Marks Murphy Prize (for exceptional interest and proficiency in clinical advocacy)
                 Harlan Fiske Stone Scholar (for academic achievement, 1999-2001)
                 Human Rights Internship
- Activities:    *Columbia Human Rights Law Review,* Submissions & Article Editor
                 Course Teaching Assistant, Asian American Jurisprudence (Prof. Neil Gotanda)
                 First-Year Moot Court Program, Editor & Student Judge
                 South Asian Law Students Association, Chair

**HARVARD UNIVERSITY**, AB, *magna cum laude,* Social Studies, June 1997                   Cambridge, MA

- Thesis:        *Sowing the Seeds of Change: The Rise of the EZLN*
- Honors:        Harvard College Academic Scholarship
                 Tinker Foundation Latin American Research Fellowship

## PUBLICATIONS

<u>Law Review Articles & Essays</u>

*Exiting the American Dream*, 72 UCLA L. REV. DISC. 122 (2024)

*Pressured Exit*, 98 TULANE L. REV. 805 (2024)

*Immigraft*, 2024 WIS. L. REV. 465 (2024) (with Anne Schaufele)

*Fleeing the Land of the Free*, 123 COLUM. L. REV. 183 (2023)

*Transformative Immigration Lawyering*, 132 YALE L.J. F. 632 (2022), *reprinted in* 43 IMMIGR. & NATIONALITY L. REV. (2023)

*Criminalization and the Politics of Migration in Brazil*, 16 OHIO ST. J. CRIM. L. 147 (2018)

*Equity in Contemporary Immigration Enforcement: Defining Contributions and Countering Criminalization,* 66 KANSAS L. REV. 951 (2018) (with Alia Al-Khatib) (invited symposium participant)

*Experiential Education en Español: A Pedagogical Model*, 21 HARV. LATINX L. REV. 87 (2018)

*Damaged Bodies, Damaged Lives: Immigrant Worker Injuries as Dignity Takings*, 92 CHICAGO-KENT L. REV. 1155 (2017) (with Rachel Nadas) (invited symposium participant)

*Danger and Dignity: Immigrant Day Laborers and Occupational Risk*, 46 SETON HALL L. REV. 813 (2016)

*Crimmigration Creep: Reframing Executive Action on Immigration*, 55 WASHBURN L.J. 173 (2015) (invited symposium participant)

*Riding the Wave: Uplifting Labor Organizations through Immigration Reform*, 4 U.C. IRVINE L. REV. 625 (2014)

*Distilling Americans: The Legacy of Prohibition on U.S. Immigration Law*, 51 HOUS. L. REV. 781 (2014), *reprinted in* 35 IMMIGR. & NATIONALITY L. REV. 171 (2014), *cited in* Ledezma-Cosino v. Lynch (9th Cir. 2016) and Manning v. Caldwell (4th Cir. 2018)

*The Transformative Potential of Attorney Bilingualism*, 46 U. MICH. J. L. REFORM 863 (2013)

JAYESH M. RATHOD
Page 4

*Reimagining the Law of Self-Employment: A Comparative Perspective*, 31 HOFSTRA LAB. & EMP. L.J. 159 (2013) (with Michal Skapski)

*Promoting Language Access in the Legal Academy*, 13 U. MD. L.J. RACE RELIGION GENDER & CLASS 7 (2013) (with Gillian Dutton, Beth Lyon, and Deborah M. Weissman)

*Protecting Immigrant Workers Through Interagency Cooperation*, 53 ARIZ. L. REV. 1157 (2011)

*Beyond the "Chilling Effect": Immigrant Worker Behavior and the Regulation of Occupational Safety & Health*, 14 EMP. RTS. & EMP. POL'Y J. 267 (2010)

*Book Review: Beate Andrees & Patrick Belser, Forced Labor: Coercion & Exploitation in the Private Economy*, 31 COMP. LAB. L. & POL'Y J. 861 (2010)

*Immigrant Labor and the Occupational Safety and Health Regime: A New Vision for Workplace Regulation*, 33 N.Y.U. REV. L. & SOC. CHANGE 479 (2009)

Book Chapters, Reports, and Other Academic Articles

*Fortress North America: Theorizing a Regional Approach to Migration Management* in NORTH AMERICAN REGIONALISM: STAGNATION, DECLINE, OR RENEWAL? (2023) (with Ernesto Castañeda & Michael Danielson)

*Legal Protections for Environmental Migrants: Expanding Possibilities and Redefining Success* (2020)

*Immigration Legal Services as a Structural HIV Intervention for Latinx Sexual and Gender Minorities*, 21 J. IMMIGRANT & MINORITY HEALTH 1365 (2019) (with Thespina J. Yamanis et al.)

*Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements* (2017) (with Dennis Stinchcomb, et al.)

*Temporary Protected Status for Honduras: Country Conditions and U.S. Legal Requirements* (2017) (with Dennis Stinchcomb, et al.)

*Country Conditions in Central America and Asylum Decision-Making: Report from a January 2017 Workshop* (2017) (with Eric Hershberg and Dennis Stinchcomb)

*Immigrant Entrepreneurs*, in COMMUNITY ECONOMIC DEVELOPMENT LAW: A TEXT FOR ENGAGED LEARNING (2012)

Op-Eds & Shorter Publications

Op-Ed, *Some trans people and others in vulnerable populations are looking to leave the US*, BALTIMORE SUN, Apr. 3, 2023

*Opinion analysis: Unusual alliance of justices holds government to strict notice requirement in removal proceedings*, SCOTUSblog, May 2, 2021

*Argument analysis: Justices revisit immigration notice provision, parsing statutory text while urging practical solutions*, SCOTUSblog, Nov. 10, 2020

*Case preview: How must the government serve notice of removal proceedings?*, SCOTUSblog, Nov. 6, 2020

*Opinion analysis: Divided court upholds restrictive reading of immigration statute, limiting relief to noncitizens facing removal*, SCOTUSblog, April 24, 2020

*Argument analysis: Justices examine structure and purpose of puzzling immigration statute*, SCOTUSblog, Nov. 6, 2019

*Argument preview: Can a noncitizen be "inadmissible" if they are not seeking admission to the U.S.?*, SCOTUSblog, Oct. 28, 2019

Op-Ed, *Brazil sets global example with inclusive new immigration law*, MIAMI HERALD, June 8, 2017 (with Carolina Claro)

Op-Ed, *U.S. can learn from Brazil about Haitian migration*, ORLANDO SENTINEL, December 10, 2016 (with João Granja)

*Uplifting labor through immigration reform*, SAN FRANCISCO DAILY JOURNAL, May 20, 2015

Op-Ed, *Republicans must embrace inevitable immigration reform*, ORLANDO SENTINEL, March 26, 2014 (with Mark Shmueli)

*Natural(ized) Enemies*, SLATE, January 17, 2013 (with Amanda Frost)

*A Season of Change: Reforming the H-2B Guest Worker Program*, 45 CLEARINGHOUSE REV. 20 (May-June 2011)

*The AFL-CIO – NDLON Agreement: Five Proposals for Advancing the Partnership*, 14 No. 3 HUM. RTS. BRIEF 8 (2007)


## SELECT PRESENTATIONS AND CONFERENCES

Presenter, *Queer Theory and Practice in Clinical Legal Education*, AALS Conference on Clinical Legal Education (Baltimore, MD), April 27, 2025.

Presenter, *Immigration in Focus: Insights from Community Partners and Policy Experts*, AU Center for Latin American & Latino Studies, Sine Institute, and School of International Service, April 24, 2025.

Presenter, *Exit Planning and Emigration Aspirations Among Trans and Nonbinary U.S. Citizens*, Queer Studies Conference (Asheville, NC), March 28, 2025.

Presenter, *Immigration, Rights, and Access*, Center for Progressive Research Webinar, March 20, 2025.

Presenter, *Why Scholarship Matters*, AALS New Law Teachers Workshop (Washington, DC), June 8, 2024.

Presenter, *Meeting the Moment: The Pedagogy and Practice of Transformative Lawyering*, AALS Conference on Clinical Legal Education (St. Louis, MO), May 4, 2024.

Presenter, *Clínica de Justicia para Inmigrantes (Immigrant Justice Clinic)*, AU Center for Latin American & Latino Studies & Universidad de Diego Portales Migration Symposium, April 18, 2024.

Presenter, *Teoría Crítica da Raça*, Universidade Federal da Paraiba (João Pessoa, Brazil), March 15, 2024.

Presenter, *Saida Pressionada*, Universidade Estadual da Paraiba (João Pessoa, Brazil), March 12, 2024.

Presenter, *Saida Pressionada*, Programa de Pós-graduação em Relações Internacionais San Tiago Dantas (Sao Paulo, Brazil), March 8, 2024.

Presenter, *Immigraft*, Law Review Symposium, University of Wisconsin School of Law, Nov. 3, 2023.

Presenter, *Pressured Exit*, Law & Society Annual Meeting (San Juan, PR), June 3, 2023.

Presenter, *Pressured Exit*, University of Pennsylvania Carey School of Law Faculty Speaker Series, March 14, 2023.

Presenter, *Exit Strategy*, Stephen Ellmann Clinical Theory Workshop, NYU School of Law, Oct. 7, 2022.

Presenter, *Representing Workers Through the NLRB Administrative Process*, Association of American Law Schools Conference on Clinical Legal Education, May 10, 2022.

Presenter, *The Impact of 9/11 on Human Rights and Immigration in the United States*, Universidade Federal Fluminense, Nov. 11, 2021.

Presenter, *A condição do imigrante nos Estados Unidos: desafios e impactos*, Universidade Estadual da Paraiba, Oct. 26, 2021.

Presenter, *Fleeing the Land of the Free*, Central States Law Schools Association Conference, Sept. 25, 2021.

JAYESH M. RATHOD
Page 6

Presenter, *Migration Law and Policy During the COVID-19 Pandemic*, WCL Faculty Speaks Series, June 29, 2020.

Presenter, *Experiential Learning*, Associate Deans Conference, Texas A & M University School of Law, June 3, 2020.

Presenter, *Advancing Migration Policy in Complex Political Times: Assessing State Interests*, Environmentally-Induced Displacement and Religion in Latin America and the Caribbean: Engaging the Normative and Legal Landscape, AU Center for Latin American and Latino Studies & Universidade de Brasília, January 24, 2020.

Presenter, *O muro invisível: Política migratoria e direitos humanos sob o governo Trump*, Conferência Brasileira Sobre Estudos Políticos Sobre os Estados Unidos (São Paulo), Nov. 26, 2019.

Discussant, *Theories of Language Access to Justice*, Law and Society Annual Meeting (Washington, DC), May 31, 2019.

Discussant, *Race, Criminal Justice, and Migration Control: Enforcing the Boundaries of Belonging*, Law and Society Annual Meeting (Washington, DC), May 31, 2019.

Presenter, *Criminalization and the Politics of Migration in Brazil*, NYU Clinical Writers' Workshop, September 22, 2018.

Presenter, *La gran expulsión? Política migratoria en la época de Trump*, FLACSO-CLALS Encuentro Internacional (San José, Costa Rica), July 12, 2018.

Presenter, *The State of South Asian Americans 95 Years After* United States v. Bhagat Singh Thind, South Asian Bar Association of North America 2018 Conference (New York, NY), June 29, 2018.

Presenter, *A Golden Door for the Global South? Brazil's New Migration Law,* Law and Society Annual Meeting (Toronto), June 7, 2018.

Presenter, *2018 Perspectives on the Future of Immigration*, Immigrant Tax Inquiry Group, U.S. House of Representatives, May 30, 2018.

Presenter, *Equity in Contemporary Immigration Enforcement*, Law & Inequity Symposium, University of Kansas School of Law, October 20, 2017.

Presenter, *Migración entre México y los Estados Unidos*, Seminario, Relación México-EEUU, Instituto Belisario Domínguez (Mexico City), August 28, 2017.

Presenter, *Criminalization and the Politics of Migration in Brazil,* Law and Society Annual Meeting (Mexico City), June 23, 2017.

Presenter, *Da Proteção à Deportação: A Política Migratória dos EUA*, Centro de Ciências Jurídicas, Universidade Estadual da Paraíba, Campina Grande, Brazil, December 14, 2016.

Presenter, *Migração Transnacional Forzada e os Direitos Humanos*, II Séminario Anula da Cátedra Sérgio Vieira de Mello, Universidade Estadual da Paraíba, João Pessoa, Brazil, December 14, 2016.

Presenter, *A Política Migratória dos Estados Unidos: Seis Principais Tendências*, 397ª reunião do Seminário de Tropicologia, Fundação Joaquim Nabuco, Recife, Brazil, November 29, 2016.

Presenter, *Política de Migração e Criminalização: Perspectivas dos Estados Unidos*, OBMigra (Observatório das Migrações Internacionais), Universidade de Brasília, Brazil, September 15, 2016.

Presenter, *Danger and Dignity: Immigrant Workers and Occupational Risk*, Temple University Beasley School of Law Faculty Speaker Series, January 28, 2016.

Presenter, *The Role of Clinical Education in the 21st Century Law School*, Origins and Innovations: A Celebration of Clinics at Columbia Law School, November 13, 2015.

**JAYESH M. RATHOD**
**Page 7**

Presenter, *Equality Gained, Equality Lost? The 1965 Immigration Law and its Aftermath*, American Constitution Society & Economic Policy Institute, October 26, 2015.

Presenter, *Drug Crimes,* Maryland Office of the Public Defender, Immigration and Criminal Defense Institute, University of Maryland School of Law (Baltimore, MD), September 26, 2015.

Presenter, *Asylum & Other Immigration Relief: Legal Aspects and Documentation*, HealthRight International Human Rights Clinic Training, Washington, DC, February 21, 2015.

Presenter, *The Precarity of Low-Wage Work: Reframing Challenges and Reconsidering Advocacy Approaches*, Class Crits VII, University of California, Davis, November 16, 2014.

Invited Guest Lecturer, *La Migración Transnacional Forzada y los Derechos Humanos*, Pontificia Universidad Javeriana de Cali (Cali, Colombia), July 18, 2014.

Presenter, *Formas Actuales de Migración Forzada,* Second Regional Humanitarian Conference on Forced Migration (Bogotá, Colombia), July 14, 2014.

Presenter, *Immigration Law En Español: Preparing Students for Multilingual Practice*, Immigration Law Professors Workshop (Irvine, CA), May 24, 2014.

Co-Convener & Co-Facilitator, *Clinic Design Workshop*, Association of American Law Schools Conference on Clinical Legal Education (Chicago, IL), April 2014.

Presenter, *Language Access and Experiential Learning: Law School Best Practices and Compliance with Civil Rights and Ethical Requirements*, AALS Section on Clinical Legal Education Webinar, April 17, 2014.

Keynote Speech, *Immigrants' Rights & Civil Rights*, 15th Annual Martin Luther King Jr. Birthday Commemoration, January 16, 2014.

Presenter, *Reimagining the Law of Self-Employment: A Comparative Perspective*, Poverty Law: Cases, Teaching & Scholarship (Washington, DC), October 26, 2013.

Presenter, *Overcoming Isolation and Exclusion: Promoting Access to Justice for Language Minorities*, Lat Crit XVI (Chicago, IL), October 4, 2013.

Presenter, *"Classroom Flipping" in Graduate Education*, American University Center for Teaching, Research & Learning Workshop, August 20, 2013.

Presenter, *Employment-Related Immigration Provisions: Developments and Trends*, Southeast Association of Law Schools Annual Conference (Palm Beach, FL), August 6, 2013.

Presenter, *Lawyering Skills 2.0*, Association of American Law Schools Conference on Clinical Legal Education (San Juan, PR), April 29, 2013.

Presenter & Conference Organizer, Multilingual Legal Education: Theory and Pedagogy (Washington, DC), April 10, 2013.

Presenter, *Riding the Wave: Uplifting Labor Organizations through Comprehensive Immigration Reform*, Reimagining Labor Law Symposium, U.C. Irvine School of Law, February 22, 2013.

Presenter, *The Legacy of Prohibition on U.S. Immigration Law*, Mid-Atlantic People of Color Legal Scholarship Conference (Philadelphia, PA), January 25, 2013.

Presenter, *Workers' Compensation for Transnational Workers*, National Farmworker Law Conference (Chicago, IL), December 7, 2012.

JAYESH M. RATHOD
Page 8

Presenter, *Promoting Language Access in the Legal Academy*, Society for American Law Teachers (SALT) 2012 Teaching Conference (Baltimore, MD), October 6, 2012.

Discussant, *Community Disruption and HIV/AIDS in the District of Columbia: Deportation*, American University Center on Health, Risk, and Society, September 13, 2012.

Presenter, *El Impacto Social de los Derechos Humanos: Migración en las Américas*, Seminar on Human Rights and International Humanitarian Law in the Western Hemisphere, Inter-American Defense College (Washington, DC), May 30, 2012.

Plenary Session Panelist, *Immigration, Low-Wage Labor, and Occupational Health and Safety*, Class Crits IV (Washington, DC), September 23, 2011.

Plenary Session Panelist, *Understanding Law Across Borders and Cultures*, Association of American Law Schools Conference on the Future of the Law School Curriculum & Conference on Clinical Legal Education (Seattle, WA), June 13, 2011.

Conference Organizer, Paper Presenter, & Commentator, Emerging Immigration Law Scholars and Teachers Conference 2011, American University Washington College of Law, May 19-20, 2011.

Presenter, *Immigrant Workers and the Occupational Safety and Health Regime*, Cornell University School of Industrial and Labor Relations, May 3, 2011.

Paper Presenter, *Immigrant Workers and the Regulation of Occupational Safety & Health*, Monash University Faculty Workshop (Melbourne, Australia), March 7, 2011.

Co-Organizer and Moderator, *Immigration: The Role of the States*, Founders' Celebration, American University Washington College of Law, February 7, 2011.

Presenter, *Workplace Justice for Latinos*, Workshop on Latina/o Politics in the 21ˢᵗ Century, Center for Latin American & Latino Studies, American University, September 27, 2010.

Presenter, *Immigration 101 - Immigrant Employment Rights*, Maryland Partners for Justice Conference (Baltimore, MD), May 27, 2010.

Presenter, *Using Non-Textbook Materials to Teach Immigration Law*, Immigration Law Teachers Workshop (Chicago, IL), May 26, 2010.

Co-Presenter, *Working with Bilingual & Multilingual Students*, Association of American Law Schools Conference on Clinical Legal Education (Baltimore, MD), May 7, 2010.

Presenter, *Convention Against Torture Claims, Withholding of Removal, and the Material Support Bar*, D.C. Bar Pro Bono Program, Advanced Political Asylum Training, March 16, 2010.

Presenter, *OSHA & Immigrant Workers*, Association of American Law Schools Annual Meeting, Labor Relations and Employment Law Section Meeting (New Orleans, LA), January 9, 2010.

Presenter, *Derecho Internacional y el Trabajador Migrante*, Global Workers Justice Alliance, Human Rights Defenders Training (Chiapas, Mexico), November 6, 2009.

Paper Presenter, *Bilingual Pedagogy: Preparing Law Students for Multilingual Practice*, Lat Crit XIV (Washington, DC), Oct. 3, 2009.

Presenter and Symposium Organizer, *Realizing the American Dream? Contemporary Challenges Facing H-2B Guest Workers and their Advocates*, Founders' Celebration, American University Washington College of Law, March 24, 2009.

Co-Presenter, *Cross-Clinic Collaborations: Looking Forward and Reflecting Back*, Association of American Law Schools Conference on Clinical Legal Education (Tucson, AZ), May 6, 2008.

**JAYESH M. RATHOD**
**Page 9**

Presenter, *Derechos Humanos y Migración*, Seminar on Human Rights and International Humanitarian Law in the Western Hemisphere, Inter-American Defense College (Washington, DC), April 17, 2008.

Keynote Speech, *Asian Americans and the Struggle for Racial Justice*, Pace University School of Law, Asian American Law Students Association Annual Dinner, March 12, 2008.

Presenter, *La Experiencia de la Clínica Legal de los Derechos Humanos Internacionales en la American University*, Annual Meeting of the Latin American Network of Public Interest and Human Rights Clinics, Universidad Iberoamericana (Mexico City), November 14, 2007.

Paper Presenter, *Dying to Work: Immigrant Labor and the Occupational Safety and Health Regime*, Conference of Asian Pacific American Law Faculty (CAPALF), William Mitchell College of Law, April 26-28, 2007.

Panelist, *America's Broken Immigration System: The Impact on Immigrants, Their Families, and Our Communities*, University of Baltimore School of Law, February 28, 2006.

Presenter, *Immigration Issues Affecting Local Unions*, Ironworkers International Union Attorneys' Conference, Las Vegas, NV, February 7, 2006.

## SELECT TESTIMONY

*Testimony in Support of Bill 22-75 (Language Access for Education Amendment Act of 2017)*, District of Columbia City Council, April 24, 2017.

*Testimony in Support of Bill 21-0066 (Language Access for Education Amendment Act of 2015)*, District of Columbia City Council, July 1, 2015.

*Impact of Immigrants on Maryland's Business Sector*, Governor's Commission to Study the Impact of Immigrants in Maryland, January 10, 2011.

*Testimony in Support of Resolution 02-2008 (Immigrant Sanctuary Ordinance)*, City Council of Mount Rainier, Maryland, February 12, 2008.

*Testimony in Opposition to H.B. 37 (Undocumented Workers and Workers' Compensation)*, Maryland House of Delegates, February 16, 2006.

*Testimony in Support of Apprenticeship Enforcement Amendment Act*, District of Columbia City Council, Committee on Public Services, June 30, 2004.

*Hate Crimes Against South Asian Americans after September 11*, U.S. House of Representatives, July 22, 2003.

## SELECT MEDIA APPEARANCES & QUOTATIONS

Bloomberg Law, *Racism Accusations Resurface in Trump Migrant Relief Crackdown*, May 9, 2025 (discussing litigation surrounding the termination of Temporary Protected Status designations).

USA Today, *She did chores for a host family – then ended up in US immigration Detention*, March 20, 2025 (discussing restrictions on work for visitors to the United States).

Insider, *Transgender Americans say climate of hate is forcing them into exile*, May 7, 2023 (discussing trends in out-migration by vulnerable U.S. citizens).

The Washington Blade, *California governor pardons MD man for 1967 gay sex conviction*, July 14, 2022 (discussing a pardon granted to a client of the WCL Immigrant Justice Clinic)

Latino USA, *Trapped in Diplomatic Limbo*, Aug. 6, 2021 (discussing a case of labor trafficking of a domestic worker by a foreign diplomat)

**JAYESH M. RATHOD**
**Page 10**

WAMU, The 1A, *How Do You Claim Asylum?*, Nov. 28, 2018 (discussing the fundamentals of U.S. asylum law).

The Washington Post Magazine, *American Girl: A Story of Immigration, Fear and Fortitude*, Oct. 2, 2018 (discussing Temporary Protected Status)

Baltimore Sun, *Howard County immigration counseling nonprofit strives to meet demand*, April 26, 2018

Washington Lawyer, *Law School in the Modern Era*, September 2017 (discussing bilingual and online courses at WCL)

India Abroad, *Liberty and Justice for All: For Indian Immigrants, Civil Rights is the New 'American Dream'*, July 8, 2017 (discussing civil rights activism among the South Asian American community)

Voice of America, *U.S. Judge Uses Rarely Used Waiver for Cambodian Facing Deportation*, March 16, 2017 (discussing the application of waiver provisions by immigration judges).

Law360, *Alcoholism Ruling Brings Science to Immigration Decisions*, March 25, 2016 (discussing the Ninth Circuit's decision in *Ledezma-Cosino v. Lynch*, which struck down the "habitual drunkard" clause in the INA).

Daily Record, *Undocumented immigrants face continuing uncertainty*, March 17, 2015 (describing the potential impact of immigration-related executive action on immigrants in the D.C. metropolitan area).

Roll Call, *The Case for Protected Status for Central American Migrants*, Dec. 22, 2014 (op-ed proposing a conferral of Temporary Protected Status as a partial solution to the Central American migration crisis) (with Eric Hershberg).

Al-Jazeera America, *A tale of two immigration politics in Maryland and Virginia*, November 3, 2014 (discussing politicians' posture towards immigration issues in advance of the 2014 elections).

Legal Tribune Online, *Der Trinker als politische Gefahr (The Drinker as Political Risk)*, February 23, 2014 (reviewing my publication on alcohol-related norms in U.S. immigration law).

Voice of America, Foro Interamericano, February 7, 2014 (discussing the prospects for immigration reform in 2014).

Poder Hispanic Magazine, *Lending His Voice – In Their Language*, June/July 2013 (profiled as an "honorary Latino").

American Magazine, *At the Edge of Justice,* May/June 2013 (feature story describing the structure, philosophy, and work of the Immigrant Justice Clinic).

WPFW, Latino Media Collective, July 18, 2012 (discussing the Obama administration's record on immigration).

Univisión, *Falta mas personal bilingüe en agencias del gobierno*, April 26, 2012 (discussing a report on language Access issued by the WCL Immigrant Justice Clinic).

KNX 1070 – CBS Radio Los Angeles, April 25, 2012 (discussing the Arizona immigration case pending before the U.S. Supreme Court).

The Daily Beast, *Supreme Court Takes Up Controversial Arizona Immigration Law*, April 24, 2012 (commenting on the immigration case pending before the U.S. Supreme Court).

BBC World, *Primarias en Nuevo Hampshire: la hora de la depuración republicana*, January 10, 2012 (discussing the Republic presidential candidates' stances on immigration).

NBC Nightly News, December 12, 2011 (discussing the U.S. Supreme Court's granting of certiorari in the Arizona immigration case)

Nuestra TeleNoticia (NTN) 24, August 6, 2011 (discussing changes to U.S. immigrant visa requirements and immigration law developments in Mexico)

CNN *En Español*, Choque de Opiniones, June 23, 2011 (discussing new legislative proposal for immigration reform)

JAYESH M. RATHOD
Page 11

CNN *En Español*, December 9, 2010 (discussing legislative debates surrounding the DREAM Act)

Voice of America, *Mexican guest workers take jobs few Americans want*, August 17, 2010 (suggesting reforms for the H-2B program based on findings from the Maryland crab industry)

The News-Journal (Delaware), *Foreign labor fills need in Delaware, even with high jobless rate*, August 15, 2010 (discussing labor supply issues that contribute to a need for foreign labor)

The Associated Press Television, August 9, 2010 (discussing SB 1070, the controversial immigration enforcement law passed in Arizona)

The Washington Post, *Report criticizes treatment of Mexican women recruited to pick Md. Crabs*, July 15, 2010 (discussing challenges faced by migrant workers the Maryland crab industry)

The Associated Press, *Visa fixes sought to protect migrant crab pickers*, July 14, 2010 (discussing the H-2B visa program)

WAMU, *Report: Local Crab picking houses relying more on immigrant women*, July 14, 2010 (describing the working conditions of migrant workers in the Maryland crab industry)

CNN *En Español*, June 24, 2009 (discussing the prospects for comprehensive immigration reform in the 111th Congress)

CNN *En Español*, October 3, 2006 (discussing the case of Elvira Orellana, an immigrant who sought sanctuary from deportation in a Chicago church)

CNN *En Español*, March 29, 2006 (discussing comprehensive immigration reform)

WUSA-TV, April 19, 2005 (discussing the risks faced by immigrant day laborers in metropolitan Washington, D.C.)

NPR, *The Working Poor: Low-Wage Workers*, March 18, 2005 (discussing the phenomenon of wage theft in the employment of day laborers in the D.C. area)

BBC World, *Latinoamérica contra el racismo*, October 6, 2003 (discussing racial discrimination in the Americas)


## APPOINTMENTS

Academic Advisory Board Member, Acacia Center for Justice

Community Advisory Committee Member, RESPIRAR Project on Migrant and Seasonal Farmworker Health

Chair, Planning Committee, 2021 AALS Conference on Clinical Legal Education (virtual)

Chair, Planning Committee, 2020 AALS Conference on Clinical Legal Education (Orlando, FL)

Chair, AALS Committee on Clinical Legal Education (2016-2018)

Member, Executive Committee, Association of American Law Schools, Section on Clinical Legal Education (2011-2016); Immediate Past Chair (2016); Chair (2015); Chair-Elect (2014); Secretary (2013)

Member, Planning Committee, 2012 AALS Conference on Clinical Legal Education (Los Angeles, CA)

Expert Consultant, Trust for the Americas, Organization of American States, Promoting a Culture of Compliance of Migrant Workers' Rights (presented workshops to diverse sectors in El Salvador and the Dominican Republic on the rights of migrant workers) (2010-2011)

Law & Society Association, Stanton Wheeler Mentorship Prize Committee (2018)

Peer Reviewer, Fulbright U.S. Scholarship Program

**JAYESH M. RATHOD**
**Page 12**

Manuscript Referee, Law & Social Inquiry

Manuscript Referee, Revista de Estudos Internacionais

Manuscript Referee, Studies in Public Law (Studia Prawa Publicznego)

## COMMUNITY INVOLVEMENT

Amica Center for Immigrant Rights (formerly Capital Area Immigrants' Rights Coalition (CAIR) Coalition), (Board Member, 2024-present) Legal Advisory Committee (2008-2014); Tenth Anniversary Honoree (June 2009)

Ayuda (Board Member, 2017-2023)

South Asian Americans Leading Together (SAALT) (Chairman, Board of Directors, 2006-2010; Vice-Chair, 2011-2013; Treasurer, 2004-2006; Board Member, 2003-2014).

## HONORS

Pauline Ruyle Moore Scholar, 2025 (WCL Faculty Scholarship Award)

Clinical Legal Education Association (CLEA) Award for Excellence in a Public Interest Case or Project, 2025 (Honorable Mention) (presented to WCL Immigrant Justice Clinic and UC Irvine Criminal Justice Clinic)

Society of American Law Teachers (SALT) Great Teacher Award, 2023

American University Faculty Award for Outstanding Community Engagement, 2021

Niles North High School Distinguished Alumnus Award, 2021

Pauline Ruyle Moore Scholar, 2018 (WCL Faculty Scholarship Award)

WCL Hispanic Law Conference, Diversity Award, 2016 (presented to WCL Immigrant Justice Clinic).

Centro de los Derechos del Migrante, Breaking Boundaries Award, 2015 (presented to WCL Immigrant Justice Clinic).

Association of American Law Schools Teacher of the Year for WCL, 2013

WCL Innovation in Pedagogy Award, 2012

WCL Public Interest/Public Service Scholars, Annual Faculty Award, 2011

Pace Law School, Asian American Law Students Association (AALSA) Award of Distinction, March 2008

Outstanding Public Interest Attorney of 2004, National South Asian Bar Association (NASABA)

## PROFESSIONAL AFFILIATIONS

American Immigration Lawyers' Association (AILA)
Society of American Law Teachers (SALT)
Clinical Legal Education Association (CLEA)
American Bar Association
Asian Pacific American Bar Association of D.C. (VP-Community Affairs, 2003-2005)
South Asian Bar Association of D.C.
National LGBTQ+ Bar Association

**JAYESH M. RATHOD**
**Page 13**

## BAR ADMISSIONS

New York
District of Columbia
United States District Court for the District of Columbia
United States District Court for the District of Maryland
United States Court of Appeals for the Fourth Circuit

## LANGUAGES

Spanish – Read; write; speak
Portuguese – Read; write; speak
Gujarati – Speak

# APPENDIX B

## Appendix B

## Sources Consulted in Drafting Expert Declaration

**Statutory Provisions**

Immigration and Nationality Act, Pub. L. No. 82-414, §§ 101, 201, 203, 209, 212, 244, 245, 248

**Regulations**

8 C.F.R. §§ 1.3(a)(3), 101.3(a), § 214, 214.2(b), 214.2(e)(19)(i), 214.2(e)(20), 214.2(h)(15)(ii)(B)(1), 214.2(k)(8), 214.2(f)(5), 245.2(a)(4)(ii)(A), 245.23, 245.24

**Cases**

*Ledezma-Cosino v. Lynch*, 819 F.3d 1070, 1078 (9th Cir. 2016), *rev'd en banc*, 857 F.3d 1042 (9th Cir. 2017)

*Manning v. Caldwell*, 900 F.3d 139, 157 (4th Cir. 2018) (Motz, J., concurring), *vacated en banc*, 930 F.3d 264 (4th Cir. 2019)

*Matter of Hosseinpour*, 15 I&N Dec. 191 (B.I.A. 1975).

*Matter of L-K-*, 23 I&N Dec. 677 (B.I.A. 2004)

**Executive Order**

Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship/

**Federal Register Notices**

Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511 (Feb. 24, 2025)

Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611 (March 25, 2025)

Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309 (May 13, 2025)

Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025)

Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025)

Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status 90 Fed. Reg. 9,040 (Feb. 5, 2025)

**U.S. Department of Homeland Security Materials**

*Arrival/Departure Forms: I-94 and I-94W*, U.S. Customs & Border Prot., https://www.cbp.gov/travel/international-visitors/i-94 (Feb. 24, 2025)

Baker, Bryan & Robert Warren, U.S. Dep't of Homeland Sec., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022* 1 (Apr. 2024), https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf

*Characteristics of T Nonimmigrant Status (T Visa) Applicant Fact Sheet*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/sites/default/files/document/fact-sheets/Characteristics_of_T_Nonimmigrant_Status_TVisa_Applicants_FactSheet_FY08_FY22.pdf

*DACA FAQ*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions (Jan. 24, 2025)

*Definition of Nonimmigrant*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/glossary-term/50717 (last visited June 15, 2025)

*DHS Implements New Processes for Cubans, Haitians, and Nicaraguans and Eliminates Cap for Venezuelans*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/newsroom/alerts/dhs-implements-new-processes-for-cubans-haitians-and-nicaraguans-and-eliminates-cap-for-venezuelans (Jan. 6, 2023)

*E-2 Treaty Investors*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors (Apr. 8, 2025)

*Form I-918, Petition for U Nonimmigrant Status, by Fiscal Year, Quarter, and Case Status and Form I-918, Petition for U Nonimmigrant Status, Bona Fide Determination Review (Fiscal Year 2025, Quarter 1)*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/sites/default/files/document/data/i918u_visastatistics_fy2025_q1.xlsx

(Apr. 30, 2025)

*Handbook for Employers M-274, 7.3 Refugees and Asylees*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/70-evidence-of-employment-authorization-for-certain-categories/73-refugees-and-asylees (Apr. 2, 2025)

*H-1B Specialty Occupation*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (May 20, 2025); 8 C.F.R. § 214.2(h)(15)(ii)(B)(1).

*Humanitarian or Significant Public Benefit Parole for Aliens Outside of the United States*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/humanitarian_parole (Jan. 24, 2025)

*L-1A Intracompany Transferee Executive or Manager*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager (July 29, 2024)

Memorandum from Donald Neufeld, Acting Assoc. Dir., Domestic Operations Directorate, U.S. Citizenship & Immigr. Servs., Lori Scialabba, Assoc. Dir., Refugee Asylum & Int'l Operations Directorate, U.S. Citizenship & Immigr. Servs., and Pearl Chang, Acting Chief, Off. of Pol'y & Strategy, U.S. Citizenship & Immigr. Servs. to Field Leadership (May 6, 2009)

*Operation Allies Welcome*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/archive/operation-allies-welcome (Jan. 22, 2025)

*Requirements for Immigrant and Nonimmigrant Visas*, U.S. Customs & Border Prot., https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas (Mar. 14, 2024)

Rukh-Kamaa, Aneer, U.S. Dep't of Homeland Sec., *U.S. Nonimmigrant Admissions: 2023* (Aug. 2024), https://ohss.dhs.gov/sites/default/files/2024-09/2024_0906_ohss_nonimmigrant_fy2023_0.pdf

Schofield, Noah & Amanda Yap, U.S. Dep't of Homeland Sec., *Asylees: 2023* (Oct. 2024), https://ohss.dhs.gov/sites/default/files/2024-10/2024_1002_ohss_asylees_fy2023.pdf

Schofield, Noah & Amanda Yap, U.S. Dep't of Homeland Sec., *Refugees: 2023* (Nov. 2024), https://ohss.dhs.gov/sites/default/files/2024-11/2024_1108_ohss_refugee_annual_flow_report_2023.pdf

Under Secretary for Management, U.S. Dep't of Homeland Sec., *Parole Requests – Fiscal Year 2023, Fourth Quarter* 3 (Apr. 3, 2024), https://www.dhs.gov/sites/default/files/2024-07/2024_0403_dmo_plcy_parole_requests_q4.pdf

U.S. Citizenship & Immigr. Servs., *Policy Manual*, 2 USCIS-PM A.4 Appendix, https://www.uscis.gov/sites/default/files/document/policy-manual-resources/Appendix-NonimmigrantCategoriesandEligibilitytoApplyforEOSandCOS.pdf

*See* U.S. Citizenship & Immigr. Servs., *Policy Manual*, 2 USCIS-PM B, https://www.uscis.gov/policy-manual/volume-12-part-d-chapter-2

U.S. Citizenship & Immigr. Servs., *Policy Manual*, 7 USCIS-PM A.10(B), https://www.uscis.gov/policy-manual/volume-7-part-a-chapter-10 (June 13, 2025)

U.S. Citizenship & Immigr. Servs., *Policy Manual*, 8 USCIS-PM B.3, https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3

*Victims of Criminal Activity, U Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status (May 16, 2025)

*Victims of Human Trafficking: T Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (May 16, 2025)

*Yearbook of Immigration Statistics 2023, Table 10*, U.S. Dep't of Homeland Sec., https://ohss.dhs.gov/topics/immigration/yearbook/2023/table10

*Yearbook of Immigration Statistics 2023, Table 26*, U.S. Dep't of Homeland Sec., https://ohss.dhs.gov/topics/immigration/yearbook/2023/table26

**U.S. Department of State Materials**

*Border Crossing Card*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/border-crossing-card.html (last visited June 15, 2025)

*Nonimmigrant Visa Issuances by Visa Class and by Nationality – FY 2023 NIV Detail Table*, U.S. Dep't of State, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY23NIVDetailTable.pdf

*Obtaining U.S. Citizenship for a Child Born Abroad*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/us-citizenship/Acquisition-US-Citizenship-Child-Born-Abroad.html (Nov. 26, 2024)

U.S. Dep't of State, *Foreign Affairs Manual*, 9 FAM 401.1.3(C, E), 9 FAM 402, 9 FAM 402.1

U.S. Dep't of State, Bureau of Consular Affs., *Immigrant Numbers for June 2025*, Visa Bulletin, May 2, 2025, at 4–5, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2025/visa-bulletin-for-june-2025.html

*Visa Waiver Program*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visa-waiver-program.html (last visited June 15, 2025)

*What the Visa Expiration Date Means*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visa-expiration-date.html (last visited June 15, 2025)

*Worldwide NIV Workload by Visa Category FY 2024*, U.S. Dep't of State, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVWorkload/FY%202024NIVWorkloadbyVisaCategory.pdf


## Other U.S. Government Materials

Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 6 (2024), https://www.congress.gov/crs-product/RS20844

*Emergency Help for Americans Abroad*, USA.gov, https://www.usa.gov/emergency-abroad (last visited June 15, 2025)

*Employment FAQ*, Off. of Pers. Mgmt., https://www.opm.gov/faq/employment/Do-I-have-to-be-a-US-citizen-to-apply.ashx (last visited June 15, 2025)

*Field Listing– Ethnic Groups*, CIA World Factbook, https://www.cia.gov/the-world-factbook/field/ethnic-groups (last visited June 15, 2025)

*Financial Aid Eligibility*, U.S. Dep't of Educ., Fed. Student Aid, https://studentaid.gov/understand-aid/eligibility (last visited June 15, 2025)

*OMB Statistical Policy Directive No. 15 on Race and Ethnicity Data Standards – Categories and Definitions*, U.S. Off. Mgmt. & Budget, https://spd15revision.gov/content/spd15revision/en/2024-spd15/categories-definitions.html (Dec. 20, 2024)

One Big Beautiful Bill Act, H.R. 1, 119th Cong. §§ 10012, 44110, 112101 (2025) (as introduced)

*SNAP Eligibility*, U.S. Dep't of Agric., Food & Nutrition Servs., https://www.fns.usda.gov/snap/recipient/eligibility (June 2, 2025)


## Journal Articles

Abrego, Leisy J., *'I Can't Go to College Because I Don't Have Papers': Incorporation Patterns of Latino Undocumented Youth*, 4 Latino Stud. 212 (2006)

Bjorklund, Jr., Peter, *Undocumented Students in Higher Education: A Review of the Literature, 2001 to 2016*, 88 Rev. Educ. Rsch. 631, 639 (2018).

Chavarria, Karina et al., *Disrupted Education?: A Latent Profile Analysis of Immigration-Related Distractions and Academic Engagement among Undocumented College Students*, 20 J. Latinos & Educ. 232 (2021)

Enriquez, Laura E. et al., *Deconstructing Immigrant Illegality: A Mixed-Methods Investigation of Stress and Health Among Undocumented College Students*, 10 Race & Soc. Problems 193 (2018)

Gonzales, Roberto G., *Learning to Be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76 Am. Soc. Rev. 602 (2011)

Jordan, Elinor, *What We Know and Need to Know about Immigrant Access to Justice*, 67 S.C. L. Rev. 295 (2016)

Rathod, Jayesh, *Distilling Americans: The Legacy of Prohibition on U.S. Immigration Law*, 51 Hous. L. Rev. 781 (2014), *reprinted in* 35 Immigr. & Nat'y L. Rev.171 (2014)

Rathod, Jayesh, *Transformative Immigration Lawyering*, 132 Yale L.J. F. 632 (2022), *reprinted in* 43 Immigr. & Nat'y L. Rev. (2023)

Suárez-Orozco, Carola et al., *Growing Up in the Shadows: The Developmental Implications of Unauthorized Status*, 81 Harv. Educ. Rev. 438 (2011)

Valdivia, Carolina et al., *Fear and Stigma: How Undocumented Students Navigate Disclosure Amid Heightened Immigration Enforcement and Rising Anti-Immigrant Sentiment*, Sociological Perspectives (2025)

Williams, Jean C., *"It's Always with You, That You're Different": Undocumented Students and Social Exclusion*, 20 J. Poverty 168 (2015)


**Other Sources**

*Immigrants Faced Multiple Barriers to Safety Net Programs in 2021*, Urban Inst. (Nov. 2022), https://www.urban.org/sites/default/files/2022-11/Immigrant%20Families%20Faced%20Multiple%20Barriers%20to%20Safety%20Net%20Programs%20in%202021.pdf

National Immigration Law Center, *Overview of Immigrant Eligibility for Federal Programs*, https://www.nilc.org/wp-content/uploads/2024/04/tbl1_ovrvw-fed-pgms-rev-2024-04-1.pdf (Apr. 25, 2024)

National Immigration Law Center, *Immigrants and the Affordable Care Act (ACA)*, https://www.nilc.org/wp-content/uploads/2015/11/Immigrants-and-the-ACA-2024.pdf (May

2024)

Passel, Jeffrey S. & Jens Manuel Krogstad, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Rsch. Ctr. (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/

Pew Rsch. Ctr., *Unauthorized Immigrant Population by Region and Selected Country of Birth, 1990-2022*, https://www.pewresearch.org/wp-content/uploads/sites/20/2024/07/SR_24.07.22_unauthorized-immigrants_table-1.xlsx

State of Tennessee, TennCare, Policy Manual No. 005.015, https://www.tn.gov/content/dam/tn/tenncare/documents/QualifiedNon-Citizens.pdf

*States*, Higher Ed Immigration Portal, Presidents' Alliance on Higher Education and Immigration, https://www.higheredimmigrationportal.org/states/ (last visited June 15, 2025).

*The Henley Passport Index*, Henley & Partners (2025), https://www.henleyglobal.com/passport-index/ranking.

Van Hook, Jennifer et al., *The Unauthorized Immigrant Population Expands amid Record U.S.–Mexico Border Arrivals*, Migration Pol'y Inst. (Feb. 2025), https://www.migrationpolicy.org/news/unauthorized-immigrant-population-mid-2023