UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OCA – ASIAN PACIFIC AMERICAN
ADVOCATES,

        Plaintiff,

   v.

MARCO RUBIO, Secretary of State, et al.,

        Defendants.

Civil Action No. 25-0287 (TJK)

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION AMENDED
COMPLAINT OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT,
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>AND MEMORANDUM IN SUPPORT</u>**

# TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities ......................................................................................................... iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

STANDARDS OF REVIEW ............................................................................................ 6

 I.  Motions to Dismiss Under Rule 12(b)(1). ......................................................... 6

 II.  Motions to Dismiss Under Rule 12(b)(6). ......................................................... 7

 III. Motions for Summary Judgment ........................................................................ 8

ARGUMENT ..................................................................................................................... 8

 I.  OCA's Claims Should Be Dismissed Because OCA Lacks Article III Standing... 8

   A. OCA Fails to Establish Organizational Standing ........................................ 9

   B. OCA Fails to Establish Representational Standing .................................. 11

 II.  The President Should Be Dismissed ................................................................ 14

 III. Plaintiffs Fail to State a Claim ......................................................................... 14

   A. Plaintiffs Lack A Cause of Action ............................................................. 14

   B. Plaintiffs' Claims Are Properly Channeled Through Other Means Under The INA. ...................................................................................................... 17

 IV. The Court Should Not Entertain Class Certification ....................................... 18

 V.  Defendants Are Entitled to Summary Judgment on the Merits of Plaintiff's Claims. ............................................................................................................... 20

   A. The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power ...................................................................................... 21

   B. Children Born of Unlawfully or Temporarily Present Aliens Fall Outside of the Citizenship Clause. .......................................................................... 25

   C. Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause ................................................................................ 32

D.    *Wong Kim Ark* Does Not Support Plaintiff's Reading of the Citizenship Clause.................................................................................................. 34

E.    Plaintiffs Do Not Succeed on Their Equal Protection Claim ................... 39

CONCLUSION................................................................................................................ 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach*,
  469 F.3d 129 (D.C. Cir. 2006) ................................................. 10

*Abimbola v. Clinton*,
  Civ. A. No. 11-3677, 2012 WL 5420349 (D. Md. Nov. 6, 2012) ........................................... 17

*Abuhajeb v. Pompeo*,
  531 F. Supp. 3d 447 (D. Mass. 2021) ................................................. 18

*Afroyim v. Rusk*,
  387 U.S. 253 (1967) ................................................. 38

*Alsaidi v. Dep't of State*,
  292 F. Supp. 3d 320 (D.D.C. 2018) ................................................. 18

*Ancient Coin Collectors Guild v. Customs & Border Prot.*,
  801 F. Supp. 2d 383 (D. Md. 2011) ................................................. 16

*Arcam Pharm. Corp. v. Faria*,
  513 F.3d 1 (1st Cir. 2007) ................................................. 36

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011) ................................................. 8

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................. 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................. 7

*Ass'n of Flight Attendants-CWA*,
  564 F.3d 462 (D.C. Cir. 2009) ................................................. 11

*"Barbara" v. Trump*,
  Civ. A. No. 25-244-JL-AJ, 2025 WL 1904338 (D.N.H. July 10, 2025) ...................... 5, 18, 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................. 7

*Benny v. O'Brien*,
  32 A. 696 (N.J. 1895) ................................................. 30, 31

*Berenyi v. Dist. Dir., INS,*
   385 U.S. 630 (1967) ............................................................................................ 34

*Bryan v. Werner,*
   516 F.2d 233 (3d Cir.1975) ................................................................................ 19

*Cambranis v. Blinken,*
   994 F.3d 457 (5th Cir. 2021) .............................................................................. 17

*CASA, Inc. v. Trump,*
   Civ. A. No. 25-00201, 2025 WL 654902 (D. Md. Feb. 28, 2025) ........................... 4

*Cherokee Nation v. Georgia,*
   30 U.S. (5 Pet.) 1 (1831) .................................................................................... 26

*Chin Bak Kan v. United States,*
   186 U.S. 193 (1902) ............................................................................................ 36

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .............................................................................................. 9

*Crawford v. Bell,*
   599 F.2d 890 (9th Cir. 1979) ........................................................................ 18, 19

*Ctr. for Law & Educ. v. Dep't of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005) ........................................................................ 8, 9

*Ctr. for Responsible Sci. v. Gottlieb,*
   346 F. Supp. 3d 29 (D.D.C. 2018) ...................................................................... 10

*Dalton v. Specter,*
   511 U.S. 462 (1994) ............................................................................................ 15

*DeVillier v. Texas,*
   601 U.S. 285 (2024) ............................................................................................ 14

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ............................................................................................ 38

*Dominguez v. UAL Corp.,*
   666 F.3d 1359 (D.C. Cir. 2012) ............................................................................ 8

*Elk Run Coal Co., Inc. v. Dep't of Lab.,*
   804 F. Supp. 2d 8 (D.D.C. 2011) ........................................................................ 15

*Elk v. Wilkins,*
   112 U.S. 94 (1884) .................................................... 2, 23, 24, 25, 26, 27, 37

*Elkins v. Moreno,*
    435 U.S. 647 (1978) ........................................................................... 26

*Equal Rights Ctr. v. Post Props.,*
    633 F.3d 1136 (D.C. Cir. 2011) .......................................................... 9

*Fitsemanu v. U.S.,*
    1 F.4th 862 (10th Cir. 2021) .............................................................. 39

*Flambeau Band of Lake Superior Chippewa Indians v. Coughlin,*
    599 U.S. 382 (2023) ..................................................................... 26, 31

*Food & Water Watch,*
    808 F.3d 905 (D.C. Cir. 2015) ............................................................ 9

*Franchise Tax Bd. of Cal. v. Hyatt,*
    587 U.S. 230 (2019) ............................................................. 27, 28, 30

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................................... 14

*Friends of Animals v. Ashe,*
    174 F. Supp. 3d 20 (D.D.C. 2016) ..................................................... 11

*Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ........................................................................... 12

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*
    458 U.S. 375 (1982) ........................................................................... 23

*Grand Lodge of Fraternal Order of Police v. Ashcroft,*
    185 F. Supp. 2d 9 (D.D.C. 2001) ........................................................ 6

*Haaland v. Brackeen,*
    599 U.S. 255  (2023) ............................................................. 21, 22, 27

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ........................................................................... 32

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ............................................................................ 9

*Herbert v. Nat'l Acad. of Scis.,*
    974 F.2d 192 (D.C. Cir. 1992) ............................................................ 6

*Inglis v. Trs. of Sailor's Snug Harbor,*
    28 U.S. (3 Pet.) 99 (1830) ..................................................... 28, 34, 36

*INS v. Chadha*,
    462 U.S. 919 (1983)..................................................................................... 38

*Int'l Fed'n of Pro. & Tech. Eng'rs v. United States*,
    934 F. Supp. 2d 816 (D. Md. 2013) ........................................................... 16

*Jerome Stevens Pharms. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) .................................................................... 6

*Kawakita v. United States*,
    343 U.S. 717 (1952)..................................................................................... 33

*Kwock Jan Fat v. White*,
    253 U.S. 454 (1920)..................................................................................... 36

*Lamar v. Micou*,
    112 U.S. 452 (1884)..................................................................................... 26

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949)..................................................................................... 15

*Liu v. SEC*,
    591 U.S. 71 (2020)....................................................................................... 32

*Lone Wolf v. Hitchcock*,
    187 U.S. 553 (1903)..................................................................................... 22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................... 6, 8, 9, 13

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803)...................................................................... 22

*Martinez v. Bynum*,
    461 U.S. 321 (1983)..................................................................................... 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................................... 8

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)..................................................................................... 23

*Miller v. Albright*,
    523 U.S. 420 (1998)..................................................................................... 34

*Minor v. Happersett*,
    88 U.S. 162 (1874)....................................................................................... 24

*Miss. Band of Choctaw Indians v. Holyfield*,
 490 U.S. 30 (1989) ..................................................................................... 26

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
 597 U.S. 1 (2022) ....................................................................................... 37

*Nat'l Assoc. of Home Builders v. EPA*,
 667 F.3d 6 (D.C. Cir. 2011) ............................................................... 8, 9, 11

*New Jersey v. Trump*,
 131 F. 4th 27 (1st Cir. Mar. 11, 2025) ........................................................ 4

*Newdow v. Roberts*,
 603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 14

*Nishimura Ekiu v. United States*,
 142 U.S. 651 (1892) ................................................................................... 32

*Norris v. Slothouber*,
 718 F.2d 1116 (D.C. Cir. 1983) ........................................................... 19, 38

*Oceanic Navigation Co. v. Stranahan*,
 214 U.S. 320 (1909) ................................................................................... 32

*Oklahoma v. Castro-Huerta*,
 597 U.S. 629 (2022) ................................................................................... 38

*Papasan v. Allain*,
 478 U.S. 265 (1986) .................................................................................. 7, 8

*Pennhurst State Sch. & Hosp. v. Halderman*,
 465 U.S. 89 (1984) ..................................................................................... 16

*PETA v. Dep't of Agric.*,
 797 F.3d 1087 (D.C. Cir. 2015) ................................................................... 9

*Pizarro*,
 15 U.S. (2 Wheat.) 227 (1817) .................................................................. 25

*Plyler v. Doe*,
 457 U.S. 202 (1982) ............................................................................. 37, 40

*Richards v. Sec'y of State*,
 752 F.2d 1413 (9th Cir. 1985) ................................................................... 17

*Robertson v. Cease*,
 97 U.S. 646 (1878) ..................................................................................... 24

*Rogers v. Bellei*,
    401 U.S. 815 (1971) ........................................................................................ 33

*Rts. Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020) ................................................................. 13

*Savorgnan v. United States*,
    338 U.S. 491 (1950) ........................................................................................ 33

*Schooner Exchange v. McFaddon*,
    11 U.S. (7 Cranch) 116 (1812) ................................................................. 22, 23

*Slaughterhouse Cases*,
    83 U.S. 36 (1873) ........................................................................................... 30

*Summers v. Earth Island Inst.*,
    555 U.S. 488, (2009) ...................................................................................... 11

*Taylor Energy Co., LLC v. United States*,
    Civ. A. No. 20-1720, 2021 WL 1876845 (E.D. La. May 10, 2021) ................ 16

*Thompson v. Dep't of Hous. & Urb. Dev.*, Civ. A.,
    No. 95-0309, 2006 WL 581260 (D. Md. Jan. 10, 2006) ................................ 15

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ........................................................................... 5, 24, 29

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .................................................................................. 16, 32

*Tuaua v. United States*,
    788 F.3d 300 (D.C. Cir. 2015) ...................................................................... 39

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ....................................................................................... 15

*U.S. Ecology, Inc. v. Dep't of Interior*,
    231 F.3d 20 (D.C. Cir. 2000) .......................................................................... 6

*U.S. Off. of Special Counsel*,
    480 F. Supp. 3d 118 (D.D.C. 2020) ............................................................. 9, 10

*United Food & Com. Workers Union v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ....................................................................................... 11

*United States v. Antelope*,
    430 U.S. 641 (1977) ....................................................................................... 37

*United States v. Holliday*,
   70 U.S. (3 Wall.) 407 (1866) ................................................................... 22

*United States v. Kagama*,
   118 U.S. 375 (1886) ............................................................................... 22

*United States v. Manzi*,
   276 U.S. 463 (1928) ............................................................................... 34

*United States v. Rahimi*,
   602 U.S. 680 (2024) ............................................................................... 37

*United States v. Rogers*,
   45 U.S. (4 How.) 567 (1846) ................................................................. 21

*Vance v. Terrazas*,
   444 U.S. 252 (1980) ............................................................................... 17

*Venetian Casino Resort, LLC v. EEOC*,
   409 F.3d 359 (D.C. Cir. 2005) ................................................................. 6

*Verlinden BV v. Central Bank of Nigeria*,
   461 U.S. 480 (1983) ............................................................................... 22

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................................. 7

*Washington v. Trump*,
   No. 25-807, 2025 U.S. App. LEXIS 18419 (9th Cir. July 23, 2025) ................ 12, 20

*Washington v. Trump*,
   Civ. A. No. 25-0127, 2025 WL 553485 (W.D. Wash. Feb. 19, 2025) ................ 4

*Winton v. Amos*,
   255 U.S. 373 (1921) ............................................................................... 21

*Wong Kim Ark*,
   169 U.S. 649 (1898) ................................... 2, 21, 22, 23, 25, 26, 27, 31, 32, 33, 34, 35, 36, 37, 38

**Statutes**

5 U.S.C. § 704 ............................................................................................. 15

5 U.S.C. § 706 ............................................................................................. 14

8 U.S.C. §1158 ............................................................................................ 13

8 U.S.C. §1401 ....................................................................................... 5, 20, 21, 34

8 U.S.C. § 1503 ............................................................................................... 17

28 U.S.C. § 2201 ............................................................................................. 17

42 U.S.C. § 1983 ............................................................................................. 14

U.S. Const. amend. XIV ................................................................................. 27

U.S. Const. Art. I ............................................................................................... 5

**Other Authorities**

2 Cong. Rec. 3279 (1874) ............................................................................... 30

Exec. Order No. 14,159, "Protecting the American People Against Invasion" (Jan. 20, 2025)..... 3

Exec. Order No. 14,160, Protecting the Meaning and Value of American Citizenship (Jan. 20, 2025) ........................................................................................................... 1

Exec. Order No. 14,165, Securing Our Borders (Jan. 20, 2025) .................................... 3

Federal Practice and Procedure § 1350 (2d ed. 1987) .................................... 6

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ................................................................. 29

Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) .......................................................................................... 31

Defendants, by and through their attorneys, respectfully: move to dismiss this action or, in the alternative, for summary judgment in their favor; and oppose Plaintiff's Motion for Partial Summary Judgment.

## INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. On January 20, 2025, President Donald J. Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States. *See* Exec. Order No. 14,160, Protecting the Meaning and Value of American Citizenship ("Citizenship EO" or "Executive Order"). That Executive Order recognizes that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States as well as children of aliens whose presence is lawful but temporary. Text, history, and precedent support what common sense compels: the Constitution does not harbor a windfall clause granting American citizenship to, among others, the children of those who have circumvented (or outright defied) federal immigration laws.

Plaintiff, OCA-Asian Pacific American Advocates ("OCA"), a non-profit organization, initially filed suit on January 31, 2025, eleven days after the Executive Order was issued and after a variety of other plaintiffs had already filed suit against the Executive Order. OCA then filed its Class Action Amended Complaint on July 1, 2025. ECF No. 29. But OCA's dramatic assertions about the supposed illegality of the Executive Order cannot substitute for a showing that OCA has representational or organizational standing, and the individual plaintiffs have standing and that their claims are able to be pursued in this forum, all of which they have failed to do. As a result, the amended complaint should be dismissed.

Nor have Plaintiffs established their entitlement to a declaration that the Executive Order is unconstitutional and unlawful in its entirety such that its enforcement should be enjoined. Therefore, the government is entitled to summary judgment on the purely legal questions at issue in counts I to V of Plaintiff's Complaint.  As was apparent from the time of its enactment, the Citizenship Clause's use of the phrase "subjection to the jurisdiction" of the United States contemplates something more than being subject to this country's regulatory power. It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, that they have a "direct and immediate allegiance" to this country, unqualified by an allegiance to any other foreign power. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for children of diplomats or occupying enemies, it similarly does not hold for children of foreigners admitted temporarily or individuals here illegally.

Although Plaintiffs contend that the Executive Order upends well-settled law, it is Plaintiffs' maximalist reading which runs headlong into existing law. Not only is it inconsistent with the Supreme Court's holding in *Elk* that the children of Tribal Indians did not fall within the Clause, even though they were subject to the regulatory power of the United States, *id*. at 101-02, but it would render the Civil Rights Act of 1866 (which defined citizenship to cover those born in the United States, not "subject to any foreign power") unconstitutional just two years after it was passed. But the Citizenship Clause was an effort to constitutionalize the Civil Rights Act. Plaintiffs rely heavily on the Supreme Court's decision in *Wong Kim Ark*, 169 U.S. 649 (1898). The Court, however, was careful to cabin its actual holding to the children of those with a "permanent domicile and residence in the United States." *Id*. at 652-53. Reading that decision to leave open the question presented here is consistent with contemporaneous accounts, prior practices of the political branches, and Supreme Court decisions in the years following *Wong Kim Ark*.

As a result, the Court should dismiss this action or alternatively grant summary judgment to Defendants.

## BACKGROUND

The Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. *See, e.g.*, Exec. Order No. 14,165, Securing Our Borders (Jan. 20, 2025); Proclamation No. 10886, "Declaring a National Emergency at the Southern Border of the United States" (Jan. 20, 2025); Exec. Order No. 14,159, "Protecting the American People Against Invasion" (Jan. 20, 2025) ("Invasion EO" or "Invasion Order"). As the President has recognized, individuals unlawfully in this country "present significant threats to national security and public safety," Invasion EO, § 1, and the severity of these problems warrants a full panoply of immigration measures. Some of these threats are related to the United States' prior, erroneous policy of recognizing near-universal birthright citizenship. For instance, "the nation's current policy of universally granting birthright citizenship to individuals who lack any meaningful ties to the United States provides substantial opportunities for abuse by motivated enemies." Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019).

The Executive Order seeks to correct the Executive Branch's prior misreading of the Citizenship Clause. It recognizes that the Constitution and the INA provide for citizenship for all persons who are born in the United States and subject to the jurisdiction thereof, and identifies two circumstances in which a person born in the United States is not automatically extended the privilege of United States citizenship:

> (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States

at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Citizenship EO § 1.

Section 2(a) of the Executive Order directs the Executive Branch: (1) not to issue documents recognizing U.S. citizenship to persons born in the United States under the conditions described in section 1, and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons. The Executive Order specifies, however, that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," or February 19. Citizenship EO § 2(b). The Executive Order makes clear that its provisions do not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship." *Id*. § 2(c).

As for enforcement, the Executive Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and not to "act, or forbear from acting, in any manner inconsistent with this order." Citizenship EO § 3(a). It further directs the heads of all federal agencies to issue public guidance within 30 days (by February 19) "regarding this order's implementation with respect to their operations and activities." *Id*. § 3(b).1.

The citizenship EO has been challenged in other judicial districts: *CASA, Inc. v. Trump*, Civ. A. No. 25-00201, 2025 WL 654902 (D. Md. Feb. 28, 2025)(issuing nationwide injunction); *Washington v. Trump*, Civ. A. No. 25-0127, 2025 WL 553485 (W.D. Wash. Feb. 19, 2025)(same); *New Jersey v. Trump*, 131 F. 4th 27 (1st Cir. Mar. 11, 2025) (same). On March 13, 2025, the

Government filed emergency applications in the United States Supreme Court seeking to limit or stay the nationwide injunctions.  *See Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). On June 27, 2025, the Supreme Court held that under the Judiciary Act of 1789, federal courts lacked authority to issue universal injunctions.  *Id.*  Thereafter, the district court in the District of New Hampshire provisionally certified a nationwide class of plaintiffs and issued a classwide preliminary injunction.  *See "Barbara" v. Trump*, Civ. A. No. 25-244-JL-AJ, 2025 WL 1904338 (D.N.H. July 10, 2025).

On January 30, 2025, Plaintiffs filed their initial Complaint.  Thereafter, on July 1, 2025, Plaintiff amended their complaint and styled it as a "Class Action Amended Complaint for Declaratory and Injunctive Relief".  *See* ECF No. 29, A. Compl. ¶¶ 159-169.  Like the initial Complaint, the amended Complaint asserts that: the EO is violative of the Fourteenth Amendment's Citizenship Clause (Claim I); the EO is *ultra vires* because it conflicts with 8 U.S.C. §1401, U.S. Const. Art. I and U.S. Const. Amend. XIV (Claim II); the EO is violative of the Administrative Procedure Act (APA) (Claim III and IV); and the Plaintiffs are entitled to declaratory judgment. (Claim VI).  It also alleges a Fifth Amendment Equal Protection violation (Claim V). Plaintiffs also assert that if the Citizenship EO is implemented, "targeted children" would lack access to: Medicaid, the Children's Health Insurance Program (CHIP), the Supplemental Nutrition Assistance Program (SNAP), the Temporary Assistance for Needy Families Program (TANF), the Supplemental Security Income (SSI) program, and Child Care Development Funds (CCDF) program benefits.  *See* Am. Compl. ¶¶ 195 – 206.

## STANDARDS OF REVIEW

### I.    <u>Motions to Dismiss Under Rule 12(b)(1).</u>

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *U.S. Ecology, Inc. v. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  *Id*. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).  Additionally, unlike when considering a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 366 (D.C. Cir. 2005) ("[G]iven the present posture of this case—a dismissal under Rule 12(b)(1) on ripeness grounds—the court may consider materials outside the pleadings."); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

The elements of Article III standing are "an indispensable part of the plaintiff's case," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561.  At the pleading stage, a plaintiff's factual allegations must be more than merely conclusory legal statements to the effect that standing exists or that the plaintiff was injured.  As the Supreme Court has stated, "[i]t is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the

dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (complaint's statement of the grounds for relief requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and a court need not accept as true "'naked assertion[s]' devoid of 'further factual enhancement'" (quoting *Twombly*, 550 U.S. at 557)).

## II.     Motions to Dismiss Under Rule 12(b)(6).

Under Rule 12(b)(6), the Court may dismiss a Complaint where a plaintiff fails to state a claim upon which relief can be granted.   To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  When resolving a motion to dismiss pursuant to Rule 12(b)(6), the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff.  *See Iqbal*, 556 U.S. at 678.  That said, a court is not required to accept conclusory allegations or unwarranted factual deductions as true.  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Likewise, a court need not "accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Ultimately, the focus is on the language in the complaint and whether that sets forth sufficient factual allegations to support a plaintiff's claims for relief.

III.    **Motions for Summary Judgment**

The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact.  *Id.*  Once the moving party has met its burden, the nonmoving part may not rest upon the mere allegations or denials of his pleading but must instead establish more than "the mere existence of a scintilla of evidence" in support of his position.  *Id.*  Thus, summary judgment is appropriate if the non-moving party fails to offer "evidence on which the jury could reasonably find for the [nonmovant]."  *Id.*  When determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## ARGUMENT

I.    **OCA's Claims Should Be Dismissed Because OCA Lacks Article III Standing**

The Court should dismiss claims brought by OCA because it lacks Article III standing at the threshold.  "To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133-34 (2011); *see Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012) (standing is a necessary "predicate to any exercise of our jurisdiction").

A plaintiff must meet three requirements to establish standing.  First, the plaintiff must have suffered an injury in fact, "an actual or imminent invasion of a legally protected, concrete and particularized interest."  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (citing *Lujan*, 504 U.S. at 560-61); *Nat'l Assoc. of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) ("The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability.").  Second, "there must be a

causal connection between the alleged injury and the defendant's conduct at issue." *Id*. That is, the injury must be "'fairly traceable to the challenged action.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). And third, "it must be 'likely,' not 'speculative,' that the court can redress the injury." *Ctr. for Law & Educ.*, 396 F.3d at 1157 (citing *Lujan*, 504 U.S. at 560-61).

An organization seeking to establish standing may "sue either on their own behalf ('organizational standing') or on behalf of their members ('representational standing')." *Citizens for Resp. & Ethics in Wash. ("CREW") v. U.S. Off. of Special Counsel*, 480 F. Supp. 3d 118, 126-27 (D.D.C. 2020). Plaintiff OCA seeks to establish organizational standing but falls far short. *See* ECF No. 30-1, Pltf's Motion at 37-43.

### A.    OCA Fails to Establish Organizational Standing

OCA surely has the indicia and structure of a membership organization, but that is not enough. For organizational standing, an organization must allege a "concrete and demonstrable injury to [its] activities." *CREW*, 480 F. Supp. 3d at 127. OCA cannot establish standing by only seeking to "vindicate their own value preferences through the judicial process." *Id*. The D.C. Circuit uses a two-part test to analyze this inquiry: the court asks first "whether the agency's action or omission to act 'injured the [organization's] interest'"; then, if satisfied, it inquires whether "the organization 'used its resources to counteract the harm.'" *PETA v. Dep't of Agric.*, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (alteration in original; quoting *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)); *accord Food & Water Watch*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding organizational injury based on an "injury to the organization's activities" followed by "the consequent drain on the organization's resources"). In reviewing the injury analysis, the government activity must "perceptibly impair [] the organization's ability to provide services." *CREW*, 480 F. Supp. 3d at

127.   It is not enough that the organization's mission has been compromised.  *Id*. at 128

(citing *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir.

2006)).  And not all use of resources will meet the second part of the test.  *CREW*, 480 F. Supp.

3d at 128.  "[T]he devotion of resources to advocacy for the organization's preferred policy—

whether that advocacy is directed at Congress, the courts, or an administrative agency—falls short

of the line."  *Id*. at 128 (citing, among others, *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp.

3d 29, 37 (D.D.C. 2018)). These are considered "self-inflicted" injuries.  *Id*. (citing *Abigail All.*,

469 F.3d at 133).

        Here, OCA fails both prongs of the test.  OCA's claim is not that it will be precluded from

providing services because of the Executive Order but that it *may* have to reallocate resources.

"OCA's members actively engage in a vibrant array of OCA's programs, services, and initiatives.

These activities include: educational services designed to foster legal literacy, financial literacy,

and personal wellness; mentorship programs; internship programs; civil advocacy trainings; and

convening at national conferences and summits.  OCA also provides subgrants to individual

chapters, which conduct specific projects or initiatives that are important to OCA members that

are part of those specific chapters, including naturalization and citizenship application counseling

and support." Pltf's Motion at 48, citing Nguyen Decl. ¶¶ 7 – 9. Nothing supports the conclusion

that the Executive Order has impaired OCA's ability to provide its core services. *Id*. Rather, OCA

argues that a part of its mission, *i.e.,* naturalization and citizenship application support, will

possibly surge causing OCA to divert resources, money, and staff time from other activities, Pltf's

Motion at 50, which is insufficient.  *See Abigail All.*, 469 F.3d at 133.  First, reallocating resources

is not rather common for organizations in meeting the demands of their membership, whatever

those demands might be.  Second, it is all speculative.  "Right now, the Order is not being

implemented because of the other cases against it, but as soon as the executive Order is upheld, we expect a substantial increase in requests for assistance. . ." Nguyen Decl. ¶ 10. "It is impossible to know whether the affected members' children will ultimately have their legal status rectified and we currently do not have guidance for either our chapters or members on how they should approach getting birth certificates or other documents for their U.S.-born children who are subject to the Order." Nguyen Decl. ¶ 12. Third, OCA's argument fails to establish that it has currently invested resources or that any alleged resources to be invested will not be "self-inflicted" to counteract any alleged harm. Plaintiff has thus failed to establish facts sufficient to meet either prong of this Circuit's test to establish organizational standing.

### B.    OCA Fails to Establish Representational Standing

Any attempt by OCA to establish representational standing fares no better. "To have representational standing, an organization must show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 28 (D.D.C. 2016) (citing *Home Builders*, 667 F.3d at 11 (quoting *Ass'n of Flight Attendants-CWA*, 564 F.3d 462, 464 (D.C. Cir. 2009), and *United Food & Com. Workers Union v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996))). To obtain injunctive relief in particular, as OCA seeks to do, a plaintiff "must show under the first prong of the test that at least one of its members 'is under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical'; it 'must be fairly traceable to the challenged action of the defendant'[]—and "it must be likely that a favorable judicial decision will prevent or redress the injury."" *Home Builders*, 667 F.3d at 12–13 (citing *Summers v. Earth Island Inst.*, 555 U.S.

488, 493, (2009) (quoting *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000))).

Again, OCA fails to meet several of the test's prongs.  First, and most importantly, OCA cannot demonstrate that its members have standing to sue in their own right.  OCA puts forth Member A, who has a nonimmigrant visa (J visa) and who gave birth to a child in the United States after February 19, 2025.  Nguyen Decl. ¶¶ 13-14. Although Member A has since given birth to her child, litigation and appeals are ongoing related to the ultimate status of her child including varying nationwide injunctions and pending appeals so as no determination of the child's legal status may be determined at this time.  *See Washington v. Trump*, No. 25-807, 2025 U.S. App. LEXIS 18419 *26 (9th Cir. July 23, 2025).

The harms cited by OCA to its members are speculative or insufficiently concrete and do not constitute an injury in fact.  Currently, the federal government is enjoined from enforcing the EO. But section 3(b) of the President's order directs the heads of agencies to issue guidance to implement it, and the Supreme Court has now allowed that part of the order to take effect. Thus, the agencies have provided specific guidance about how to implement the balance of the President's order when it takes effect for those children.  Further, it is still speculative and unclear as to exactly how many of these children would even be eligible for Medicaid, CHIP, SNAP TANF or SSI in the first place.  Even OCA realizes that "[i]t might be possible for the U.S.-born (but non-U.S. citizen) child to ultimately obtain a nonimmigrant visa linked to that of their parent." ECF No. 30-11, Rathod Decl. at ¶76.

Finally, OCA's asserted harm of statelessness and being left without status is also speculative since there are other routes of obtaining status for children and citizenship.  For instance, "[a]sylum provides individuals who qualify several distinct benefits: a path to citizenship,

eligibility for certain government benefits, and the chance for family members to receive asylum as well." *Cap. Area Immigrs.' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 32 (D.D.C. 2020). Children can be derivative beneficiaries of their parents' asylum application. *See* 8 U.S.C. §1158(b)(3)(A). Because there is currently no concrete harm for the Court to address, any opinion at this stage would be nothing more than an advisory opinion precluded by Art. III. *See Lujan*, 504 U.S. at 560-61.

Representational standing also does not exist for a second reason. OCA cannot show that it seeks to protect interests that are "germane to the organization's purpose," and particularly with respect to the organization's alleged connection with the immigration status of these unborn infants, which is particularly speculative. *See* Nguyen Dec*l*. ¶ 5 ("OCA's mission is to advance the social, political, and economic well-being of Asian Americans, native Hawaiians, and Pacific Islanders ("AANHPIs"). Since our founding in 1973, [they] have sought to provide a unified voice for Chinese Americans. . . We advocate for the immigration rights of our members and the broader AANHPI community.") *Id*. And, OCA alleges that its "mission is to advance the social, political, and economic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders ('AANHPIs')", and in so doing advocates against racial harassment and xenophobia, provides leadership training for high school and college students, the creation of internships and fellowships and other scholarly endeavors, which all bears little relation to advancing the interests of noncitizen parents in having their children acquire status in the United States. *See Id* at ¶ 12. See https://www.ocanational.org/ (last visited 07.30.2025)  In sum, OCA fails to meet multiple prongs of the test required to establish representational standing, and its claim should therefore be dismissed.

II.    **The President Should Be Dismissed**

Plaintiff has named the President as a Defendant but "courts do not have jurisdiction to enjoin [the president] . . . and have never submitted the president to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (citation omitted)).  Accordingly, the Court lacks jurisdiction to enter Plaintiff's requested relief against the President and should dismiss him as a defendant in this case at a minimum.

III.    **Plaintiffs Fail to State a Claim**

A.    **Plaintiffs Lack A Cause of Action**

This action should be dismissed at the threshold because Plaintiffs' claims are not recognized causes of action against the government.

As to Claim I, Plaintiffs cannot bring a cause of action independently under the Fourteenth Amendment's Citizenship Clause but must otherwise invoke the Administrative Procedure Act ("APA"), which permits a Court to "set aside agency action . . . otherwise not in accordance with law; contrary to constitutional right. . . [or] in excess of statutory jurisdiction." 5 U.S.C. § 706(2)(A)-(C). The Citizenship Clause does not, by itself, allow Plaintiffs to bring suit. "Constitutional rights do not typically come with a built-in cause of action to allow private enforcement in courts." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). "Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose" (such as 42 U.S.C. § 1983). *Id.* at 291.

- 14 -

Meanwhile, Claims III and IV, which Plaintiffs purport to bring under the APA, fail as the APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  But Plaintiffs' claims do not come within the APA as they do not even attempt to "identify the final agency action being challenged." *Elk Run Coal Co., Inc. v. Dep't of Lab.*, 804 F. Supp. 2d 8, 30 (D.D.C. 2011). Nor can they.  The Executive Order is not final agency action as it was issued by the President, who is not subject to the APA. *See Dalton v. Specter*, 511 U.S. 462, 469 (1994). Until such time as an agency named in the Complaint takes an action, determines rights or obligations, or otherwise causes legal consequences, *see, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016), the APA affords no cause of action.

Plaintiffs otherwise assert that the Executive Order is ultra vires under the Fourteenth Amendment or the Immigration and Nationality Act ("INA") in Claim II. *See* Compl. ¶¶ 142-47. But that cause of action is questionable at best. The decision suggesting the existence of ultra vires claims against federal officials, *Larson v. Domestic & Foreign Com. Corp.,* 337 U.S. 682 (1949), predates amendments to the APA that clarified what agency action can and cannot be subject to judicial review. *See Thompson v. Dep't of Hous. & Urb. Dev.*, Civ. A. No. 95-0309, 2006 WL 581260, at *8 (D. Md. Jan. 10, 2006) ("While *Larson* created an exception to sovereign immunity when federal officers acted ultra vires, Section 702 of the APA provides a general waiver of sovereign immunity for all unconstitutional acts where injunctive relief is requested."). Moreover, the Supreme Court has otherwise rejected actions in equity, like ultra vires claims, where Congress has provided for a specific remedial scheme as is the case here, *see infra* § III.B. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015). Nonetheless, some courts have recognized *ultra vires* claims, stating that "[e]ven if a statute does not provide for judicial review, [w]hen an executive acts ultra vires, courts are normally available to reestablish the limits on his

authority." *Ancient Coin Collectors Guild v. Customs & Border Prot.*, 801 F. Supp. 2d 383, 405 (D. Md. 2011) (quotation omitted).

These claims—even when recognized—are circumscribed. Ultra vires "review is limited to whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Id.* at 406. Indeed, the "modern cases make clear" that an officer may be said to act ultra vires "only when he acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984) (citation omitted). And more recent cases indicate that such claims are inappropriate against non-officers, such as the United States and agencies. *See Taylor Energy Co., LLC v. United States*, Civ. A. No. 20-1720, 2021 WL 1876845, at *3 (E.D. La. May 10, 2021) (finding *Larson* inapplicable against "the United States and its agencies"); *see also Int'l Fed'n of Pro. & Tech. Eng'rs v. United States*, 934 F. Supp. 2d 816, 821 (D. Md. 2013). Thus, Plaintiff's claim as brought against the federal agencies is improperly brought as an *ultra vires* claim.

Plaintiffs also cannot bring their ultra vires claim against the President and various agency heads. Regardless of the underlying merits of Plaintiffs' claims, it cannot be said that in issuing the Executive Order in the field of immigration law, the President failed to act "without any authority whatever." To the contrary, immigration law and foreign relations—the subjects of the Executive Order—are areas where the Executive Branch's authority is particularly broad, even when those actions implicate constitutional questions and questions under the INA. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (citation

modified)). Thus, even if Plaintiffs were correct regarding its interpretation of the Citizenship Clause and the INA, it cannot bring any challenge based on those disputes as an ultra vires claim.

Lastly, Claim V alleging a violation of the Fifth Amendment Equal Protection clause, should be dismissed because the President has set forth a compelling basis for not extending birthright citizenship to this class of children.

### B.    Plaintiffs' Claims Are Properly Channeled Through Other Means Under The INA.

Rather than ultra vires claims and a pre-enforcement challenge to the Executive Order, Plaintiffs have an available and exclusive mechanism to challenge citizenship determinations under the INA. Pursuant to the INA's comprehensive statutory framework for judicial review, disputes regarding an individual's citizenship are resolved by the individual filing an action for declaratory relief once he is denied a right or privilege as a U.S. national. 8 U.S.C. § 1503. Thus, "[i]f any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States," then that person may institute an action under 8 U.S.C. § 1503, in conjunction with 28 U.S.C. § 2201, for a declaratory judgment that she is a U.S. national. *See id.* § 1503(a). Under section 1503, district courts conduct de novo proceedings as to the noncitizen's nationality. *See Vance v. Terrazas*, 444 U.S. 252, 256 (1980); *Richards v. Sec'y of State*, 752 F.2d 1413, 1417 (9th Cir. 1985); *Abimbola v. Clinton*, Civ. A. No. 11-3677, 2012 WL 5420349, at *2 (D. Md. Nov. 6, 2012) (same).

Because "Congress intended § 1503(a) to be the exclusive remedy for a person within the United States to seek a declaration of U.S. nationality following an agency or department's denial of a privilege or right of citizenship upon the ground that the person is not a U.S. national," *Cambranis v. Blinken,* 994 F.3d 457, 466 (5th Cir. 2021), courts have consistently concluded that

section 1503(a) offers an adequate alternative remedy to APA review. *See, e.g. Alsaidi v. Dep't of State*, 292 F. Supp. 3d 320, 326-27 (D.D.C. 2018); *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 455 (D. Mass. 2021). As a result, any challenges to an agency's determination that an individual lacks citizenship under the Executive Order should be channeled through section 1503(a) proceedings rather than through various claims brought by an organization like OCA in federal court and this presents a separate ground for dismissal of Plaintiff's claims.

Accordingly, because Plaintiffs lack a cause of action to assert its various claims and its claims are otherwise channeled through the INA, Plaintiffs' amended complaint should be dismissed for failure to state a claim.

## IV.    The Court Should Not Entertain Class Certification

Individual Plaintiffs are already members of multiple class actions enjoining the implementation of the EO while litigation is ongoing, therefore, the Court need not certify a class here. To the extent the Individual Plaintiffs[1] have live claims, those claims are covered by the class action certified by the district court of New Hampshire in *"Barbara" v. Trump,* Civ. A. No. 25-244, 2025 WL 1904338 (D.N.H. July 10, 2025), and dismissal of the Individual Plaintiffs here is proper on those grounds. "A court may choose not to exercise its jurisdiction when another court having jurisdiction over the same matter has entertained it and can achieve the same result." *Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979). "Because [individual plaintiff's] allegations substantially overlap those in [pending class action], his case should be referred to the

---

[1] The Individual Plaintiffs are Jane Doe # 1 and Jane Doe # 2.  Jane Doe # 1 is a Mexican citizen, living in California, with "U" nonimmigrant status, who has a young child born after February 19, 2025, the effective date of the Executive Order.  The father of the child is neither a U.S. citizen nor a Lawful Permanent Resident ("LPR").  *See* ECF No. 30-13, Decl. of Jane Doe, #1. Jane Doe# 2 is Nepali, living in New Jersey and has been in the United States for almost 10 years with Temporary Protected Status. She is pregnant with her second child and is due later this year. *See* ECF No. 30-15, Decl. of Jane Doe, #2. The father of the child is neither a U.S. citizen nor a LPR.

district judge before whom the [class] action is pending." *Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983). In *Bryan v. Werner,* 516 F.2d 233, 239 (3d Cir.1975), appellant could not bring a separate action challenging the adequacy of a prison law library when a class action challenging the same was pending elsewhere.

While Defendants do not concede that the individual Plaintiffs are entitled to citizenship as a right of birth as the legal challenges and potential appeals are ongoing, the district court of New Hampshire certified a class that includes:

> All current and future persons who are born on or after February 20, 2025, where (1) that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*"Barbara"*, 2025 WL 1904338, at *16. Individual Plaintiffs' children undoubtedly are encompassed by that class definition. Individual Plaintiffs' claimed injuries relate to the harm faced by their children: the prospect of removal and separation from their families, the exclusion from legal immigration status if not removed, the denial of lawful employment and educational opportunities, and the deprivation of both constitutional and statutory rights. Moreover, both the class certified in *"Barbara"* and the Individual Plaintiffs here seek an injunction of the Executive Order on the basis that it violates the Fourteenth Amendment and the INA. *See* Am. Compl. ¶¶ 57-59. There is no reason to believe that these claims will not be fully litigated by the *"Barbara"* class representatives. *See Crawford*, 599 F.2d at 893. Because Individual Plaintiffs' children can obtain relief for those injuries through the class certified by the District Court of New Hampshire, and because relief in this court may conflict with or circumscribe the flexibility of relief in that other

case, this court should decline to exercise its jurisdiction over the Individual Plaintiffs' claims. *Washington v. Trump*, 2025 U.S. App. LEXIS 18419, \*27-28.

## V.    Defendants Are Entitled to Summary Judgment on the Merits of Plaintiff's Claims.

Even assuming this Court has jurisdiction over Plaintiff's claims and those claims are cognizable causes of action, this Court should nevertheless grant summary judgment to Defendants on all of Plaintiff's claims because the Executive Order is lawful under the Citizenship Clause and the INA.[2] The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1. And the INA grants U.S. citizenship to any "person born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). Plaintiffs contend that the Executive Order violates both the Citizenship Clause and the INA, but they are mistaken. *See* Compl. at pp. 29-32. Because the two provisions are coterminous, Defendants focus here on the constitutional provision.[3]

To obtain U.S. citizenship under the Citizenship Clause, a person must be: (1) "born or naturalized in the United States" and (2) "subject to the jurisdiction thereof." U.S. Const. amend XIV, § 1. The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not subject to the jurisdiction of the United States: children of foreign sovereigns or their diplomats, children of noncitizen enemies in hostile occupation, children born on foreign public ships, and certain

---

[2]    Because the claims raised by Plaintiffs present purely legal issues—namely the lawfulness of the Executive Order under the Citizenship Clause—Defendants submit that the legal question can be resolved through summary judgment briefing at the threshold without any need for fact discovery.

[3]    Plaintiff's statutory claim rises and falls with its constitutional claim as OCA alleges that 8 U.S.C. § 1401 codifies the meaning of the Citizenship Clause. *See* Compl. ¶¶ 66-71.

children of members of Indian tribes.[4] *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898). The Executive Order adds an additional category of persons not subject to the jurisdiction of the United States: children born in the United States of foreign parents whose presence is either unlawful or lawful but temporary. As discussed below, the Executive Order fully comports with the Citizenship Clause in doing so.

### A. The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power.

"Jurisdiction . . . is a word of many, too many, meanings." *Wilkins v. United States*, 598 U.S. 152, 156 (2023) (citation omitted). The Court may not equate the term "jurisdiction" with something akin to regulatory power, interpreting it to mean anyone who must necessarily submit to the rule of U.S. law. That interpretation is incorrect and conflicts with both Supreme Court precedent and ample evidence as to the provision's original public meaning.

Most importantly, the term "jurisdiction" in the Citizenship Clause should not be interpreted to conflict with Supreme Court precedents identifying the categories of persons who are not subject to the United States' jurisdiction within the meaning of the Citizenship Clause. For example, the Supreme Court has held that children of members of Indian tribes, "owing immediate allegiance" to those tribes, do not acquire citizenship by birth in the United States. *Elk*, 112 U.S. at 102; *see Wong Kim Ark*, 169 U.S. at 680-82. Yet members of Indian tribes and their children are plainly subject to the United States' regulatory power. *United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846). "It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations." *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see Haaland v. Brackeen*,

---

[4]    Although the Citizenship Clause has always been understood to exclude certain children of members of Indian tribes from a constitutional right to citizenship by birth, Congress has by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe." 8 U.S.C. §1401(b).

599 U.S. 255 272-73 (2023). For example, Congress may regulate Indian commercial activities, *see United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866); Indian property, *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903); and Indian adoptions, *see Brackeen*, 599 U.S. at 276-280. And the United States may punish Indians for crimes. *See United States v. Kagama*, 118 U.S. 375, 379-385 (1886). If the term, "subject to the jurisdiction thereof" means subject to U.S. law, this longstanding exception for Indians would be inexplicable.

In fact, this incorrect reading of the Citizenship Clause cannot explain the exception to birthright citizenship for "children of foreign sovereigns or their ministers." *Wong Kim Ark*, 169 U.S. at 693. Although foreign leaders and diplomats have traditionally enjoyed immunity as a matter of common law, the Constitution allows Congress to abrogate that immunity or to make exceptions to it. *See Verlinden BV v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). And to the extent Plaintiffs argue that children of foreign leaders or diplomats are not subject to the United States' jurisdiction because the United States chooses to extend immunity to them, their theory would allow Congress to turn the Citizenship Clause on and off at will by extending or retracting immunity.

Thus, under Plaintiffs' construction, the phrase "subject to the jurisdiction thereof" would add nothing to the phrase "born . . . in the United States." Because the United States is sovereign over its territory, everyone who is born (and so present) in the United States would necessarily be subject, at least to some extent, to the United States' regulatory authority. *See Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). But "[i]t cannot be presumed that any clause in the [C]onstitution is intended to be without effect; and, therefore, such a construction is inadmissible." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

Instead of equating "jurisdiction" with regulatory authority, the Supreme Court has held that a person is "subject to the jurisdiction" of the United States under the Citizenship Clause if he is born "in the allegiance and under the protection of the country." *Wong Kim Ark*, 169 U.S. at 693. That allegiance to the United States, the Court has further held, must be "direct," "immediate," and "complete," unqualified by "allegiance to any alien power." *Elk*, 112 U.S. at 101-02. In other words, a person is subject to the jurisdiction of the United States within the meaning of the Clause only if he is not subject to the jurisdiction of a foreign power, and the "nation" has "consent[ed]" to him becoming part of its own "jurisdiction." *Elk*, 112 U.S. at 102-03; *see also Schooner Exchange*, 11 U.S. at 136 (explaining a nation's "jurisdiction . . . must be traced up to the consent of the nation itself").

That reading of the Citizenship Clause reflects its statutory background. Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as "the initial blueprint" for the Amendment, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). The Act stated, as relevant here, that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act § 1, 14 Stat. 27. There is no reason to read the phrase "subject to the jurisdiction thereof" in the Amendment as broader than the phrase "not subject to any foreign power" in the Act—in no small part, because doing so would render the Civil Rights Act unconstitutional. And, as telling, the Act's citizenship language remained on the books until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138—suggesting that Congress regarded the Act's "not subject to any foreign power" requirement as consistent with the

Amendment's "subject to the jurisdiction" requirement. The Act thus confirms that, to be subject to the jurisdiction of the United States under the Clause, a person must owe "no allegiance to any alien power." *Elk*, 112 U.S. at 101.

Debates on the Act and the Amendment show that members of Congress shared that understanding. During debates on the Act, Senator Lyman Trumbull explained that the purpose of the Act was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States." Cong. Globe, 39th Cong., 1st Sess. 572 (1866). Trumbull went on to equate "being subject to our jurisdiction" with "owing allegiance solely to the United States." *Id.* at 2894. And Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power . . . shall be considered as citizens." *Id.* at 2893.

The full text of the Citizenship Clause reinforces that reading of the Clause's jurisdictional element. The Clause provides that persons born in the United States and subject to its jurisdiction "are citizens of the United States and of the States wherein they reside." U.S. Const. amend. XIV, § 1. The Clause uses the term "reside[nce]" synonymously with "domicile." *See Robertson v. Cease*, 97 U.S. 646, 650 (1878) (explaining that state citizenship requires "a fixed permanent domicile in that State"). The Clause thus makes clear that citizenship flows from lawful domicile.

Finally, as a decisive cross-check, the government's reading, unlike Plaintiffs' interpretation, is the only one that fully explains the Supreme Court's precedents on citizenship by birth in the United States. It was "never doubted" that "children born of citizen parents" owe allegiance to the United States and are subject to its jurisdiction. *Minor v. Happersett*, 88 U.S. 162, 167 (1874). In *Wong Kim Ark*, the Court held that a child born in the United States "of parents of Chinese descent, who at the time of his birth [were] subjects of the emperor of China, but have a

permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity" by China are likewise subject to the jurisdiction of the United States. 169 U.S. at 653. The Court explained that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance . . . of the United States." *Id.* at 693. By contrast, children of diplomats, children of certain noncitizen enemies, and children born on foreign public ships are not subject to the jurisdiction of the United States because they all owe allegiance to foreign sovereigns under background principles of common law. *See id.* at 655. And the Supreme Court has held that certain children of members of Indian tribes are not subject to U.S. jurisdiction in the necessary sense because they "owe[] immediate allegiance to their several tribes." *Elk*, 112 U.S. at 99.

**B.      Children Born of Unlawfully or Temporarily Present Aliens Fall Outside of the Citizenship Clause.**

To determine whether an individual has sufficient allegiance to the United States, the Supreme Court has looked to the background principles of the common law and the law of nations, as understood in the United States at the time of the ratification of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S. at 653-55. Under those principles, a child born of foreign parents other than lawful permanent residents is domiciled in, and owes primary allegiance to, his parents' home country. As a result, such a child is not subject to the jurisdiction of the United States within the meaning of the Citizenship Clause.

Under the common law, a person owes a form of "allegiance" to the country in which he is "domiciled." *Carlisle v. United States*, 83 U.S. (16 Wall). 147, 155 (1872); *see The Pizarro*, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.) ("[A] person domiciled in a country . . . owes allegiance to the country."). A child's domicile, and thus his allegiance, "follow[s] the independent domicile

of [his] parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *see also Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Unlawful or temporarily present aliens, however, are not domiciled here but in foreign countries. As touched on above, "[i]n general, the domicile of an individual is his true, fixed and permanent home." *Martinez v. Bynum*, 461 U.S. 321, 331 (1983). Temporarily present aliens in the United States, by definition, retain permanent homes in foreign countries. And noncitizens without legal presence in the United States, by definition, have no right even to be present in the United States, much less a right to make lawful residence here. Instead, as a matter of law, those aliens formally retain their foreign domiciles because they have not yet been accepted to reside anywhere else. *See*, *e.g.*, *Elkins v. Moreno*, 435 U.S. 647, 665-66 (1978) (recognizing that federal immigration law restricts the ability of foreigners to establish domiciles in the United States). And the domicile of children born in the United States to such persons also lies in the foreign country, and those children owe primary allegiance to the countries of their parents' nationalities. That degree of "allegiance to [an] alien power" precludes the child from being "completely subject" to the United States' jurisdiction, as the Fourteenth Amendment requires. *Elk*, 112 U.S. at 101-02.

Indeed, the Executive Order follows directly from Supreme Court precedent recognizing that distinction, and the established exception to birthright citizenship for certain "children of members of the Indian tribes." *Wong Kim Ark*, 169 U.S. at 682. Indian tribes form "an intermediate category between foreign and domestic states." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (citation omitted). The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.). Yet the Court has held that "an Indian, born a member of one of the Indian tribes,"

has no constitutional birthright to U.S. citizenship given his "immediate allegiance" to his tribe. *Elk*, 112 U.S. at 99, 101-02; *see Wong Kim Ark*, 169 U.S. at 680-82.

Unlawfully or temporarily present aliens have far weaker connections to the United States than do members of Indian tribes. "Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life." *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring). If the United States' link with Indian tribes does not suffice as a constitutional matter for birthright citizenship, its weaker link with unlawfully or temporarily present aliens even more obviously does not do so. *See, e.g.*, William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

The Fourteenth Amendment's historical background provides additional support for the conclusion that, while children born here of U.S. citizens and permanent residents are entitled to U.S. citizenship by birth, children born of parents whose presence is either unlawful or lawful but temporary are not. Under the common law, "[t]wo things usually concur to create citizenship; [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth . . . within the ligeance of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (citation omitted). The phrase "born . . . in the United States," U.S. Const. amend. XIV, § 1, codifies the traditional requirement of "birth within the territory," *id.* at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. Amend. XIV, § 1, codifies the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

Drawing from the same tradition, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)— explained that citizenship under the law of nations depended not only on the child's place of birth,

but also on the parents' political status. "[N]atural-born citizens," Vattel wrote, include "those born

in a country, of parents who are citizens." Ememrich de Vattel, *The Law of Nations* § 212, at 101

(London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.). Citizenship by virtue of

birth in the country also extends to the children of "perpetual inhabitants" of that country, whom

Vattel regarded as "a kind of citize[n]." *Id.*; *see also id.* § 215, at 102. According to Vattel,

citizenship does not extend, however, to children of those foreigners who lack "the right of

perpetual residence" in the country. *Id.* § 213, at 102.

Justice Story also understood that birthright citizenship required more than mere physical

presence. He explained in a judicial opinion later quoted in *Wong Kim Ark* that "children of even

aliens born in a country, while the parents are resident there," "are subjects by birth." *Inglis v. Trs.*

*of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830). He also wrote in a treatise:

> Persons, who are born in a country, are generally deemed citizens and subjects of
> that country. A reasonable qualification of this rule would seem to be, that it should
> not apply to the children of parents, who were *in itinere* in the country, or abiding
> there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834).

Congressional debates over the Civil Rights Act and Fourteenth Amendment also confirm

that children born in the United States to non-resident aliens lack a right to U.S. citizenship because

they are not subject to U.S. jurisdiction. For instance, Representative James Wilson explained

during a debate over the Civil Rights Act that, under "the general law relating to subjects and

citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-

born citizen." Cong. Globe, 39th Cong., 1st Sess. 1117 (1866). But he recognized "except[ions]"

to that general rule for "children born on our soil to temporary sojourners or representatives of

foreign Governments." *Id.*

When Congress was considering the Civil Rights Act, Senator Trumbull, "who wrote [the Act's] citizenship language and managed the Act in the Senate, wrote a letter to President Andrew Johnson summarizing the bill." Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010) (footnotes omitted). The Act, as noted above, provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens." Civil Rights Act § 1, 14 Stat. 27. Senator Trumbull summarized that provision: "The Bill declares 'all persons' born of parents domiciled in the United States, except untaxed Indians, to be citizens of the United States." Shawhan, *supra*, at 1352-53 (quoting Letter from Sen. Lyman Trumbull, Chairman, S. Judiciary Comm., to President Andrew Johnson, (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress)).

During a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the additional qualification of being "subject to the jurisdiction"). Cong. Globe, 39th Cong., 1st Sess. 2768 (1866). One of his colleagues objected that "persons may be born in the United States and yet not be citizens," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. That exchange concludes that "a person [who] is born here of parents from abroad temporarily in this country" is not subject to the jurisdiction of the United States, *id.* at 2768, and is accordingly not constitutionally entitled to citizenship by birth.

Contemporaneous understanding following ratification accords with that reading of the Fourteenth Amendment. Perhaps most telling, right on the heels of the Citizenship Clause, the Supreme Court described its scope as such: "The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States." *The Slaughterhouse Cases*, 83 U.S. 36, 73 (1873). That is wholly consistent with the Executive Order. Contemporary commentators expressed similar views. *See, e.g.*, *Hall*, *supra*, at 236-37 ("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Alexander Porter Morse, *A Treatise on Citizenship*, at 248 (1881) ("The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States.").

The Supreme Court of New Jersey similarly linked birthright citizenship with parental domicile in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895). In a passage that was later quoted in *Wong Kim Ark*, the court interpreted the Citizenship Clause to establish "the general rule that, when the parents are domiciled here, birth establishes the right of citizenship." *Id.* at 698. And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

The political branches operated from the same understanding in the years following the Fourteenth Amendment's enactment. For instance, six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment . . . concerning citizenship." 2 Cong. Rec. 3279 (1874). The bill would have provided that, as a general matter, "a child born within the United States of parents who are not citizens, and who do not reside within the United States, . . . shall not be regarded as a citizen

thereof." *Id.* Although the bill ultimately failed its "parental domicile requirement" generated little meaningful "debate or controversy." Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015). The bill thus suggests that, soon after the ratification of the Fourteenth Amendment, members of Congress accepted that children born of non-resident noncitizen parents are not subject to the Citizenship Clause.

The Executive Branch, too, at times took the position that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident noncitizen parents. In 1885, Secretary of State Frederick T. Frelinghuysen issued an opinion denying a passport to an applicant who was "born of Saxon subjects, temporarily in the United States." 2 *A Digest of the International Law of the United States* § 183, at 397 (Francis Wharton ed., 2d. ed. 1887) (*Wharton's Digest*). Secretary Frelinghuysen explained that the applicant's claim of birthright citizenship was "untenable" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship." *Id.* at 398.

Finally, *Wong Kim Ark* recognized an exception to birthright citizenship for "children born of alien enemies in hostile occupation," *Wong Kim Ark*, 169 U.S. at 682. Here, the President has determined that the United States has experienced "an unprecedented flood of illegal immigration" in which "[m]illions of illegal aliens"—many of whom "present significant threats to national security and public safety"—have entered the country in violation of federal law. Invasion EO § 1; *see also id.* (explaining that "[o]thers are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities"). Plaintiffs' maximalist reading of the Citizenship Clause would require extending birthright citizenship to the children of

individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile networks.

### C.    Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause.

"[A]ny policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (citation omitted). The government's reading of the Citizenship Clause respects that principle, while Plaintiffs' reading violates it. The Citizenship Clause sets a constitutional floor, not a constitutional ceiling. Although Congress may not deny citizenship to those protected by the Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. Art. I, § 8, Cl. 4; *see Wong Kim Ark*, 169 U.S. at 688. The government's reading would thus leave Congress with the ability to extend citizenship to the children of unlawful or temporarily present aliens, just as it has extended citizenship to the children of members of Indian tribes.

As a "sovereign nation," the United States has the constitutional power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). "[O]ver no conceivable subject" is federal power "more complete" than it is over the admission of aliens. *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909). Interpreting the Constitution to require the extension of birthright citizenship to the children of aliens with no legal presence directly undermines that power by holding out a powerful incentive for illegal entry. Contrary to the principle that no wrongdoer should "profit out of his own wrong," *Liu v. SEC*, 591

U.S. 71, 80 (2020) (citation omitted), it also allows foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971). Although the United States tolerates dual citizenship in some circumstances, it has "long recognized the general undesirability of dual allegiances." *Savorgnan v. United States*, 338 U.S. 491, 500 (1950). "One who has a dual nationality will be subject to claims from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952).

Plaintiffs' reading of the Citizenship Clause invites just such problems. For centuries, countries have extended citizenship to the foreign-born children of their citizens because children born abroad "follow the condition of their fathers," so long as "the father has not entirely quitted his [home] country." Vattel, *supra*, § 215, at 102. England has extended citizenship to certain foreign-born children of its subjects since at least the 14th century. *See Wong Kim Ark*, 169 U.S. at 668-71. In 1790, Congress extended citizenship to "children of citizens" born "out of the limits of the United States," with the proviso that "the right of citizenship shall not descend to persons whose fathers have never been resident in the United States." Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104. Today, federal law recognizes as a citizen any "person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a

residence in the United States." 8 U.S.C. § 1401(c). Many other countries have similar laws. *See Miller v. Albright*, 523 U.S. 420, 477 (1998) (Breyer, J., dissenting).

Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967). For the reasons discussed above, the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of unlawfully or temporarily present aliens.

### D.    *Wong Kim Ark* Does Not Support Plaintiff's Reading of the Citizenship Clause.

In arguing that the Executive Order violates the Citizenship Clause, Plaintiffs' Amended Complaint and argument chiefly cites the Supreme Court case *Wong Kim Ark*, *see, e.g.*, *Am. Compl.* ¶¶ 44, 46, 73; Pltf's motion, *passim*, but *Wong Kim Ark* did not concern the status of children born in the United States to parents who were unlawfully or temporarily present aliens. To the contrary, the Court precisely identified the specific question presented:

> [W]hether a child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States.

*Wong Kim Ark*, 169 U.S. at 653 (emphasis added).

In analyzing that question, the Court repeatedly relied on the fact that the parents were domiciled in the United States. For example, it quoted an opinion in which Justice Story recognized that "the children, even of aliens, born in a country, while the parents are resident there under the protection of the government, . . . are subjects by birth." *Wong Kim Ark*, 169 U.S. at 660 (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., dissenting)). It quoted the New Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the general rule, that when the parents are

domiciled here birth establishes the right to citizenship." *Id.* at 692 (citation omitted). It explained that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693. And it noted that "Chinese persons. . . owe allegiance to the United States, so long as they are permitted by the United States to reside here; and are 'subject to the jurisdiction thereof,' in the same sense as all other aliens residing in the United States." *Id.* at 694.

After reviewing the relevant history, the Court reached the following "conclusions": "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children born of resident aliens." *Wong Kim Ark*, 169 U.S. at 693. Although the Amendment is subject to certain "exceptions" (e.g., for "children of foreign sovereigns or their ministers"), the Amendment extends citizenship to "children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States." *Id.* The Court then summed up its holding as follows:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but have a permanent domicile and residence in the United States, . . . and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705.

No doubt some statements in *Wong Kim Ark* could be read to support Plaintiff's position. *Wong Kim Ark* never purported to overrule any part of *Elk*, however, and the Supreme Court has previously (and repeatedly) recognized *Wong Kim Ark*'s limited scope. In one case, the Court stated that:

> [t]he ruling in [*Wong Kim Ark*] was to this effect: "A child born in the United States, of parents . . . who, at the time of his birth, are subjects of the Emperor of China,

but have a permanent domicile and residence in the United States, becomes at the time of his birth a citizen."

*Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902) (citation omitted). In another, the Court cited *Wong Kim Ark* for the proposition that a person is a U.S. citizen by birth if "he was born to [foreign subjects] when they were permanently domiciled in the United States." *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920) (citation omitted).

About a decade after *Wong Kim Ark* was decided, the Department of Justice likewise explained that the decision "goes no further" than addressing children of foreigners "domiciled in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General*, at 121 (1910). "[I]t has never been held," the Department continued, "and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship. It was not so held in the *Wong Kim Ark* case." *Id.* at 124. Commentators, too, continued to acknowledge the traditional rule denying citizenship to children of non-resident foreigners. *See, e.g.*, John Westlake, *International Law*, at 219-20 (1904) ("[W]hen the father has domiciled himself in the Union . . . his children afterwards born there . . . are citizens; but . . . when the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality.").

In short, only "those portions of [an] opinion necessary to the result . . . are binding, whereas dicta is not," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), and the *Wong Kim Ark* Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." 169 U.S. at 679 (citation omitted). The only question that was presented, investigated, and resolved in *Wong Kim Ark* was whether children born in the United States to alien parents with "a permanent domicile and residence in the

- 36 -

United States" are U.S. citizens. *Id.* at 653; *see id.* at 705. The case should not be read as doing anything more than answering yes.

Nor do Plaintiffs advance their argument by relying on *Plyler v. Doe*, 457 U.S. 202 (1982), a case asserted as invoking *Wong Kim Ark*'s reasoning and holding that undocumented aliens are within the jurisdiction of any state in which they are physically present. *See Plyler*, 457 U.S. at 215. But the phrase "within its jurisdiction" cited in *Plyler* comes from the Equal Protection Clause which focuses on a person's geographic location and differs from the phrase "subject to the jurisdiction thereof" in the Citizenship Clause, which focuses on an individual's personal subjection or allegiance to the United States. As Supreme Court cases illustrate, a person may fall outside the scope of the Citizenship Clause even if the person or his parents falls within the scope of the Equal Protection Clause. For example, certain children of members of Indian tribes lack a constitutional right to U.S. citizenship by birth, *see Elk*, 112 U.S. at 102, but Indians *are* entitled to the equal protection of the laws, *see United States v. Antelope*, 430 U.S. 641, 647-50 (1977). Children of foreign diplomats also are not entitled to birthright citizenship, *see Wong Kim Ark*, 169 U.S. at 682.

As to the "common-law principle of *jus soli*," the Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 39 (2022) (citation omitted). And that admonition holds particular force here. *Cf. United States v. Rahimi*, 602 U.S. 680, 722 & n.3 (2024) (Kavanaugh, J., concurring). The English *jus soli* tradition was premised on an unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) (statement of Rep.

Woodward) (calling the British tradition an "indefensible feudal doctrine of indefeasible allegiance"); *id.* at 967 (statement of Rep. Bailey) (calling it a "slavish" doctrine); *id.* at 1130-31 (statement of Rep. Woodbridge) (saying it conflicts 26 with "every principle of justice and of sound public law" animating America and its independent identity).

Indeed, the Supreme Court has already held that the Citizenship Clause departs from English common law in important respects. For example, the Clause's exception for certain children of members of Indian tribes has no parallel in English law, *see Wong Kim Ark*, 169 U.S. at 693; and the Clause permits voluntary renunciation of citizenship, even though English common law did not, *see Afroyim v. Rusk*, 387 U.S. 253, 257-262 (1967). This Court should thus interpret the Citizenship Clause in light of American common-law principles, and as shown above, those principles do not support birthright citizenship for children of unlawfully or temporarily present aliens.

To the extent that Plaintiff points to precedent that accords with its view, it is not unusual for the Supreme Court, after fully exploring a legal issue, to reach a conclusion that conflicts with earlier assumptions. *See*, *e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 644-45 (2022) (holding that states may prosecute non-Indians for crimes against Indians in Indian country despite decades of contrary Supreme Court dicta); *District of Columbia v. Heller*, 554 U.S. 570, 624 n.24 (2008) (holding that the Second Amendment protects an individual right even though lower courts had long read it to protect a collective right); *INS v. Chadha*, 462 U.S. 919, 944-45 (1983) (holding the legislative veto unconstitutional even though Congress had enacted, and the President had signed, almost 300 legislative-veto provisions over the preceding 50 years).

In short, the Executive Order accords with the Citizenship Clause and is thus constitutional and lawful. Therefore, assuming that Plaintiffs have standing and can properly bring their claims in this forum, the Court should grant summary judgment to Defendants in the alternative.

### E.    Plaintiffs Do Not Succeed on Their Equal Protection Claim

Plaintiffs' Equal Protection Clause claim (*see* Plfs. Compl. at ¶¶232-257) fares no better. Nowhere in the Citizenship Clause did Congress confer citizenship on children born in the United States of parents who are unlawfully or temporarily present. Accordingly, the EO is consistent with the Citizenship Clause.

It is not clear what Plaintiffs' argument is here but there is no fundamental right for Plaintiffs to claim in order for strict scrutiny to apply. The proper focus here is birthright citizenship, not citizenship in general. As courts have recognized, "birthright citizenship does not qualify as a fundamental right under the Insular framework." *Fitsemanu v. U.S.*, 1 F.4th 862, 878 (10th Cir. 2021); *see also Tuaua v. United States*, 788 F.3d 300, 308 (D.C. Cir. 2015) (same). While "birthright citizenship, like the right to a trial by jury, is an important element of the American legal system," it is not a "prerequisite to a free government. Numerous free countries do not practice birthright citizenship, or practice it with significant restrictions, including Australia, France, and Germany." *Fitsemanu*, 1 F.4th at 878. "To find a natural right to *jus soli* birthright citizenship would give umbrage to the liberty of free people to govern the terms of association within the social compact underlying formation of a sovereign state." *Tuaua*, 788 F.3d at 309.

In any event, any assertion that the EO's differential treatment of children of parents who are citizens and lawful permanent residents (who receive birthright citizenship) and children of parents who are unlawfully or temporarily present (who do not) cannot be justified is mistaken. The President has set forth the compelling reasons for not extending birthright citizenship to this class of children. *See* Citizenship EO, § 1; Unlawful Immigration EO, § 1 (identifying the severity

of the problems associated with illegal immigration).  The difference in treatment, which derives from the Constitution, thus is justified by, among other things, the severity of the problems associated with illegal immigration and the fact that the government has not consented to the permanent presence in this country of these parents.  *See Plyler v. Doe*, 457 U.S. 202, 219 (1982) ("Persuasive arguments support the view that a State may withhold its beneficence from those whose very presence within the United States is the product of their own unlawful conduct.").  This distinction is no different than the recognized exceptions to birthright citizenship for children of foreign sovereigns or their diplomats, children of alien enemies in hostile occupation, and children born to foreigners on foreign public vessels in U.S. waters, and the prior exception for children of members of Indian tribes.  *See Plyler*, 457 U.S. at 223 ("Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'").  Accordingly, there is no Equal Protection violation.

*     *     *

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint or in the alternative

grant the Defendants summary judgment.

Dated: July 28, 2025
      Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

BRIAN P. HUDAK, D.C. Bar #90034769
Chief, Civil Division

By:          */s/ Heather Graham-Oliver*
      HEATHER GRAHAM-OLIVER
      Assistant United States Attorney
      601 D Street, NW
      Washington, DC 20530
      (202) 252-2520
      heather.graham-oliver@usdoj.gov

      *Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES,<br><br>        Plaintiff,<br><br>    v.<br><br>MARCO RUBIO, Secretary of State, et al.,<br><br>        Defendants. | Civil Action No. 25-0287 (TJK) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Civil Rule 7(h), Defendants respectfully submit this statement of material facts as to which there is no genuine dispute.

| | |
|---|---|
| 1.    The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. | |
| 2.    On January 20, 2025, President Donald J. Trump issued an Executive Order entitled: "Protecting the Meaning and Value of American Citizenship" and addressing what it means to be "subject to the jurisdiction" of the United States under the Fourteenth Amendment. *See* Exec. Order No. 14160, (Jan. 20, 2025). | |
| 3.    That Executive Order recognizes that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States as well as children of aliens whose presence is lawful but temporary. *Id*. | |

| | |
|---|---|
| 4.　　Section 2(a) of the Executive Order directs the Executive Branch: (1) not to issue documents recognizing U.S. citizenship to persons born in the United States under the conditions described in section 1, and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons. The EO specifies, however, that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," or February 19. *Id*. § 2(b). The Citizenship EO makes clear that its provisions do not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship." *Id*. § 2(c). | |
| 5.　　The EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and not to "act, or forbear from acting, in any manner inconsistent with this order." *Id*. § 3(a). It further directs the heads of all federal agencies to issue public guidance within 30 days (by February 19) "regarding this order's implementation with respect to their operations and activities." *Id*. § 3(b).1. | |

\*　　\*　　\*

Dated: July 28, 2025
      Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

BRIAN P. HUDAK, D.C. Bar #90034769
Chief, Civil Division

By:          */s/ Heather Graham-Oliver*
      HEATHER GRAHAM-OLIVER
      Assistant United States Attorney
      601 D Street, NW
      Washington, DC 20530
      (202) 252-2520
      heather.graham-oliver@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES,<br><br>    Plaintiff,<br><br>  v.<br><br>MARCO RUBIO, Secretary of State, et al.,<br><br>    Defendants. | Civil Action No. 25-0287 (TJK) |

## **[PROPOSED] ORDER**

Upon consideration of Defendants' motion to dismiss or in the alternative for summary judgment ("Motion"), and the entire record herein it is hereby:

ORDERED that Defendants' Motion is GRANTED.


SO ORDERED:


_____        _____
Date                      TIMOTHY J. KELLY
                         United States District Judge