# SUPPLEMENTAL EXPERT DECLARATION OF PROFESSOR BETH LEW-WILLIAMS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:25-cv-00287 |
| v. | ) ) | The Hon. Timothy J. Kelly |
| MARCO RUBIO ET AL., | ) ) | |
| Defendants. | ) | |

**SUPPLEMENTAL EXPERT DECLARATION OF**

**PROFESSOR BETH LEW-WILLIAMS**

I, Beth Lew-Williams, am Professor of History at Princeton University. If called to testify, I could and would do so as follows:

1.      I have been asked to provide my expert opinion on the historical meaning of the Citizenship Clause of the Fourteenth Amendment at the time it was adopted, specifically in light of and in response to new information provided by Defendants. I stand by and incorporate by reference into this declaration the declaration I provided previously. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. The opinions in this declaration are my own.

2.      Based on my research, I conclude that the historical material provided by Defendants is unpersuasive. There is overwhelming evidence that at the time of its enactment the Fourteenth Amendment was understood to guarantee birthright citizenship to persons born on United States soil, including the children of all non-diplomatic aliens, subject to the narrow

1

exceptions discussed in my previous declaration. In reaffirming this opinion, I find the following

additional evidence most significant:

    a.   Defendants repeatedly cite theories of citizenship found in international law, but
the Citizenship Clause is not based on international law. Instead, it based on the
English common law principle of *jus soli,* which holds that all persons born
within the United States are natural-born citizens of the Republic, with very
narrow exceptions discussed in my previous declaration.

    b.   Defendants argue that "citizenship flows from lawful domicile," but I find no
indication that the Citizenship Clause of the Fourteenth Amendment includes a
"domicile" requirement.

    c.   Defendants repeatedly cite Congressional discussions of Indians and court cases
regarding Indians. But it is important to note that tribal Indians have held a
distinct status within the United States since the founding. During the nineteenth
century, the status of Indians differed significantly from the status of foreign
aliens.

        i.   In debates surrounding the Civil Rights Act of 1866 and the
Fourteenth Amendment, Congress clearly distinguished between
the status of tribal Indians and aliens.

        ii.   The phrase "subject to the jurisdiction thereof" was specifically
designed to exclude tribal Indians, as well as encompass the very
narrow exceptions traditionally associated with the common law
principle of *jus soli* discussed in my previous declaration.

2

        Congressional debates confirm that lawmakers did not intend or expect the Citizenship Clause to apply to tribal Indians.

    iii.  In contrast, Congressional debates confirm that lawmakers intended and fully expected the Citizenship Clause to apply to the children of all aliens, subject to the very narrow exceptions discussed in my previous declaration.

  d.  Defendants cite William Edward Hall's *Treatise on International Law* (4th ed. 1895) and an 1885 determination by Secretary of State Frederick T. Frelinghuysen to question the status of children of temporary residents. But these documents must be understood within the larger historical context, in particular debates over dual nationality and expatriation that arose in the late nineteenth century.

  e.  Defendants equate the parents of Wong Kim Ark with present-day status of "lawful permanent residents." But in fact they, like all Chinese immigrants at the time, occupied a tenuous legal status in the United States, one that has no equivalent in modern law.

**Distinctions between International and Common Law**

3.    Defendants repeatedly cite theories of citizenship found in international law, *e.g.*, ECF No. 34 at 27-28, 33, but the Citizenship Clause is not based on international law.

4.    It is well accepted by historians that the Fourteenth Amendment's Citizenship Clause was derived from seventeenth-century English common law, which held that all persons born within royal dominions were natural-born subjects of the Crown, except the children of foreign diplomats or invading armies. Since the nineteenth century, jurists have referred to this

English common law rule as *jus soli*, or the right of the soil.[1] The American colonies adopted

many aspects of English common law, including the principle of *jus soli*.[2]

5.      Although the common law principle of *jus soli* prevailed in the United States, this

was not the case in all nations. Nations differed in their approach to citizenship. In addition,

nineteenth-century legal writers who theorized about international law proposed different models

for citizenship.[3]

6.      One such jurist was renowned Swiss legal thinker, Emer de Vattel (1714-1767),

who published *The Law of Nations* (1758), which helped to develop the field of international

law. In *The Law of Nations,* Vattel developed a model for citizenship, which used a different

definition of natural-born citizenship than the common law tradition. In Vattel's model,

citizenship is conferred only if a person is born in the country and their parents are citizens of

that country.[4]

7.      In the nineteenth century United States, Vattel remained an important legal

thinker for American lawmakers on subjects other than citizenship. This is evidenced by the fact

---

[1] James H. Kettner, *The Development of American Citizenship, 1608-1870* (Omohundro Institute and UNC Press, 2014), 3, 7-10, 13-17; Kunal M. Parker, *Making Foreigners: Immigration and Citizenship Law in America, 1600–2000* (Cambridge University Press, 2015), 25-27; Carol Nackenoff and Julie Novkov, *American by Birth: Wong Kim Ark and the Battle for Citizenship* (University Press of Kansas, 2021), 6-7; Calvin's Case 7 Coke Report 1a, 77 ER 377 (K.B.); see also, Polly Price, "Natural Law and Birthright Citizenship in *Calvin's Case* (1608), *Yale Journal of Law and the Humanities* 9 (1997), 183 n. 54; Nathan Perl-Rosenthal and Sam Erman, "Inventing Birthright: The Nineteenth-Century Fabrication of jus soli and jus sanguinis," *Law and History Review* 42 (2024): 422; Lew-Williams Decl. ¶10.
[2] Kettner, *The Development of American Citizenship*, 3-5; Lew-Williams Decl. ¶10.
[3] Rosenthal and Erman, "Inventing Birthright," 421-424; Peter J. Spiro, "Dual Nationality and the Meaning of Citizenship," *Emory Law Journal*, vol. 46, no. 4 (1997): 1432-1433.
[4] Emer de Vattel, *The Law of Nations: or, Principles of the Law of Nature; Applied to the Conduct and Affairs of Nations and Sovereigns* (Dublin: L. White, 1787) § 212, at 166.

that the Thirty-Ninth Congress cited Vattel repeatedly in 1866, for example, when discussing the disenfranchisement of the rebels[5], and the nature of civil war.[6]

8.      However, no members of the Thirty-Ninth Congress cited Vattel as part of the discussion of the Citizenship Provision of the 1866 Civil Rights Act or the Citizenship Clause of Fourteenth Amendment.[7] The omission is unsurprising. The Citizenship Clause arose from the British common law tradition and Congress recognized that Vattel was not part of that tradition. I find no indications in the congressional record that Vattel's theories of citizenship influenced Congress, or reflected its intent.

**Background on Domicile**

9.      Defendants argue that "citizenship flows from lawful domicile," *e.g.*, ECF No. 34 at 24, but I find no indication that the Citizenship Clause of the Fourteenth Amendment includes a "domicile" requirement.

10.      In the decades before the adoption of the Fourteenth Amendment, legal thinkers did discuss the possible merits of a domicile requirement. For example, Justice Joseph Story in *Commentaries on the Conflict of Laws* (1834)*,* suggested that such a requirement might be "reasonable," but in the same passage he admitted that it was not an established universal rule. He wrote, "Persons, who are born in a country, are generally deemed citizens and subjects of that

---

[5] *Cong. Globe*, 39th Cong., 1st sess., (1866), 2102-2105, 2885.
[6] *Cong. Globe*, 39th Cong., 1st sess., (1866), 2536, 2690-2691.
[7] See, *Cong. Globe*, 39th Cong., 1st sess., (1866), 498-507, 525-530, 569-578, 594-607, 1115-1125, 1832-1837, 2764-2771, 2890-2902, 3148-3149. As previously noted, Representative James Wilson did make a reference to international law in his discussion of the 1866 Civil Rights Act. As he reviewed the history of Black citizenship, Representative Wilson made an aside that had no direct bearing on his point, but appeared to exclude the children of "temporary sojourners." At the time, Representative Wilson explained that he was referring to "general law… recognized by all nations," rather than the specific circumstances of the United States. *Cong. Globe*, 39th Cong., 1st sess., (1866), 1115-1117; Lew-Williams Decl. ¶40.

country. A reasonable qualification of this rule *would seem to be*, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business. *It would be difficult however to assert that in the present state of public law such a qualification is universally established.*"[8] His statement is prescriptive rather than descriptive. Although Justice Story contemplated the wisdom of a domicile requirement, he made clear that such a requirement was not "universally established" in public law.

11.    When Congress considered the Citizenship Clause of the Fourteenth Amendment, no member of Congress argued for a domicile requirement. In fact, Congressional debates regarding the Citizenship Clause contain no reference to "domicile" at all.[9]

12.    Moreover, the Citizenship Clause does not state any residency requirements for *parents*. Instead, it refers only to the children—the "persons born" in the United States—making them citizens "of the United States and of the State wherein they reside."[10]

13.    At the time of the adoption of the Fourteenth Amendment, jurists had distinct understandings of the term "reside" (or to be in "residence") and "domiciled" (or to be in "domicile"). According to Bouvier's 1860 *Law Dictionary*, "There is a difference between a man's residence and his domicil. . . . A residence is usually transient in nature, it becomes a domicil when it is taken up *animo manendi*," that is, with the intent of staying.[11]

---

[8] Emphasis added by author. Jospeh Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* (Boston, Hillard, Gray and Co., 1834), 56.

[9] See, *Cong. Globe*, 39th Cong., 1st sess., (1866), 498-507, 525-530, 569-578, 594-607, 1115-1125, 1832-1837, 2764-2771, 2890-2902, 3148-3149.

[10] Emphases added by author. U.S. Const., amend. XIV, § 1.

[11] John Bouvier, *A Law Dictionary: Adapted to the Constitution and Laws of the United States of America* (Philadelphia: Childs & Peterson, 1860), 468.

14.     Defendants suggest that only those domiciled in a nation owe an allegiance to that nation. *e.g.*, ECF No. 34 at 24-25. However, at the time of the adoption of the Fourteenth Amendment, American jurists recognized that anyone who "resides" in a nation owes a form of allegiance to that nation. "Local allegiance," Webster's dictionary of 1828 noted, was a duty "due from an alien to the government or state in which he resides." An 1860 law dictionary further explained, "in the United States, during the residence of aliens amongst us, they owe a local allegiance, and are equally bound with natives to obey all general laws for the maintenance of peace and the preservation of order…." It was widely understood that local allegiance was predicated on residence, not domicile.[12]

15.     Defendants suggest that Senator Lyman Trumbull, drafter of the Civil Rights Act, wrote a private letter to President Andrew Johnson that states a domicile requirement. However, I have been unable to confirm this claim.[13] I consulted a digitization of the original document, and I found it to be both *undated* and *unsigned*. The document is part of a collection of notes and drafts regarding the President's veto of the Civil Rights Act. The attribution to Trumbull appears to be based on a handwriting analysis conducted in 1966 by historians John H. and LaWanda Cox. Neither author appears to have a background in forensic document analysis, and their article offers no evidence to support this supposition.[14] While it is possible this document was authored by Senator

---

[12] James Kent, *Commentaries on American Law,* O.W. Holmes, Jr. ed., vol. 2, [1827], (Little, Brown and Company, 1873), 39, 65; Noah Webster, *An American Dictionary of the English Language* (1828) *Webster's Dictionary 1828, https://websters1828.com/*; Alexander M. Burrill, *A Law Dictionary and Glossary: Containing Full Definitions of the Principal Terms of the Common and Civil Law* (1860, 2d. ed.), 86, 164; Lew-Williams Decl. ¶13.

[13] Mark Shawhan, Note, "The Significance of Domicile in Lyman Trumbull's Conception of Citizenship," *Yale Law Journal* vol. 119 (2010): 1351, 1352-1353. For the original document see [no author], [untitled], [undated], *Andrew Johnson Papers,* Reel 45, image nos. 372-373, Manuscript Division, Library of Congress.

[14] John H, and LaWanda Cox, "Andrew Johnson and His Ghost Writers: An Analysis of the Freedmen's Bureau and Civil Rights Veto Messages," *The Mississippi Valley Historical Review* 48,

Trumbull, I cannot confirm it, and I am concerned that the evidentiary basis for the attribution is extremely weak. Therefore, I believe that Senator Trumbull's public statements during congressional debates provide significantly better evidence of his beliefs and, by extension, congressional intent.

16.    After the adoption of the Fourteenth Amendment, there was a proposal to add a domicile requirement by statute. In 1874, Representative Ebenezer Hoar proposed a bill, which ultimately failed, that would have provided that, "a child born within the United States of parents who are not citizens, and who do not reside within the United States,… shall not be regarded as a citizen thereof."[15] This failed proposal to introduce a domicile requirement underscores the fact that no such requirement was in operation under the Fourteenth Amendment.

17.    As part of discussion of the Hoar Bill, Representative Robert S. Hale clearly stated that the bill "propose[d] to change the existing law." He explained "existing law" at length: "The general rule is that every person born within a sovereignty is by birth the subject of that sovereignty. That is the recognized rule within the United States; it is specifically provided for in the constitutions of many of the States, and by the fourteenth amendment to the Constitution of the United States. This rule has no respect to the circumstances under which the person may have been born, or the status of the parents at the time of birth; whether the father of the child born here is permanently domiciled without our borders, or is here for temporary and commercial purposes, or is a mere visitor or a casual traveler without our boundaries. If the child

---

no. 3 (1961): 460–479. In "The Significance of Domicile," Shawhan does not mention that the document is unsigned and does not address the issue of authorship. Shawhan does cite Senator Trumbull's biographer, but Mark M. Krug simply cites Cox and Cox's handwriting analysis without further comment. *Lyman Trumbull: Conservative Radical* (New York: A. S. Barnes & Co., 1965), 240. In addition, since the document is undated, we cannot know under what circumstances it was produced.

[15] 43 Cong. Rec. 3460 (1874).

is born within the United States, by that birth he is a citizen of the United States."[16] Six years

after the ratification of the Fourteenth Amendment, Representative Hale made clear that no

domicile requirement was in effect. He affirmatively stated that the status of the parents—even if

they are "mere visitor[s]" or "casual traveler[s]"—did not impact a U.S.-born child's claim to

U.S. citizenship.

**The Status of Indians**

      18.     Defendants repeatedly cite Congressional discussions of Indians and court cases

regarding Indians. But it is important to note that, during the time of the Founding and

throughout the nineteenth century, the relationship between the United States and Native peoples

was unique.

      19.     For example, the Constitution set certain Indians apart, as "Indians not taxed,"

and did not count them towards apportionment of congressional representatives.[17]

      20.     During the Antebellum Period, the United States did not extend U.S. citizenship

to "Indians not taxed" (i.e. tribal Indians), except by express action, such as through court decree,

naturalization, or treaty.[18]

      21.     During the Antebellum Period, jurists also recognized the unique status of tribal

Indians in regards to citizenship. For example, Chancellor Kent explained in *Goodell v. Jackson*

(1823) that tribal Indians were not U.S. citizens because they "are not our subjects… born in

---

[16] 43 Cong. Rec. 3460 (1874); Justin Lollman, "Note, The Significance of Parental Domicile Under the Citizenship Clause," *Virginia Law Rev*iew vol. 101 (2015): 455, 475.
[17] Bethany R. Berger, "Birthright Citizenship on Trial: *Elk v. Wilkins* and *United States v. Wong Kim Ark*," Cardoza Law Review 37 (2016): 1197; Gregory Ablavsky, "The Savage Constitution," *Duke Law Journal* vol. 63, no. 5 (2014): 1001-1002.
[18] For example, see Treaty with the Cherokee, 1817 (July 8, 1817).

obedience to us. They belong, by birth, to their own tribes, and these tribes are placed under our protection and dependent upon us; but still we recognize them as national communities."[19]

22.      Congress also recognized the unique status of tribal Indians in regard to citizenship. In 1862, Representative John Bingham, who would later help to draft the Citizenship Clause, urged extending citizenship to "every human being, no matter what his complexion," but he drew a distinction for tribal Indians. He believed that Indians were an exception to the rule because tribes had been "recognized at the organization of this Government as independent sovereignties."[20]

23.      Congressional debates over the Civil Rights Act of 1866 reveal the intent to exclude tribal Indians from birthright citizenship, in keeping with longstanding American norms. Drafters sought appropriate language to achieve this clear aim, and Congress ultimately amended the Citizenship Provision to insert the words, "Indians not taxed."[21]

---

[19] *Goodell v. Jackson*, 20 Johns. 693 (N.Y. 1823); Berger, "Birthright Citizenship on Trial," 1197-1198.

[20] Rep. Bingham explained, "The reason why that exception was made in the Constitution is apparent to everybody. The several Indian tribes were recognized at the organization of this Government as independent sovereignties. They were treated with as such; and they have been dealt with by the Government ever since as separate sovereignties. Therefore, they were excluded from the general rule." *Cong. Globe*, 37th Cong., 1st sess., (1862), 1639. See also, Berger, "Birthright Citizenship on Trial," 1198.

[21] Sen. Trumbull stated, "Our dealings with the Indians are with them as foreigners, as separate nations. We deal with them by treaty, and not by law, except in reference to those who are incorporated into the Untied States.… In reference to the other tribes, they will not be embraced by this provision because we have always treated Indian tribes as nations with whom we make treaties. The intention is not to embrace them. If the Senator from Kentucky thinks that language would embrace them, I should have no objection to changing it so as to exclude the Indians. It is not intended to include them. …" *Cong. Globe*, 39th Cong., 1st sess., (1866), 498.

24.    Congressional debates over the Fourteenth Amendment also reveal the intent to exclude tribal Indians from birthright citizenship. Again, drafters sought appropriate language to fulfill this clear aim.[22]

25.    The phrase "subject to the jurisdiction thereof" was specifically designed to exclude tribal Indians, as well as encompass the very narrow exceptions traditionally recognized by the common law principle of *jus soli*, such as the children of foreign diplomats and of invading armies.[23]

26.    The phrase "subject to the jurisdiction" was understood to encompass the sovereign authority to govern, not simply regulatory power.[24]

27.    Tribal Indians were not understood to be "subject to the jurisdiction" of the United States, because the U.S. did not have sovereign authority over them. During debates over the Citizenship Clause, members of Congress clearly stated that tribal Indians were not "subject to the jurisdiction" of the United States. For example, Senator Howard states, "Indians born within the limits of the United States, and who maintain their tribal relations, are not in the sense

---

[22] Sen. Trumbull stated, "It seems to me, sir, that to introduce the words suggested by the Senator from Wisconsin would not make the proposition any clearer than it is, and that it by no means embraces, or by any fair construction—by any construction, I may say—could embrace the wild Indians of the plains or any with whom we have treaty relations, for the very fact that we have treaty relations with them shows that they are not subject to our jurisdiction." *Cong. Globe*, 39th Cong., 1st sess., (1866), 2892-2895; Lew-Williams Decl. ¶36.

[23] *Cong. Globe*, 39th Cong., 1st sess., (1866), 2893; Lew-Williams Decl. ¶36.

[24] Noah Webster, *A Dictionary of the English Language Exhibiting the Origin, Orthography, Pronunciation and Definitions of Words* (George Routledge & Company, 1856), 571; Burrill, *A Law Dictionary and Glossary*, 112-113; *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812); Henry Wheaton, *Elements of International Law* [1836], Fourth English Edition, (Stevens and Sons, Limited, 1904), 150, 161; *Cong. Globe*, 39th Cong., 1st sess., (1866), 2890; *Cong. Globe*, 39th Cong., 1st sess., (1866), 2897; Lew-Williams Decl. ¶32, 33, 34, 35.

of this amendment, born subject to the jurisdiction of the United States. They are regarded, and always have been in our legislation and jurisprudence, as being *quasi* foreign nations."[25]

28.    Congress discussed at length whether the phrase "Indians not taxed" should be inserted into the Citizenship Clause to clarify the exclusion of tribal Indians. Senator Lyman Trumbull strongly argued against this insertion. He believed that the phrase "subject to the jurisdiction thereof" already excluded tribal Indians and that no additional language was necessary. He opposed adding the phrase "Indians not taxed," because he was afraid the phrase would be taken literally, and he was "not willing to make citizenship in the country dependent on taxation.[26]

29.    In contrast, Senator Revery Johnson argued that it was necessary to insert the terms "Indians not taxed" into the Citizenship Clause. In this context—making an argument to revert to the language of the Civil Rights Act—he quoted the Act's Citizenship Provision in full, asserted the superiority of its language, and argued that the intent of the Act and Amendment were the same in regard to Indians.[27] But over his and other's objections, the Senate defeated proposals to amend the law. Instead, the Senate maintained the phrase "subject to the jurisdiction thereof," which they understood to exclude tribal Indians.

30.    Although Senate debates reflect minor disagreement over whether "subject to the jurisdiction thereof" applied to tribal Indians, the debates show no similar confusion over the status of aliens. All aliens (with the narrow exception of diplomats and hostile invading armies)

---

[25] *Cong. Globe*, 39th Cong., 1st sess., (1866), 2890.

[26] Trumbull explains, "In some sense [Indians] are regarded as within the territorial boundaries of the United States but I do not think they are subject to the jurisdiction of the United States in any legitimate sense; certainly not in the sense that the language is used here. The language seems to me to be better chosen than it was in the other bill. There is a difficulty about the words, 'Indians not taxed.'" *Cong. Globe*, 39th Cong., 1st sess., (1866), 2894.

[27] *Cong. Globe*, 39th Cong., 1st sess., (1866), 2893-2894.

were understood to be subject to the jurisdiction of the United States. Both Senators who supported birthright citizenship for the children of aliens, and those who opposed it, understood that the Citizenship Clause would achieve this aim.[28]

31.    Two years after the ratification of the Fourteenth Amendment, in 1870, the Senate Judiciary Committee reaffirmed that the Citizenship Clause did not apply to tribal Indians. The Committee stated, "the fourteenth amendment [sic] to the Constitution has no effect whatever on the status of the Indian tribes within the limits of the United States...." It affirmed that Indian tribes still maintained their "character as a nation or political community." The Committee found that "Congress has never regarded the Indian tribes as subject to the municipal jurisdiction of the United States" and further, "it is evident that an act of Congress which should assume to treat the members of the tribe as subject to the municipal jurisdiction of the United States would be unconstitutional and void."[29]

---

[28] *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812); Henry Wheaton, *Elements of International Law* [1836], Fourth English Edition, (Stevens and Sons, Limited, 1904), 150, 161; Masur, *Until Justice Be Done*, 338; *Cong. Globe*, 39th Cong., 1st sess., (1866), 2769, 2890-2891, 2893-2895, 2897; "Senate," May 31, 1866, *Daily Morning Chronicle* (Washington, DC), 1; Lew-Williams Decl. ¶33, 34, 35, 37, 38, 39. See also, the case of *Schooner Exchange v. McFaddon* (1812), which regarded a foreign war ship in a U.S. harbor. In his opinion, Chief Justice Marshall explained, "The jurisdiction of a nation within its own territory, is exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction deriving validity from an external source would imply a diminution of its sovereignty...." Chief Justice Marshall equated "jurisdiction" with the sovereign authority to govern. And importantly, in *Schooner Exchange v. McFaddon*, Chief Justice Marshall further clarified that aliens within U.S. territory fall under the "jurisdiction" or "sovereignty" of the United States. He stated that foreign "private individuals" were subject to U.S. jurisdiction and owed "temporary and local allegiance," because any other interpretation would be "dangerous to society." It is important to note that Chief Justice Marshall *did not* state "jurisdiction… must be traced up to the consent of the nation itself;" rather he stated (and I here quote the sentence in full with emphasis added), "All *exceptions* to the full and complete power of a nation within its own territories must be traced up to the consent of the nation itself." (Emphasis added) *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 116 (1812).
[29] Committee on the Judiciary, "Effect of Fourteenth Amendment upon Indian Tribes," S. REP. No. 41-268 (1870), 1, 9; Berger, "Birthright Citizenship on Trial," 1199.

32.    In 1880, a court cited this report and affirmed its conclusion. In *United States v. Osborn* (1880), the court asserted that "the Indian tribes in the United States, or the members thereof, are not born 'subject to the jurisdiction' of the United States." It then cited the 1870 report from the Senate Judiciary Committee, which the court said "stated that the Indian tribes, or the members thereof, are not subject to the jurisdiction of the United States, and, therefore, such Indians are not made citizens by the fourteenth amendment [sic]."[30]

33.    *Elk v. Wilkins* (1884) reflects the longstanding understanding that tribal Indians hold a unique status in U.S. law. The case considers the phrase "subject to the jurisdiction thereof" specifically in relation to "a member of one of the Indian tribes within the United States." The court found that, "Indians born within the territorial limits of the United States, members of and owing immediate allegiance to one of the Indian tribes (an alien though dependent power), although in a geographical sense born in the United States, are no more 'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the Fourteenth Amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States of ambassadors or other public ministers of foreign nations." The court compared the child of tribal Indians to that of a foreign diplomat, in terms of jurisdiction, allegiance, and citizenship. It ruled that the Indian plaintiff was not subject to the jurisdiction of the United States upon birth, as was the case of the children of foreign diplomats. However, *Elk v. Wilkins* did not address the status of non-diplomatic aliens.[31]

---

[30] *United States v. Osborn*, 2 F. 58 (D. Or. 1880).
[31] *Elk v. Wilkins*, 112 U.S. 94 (1884).

34.     The opinion in *U.S. v. Wong Kim Ark* (1898) described the unique status of tribal Indians and reaffirmed Congress's intent to exclude them from birthright citizenship. The court stated, "The real object of the Fourteenth Amendment of the Constitution, in qualifying the words, 'All persons born in the United States' by the addition 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the National Government, unknown to the common law), the two classes of cases—children born of alien enemies in hostile occupation and children of diplomatic representatives of a foreign State—both of which, as has already been shown, by the law of England and by our own law from the time of the first settlement of the English colonies in America, had been recognized exceptions to the fundamental rule of citizenship by birth within the country."[32] Like *Elk v. Wilkins*, the *Wong Kim Ark* opinion likened tribal Indians to other individuals traditionally excluded from the common law principle of *jus soli*, including the children of diplomats and the children of hostile invading armies.

35.     Since the time of the Founding and throughout the nineteenth century, the United States has distinguished between the status of tribal Indians and the status of foreign aliens. Therefore, I find that nineteenth-century statements made about tribal Indians do not necessarily apply to foreign aliens, and vice versa.

**Dual Citizenship and Expatriation**

36.     Defendants question whether the Citizenship Clause applies to the children of temporary residents, citing an 1885 determination by the Secretary of State. ECF No. 34 at 31. In fact, this determination is related to the challenging question of what particular actions *after*

---

[32] *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

birth (or *after* naturalization) could reveal an intent to renounce citizenship. This and related rulings do not have direct bearing on the meaning of the Fourteenth Amendment at the time of its adoption, rather they reflect newfound concerns about expatriation that arose after ratification.

37.     In the decades following the ratification of Fourteenth Amendment, the United States routinely recognized the citizenship of the children of non-diplomatic aliens who were born in the United States.[33]

38.     During the mid-1870s, however, the United States began encountering occasional problems in applying the Citizenship Clause due to the actions of other countries. As an incident of birth, a child could acquire two nationalities. This occurred when a child was born in the United States (operating under the principle of *jus soli)* and their parents were citizens of a country that operated under *jus sanguinis* (citizenship by descent). An example would be a U.S.-born child whose parents were citizens of a German state.[34]

39.     At the time, the United States and many other countries did not recognize the existence of dual citizenship, known as "double allegiance." Therefore, at least theoretically, competing claims of citizenship posed complications for U.S. citizenship law.[35]

40.     However, it was not until after the United States first recognized the right of expatriation with an 1868 Act, that lawmakers began to contemplate how to adjudicate these competing claims.[36] In the following decade, there was disagreement within the United States

---

[33] Gerald L. Neuman, *Strangers to the Constitution: Immigrants, Borders, and Fundamental Law*, (Princeton: Princeton University Press, 1996), 165, 178-179.

[34] Spiro, "Dual Nationality," 1436; John Bassett Moore, *A Digest of International Law*, vol. 3 (Washington: Government Printing Office, 1906), 518.

[35] Lucy E. Salyer, *Under the Starry Flag: How a Band of Irish Americans Joined the Fenian Revolt and Sparked a Crisis Over Citizenship* (Cambridge, Mass: Harvard University Press, 2018), 189-195.

[36] Act of July 27,1868, ch. 249, 3, 15 Stat. 223, 224; Salyer, *Under the Starry Flag,* 190.

about what to do about naturalized U.S. citizens who returned to their countries of origin, and to a much lesser extent, what to do about children who were born with two possible nationalities. In 1874, President Grant denounced these individuals and called for statutory standards for denaturalization and expatriation. Despite his call and others, Congress provided no guidelines until the early twentieth century.[37]

41.     In the absence of statutory rules and court decisions in the late nineteenth century, the United States tolerated millions of second-generation immigrants—U.S. citizens by birth— who never formally renounced their "alleged technical allegiance" (via *jus sanguinis* citizenship) to another country. These children of immigrants had U.S. citizenship by birth, and retained it.[38]

42.     On rare occasions, individual cases of children born with "double allegiance" came to the attention of the Executive Branch due to property disputes, draft requirements, or conflicting claims. Starting in the late 1870s—after the Expatriation Act took effect and immigration rates continued to climb—the United States sought to compel these individuals to choose a single citizenship early in their adulthood. As Dr. Francis Wharton, law officer of the Department of State, explained in 1885, "In cases of double allegiance, the child, when he becomes of age, is required to elect between the country of his residence and the country of his alleged technical allegiance." Dr. Wharton also explained that this election may not be a "formal act," instead it may be "inferred from the conduct of the party from whom the election is required."[39] In 1887, U.S. ministers advised a U.S.-born individual, upon reaching the age of

---

[37] Salyer, *Under the Starry Flag,* 189-195; Spiro, "Dual Nationality," 1439.
[38] Spiro, "Dual Nationality," 1438.
[39] Opinion of Dr. Francis Wharton, law officer of the Department of State, April 29, 1885, communicated by Mr. Bayard, Secretary of State, to Mr. Smithers, chargé d'affaires at Pekin. May 4, 1885, For. Rel. 1885, 171-172 as quoted by John Bassett Moore, *A Digest of International Law* (Washington: Government Printing Office, 1906), 545.

twenty-one, "to express[] his election to be a citizen of the United States ... by promptly returning to the United States."[40] At times, U.S. officials found that U.S.-born individuals who failed to return to the United States had effectively elected another nationality, as is the case in the 1885 determination by Secretary of State Frelinghuysen.[41]

43.    However, U.S. officials' rulings on individual cases of "double allegiance" in the 1880s suggest a general understanding that children born in the United States, even to parents temporarily present, were entitled to birthright citizenship—unless they acted to renounce it.[42]

44.    In regards to the children of temporary immigrants, Defendants also cite the fourth edition of William Edward Hall's *Treatise on International Law* (1895). However, the *first* edition of the treatise (1880) was published closer in time to the Fourteenth Amendment, and therefore is more likely to represent the Amendment's meaning at the time of adoption. The first edition is clear: "In the United States, the children of foreigners born there are American citizens," and the second edition contains identical language.[43] I believe the earlier editions of

---

[40] Mr. Lothrop, minister to Russia, to Mr. Bayard, Secretary of State, June 6, 1887 as quoted by Moore, *A Digest of International Law*, 548.

[41] Mr. Frelinghuysen, Secretary of State, to Mr. Kassan, Jan. 15, 1885, as quoted by Wharton ed., *A Digest of the International Law of the United States,* 398-399.

[42] See, for example, F.W. Seward, Acting Secretary of State, to Mr. Fish, Aug 20, 1878 as quoted by Wharton ed., *A Digest of the International Law of the United States*, 396.

[43] William Edward Hall, *A Treatise on International Law*, first edition (Oxford: Clarendon Press, 1880), 188. Hall repeated his statement verbatim in his second edition (1884) of the treatise. William Edward Hall, *A Treatise on International Law,* second edition (Oxford: Clarendon Press, 1884), 203. Hall revised his statement in the third edition (1890), reflecting contemporaneous concerns about dual citizenship during a period of rising immigration, writing, "In the United States the children of foreigners born there are American citizens if they elect to declare themselves so." William Edward Hall, *A Treatise on International Law,* third edition (Oxford: Clarendon Press, 1890), 223. The fourth (and final) edition (1895) hesitantly introduced an update, which the Defendants cite. Hall explained that "it would seem" in the United States "that the children of foreigners in transient residence are not citizens, but that the children of foreigners, who are in more prolonged residence, fall provisionally within the category of American citizens, though they lose their American character if they leave the United States

Hall's treatise, written closer in time to the Fourteenth Amendment, are far more likely to offer faithful representations of its meaning at the time of adoption. The fourth edition, written decades after the fact, reflects the effect of evolving thoughts on dual nationality and expatriation which I have described above.[44]

45.     It is noteworthy that in *United States v. Wong Kim Ark*, the Supreme Court reviewed a series of Executive Department determinations regarding children with multiple technical allegiances, as I have done above, and came to the same conclusion. Quoting Secretary of State Hamilton Fish's determination in an 1873 case, the Court stated, "The child born of alien parents in the United States is held to be citizen thereof…." The court further explained, "To hold that the Fourteenth Amendment of the constitution excludes from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German, or other European parentage, who have always been considered and treated as citizens of the United States."[45]

_____

during their minority." William Edward Hall, *A Treatise on International Law,* fourth edition (Oxford: Clarendon Press, 1895), 237.

[44] Specifically, it appears that the change in Hall's thinking may be traced to Francis Wharton, an American expert in international law, whom Hall cites in the fourth edition. But it appears that Hall may have misinterpreted the cited passage. Wharton's statements on the children of transient aliens appear to be prescriptive rather than descriptive. Wharton wrote, "Indians are held not within this clause, not being 'subject to the jurisdiction of the United States…. The same reasoning, *it may be argued*, would exclude children born in the United States to foreigners here on transient residence, such children not being by the *law of nations* 'subject to the judication of the United States.'"[44] (Emphasis added.) Wharton did not purport to describe current U.S. law, instead he made a novel argument ("it may be argued") based on international law ("by the law of nations"), rather than common law tradition. Wharton ed., *A Digest of the International Law of the United States*, 393-394.

[45] *United States v. Wong Kim Ark*, 169 U.S. 649 (1898) citing Opinions of the Executive Departments on Expatriation, Naturalization, and Allegiance (1873) 17, 18; U. S. Foreign Relations, 1873-74, pp. 1191, 1192.

**The Status of Chinese Immigrants in the Nineteenth Century**

46.    Defendants equate the parents of Wong Kim Ark with the present-day status of "lawful permanent residents." When Wong Kim Ark was born in 1873, his parents had "a permanent domicile and residence in the United States."[46] But they were not lawful permanent residents—a status that did not yet exist[47]—instead they occupied a tenuous legal status in the United States, one that has no equivalent in modern law.

47.    At the time, Chinese immigrants were racially barred from naturalization. The Naturalization Act of 1790 permitted only "free white persons" to naturalize; the Naturalization Act of 1870 permitted only "free white persons" as well as "aliens of African nativity" and "persons of African descent" to naturalize. These laws made all Chinese immigrants "aliens ineligible to citizenship" until they were amended in 1943.[48]

48.    In the Post-Civil War Period, Chinese immigrants also faced discriminatory federal, state, and local laws. Federal laws restricted migration and prohibited naturalization; local and state laws regulated the ability of Chinese people to work, operate a business, own property, testify in court, seek education, and form families.[49]

49.    In part due to this hostile legal environment, many Chinese immigrants resided in the United States only temporarily or at least made frequent trips to China.[50]

---

[46] *United States v. Wong Kim Ark.*

[47] Permanent resident status was formalized by the Immigration and Nationality Act of 1952, which described such persons as "lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." Public Law 82-414.

[48] Racial restrictions on naturalization ended in 1952. Ian Haney-Lopez, *White by Law: The Legal Construction of Race* (New York: NYU Press, 2006), 1-2; Act of March 26, 1790, ch. 3, 1 Stat. 103; Naturalization Act of 1870, ch. 254, 16 Stat. 254–256; Public Law 82-414.

[49] Beth Lew-Williams, *John Doe Chinaman: The Forgotten History of Chinese Life under American Racial Law* (Cambridge, Mass.: Harvard University Press, 2025), 6-7.

[50] Beth Lew-Williams, *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* (Harvard University Press, 2018), 22, 27.

50.     Americans, including lawmakers, often assumed that all Chinese in the United States were "temporary sojourners," despite the existence of long-term Chinese residents.[51] For example, during the Senate debates over the Citizenship Clause, Senator Conness stated that Chinese immigrants "all return to their own country at some time or other, either alive or dead… Those persons return invariably, while others take their places."[52]

51.     In the 1870s, the prevailing belief was that Chinese held no permanent place in America. A congressional investigation in 1877 concluded, "The Chinese do not come to make their home in this country; their only purpose is to acquire what would be a competence in China and return there to enjoy it."[53] The committee recommended restricting Chinese immigration, "unless our Pacific possessions are to be ultimately given over to a race alien in all its tendencies, which will make it practically provinces of China rather than State of the Union."[54]

52.     Ultimately, Congress chose to restrict Chinese immigration. First the Page Act (1875) targeted Oriental women, criminals, and contract laborers; then the Chinese Restriction Act (1882), Chinese Exclusion Act (1888), and Geary Act (1892) targeted Chinese laborers, baring the vast majority of prospective immigrants from China.[55] These laws also reaffirmed that Chinese immigrants were ineligible to naturalize.

---

[51] Report of the Joint Special Committee to Investigate Chinese Immigration (Washington: Government Printing Office, 1877), vii.

[52] While "fully aware of the nature of that class of people," Senator Conness was "entirely ready to accept the provision proposed in this constitutional amendment…." Despite understanding Chinese immigrants to be only temporary residents within the United States, Senator Conness asserted that their U.S.-born children would be U.S. citizens. *Cong. Globe*, 39th Cong., 1st sess., (1866), 2892; Lew-Williams Decl. ¶38.

[53] Joint Special Committee to Investigate Chinese Immigration (Washington: Government Printing Office, 1877), vii.

[54] Joint Special Committee to Investigate Chinese Immigration, viii.

[55] Lew-Williams, *The Chinese Must Go,* 8; Erika Lee, *At America's Gates: Chinese Immigration During the Exclusion Era, 1882-1943* (Chapel Hill: UNC Press, 2003), 24, 46, 73, 153.

53.     Together, the introduction of Chinese exclusion and the denial of naturalization rights meant that Chinese immigrants were uniquely vulnerable to deportation. Simply by losing a job, a Chinese merchant could lose their exemption from exclusion and become subject to deportation.[56]

54.     As aliens ineligible to citizenship, as Chinese persons subject to racial laws, and as immigrants assumed to be forever foreign, Wong Kim Ark's parents held an extremely tenuous status in American law and society. They were assumed to be temporary laborers in the United States, regardless of their actual intent. Their legal status was not equivalent to today's lawful permanent residents; in fact, their status has no modern-day equivalent.

**Summary of Conclusions**

55.     Based on my research, I conclude that there is overwhelming evidence that at the time of its enactment the Fourteenth Amendment was understood to guarantee birthright citizenship to persons born on U.S. soil, including the children of all non-diplomatic aliens, subject to the few narrow exceptions I have discussed. In addition to the evidence I introduced in my previous declaration, my conclusion relies specifically on the following:

> a.   Defendants repeatedly cite theories of citizenship found in international law, but the Citizenship Clause is not based on international law. Instead, it is based on the English common law principle of *jus soli,* which holds that all persons born within the United States are natural-born citizens of the Republic, with very narrow exceptions discussed in my previous declaration.

---

[56] Kitty Calavita, "The Paradoxes of Race, Class, Identity, and 'Passing': Enforcing the Chinese Exclusion Acts, 1882-1910," *Law & Social Inquiry,* vol. 25, no. 1 (2000): 18-20.

b.  Defendants argue that "citizenship flows from lawful domicile," but I find no indication that the Citizenship Clause of the Fourteenth Amendment includes a "domicile" requirement. Congressional debates surrounding the Amendment also do not describe a domicile requirement. Furthermore, the Citizenship Clause does not state any residency requirements for parents. Instead, it refers only to the children—the "persons born" in the United States—making them citizens "of the United States and of the State wherein they *reside*." Legal dictionaries at the time distinguished between domicile and residency, stating that the latter is "usually transient in nature."

c.  Defendants repeatedly cite Congressional discussions of Indians and court cases regarding Indians. But it is important to note that tribal Indians have held a distinct status within the United States since the founding. During the nineteenth century, the status of Indians differed significantly from the status of foreign aliens.

   i.  In debates surrounding the Civil Rights Act of 1866 and the Fourteenth Amendment, Congress clearly distinguished between the status of tribal Indians and aliens. Therefore, statements made about tribal Indians do not necessarily apply to aliens, and vice versa.

   ii. The phrase "subject to the jurisdiction thereof" was specifically designed to exclude tribal Indians, as well as encompass the very narrow exceptions traditionally associated with the common law

principle of *jus soli* discussed in my previous declaration. Congressional debates confirm that lawmakers did not intend or expect the Citizenship Clause to apply to tribal Indians.

iii.   In contrast, Congressional debates confirm that lawmakers intended and fully expected the Citizenship Clause to apply to the children of all aliens, subject to the very narrow exceptions discussed in my previous declaration.

d.   Defendants cite William Edward Hall's *Treatise on International Law* (4th ed. 1895) and an 1885 determination by Secretary of State Frederick T. Frelinghuysen to question the status of children of temporary residents. But these documents must be understood within the larger historical context, in particular debates over dual nationality and expatriation that arose after the adoption of the Fourteenth Amendment. These discussions are fundamentally about the act and effect of expatriation, rather than the right to citizenship by birth. These rulings do not challenge the fundamental starting point: that any person born within United States is a U.S. citizen, subject to very narrow exceptions discussed in my previous declaration.

e.   The parents of Wong Kim Ark were not akin to "lawful permanent residents." As aliens racially barred from naturalization, they occupied a tenuous legal status in the United States, one that has no equivalent in modern law.

24

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

DATED: August 13, 2025                    Beth Lew-Williams

# Works Cited

## Cases

*The Schooner Exchange v. McFaddon*, 11 U.S. 7 Cranch 116 116 (1812).

*Goodell v. Jackson*, 20 Johns. 693 (N.Y. 1823).

*McKay v. Campbell*, 16 F. Cas. 161, 164 (D. Or. 1871).

*Elk v. Wilkins*, 112 U.S. 94 (1884).

*Chae Chan Ping v. U.S.* (Chinese Exclusion Case),130 U.S. 581 (1889).

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

## Constitution

U.S. Const., amend. XIV, § 1.

## Statutes

Act of March 26, 1790, ch. 3, 1 Stat. 103.

Naturalization Act of 1870, ch. 254, 16 Stat. 254–256.

Immigration and Nationality Act, Public Law 82-414.

## Legislative and Executive Materials

Treaty with the Cherokee, 1817 (July 8, 1817).

*Cong. Globe*, 39th Cong., 1st sess., (1866), 498-507, 525-530, 569-578, 594-607, 1115-1125, 1832-1837, 2764-2771, 2890-2902, 3148-3149.

Committee on the Judiciary, "Effect of Fourteenth Amendment upon Indian Tribes," S. Rep. No. 41-268 (1870).

Report of the Joint Special Committee to Investigate Chinese Immigration (Washington: Government Printing Office, 1877).


**Other Historical Sources**

Emer de Vattel, *The Law of Nations: or, Principles of the Law of Nature; Applied to the Conduct and Affairs of Nations and Sovereigns* (Dublin: L. White, 1787).

Jospeh Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* (Boston, Hillard, Gray and Co., 1834).

John Bouvier, *A Law Dictionary: Adapted to the Constitution and Laws of the United States of America* (Philadelphia: Childs & Peterson, 1860).

William Edward Hall, *A Treatise on International Law*, first edition (Oxford: Clarendon Press, 1880).

William Edward Hall, *A Treatise on International Law,* second edition (Oxford: Clarendon Press, 1884).

Francis Wharton ed., *A Digest of the International Law of the United States* (Washington: Government Printing Office, 1886), 397.

William Edward Hall, *A Treatise on International Law,* third edition (Oxford: Clarendon Press, 1890).

William Edward Hall, *A Treatise on International Law,* fourth edition (Oxford: Clarendon Press, 1895).

John Bassett Moore, *A Digest of International Law*, vol. 3 (Washington: Government Printing Office, 1906).

**Secondary Sources**

Berger, Bethany *R.* "Birthright Citizenship on Trial: *Elk v. Wilkins* and *United States v. Wong Kim Ark*," Cardoza Law Review 37 (2016).

Cox, John H, and LaWanda, "Andrew Johnson and His Ghost Writers: An Analysis of the Freedmen's Bureau and Civil Rights Veto Messages," *The Mississippi Valley Historical Review* 48, no. 3 (1961).

Haney-Lopez, Ian, *White by Law*: *The Legal Construction of Race* (New York: NYU Press, 2006).

Lee, Erika. *At America's Gates: Chinese Immigration During the Exclusion Era, 1882-1943* (Chapel Hill, 2003).

Lew-Williams, Beth, *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* (Harvard University Press, 2018).

Lew-Williams, Beth, *John Doe Chinaman: The Forgotten History of Chinese Life under American Racial Law* (Cambridge, Mass.: Harvard University Press, 2025).

Lollman, Justin, "Note, The Significance of Parental Domicile Under the Citizenship Clause," *Virginia Law Rev*iew vol. 101 (2015).

Neuman, Gerald L., *Strangers to the Constitution: Immigrants, Borders, and Fundamental Law*, (Princeton: Princeton University Press, 1996).

Perl-Rosenthal, Nathan, and Erman, Sam, "Inventing Birthright: The Nineteenth-Century Fabrication of jus soli and jus sanguinis," *Law and History Review* 42 (2024).

Salyer, Lucy E., *Under the Starry Flag: How a Band of Irish Americans Joined the Fenian Revolt and Sparked a Crisis Over Citizenship*. (Cambridge, Mass: Harvard University Press, 2018).

Shawhan, Mark, "The Significance of Domicile in Lyman Trumbull's Conception of Citizenship," *Yale Law Journal* vol. 119 (2010).

Spiro, Peter J., "Dual Nationality and the Meaning of Citizenship," *Emory Law Journal*, vol. 46, no. 4 (1997)