# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCA – ASIAN PACIFIC AMERICAN ADVOCATES, JANE DOE #1, BABY DOE #1, and JANE DOE #2<br><br>*Plaintiffs*,<br><br>v.<br><br>MARCO RUBIO, U.S. Secretary of State, in his official capacity; U.S. DEPARTMENT OF STATE; PAMELA BONDI, Attorney General, in her official capacity; U.S. DEPARTMENT OF JUSTICE; KRISTI NOEM, Secretary of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; FRANK BISIGNANO, Commissioner of the Social Security Administration, in his official capacity; U.S. SOCIAL SECURITY ADMINISTRATION; and DONALD J. TRUMP, President of the United States, in his official capacity,<br><br>*Defendants*. | Civil Action No. 1:25-cv-00287 (TJK) |

**CORRECTED PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ......................................................................................2

ARGUMENT ...........................................................................................................2

I.    PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT ............................2

  A.    Defendants' Failure to Comply with Rule 56(c) Warrants Granting Summary
        Judgment to Plaintiffs ...............................................................................2

  B.    Defendants' Failure to Respond to Plaintiffs' Motion as to 8 U.S.C. § 1401
        (Second and Sixth Claims) Warrants Granting Summary Judgment to Plaintiffs...4

    1.    8 U.S.C. § 1401(a) codifies *Wong Kim Ark's* well-settled meaning
          of the Citizenship Clause. ...............................................................5

    2.    Congress understood and intended to codify the settled meaning of
          the Citizenship Clause...................................................................7

  C.    Defendants' Response Confirms That Plaintiffs Should Be Granted Summary
        Judgment on their Citizenship Clause Claims (First and Sixth Claims)................10

    1.    Plaintiffs prevail under the plain meaning of the Citizenship
          Clause.....................................................................................10

    2.    The original meaning of the Citizenship Clause confirms its plain
          meaning....................................................................................18

      a.    The Citizenship Clause contains no parental "allegiance"
            requirement relevant to the Executive Order ...............................18

      b.    The Clause contains no parental "domicile" requirement. ...........23

    3.    The children targeted by the Executive Order are not born to "alien
          enemies in hostile occupation." ..................................................26

    4.    Defendants' position is barred by precedent...............................27

    5.    Defendants' policy arguments are unavailing..............................31

  D.    Defendants' Response Confirms Plaintiffs Should Be Granted Summary
        Judgment on their Ultra Vires Claims (First, Second, and Sixth Claims). ...........32

II.   RESPONSE TO DEFENDANTS' RULE 12/56 MOTION FOR SUMMARY
      JUDGMENT ..........................................................................................34

  A.    Plaintiffs have standing................................................................36

    1.    OCA has established associational standing..............................37

    2.    OCA has also established organizational standing. ...................40

    3.    Defendants' arguments challenging OCA's organizational standing
          fail. .........................................................................................42

**B.**  The President should not be dismissed because he is a proper party for the claims asserted against him. ...................................................................................44

**C.**  Plaintiffs have adequately pled each of their claims. ...........................................45

    **1.**  Plaintiffs are permitted to bring a direct cause of action under the Citizenship Clause. ...................................................................................45

    **2.**  Plaintiffs' APA claims are sufficiently pled. ...............................................46

    **3.**  Plaintiffs need not channel their claims through 8 U.S.C. § 1503. ............48

    **4.**  Plaintiffs have pled a viable Equal Protection claim. ...............................50

**D.**  Class actions in other jurisdictions do not compel dismissal of Plaintiffs' class action claims. ...................................................................................................52

CONCLUSION ...........................................................................................................................53

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Abbot Laboratories v. Gardner*,
   387 U.S. 136 (1967)...................................................................................................47

*Abigail All. For Better Access to Dev. Drugs v. Eschenbach*,
   469 F.3d 129 (D.C. Cir. 2006).............................................................................42, 43

*Abuhajeb v. Pompeo*,
   531 F. Supp. 3d 447 (D. Mass. 2021)........................................................................49

*Afroyim v. Rusk*,
   387 U.S. 253 (1967).................................................................................1, 28, 46, 50

*Alsaidi v. Dep't of State*,
   292 F. Supp. 3d 320 (D.D.C. 2018)...........................................................................49

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)...................................................................................................46

*Barbara v. Trump*,
   No. 25-cv-244-JL-AJ, 2025 U.S. Dist. LEXIS 130805 (D.N.H. July 10, 2025).........11, 52, 53

*Bennett v. Spear*,
   520 U.S. 154 (1997)...................................................................................................47

*Benny v. O'Brien*,
   32 A. 696 (N.J. 1895).................................................................................................26

*Biden v. Nebraska*,
   600 U.S. 477 (2023)...................................................................................................36

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)...............................................................................................4, 5

*Browder v. Wormuth*,
   No. 1:18-cv-2411 (TJK), 2024 WL 5168281 (D.D.C. Dec. 19, 2024)...........................35, 48

*Bryan v. Werner*,
   516 F.2d 233 (3d Cir.1975)........................................................................................53

*Califano v. Sanders*,
   430 U.S. 99 (1977).....................................................................................................48

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ...................................................................41, 43

*Carlisle v. United States*,
  83 U.S. (16 Wall.) 147 (1872) ......................................................................21

*Carrera v. Carrera*,
  174 F.2d 496 (D.C. Cir. 1949) ......................................................................19

*Casa, Inc. v. Trump*,
  2025 WL 2263001 (D. Md. Aug. 7, 2025) ....................................................52, 53

*\*CASA, Inc. v. Trump*,
  763 F. Supp. 3d 723 (D. Md. 2025) ......................................................... *passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................51

*Chiafalo v. Washington*,
  591 U.S. 578 (2020) ......................................................................................17

*Chin Bak Kan v. United States*,
  186 U.S. 193 (1902) ......................................................................................29

*Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*,
  480 F. Supp. 3d 118 (D.D.C. 2020) ................................................................42

*City & Cnty. Of San Francisco v. EPA*,
  145 S. Ct. 704 (2025) ...................................................................................10

*City of Cleburne v. Cleburne Living Center*,
  473 U.S. 432 (1985) ......................................................................................50

*Clinton v. Jones*,
  520 U.S. 681 (1997) ......................................................................................45

*Crawford v. Bell*,
  599 F.2d 890 (9th Cir. 1979) ........................................................................53

*Ctr. for Sustainable Econ. v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015) ...................................................................37, 39

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ......................................................................32

*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998) ....................................................................39

*De La Raza v. Trump*,
706 F. Supp. 3d 903 (N.D. Cal. 2020) ................................................45

*DeVillier v. Texas*,
601 U.S. 285 (2024)............................................................................45

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ...........................................................................17

*\*Doe v. Trump*,
766 F. Supp. 3d 266 (D. Mass. 2025) ......................................... *passim*

*Elk v. Wilkins*,
112 U.S. 94 (1884).......................................................................14, 30

*Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ...........................................................41

*Federal Express Corp. v. U.S. Dep't of* Commerce,
39 F.4th 756, 763–64 (D.C. Cir. 2022) ..............................................32

*Frank v. Rogers*,
253 F.2d 889 (1958)...........................................................................48

*Franklin v. Massachusetts*,
505 U.S. 788  (1992)...........................................................................44

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ...........................................................................46

*George v. McDonough*,
596 U.S. 740 (2022) .............................................................................5

*Gonzalez Boisson v. Pompeo*,
459 F. Supp. 3d 7 (D.D.C. 2020) ..................................................48, 49

*Goodell v. Jackson*,
20 Johns. 693 (N.Y.) (Kent).............................................................14

*Gundy v. United States*,
588 U.S. 128 (2019)..............................................................................9

*Haaland v. Brackeen*,
599 U.S.  255 (2023)...........................................................................14

*Hampton v. Mow Sun Wong*,
426 U.S. 88 (1976)..............................................................................13

*Harbor Ins. Co. v. Schnabel Found. Co.*,
   946 F.2d 930 (D.C. Cir. 1991) ........................................................................13

*Harisiades v. Shaughnessy*,
   342 U.S. 380 (1952) ...............................................................................12, 13

*Harper v. White Earth Human Res.*,
   No. 16-cv-1797, 2016 U.S. Dist. LEXIS 184392 (D. Minn. Oct. 7, 2016) ..........................30

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ...............................................................................40

*In re Estate of Ray*,
   150 Misc. 728, 270 N.Y.S. 333 (N.Y. Sur. Ct. 1934) ................................................26

*Int'l Dark Sky Ass'n v. FCC*,
   106 F.4th 1206 (D.C. Cir. 2024) .......................................................................39

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*
   101 F.3d 145 (D.C. Cir. 1996) ................................................................3, 34, 35

*Jasperson v. Fed. Bureau of Prisons*,
   460 F. Supp. 2d 76 (D.D.C. 2006) .....................................................................32

*Joint Anti-Fascist Comm. v. McGrath*,
   341 U.S. 123 (1951) ...............................................................................46

*Kiviti v. Pompeo*,
   467 F. Supp. 3d 293 (D. Md. 2020) ...................................................................30

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
   302 F. Supp. 3d 541 (S.D.N.Y. 2018) .................................................................45

*Kwock Jan Fat v. White*,
   253 U.S. 454 (1920) ...............................................................................29

*Lake Cnty. v. Rollins*,
   130 U.S. 662 (1889) ...............................................................................18

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) ...............................................................................32

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ...............................................................................31

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ................................................................................5

*Loughrin v. United States*,
    573 U.S. 351 (2014) ............................................................................6

*McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*,
    611 F.3d 1 (D.C. Cir. 2010) ................................................................4

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ........................................................37

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ..........................................................................36

*Morissette v. United States*,
    342 U.S. 246 (1952) ............................................................................6

*Muthana v. Pompeo*,
    985 F.3d 893 (D.C. Cir. 2021) ..........................................................15

*Muwekma Ohlone Tribe v. Salazar*,
    708 F.3d 209 (D.C. Cir. 2013) ..........................................................51

*\*N.H. Indonesian Cmty. Support v. Trump*,
    765 F. Supp. 3d 102 (D.N.H. 2025) ................................5, 11, 17, 39

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*,
    261 F. Supp. 3d 20 (D.D.C. 2017) ....................................................42

*Nishimura Ekiu v. United States*,
    142 U.S. 659 (1892) ..........................................................................13

*Norris v. Slothouber*,
    718 F.2d 1116 (D.C. Cir. 1983) ........................................................53

*NTEU v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ..........................................................45

*Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*,
    496 F. Supp. 3d 31 (D.D.C. 2020) ....................................................42

*Oviedo v. Wash. Metro Transit Authority*,
    948 F. 3d 386 (D.C. Cir. 2020) ..........................................................3

*Parker v. District of Columbia*,
    473 F.3d 370 (D.C. Cir. 2007) ..........................................................38

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ..............................................40, 43, 44

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  No. CV 25-716 (BAH), 2025 WL 1276857 (D.D.C. May 2, 2025) .......................46

*Personnel Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ....................................................................................51

*Plessy v. Ferguson*,
  163 U.S. 537 (1896) ....................................................................................20

*Pocket Veto Case*,
  279 U.S. 655 (1929) ....................................................................................10

*Rabang v. INS*,
  35 F.3d 1449 (9th Cir. 1994) .......................................................................30

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
  490 U.S. 477 (1989) ....................................................................................31

*Rothe v. U.S. Dep't of Def.*,
  836 F.3d 57 (D.D.C. 2016) ..........................................................................50

*Rumsfeld v. Forum for Academic and Institutional Rights*,
  547 U.S. 47 (2006) ......................................................................................36

*Rusk v. Cort*,
  369 U.S. 367 (1962) ....................................................................................48

*Russello v. United States*,
  464 U.S. 16 (1983) ......................................................................................10

*Santa Clara Pueblo v. Martinez*,
  436 U.S. 49 (1978) ......................................................................................30

*Shapiro v. U.S. Dep't of Justice*,
  153 F. Supp. 3d 253 (D.D.C. 2016) .............................................................31

*Shapiro v. U.S. Dep't of Justice*,
  507 F. Supp. 3d 283 (D.D.C. 2020) ..........................................................3, 36

*Sharp Farms v. Speaks*,
  917 F.3d 276 (4th Cir. 2019) .......................................................................52

*Shuler v. District of Columbia*,
  744 F. Supp. 2d 320 (D.D.C 2010) ..............................................................51

*Sierra Club v. EPA*,
  322 F.3d 718 (D.C. Cir. 2003) .....................................................................28

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ..................................................................................39

*Taggart v. Lorenzen*,
    139 S.Ct. 1795 (2019) ..............................................................................................5

*The Pizarro*,
    15 U.S. (2 Wheat.) 227 (1817) ...............................................................................22

*The Schooner Exchange v. McFaddon*,
    11 U.S. (7 Cranch) 116 (1812) ....................................................................5, 15, 19

*Thompson v. Dep't of Hous. & Urb. Dev.*,
    2006 WL 581260 (D. Md. Jan. 10, 2006) ..............................................................32

*Ticor Title Ins. Co. v. FTC*,
    814 F.2d 731 (D.C. Cir. 1987) ...............................................................................48

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ..........................................................................................13, 39

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ................................................................................................47

*United States v. Antelope*,
    430 U.S. 641 (1977) ................................................................................................31

*United States v. Johnson*,
    40 F.3d 436 (D.D.C 1994) ......................................................................................51

*United States v. Kozminski*,
    487 U.S. 931 (1988) ..............................................................................................5, 6

*United States v. Oakar*,
    111 F.3d 146 (D.C. Cir. 1997) ...............................................................................28

*United States v. Rahimi*,
    602 U.S. 680 (2024) ..........................................................................................18, 31

*United States v. Rice*,
    17 U.S. (4 Wheat.) 246 (1819) ...............................................................................27

\*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ....................................................................................... *passim*

*Verlinden B.V. v. Cent. Bank of Nig.*,
    461 U.S. 480 (1983) ................................................................................................15

*Village of Arlington Heights v. Metro Housing Dev. Corp.*,
  429 U.S. 252 (1977).........................................................................................51

*Walby v. United States*,
  144 Fed. Cl. 1 (2019)......................................................................................17

*Washington v. Glucksberg*,
  521 U.S. 702 (1997).........................................................................................50

*Washington v. Trump*,
  765 F. Supp. 3d 1142 (W.D. Wash. 2025)..................................................... *passim*

*Washington v. Trump*,
  No. 25-807, 2025 U.S. App. LEXIS 18419 (9th Cir. July 23, 2025) ............................ *passim*

*Weedin v. Chin Bow*,
  274 U.S. 657 (1927).................................................................................18, 29

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020) ...........................................................41, 42

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)...................................................................................33, 46

## Statutes and Constitutional Provisions

*8 U.S.C. § 1401 .......................................................................................... *passim*

8 U.S.C. § 1431..............................................................................................9

8 U.S.C. § 1503..............................................................................................48

18 U.S.C. § 1584..............................................................................................6

Administrative Procedure Act...............................................................................35

Chinese Exclusion Act ........................................................................................29

Civil Rights Act of 1866 .......................................................................................16

Hatch Act .........................................................................................................42

Immigration and Nationality Act of 1952.......................................................... *passim*

Nationality Act of 1940 ...........................................................................5, 6, 7, 8, 9

U.S. Const. Art. I, § 8 .........................................................................................33

Second Amendment .....................................................................................18, 31

Fifth Amendment ................................................................................................31, 46

Thirteenth Amendment ...................................................................................................6

*Fourteenth Amendment ...................................................................................... *passim*

## **Other Authorities**

43 Cong. Rec. 3460 (1874) ...........................................................................................24

Cong. Globe, 39th Cong., 1st sess. (1866) ....................................................14. 24, 25

Black's Law Dictionary (12th ed. 2024) .......................................................................10

Garrett Epps, *The Fourteenth Amendment and the Fight for Equal Rights in Post-
Civil War America* 236 (2006) .................................................................................16

Exec. Order, No. 14,160, "Protecting the Meaning and Value of American
Citizenship," 90 Fed. Reg. 8449 (Jan. 20, 2025) ............................................ *passim*

*Executive Order 14160 – Protecting the Meaning and Value of American
Citizenship: Department of State Implementation Plan*, U.S. Dep't State ............................47

Federal Rule 12(b)(6) ..............................................................................................1. 33

Federal Rule 56 ................................................................................................... *passim*

Richard W. Flournoy, Jr., Dual Nationality and Election, 30 YALE L.J. 545, 552-
53 (1921) ...................................................................................................................8

Jonathan M. Gaffney, *Judicial Review Under the Administrative Procedure Act*,
CONGRESS.GOV (Sept. 16, 2024), ...........................................................................33

*Guidance on Protecting the Meaning and Value of American Citizenship
(Executive Order 14160) for Verification Requirements under the Personal
Responsibility and Work Opportunity Reconciliation Act of 1996*, U.S. Social
Security Admin ........................................................................................................47

Green Haywood Hackworth, DIGEST OF INTERNATIONAL LAW, ch. 9, § 221
(1942) .......................................................................................................................8

H.R. 6127 ...................................................................................................................7, 8

H.R. 9980 ......................................................................................................................7

Kurt T. Lash, *The Fourteenth Amendment and the Privileges and Immunities of
American Citizenship* 172-174 (2014) .....................................................................16

Local Rule 7(h) .............................................................................................1, 2, 34, 35

Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881).....................................................20

Bernadette Meyler, *The Gestation of Birthright Citizenship, 1868-1898 States' Rights, the Law of Nations, and Mutual Consent*, 15 GEO. IMMIGR. L.J. 519, 520 (2001)....................................................................................................................................20

Nationality Laws of the United States: Message from the President of the United States, 76th Cong. 7 (1939) ...................................................................................................8

George Rutherglen, *Civil Rights in the Shadow of Slavery: The Constitution, Common Law, and the Civil Rights Act of 1866* 72 (2013) ....................................................16

S. Rep. No. 81-1515 (1950)...........................................................................................................9

Sec. Webster, Report to the President on Thrasher's Case (1851) .............................................29

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010)...........................................24, 25

Staff of President's Comm. on Imm. and Naturalization, Whom We Shall Welcome 235, 240 (1953) ...........................................................................................................9

USCIS *Implementation Plan of Executive Order 14160 – Protecting the Meaning and Value of American Citizenship*, U.S. Citizenship and Imm. Servs. (July 25, 2025),...........................................................................................................................38, 47

Vienna Convention on Diplomatic Rels., 1961 U.S.T. LEXIS 883 (1961), art. 37 § 1.......................................................................................................................................15

Rebecca E. Zietlow*, The Other Citizenship Clause* in *The Greatest and Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Christian G. Samito, ed., 2018) .........................................................................................................16

## INTRODUCTION

The Executive Order erodes the "very nature of our free government" because our Republic is "incongruous" with "a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Afroyim v. Rusk*, 387 U.S. 253, 268 (1967). After a century and a half of consensus over the meaning of birthright citizenship, the Executive Order has now, by fiat, sought to strip that right from millions, without basis in law and contrary to our Nation's history and traditions, as explained at length in Plaintiffs' initial Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment, ECF No. 30-1, and exhibits in support.

Defendants' joint opposition and Rule 12/56 motion (ECFs 34, 35 & 36) confirm that Plaintiffs' Motion for Partial Summary Judgment (ECF 30) should be granted. For starters, Defendants offer no response to Plaintiffs' motion for summary judgment on Claims Two and Six (asserting statutory violations of 8 U.S.C. § 1401). *Compare* ECF 30-1 at 28-31 *with* ECF 36 (no response). More fundamentally, Defendants have failed to meet their obligations under Rule 56(c), Local Rule 7(h) and the January 31, 2025 Standing Order Paragraph 12 to respond adequately to Plaintiffs' Statement of Undisputed Material Facts (ECF 36-3) by citing admissible evidence to support their contention that Plaintiffs' proffer of facts is contested. Rather than offering evidence, Defendants' brief presents an extended eighteen-page discussion of a contorted Bizzaro World alternative version of the legislative history of the Fourteenth Amendment's Citizenship Clause, ECF 36 at 20-39, that is inaccurate, highly misleading, and entirely unsupported by admissible evidence, and as such fails to overcome Plaintiffs' motion for summary judgment.

Defendants' affirmative motion for judgment under Rules 12 and 56 fares no better. Defendants' standing arguments (ECF 36 at 9-13) do not address the claims of the Individual Plaintiffs Jane Does #1 and #2 or Baby Doe #1, and their arguments as to the Organizational

Plaintiff OCA ignore Plaintiffs' attestations of injury and misconstrue legal principles of standing. Defendants' arguments that Plaintiffs lack a cause of action (ECF 36 at 14-17) and have to be channeled into a particular statutory proceeding (*id.* at 17-18) are also wrong as a matter of law. Moreover, for reasons detailed in the opening brief, Defendants' arguments as to Plaintiffs' APA and Equal Protection Claims (Third, Fourth and Fifth Claims) are premature under Rule 56(d) and cannot be addressed until the Administrative Records have been produced and discovery is completed. ECF 30-1 at 5 & Freedman Decl. ¶¶ 8-17. Plaintiffs' motion for partial summary judgment should be granted and Defendants' motion should be denied.

## STATEMENT OF FACTS

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7(h)(1), Plaintiffs filed a Statement of Undisputed Material Facts (ECF 30-3) as well as a summary in the opening brief (ECF 30-1 at 2-3), which are incorporated herein by reference. With this brief, pursuant to the January 31, 2025 Standing Order Paragraphs 12(b) and 12(c), Plaintiffs are filing a reply to Defendants' Counter-Statement of Material Disputed Facts and a response to Defendants' Rule 7(h)(1) Statement of Undisputed Material Facts.

## ARGUMENT

### I. PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT

#### A. Defendants' Failure to Comply with Rule 56(c) Warrants Granting Summary Judgment to Plaintiffs

Defendants' opposition fails to comply with Rule 56(c). Rather than responding to Plaintiffs' Statement of Material Undisputed Facts (ECF 30-3), Defendants' Counter-Statement (ECF 36-1) asserts four so-called "General Objections" which are putatively incorporated by reference into the 106 challenged facts that Defendants dispute. These General Objections are not tailored to the particular challenged facts, and in many cases, have no obvious application to the

asserted facts—for example, Defendants characterize historical events or statements people made leading up to the passage of the Fourteenth Amendment (Nos. 103–110, 114–119, 121–124, 127–146) as "conclusions of law."

Defendants' boilerplate objections to the 106 challenged facts fail to comport with Rule 56(c), which "explicitly require[s] a party opposing summary judgment to support an assertion that a fact is generally disputed with materials in the record." *Oviedo v. Wash. Metro Transit Authority*, 948 F. 3d 386, 396 (D.C. Cir. 2020). Under Rule 56(c)(1), a party seeking to dispute a fact supported by competent evidence must either show that the proffered evidence "does not establish the absence . . . of a genuine dispute" or "cite to particular parts of materials in the record controverting the proffered evidence." *Shapiro v. U.S. Dept. of Justice*, 507 F. Supp. 3d 283, 304 (D.D.C. 2020) (cleaned up). Defendants have done neither. Where a party's counterstatement of material fact—as Defendants' does here—"rather than seriously addressing the substance of each asserted fact" provides a boilerplate response that a fact is "disputed and not material," that party's response "demonstrates so little care and is so devoid of evidentiary support that it is properly treated as a nullity." *Id.* at 304 (cleaned up). A party opposing a motion for summary judgment "may not rest upon the mere allegation or denials" as Defendants have done, but "must set forth specific facts showing that there is a genuine issue for trial." *Jackson v. Finnegan, Henderson, Farabow, Garrett*, 101 F.3d 145, 148, 150 (D.C. Cir. 1996) (citing Rule 56(e) and affirming summary judgment against party whose counterstatement of fact was "devoid of citations to the record, depositions, or affidavits"). Under Rule 56(e), Defendants' failure to "properly address" Plaintiffs' "assertion of fact as required by Rule 56(c)" are grounds to grant Plaintiffs summary judgment. *See generally id*. at 150; *Shapiro,* 507 F. Supp. 3d at 304.

**B.    Defendants' Failure to Respond to Plaintiffs' Motion as to 8 U.S.C. § 1401 (Second and Sixth Claims) Warrants Granting Summary Judgment to Plaintiffs.**

The Court should enter summary judgment on Plaintiffs' Second and Sixth Claims because the Order violates the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1401(a).  Defendants devote only a single footnoted sentence addressing Plaintiffs' statutory arguments, declaring that "Plaintiff's statutory claim rises and falls with its constitutional claim as OCA alleges that 8 U.S.C. § 1401(a) codifies the meaning of the Citizenship Clause."  *See* ECF 36 at 20, n.3.[1]  By so misconstruing Plaintiffs' statutory claims, Defendants wholly fail to address how the Order contravenes Congress's separate and independent grant of birthright citizenship in the INA, 8 U.S.C. § 1401(a).  Defendants' failure to substantively respond to Plaintiffs' claims under the INA and §1401(a) forfeits their right to do so going forward.  *See e.g.*, *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010) (arguments not made are forfeited).

Section 1401(a) must be interpreted in accordance with its meaning *at the time of enactment*.  *See Bostock v. Clayton County*, 590 U.S. 644, 654 (2020).  At the time of enactment, the ordinary public meaning of the language drawn from the Citizenship Clause and incorporated in Section 1401(a) was that all children born in the United States are citizens, subject to the narrow exceptions elucidated in *Wong Kim Ark*.  Moreover, contemporaneous evidence confirms that Congress and the drafters of Section 1401(a) intended for the statute to embody this understanding of birthright citizenship.  Consequently, even if Defendants' radical and baseless reinterpretation of the Citizenship Clause were correct, the Order independently violates Section 1401(a) and is unlawful for that reason.

---

[1] Defendants inexplicably cite to Plaintiffs' non-operative original complaint for this inaccurate statement and ignore that Plaintiffs comprise more than just OCA.  Defendants have failed to cite to anything in the record or in law to substantiate their argument.

1.    **8 U.S.C. § 1401(a) codifies *Wong Kim Ark's* well-settled meaning of the Citizenship Clause.**

Section 1401(a) must be "interpret[ed] . . . in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock*, 590 U.S. at 654.  When Congress codified the Citizenship Clause in 1940 and again in 1952 as Section 1401(a), the ordinary public meaning of "[a]ll persons born . . . in the United States, and subject to the jurisdiction thereof" was directly informed by the Supreme Court's decision in *Wong Kim Ark*." *See N.H. Indonesian Cmty.*, 765 F. Supp. 3d at 110.  Indeed, because "Congress employ[ed] a term of art obviously transplanted from another legal source," (*i.e.*, the Citizenship Clause), Section 1401(a) "brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (quoting *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801 (2019) (cleaned up); *see also Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating . . . prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law.").  More pointedly, where a later statutory provision incorporates language from the Constitution, courts look to Congress's "understanding of the [Constitutional provision] that prevailed at the time of [the statute's] enactment" and are cautious to "draw [] conclusions from th[e] historical survey about the potential scope of the [Constitutional Provision]" itself.  *See United States v. Kozminski*, 487 U.S. 931, 944–45 (1988).

As is discussed at length below, see *infra* Section I.C.4 , in *Wong Kim Ark*, the Supreme Court clearly held that "jurisdiction" carried the same meaning as it was used in *The Schooner Exchange*, which in turn made clear that temporary visitors were "amenable to the jurisdiction of the country." 11 U.S. at 138, 144.  Likewise, *Wong Kim Ark* itself held that the Citizenship Clause grants citizenship to the children of non-citizens, regardless of their status, with only very narrow exceptions to that rule such as the children of foreign dignitaries and Native Americans.  *See Wong*

*Kim Ark*, 169 U.S. at 682.    Accordingly, when Congress adopted the Citizenship Clause's "jurisdiction" language in 1940 as part of the Nationality Act and in 1952 as part of the INA and Section 1401(a), it was aware of, informed by, and incorporated the same "cluster of ideas that were attached" to that language, *Morissette v. United States*, 342 U.S. 246, 263 (1952), as flowed from the Supreme Court's decision in *Wong Kim Ark*.    Thus, Section 1401(a) "cements the meaning of the disputed phrase" as understood at the time it was enacted, separately and independently from the Fourteenth Amendment.    *Doe v. Trump*, 766 F. Supp. 3d 266, 282 (D. Mass. 2025).[2]

Defendants ignore and wholly fail to address this separate and independent bar to the Order, arguing instead that "Plaintiff's statutory claim rises and falls with its constitutional claim."  ECF 36 at 20, n.3.  But even if this Court were to accept Defendants' baseless reinterpretation of the Fourteenth Amendment, that does nothing to change the meaning of the statutory text, which must be interpreted as understood by Congress in 1952 when it enacted the INA and Section 1401(a). *See e.g.*, *Kozminski*, 487 U.S. at 945 (interpreting phrase "involuntary servitude" within 18 U.S.C. § 1584 as it was understood at enactment and not as the same phrase in the 13th Amendment was understood at enactment); *Loughrin v. United States*, 573 U.S. 351, 359–60 (2014) (applying same analysis to statute that borrowed language from an earlier statute).  As Defendants admit, the Citizenship Clause is a "constitutional floor, not a constitutional ceiling," ECF 36 at 32, meaning that Congress may—and has with regard to Native Americans—expand birthright citizenship beyond the confines of the Fourteenth Amendment.  *See, e.g.*, 8 U.S.C. §1401(b) (extending birthright citizenship to  members of "Indian, Eskimo, Aleutian, or other aboriginal tribe[s].").

---

[2] Subsequent decisions by the Supreme Court—which also informed Congress's enactment of the Nationality Act and INA—apply and reinforce *Wong Kim Ark*'s interpretation of the Citizenship Clause.  *See* ECF 30-1 at 26–28 (collecting cases); *Doe*, 766 F. Supp. 3d at 280–82 (same).

That applies with equal force here, such that Defendants' interpretation of the Citizenship Clause—as *excluding* children of undocumented immigrants or temporary residents—can coexist with Congress's clear intent of *including* such children within the scope of Section 1401(a)'s grant of birthright citizenship.  Thus, even if the Court finds that Defendants' novel interpretation of the Citizenship Clause is correct, which it should not, Congress's passage of Section 1401(a) means that the children of undocumented and temporary residents are nonetheless statutorily entitled to birthright citizenship.

### 2.    Congress understood and intended to codify the settled meaning of the Citizenship Clause.

Contemporaneous evidence confirms that the drafters of the Nationality Act and the INA understood and intended these statutes to codify birthright citizenship for all children born in the United States, subject only to the exceptions set forth in *Wong Kim Ark*.  This understanding was unambiguously conveyed to, accepted, and intended by Congress.

Both the Legislative and Executive Branches understood that the 1940 Nationality Act would confer citizenship on children of non-citizens and temporary residents in the United States, consistent with the settled interpretation of the Citizenship Clause.  In discussions of the Act by the House Committee on Immigration and Naturalization, Representative Austin asked whether birthright citizenship would apply "[r]egardless of the nationality of the parents," and Representative Rees answered in the affirmative "because the Constitution provides that all persons born in the United States are citizens."  To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980, 76th Cong. 298 (1940).  Similarly, in discussing dual citizenship, Representative Curtis posed the hypothetical of a French couple having a child after two weeks in the United States while on a visitor's visa, and asked what the

nationality of their child would be. *Id.* at 246. Representative Van Zandt replied, "American citizen," and Representative Rees reiterated, "An American-born citizen." *Id.*

The Roosevelt Administration voiced the same understanding to Congress. During the congressional debates, Richard Flournoy, Assistant Legal Adviser to the State Department and a primary drafter of the 1940 Nationality Act, provided a statement to the Subcommittee emphasizing that the Constitution guarantees that persons born in the United States are citizens, regardless of parentage, and that the Act did not purport to alter the Constitution in this regard.[3] *Id.* at 37–38. President Roosevelt submitted a report to Congress regarding the Act, which approvingly cited *Wong Kim Ark* for the proposition that the "subject to the jurisdiction thereof" clause "had the effect of barring certain classes of persons, including children born in the United States to parents in the diplomatic service of foreign states and persons born in the United States to members of Indian Tribes." Nationality Laws of the United States: Message from the President of the United States, 76th Cong. 7 (1939). The report reiterated that not only are persons born to parents domiciled in the United States citizens, but "the same rule is also applicable to a child born in the United States to parents residing therein temporarily," that is, "it is the fact of birth within

---

[3] Flournoy's writing from this period specifically counters the argument that parents must be "domiciled" in the United States for their children to benefit from birthright citizenship, explaining that, under *Wong Kim Ark*, the children of "sojourners or transients" in the United States are citizens from birth. Richard W. Flournoy, Jr., Dual Nationality and Election, 30 YALE L.J. 545, 552-53 (1921). Similarly, another drafter, Green Haywood Hackworth, prepared a State Department publication shortly after the Nationality Act's passage, which explained that "[t]he circumstance of birth within the United States makes one a citizen thereof even if his parents were at the time aliens," and reported a State Department opinion finding that a child born at Ellis Island to a mother not yet admitted under the immigration laws was a citizen, as the mother did not "belong[] to any one of the classes of aliens referred to [in *Wong Kim Ark*] as enjoying immunity from the jurisdiction of the United States." 3 Green Haywood Hackworth, DIGEST OF INTERNATIONAL LAW, ch. 9, § 221, at 9-10 (1942).

the territory and jurisdiction, and not the domicile of the parents, which determines the nationality of the child." *Id.*

The history surrounding the passage of the INA and 8 U.S.C. § 1401(a), wherein Congress reenacted a nearly identical provision, compels the same conclusion.  A 1950 Senate Judiciary Report explained that for the citizenship of persons born in the United States, "it is immaterial whether the parents are citizens or aliens."  S. Rep. No. 81-1515, at 685 (1950).  The report noted "[t]he only exception, of course, is that the person must be subject to the jurisdiction of the United States," which "[b]y common law and court decision, . . .  has been interpreted to exempt children born in the United States to parents in the diplomatic service of a foreign state."  *Id.*  The Truman administration similarly understood that persons born in the United States are citizens, including those who are "born in the United States of aliens."  Staff of President's Comm. on Imm. and Naturalization, Whom We Shall Welcome 235, 240 (1953).

Defendants proffer no evidence of a contrary understanding or intention by Congress in enacting Section 1401.  Many of the sources Defendants' cite elsewhere concerning the meaning of the Citizenship Clause are irrelevant to the statutory  provision, as they predate *Wong Kim Ark*, see ECF 36 at 30–31, and none are contemporaneous with the passage of either the 1940 Nationality Act or the 1952 INA.  The undisputed evidence Plaintiffs have put forth establishes that—regardless of whether Defendants' baseless reinterpretation of the Citizenship Clause prevails—the drafters of Section 1401 intended to, and did, codify in federal law birthright citizenship for children born in the United States to parents unlawfully or temporarily present.[4]

---

[4] The broader statutory framework governing naturalization and citizenship also supports the well-settled understanding of Section 1401(a).  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Gundy v. United States*, 588 U.S. 128, 141 (2019) (citation omitted).  Likewise,

C.    **Defendants' Response Confirms That Plaintiffs Should Be Granted Summary Judgment on their Citizenship Clause Claims (First and Sixth Claims).**

1.    **Plaintiffs prevail under the plain meaning of the Citizenship Clause.**

The central question of Plaintiffs' Citizenship Clause claim is the definition of "jurisdiction" as "taken in [its] natural and obvious sense . . . and . . . given the meaning [it] ha[s] in common use[.]" *Pocket Veto Case*, 279 U.S. 655, 679 (1929).

The answer is straightforward: The uniform relevant understanding of "jurisdiction", both at the time of the Clause's ratification and today, is one of sovereign authority to govern. *Jurisdiction*, Black's Law Dictionary (12th ed. 2024) ("[G]overnment's general power to exercise authority over all persons and things within its territory."); Lew-Williams Supp. Decl. ¶ 26 & n.24 ECF 30-1 at 6–9, 12–14.  Every court to consider this issue has held similarly.  *Washington v. Trump*, No. 25-807, 2025 U.S. App. LEXIS 18419, at *21 (9th Cir. July 23, 2025) ("When the Fourteenth Amendment was adopted, as it is today, 'jurisdiction' was commonly used in reference

---

"where Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *City & Cnty. Of San Francisco v. EPA*, 145 S. Ct. 704, 713–14 (2025) (cleaned up) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).  Here, neighboring statutory provisions demonstrate that Defendants' novel interpretation of Section 1401(a) is unworkable with the rest of the statutory scheme.  For example, Section 1401(f) provides that "a person of unknown parentage found in the United States" "shall be [a] national[] and [a] citizen[] of the United States at birth" "until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States."  8 U.S.C. § 1401(f).  This provision rests on the core presumption of birthright citizenship for all those "born in the United States," and it makes no mention as to the immigration status of the person's parents, which would be necessary under Defendants' interpretation of Section 1401(a).  Conversely, other statutory provisions demonstrate that when Congress intends for citizenship to depend on the immigration status of that person's parents, the statute will expressly say so.  *See e.g.*, 8 U.S.C. §§ 1401(c)–(e), 1401(g)–(h), 1403 (a)–(b).  And crucially, while Congress has enacted statutes addressing naturalization procedures for children born abroad—*see, e.g.*, 8 U.S.C. §§ 1431, 1433—it has chosen *not* to enact any provisions governing the naturalization of children born in the United States.  The only logical conclusion for this absence is that Congress viewed such a provision unnecessary because Section 1401(a) and the Citizenship Clause clearly provide birthright citizenship for all children born in the United States—subject to narrow exceptions.

to the power of the courts . . . . But in reference to nations, 'jurisdiction' was also defined as . . . 'extent of power or authority.'"); *N.H. Indonesian Comty. Support*, 765 F. Supp. 3d at 110; *CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 733 (D. Md. 2025) ("The President's novel interpretation of the Citizenship Clause contradicts the plain language of the Fourteenth Amendment and conflicts with 125-year-old binding Supreme Court precedent."); *Washington*, 765 F. Supp. 3d at 1150 ("[A]nyone who answers to the political or judicial authority of the United States is 'subject to [its] jurisdiction.'"); *Barbara v. Trump*, No. 25-cv-244-JL-AJ, 2025 U.S. Dist. LEXIS 130805, at *36 (D.N.H. July 10, 2025) (adopting reasoning in *N.H. Indonesian Cmty*).

Defendants give this Court no serious reason to depart from this consensus about the plain meaning of the constitutional text. Defendants provide no authorities suggesting that "jurisdiction"—then, or now—meant anything else but ability to exercise sovereign authority. They do not explain why the characteristics of a child's parents should determine the child's citizenship when the Citizenship Clause says nothing about the parents, only the situs where the child is born. Defendants do not grapple with any of the myriad authorities rejecting the same arguments they make here.

Instead, Defendants invoke terminology nowhere actually found in the Citizenship Clause—raising concepts like of parental "allegiance" thirty times (*see* ECF 36 at 2, 21, 23–27, 30, 33, 35, 37–38) and parental "domicile" thirty-two times (*see* ECF 36 at 2, 24–26, 29–31, 34–36)—though the text of the Citizenship Clause contains no such words. Nor does the Clause contain *any* qualifiers based on the citizenship, allegiance, domicile, immigration status, or country of origin of a child's parents, something courts have long noted. *See, e.g., United States v. Wong Kim Ark*, 169 U.S. 649, 664 (1898) ("Natives are all persons born within the jurisdiction and allegiance of the United States. This is the rule of the common law, without any regard or reference

11

to the political condition or allegiance of their parents[.]") (quoting 2 Kent Comm. 39, 42 (6th ed.)); *Doe v. Trump*, 766 F. Supp. 3d 266, 278 (D. Mass. 2025) ("The text [of the Citizenship Clause] is directed at the person born (or naturalized)."); *id*. at 272 ("Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake. In so doing, these interpretations stray from the text of the Citizenship Clause."); *Washington v. Trump*, 765 F. Supp. 3d 1142, 1150 (W.D. Wash. 2025) ("[N]owhere in the text [of the Citizenship Clause] does it refer to a person's parentage.").

Defendants' sole textual argument is the presence of the word "reside" in the clause—which, as Plaintiffs previously noted, is not the same word as "domicile" and has a distinct meaning. ECF 30-1 at 8 n.2; *see also* Lew-Williams Supp. Decl. ¶ 13. Even if that were not the case, the word "reside" in the Amendment is used only in reference to state citizenship, not federal. ECF 30-1 at 8 n.2; *accord Doe v. Trump*, 766 F. Supp. 3d 266, 285 (D. Mass. 2025) ("The word 'reside' appears in the Citizenship Clause only in the phrase specifying that a person entitled to birthright citizenship becomes a citizen not only of the United States, but also of the state where they live. . . . The word 'reside' does not inject a 'domicile' requirement limiting the reach of the Citizenship Clause as a whole and justifying examination of the immigration status of a child's parents.").

Defendants' arguments concerning interpretive methods (ECF 36 at 32–34) are no more convincing. For example, there is no reason to extend undue solicitude to Defendants' interpretation, which they claim applies because the Executive Order pertains to a "policy toward aliens." ECF 36 at 32 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 380, 588-89 (1952)). To begin, the Executive Order concerns questions of citizenship due to persons already present and who would be citizens *but for the policy challenged here*. Asking for deference for a policy

affecting "aliens" made aliens only by operation of the policy itself is not only circular but reminiscent of "the legal definition of chutzpah: . . . [A] young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan." *Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 n.5 (D.C. Cir. 1991). The Court should not indulge it.

Moreover, case law suggests that deference is due only when the "policy toward aliens" at issue concerns questions of admission or deportation, even under the authority Defendants cite. ECF 36 at 32 (citing, *inter alia*, *Harisiades*, 342 U.S. at 588 (deportation); *Nishimura Ekiu v. United States*, 142 U.S. 659 (1892) (denial of admission); *Trump v. Hawaii*, 585 U.S. 667 (2018) (denial of admission)).[5] Other authority confirms this. For example, the federal government may not deny federal employment "solely because of [a person's] alienage," *Hampton v. Mow Sun Wong*, 426 U.S. 88, 91 (1976), an outcome that would be impossible under Defendants' view. *See id*. at 121 (Rehnquist, J., dissenting) ("[T]he 'overriding national interest' asserted by the petitioners is not a specific interest in excluding these particular aliens from the civil service, but a general interest in formulating policies toward aliens." (citing *Harisiades*)).

Nor does the "surplusage" canon weigh in favor of Defendants' position. ECF 36 at 22. For more than a century, Plaintiffs' interpretation of the "jurisdiction" requirement has, without incident, excluded from citizenship "(besides children of members of the Indian tribes, standing in a peculiar relation to the National Government, unknown to common law), the two classes of cases – children born of alien enemies in hostile occupation, and children of diplomatic representatives

---

[5] *Trump v. Hawaii*, 585 U.S. 667 (2018), is instructive. The Court's deference did not preclude its ability to interpret the text of the relevant legal documents. In fact, the primary source of deference *was* the text of the statute in question. *Id*. at 684 ("By its terms, [the statute] exudes deference to the President in every clause."). The Court's deference based on that "traditionally accorded the President" in the sphere of "international affairs and national security" merely precluded a "searching inquiry into the persuasiveness of the President's justifications." *Id*. at 686.

of a foreign State[.]" *Wong Kim Ark*, 169 U.S. at 682. *See also Washington*, 2025 U.S. App. LEXIS 18419, at *22-24 (rejecting "surplusage" argument). In fact, at least some evidence suggests that the "jurisdiction" requirement was added precisely *because* without it "the children of foreign ministers" would receive birthright citizenship. ECF 30-10 ¶ 39 (quoting Cong. Globe, 39th Cong., 1st sess. 2769 (1866)).

This is entirely in keeping with relevant Supreme Court precedents, including *Wong Kim Ark*. As for Indian tribes, they were considered not identical but analogous to foreign nations, to which the Citizenship Clause naturally would not apply, as the United States lacked the "sovereign authority to govern" them. Lew-Williams Supp. Decl. ¶¶ 26-27; *Elk v. Wilkins*, 112 U.S. 94, 99 (1884) ("The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities[.]"). And the undisputed evidence shows a common understanding that they were not "subject to the jurisdiction" of the United States at the time of the enactment of the Fourteenth Amendment. *See infra* at 27; *Goodell v. Jackson*, 20 Johns. 693, 712 (N.Y.) (Kent) ("They are not our subjects, born within the purview of the law, because they are not born in obedience to us."); Lew-Williams Supp. Decl. ¶¶ 27-29; *see also* ECF 30-1 at 15–16, 23 n.11. For these reasons, the Court concluded in *Elk* that the Citizenship Clause "did not apply on Indian land." *Haaland v. Brackeen*, 599 U.S. 255, 307 (2023) (Gorsuch, J., concurring) (summarizing *Elk v. Wilkins*, 112 U.S. 94 (1884)). That central fact has not changed: the tribes "remain independent sovereigns with the exclusive power to manage their internal matters." *Id*. at 307 (Gorsuch, J., concurring). To the extent that *has* since changed, it is irrelevant: Congress extended birthright citizenship by statute over 100 years ago. *See, e.g.*, 8 U.S.C. § 1401(b); *see also Washington v. Trump*, 765 F. Supp. 3d 1142, 1151 n.8 (W.D. Wash. 2025) ("[T]his exception for Native American children no longer applies.").

The exception for children of diplomats and of sovereigns also makes sense within this "sovereign authority" framework. Diplomats, and their children, enjoy diplomatic immunity pursuant to ratified treaties and international law, as well as statute. *E.g.*, *Muthana v. Pompeo*, 985 F.3d 893, 898-99 (D.C. Cir. 2021) ("A child born in the United States to a foreign diplomat is not born 'subject to the jurisdiction' of the United States . . . . [The plaintiff] is not now and never was a citizen of the United States because her father enjoyed diplomatic immunity pursuant to the Vienna Convention on Diplomatic Relations when she was born, and she was never naturalized.").[6] But even if Congress *could* "turn the Citizenship Clause on and off" by extending or denying immunity by statute alone, ECF 36 at 22, doing so would come at a cost, and Congress would need to do so judiciously: those granted immunity would then, definitionally, be immune from our laws. *Cf. The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812) ("[I]t would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country.").[7] So if Congress wished to exclude from citizenship those targeted by the Executive Order by granting them immunity, it might attempt to do so—but if successful it would likely find exempting millions from legal consequence to be less desirable than allowing them the birthright citizenship to which they and others similar to them have been long entitled.

---

[6] A diplomat's children receive diplomatic immunity and are not "subject to the jurisdiction" of the United States. *See* Vienna Convention on Diplomatic Rels., 1961 U.S.T. LEXIS 883 (1961), art. 37 § 1.

[7] Defendants' sole authority is inapposite as it concerns "immunity from suit in the courts of this country" of a foreign corporate entity, not a person. *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 486 (1983).

Defendants' remaining textual argument—that interpreting the Clause as it has been understood for over a century "would render the Civil Rights Act [of 1866] unconstitutional," ECF 36 at 2, 23—is irrelevant to the interpretation of the Amendment. Again, the question is moot: the relevant statute governing birthright citizenship, Section 1401(a) modified the language of the Civil Rights Act such that it now mirrors the text of the Fourteenth Amendment, incorporating its meaning at the time of its enactment in 1940 and when it was recodified in 1952. *See* 8 U.S.C. § 1401(a); *see generally supra* Section I.B.1. And the fact that Congress left the Act undisturbed is more plausibly explained by a lack of need to modify it, having enacted the Fourteenth Amendment. In drafting the Amendment, Congress could sweep more broadly, for "[t]he amendment, unlike the act, did not have to be portrayed as an exercise of congressional power of naturalization under the original Constitution." George Rutherglen, *Civil Rights in the Shadow of Slavery: The Constitution, Common Law, and the Civil Rights Act of 1866* 72 (2013).[8]

Turning from the text of the Citizenship Clause, Defendants focus on the text of the Civil Rights Act, ECF 36 at 28–29, which also does not use the word "allegiance", and is of no greater help. Again, "allegiance" did not mean then what Defendants understand it to mean today, *see* ECF 30-1 at 13 n.5, and the term applies to children, not parents. *See supra* at 11; *see also infra*

---

[8] The Court should not disregard the plain meaning of the Fourteenth Amendment when scholars continue to debate whether the Citizenship Clause even originated with the Civil Rights Act. *Compare* Kurt T. Lash, *The Fourteenth Amendment and the Privileges and Immunities of American Citizenship* 172-174 (2014) (explaining that the Amendment's Citizenship Clause's "drafting and debate followed parallel, but entirely different, tracks from those of the Civil Rights Act") *and* Garrett Epps, *The Fourteenth Amendment and the Fight for Equal Rights in Post-Civil War America* 236 (2006) (concluding Fourteenth Amendment's Clause had different origin from that of the Act and "focused around [Rep.] Bingham's ideas, not [Sen.] Trumbull's Civil Rights Bill") *with* Rebecca E. Zietlow, *The Other Citizenship Clause* in *The Greatest and Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Christian G. Samito, ed., 2018) ("The citizenship clause of the Fourteenth Amendment was intended to constitutionalize the act's citizenship clause.").

at 18-19.  Even if that were not the case, the Act's citizenship language was "not the language that was ultimately adopted in the text of the Fourteenth Amendment," *Washington*, 2025 U.S. App. LEXIS 18419, at *37, which included no reference to "allegiance."  *See Wong Kim Ark*, 169 U.S. at 688 ("[A]ny possible doubt . . . was removed when the negative words of the Civil Rights Act, 'not subject to any foreign power,' gave way, in the Fourteenth Amendment of the Constitution, to the affirmative words, 'subject to the jurisdiction of the United States.'").  As the Supreme Court has warned, "it is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process."  *District of Columbia v. Heller*, 554 U.S. 570, 590 (2008).  Furthermore, the drafters of the Clause could have limited citizenship on the basis of "allegiance", or "domicile" but chose not to.  *See Chiafalo v. Washington*, 591 U.S. 578, 590-91 (2020) ("The Framers could have done it [drafting the Constitution's provisions governing presidential elections] differently. . . . But although the Framers knew of [an alternative], no language of that kind made it into the document they drafted.").

In short, Defendants' interpretation of "jurisdiction" is "beyond its normal and ordinary meaning."  *Washington v. Trump*, 765 F. Supp. 3d 1142, 1150 (W.D. Wash. 2025).  The plain meaning of the Citizenship Clause today, as it was at the time it was ratified, is that it confers birthright citizenship on "all babies born on U.S. soil" apart from narrow exceptions not addressed by the Executive Order.  *E.g.*, *N.H. Indonesian Cmty. Support v. Trump*, 765 F. Supp. 3d. 102, 110 (D.N.H. 2025); *Walby v. United States*, 144 Fed. Cl. 1, 8 (2019) ("It [exclusions arising from the 'jurisdiction' requirement] applies only to children born to foreign diplomats, which typically enjoy immunity under federal law and are thus not subject to its jurisdiction, and certain other diplomatic officers.").

17

### 2.    The original meaning of the Citizenship Clause confirms its plain meaning.

Because Defendants' position is without support in the plain text of the Citizenship Clause and is contrary to binding precedent, this Court need not look further afield. *Lake Cnty. v. Rollins*, 130 U.S. 662, 670 (1889) (courts should "assume that the framers of the constitution, and the people who voted it into existence, meant exactly what it says").

But even if the Court were tempted to pursue further Defendants' theories of parental "allegiance" and parental "domicile" requirements, it would find no reason in the Clause's original meaning to doubt the plain text.[9] *See* ECF 30-1 at 13 n.5. Though Plaintiffs previously addressed both points, Defendants make little effort at rebuttal, instead putting forward a smattering of material, none of which is persuasive. *E.g.*, *Washington*, 2025 U.S. App. LEXIS 18419, at *41-43 (finding same historical evidence presented here to be unpersuasive).

#### a.    The Citizenship Clause contains no parental "allegiance" requirement relevant to the Executive Order

Setting aside the lack of any textual basis, Defendants' parental allegiance argument fails. *First*, it improperly seeks to link birthright citizenship to parental allegiance when the Citizenship Clause is concerned only with the child's status. *See supra* at 11 (discussing textual focus on the

---

[9] Defendants contend that the principle of *jus soli* is not enshrined in the Fourteenth Amendment but provide no relevant authority in support. The cases Defendants cite—*N.Y. State Rifle & Pistol Ass'n v. Bruen* and *United States v. Rahimi*—concern the Second Amendment. Defendants' historical authority is unpersuasive for reasons previously discussed. Lew-Williams Decl. ¶ 30; *see also* Lew-Williams Supp. Decl. ¶ 2.

In any event, the weight of the evidence indicates that the Citizenship Clause "[was] declaratory of existing rights, and affirmative of existing law," drawing significantly from the principle of *jus soli* as understood in the American context, as illustrated by the Court's extensive discussion of pre-ratification evidence. *Wong Kim Ark*, 169 U.S. at 688; *see also Weedin v. Chin Bow*, 274 U.S. 657, 660 (1927) ("[*Wong Kim Ark*] establishes that, at common law in England and the United States, the rule with respect to nationality was that of the *jus soli*[.]"). Notably, members of Congress repeatedly stated as much. *E.g.*, Lew-Williams Decl. ¶ 30. At a minimum, however, it cannot be denied that *jus soli* "inform[s] interpretation" of the Citizenship Clause. *Rahimi*, 602 U.S. at 723 (Kavanaugh, J., concurring).

18

child).  Specifically, nearly every child born in the United States "necessarily acquires at birth the sort of allegiance that justified birthright citizenship at the common law" because they were born "'locally within the dominions' of the United States and immediately 'derive protection from' the United States."  *Doe v. Trump*, 766 F. Supp. 3d 266, 283-84 (D. Mass. 2025); *see also* ECF 30-1 at 13 n.5 ("It was also understood that birth within the United States itself created allegiance.") (providing citations).  Those who do not are *themselves*, by some mechanism, insulated from federal political authority in some way.  For example, the children of diplomats are excluded from citizenship not because of their parents but because they *themselves* enjoy diplomatic immunity. *See, e.g.*, *Carrera v. Carrera*, 174 F.2d 496, 498 (D.C. Cir. 1949) (noting that under diplomatic immunity statute in place between 1790 and 1961, "[t]he same immunity is not only given an ambassador himself, but to his subordinates, family and servants as well.") (quoting 27 Harv. L. Rev. (1914)); *accord* 1 Kent's Commentaries 38–39 ("The attendants and effects of the ambassador are under his protection and privilege, and equally exempt from the foreign jurisdiction[.]").

*Second*, the parents of the children affected by the Executive Order owe "allegiance" (as that term was understood at the time of the Fourteenth Amendment's ratification) to the United States.  Notably, at the time of the Fourteenth Amendment's ratification "allegiance" meant only "a duty to follow [the] law, and enjoyment of the protection of the law."  ECF 30-1 at 13 n.5 (collecting sources).  Even persons temporarily in another nation "owe[d] temporary and local allegiance," for to hold otherwise "would subject the laws to continual infraction, and the government to degradation" if visitors "were not amenable to the jurisdiction of the country." *Wong Kim Ark*, 169 U.S. at 685-86 (quoting *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812)); ECF 30-10 ¶¶ 13, 33; *see also Doe v. Trump*, 766 F. Supp. 3d 266, 284 n.19 (D.

Mass. 2025) ("To the extent the defendants believe temporary, lawful visitors to this country are people who 'do not owe an allegiance to the United States . . . the Supreme Court disagrees[.]'"); *Washington v. Trump*, 765 F. Supp. 3d 1142, 1151 (W.D. Wash. 2025) ("In other words, 'aliens' and other individuals who avail themselves of this country for non-diplomatic purposes—whether lawfully or not—are necessarily 'subject to the jurisdiction' of the United States."). Again, Defendants do not address these arguments.

In support of their view that the Clause incorporates their parental "allegiance" requirement, Defendants provide little. They cite three quotations from the congressional record that relate generally the word "allegiance." ECF 36 at 24. But those statements are entirely consistent with Plaintiffs' position, given the contemporaneous meaning of "allegiance". *See supra* at 11, 16. Defendants also refer to the *Slaughter-House Cases*, ECF 36 at 30, which predated *Wong Kim Ark* and which *Wong Kim Ark* explicitly distinguished, noting they "did not have in mind the distinctions between persons charged with diplomatic functions and those who were not[.]" 169 U.S. at 723. Other courts presented with this argument have accordingly rejected it. *E.g.*, *CASA*, 763 F. Supp. 3d at 741.

*Third,* Defendants' invocation of purportedly "[c]ontemporary commentators" does not alter the analysis. ECF 36 at 30. As for Alexander Morse, a Confederate soldier who went on to defend racial segregation in *Plessy v. Ferguson*, 163 U.S. 537 (1896), Defendants badly misquote him. Bernadette Meyler, *The Gestation of Birthright Citizenship, 1868-1898 States' Rights, the Law of Nations, and Mutual Consent*, 15 GEO. IMMIGR. L.J. 519, 520 (2001). While Morse's 1881 treatise does assert that the Citizenship Clause excludes "the children of foreigners transiently within the United States", the same sentence continues: "*as ministers, consuls, or subjects of a foreign nation.*" Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) (emphasis added).

For this, Morse cited to, and paralleled the language of, the *Slaughter-House Cases*, which as *Wong Kim Ark* later explained meant to refer more narrowly to those who enjoy diplomatic immunity. 169 U.S. at 723.

The fourth edition of William Hall's treatise cited by Defendants, ECF 36 at 30, was published a quarter-century after enactment of the Fourteenth Amendment and is hardly "contemporary." Notably, Hall did not include similar language to that Defendants quote in any of the three prior editions, including the first edition, published in 1880. According to both the first and second editions, "the children of foreigners born [in the United States] are American citizens." Lew-Williams Supp. Decl. ¶ 44. Accordingly, the edition Defendants cite, rather than reflecting the original meaning of the Clause, more likely "reflects the effect of evolving thoughts on dual nationality and expatriation" not shared at the time of ratification. *Id.*

Finally, as for the miscellany of other material Defendants cite, it is unrelated to the Citizenship Clause or the Civil Rights Act – in addition to being irrelevant, in many cases Defendants misstate the relevant point, which (in full context) undermines their position:

1.    *Carlisle v. United States*, 83 U.S. 147 (1872) (cited at ECF 36 at 25) *undermines* Defendants' position. The *Carlisle* decision repeatedly recognized that a duty of "allegiance" extends even to temporary visitors to a foreign nation. *Id.* at 154 ("[A]ll persons and things not privileged that are within the territory [of a sovereign]. . . . [N]ot only to those who are naturalized and to those who are domiciled therein *. . . but also to those whose residence is transitory*.) (emphasis added); *see also id.* at 155 ("Independently of a residence with intention to continue such residence; independently of any domiciliation; independently of the taking of any oath of allegiance or of renouncing any former allegiance, it is well known that, by the public law, an alien

or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government[.]").

2.    *The Pizarro*, 15 U.S. (2 Wheat.) 227 (1817) (Story, J.) (cited at ECF 36 at 25), is irrelevant, as it concerned the interpretation of treaty protections owed passengers of a Spanish ship seized by privateers.  The Court there found the passengers entitled to the treaty protections as the ship was of a "Spanish character" and therefore a "subject" for purposes of the treaty.  The case is hardly illustrative of the meaning of the term "allegiance" as used during the framing of the Clause, for two significant reasons.  *First*, Justice Story was interpreting a narrow and technical question of international law, not American law.  *Id*. at 246–47 (looking to "the language of the law of nations, which is always to be consulted in the interpretation of treaties").  Justice Story's understanding of citizenship was notably different when specifically discussing American law.  *See* ECF 30-1 at 11 n.4 (contrasting Justice Story's international law treatise with opinion in *Inglis*).  *Second*, in the cited portion, Justice Story was not pronouncing a general rule about "allegiance" but rather considering the law as to a *subset* of "persons owing allegiance to the United States", specifically, "subjects", whom he equated with "the terms 'citizens,' or 'inhabitants,' *when applied to* persons owing allegiance to the United States."  *Id*. at 245 (emphasis added).  As he explained, the purpose was to determine whether the passengers had an allegiance "so fixed that, as to all other nations, he follows the character of that country, in war as well as in peace."  *Id*. at 246.  By contrast, no evidence suggests that such a degree of "allegiance" is required for purposes of birthright citizenship.

3.    The Frelinghuysen opinion (cited at ECF 36 at 31) denying a passport to the child of "Saxon subjects, temporarily in the United States" provides little insight into birthright citizenship.  Rather, the denial related less to the parents' temporary presence in the United States

than it did to the fact that the dual citizenship was not recognized at the time, so such cases were governed by a complex series of treaties. Lew-Williams Supp. Decl. ¶¶ 41–43; *see also Washington*, 2025 U.S. App. LEXIS 18419, at *42 ("[B]oth Secretaries of State relied on the assumption that a natural-born United States citizen would *lose* birthright citizenship if their noncitizen parents removed the child from the country while still a minor and the child did not reclaim citizenship as an adult.") (emphasis in original). Regardless, "the fact that most Executive Branch interpretation is contrary to Defendants' interpretation is relevant evidence that Defendants' novel interpretation is incorrect." *Id.* [10]

### b.    The Clause contains no parental "domicile" requirement.

The history of the Fourteenth Amendment, and of the Civil Rights Act, reveals no interest in requiring a parental domicile as a precondition for birthright citizenship. *See* ECF 30-1 at 14–21; *see also* Lew-Williams Supp. Decl. ¶ 11 ("When Congress considered the Citizenship Clause of the Fourteenth Amendment, no member of Congress argued for a domicile requirement. In fact, Congressional debates regarding the Citizenship Clause contain no reference to 'domicile' at all."). To the contrary, available evidence indicates that Congress intended to extend birthright citizenship to children of temporary visitors. Children of Chinese migrants, widely understood at the time to be temporary workers, Lew-Williams Supp. Decl. ¶¶ 46–54, were explicitly to be granted citizenship under the Clause. *See, e.g.*, ECF 30-1 at 16–17, 18; ECF 30-10 ¶ 37. And at least one Senator expressed his view that "traveler[s]" are "within [the] jurisdiction" of American courts and "in one sense of the word a citizen, that is, a person entitled to protection." ECF 30-1

---

[10] For reasons explained in the opening brief, ECF 30-1 at 11 n.4, the international law treatises to which Defendants cite should not be credited. *E.g.*, ECF 36 at 27–28, 33 (Vattel); *id.* at 28 (Story). As a general matter, the principles of international law were distinct from those of American law, including specifically as to the question of citizenship. ECF 30-1 at 11 n.4; Lew-Williams Supp. Decl. ¶¶ 4–5. And each of the treatises Defendants cite is independently objectionable. *See, e.g.*, ECF 30-1 at 12 n.4 (Story); Lew-Williams Supp. Decl. ¶¶ 6–8 (Vattel).

at 16; ECF 30-10 ¶¶ 37–38 (discussing Cong. Globe, 39th Cong., 1st sess. 2890 (statement of Sen. Cowan)).

Defendants do not address or contest this evidence.  Without citing competent evidentiary sources or supporting their assertions as required by Rule 56(c), the few additional factual points they make are irrelevant, misleading, or in their full context undermine Defendants' position:

1.      The Hoar bill, ECF 36 at 30, introduced six years after ratification of the Fourteenth Amendment, undermines rather than supports Defendants' position.  That legislation sought to impose a new "parental domicile requirement" for citizenship and failed.  *Id*. at 31.  The fact that the legislation was introduced at all suggests that the Citizenship Clause and existing law included no such "parental domicile" requirement.  And this is confirmed by the debate, when one legislator noted the bill was a proposal to "change the existing law".  Lew-Williams Supp. Decl. ¶ 17 (quoting 43 Cong Rec. 3460 (1874) (statement of Rep. Hale)).  Moreover, that representative proceeded to explain "existing law": that birthright citizenship "has no respect to the circumstances under which the person may have been born, or the status of the parents at the time of birth; whether the father of the child born here is permanently domiciled without our borders, or is here for temporary and commercial purposes, or is a mere visitor or a casual traveler without our borders. If the child is born within the United States, by that birth he is a citizen of the United States." *Id*.

2.      The purported Trumbull "letter" to President Johnson which Defendants refer, ECF 36 at 29, is not a "letter"; rather it is an unsigned document and contains no information on its face suggesting it is in fact from Trumbull.  Lew-Williams Supp. Decl. ¶ 15.  The notion that Senator Trumbull wrote it comes from an unreliable handwriting analysis from someone with no qualifications to assess handwriting.  *Id*.  And Defendants' sole authority for it is a student law review comment.  ECF 36 at 29 (citing Mark Shawhan, Comment, *The Significance of Domicile*

*in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010)). Even if it were reliable, it would be of little use for interpreting the original meaning of the Clause, particularly in light of Senator Trumbull's extensive remarks during the congressional debate over the Civil Rights Act to the effect that all "persons born in the United States and under its authority . . . are citizens without any act of Congress." ECF 30-1 at 19 & n.9.

3.     Defendants' discussion of the Wade Amendment, ECF 36 at 29, is misleading. *Cf.* ECF 30-1 at 17 & n.7 (discussing same exchange); ECF 30-10 ¶ 39 (same). It is true that another Senator suggested during debate over the Privileges and Immunities Clause that "a person [who] is born here of parents from abroad temporarily in this country" would not be a citizen, Cong. Globe, 39th Cong., 1st sess. 2769, but Senator Wade *disagreed* with that characterization. Rather, in response he asserted that "a person may be born here and not be a citizen" *only* in "one instance, in the case of the children of foreign ministers[.]" *Id.* It was this fact that Wade "acknowledged," ECF 36 at 29, as evidenced by (1) his statement "I agree to that" followed immediately after his comments about "foreign ministers", Cong. Globe, 39th Cong., 1st sess. 2769, and (2) he then stated "it could hardly be applicable to more than two or three or four persons," *id.*, which is an assessment that could not be made if he were referring to temporary visitors. This particular exchange was well prior to the introduction of the Citizenship Clause and in its full context, is directly contrary to the point Defendants assert.

4.     Defendants again cite to passing comments made by Representative James Wilson. ECF 36 at 28. These are unpersuasive for reasons previously explained. ECF 30-1 at 20 n.10; ECF 30-10 ¶¶ 38, 40 & n.73, 41.

5.     Defendants place weight on a New Jersey state supreme court decision, ECF 36 at 30, issued 19 years after enactment of the Fourteenth Amendment and prior to *Wong Kim Ark*.

25

That weight is misplaced. The quoted proposition—that "those born in this country of foreign parents who are temporarily traveling here" are "within the allegiance of [a foreign] sovereign"—is, at most, *dicta*, as the court did not need to reach that question. Furthermore, the court provided no reasoning or citation for it. *Benny v. O'Brien*, 32 A. 696, 698 (N.J. 1895). That is especially striking in light of the analysis preceding the statement, which would seem to encompass children of temporary travelers: "[t]he right of our government to [a child's] allegiance, on the one hand, and its duty to protect him, on the other hand, cannot be denied if, in any case, birth here is to be of controlling force[.]" *Id*. at 697. To be sure, *Benny* was quoted in *Wong Kim Ark*, but for an entirely different proposition, *i.e.*, that the Citizenship Clause was "intended to bring all races, without distinction of color, within the rule which prior to that time pertained to the white race." 169 U.S. at 692–93. In any event, it is an outlier as other contemporary court decisions found the children of temporary travelers were citizens. *See, e.g.*, ECF 30-1 at 10-11 (collecting cases); *In re Estate of Ray*, 150 Misc. 728, 729, 270 N.Y.S. 333, 335 (N.Y. Sur. Ct. 1934) (collecting cases). Finally, to the extent it conflicts with *Wong Kim Ark* or subsequent case law, it "has no precedential value." *CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 739 n.4 (D. Md. 2025).

**3.    The children targeted by the Executive Order are not born to "alien enemies in hostile occupation."**

The Citizenship Clause guarantees citizenship to children born within and "subject to the jurisdiction" of the United States. Among those not "subject to the jurisdiction" of the United States are children born to an "alien enemy in hostile occupation of the place where the child [is] born," *Wong Kim Ark*, 169 U.S. at 658, because under such circumstances "[t]he sovereignty of the United States over the territory [is], of course, suspended, and the laws of the United States [can] no longer be rightfully enforced there[.]" *Id*. at 683.

26

Under this—or any reasonable—standard, neither Plaintiffs, nor anyone else born in the United States, can be considered born to an "alien enemy in hostile occupation," as Defendants suggest.  ECF 36 at 31.  *See generally CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 740 n.5 (D. Md. 2025) (rejecting this argument because "[a] 'hostile occupation' entails the 'firm possession' of a territory that enables the occupier 'to exercise the fullest rights of sovereignty over that place'" (quoting *United States v. Rice*, 17 U.S. (4 Wheat.) 246, 254 (1819)).  Even if such an argument could be articulated, Defendants have neither included in their Statement of Undisputed Material Facts any factual assertions to support their argument, let alone put forward any evidence that might support such assertions.

Also fatal is that Defendants have made no effort to "specif[y] which portions of the country are presently so occupied, or identified which foreign powers . . . are the 'enemies' presently controlling those areas."  *Doe v. Trump*, 766 F. Supp. 3d 266, 279 n.13 (D. Mass. 2025).

### 4.    Defendants' position is barred by precedent.

Defendants face another difficulty: their view of the Citizenship Clause is in direct conflict with binding Supreme Court precedent.  *See, e.g.*, ECF 30-1 at 26–28 (collecting cases).

In *Wong Kim Ark*, the Supreme Court held that the Fourteenth Amendment reaffirmed "the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding the alienage of parents", 169 U.S. at 688, with very narrow exceptions for "children of members of the Indian tribes," "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign State."  *Id.* at 682; *see also id.* at 693 (similar). *See also CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 737 (D. Md. 2025) ("*Wong Kim Ark* held that, under the Fourteenth Amendment, '[e]very person born . . . in the United States' is 'subject to the jurisdiction thereof' and thus a citizen by birth, unless they fall into one of the recognized

exceptions to citizenship by birth.") (citations omitted).  Everyone else born here was "subject to the jurisdiction" of the United States and a citizen at birth.  *Wong Kim* Ark, 169 U.S. at 693.

Contrary to Defendants' suggestion, this is not mere *dicta*.  But even if that portion of the decision were dicta, it was "evidently the result of serious consideration and is entitled to great weight."  *Afroyim v. Rusk*, 387 U.S. 253, 266 n.22 (1967) (discussing *Wong Kim Ark*'s analysis of ability of government to abridge citizenship); *accord Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (quoting *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997)).

Nor does *Wong Kim Ark* limit birthright citizenship on the basis of parental "domicile".  Naturally, because Wong Kim Ark's parents were "domiciled residents at San Francisco", 169 U.S. at 649, the Court did use the word "domicile" in the course of its opinion.  Defendants seize on this fact, yet nothing in the opinion itself suggests that its holding *restricts* birthright citizenship to persons "domiciled" here.  *See, e.g.*, *Washington*, 2025 U.S. App. LEXIS 18419, at *29–30 ("[D]omicile did not play a significant role in the Court's analysis of the Citizenship Clause's requirements[.]"); *CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 739 (D. Md. 2025) (rejecting argument that "under *Wong Kim Ark*, a person's parents must, at the time of the person's birth, be lawfully domiciled in the country for the person to be 'subject to the jurisdiction' of the United States").  To the contrary, the Court repeatedly suggested that domicile was irrelevant for purposes of determining "jurisdiction."  169 U.S. at 656 (quoting English authority for proposition that "[t]he question of naturalization and of allegiance is distinct from that of domicil [sic].");  *id*. at 666 (stating "rule in Europe generally" at time of ratification of Constitution that "mere birth within the realm gives the rights of the native-born citizen, independently of the origin of the

28

mother or father, and of their domicil [sic]"); *id*. at 693 (finding that all aliens, except those in the specific categories identified, were "completely subject to the political jurisdiction of the country in which [they] reside[] . . . 'independently of a residence with intention to continue such residence; independently of any domiciliation; independently of taking any oath of allegiance or of renouncing any former allegiance[.]'" (quoting Sec. Webster, Report to the President on Thrasher's Case (1851)).

Defendants cite only two authorities for their interpretation of *Wong Kim Ark*, neither of which analyzed the case in any depth. For example, *Chin Bak Kan v. United States*, 186 U.S. 193 (1902), in its rush to affirm the deportation of a Chinese national pursuant to an amendment to the Chinese Exclusion Act, merely quoted part of *Wong Kim Ark* without further analysis. Meanwhile, the treatment of *Wong Kim Ark* in *Kwock Jan Fat v. White*, 253 U.S. 454 (1920), was even less extensive, for it was cited, without explanation, in support of the proposition that the government did not dispute that "if petitioner is the son of Kwock Tuck Lee and his wife . . . he was born to them when they were permanently domiciled in the United States, is a citizen thereof, and is entitled to admission to the country." *Id*. at 547. (The petitioner in *Kwock Jan Fat* had misrepresented himself as their son but had in fact been born in China, and so was not a citizen.)

Other cases provide more recent, and persuasive, analyses concerning *Wong Kim Ark*'s central holding and uniformly do not support Defendants' view that *Wong Kim Ark* imposes a "domicile" requirement. *E.g.*, *Doe v. Trump*, 766 F. Supp. 3d 266, 278–82 (D. Mass. 2025) ("The Supreme Court concluded [in *Wong Kim Ark*] that 'subject to the jurisdiction thereof' was meant 'to exclude, by the fewest and fittest words'" specific, narrow categories of persons, and "[a]s to all other persons, 'the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of parents,' applied.") (collecting cases). *See also Weedin v. Chin*

*Bow*, 274 U.S. 657, 660 (1927) ("*United States v. Wong Kim Ark*, 169 U.S. 649, establishes that, at common law in England and the United States, the rule with respect to nationality was that of the *jus soli*[.]"); *Rabang v. INS*, 35 F.3d 1449, 1453 (9th Cir. 1994) ("The Supreme Court held that the Citizenship Clause confers citizenship 'by birth within the territory.'"); *Kiviti v. Pompeo*, 467 F. Supp. 3d 293, 312 (D. Md. 2020) (citing *Wong Kim Ark* for proposition of "the established rule of citizenship by birth within the dominion").

Plyler is no less relevant here because it pertained to the Equal Protection Clause. Defendants' argument to the contrary merely assumes their own conclusion: the Equal Protection Clause, they say, "focuses on a person's geographic location" whereas the Citizenship Clause "focuses on an individual's personal subjection or allegiance to the United States." ECF 36 at 37. That distinction requires Defendants to establish that the Citizenship Clause is so limited, which they have not done; they cannot do so by distinguishing away *Plyler* on the basis that it undermines their conclusion.

The question of whether there is any daylight between the category of those within scope of the Citizenship Clause and those protected by the Equal Protection Clause is a distraction. *Elk* held that children born on tribal lands are not "subject to the jurisdiction" of the United States, and the tribes are not bound by the Fourteenth Amendment's Equal Protection Clause, because tribes are not states and that clause only limits a state's authority. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) ("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority."); *see also Harper v. White Earth Human Res.*, No. 16-cv-1797 (JRT/LIB), 2016 U.S. Dist. LEXIS 184392, at *15 (D. Minn. Oct. 7, 2016) ("By their terms, the Equal Protection and Due Process Clauses of the Fourteenth Amendment apply only to

the actions of the states, not Tribal governments.").  What Defendants discuss is far different: whether the *federal government* can violate the equal protection rights of a Native American as guaranteed by the Fifth Amendment, which speaks of "person[s]", U.S. Const., Amend. V, not jurisdiction.  ECF 36 at 37 (citing *United States v. Antelope*, 430 U.S. 641 (1977)).

Finally, the Court should not attempt to "anticipate a possible shift in Supreme Court precedent," *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 279 (D.D.C. 2016), as Defendants urge.  ECF 36 at 38.  The fact that there are some instances in which the Supreme Court has overruled itself changes nothing about the directly applicable precedent here.  *See* ECF 36 at 38 (citing to cases concerning whether "states may prosecute non-Indians for crimes against Indians in Indian country", if "the Second Amendment protects an individual right", and "the legislative veto").  When precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to th[e] [Supreme Court] the prerogative of overruling [its] own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

### 5.    Defendants' policy arguments are unavailing.

Having taken a position contrary to (1) the plain meaning of the Citizenship Clause, (2) the original meaning of the Citizenship Clause, and (3) directly applicable precedent, Defendants turn to policy arguments (though framed as "interpretive principles"), ECF 36 at 32–34, which are inappropriate for consideration in matters of constitutional interpretation.  *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024) ("Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences."); *United States v. Rahimi*, 602 U.S. 680, 736 (2024) (Kavanaugh, J., concurring) ("Deciding constitutional cases in a still-developing area of this Court's jurisprudence can sometimes be difficult. But that is not a permission slip for a judge to let constitutional analysis morph into policy preferences[.]").  It is

therefore immaterial whether the Citizenship Clause "hold[s] out a powerful incentive for illegal entry", ECF 36 at 32, or "inhibit[s] the political branches' ability to address 'problems attendant on dual nationality,'" ECF 36 at 33, even setting aside the fact that Defendants have established neither as fact, either generally or through admissible evidence.

### D.    Defendants' Response Confirms Plaintiffs Should Be Granted Summary Judgment on their Ultra Vires Claims (First, Second, and Sixth Claims).

Defendants' arguments against Plaintiffs' *ultra vires* claims confirm that summary judgment should be granted. Notably, rather than responding to Plaintiffs' arguments as to why summary judgment should be granted, Defendants focus exclusively on purported procedural defects why an *ultra vires* claim cannot be brought. ECF 36 at 15-16. Each of Defendants' arguments is wrong and they have no response as to the substance.

*First*, Defendants argue that Plaintiffs' *ultra vires* claim fails because the APA was passed after, and therefore allegedly supersedes, the original *ultra vires* case, *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682 (1949). *See* ECF 36 at 15. Numerous courts have found that the APA does not foreclose an *ultra vires* claim, and plaintiffs can simultaneously assert both APA and ultra vires claims. *E.g., Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("[T]he APA's own guarantee of judicial review . . . does not repeal the review of ultra vires actions."); *Federal Express Corp. v. U.S. Dep't of* Commerce, 39 F.4th 756, 763–64 (D.C. Cir. 2022) (recognizing right to bring an *ultra vires* claim); *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 85 (D.D.C. 2006) (recognizing right to bring both ultra vires and APA claims).  Even the (unpublished) case Defendants cite rejects their position. ECF 36 at 15 (citing *Thompson v. Dep't of Hous. & Urb. Dev*., 2006 WL 581260, at *8 (D. Md. Jan. 10, 2006) ("the fact that [the APA] makes the *Larson* sovereign immunity exceptions no longer necessary *does not mean that all constitutional challenges must take the form of APA claims*.") (emphasis added). Defendants also

ignore the fact that *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the ultimate *ultra vires* opinion, was issued in 1952—six years after the passage of the APA. *See generally* Jonathan M. Gaffney, *Judicial Review Under the Administrative Procedure Act,* CONGRESS.GOV (Sept. 16, 2024), https://www.congress.gov/crs-product/LSB10558.

*Second*, Defendants argue, also incorrectly, that *ultra vires* claims are only viable where the President "acts 'without any authority whatever'"—and go further still, contending that *ultra vires* claims are all but impossible here because the Order addresses immigration and foreign relations. *See* ECF 36 at 16. Not so. To begin, the Order does not concern either immigration or foreign relations. *See* ECF 30-1 at 32–33. Beyond that, if the Court were to accept Defendants' logic, *Youngstown* would be a dead letter (along with *ultra vires* claims more generally). There, the President's actions in *Youngstown* were taken under the guise of war planning, which is within the President's authority as commander in chief. The *Youngstown* Court held that even if executive action was taken under the auspice of legal authority, it still must be struck down if it is flagrantly violative of the separation of powers in the Constitution. *See Youngstown*, 343 U.S. at 587–89.

Such is the case here. The Order addresses *citizenship*—which Congress has exclusive authority to define, and has defined by legislation and constitutional amendment, and which definition has been interpreted time and time again by judicial precedent. U.S. Const. Art. I, § 8; *id.* amend. XIV, § 1, cl. 1; 8 U.S.C. § 1401; *see generally Wong Kim Ark*, 169 U.S. 649 (1898). Regardless of any authority Defendants may cite ex post facto to try to support the Order, it is nakedly *ultra vires* and accordingly should be struck down as unconstitutional. *See Youngstown*, 343 U.S. at 589.

Other than raising these Rule 12(b)(6) arguments, Defendants have not responded to Plaintiffs' arguments that the President lacked any constitutional or statutory authority to issue the

33

Executive Order, *see generally* ECF 30-1 at 31–33 (detailing the Order's failure to identify any specific constitutional authority, and noting that the constitution vests Congress with exclusive authority to determine citizenship), and that the Order directly contravenes congressional pronouncements in the form of the text of the Fourteenth Amendment, the interpretation of which has been settled for well over a century, and the Immigration and Nationality Act of 1952, 8 U.S.C. § 1401. ECF 30-1 at 33. Accordingly, summary judgment should be granted on the *ultra vires* claims brought in the First, Second, and Sixth Claims.

## II.    RESPONSE TO DEFENDANTS' RULE 12/56 MOTION FOR SUMMARY JUDGMENT

Defendants' motion to dismiss, and in the alternative, for summary judgment (ECF 36) should be summarily denied for the following reasons:

1.    Defendants' motion failed to comply with Federal Rule of Procedure 56(c), Local Rule 7(h)(1) and the Court's January 31, 2025 Standing Order (ECF 6) ¶12 in the following ways:

- Defendants' cursory statement of material facts (ECF 36-1) is limited to five factual assertions and fails to cite to "particular parts of materials in the record, including depositions, documents . . . affidavits or declarations . . . or other materials," as required by Rule 56(c)(1)(A). Defendants' cursory statement does not include "references" or "specific citations to those portions of the record upon which the party relies," as required by Local Rule 7(h)(1) and the Standing Order.

- Defendants' statement of material facts suffers from the same defects as described in *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153-154 (D.C. Cir. 1996), in that it does not reflect extensive factual contentions in the body of its brief at pages 20–39. *See* ECF 36 at 20-29. These sections, in turn, flout what the D.C. Circuit noted was Rule 7(h)'s "requirement that statement of genuine disputed

material issues be 'concise,'" and not "blend[] factual assertions with legal argument." *See Jackson,* 101 F.3d at 153. Defendants' failure to comply with *Jackson* reflects their failure to comply with Local Rule 7(h) or Paragraphs 12 and 12(a) of this Court's January 31 Standing Order which, inter alia, expressly "encourage[s litigants] to carefully review" *Jackson*.

Pursuant to the Court's Standing Order, the Defendants' statement of material facts should be stricken for non-compliance and the motion should be summarily denied for failure to submit a compliant Rule 56(c) statement.

2.    While several of Plaintiffs' claims raise pure questions of law, Plaintiffs' Fifth Claim (for violation of the Equal Protection Clause) raises factual issues where certain facts essential to the opposition are in the Defendants' possession and are not available to Plaintiffs. Moreover, Defendants have improperly moved for summary judgment on Plaintiffs' Third and Fourth claims (under the Administrative Procedure Act) despite not having produced any administrative record(s). *See, e.g.*, *Browder v. Wormuth*, 2024 WL 5168281, at *16 (D.D.C. Dec. 19, 2024) (denying motion to for summary judgment as "premature" because a court "cannot review a decision under the APA without having the entire administrative record before it") (citation omitted). Pursuant to Rule 56(d), the Court should deny the Defendants' motion under Rule 56(d). *See generally* ECF 30-4 (Freedman Decl.) ¶¶ 8–17.

3.    As discussed in conjunction with Plaintiffs' affirmative motion for summary judgment, Defendants' legal arguments concerning Article III standing and the merits are incorrect and warrant denial of Defendants' motion even if the motion were not procedurally defective, and premature. To the extent the Court concludes that Defendants' motion is not procedurally

defective, or premature, Plaintiffs incorporate by reference their arguments for Partial Summary Judgment, including those made above, in opposition to Defendants' motion.

### A.    Plaintiffs have standing.

To plead standing sufficiently for purposes of Article III, a plaintiff must plead an injury which is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights,* 547 U.S. 47, 52 n.2 (2006). *See also Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

Here, Defendants have not challenged the standing of Plaintiffs Jane Doe #1, Jane Doe #2, or Baby Doe #1. In addition to detailed allegations in the Amended Complaint, each of these Plaintiffs submitted detailed declaration attesting to their injury in fact arising from the Executive Order (ECF 30-13, 30-14 & 3015) which are substantiated in Plaintiffs' Rule 56 Statement of Material Undisputed Facts (ECF 30-3 Nos. 23-38). In their Counter-Statement (ECF 36-1), Defendants failed to comply with Rule 56(c) by citing specific record evidence to dispute the factual bases for standing. *See generally Shapiro v. U.S. Dept. of Justice*, 507 F. Supp. 3d 283, 304 (D.D.C. 2020) ("Under Rule 56(c)(1), a party seeking to dispute a fact supported by competent evidence must either show that the proffered evidence "does not establish the absence . . . of a genuine dispute" or "cite to particular parts of materials in the record controverting the proffered evidence") (cleaned up) Accordingly, Plaintiffs' facts as to the standing of these three Plaintiffs should be treated as undisputed. With the standing of the three Individual Plaintiffs established, the Court should conclude there is Article III standing over this dispute.

Because the Individual Plaintiffs have standing, the Court need not reach the question of whether Plaintiff OCA has standing, as "[t]o establish jurisdiction, the court need only find one

plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Nevertheless, if the Court were to reach Defendants' arguments regarding OCA, the Court should reject them. OCA has adequately alleged and put forth competent evidence to support both associational and organizational standing (*see* ECF 30-12 and ECF 30-3 Nos. 11-22), and Defendants' Counter-Statement (ECF 36-1) has failed to cite any record evidence to dispute the factual bases for OCA's standing. Moreover, Defendants' characterization of the factual basis for OCA's standing is misleading and misapplies controlling law.

### 1.    OCA has established associational standing.

Defendants argue that OCA lacks representational standing by asserting that OCA cannot demonstrate that individual members have standing to sue in their own right and that the interests OCA seeks to protect are not germane to the organization's purpose. *See* ECF 36 at 11–13.  OCA satisfies both elements to assert standing.

As a threshold matter, Defendants do not dispute that OCA is a valid membership organization capable of asserting standing on behalf of its members. *See* ECF 36 at 11–13; ECF 36-1 No. 11 ("Undisputed"). An organization may assert standing on behalf of its individual members when: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (citation ommitted).

*First*, OCA's individual members have standing to sue in their own right. In her declaration, OCA's Executive Director stated that she has specifically identified two members who would suffer an injury upon implementation of this order when their children are denied birthright citizenship. ECF 30-12 ¶¶ 13–14.  In further support of OCA's standing, Plaintiffs are submitting

the declaration of an additional OCA member, which describes his injuries. *See generally* Member B Decl. Defendants' argument that OCA's members have not suffered a concrete harm because the federal government is currently enjoined from enforcing the Order is not tenable. *See* ECF 36 at 12.

Beyond that, absent the injunction, OCA members will suffer an immediate injury as the Order is self-executing and will apply to "persons who are born within the United States after 30 days from the date of this order." Exec. Order, No. 14,160, "Protecting the Meaning and Value of American Citizenship," 90 Fed. Reg. 8449 (Jan. 20, 2025).[11] Defendants' acknowledgement that the Supreme Court has not enjoined section 3(b) of the Order directing agencies to issue guidance on its implementation belies their claim that the injury is speculative. *See* ECF 36 at 12. U.S. Citizenship and Immigration Services has already issued guidance on implementation of the Order which makes clear that the children of OCA members "will no longer be U.S. citizens at birth" and "the Government is preparing to implement the E.O. in the event that it is permitted to go into effect."[12] Defendants' suggestion that Plaintiffs have alternative paths to citizenship (ECF 36 at 12-13) without further explanation is itself speculative and has no bearing on whether the injury is concrete. And the threat of unconstitutionally depriving the OCA members of citizenship is enough

---

[11] The notion that Plaintiffs are not injured because "no determination of the child's legal status may be determined [sic]" at this time runs headlong into the requirement that "when considering whether a plaintiff has Article III standing, a federal court must assume, arguendo, the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). On its face, the Order excludes Member A's child from birthright citizenship to which, assuming the merits of Plaintiffs' legal claims, she is entitled. That deprivation is by itself an injury.

[12] *See USCIS Implementation Plan of Executive Order 14160 – Protecting the Meaning and Value of American Citizenship*, U.S. Citizenship and Imm. Servs. (July 25, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/IP-2025-0001-USCIS_Implementation_Plan_of_Executive_Order_14160%20%E2%80%93%20Protecting_the_Meaning_and_Value_of_American_Citizenship.pdf ("[T]he Government is preparing to implement the E.O. in the event that it is permitted to go into effect"); Nguyen Supp. Decl. ¶¶ 13-15; OCA Member B Decl. ¶¶ 3-8.

to establish an injury for purposes of the OCA members' own standing. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)) ("A prospective violation of a constitutional right constitutes irreparable injury") (cleaned up). This factor therefore weighs in favor of associational standing because the OCA members would have standing to sue in their own right. *See, e.g.*, *Singh v. Berger*, 56 F.4th 88, 110 (D.C. Cir. 2022) (finding loss of constitutional right to be irreparable harm); *N.H. Indonesian Community Support v. Trump*, 765 F. Supp. 3d 102, 111 (D.N.H. 2025) ("The court has little difficulty concluding that the denial of citizenship status to newborns, even temporarily, constitutes irreparable harm."); *Trump v. Hawaii*, 585 U.S. 667, 670 (2018) ("A person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact.").

*Second*, OCA seeks to advance interests germane to its purpose as an organization serving immigrants and their families. In order to meet this standard, Plaintiffs must show "pertinence between [the] litigation subject and organizational purpose." *Jewell*, 779 F.3d at 597. OCA described in detail why the litigation is pertinent to its organizational purpose. ECF 30-12 ¶¶ 5, 8-12, ECF 30-3 Nos. 12, 14-21. Defendants assert in conclusory fashion that OCA's suit does not seek to advance interests germane to its purpose (ECF 36 at 13). But that ignores D.C. Circuit precedent that requires simply that there be some "pertinence between [the] litigation subject and organizational purpose" to assert associational standing. *Int'l Dark Sky Ass'n v. FCC*, 106 F.4th 1206, 1218 (D.C. Cir. 2024) (citation omitted). In other words, litigation is germane to an organization's purpose where it advances the interests of that organization and its members. *Id.* (finding that litigation seeking an environmental assessment was germane to the purpose of an educational organization). As Defendants acknowledge, a significant purpose of OCA is to "advocate for the immigration rights of [its] members" and for the "social, political, and economic

well-being of Asian Americans." ECF 36 at 13 (quoting ECF 30-12 ¶ 5); ECF 30-3 No. 12

("Undisputed"). OCA's mission and activities include supporting members who are non-citizens

and who live in the United States on temporary or nonimmigrant visas, ECF 30-12 ¶¶ 6, 11,

including through "naturalization and citizenship application support." ECF 30-12 ¶ 9; ECF 30-3

Nos. 16, 18–19. That OCA *also* provides services unrelated to immigration is not evidence to the

contrary, but corroborative of OCA's mission. *See* ECF 36 at 13. This litigation is pertinent to

activities OCA has long-conducted, advances the interests of OCA members, and fulfills its core

mission.

*Finally*, Defendants do not dispute that OCA's claims here may proceed without the

participation of individual members in this litigation. *See* ECF 36 at 11–13; *see also* ECF 30-1 at

41. Accordingly, OCA has satisfied each prong of associational standing.

## 2.    OCA has also established organizational standing.

An organization can assert standing on its own behalf when it has suffered a concrete and

demonstrable injury to its activities as a result of the defendants' unlawful action. *People for the

Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)

("*PETA*") (holding that "a concrete and demonstrable injury to [an] organization's activities—with

the consequent drain on the organization's resources—constitutes far more than simply a setback

to the organization's abstract social interests" and is sufficient to establish Article III standing

(citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))). To determine whether an

organization has suffered a concrete and demonstrable injury, the D.C. Circuit first asks "whether

the [defendant's] action or omission to act injured the organization's interest and, second, whether

the organization used its resources to counteract that harm." *PETA*, 797 F.3d at 1094 (cleaned up).

Both factors are met here.

Plaintiff OCA submitted a declaration from its Executive Director establishing that the Order "conflicts with [OCA's] mission and inhibits [OCA's] daily activities," with a resulting diversion of resources. *See Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 39 (D.D.C. 2020). For example, the Order will greatly increase demand for the naturalization and citizenship counseling that OCA provides because these services will now be required for U.S.-born children, where OCA previously provided these services only to parents. ECF 30-12 ¶ 10; ECF 30-3 No. 18. This will significantly increase the base of services provided. ECF 30-3 Nos. 18, 19. Moreover, the Order requires OCA to navigate new regulations and develop policy guidance addressing the effect of the order on children's status. ECF 30-12 ¶¶ 10, 12; ECF 30-3 No. 19. As a consequence, OCA will be forced to divert funding from other areas of its programming to support its naturalization and citizenship counseling. *Id*. This "increase[] [in] the number of people in need of counseling" and "reduc[tion] in the effectiveness of any given level of outreach efforts" is precisely the harm recognized as conferring organizational standing in D.C. Circuit precedent. *See Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *see also Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 41 (finding organizational standing where organization was forced to expend resources to adapt to asylum rule, reducing the number of clients it could serve); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 23 (D.D.C. 2020) (finding organizational standing where plaintiffs alleged that demand for their services would increase as a result of government action).

This diversion of resources will impact, and in fact is already impacting OCA. Nguyen Supp. Decl. ¶¶ 5-8; ECF 30-3 Nos. 19-21. Further, this injury is not simply a result of OCA seeking to "vindicate value preferences," but is a cognizable fiscal injury resulting from diverting resources

to counteract the harm of the Order on its membership community. *Compare Citizens for Resp. &*
*Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 129‑31 (D.D.C. 2020)
(finding no organizational standing where plaintiff did not operate counseling or educational
services and complained only that defendants had elected not to prosecute alleged Hatch Act
violations) *with Whitman-Walker Clinic, Inc.*, 485 F. Supp. 3d at 23 (finding organizational
standing where plaintiffs alleged that government action "will cause individuals to turn to Plaintiff
organizations for care, thereby necessarily generating financial and operational burdens that
'impair[ ] [Plaintiffs'] ability to provide services.'") (citation omitted) *and Nw. Immigrant Rts.*
*Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46-47 (D.D.C. 2020)
(finding organizational standing where plaintiffs alleged that government action imposed
burdensome and costly requirements on programs offering assistance with asylum applications);
*see also* Nguyen Supp. Decl. ¶¶ 5–8.

### 3.    Defendants' arguments challenging OCA's organizational standing fail.

Each of Defendants' arguments challenging OCA's organizational standing is premised on
a misreading of the law, the facts, or both.

*First,* Defendants argue that injury to OCA's naturalization and citizenship counseling
cannot confer standing because this counseling is part of OCA's mission, and reallocating
resources from one part of OCA's mission to another is not harm. ECF 36 at 10 (citing *Abigail All.*
*for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006)).  As courts in
this District have held, this argument "borders both on the offensive and absurd." *See Nat'l Fair*
*Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 28 (D.D.C. 2017) ("[I]n nearly all of the
cases where an organization has standing to pursue a claim under the FHA, of course those
organizations' activities are 'wholly consistent' with their mission . . . .").  Moreover, Defendants

misstate the governing precedent they cite.  In *Abigail Alliance*, the D.C. Circuit found that Abigail Alliance had established standing where "unduly burdensome [FDA] requirements" to access certain medications forced the Alliance to divert resources from other portions of its mission to expand its drug access counseling.  *Id*. at 132–33.  Here, the Order places resource-intensive burdens upon OCA's naturalization and citizenship counseling, leading to a diversion of resources from other areas of its programming.  This type of  injury on OCA's resources establishes organizational standing.

*Second*, Defendants suggest that OCA's harm is "speculative." ECF 36 at 10–11 (citing no cases).  Defendants are wrong.  OCA's harm "do[es] not rely on an attenuated chain of improbable causes and effects."  *See Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 41 (cleaned up).  Instead, OCA has demonstrated a realistic danger of direct injury "as soon as the executive Order is upheld."  ECF 30-12 ¶ 10.  Even the specter of litigation and appeals across the country has already required OCA to divert resources to prepare for the possibility that the Order will be enforced.  Nguyen Supp. Decl. ¶¶ 7-8.  That the order is not yet in effect does not defeat standing— the threat of injury and the already-occurring diversion of resources are enough to demonstrate Article III standing.  *See PETA*, 797 F.3d at 1093 ("The United States Supreme Court has made plain that a 'concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests' and thus suffices for standing." (citation omitted)); *Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 41; *see also supra* 37-38.

*Third,* Defendants argue that OCA's harm is "self-inflicted," and that OCA must prove that its resources were not invested "to counteract any alleged harm" that is self-inflicted. ECF 36 at 11 (citing no cases). But Defendants again misstate the legal standard. While a plaintiff may not

establish standing on the basis of expenditures undertaken "to challenge the regulation itself," OCA has alleged no harm from expenditures related to litigation or issue advocacy. *Abigail All.*, 469 F.3d at 133. D.C. Circuit precedent makes clear that when "an organization expends resources *in response to, and to counteract*, the effects of defendants' alleged unlawful conduct rather than in anticipation of litigation, it has suffered a concrete and demonstrable injury for purposes of standing." *PETA*, 797 F.3d at 1097 (cleaned up) (emphasis added). Here, OCA has shown that Defendants' unlawful Order will increase demand for their naturalization and citizenship counseling efforts and require a redirection of resources from their other programming. ECF 30-12 ¶ 10. No aspect of this harm is related to advocacy expenses.

OCA has established an injury to its core programmatic activities as a result of the Order, and a consequent diversion of resources. Defendants assert no facts to the contrary. Accordingly, this Court should find organizational standing for OCA.

**B.    The President should not be dismissed because he is a proper party for the claims asserted against him.**

There is no need to dismiss the President from this action. Defendants' argument, ECF 36 at 14, relies on the now-overturned *Newdow v. Roberts* decision, as well as *Franklin v. Massachusetts*, for the proposition that courts can *never* enjoin the President. But *Franklin* explicitly did not reach the question of the courts' power to enjoin the President. *See Franklin*, 505 U.S. 788, 801-03 (1992) ("[T]he President's actions may still be reviewed for constitutionality[.] . . . We have left open the question whether the President might be subject to a judicial injunction . . . . [W]e need not decide whether injunctive relief against the President was appropriate[.]")

Defendants *ignore* that courts have repeatedly rejected the idea that the President is insulated from appropriate judicial process. *See generally* ECF 30-1 at 31 n.13 (collecting

authority).  *See also NTEU v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) (there is "no immunity established under any case known to this Court [that] bars every suit against the President for injunctive, declaratory or mandamus relief"); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 577-78 (S.D.N.Y. 2018) ("Defendants suggest that we categorically lack authority to enjoin the President, a proposition we do not accept."); *see also Clinton v. Jones*, 520 U.S. 681, 703 (1997) ("the President is subject to judicial process in appropriate circumstances.").

Regardless, even if the Court is reluctant to issue injunctive relief against the President, it does not follow that the President must be dismissed as a defendant entirely, as Plaintiffs also seek declaratory relief.  *See De La Raza v. Trump*, 706 F. Supp. 3d 903, 935 (N.D. Cal. 2020). (noting that even if there is a *general* rule against enjoining the President, "[i]t does not follow [] that the court should therefore dismiss the President as a defendant" because his actions are nevertheless subject to judicial review for constitutionality).  Accordingly, the President should not be dismissed.

### C.    Plaintiffs have adequately pled each of their claims.

Defendants argue, in largely conclusory terms,  that Claims I through V in Plaintiffs' Amended Complaint fail to state a claim.  ECF 36 at 14-17. These arguments all fail.

### 1.    Plaintiffs are permitted to bring a direct cause of action under the Citizenship Clause.

Plaintiffs appropriately seek declaratory and injunctive relief under the Citizenship Clause. Defendants incorrectly argue that Plaintiffs cannot bring a direct cause of action under the Citizenship Clause because "Constitutional rights do not typically come with a built-in cause of action to allow private enforcement in courts."  ECF 36 at 14 (citing *DeVillier v. Texas*, 601 U.S. 285, 291 (2024)).  But *DeVillier* decided *only* whether a plaintiff could seek money damages ("just

45

compensation") under the Fifth Amendment Takings Clause. *Id.* at 290, 292 (denying that the Takings Clause "creates a cause of action for damages, a remedy that is legal, not equitable, in nature"). In fact, in holding that the Takings Clause does not provide a cause of action for just compensation, *DeVillier* cites to and distinguishes multiple cases in which "property owners sought injunctions to prevent the Government from interfering with their property rights." *Id.* at 292. Furthermore, the Supreme Court has held on numerous other occasions that an equitable cause of action is available against unconstitutional executive actions, as is the case here. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (rejecting argument that there is no cause of action under the Appointments Clause or separation-of-powers principles as these claims should not be treated differently than "every other constitutional claim"); *Afroyim v. Rusk*, 387 U.S. 253 (1967); *Youngstown Sheet & Tube Co.*, 343 U.S. at 589 (finding President's seizure order was unauthorized); *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 141 (1951) ("We long have granted relief to parties whose legal rights have been violated by unlawful public action[.]"); s*ee also Perkins Coie LLP v. U.S. Dep't of Just.*, 2025 WL 1276857, at *48 (D.D.C. May 2, 2025) (discussing relevant authority). Defendants' argument is simply wrong.

### 2.    Plaintiffs' APA claims are sufficiently pled.

Defendants contend that Plaintiffs cannot bring Claims III and IV under the APA, as there is no "final agency action" in the matter. ECF 36 at 26. But in making this argument, Defendants do not acknowledge (even though they do elsewhere in their papers) that the Defendant agencies have now taken action. *See, e.g.*, ECF 36 at 12 ("the agencies have provided specific guidance about how to implement the balance of the President's order when it takes effect"); ECF 36-1 at 2

(discussing agency actions taken by Departments of State and DHS, and SSA).[13] In other words, the procedural predicate for Defendants' argument is no longer applicable.

Moreover, Defendants' reliance on *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc*. for this contention is misplaced. That case specifically emphasized the "'pragmatic' approach [the Court] has long taken to finality." *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (citing *Abbot Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). The guidance issued by the agencies is evidence that, but for the current preliminary injunctions issued by other federal courts, agencies are prepared to implement the Order and take action. Pragmatically, it is evident that these plans should be considered final agency actions. Each plan conditions its full implementation on only the execution of the Order such that they undoubtedly constitute "consummation of the agency's decision making process" and are not of a "tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Furthermore, it is undeniable that the plans are actions by which "rights or obligations have been determined," as they would alter the previously long-maintained policies regarding birthright citizenship in the United States. *Id*.; ECF 29-1 at ¶¶ 152-58. These agency actions support the finding that Plaintiffs have APA claims that are ripe and that, absent judgment on the merits of these claims, they will experience imminent injury. ECF 29-1 at ¶¶ 183-214. Rather than dismissing these claims, the proper course

---

[13] *See generally USCIS Implementation Plan of Executive Order 14160 – Protecting the Meaning and Value of American Citizenship*, U.S. Citizenship and Imm. Servs. (July 25, 2025) ("[T]he Government is preparing to implement the E.O. in the event that it is permitted to go into effect"); *Executive Order 14160 – Protecting the Meaning and Value of American Citizenship: Department of State Implementation Plan*, U.S. Dep't State, ("The following is the Department of State's Implementation Plan once we are allowed to comply with the Executive Order"); *Guidance on Protecting the Meaning and Value of American Citizenship (Executive Order 14160) for Verification Requirements under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, U.S. Social Security Admin., ("This document, consistent with the President's direction, provides guidance about how the Social Security Administration (SSA) will implement the President's order when it takes effect").

is for the Defendants to produce the Administrative Records relevant to these agency actions, following which the Parties can further adjudicate the Third and Fourth Claims. *See, e.g.*, *Browder v. Wormuth*, 2024 WL 5168281, at \*6 (D.D.C. Dec. 19, 2024) (denying motion to for summary judgment as "premature" because a court "cannot review a decision under the APA without having the entire administrative record before it.").

Additionally, the Court is permitted to review even non-final agency actions where there has been an "outright violation" of a clear statute or of the Constitution. *See Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 749-50 (D.C. Cir. 1987). That is the case here, where the Executive Order and the agency guidance plans stands in blatant contradiction to multiple Constitutional and statutory rights. ECF 29-1 at ¶¶ 215-61. Accordingly, the Court should deny Defendants' motion to dismiss as to Counts III and IV.

### 3.    Plaintiffs need not channel their claims through 8 U.S.C. § 1503.

Plaintiffs need not bring their claims under 8 U.S.C. § 1503. ECF 36 at 17–18. Defendants' application of the provision is incorrect. The Supreme Court has squarely held that the text and legislative history of section 1503 "shows no intention to provide an exclusive remedy." *Rusk v. Cort*, 369 U.S. 367, 375 (1962), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977). *See also Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 14-16 (D.D.C. 2020) (rejecting argument that *Cort's* holding as to Section 1503 is no longer good law).

Both the text and its legislative history of Section 1503 indicate that it was not intended to be the exclusive remedy when the government seeks to deny a plaintiff's citizenship. *Frank v. Rogers*, 253 F.2d 889, 892 (1958) ("Neither [section 1503] nor its predecessor recites that the remedy there given is to be exclusive, or that when the issue of citizenship is necessarily involved in another proceeding, it may not be there considered, or that existing remedies are to be denied: in fact, the legislative history of the predecessor statute indicates the contrary."). The text of

Section 1503 itself only applies to claims of rights or privileges of United States nationals, not determinations of citizenship itself. The three cases cited by Defendants make this distinction even clearer—*Vance v. Terrazas*, *Richards v. Sec'y of State*, and *Abimbola v. Clinton*, (cited at ECF 36 at 17) all concern a Plaintiffs' privileges after they have relinquished citizenship. These cases are inapposite because they do not consider the constitutionality of a policy denying citizenship. Defendants themselves argue that the Order would not just deny certain rights or privileges, but rather would deny citizenship entirely. *See, e.g.*, ECF 36 at 1.

Defendants' other citations are similarly inapposite—they  concern situations where a plaintiff was seeking  a passport or renewals of passports, and "nothing else." *Alsaidi v. Dep't of State*, 292 F. Supp. 3d 320, 327 (D.D.C. 2018) (narrowing its holding that Section 1503(a) provides an adequate remedy to achieve plaintiff's renewal of her passport and nothing else) *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 455 (D. Mass. 2021) (considering the revocation of passports of children born outside the United States).

Here, Plaintiffs are not questioning an administrative right of citizenship like the right to hold a passport but rather "citizenship itself."  *Gonzalez Boisson*, 459 F. Supp. 3d at *16–17 (holding that Section 1503 offered only "doubtful and limited relief, that might well never result in a determination of the underlying legal question: is plaintiff a citizen?" (cleaned up)). Defendants all but admit as much in their own guidance, which states that affected individuals "will no longer be U.S. citizens at birth." *E.g.*, U.S. Citizenship and Imm. Servs., *supra* at n.12. Even if that were not so, the difference between the entire federal government treating an entire class as non-citizens and *deeming* them non-citizens would be a fine distinction indeed.

Defendants have not—and cannot—cite to any authority which found that the constitutionality of a broad sweeping federal order must exclusively be challenged under Section 1503. Accordingly, Defendants' arguments should be rejected.

### 4.    Plaintiffs have pled a viable Equal Protection claim.

Defendants' cursory attempt to dismiss Plaintiffs' Equal Protection Claim, ECF 36 at 17, 39-40, provides no legal or factual basis for dismissal (let alone summary judgment). Defendants' argument that the Order does not implicate a "fundamental right" is both wrong (the Order concerns the right to citizenship)[14] and beside the point: the Order is subject to heightened scrutiny under the Equal Protection Clause not only because it concerns a fundamental right but because it classifies by "race, alienage, or national origin," *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985), specifically, as Plaintiffs explained, nativist animus against nonwhite immigrants. *See* ECF 29-1 ¶ 234. Defendants nowhere address the Order's facial classification.

Similarly, Defendants argument that the Order's "differential treatment of children of parents" does not support a cause of action, ECF 36 at 39, is wrong. Plaintiffs' allegations that the "facially neutral" Order has a disproportionate impact and is "motivated by" a discriminatory purpose is one of "at least three ways a plaintiff can plead an equal protection violation." *Rothe v. U.S. Dep't of Def.*, 836 F.3d 57, 63 (D.D.C. 2016); *see* ECF 29-1 ¶ 234. For the Executive Order to survive then, it must be narrowly tailored to further a compelling government interest. Plaintiffs

---

[14] As guaranteed under the Fourteenth Amendment, birthright citizenship is both "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). It is "deeply rooted" in our history in light of the centuries of adherence to the principle of *jus soli*, as discussed at length in *Wong Kim Ark*, 169 U.S. 658-691, and in prior briefing, ECF 30-1 at 9-14. And citizenship is also "implicit in the concept of ordered liberty," for as the Court explained in *Afroyim v. Rusk*, 387 U.S. 253 (1967), "*[t]he very nature of our free government* makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Id.* at 263 (emphasis added).

have alleged more than sufficient facts regarding the discriminatory intent behind the order under *Village of Arlington Heights v. Metro Housing Dev. Corp.*, 429 U.S. 252, 265 (1977 (intent can be demonstrated through the 1) historical background; 2) administrative history, including "contemporary statements" by decisionmakers; 3) evidence of the disparate impact of the Order; 4) the sequence of events leading up to the Order; and 5) departure from ordinary procedures).Plaintiffs have alleged more than sufficient facts regarding the historical background, ECF 29-1 ¶¶ 109-14; administrative history, *id.* ¶¶ 118-24; procedural irregularities, *id.* ¶¶ 151-57; and disproportionate impact of the Order, *id.* ¶¶ 170, 174-81, to sustain their claim that the Order discriminates against immigrants of color "because of, not merely in spite of," *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), race, national origin, and alienage, *Arlington Heights*, 429 U.S. at 267. These facts, viewed in "a light most favorable to the nonmoving party"— Plaintiffs—"could support a reasonable [factfinder's] verdict for [Plaintiffs]." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013).

Defendants do not address why the facts Plaintiffs present in support of their *Arlington Heights* factors are insufficient to establish any element of Plaintiffs' claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Meanwhile, Defendants entirely fail to refute Plaintiffs' allegations of discriminatory animus on the basis of race and national origin and cannot point to any "absence of evidence" on Plaintiffs' part, *Shuler v. District of Columbia,* 744 F. Supp. 2d 320, 324 (D.D.C 2010).

Because the Executive Order has both a disparate impact and was motivated by an "invidious discriminatory purpose," the onus is on the government to show that the Order is narrowly tailored to further a compelling governmental interest. *United States v. Johnson*, 40 F.3d 436, 439 (D.D.C 1994). Defendants do not meet their burden, nor do Defendants make any effort

to do so.   Defendants do not offer any facts in support of their legal arguments and do not cite to any materials other than the Order itself and another Executive Order on immigration. ECF 36 at 39-40; ECF 36-1 Nos. 53-56. They thus fail to explain how the alleged "problems associated with illegal immigration" satisfy this standard beyond a cursory statement that any disparate treatment "thus is justified." ECF 36 at 40.   To the extent Defendants claim that the governmental interest is "compelling" because it "derives from the Constitution," they cite no authority for this proposition. Nor do they explain how this particular Order is narrowly tailored to achieve such an interest. There is no basis to either dismiss or grant summary judgment as to this claim.

### D.      Class actions in other jurisdictions do not compel dismissal of Plaintiffs' class action claims.

The Court should continue to exercise jurisdiction over Plaintiffs' class action claims. Contrary to Defendants' contention, ECF 36 at 18, the certification of a class in one suit has no impact on a parallel litigation. *See Sharp Farms v. Speaks*, 917 F.3d 276, 309 (4th Cir. 2019) ("[A] parallel action has no effect on a competing action until a final judgment is reached. That is even true for the certification decision.") (Quattlebaum, J., concurring) (citing Newberg § 10:33). Recognizing this, the District of New Hampshire noted in *Barbara v. Trump* that certification of a nationwide class in that case would not have "'any formal effect on litigation elsewhere.'"  2025 WL 1904338, at *12 (D.N.H. July 10, 2025) (quoting 3 Newberg § 10:33).   As the District of Maryland recently held in *Casa v. Trump*, the mere fact that "a nearly identical class" has been provisionally certified in a different district "does not obviate the need for class certification here," as it is not uncommon for multiple class actions to be filed simultaneously concerning the same events and transactions.  *Casa, Inc. v. Trump*, 2025 WL 2263001 at *15 (D. Md. Aug. 7, 2025) (citing Newberg § 10:33).  The same is true here.  Though the individual plaintiffs may be eligible

to be members of a nationwide class in other cases challenging this order in other jurisdictions, this does not foreclose litigation challenging the order on a class basis before this Court.[15]

Additionally, Plaintiffs' proposed class definition in this case is not coextensive with and is broader than the class definition of the class certified in other jurisdictions. *Compare Barbara*, 2025 WL 1904338 at \*4 (defining class to include children affected by the order, but not their parents) and *Casa*, 2025 WL 2263001 at \*15 (same) *with* ECF 29-1 ¶ 160 (defining plaintiffs proposed class to include both parents and children). Thus, even concerns of judicial economy would not justify dismissing their class action claims. Accordingly, the Court should reject Defendants' arguments and continue to exercise jurisdiction over the class claims in this case.

## CONCLUSION

For the foregoing reasons, the Court should enter partial summary judgment for Plaintiffs on Claims 1, 2, and 6, and should deny Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment.

---

[15] Defendants' caselaw does not support dismissal of class claims in these circumstances. *See* ECF 36 at 18-20. The authorities cited by Defendants are inapposite for two reasons: (1) the cited cases deal with individual claims overlapping with separate class actions pending in the same court, whereas the instant case is an overlapping putative class action pending in a different court, and (2) the cited cases only hold that a court, in those limited circumstances *may* dismiss a case for judicial economy rather than being required to do so. *See Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979) (finding that a court may choose not to exercise its jurisdiction where an individual plaintiff was listed in the complaint of a separate class action); *Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983) (recommending referral rather than dismissal of an individual plaintiff's claim where there is a separate class action dealing with the same matter); *Bryan v. Werner*, 516 F.2d 233, 239 (3d Cir.1975) (dismissing an individual plaintiff's claim covered by a pending class action under inherent discretionary judicial power rather than mandate). To the extent Defendants cite authority dealing with two parallel actions challenging the executive order, this again concerns an individual claim covered by a pending class action, rather than a competing putative class action, and demonstrates a discretionary exercise of judicial power to decline jurisdiction in the interest of judicial economy. *Washington v. Trump*, 2025 WL 2061447, at \*6 (9th Cir. July 23, 2025).

Dated: August 14, 2025

Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (D.C. Bar No. 453075)
Sally Pei (D.C. Bar No. 1030194)
Jonathan L. Stern (D.C. Bar No. 375713)
Ronald D. Lee (D.C. Bar No. 411516)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Sally.Pei@arnoldporter.com
Jonathan.Stern@arnoldporter.com
Ronald.Lee@arnoldporter.com

John C. Yang (D.C. Bar No. 438672)
Niyati Shah (D.C. Bar No. 1659560)*
Noah Baron (D.C. Bar No. 1048319)
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street, Suite 1050
Washington, D.C. 200036
(202) 296-2300
jcyang@advancingjustice-aajc.org
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Sarah Bessell (D.C. Bar No. 219254)
Madeleine Gates (D.C. Bar No. 90024645)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org
sarah_bessell@washlaw.org
madeleine_gates@washlaw.org

*Application for admission to D.D.C. pending

*Counsel for Plaintiff*