# United States Court of Appeals
## For the First Circuit

No. 25-1169

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the
United States; US DEPARTMENT OF STATE; MARCO RUBIO, in his
official capacity as Secretary of State; US SOCIAL SECURITY
ADMINISTRATION; FRANK J. BISIGNANO, in his official capacity as
Commissioner of Social Security,

Defendants, Appellants.

No. 25-1170

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE;
STATE OF MARYLAND; DANA NESSEL, Attorney General for the People
of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA;
STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA;
STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN;
CITY AND COUNTY OF SAN FRANCISCO, CA,

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the
United States; US DEPARTMENT OF STATE; MARCO RUBIO, in his
official capacity as Secretary of State; US DEPARTMENT OF
HOMELAND SECURITY; KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity
as Secretary of Health and Human Services; US SOCIAL SECURITY
ADMINISTRATION; FRANK J. BISIGNANO, in his official capacity as
Commissioner of Social Security; UNITED STATES,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, <u>U.S. District Judge</u>]

---

Before

Barron, <u>Chief Judge</u>,
Rikelman and Aframe, <u>Circuit Judges</u>.

---

    <u>Eric D. McArthur</u>, Deputy Assistant Attorney General, with whom <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Mark R. Freeman</u>, <u>Sharon Swingle</u>, <u>Brad Hinshelwood</u>, and <u>Derek Weiss</u>, Attorneys, U.S. Department of Justice, were on brief for appellants.
    <u>William J. Olson</u>, <u>Jeremiah L. Morgan</u>, <u>William J. Olson, P.C.</u>, <u>Jeffrey C. Tuomala</u>, <u>Michael Boos</u>, and <u>Citizens United</u>, on brief for America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Citizen United, U.S. Constitutional Rights Legal Defense Fund, Leadership Institute, and Conservative Legal Defense and Education Fund as amici curiae supporting appellants.
    <u>Judd E. Stone II</u>, <u>Christopher D. Holton</u>, <u>Ari Cuenin</u>, <u>Stone Hilton PLLC</u>, <u>Daniel Z. Epstein</u>, and <u>America First Legal Foundation</u>, on brief for Former National Security Official Joshua Steinman as amicus curiae supporting appellants.
    <u>R. Trent McCotter</u>, <u>Boyden Gray PLLC</u>, <u>Daniel Z. Epstein</u>, <u>America First Legal Foundation</u>, <u>George W. Vien</u>, <u>Pietro A. Conte</u>, and <u>Donnelly, Conroy, & Gelhaar LLP</u>, on brief for Members of Congress as amici curiae supporting appellants.
    <u>Jonathan Skrmetti</u>, Attorney General & Reporter, and <u>J. Matthew Rice</u>, Solicitor General, on brief for the State of Tennessee as amicus curiae supporting appellants.
    <u>Matt A. Crapo</u>, <u>Christopher J. Hajec</u>, <u>Gabriel R. Canaan</u>, and <u>Immigration Reform Law Institute</u>, on brief for Immigration Reform Law Institute as amicus curiae supporting appellants.
    <u>Shankar Duraiswamy</u>, Deputy Solicitor General, with whom <u>Matthew J. Platkin</u>, Attorney General of New Jersey, <u>Viviana M. Hanley</u>, <u>Elizabeth R. Walsh</u>, <u>Shefali Saxena</u>, Deputy Attorneys General, <u>Jeremy M. Feigenbaum</u>, Solicitor General, <u>Andrea Joy Campbell</u>, Attorney General of Massachusetts, <u>Gerard J. Cedrone</u>, Deputy State Solicitor, <u>Jared B. Cohen</u>, Assistant Attorney General, <u>Rob Bonta</u>, Attorney General of California, <u>Denise Levey</u>, <u>Lorraine López</u>, <u>Delbert Tran</u>, <u>Annabelle Wilmott</u>, Deputy Attorneys General, <u>Michael L. Newman</u>, Senior Assistant Attorney General,

Marissa Malouff, Irina Trasovan, Supervising Deputy Attorneys General, Christopher D. Hu, Deputy Solicitor General, Phil Weiser, Attorney General of Colorado, Shannon Stevenson, Solicitor General, William M. Tong, Attorney General of Connecticut, Janelle Rose Medeiros, Assistant Attorney General, Brian L. Schwalb, Attorney General for the District of Columbia, Caroline S. Van Zile, Solicitor General, Jeremey R. Girton, Assistant Attorney General, Kathleen Jennings, Attorney General of Delaware, Vanessa L. Kassab, Deputy Attorney General, Ian R. Liston, Director of Impact Litigation, Anne E. Lopez, Attorney General of Hawai'i, Kaliko'onālani D. Fernandes, Solicitor General, Aaron M. Frey, Attorney General of Maine, Thomas A. Knowlton, Assistant Attorney General, Dana Nessel, Attorney General of Michigan, Toni L. Harris, Neil Giovanatti, Stephanie M. Service, Assistant Attorneys General, Anthony G. Brown, Attorney General of Maryland, Adam D. Kirschner, Senior Assistant Attorney General, Julia Doyle, Solicitor General, Keith Ellison, Attorney General of Minnesota, John C. Keller, Chief Deputy Attorney General, Aaron D. Ford, Attorney General of Nevada, Heidi Parry Stern, Solicitor General, Letitia James, Attorney General of New York, Matthew William Grieco, Senior Assistant Solicitor General, Ester Murdukhayeva, Deputy Solicitor General, Raúl Torrez, Attorney General of New Mexico, James W. Grayson, Chief Deputy Attorney General, Jeff Jackson, Attorney General of North Carolina, Daniel P. Mosteller, Associate Deputy Attorney General, Peter F. Neronha, Attorney General of Rhode Island, Katherine Connolly Sadeck, Solicitor General, Joshua L. Kaul, Attorney General of Wisconsin, Gabe Johnson-Karp, Assistant Attorney General, Charity R. Clark, Attorney General of Vermont, Jonathan T. Rose, Solicitor General, David Chiu, City Attorney of San Francisco, and David S. Louk, Deputy City Attorney, were on brief for appellees.

  Oren Sellstrom, with whom Ivan E. Espinoza-Madrigal, Jacob M. Love, Mirian Albert, and Lawyers for Civil Rights, were on brief for appellees.

  Vincent Levy and Hannah Bartlett, on brief for Professor Rothman as amicus curiae supporting appellees.

  Lori Chen, Owen R. Wolfe, Wendy M. Feng, Seyfarth Shaw LLP, Rahat N. Babar, Edgar Chen, Chris M. Kwok, and National Asian Pacific American Bar Association, on brief for National Asian Pacific American Bar Association, et al. as amici curiae supporting appellees.

  Douglas E. Lieb and Kaufman Lieb Lebowitz & Frick LLP, on brief for Immigration Law Scholars Kristin Collins, Gerald Neuman, and Rachel Rosenbloom as amici curiae supporting appellees.

  Elizabeth B. Wydra, Brianne J. Gorod, Smita Ghosh, Anna K. Jessurun, and Constitutional Accountability Center, on brief for Scholars of Constitutional Law and Immigration as amici curiae

supporting appellees.

Anna M. Baldwin, Campaign Legal Center, Angelo Ancheta, and Dēmos, on brief for Secure Families Initiative as amicus curiae supporting appellees.

Jonathan D. Hacker, Arjun A. Shenoy, Anthony S. Wang, O'Melveny & Myers LLP, Jessica Levin, Melissa R. Lee, Center for Civil Rights and Critical Justice, Robert S. Chang, Susan McMahon, Fred T. Korematsu Center for Law and Equality, Bethany Li, Niji Jain, Razeen Zaman, and Asian American Legal Defense and Education Fund, on brief for Fred T. Korematsu Center for Law and Equality, Asian American Legal Defense and Education Fund, Center for Civil Rights and Critical Justice, and 84 Additional Nonprofit and Grassroots Organizations and Race and Law Centers as amici curiae supporting appellees.

Reena Parikh, John Cort, Kira Hinchey, Shaquan McDowell, Carolyn Zaccaro, Boston College Legal Services LAB, Juan Camilo Mendez, Sarai Suarez Campos, and HarborCOV, on brief for Non-Profit Organizations Serving Immigrant Survivors of Domestic Violence and Sexual Assault as amici curiae supporting appellees.

James J. Pastore, Stephanie D. Thomas, Natalie Tsangu, Chester S. Dubov, Debevoise & Plimpton LLP, Edward G. Caspar, Olivia N. Sedwick, and Lawyers' Committee for Civil Rights Under Law, on brief for National Association for the Advancement of Colored People, the League of Women Voters, and the Equal Justice Society as amici curiae supporting appellees.

Richard B. Kendall, Kendall Brill & Kelly LLP, on brief for Historians Martha S. Jones and Kate Masur as amici curiae supporting appellees.

Jonathan Weinberg, Linus Chan, Douglas Jensen, Michael Bass, and Sher Tremonte LLP, on brief for American Immigration Lawyers Association as amicus curiae supporting appellees.

Dena Kia, Ishika Desai, Neel Chatterjee, Andrew Ong, and Goodwin Procter LLP, on brief for Professors Eika Lee, Paul Finkelman, and Gabriel J. Chin as amici curiae supporting appellees.

Matthew Holder, Communications Workers of America, Alice O'Brien, National Education Association, Mario Martinez, United Farm Workers of America, Lisa Pedersen, United Food and Commercial Workers International Union, Steven K. Ury, Elena Medina, Deborah L. Smith, Mac McMechan, Service Employees International Union, Daniel McNeil, American Federation of Teachers, Teague Paterson, and American Federation of State, County, & Municipal Employees, AFL-CIO, on brief for Service Employees International Union, American Federation of Teachers, American Federation of State, County and Municipal Employees, Communications Workers of America, National Education Association, United Farm Workers of America, and United Food and Commercial Workers International Union, as

amici curiae supporting appellees.

_____

October 3, 2025

_____

BARRON, **Chief Judge**.   In the wake of the Civil War, our
nation, in 1868, ratified the Fourteenth Amendment to the U.S.
Constitution.   The amendment provides, in its first clause, that
"[a]ll persons born or naturalized in the United States, and
subject to the jurisdiction thereof, are citizens of the United
States and of the State wherein they reside."   U.S. Const.
amend. XIV, § 1.   Nearly a century later, after a thorough review
of our nationality laws, Congress passed § 301(a)(1) of the
Immigration and Nationality Act, codified as 8 U.S.C. § 1401(a).
That measure similarly provides that "a person born in the United
States, and subject to the jurisdiction thereof" "shall be [a]
national[] and citizen[] of the United States."   Pub. L. No.
82-414, § 301(a)(1), 66 Stat. 235, 235 (1952).

Relying on these longstanding guarantees of birthright
citizenship, a Massachusetts federal district court, in a pair of
consolidated cases, preliminarily enjoined the enforcement and
implementation of Executive Order No. 14160, 90 Fed. Reg. 8449
(Jan. 20, 2025), "Protecting the Meaning and Value of American
Citizenship" (the EO).   The EO's "purpose" is to deny birthright
citizenship to children born after the EO's effective date if, at
the time of their birth, their fathers are not United States
citizens or lawful permanent residents (LPR) and their mothers are
in this country either (1) unlawfully or (2) temporarily.

Id. § 1.   The EO "[e]nforce[s]" this "[p]urpose" through directives to various federal agency heads.  Id. § 3.

The Government[1] now asks us to reverse the preliminary injunctions in these cases.  We see no reason to do so.  The Government is right that the Framers of the Citizenship Clause sought to remove the stain of Dred Scott v. Sandford, 60 U.S. (19 How.) 393 (1857), which shamefully denied United States citizenship to "descendants of Africans who were imported into this country, and sold as slaves," even when the descendants were born here.  Id. at 403.  But the Framers chose to accomplish that just purpose in broad terms, as both the Supreme Court in United States v. Wong Kim Ark, 169 U.S. 649 (1898), and Congress in passing § 1401(a) have recognized.  The Government is therefore wrong to argue that the plaintiffs are not likely to succeed in showing that the children that the EO covers are citizens of this country at birth, just as the Government is wrong to argue that various limits on our remedial power independently require us to reverse the preliminary injunctions.[2]

_____

[1] For ease of exposition, we refer to the governmental defendants throughout as "the Government."

[2] We nonetheless conclude that, given the nature of the underlying claims, the preliminary injunctions may apply only to agency officials, rather than the agencies themselves.  See Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015) ("What our cases demonstrate is that, 'in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer.'" (alteration in original) (emphasis

The analysis that follows is necessarily lengthy, as we must address the parties' numerous arguments in each of the cases involved.  But the length of our analysis should not be mistaken for a sign that the fundamental question that these cases raise about the scope of birthright citizenship is a difficult one.  It is not, which may explain why it has been more than a century since a branch of our government has made as concerted an effort as the Executive Branch now makes to deny Americans their birthright.

## I.  Procedural History

On January 20, 2025, O. Doe (a pseudonym) and two immigrant-focused nonprofit organizations -- Brazilian Worker Center and La Colaborativa -- filed suit in the United States District Court for the District of Massachusetts to challenge the EO.  These plaintiffs -- collectively the Doe-Plaintiffs -- named as defendants the President, the U.S. Department of State (DOS), Marco Rubio in his capacity as Secretary of DOS, the U.S. Social Security Administration (SSA), and Michelle King in her capacity as Acting Commissioner of SSA.

---

added) (quoting Carroll v. Safford, 44 U.S. (3 How.) 441, 463 (1845))); cf. FDIC v. Meyer, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." (citing Loeffler v. Frank, 486 U.S. 549, 554 (1988))).  The preliminary injunctions are therefore vacated in that one limited respect.

The complaint alleges that the EO violates (1) the Citizenship Clause of the Fourteenth Amendment and (2) the equal protection component of the Fifth Amendment. It also alleges that the EO violates (1) § 1401(a) and (2) the Administrative Procedure Act (APA), 5 U.S.C. § 706. For relief, the complaint seeks a declaratory judgment that the EO is unlawful in these respects and a preliminary and permanent injunction barring the defendants from enforcing or "carrying out [the EO's] directive[s]."

A day later, on January 21, 2025, a group of states and others -- collectively, the State-Plaintiffs -- filed a suit of their own in the same District Court to challenge the EO. They named as defendants the President, Marco Rubio in his capacity as Secretary of DOS, Benjamine Huffman in his capacity as Acting Secretary of the U.S. Department of Homeland Security (DHS), Dorothy Fink in her capacity as Acting Secretary of the U.S. Department of Health and Human Services (HHS), and Michelle King in her capacity as Acting Commissioner of SSA. The State-Plaintiffs also sued DOS, DHS, HHS, SSA, and the "United States of America."

The State-Plaintiffs' complaint alleges that the EO violates the (1) Citizenship Clause of the Fourteenth Amendment and (2) Separation of Powers doctrine. It also alleges that the EO violates (1) § 1401(a) and (2) the APA. The complaint seeks a declaratory judgment that the EO is unlawful in these respects and

that "actions taken by Defendant agencies to implement or enforce the [EO] violate the [APA]."  It also seeks a preliminary and permanent injunction barring the Government from enforcing or implementing the EO.  Finally, the complaint requests that the District Court "[v]acate any actions taken by Defendant agencies to implement or enforce the [EO]."

The District Court granted both sets of plaintiffs' motions for preliminary injunctions on February 13, 2025.  It did so after concluding that the plaintiffs in both cases were "exceedingly likely" to succeed on their Citizenship Clause and § 1401(a) claims.

In the Doe-Plaintiffs' case, the preliminary injunction bars the federal agencies and officials that the plaintiffs named as defendants, but not the President, as well as all "other persons acting in concert with or [on] behalf of any named defendant in this action" from "implementing and enforcing" the EO "against plaintiff O. Doe, or against any member of La Colaborativa or the Brazilian Worker Center."  In the State-Plaintiffs' case, the District Court determined that it was necessary to issue a "universal" preliminary injunction to provide "complete relief" to the State-Plaintiffs.  That was so, the District Court determined, because some of the harms identified by the State-Plaintiffs -- including the administrative burdens that would flow from barring enforcement of the EO only in the

Plaintiff-States, given that people move across state
lines -- would likely arise unless the EO was barred from being
enforced nationwide.  This order enjoins substantially the same
defendants as the other order.

On February 19, 2025, the Government filed a notice of
appeal as to each of the preliminary injunctions.  That same day,
the Government also filed in the State-Plaintiffs' case a motion
in the District Court to stay the preliminary injunction pending
resolution of the appeal.  The District Court denied the motion on
February 26, 2025.

The following day, the Government filed a stay motion in
the State-Plaintiffs' case in this Court.  See New Jersey v. Trump,
131 F.4th 27 (1st Cir. 2025).  The motion argued that the
State-Plaintiffs lacked standing under Article III of the U.S.
Constitution, see id. at 35-37, and third-party standing to assert
the citizenship rights of others, see id. at 35, 38.  The motion
also argued that a universal injunction was not necessary to
provide complete relief to the State-Plaintiffs.  See id. at 42-43.

We denied the stay.  See id. at 33.  The Government then
moved in the Supreme Court for a partial stay pending appeal of
the preliminary injunction in the State-Plaintiffs' case, as well
as in two out-of-circuit cases in which district courts had issued
similar preliminary injunctions.  See Trump v. CASA, Inc., 606
U.S. 831, 837-38 (2025).

The Government argued that some of the plaintiffs in this group of cases -- including the State-Plaintiffs here -- lacked Article III and third-party standing. See id. at 838 n.2. It also argued that each of the district courts -- and thus the District Court here -- erred in issuing a "universal injunction." Id. at 841.

On June 27, 2025, the Supreme Court held that universal injunctions, insofar as they provide relief to non-parties, "likely exceed the equitable authority that Congress has granted to federal courts." Id. at 837. The Supreme Court explained, however, that "the equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties.'" Id. at 851 (quoting Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 507 (1928)). It further explained that "the complete-relief inquiry is more complicated" in the State-Plaintiffs' case "because the relevant injunction does not purport to directly benefit nonparties." Id. at 853. Indeed, the Supreme Court noted that in the State-Plaintiffs' case, the District Court had specifically "decided that a universal injunction was necessary to provide the States themselves with complete relief." Id.

After summarizing the competing arguments about whether a universal injunction was necessary to provide "complete relief" to the State-Plaintiffs and noting two alternative and narrower

preliminary injunctions that the Government proposed, the Supreme Court declined to take up the "arguments in the first instance." Id. at 854. The Court "le[ft] it to" the "lower courts" to "determine whether a narrower injunction is appropriate." Id. Ultimately, the Court granted the "Government's applications to partially stay the preliminary injunctions . . ., but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." Id. at 861.

Thereafter, in the State-Plaintiffs' case, the Government moved in our Court to be permitted to provide supplemental briefing as to CASA's effect on the pending appeal. Doe v. Trump, 142 F.4th 109 (1st Cir. 2025). We denied the motion. But, while retaining jurisdiction over the appeal, we "remanded to the District Court for the limited purposes" of "enabling the District Court to consider the bearing, if any, of [the Supreme Court's] guidance in CASA on the scope of the preliminary injunction," "to address any arguments that the parties may advance with respect to what grounds may now be asserted regarding the injunction's scope," and "to act accordingly." Id. at 112.

On July 25, 2025, the District Court determined that "no workable, narrower alternative to the injunction issued originally would provide complete relief to the" State-Plaintiffs. The

District Court therefore "decline[d] to modify [its preliminary] injunction."

On August 1, 2025, we heard oral argument in the appeal of the preliminary injunctions in the Doe-Plaintiffs' and State-Plaintiffs' cases.  We also heard oral argument, at that time, in the appeal of a similar preliminary injunction that had been issued by the United States District Court for the District of New Hampshire on February 11, 2025, in favor of three other immigrant-focused nonprofit organizations.  See N.H. Indon. Cmty. Support v. Trump, 765 F. Supp. 3d 102 (D.N.H. 2025).  That appeal was heard with the appeals in the Doe-Plaintiffs' and State-Plaintiffs' cases.[3]  We resolve the appeal in that case in a separate opinion that we also issue today.  See N.H. Indon. Cmty. Support v. Trump, No. 25-1346 (1st Cir. Oct. 3, 2025).

## II.  Standard of Review

To be granted a preliminary injunction, a plaintiff "must establish" that: (1) it is "likely to succeed on the merits";

---

[3] The District Court for the District of New Hampshire separately issued an order provisionally certifying a class of persons covered by the EO and entered a preliminary injunction barring enforcement of the EO against the class.  Barbara v. Trump, No. 25-cv-244, 2025 WL 1904338 (D.N.H. July 10, 2025).  No party has suggested that Barbara has any bearing on these appeals.  The Government filed a petition for a writ of certiorari before judgment in Barbara in the Supreme Court on September 26, 2025.  Pet. for Writ of Cert., Trump v. Barbara, No. 25-365 (U.S. Sept. 26, 2025).

(2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). We review a grant of a preliminary injunction for abuse of discretion. Ashcroft v. ACLU, 542 U.S. 656, 664 (2004). We review legal determinations de novo and findings of fact for clear error. Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 77-78 (1st Cir. 2025).

### III.  Standing

The Government does not question the District Court's ruling that, under Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320, 327 (2015), the plaintiffs have equitable causes of action to challenge the EO, its enforcement, and its implementation for violating § 1401(a) and the Citizenship Clause.  The Government contends, however, that under Article III of the Constitution, which provides that "the judicial Power of the United States" extends to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, the State-Plaintiffs lack standing to bring these claims. The Government contends that, for this reason alone, the State-Plaintiffs cannot satisfy the "likelihood of success" prong of the test for securing preliminary injunctive relief.  We are not persuaded.  In addition, we conclude that the other plaintiffs

also have shown that they likely have Article III standing. See Roe v. Healey, 78 F.4th 11, 21 n.8 (1st Cir. 2023) (noting federal courts' independent obligation to confirm Article III standing).

### A.  Legal Framework

To have Article III standing, the plaintiff bears the burden of showing that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  An organization with individual members may establish Article III standing by satisfying the three elements of such standing based on an "injury in fact" of its own. FDA v. All. for Hippocratic Med., 602 U.S. 367, 393-94 (2024).  But such an organization also may establish "associational standing" to sue in a "representational capacity." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343, 345 (1977); see Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll., 600 U.S. 181, 199 (2023).  To do so, under the test set forth in Hunt, the organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." 432 U.S. at 343.

Because these appeals concern preliminary rather than permanent injunctions, the plaintiffs need only make a clear showing that they are <u>likely</u> to succeed in establishing Article III standing. <u>See</u> <u>Murthy</u> v. <u>Missouri</u>, 603 U.S. 43, 58 (2024). We look at the allegations in the plaintiffs' complaints and the evidence from the preliminary injunction proceedings. <u>See</u> <u>Norris ex rel. A.M.</u> v. <u>Cape Elizabeth Sch. Dist.</u>, 969 F.3d 12, 14 (1st Cir. 2020); <u>Lujan</u> v. <u>Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992).

## B. The Doe-Plaintiffs' Article III Standing

As for O. Doe's Article III standing, the Government does not challenge the District Court's determination that she likely has it. Nor do we see how the Government could, given the allegations in O. Doe's complaint that she is "an expectant mother" who "is lawfully present in the country through Temporary Protected Status," the father of her child "is not a U.S. citizen or a [LPR]," and "the EO declares that [her child] will not be [a U.S.] citizen[] and instructs federal agencies like Defendants DOS and SSA to refuse to recognize [her child] as such, including by denying [the child a] passport[] and Social Security number[] and card[]." <u>See</u> <u>CASA</u>, 606 U.S. at 838 n.2; <u>see also</u> <u>Doe</u> v. <u>Israel</u>, 482 F.2d 156, 158 (1st Cir. 1973) ("[T]he necessarily short

- 17 -

duration of a pregnancy does not, in normal circumstances, create mootness when pregnancy ceases.").

We also agree with the District Court that the two organizations in the Doe-Plaintiffs' case likely have associational standing under <u>Hunt</u>. Each has shown that it has members who "would otherwise have standing to sue in their own right," <u>Hunt</u>, 432 U.S. at 343, by identifying individual members who are pregnant or expecting to become pregnant and whose children, under the EO, would be denied passports and social security numbers (SSNs) through the Enumeration at Birth (EAB) program.[4] <u>See</u> <u>All. for Hippocratic Med.</u>, 602 U.S. at 381 ("An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples."). Indeed, the Government does not argue otherwise, nor do we see how it could. <u>See</u> <u>CASA</u>, 606 U.S. at 838 n.2 ("The Government does not

---

[4] The EAB program enables parents of children born in the United States to apply for SSNs for their children based on their birth certificates, seemingly because "U.S. born children are generally considered to be U.S. citizens and as such, are eligible for SSNs [through the EAB program] without regard to the parents' immigration status." Soc. Sec. Admin., <u>State Processing Guidelines for Enumeration at Birth</u> 5 (2024), https://perma.cc/2JFA-9QLM; <u>see also</u> Soc. Sec. Admin., Pub. No. 05-10023, <u>Social Security Numbers for Children</u> (2024), https://perma.cc/WG9B-K5BD.

dispute -- nor could it -- that the individual plaintiffs have standing to sue.").[5]

In addition, the organizations' § 1401(a) and Citizenship Clause claims relate directly to the organizations' immigrant-focused purposes and work, and so "seek[] to protect" interests "germane" to the organizations' purposes.  Hunt, 432 U.S. at 343.  The claims also do not, in their nature, require individualized proof.  See id. at 344.

### C. State-Plaintiffs' Article III Standing

In ruling that the State-Plaintiffs likely have Article III standing, the District Court determined that the State-Plaintiffs had shown that the EO, through its enforcement and implementation, ensures that the children that it covers are denied eligibility for certain federal programs that the State-Plaintiffs administer through agreements with the federal government.  The District Court further determined that, because these are programs through which the State-Plaintiffs provide services to United States citizens for which the federal government pays them, the EO's enforcement and implementation would

---

[5] The Government does not dispute the premise of the plaintiffs' claims against the Secretary of DOS and the Commissioner of SSA that the laws governing eligibility to obtain a passport or an SSN through the EAB program do not permit persons to be denied such documents if, under § 1401(a) or the Citizenship Clause, those persons are United States citizens.

- 19 -

"directly" cause the State-Plaintiffs to lose federal funds that they would otherwise be entitled to receive. The programs at issue are the EAB program, Medicaid, Children's Health Insurance Program (CHIP), special needs education programs under the Individuals with Disabilities in Education Act (IDEA), and child welfare services funded by Title IV-E of the Social Security Act.

The District Court relied in its ruling, in part, on Biden v. Nebraska, 600 U.S. 477 (2023). There, a group of states challenged the Executive Branch's decision to discharge the federal student loan obligations of many borrowers. Id. at 487-90. One of those states, Missouri, premised its Article III standing on a contract that the Missouri Higher Education Loan Authority (MOHELA) -- a nonprofit government corporation of the state of Missouri -- had with the U.S. Department of Education (DOE) to service federal student loans. Id.

The Court explained that, under MOHELA's contract with DOE, MOHELA received from the federal government "an administrative fee for each of the five million [student loan] accounts it services," yielding it roughly $89 million in revenue in 2022. Id. at 489-90. The Court further explained that the Executive Branch's challenged action would result in the complete discharge of all loans for "roughly half of all federal borrowers," and that because MOHELA "could no longer service those closed accounts," MOHELA stood to lose around $44 million in

administrative fees from the federal government each year.  Id. at
490.  The Court then held that this "financial harm [was] an injury
in fact directly traceable to the [challenged Executive Branch
action]" and thus sufficed to give Missouri, given its relation to
MOHELA, standing under Article III.  Id. at 490-92, 494.[6]

        In its most sweeping challenge to the State-Plaintiffs'
Article III standing, the Government relies on a footnote in United
States v. Texas, 599 U.S. 670 (2023).  It argues that, in that
footnote, the Court established that "indirect effects on state
revenues or state spending" arising from a challenged federal
action -- there, the allegedly unlawful refusal by the Executive

---

[6] We do not address whether the State-Plaintiffs also likely
have Article III standing based on various additional
administrative costs that they would incur to, among other things,
determine eligibility for the federally funded programs, train
staff, and revise guidance.  As to the EAB program in particular,
the State-Plaintiffs contended below that they would "face
increased administrative burdens trying to secure SSNs for newborn
children through the EAB program," because "state facilities will
no longer be able to count on the fact of the child's birth at
their facility" as evidence that the child will qualify for an SSN
and so "will incur new costs to verify [the child's] parents'
immigration statuses."  We note that the District Court observed
that, although the State-Plaintiffs had not advanced the theory in
any of their submissions to the District Court at that time, they
"also probably have standing based on their sovereign interests."
The District Court explained that the Citizenship Clause "defines
which individuals become birthright citizens . . . of the state in
which they reside . . . . [and] [s]tates have general sovereign
interests in which persons are their citizens."  It then noted
that states "very likely also have sovereign interests in which
persons are U.S. citizens, as state laws commonly define civic
obligations such as jury service using eligibility criteria that
include U.S. citizenship."

Branch to enforce immigration laws against persons within the plaintiffs' states -- cannot suffice to secure Article III standing. (Citing id. at 680 n.3.) The Government goes on to contend that the State-Plaintiffs' alleged loss of federal funds is the kind of "indirect" pocketbook injury that Texas deemed insufficient to secure Article III standing. See id.

We do not see how Texas undermines the State-Plaintiffs' Article III standing. The State-Plaintiffs premise that standing on their loss of federal funds to which they would be entitled under various federal programs, not state funds that they would have to expend to cover the costs imposed on them by an allegedly unlawful failure to enforce federal law. See id.

The Government's related contention, based on Florida v. Mellon, 273 U.S. 12 (1927), is also unpersuasive. That precedent does not speak to whether a plaintiff's loss of federal funding to which it is otherwise entitled, resulting directly from a challenged federal action, suffices to secure Article III standing. See id. As the Government acknowledges, Mellon merely rejected a state's claim that it "had standing to challenge federal policy on the basis that [the federal policy] 'induc[ed] potential taxpayers to withdraw property' and thereby diminished the State's tax base, explaining that such harms are 'purely speculative, and, at most, only remote and indirect.'" (Quoting id. at 17-18.)

The Government separately argues that <u>Nebraska</u> does not apply because the "direct link between the challenged federal funding and the action[s] at issue [in that case] is distinct from the attenuated relationship here."  We are not convinced.

To the extent that the Government means to argue that the State-Plaintiffs' loss of EAB funds is a less "direct injury" than MOHELA's loss of administrative fees, we cannot see why that would be so.  In the preliminary injunction proceedings, the Government did not dispute -- and in fact expressly agreed -- that the EO would cause the State-Plaintiffs to lose out on fees under the EAB program precisely because the EO directs that SSNs not be issued under that program to children that the EO covers.[7]

As to the alleged loss of federal funds under Medicaid, CHIP, special needs education programs under IDEA, and child welfare services funded by Title IV-E of the Social Security Act,

---

[7] The State-Plaintiffs filed a notice of supplemental authority in this Court during the pendency of this appeal that included SSA's guidance on how it intended to implement the EO with respect to the EAB program.  The guidance states that, even after the EO was implemented, SSA would "[c]ontinue to receive the data files from the States as [it does] today and reimburse states for <u>records received</u>." (Emphasis added.)  It is not evident that this new guidance has any bearing on the preliminary injunction itself, as the Government has not sought to modify the preliminary injunction based on it.  But, in any event, SSA's guidance states that, upon receipt of an EAB application, SSA will conduct an inquiry into the citizenship or immigration status of the applicant's parents, thereby evidently making it futile to seek an SSN through the program for a child that the EO covers if the EO is enforced.  The Government does not explain why that would not be the case.

the Government argues as follows.  It does not dispute that the children that the EO describes would be eligible for those programs if they were recognized as United States citizens.  See 8 U.S.C. § 1611 (stating that non-qualified aliens as defined under § 1641 are "not eligible for any Federal public benefit"); 42 U.S.C. § 1396b(v)(1) (restricting Medicaid funding for "alien[s] who [are] not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law").  But it contends that, insofar as these children will no longer qualify for Medicaid and CHIP after the EO takes effect, the State-Plaintiffs will be relieved of their obligation to provide any Medicaid or CHIP services to these children.  It then goes on to argue that "the net effect of the federal action is not an injury when, for example, the reduced obligation on the States to provide care under Medicaid is larger than the reduction in federal reimbursement."[8]

      This argument appears to have no bite, however, as to the "early-intervention and special-education services to certain

---

[8] The Government does not dispute the premise of the State-Plaintiffs' claims that, insofar as the EO would bar a child whom the EO covers from receiving federally funded assistance under the programs at issue, then the EO would be unlawful if either § 1401(a) or the Citizenship Clause secures birthright citizenship to the children that the EO describes.  For, here too, the Government does not suggest that the laws governing eligibility for these programs permit persons to be denied assistance if they are United States citizens under that constitutional or federal statutory provision.

children, including infants and toddlers" under IDEA. 20 U.S.C. §§ 1400(d)(1)(A), (C)(2); 1412(a)(1)(C); 1433. The State-Plaintiffs maintain that they "must provide" those services regardless of a child's immigration status, and the State-Plaintiffs submitted declarations to that effect. Moreover, IDEA does not suggest otherwise on its face, see, e.g., 20 U.S.C. § 1433, and the Government develops no argument that the State-Plaintiffs are not obliged under IDEA to provide the services in question.

More fundamentally, the Government's response fails to grapple with the fact that, as in Nebraska, the challenged governmental action -- here, the EO's implementation and enforcement -- is alleged to result in the plaintiffs losing out on federal funds by dispensing with their need to carry out their agreement to provide a federally reimbursable service. See 600 U.S. at 490, 494. Indeed, in Singleton v. Wulff, the Court held that "there [was] no doubt" physicians who alleged that "they have performed and will continue to perform operations for which they would be reimbursed under the Medicaid program, were it not for the [challenged] limitation of reimbursable abortions to those that are 'medically indicated,'" had alleged "concrete injury from the operation of the challenged statute." 428 U.S. 106, 112-13 (1976). And nothing in Nebraska, 600 U.S. 477, or Singleton, 428 U.S. 106, indicates that, for there to be injury in fact, the lost

federal payment must have been for an amount that would have exceeded (or even equaled) the costs incurred by the plaintiff in providing the federally reimbursable service.

Of course, the alleged loss of federal funds must be fairly traceable to the EO. See Spokeo, 578 U.S. at 338. But, insofar as the Government now means to dispute whether the loss of federal funds is so traceable, we note that at the hearing on the motion for preliminary injunction in the State-Plaintiffs' case, the Government confirmed that it shared the State-Plaintiffs' view, which was that the Government did not "dispute that . . . federal funding will be lost."[9]

It should have come as no surprise to the Government, then, that the District Court explained, with respect to the

---

[9] The District Court asked the Government's counsel whether "what follows from the [EO] is that Doe's child is not a citizen under the [EO]." The Government's counsel answered, "Yes." The District Court then asked the Government's counsel to confirm its understanding that the State-Plaintiffs, in establishing their Article III standing, "point to . . . various monies they get based on people being citizens." The Government's counsel responded, "Yes." The District Court next asked whether it was true that the State-Plaintiffs would not get "the money they would [otherwise] get for [rendering services to a child covered by the EO] . . . if the executive order is in place." The Government's counsel again answered, "Yes." Finally, the District Court expressly attempted to confirm that the Government did not "dispute[]" the State-Plaintiffs' claim that -- as a result of the EO -- they would not receive certain federal reimbursements for services rendered to the children at issue. The Government's counsel so confirmed and also "conceded" as a "fact" that the State-Plaintiffs "will lose that money."

directness of the link between the EO and the loss of the federal funds, that

> [State-Plaintiffs] receive federal funding to cover portions of services like health insurance, special education, and foster care in amounts that depend on how many "eligible" children receive such services. Citizenship is one component of eligibility for purposes of these programs. Pursuant to the EO, fewer children will be recognized as citizens at birth. That means the number of persons receiving services who are "eligible" under the identified federal programs will fall -- and, as a direct result, the reimbursements and grants the [State-Plaintiffs] receive for these services will decrease.

At oral argument in our Court, the Government did assert that the EO "says nothing about who is or is not eligible for federal benefits," and, thus, that the State-Plaintiffs' claimed injuries are not "traceable to the EO itself." But the fact that the EO does not expressly mandate the result that the State-Plaintiffs allege is not inconsistent with the Government's concession below that the loss of federal funds would result from the EO's enforcement and implementation.

That concession also lines up with both the EO's "purpose" section -- that "the privilege of United States citizenship does not automatically extend to" the children in question -- and the EO's enforcement directive -- that "[t]he heads of all executive departments and agencies shall issue public guidance within 30 days of the [EO] regarding [the EO's]

implementation with respect to their operations and activities."
90 Fed. Reg. at 8449-50, §§ 1, 3(b).  That concession also aligns
with the State-Plaintiffs' allegations and declarations.

        For these reasons, we cannot conclude that the District
Court clearly erred in finding -- given the Government's concession
about how its own actions would unfold under the EO -- that the
claimed loss of federal funds likely will be a direct result of
the EO's enforcement and implementation as in Nebraska, 600 U.S.
at 490, 494, rather than an indirect one as in Texas, 599 U.S. at
680 n.3.  See Dep't of Com. v. New York, 588 U.S. 752, 767 (2019)
(applying clear error review to district court's findings
regarding the likely "result" of challenged government conduct and
that such conduct would "lead to many of [the plaintiffs'] asserted
injuries"); United States v. Gates, 709 F.3d 58, 63 (1st Cir. 2013)
("[A] party cannot concede an issue in the district court and
later, on appeal, attempt to repudiate that concession and
resurrect the issue."); Nebraska, 600 U.S. at 490 ("This financial
harm is an injury in fact directly traceable to the Secretary's
plan, as . . . the Government . . . concede[s].").  We therefore
conclude that the State-Plaintiffs are likely to succeed in showing
that they have Article III standing as to their claims.[10]

_____

        [10] Given the roles that DOS and DHS play in issuing
documents -- passports and citizenship cards, respectively -- that
can be proof of eligibility for programs implicated by the

## D. State-Plaintiffs and Third-Party Standing

The Government's remaining objection concerning "standing" is different. It relates to whether, even if the State-Plaintiffs have Article III standing to assert their own rights, they lack standing to "assert individual-rights claims of their residents" -- and thus to assert the rights under the Citizenship Clause and § 1401(a) of the children that the EO covers. The District Court quite reasonably understood the Government, in pressing this contention, to be arguing only that the State-Plaintiffs could not rely on a parens patriae theory to support their standing to assert the claims at issue. The Government's opposition to the motion for preliminary injunction invited precisely that understanding.

On appeal, the Government now appears to agree that the District Court correctly determined that the State-Plaintiffs are not directly relying on a parens patriae theory. After all, the State-Plaintiffs are claiming their own Article III injuries in asserting their standing to bring the claims at issue, not Article III injuries only to their residents.

_____

State-Plaintiffs' claims, see, e.g., 42 U.S.C. §§ 1396b(x)(3)(A), 1397ee(c)(9)(A), we see no reason to question the District Court's Article III-standing ruling as to the State-Plaintiffs' claims against the Secretary of DOS or the Secretary of DHS. We note, too, that the Government does not itself question the District Court's ruling as to the State-Plaintiffs' Article III standing with respect to those claims apart from its challenges to Article III standing that we have addressed.

Nonetheless, the Government advances the seemingly distinct contention -- not clearly advanced in any of the proceedings below -- that the State-Plaintiffs still lack "standing" because they are making a "'thinly veiled attempt to circumvent the limits on parens patriae standing,' [Haaland v.] Brackeen, 599 U.S. [255, 295 n.11 (2023)], by asserting derivative injuries from the alleged violations of individuals' rights." Ordinarily, of course, arguments may not be advanced for the first time on appeal. See Eldridge v. Gordon Bros. Grp., 863 F.3d 66, 85 (1st Cir. 2017). But even if we were to assume that the "circumvention" argument relates to our Article III jurisdiction (and so may not be waived) or was sufficiently raised below, it fails.

Neither Brackeen, 599 U.S. at 295 n.11, nor Murthy, 603 U.S. at 75-76, supports the argument. In each of those cases, the State-Plaintiffs had no Article III injury of their own. The Court therefore had no occasion in either case to address when, if ever, a state that has been injured in fact may be barred from asserting a claim on the ground that it is effectively asserting a parens patriae theory. The same is true of South Carolina v. Katzenbach, which addressed the assertion by a state of its rights under the Due Process Clause of the Fifth Amendment and the Bill of Attainder Clause of Article I, not the standing of a state to assert the

- 30 -

rights of third parties in seeking redress for its own injury in fact. <u>See</u> 383 U.S. 301, 323-24 (1966).

That leaves only the Government's contention that, independent of its concerns about the State-Plaintiffs circumventing limits on parens patriae standing, they are barred from bringing their claims by generally applicable prudential limits on third-party standing. The District Court, again understandably, did not perceive the Government to be making this argument in opposing the motion for preliminary injunction, given how the argument was framed at that time. Nor was it made in the Government's stay motion to the District Court in any clear way, given that the argument was framed in a way that tied it to limits on parens patriae standing. As best we can tell, it first appeared in a clearly recognizable form in the Government's motion to our Court to stay the preliminary injunction pending this appeal. For that reason, we are being asked to address this argument even though it was not presented or passed upon below.

On this basis alone, there is reason to reject the argument. <u>B & T Masonry Constr. Co.</u> v. <u>Pub. Serv. Mut. Ins. Co.</u>, 382 F.3d 36, 40-41 (1st Cir. 2004) ("[L]egal theories not raised squarely in the lower court cannot be broached for the first time on appeal." (quoting <u>Teamsters Union</u> v. <u>Superline Transp. Co.</u>, 953 F.2d 17, 21 (1st Cir. 1992))). True, the argument concerns "standing." But it concerns a prudential form of it that does not

implicate the three elements of Article III standing and so is waivable.  See June Med. Servs. L.L.C. v. Russo, 591 U.S. 299, 316–17 (2020) (plurality opinion); id. at 354 n.4 (Roberts, C.J., concurring in the judgment) (agreeing "[f]or the reasons the plurality explains" that the plaintiffs "have standing to assert the constitutional rights of their patients"); Craig v. Boren, 429 U.S. 190, 193 (1976); cf. Mata v. Lynch, 576 U.S. 143, 150 (2015) ("[W]hen a federal court has jurisdiction, it also has a 'virtually unflagging obligation . . . to exercise' that authority." (second alteration in original) (quoting Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976))).

        In any event, we also must reject the argument on the independent ground that we see no basis for crediting it on the record as it exists at this stage of the litigation.  As the State-Plaintiffs point out, the Citizenship Clause determines more than whether a person is a citizen of the United States at the time of their birth.  It also determines whether that person is a citizen of the state in which they reside.  U.S. Const. amend. XIV, § 1.  Thus, unlike all the cases that the Government relies on in pressing this third-party standing argument, this is hardly a case in which the plaintiff is seeking to litigate a dispute over a constitutional provision that concerns only the interests of third parties.

- 32 -

In addition, the State-Plaintiffs allege that the EO operates directly against them by preventing them from demonstrating that the children covered by the EO are eligible for the federal programs at issue.  The State-Plaintiffs therefore contend that, unlike the case on which the Government primarily relies, Kowalski v. Tesmer, this is a case in which "enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights."  543 U.S. 125, 131 (2004) (quoting Warth v. Seldin, 422 U.S. 490, 510 (1975)).

The Government disputes that point.  But it fails to meaningfully dispute that the EO directs Executive Branch officials not to deem the children that the EO covers as United States citizens at birth.  In fact, this effect of the EO is the premise of the Government's concession in the preliminary injunction proceedings that the State-Plaintiffs would lose federal funding if the EO went into effect.

Thus, because those federal programs require the State-Plaintiffs to verify the eligibility of those that they serve under those programs, see, e.g., 42 U.S.C. § 1396a(a)(5), the EO does directly operate against the State-Plaintiffs by precluding the State-Plaintiffs from verifying the children's program eligibility based on their being citizens of this country because they were born here.  In so doing, the EO, through its enforcement

and implementation, prevents the State-Plaintiffs from extending federally reimbursable services to children covered by the EO who would otherwise be entitled to them. See Dep't of Lab. v. Triplett, 494 U.S. 715, 720 (1990) (holding that third-party standing exists when "enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant . . . to which relationship the third party has a legal entitlement").

By contrast, in Kowalski, the challenged governmental action would not similarly have prevented the litigant from entering into a relationship with a third party "to which relationship the third party has a legal entitlement," Triplett, 494 U.S. at 720. In that case, there was no guarantee that the litigant (an attorney) would have been appointed to represent the rights-bearing third parties (unidentified indigent defendants) even if the challenged governmental measure were struck down. See Kowalski, 543 U.S. at 127-28, 131.

The Government separately argues that the "enforcement against the litigant" basis for asserting third-party standing has no application here because the EO imposes no "sanctions" on the State-Plaintiffs. But a challenged regulation does not need to carry the threat of punishment to sufficiently influence a litigant's behavior to the detriment of a third party's rights,

- 34 -

such that the litigant may assert those rights in seeking redress for its own injury in fact.  See <u>Triplett</u>, 494 U.S. at 720.

In sum, the limitation on third-party standing "assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action." <u>Kowalski</u>, 543 U.S. at 129.  At least as the record reveals thus far, this is not a case in which the rationale for the limitation on third-party standing  --  "to  minimize  unwarranted  intervention  into controversies where the applicable constitutional questions are ill-defined and speculative," <u>Craig</u>, 429 U.S. at 193 -- would apply, <u>see</u> <u>Kozera</u> v. <u>Spirito</u>, 723 F.2d 1003, 1006 (1st Cir. 1983).

### IV.  § 1401(a), the Citizenship Clause, and <u>**Wong Kim Ark**</u>

We  are  now,  at  last,  positioned  to  take  up  the Government's  challenges  to  the  merits  of  the  plaintiffs' allegations that the EO's enforcement and implementation will unlawfully deny birthright citizenship to the children that the EO describes.  Here, the plaintiffs invoke the guarantee of birthright citizenship secured by 8 U.S.C. § 1401(a) and by the Citizenship Clause of the Fourteenth Amendment.

The plaintiffs contend, of course, that they are likely to succeed on the merits of their allegations based on these two provisions.  They acknowledge, though, that neither § 1401(a) nor the Citizenship Clause guarantees birthright citizenship to <u>all</u>

persons born here.  They recognize that these provisions guarantee such citizenship only to those born "in the United States" while they are "subject to the jurisdiction thereof."  (Quoting U.S. Const. amend. XIV, § 1; § 1401(a).)

Thus, because all the children that the EO covers are "born . . . in the United States,"[11] the dispute over the merits

---

[11] The Government appears to suggest otherwise based on <u>Kaplan</u> v. <u>Tod</u>, 267 U.S. 228, 230 (1925); <u>United States</u> v. <u>Ju Toy</u>, 198 U.S. 253, 263 (1905); <u>Nishimura Ekiu</u> v. <u>United States</u>, 142 U.S. 651, 661 (1892); and a law review note, Note, <u>The Nationality Act of 1940</u>, 54 Harv. L. Rev. 860, 861 n.8 (1941).  But the Government waived this argument by making it for the first time in its reply brief.  <u>See</u> <u>United States</u> v. <u>Coviello</u>, 225 F.3d 54, 70 n.10 (1st Cir. 2000).  In any event, given the specific facts of those cases, they do not establish that a person born within the territory of the United States is not born "in the United States" within the meaning of the Citizenship Clause just because, at the time of the person's birth, the father was not an LPR or U.S. citizen and the mother was here unlawfully or temporarily.  <u>See</u> <u>Kaplan</u>, 267 U.S. at 229 (noting that "[t]he appellant was born in Russia," was brought to the U.S., "was ordered to be excluded" and then "was kept at Ellis Island . . . . until she could be deported safely"); <u>Ju Toy</u>, 198 U.S. at 258, 260 ("[T]he appellee [was] a person of Chinese descent being held for return to China by the steamship company which recently brought him therefrom to a port of the United States, and who . . . was . . . denied admission . . . ."); <u>Nishimura Ekiu</u>, 142 U.S. at 652 ("[A] female subject of the emperor of Japan [was] restrained of her liberty and detained at San Francisco upon the ground that she should not be permitted to land in the United States.").  These cases also do not interpret the Citizenship Clause or § 1401(a).  <u>See</u> <u>Kaplan</u>, 267 U.S. at 230-31 (affirming a warrant of deportation under various immigration laws that have since been amended, including the "Act of March 26, 1910"); <u>Ju Toy</u>, 198 U.S. at 261-63 (upholding a dismissal of a habeas petition after interpreting Congress's authority over immigration affairs, an 1894 Act, and the Fifth Amendment); <u>Nishimura Ekiu</u>, 142 U.S. at 660-63 (affirming an appellate court order after interpreting "[t]he immigration act of August 3, 1882," "the act of March 3, 1891," and the Appointments Clause).

of the plaintiffs' claims depends, at bottom, on whether the children are "subject to the jurisdiction" of the United States at the time of their birth. We conclude that this dispute clearly must be resolved in favor of the plaintiffs and, therefore, that they clearly are likely to succeed on the merits of their § 1401(a) and Citizenship Clause claims. To explain why, though, it first helps to sketch the parties' basic positions as to the meaning of the key phrase -- "subject to the jurisdiction thereof."

### A. The Plaintiffs' View

The plaintiffs argue that both in 1952, when § 1401(a) was enacted, and in 1868, when the Citizenship Clause was ratified, the phrase "subject to the jurisdiction thereof" was understood to codify Founding-era understandings of who becomes a United States citizen upon being born here. Those understandings, according to the plaintiffs, were drawn from the "jus soli" principle of the English common law. In contrast to the "jus sanguinis" principle that prevailed in some other countries, the jus soli principle makes birth on the country's soil -- rather than birth to a parent with certain ties to that country -- the determining factor of nationality. (Quoting Wong Kim Ark, 169 U.S. at 667.)

The plaintiffs acknowledge that this ancient jus soli principle was not absolute. For centuries, English common law deemed those born on English soil to be English subjects at birth

only if, at the time of their birth, they were "within the allegiance . . . of the king." (Quoting id. at 655.) But, the plaintiffs assert, it was thought that such allegiance "attached automatically to anyone . . . 'within the kingdom'" so long as the person was "within the jurisdiction[] of the king." (Quoting id.)

The plaintiffs emphasize that the circumstances in which a person born in English territory was not subject to the Crown's "jurisdiction" -- or, as the plaintiffs describe it, "complete authority" -- were few and far between. Those circumstances existed only when, notwithstanding the sovereign's otherwise complete and "exclusive sovereign authority" over those within its territory, a person had some kind of immunity or exemption from that authority. And that limitation on the Crown's authority was understood to exist, as to a person born on English soil, at the time of that person's birth, only as to the child born to the family of a foreign ambassador, minister, or consul; to an alien enemy hostilely occupying English territory; or on a foreign public ship. In all other cases, the plaintiffs contend, "allegiance" was "conferred automatically by birth within the sovereign's territory," such that a person born in England was an English subject by that fact alone.

The plaintiffs do acknowledge that one additional limitation on the jus soli principle had been recognized in the United States by 1868. This limitation followed from the

quasi-sovereign status of Native American tribes and the accompanying partial waiver of complete authority over tribal members that the United States had made in recognizing their exemption from some generally applicable laws. (Citing Elk v. Wilkins, 112 U.S. 94, 99-100 (1884) (describing Indian tribes as "exempt from taxation by treaty or statute" and noting the default rule that "[g]eneral acts of congress did not apply to Indians").) Thus, the plaintiffs do not dispute that it was understood by 1868 that tribal members were not themselves "subject to the jurisdiction" of the United States any more than were those persons in the classes long thought under English common law to fall outside the jus soli principle.

Based on this historical account of the phrase "subject to the jurisdiction thereof," the plaintiffs contend that they are likely to succeed on the merits of their § 1401(a) and Citizenship Clause claims. After all, the EO does not cover only children who are born members of Native American tribes or who are in any of the circumstances historically excepted from the jus soli principle. And, the plaintiffs contend, the words of the Clause, including the critical phrase "subject to the jurisdiction thereof," easily bear the construction that the plaintiffs contend they were understood to have in 1868.

The plaintiffs add that, if there were any reason to doubt their historically rooted account of that critical phrase's

meaning, the Supreme Court's 1898 decision in Wong Kim Ark makes
it clear that they are likely to succeed in showing that the
children that the EO covers are "subject to the jurisdiction" of
the United States at birth.  They contend that Wong Kim Ark
interpreted the phrase "subject to the jurisdiction thereof" in
the Citizenship Clause to track English common law, save for the
additional limitation pertaining to Native Americans described
above.  They thus maintain that, as a matter of binding Supreme
Court precedent, the EO violates the Citizenship Clause.

All that said, the plaintiffs separately contend that,
no matter how we might now read Wong Kim Ark to have construed the
Citizenship Clause or how we might understand the history up to
1868, we must construe § 1401(a) as it was understood when it was
passed in 1952.  (Quoting United States v. Kozminski, 487 U.S.
931, 944-45 (1988) ("We draw no conclusions from this historical
survey about the potential scope of the Thirteenth Amendment," but
instead look to "the understanding of the Thirteenth Amendment
that prevailed at the time of [the relevant statute's]
enactment.").)  The plaintiffs argue that the relevant materials
demonstrate that, as of 1952, § 1401(a)'s words were understood to
guarantee birthright citizenship in the broad manner that the
plaintiffs contend that those words guarantee it.
Section 1401(a), the plaintiffs argue, therefore guarantees
birthright citizenship to the children that the EO describes even

if the Government is right about what the Supreme Court decided (or did not decide) in Wong Kim Ark.

### B. The Government's View

The Government responds that neither the Citizenship Clause nor § 1401(a) imported the English common law jus soli principle into American law. The plaintiffs' contrary view, the Government argues, wrongly equates "jurisdiction" with the mere "power to regulate." The Government therefore contends that the plaintiffs' view impermissibly renders the Citizenship Clause's inclusion of the phrase referencing "jurisdiction" redundant, given that the United States's "regulatory power extends to all persons born on U.S. soil."

In the Government's view, as of 1868, a person was understood to be "subject to the jurisdiction" of the United States only if the person owed the United States "primary allegiance." It explains that this "primary allegiance" view is the same as that adopted by the Supreme Court in Elk. The Government relies on the Court there having stated that "subject to the jurisdiction thereof" means "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." (Quoting Elk, 112 U.S. at 102.) And, the Government argues, a person was understood to be "'completely subject' to the

[United States's] 'political jurisdiction'" only if they were a U.S. citizen or if they were domiciled in the United States.

Thus, in the Government's view, a child born in the United States to a noncitizen mother who is here only temporarily or unlawfully is not "subject to the jurisdiction" of the United States when their father is a noncitizen who is not himself an LPR. That is because, the Government argues, one must be physically present here both lawfully and while having "an intent to remain indefinitely" to be domiciled in the United States.

The Government also asserts that Wong Kim Ark comports with this understanding. As the Government sees it, the Supreme Court held there only that a child born to a noncitizen parent domiciled in this country is, when born, "subject to the jurisdiction" of the United States. In fact, the Government at times even suggests that Wong Kim Ark must be read to hold that children of noncitizen parents are citizens of this country only if their mother is so domiciled. So, on this view, Wong Kim Ark does not reject -- and may even endorse -- the domicile-based limitation on the scope of the birthright citizenship guarantee.

Even so, the Government recognizes that we cannot interpret "subject to the jurisdiction thereof" to contradict the Supreme Court's own interpretation of those words. The Government thus does not dispute that, if Wong Kim Ark construed those words as the plaintiffs argue that we must construe them, then its

- 42 -

challenge to the merits of the plaintiffs' Citizenship Clause claims necessarily fails.  Nor does the Government appear to dispute that, in such case, its merits-based challenge to the plaintiffs' § 1401(a) claims also fails.

### C.  Analysis

Against this backdrop, we first zero in on the plaintiffs' contention that their § 1401(a) claims are likely to succeed on the merits even if the Government's view of what Wong Kim Ark decided were correct.  Because the plaintiffs are clearly right on this score, we agree that they are likely to succeed for this reason alone on the merits of their § 1401(a) claims.  But, as we also will explain, we conclude that Wong Kim Ark construed the Citizenship Clause just as the plaintiffs contend that it did. And so, in the end, we conclude that the plaintiffs are likely to succeed on the merits of their claims three times over -- first, in showing that the children that the EO describes are entitled to birthright citizenship under § 1401(a) even if Wong Kim Ark must be read as the Government urges us to read it; second, in showing that those children are entitled to birthright citizenship under that federal statutory provision because Wong Kim Ark may not be so read; and third, in showing that, for the very same reason, those children are entitled to birthright citizenship under the Citizenship Clause itself.

## 1.   § 1401(a)

Section 1401(a) was enacted as part of the Immigration and Nationality Act (INA) in 1952.   It provides, in relevant part: "a person born in the United States, and subject to the jurisdiction thereof" is a citizen of this country.   8 U.S.C. § 1401(a).

As a general matter, we treat a statute's words, unless otherwise defined, "as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute."   Wis. Cent. Ltd. v. United States, 585 U.S. 274, 284 (2018) (alteration in original) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)).   There is a question, though, about whether we should follow that approach in interpreting § 1401(a).

In referring to "person[s] born in the United States, and subject to the jurisdiction thereof," § 1401(a) borrows from the Citizenship Clause of the Fourteenth Amendment.   And, in general, "[w]here Congress employs a term of art 'obviously transplanted from another legal source,' it 'brings the old soil with it.'"   George v. McDonough, 596 U.S. 740, 746 (2022) (citation modified) (quoting Taggart v. Lorenzen, 587 U.S. 554, 560 (2019)).

Thus, we can see how the old-soil principle might be thought to suggest that what matters in construing § 1401(a) is what the phrase "subject to the jurisdiction thereof" was understood to mean at the time the Citizenship Clause became law

in 1868.  See id. at 753 ("The point of the old-soil principle is
that 'when Congress employs a term of art,' that usage itself
suffices to 'adop[t] the cluster of ideas that were attached to
each borrowed word' in the absence of indication to the contrary."
(alteration in original) (quoting FAA v. Cooper, 566 U.S. 284, 292
(2012))).    The old-soil principle, however, is a tool for
interpreting statutes, not abstractions.   So, even under that
principle, "[t]he real question is not what might be" the meaning
of the phrase "in the abstract, but what the prevailing
understanding" of this phrase was when "Congress . . . codif[ied]
it."    Id. at 741 (emphasis added); see also Sekhar v. United
States, 570 U.S. 729, 735 (2013) (looking to the understanding
"[a]t the time of the borrowing").

        Consistent with this understanding, the Supreme Court in
United States v. Kozminski followed this time-of-enactment
approach in interpreting unusual words in another statute that
borrowed them directly from an amendment to the U.S. Constitution.
See 487 U.S. at 945 ("In the absence of any contrary indications,
[it] . . . give[s] effect to congressional intent by construing
'involuntary servitude' in a way consistent with the understanding
of the Thirteenth Amendment that prevailed at the time of [the
statute's] enactment." (emphasis added)); cf. Dir., Off. of
Workers' Comp. Programs, Dep't of Lab. v. Greenwich Collieries,
512 U.S. 267, 272, 275 (1994) ("We interpret Congress'[s] use of

the term . . . in light of th[e] history, and presume Congress intended the phrase to have the meaning generally accepted in the legal community at the time of enactment."). At oral argument, the Government -- seemingly for the first time -- tried to distinguish Kozminski on the ground that the federal statute there was implementing legislation, under the Thirteenth Amendment, that imposed criminal penalties. We are not persuaded.

Even if this argument for distinguishing Kozminski is preserved, cf. Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015), Kozminski did not rely for its time-of-enactment focus on those features of the statute, 487 U.S. at 945-48. Moreover, § 1401(a) itself seeks to implement a constitutional provision in guaranteeing at least the constitutional minimum that the Citizenship Clause secures. And, although § 1401(a) does not define a crime, it defines who is protected from, among other things, being removed from this country. Cf. Sessions v. Dimaya, 584 U.S. 148, 156-57 (2018) (noting that the "most exacting vagueness standard" typically reserved for criminal cases applies to removal cases given the "grave" and "drastic" nature of deportation (quoting Jordan v. De George, 341 U.S. 223, 231 (1951))). Finally, the statutory scheme reflects an intent to extend citizenship beyond the constitutional floor. See, e.g., 8 U.S.C. § 1401(b) (extending citizenship to "person[s] born in the United States to a member of an Indian,

Eskimo, Aleutian, or other aboriginal tribe"). We therefore see no reason to conclude that Congress meant to hold § 1401(a) hostage to future interpretations of the Citizenship Clause that would narrow its scope from the scope that it was understood to have in 1952.

What matters in construing § 1401(a), then, is what the unusual phrase "subject to the jurisdiction thereof" was understood to mean when § 1401(a) became law in 1952. That said, there is every indication that the phrase was understood to have the same meaning at that time that it had when it appeared twelve years before in the Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137, 1138 (1940). We therefore begin by reviewing the understanding of the phrase that prevailed in 1940 before then considering the import of Congress's recodification of the phrase in enacting § 1401(a) as part of the INA in 1952. See Kozminski, 487 U.S. at 945-46; id. at 948 (using "legislative history" to help determine the prevailing understanding of "the scope of [a] constitutional provision at the time [a federal statute] was enacted" given that "Congress chose to use . . . language" from that constitutional provision in the statute); cf. Greenwich Collieries, 512 U.S. at 276 (determining that "Congress indicated that it shared [a] settled understanding" of a term of art in the APA).

### a.   The 1940 Precursor to § 1401(a)

The Nationality Act of 1940 was the product of years of work by an interagency group that President Franklin Roosevelt first convened in 1933 to "review the nationality laws of the United States," "recommend revisions" to those laws, and "codify those laws [and their recommendations] into one comprehensive nationality law for submission to the Congress."  Exec. Order No. 6115, "Revision and Codification of the Nationality Laws of the United States" (Apr. 25, 1933).  The committee was comprised of thirteen representatives from DOS, the U.S. Department of Labor, and the U.S. Department of Justice (DOJ), who were appointed by their respective agency heads at the direction of the President. See To Revise and Codify the Nationality Laws of the United Sates into a Comprehensive Nationality Code: Hearings on H.R. 6127 Superseded by H.R. 9980 Before the H. Comm. on Immig. & Naturalization, 76th Cong. 407 (Comm. Print. 1940) [hereinafter Hearings].

In 1938, President Roosevelt submitted the committee's draft code and comments to Congress, urging it to give "attentive consideration" to this matter of "great importance."  Id. at 406. In its explanatory comments to the draft provision that -- word for word -- became the corresponding provision of the Nationality Act of 1940, the committee described its thinking.

The committee explained that the proposed legislation, in providing that "[a] person born in the United States and subject to the jurisdiction thereof" "shall be . . . [a] citizen of the United States at birth," was merely expressing "a statement of the common-law rule, which has been in effect in the United States from the beginning of its existence as a sovereign state" and which itself "accords with the [Citizenship Clause of] the [F]ourteenth [A]mendment." Id. at 418. "The meaning of" the phrase "subject to the jurisdiction thereof" in that Clause, the committee further explained, "was discussed by Mr. Justice Gray[, the author of the Court's opinion,] in United States v. Wong Kim Ark." Id. And "[a]ccording to . . . Wong Kim Ark," the committee noted, "the words in the [F]ourteenth [A]mendment to the Constitution, 'and subject to the jurisdiction thereof,' were meant to except" three exclusive groups: the "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes." Id. at 429 (emphasis added) (quoting Wong Kim Ark, 169 U.S. at 693).

The committee recognized that Wong Kim Ark "related to a person born to parents who were domiciled in the United States." Id. at 418. It made clear, however, that "according to the reasoning of the [C]ourt . . . the same rule is also applicable to

a child born in the United States of parents residing therein
temporarily." Id. (emphasis added). The committee further
explained that the Court's reasoning in Wong Kim Ark "was in
agreement" with the earlier "decision of the Court of Chancery of
New York," Lynch v. Clarke, 1 Sand. Ch. 583 (N.Y. Ch. Ct. 1844),
that the domicile of a U.S.-born child's parents was simply
irrelevant. "In other words," the committee stated, "it is the
fact of birth within the territory and jurisdiction, and not the
domicile of the parents, which determines the nationality of the
child." Hearings, at 418 (emphasis added).

    The committee's views about the scope of birthright
citizenship under the common law and Wong Kim Ark did not appear
out of the blue. For over forty years before, DOS had issued
regulations interpreting the Citizenship Clause on the
understanding that it was "[t]he circumstance of birth within the
United States [that] makes one a citizen thereof, even if his
parents were at the time aliens, provided they were not, by reason
of diplomatic character or otherwise, exempted from the
jurisdiction of its laws." See U.S. Dep't of State, Regulations
Prescribed for the Use of the Consular Service of the United
States, ¶ 137 (1896); 22 C.F.R. § 79.137 (1938); cf. id. § 79.157
(requiring "[n]ative citizens who apply for passports [to] submit
with their applications birth or baptismal certificates or
affidavits . . . as to the place and date of their births" -- not

- 50 -

information regarding their parent's domicile or immigration status). Legal analyses by DOS and DOJ were to the same effect.[12]

There is scant evidence that in considering the committee's proposed legislation members of Congress had a different view than the committee. <u>See, e.g.,</u> <u>Hearings</u>, at 49 (statement of Rep. Poage) (responding to testimony that "[i]n the United States, insofar as the question of citizenship is concerned, the doctrine of <u>jus soli</u> applies" by noting that "the Constitution

---

[12] <u>See</u> <u>Memorandum of the Office of the Solicitor for the Department of State</u> (Feb. 6, 1930), <u>in</u> 3 Green Haywood Hackworth, <u>Digest of International Law</u> 10 (1942) (concluding that a child "born in the United States" was "'subject to the jurisdiction thereof[,]'[] within the meaning of the Fourteenth Amendment" based on <u>Wong Kim Ark</u>, because it "d[id] not appear that the mother . . . belonged to any one of the classes of aliens referred to by [the Court] as enjoying immunity from the jurisdiction of the United States," and because "there seem[ed] to be no question but that [the mother] would have been subject to prosecution and punishment under the laws of this country" if "she had committed a murder or any other criminal offense" while present here); <u>Memorandum of the Office of the Legal Adviser of the Department of State</u> (July 17, 1933), <u>in</u> Hackworth, <u>supra</u>, at 13 (explaining "[w]ith reference to the question of the meaning of the phrase 'subject to the jurisdiction of the United States,' the court in the <u>Wong Kim Ark</u> case . . . stated that it meant 'subject to the laws of the United States'"); Letter from the Attorney General, H.R. Doc. No. 77-47, at 82 (1st Sess. 1941) (explaining that the children of an "illegally resident alien" were "native-born citizens of the United States" by virtue of their birth here); <u>see also, e.g.,</u> <u>id.</u> at 24-25 (referring to the child "born to" parents who "entered the United States unlawfully" and "were not in possession of immigration visas" as a "citizen minor child"); Facts in Cases of Certain Alien Deportations: Letter from the Attorney General, H.R. Doc. No. 78-92, at 18-19 (1st Sess. 1943) (referring to a "child born in this country" of parents "illegally living in the United States" as a "citizen minor child"); <u>id.</u> at 51-52 (child of stowaways is a "minor citizen child").

makes that apply").  In fact, there is every indication that the phrase "subject to the jurisdiction thereof" in the Nationality Act was understood at the time of its 1940 enactment just as the committee had understood that phrase.  See George, 596 U.S. at 746 (explaining that when Congress "use[s] an unusual term that ha[s] a long regulatory history in [the same] context," and "enact[s] no new 'definition' or other provision indicating any departure from the 'same meaning'" employed by the agency, the "prior agency practice" bears on the meaning of that term).

Consistent with this assessment, a private bill that Congress passed just months before the Nationality Act of 1940 became law reflects the same understanding.  It "directed" the Secretary of Labor "to cancel the outstanding orders and warrants of deportation," 54 Stat. 1267 (1940), of Canadian citizens by naturalization and their two Canadian-born daughters, H.R. Rep. 76-773 at 1-2 (1939).

The family had come to New York for a wedding and never left or sought immigration visas to remain.  See id.  Notably, a House Report recommending passage referred to the daughter that the parents had while in the United States as an "American citizen" -- notwithstanding the report's explicit recognition that at the time of her birth the parents were unlawfully present in the United States.  Id. at 1-2.  And the bill itself makes no mention of that daughter, who, if a United States citizen in her

own right, would not have needed relief as the other family members did.

### b.  The Recodification in 1952

There remains to consider whether the phrase "subject to the jurisdiction thereof" was understood the same way when Congress, using those very words, recodified the Nationality Act of 1940 in the Immigration and Nationality Act of 1952.  We see no reason to conclude otherwise.

All indications are that the aim of the recodification was to "carr[y] forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth." Revision of Immigration and Nationality Laws, S. Rep. No. 1137, 82d Cong. 2d 38 (1952); Revising the Laws Relating to Immigration, Naturalization, and Nationality, H.R. Rep. No. 1365, 82d Cong. 2d 76 (1952) (same).  For example, in a House Report, the Committee of the Judiciary described Wong Kim Ark as determining "whether . . . persons born in the United States of alien parents are citizens."  Id. at 25.  The report continued by noting that the Supreme Court held the Fourteenth Amendment's language to be "but declaratory of the common-law principle . . . that all persons, regardless of the nationality of their parents born within the territorial limits of a State are ipso facto citizens of that State."  Id.; see also Revision of Immigration and Nationality

<u>Laws</u>, S. Rep. No. 1137, 82d Cong. 2d 38 (1952) ("The <u>only</u>
exceptions are those persons born in the United States to alien
diplomats." (emphasis added)).  Thus, we see no reason to conclude
that the same broad understanding of birthright citizenship that
was prevailing in 1940 no longer was prevailing in 1952.

### c.  The Government's Response

The Government does assert that "at most," the meaning
of the Citizenship Clause in 1940 and 1952 was "contested."  But
it offers no meaningful support for that contention.

The 1912 treatise that the Government relies on to
support its position in fact appears to support the plaintiffs'
contrary one.  <u>See</u> Clement L. Bouvé, <u>A Treatise on the Laws
Governing the Exclusion and Expulsion of Aliens in the United
States</u> 427 (1912) [hereinafter Bouvé, <u>A Treatise on the Laws
Governing Aliens</u>] ("[T]he child born of alien parents who, though
under the immigration law they have no right to do so and are
subject at any time to deportation thereunder, are nevertheless
residing in the United States and owe temporary allegiance thereto,
is necessarily born in allegiance to, and, therefore, is a citizen
of this country.").  The 1953 treatise on which the Government
also relies simply concludes that the "children
of . . . transients or visitors" count among the "exceptions" to
birthright citizenship without offering any support for the

assertion.    Sidney Kansas,  Immigration  and  Nationality  Act

Annotated  188 (4th ed. 1953).   That one treatise, thus, cannot

suffice to show -- given all the competing evidence of prevailing

views -- that Congress was not acting on a settled and contrary

understanding.

The  Government  does  direct  our  attention  to  the  1907

regulations implementing the Chinese Exclusion Act.  They exempted

from exclusion persons "born in the United States, of parents who

at the time of his birth have a permanent domicile and residence

in the United States."  Regulations Governing the Admission of

Chinese  r.  2  (Feb. 26, 1907),  in  Bureau  of  Immigration  &

Naturalization, Dep't of Com. & Lab., Doc. No. 54, Treaty, Laws,

and  Regulations  Governing  the  Admission  of  Chinese  33,  33

(July 1907).

These  regulations  predate,  however,  the  decades  during

which, as we noted above, DOS explicitly relied on the Fourteenth

Amendment to give effect to the jus soli principle.  They predate,

too, the report from President Roosevelt's committee.  Given the

clear evidence of that different understanding directly precursing

the Act's passage, these regulations do little more than show what

an agency may have thought decades before.

The  Government  also  attempts  to  show  the  waters  were

muddy in 1952 by highlighting a "Brief on the Law of Citizenship"

that was included as an appendix to a 1910 report from Assistant

Attorney General William Wallace Brown and which stated that Wong
Kim Ark, "when limited to its own facts and the law pronounced
thereon, . . . goes no further than to determine that the child
born to parents who are foreigners[,] but domiciled in the United
States and there engaged in business, is a citizen of the United
States." E.S. Huston, Brief on the Law of Citizenship, in Spanish
Treaty Claims Comm'n, U.S. Dep't of Just., Final Report of William
Wallace Brown, Assistant Attorney-General 121 (1910). That report
also precedes, however, the decades in which the plaintiffs' view
of the scope of the birthright citizenship guarantee was widely
shared.[13]

### d.  Conclusion

In short, the materials before us make clear that
Congress, when enacting § 1401(a), was recognizing the broad scope
of birthright citizenship that the plaintiffs identify. Thus, it

_____

[13] In their reply brief, the appellants point to additional
sources. But, even if we were to consider these late entries, cf.
United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008)
(stating that arguments raised for the first time in a reply brief
are deemed waived), we note that one source predates even Wong Kim
Ark, while the rest predate -- by decades -- the evidence as to
what was understood in the run-up to the passage of the Nationality
Act of 1940. Finally, for obvious reasons, we do not find
persuasive the appellants' reference to failed legislative efforts
in the wake of the Fourteenth Amendment. Rapanos v. United States,
547 U.S. 715, 749 (2006) ("Failed legislative proposals are a
particularly dangerous ground on which to rest an interpretation
of a prior statute." (quoting Solid Waste Agency of N. Cook Cnty.
v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 160 (2001))).

is quite clear for this reason alone that the plaintiffs are likely to succeed as to the merits of their § 1401(a) claims.

### 2.  The Citizenship Clause and <u>Wong Kim Ark</u>

Because the plaintiffs' § 1401(a) claims suffice on their own to support the preliminary injunctions, <u>see</u> <u>Somerville Pub. Schs.</u> v. <u>McMahon</u>, 139 F.4th 63, 72 (1st Cir. 2025), we could bypass the parties' additional dispute about what <u>Wong Kim Ark</u> decided in 1898 regarding the meaning of "subject to the jurisdiction thereof" in the Citizenship Clause.  The Government does not suggest, however, that § 1401(a) is narrower than the Citizenship Clause as construed by <u>Wong Kim Ark</u>.  Thus, if -- as the plaintiffs contend -- <u>Wong Kim Ark</u> construed the phrase "subject to the jurisdiction thereof" in the Citizenship Clause the same way that they contend that the phrase was understood in 1952, then even the Government does not dispute that the plaintiffs are likely to succeed on the merits of their § 1401(a) claims for that reason as well.  And, of course, in that event, the plaintiffs also would be likely to succeed as to the merits of their Citizenship Clause claims.

In these circumstances, we think it appropriate to address the parties' thoroughly briefed dispute over the proper way to understand the Court's decision in <u>Wong Kim Ark</u>.  As we will explain, that dispute must be resolved in a way that supports

the plaintiffs' position.  And so, we conclude that the plaintiffs clearly are likely to succeed as to the merits of all the claims before us.

### a.  The Facts of Wong Kim Ark

Wong Kim Ark involved a challenge to a writ of habeas corpus that had been granted to a young man who was born in San Francisco in 1873 to Chinese nationals who were permanently domiciled in San Francisco until their return to China in 1890. Wong Kim Ark, 169 U.S. at 652-53.  At the age of 17, the man, Wong Kim Ark, traveled with his parents to China when they returned there in 1890, before, seemingly without incident, he returned to the United States on his own that same year.  See id. at 653.  But, in 1895, when he attempted to return to the United States after having made another temporary visit to China beginning the year before, federal authorities denied him entry and detained him pursuant to the Chinese Exclusion Act, Act of May 6, 1882, ch. 126, 22 Stat. 58.  Id.; see also In re Wong Kim Ark, 71 F. 382, 383 (N.D. Cal. 1896).  He then petitioned for a grant of the writ of habeas corpus.  Id.[14]

---

[14] Although Wong Kim Ark based his habeas corpus action on the Citizenship Clause, see In re Wong Kim Ark, 71 F. 382, 384 (N.D. Cal. 1896), the question in that case did not turn, strictly speaking, only on whether, under that Clause, he became a United States citizen upon his birth in this country.  It turned, ultimately, on whether he was still a citizen when, in 1895, he

The Supreme Court affirmed the grant of the writ, concluding that Wong Kim Ark was right that, at birth, he was a citizen of the United States under the Citizenship Clause.  See Wong Kim Ark, 169 U.S. at 704-05.  For that reason, the Court's decision is of obvious significance to the merits of the plaintiffs' claims under both that Clause and § 1401(a).[15]

### b.  Wong Kim Ark's Rationale

Wong Kim Ark began by explaining that the key words of the Citizenship Clause, having not been defined there or elsewhere in the Constitution, "must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the constitution."  Id. at 654.  The Court then described the "fundamental principle of the common law with regard to English nationality" as:

---

was denied entry and detained.  See Wong Kim Ark, 169 U.S. at 704. Indeed, Wong Kim Ark argued not only that he was a citizen because he was born here, but also that he had never lost his citizenship, as "he ha[d] remained here until twenty-one and ha[d] elected an American nationality."  Brief for the Appellee at 40, Wong Kim Ark, 169 U.S. 649.  The Court agreed on that ultimate point as well.  See Wong Kim Ark, 169 U.S. at 704 ("Whether any act of [Wong Kim Ark], or of his parents, during his minority, could have the . . . effect [of taking away or causing Wong Kim Ark to lose his citizenship], is at least doubtful.  But it would be out of place to pursue that inquiry, inasmuch as it is expressly agreed that his residence has always been in the United States, and not elsewhere . . . .").

[15] As noted previously, however, the plaintiffs' § 1401(a) claims provide an independent basis upon which to grant the preliminary injunction.

[B]irth within the allegiance -- also called
'ligealty,' 'obedience,' 'faith,' or
'power' -- of the king. The principle
embraced all persons born within the king's
allegiance, and subject to his protection.
Such allegiance and protection were
mutual . . . and were not restricted to
natural-born subjects and naturalized
subjects, or to those who had taken an oath of
allegiance; but were predicable of aliens in
amity, so long as they were within the
kingdom. Children, born in England, of such
aliens, were therefore natural-born subjects.
But the children, born within the realm, of
foreign ambassadors, or the children of alien
enemies, born during and within their hostile
occupation of part of the king's dominions,
were not natural-born subjects, because not
born within the allegiance, the obedience, or
the power, or, as would be said at this day,
within the jurisdiction, of the king.

Id. at 655. The Court explained that this "same rule was in force

in all the English colonies upon this continent down to the time

of the Declaration of Independence, and in the United States

afterwards, and continued to prevail under the constitution as

originally established." Id. at 658. It also rejected the

suggestion that by 1868 -- when the Fourteenth Amendment was

ratified -- "there was any settled and definite rule of

international law generally recognized by civilized nations,

inconsistent with the ancient rule of citizenship by birth within

the dominion." Id. at 667.

Based on this historical account, the Court concluded

that "[i]n the forefront . . . of the fourteenth amendment . . .,

the fundamental principle of citizenship by birth within the

dominion was reaffirmed in the most explicit and comprehensive terms." Id. at 675. For, while the Court acknowledged that the Fourteenth Amendment's "main purpose doubtless was . . . to establish the citizenship of free negroes" denied in Dred Scott, it also emphasized that "the opening words, 'All persons born,' are general, not to say universal, restricted only by place and jurisdiction." Id. at 676.

Wong Kim Ark did recognize that, in an earlier case, the Court had held that the Citizenship Clause -- through the "subject to the jurisdiction thereof" language -- recognized a "single additional exception," id. at 693, to the ancient common law rule of birthright citizenship, id. at 680. That exception pertained to a child "born a member of one of the Indian tribes." See id. (citing Elk, 112 U.S. 94). But Wong Kim Ark did not purport to identify any other exception. See id. at 676 (explaining that the Citizenship Clause, being "declaratory in form, and enabling and extending in effect," "was not intended to impose any new restrictions upon citizenship").[16]

_____

[16] We note that, independent of the common law-based construction of the phrase "subject to the jurisdiction thereof," the Court recognized the "natural and inherent right" of expatriation. Wong Kim Ark, 169 U.S. at 704 (quoting An Act Concerning the Rights of American Citizens in Foreign States, ch. 249, § 1, 15 Stat. 223, 223 (1868)). The dissenters in Wong Kim Ark contended English common law did not recognize that "right," as they contended that the common law considered the ties of allegiance to be "indissoluble." See id. at 711-13 (Fuller,

Moreover, Wong Kim Ark explained that this one additional exception had been recognized because the "meaning of" the phrase "subject to the jurisdiction thereof" was "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." Id. at 680 (quoting Elk, 112 U.S. at 102). Wong Kim Ark went on to explain that Elk determined that, because "the Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign states, but were alien nations," it followed that those born tribal members here were "no more 'born in the United States, and subject to the jurisdiction thereof,' . . . than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States of ambassadors or other public ministers of foreign nations." Id. at 681 (quoting Elk, 112 U.S. at 102).

Thus, by way of summation, the Court in Wong Kim Ark set forth the following critical conclusion midway through its analysis:

---

C.J., dissenting).  One treatise cited by the Government states, however, that both the United States and England "expressly repudiated" the old rule of indelibility: the United States by statute in 1868 and England by statute in 1870.  See Hannis Taylor, A Treatise on International Public Law 217-18 (1901).

The real object of the fourteenth amendment of
the constitution, in qualifying the words 'all
persons born in the United States' by the
addition 'and subject to the jurisdiction
thereof,' would appear to have been to
exclude, by the fewest and fittest words
(besides children of members of the Indian
tribes, standing in a peculiar relation to the
national government, unknown to the common
law), the two classes of cases, -- children
born of alien enemies in hostile occupation,
and children of diplomatic representatives of
a foreign state, -- both of which, as has
already been shown, by the law of England and
by our own law, from the time of the first
settlement of the English colonies in America,
had been recognized exceptions to the
fundamental rule of citizenship by birth
within the country.

Id. at 682.

That is not to say that Justice Gray -- the author of

the Court's opinion in Wong Kim Ark -- cut to the chase in reaching

this conclusion for the Court. His opinion ran over 50 pages and

canvassed the full range of authorities. See id. at 652-705. But

it is evident that he engaged in this comprehensive review to

support the conclusion, succinctly set forth in the passage above,

that "subject to the jurisdiction thereof" was a well-understood

and carefully chosen phrase that ensured the Clause mirrored the

ancient common law principle for determining nationality, while

allowing for a single additional, peculiarly American exception

pertaining to members of Native American tribes.

Consistent with this understanding of Wong Kim Ark,

Justice Gray, right after his crisp description of the "real

object" of the words "subject to the jurisdiction thereof," id. at 682, examined "the well[-]known case of The Exchange," id. at 687 (referencing The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch.) 116 (1812)); see also id. at 684-87. He did so because he explained that those words "must be presumed to have been understood and intended by the congress which proposed the amendment, and by the legislatures which adopted it, in the same sense in which the like words had been used by Chief Justice Marshall" in that case. Id. at 687.

Justice Gray proceeded to explain that Chief Justice Marshall's opinion in The Exchange used "like words" in accord with the use that he had just attributed to the words in the Citizenship Clause. Id. Noting that The Exchange concerned "the grounds upon which foreign ministers are, and other aliens are not, exempt from the jurisdiction of this country," Justice Gray explained that Chief Justice Marshall had no occasion to address "the anomalous case of the Indian tribes" or the "suspension of the sovereignty of the United States over part of their territory by reason of a hostile occupation." Id. at 683. But, Justice Gray stated, "in all other respects," Chief Justice Marshall's opinion "covered the whole question of what persons within the territory of the United States are subject to the jurisdiction thereof." Id. And Justice Gray further explained that, in The Exchange, Chief Justice Marshall described "the general principle"

that "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute," id. at 683-84 (quoting The Exchange, 11 U.S. (7 Cranch.) at 136), subject only to those waivers of that jurisdiction that the sovereign itself chooses to make, id. at 684.

Justice Gray thus noted that it was significant for purposes of understanding the Citizenship Clause that Chief Justice Marshall recognized in The Exchange that there are certain "class[es] of cases in which every sovereign is understood to waive . . . [its] complete exclusive territorial jurisdiction" by recognizing an "immunity" or "exempt[ion] from . . . jurisdiction" derived from the "political fiction" of extraterritoriality or the consent of the sovereign. Id. at 684-85 (quoting The Exchange, 11 U.S. (7 Cranch.) at 137-39, 147). These classes were for "foreign sovereign[s]," "foreign ministers," foreign troops permitted to pass through the territory, and individuals on "public armed ship[s]" serving a friendly foreign state. Id. at 684 (quoting The Exchange, 11 U.S. (7 Cranch.) at 137-39, 147).

Moreover, Justice Gray explained, it was significant that Chief Justice Marshall recognized that no such exemption could be afforded to "other aliens" because:

> When private individuals of one nation spread
> themselves through another as business or
> caprice may direct, mingling indiscriminately
> with the inhabitants of that other, or when
> merchant vessels enter for the purposes of

> trade, it would be obviously inconvenient and
> dangerous to society, and would subject the
> laws to continual infraction, and the
> government to degradation, if such individuals
> or merchants did not owe temporary and local
> allegiance, and were not amenable to the
> jurisdiction of the country.

Id. at 685-86 (emphases added) (quoting The Exchange, 11 U.S. (7
Cranch.) at 144).

In fact, Justice Gray affirmatively endorsed that aspect
of temporary allegiance articulated in The Exchange when, in
setting forth his understanding of that decision's "conclusions,"
he stated the following:

> It can hardly be denied that an alien is
> completely subject to the political
> jurisdiction of the country in which he
> resides, seeing that, . . . 'independently of
> a residence with intention to continue such
> residence; independently of any
> domiciliation; independently of the taking of
> any oath of allegiance or of renouncing any
> former allegiance, it is well known that by
> the public law an alien, or a stranger born,
> for so long a time as he continues within the
> dominions of a foreign government, owes
> obedience to the laws of that government, and
> may be punished for treason or other crimes as
> a native-born subject might be . . . .

Id. at 693-94 (quoting 6 The Works of Daniel Webster 526 (1851));
see also Carlisle v. United States, 83 U.S. (16 Wall.) 147, 154-55
(1872) (quoting the same, and stating that "[t]he rights of
sovereignty . . . extend to all persons and things not privileged
that are within the territory," including "all strangers therein,

not only . . . to those who are domiciled therein," "but also to those whose residence is transitory" (citing Richard Wildman, 1 Institutes of International Law 40 (1849))).

Justice Gray made the same point in addressing the import of the Civil Rights Act of 1866, which had granted citizenship to "all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed." See Wong Kim Ark, 169 U.S. at 688 (emphasis added) (quoting Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27). He rejected the contention that the phrase "not subject to any foreign power" in the Civil Rights Act was "intended," "for the first time in our history, to deny the right of citizenship to native-born children . . . ." Id. Instead, he explained, the Civil Rights Act "reaffirmed" "the fundamental principle of citizenship by birth within the dominion . . . in the most explicit and comprehensive terms," id. at 675, and "any possible doubt in th[at] regard was removed when the negative words of the civil rights act, 'not subject to any foreign power,' gave way, in the [Citizenship Clause], to the affirmative words, 'subject to the jurisdiction of the United States,'" id. at 688.

Given the Court's rationale for ruling as it did, we fail to see how we could read Wong Kim Ark to reject the plaintiffs' construction of the phrase "subject to the jurisdiction thereof" in the Citizenship Clause or even to leave open the question as to

whether that construction is right.  The Court expressly tied the phrase to the similar phrase in "the well[-]known case of The Exchange."  Id. at 687.  And Justice Gray explained that, in The Exchange, Chief Justice Marshall treated all those present here as having a temporary allegiance to the United States and being subject to the jurisdiction of the United States -- "exclusive and absolute" as it is, The Exchange, 11 U.S. (7 Cranch.) at 136 -- unless they fall into one of the special classes of foreign nationals for which a person is not "subject to" United States jurisdiction because of an immunity or exemption from it owing to sovereign waiver, Wong Kim Ark, 169 U.S. at 686.

Finally, nothing in Wong Kim Ark suggested that the waivers of complete jurisdiction that "every sovereign" has been understood to make for certain classes of people -- namely, foreign sovereigns and ministers, foreign troops, and those aboard public armed ships, id. at 684 (quoting The Exchange, 11 U.S. (7 Cranch.) at 137-39, 147) -- extend in this country, outside the context of a foreign military occupation, beyond a "single additional exception," see id. at 693.  That exception was the one for children born members of Native American tribes.  See id.

We also find it significant, given the Fourteenth Amendment's focus on the child, not the parent, see U.S. Const. amend. XIV, § 1 ("All persons born . . . in the United States . . . ."), that The Exchange's waiver-based justification

applies not only to the parent, but also to a child at the moment
of the child's birth. For example, when the parents are beyond
U.S. jurisdiction -- as where U.S. sovereignty is "suspended" due
to "military occupation," Wong Kim Ark, 169 U.S. at 683 (quoting
United States v. Rice, 17 U.S. (4 Wheat.) 246, 254 (1819)) -- any
child would equally be beyond its reach, see Inglis v. Trs. of
Sailor's Snug Harbour, 28 U.S. (3 Pet.) 99, 155-56 (1830) (opinion
of Story, J.) (explaining that, for a person to acquire "allegiance
by birth," he "must be born within a place where the sovereign is
at the time in full possession and exercise of his power," and
illustrating that "general doctrine" through several exceptions,
including when the sovereign's dominion is "occupied . . . by
conquest"). Similarly, in the case of Native American tribal
members, ambassadors, or those on armed public ships, the
justification for each sovereign waiver of complete jurisdiction
applies independently to the child as much as to the parent. See
Eileen Denza, 4 Diplomatic Law 319 (2016) (explaining that, since
the 1700s, it has been "accepted" that "the wife and minor
children" of diplomats "[a]re entitled to the same privileges and
immunities as the diplomat himself"); McKay v. Campbell, 16 F.
Cas. 161, 167 (D. Or. 1871) (stating that a child born to a Native
American mother and a Canadian father would not be considered "born
subject to the jurisdiction of the United States" if he was "born
a member" of the tribe, but suggesting he would otherwise be "in

the allegiance" of the occupying power); Wong Kim Ark, 169 U.S. at
680 ("[A]n Indian born a member of one of the Indian
tribes . . . was not a citizen of the United States, as a person
born in the United States, 'and subject to the jurisdiction
thereof,' within the meaning of the clause in question." (emphasis
added));[17] id. at 693 (noting that the Fourteenth Amendment
excludes "children . . . born on foreign public ships" (emphasis
added)).

### c.  The Government's Objections

The Government nonetheless argues, for a variety of
reasons, that Wong Kim Ark must be read to make "domicile" an
independent determinant of citizenship.  Those reasons relate
either directly to what Wong Kim Ark itself said or, more
indirectly, to what the understanding was (in the Government's
view) at the time that Wong Kim Ark was decided or to what the

---

[17] Wong Kim Ark described this exception in various ways, each
hinging on a tribal member's relationship to the United States as
a member of a "distinct political communit[y]." See 169 U.S. at
681; see also id. at 680-81 (explaining tribal members' exclusion
from the Citizenship Clause because "Indians born within the
territorial limits of the United States, members of, and owing
immediate allegiance to, one of the Indian tribes" were not
"completely subject to [the United States's] political
jurisdiction" (emphasis added)); id. at 682 (explaining that the
addition of "'subject to the jurisdiction thereof' would appear to
have been to exclude . . . children of members of the Indian
tribes" because the tribes "stand[] in a peculiar relation to the
National Government"); id. at 693 (explaining that the Citizenship
Clause does not apply to "children of members of the Indian tribes
owing direct allegiance to their several tribes").

Court itself has decided since.  These arguments are all without merit.

### i.  Coherence of the Exceptions Recognized in <u>Wong Kim Ark</u>

The Government contends that to form "a coherent account" of the exceptions enumerated in <u>Wong Kim Ark</u> -- and, in particular, the carve-out for the children born Native American tribal members -- we must adopt the view of "political jurisdiction" that makes the domicile of a child's mother of critical import to whether the child is "subject to the jurisdiction" of the United States upon being born here.  We disagree.

<u>Wong Kim Ark</u>'s discussion of <u>The Exchange</u>, when paired with its discussion of <u>Elk</u>, makes clear what was understood to be the coherent basis for concluding that children born Native American tribal members are not "subject to the jurisdiction" of the United States.  Due to the peculiar quasi-sovereign status of tribes, the United States's otherwise "full and absolute territorial jurisdiction" over those present here has been voluntarily waived as to tribal members (albeit in part, rather than in full) just as it has been waived (again, in part, rather than in full) in the special classes of cases -- involving "foreign ministers," friendly "sovereigns or their armies," and "public

ships of war" -- in which "every nation" is understood to have waived "a part of it[]."[18]  Id. at 686.

     This understanding of the phrase "subject to the jurisdiction thereof" also fits comfortably with the Citizenship Clause's text.  Even if there is potential ambiguity as to the scope of the words "subject to," there is nothing strange about reading those words so that the Clause refers to those <u>actually</u> subjected to United States law in full when "born . . . in the United States" (as opposed to those, due to a sovereign waiver, merely <u>potentially</u> subjected to it in full, like the members of the aforementioned special classes).  U.S. Const. amend. XIV, § 1.

     In fact, if anything, the incoherence inheres in the Government's view that "domicile" determines whether a noncitizen's child is "subject to the jurisdiction" of the United States.  That view apparently treats a noncitizen who lacks such a domicile as not "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause because that person

---

[18] This understanding was also reflected in the congressional debates on the ratification of the Fourteenth Amendment.  For example, Senator Trumbull supposed that the United States "ha[d] the power" to extend its laws over Native American tribes, but that it chose not to do so because it "would be a violation of [the United States's] treaty obligations."  Cong. Globe, 39th Cong., 1st Sess., 2887, 2894 (statement of Sen. Trumbull).  And given <u>Wong Kim Ark</u>'s sovereign-waiver-based understanding of the jurisdictional phrase, the Government's contention that the United States departed from English common law in other respects regarding Native Americans is of no consequence.

lacks allegiance to the United States.  Yet, that view does not
dispute that under The Exchange that same person still "owe[s]
temporary and local allegiance" to this nation.  Wong Kim Ark, 169
U.S. at 685 (emphasis added) (quoting The Exchange, 11 U.S. (7
Cranch.) at 144).

        The Government's apparent view, then, is that such a
person is not "subject to the jurisdiction" of the United States
for purposes of the Citizenship Clause under Wong Kim Ark, even
though that same person is "amenable to the jurisdiction of the
country," and so not free to engage in the "continual infraction"
of our laws, under The Exchange.  Id. at 685-86 (emphasis added)
(quoting The Exchange, 11 U.S. (7 Cranch.) at 144).  The only way
to square that circle is to conclude, despite what Wong Kim Ark
said, that the phrase "subject to the jurisdiction" in the
Citizenship Clause has no relation to the discussion of who is
subject to the jurisdiction of the United States in The Exchange.

        The Government offers no explanation for how such a
conclusion accords with Wong Kim Ark's explicit reliance on The
Exchange in construing the "like words" in the Citizenship Clause.
So, whatever other defects inhere in the Government's view of the
meaning of those words, a leading one is that its view cannot
account for the Court's construction of them in Wong Kim Ark.  It
is worth noting, too, that the text of the Citizenship Clause
hardly compels the Government's domiciled-based reading, as it is

far from evident why the word "domicile" would not have been used if it were understood to be so critical.[19]

### ii. References to Domicile in <u>Wong Kim Ark</u>

The Government also seizes on the Court's "precise[] identifi[cation]" of "the narrow question presented"[20] in <u>Wong Kim Ark</u> and subsequent statement of its holding in that case, which referred to Wong Kim Ark's parents having a permanent domicile in this country at the time of his birth. The Government argues that

---

[19] One amicus advances the textual argument that, because the Citizenship Clause makes a person a "citizen[] of the United States and of the State wherein they reside," that "textual feature" shows that the Clause was intended to incorporate a residency or domicile requirement. See Corrected Amicus Brief of the State of Tennessee in Support of Defendants-Appellants and Reversal 9 (emphasis added). But, textually, that phrase, like the phrase that precedes it, which makes individuals "citizens of the United States," U.S. Const. amend. XIV, § 1, cl. 1, describes the benefit (state citizenship) that flows to those who meet the requirements set forth earlier in the Clause (being "born or naturalized in the United States, and subject to the jurisdiction thereof," id.). And, in any case, we are unable to square this reading of the Citizenship Clause with Wong Kim Ark, which, for the reasons we have already explained, cannot be read to impose a domicile requirement under the Fourteenth Amendment.

[20] The question presented by the Court in Wong Kim Ark was as follows: "[W]hether a child born in the United States, of parents of Chinese descent, who at the time of his birth are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the fourteenth amendment of the constitution . . . ." 169 U.S. at 653.

these features of the Court's opinion show that the Court's holding was "carefully cabined" to those facts.

The question "presented," however, appears to simply draw much of its phrasing verbatim from the facts stipulated to by the parties. See id. at 652-53. And, given the potential issues about expatriation during a person's minority that the case presented when filed, the references to domicile in the stipulated facts are not anomalous even if they do not bear on whether Wong Kim Ark was a citizen at birth under the Citizenship Clause. See id. at 704 ("Upon the facts agreed in this case, the American citizenship which Wong Kim Ark acquired by birth within the United States has not been lost or taken away by anything happening since his birth."). Moreover, as we have explained, the answer given to the question presented, which was favorable to Wong Kim Ark, rested on the jus soli-based rationale for defining citizenship that we have described. See id. at 705 ("For the reasons above stated, this court is of opinion that the question must be answered in the affirmative." (emphasis added)).

There also is not a word in Justice Gray's lengthy opinion setting forth its rationale that purports to explain why the fact that Wong Kim Ark's parents had a permanent domicile in San Francisco made Wong Kim Ark "subject to the jurisdiction" of the United States at the time of his birth. By contrast, the opinion begins by stating that the Citizenship Clause must be

construed in "light of the common law," id. at 654, and continues by spending page after page explaining the common law in terms that rendered domicile irrelevant to nationality,[21] see id. at 655-75, before then linking that critical phrase to Chief Justice Marshall's reasoning in The Exchange, see id. at 683-87.

We decline to conclude that Justice Gray either decided only what he did not explain or explained only what he did not decide. We note as well that two unusually interested readers of his opinion -- the dissenters in Wong Kim Ark -- understood the Court to have adopted the ancient common law rule. See id. at 705 (Fuller, C.J., dissenting) ("The [majority's] argument is that . . . [the constitution] must be interpreted in the light of the English common-law rule which made the place of birth the criterion of nationality . . . .").

---

[21] See, e.g., Wong Kim Ark, 169 U.S. at 657 ("By the common law of England, every person born within the dominions of the crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject . . . ." (quoting Alexander Cockburn, Nationality: Or the Law Relating to Subjects and Aliens 7 (1869))); id. at 660 ("Nothing is better settled at the common law than the doctrine that the children, even of aliens, born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth." (quoting Inglis v. Trs. of Sailor's Snug Harbour, 28 U.S. (3 Pet.) 99, 164 (1830) (opinion of Story, J.))); id. at 656 ("The question of naturalization and of allegiance is distinct from that of domicile." (quoting Udny v. Udny, [1869] 1 LR (HL) 441, 452 (appeal taken from Scot.))).

In suggesting that the dissenters nonetheless misapprehended the majority's decision, the Government points to the references to domicile[22] in the following passage:

> The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.

Id. at 693 (majority opinion) (emphases added). This language, however, followed the Court's discussion of several Executive Branch opinions regarding issues that arise from the United States's conferral of United States citizenship on those born abroad. See id. at 689-92.

---

[22] The Government also highlights references to those "resident" or "residing in the United States." But the Government fails to develop an argument as to why we must understand Wong Kim Ark to have used "domicile" and "residence" as synonyms, when the opinion repeatedly used the terms in ways that suggested they had distinct meanings. See, e.g., Wong Kim Ark, 169 U.S. at 693 (majority opinion) ("[I]ndependently of a residence with intention to continue such residence; independently of any domiciliation . . . ." (quoting Letter from Daniel Webster, Sec'y of State, to Millard Fillmore, President of the United States, reprinted in 6 The Works of Daniel Webster 526 (1851))); id. at 653, 705 ("domicile and residence"); cf. Brief for Appellants 31 ("Domicile, recall, requires residence and an intent to remain indefinitely."); Frederick A. Cleveland, American Citizenship as Distinguished from Alien Status 39 (1927) ("'Residence' is of a more temporary character than 'domicile.' 'Residence' simply indicates the place of abode, whether permanent or temporary; 'domicile' denotes a fixed, permanent residence . . . .").

In that discussion, the Court reviewed circumstances in which domicile was relevant to the naturalization of a person born outside of the United States to a United States citizen. See id. at 689 (citing an 1869 opinion from Attorney General Ebenezer Hoar in which he concluded that "children born and domiciled abroad, whose fathers were native-born citizens of the United States, and had at some time resided therein, were, under the statute . . . citizens of the United States," but cautioning that this statutory conferral of citizenship could not extend to those "who have not come within our territory," lest the conferral of citizenship upon a foreign-born child who remains abroad interfere with the laws of the child's country of birth). And, earlier still in the opinion, Justice Gray observed that while naturalization laws restricted the right of citizenship "conferred upon foreign-born children of American citizens, to those children themselves, unless they became residents of the United States," "nothing," including that restriction, could be understood "to countenance the theory that a general rule of citizenship by blood or descent has displaced in this country the fundamental rule of citizenship by birth within its sovereignty." Id. at 674.

So, in context, the evident purpose of the passage to which the Government directs our attention was to emphasize the breadth of the rule of birthright citizenship applicable to those born within the United States under "our own established rule of

citizenship by birth in this country," <u>id.</u> at 692, relative to the
more limited scope of United States citizenship conferred on those
born <u>outside</u> the United States to a United States citizen.  Thus,
consistent with the quoted passage's use of the word "includes,"
we do not read the passage to have been intended to draw, for
purposes of defining the Citizenship Clause's scope, a wholly
unexplained distinction between those born in the United States to
persons domiciled here and those born in the United States to
persons not domiciled here.  <u>See id.</u> ("The amendment, in clear
words and in manifest intent, <u>includes</u> the children born within
the territory of the United States of all other
persons . . . domiciled within the United States." (emphasis
added)).[23]

 The Government additionally -- and seemingly
counterintuitively -- argues that the following language in <u>Wong
Kim Ark</u> supports its position:

> It can hardly be denied that an alien is
> completely subject to the political
> jurisdiction of the country in which he

---

[23] The Government also directs our attention to a passage that
reads: "Chinese persons . . . are entitled to the protection of
and owe allegiance to the United States, <u>so long as they are
permitted by the United States to reside here</u>; and are 'subject to
the jurisdiction thereof,' in the same sense as all other aliens
<u>residing in the United States</u>." (Quoting <u>Wong Kim Ark</u>, 169 U.S.
at 694 (emphases added).)  But, as noted above, the Government
does not explain why references to "residence" support its
domicile-based rule, and, in any event, this passage is
unpersuasive for the same reasons as those set forth above, as
nothing in the opinion's reasoning appears to turn on domicile.

> resides, seeing that, . . . 'independently of a residence with intention to continue such residence; independently of any domiciliation; independently of the taking of any oath of allegiance or of renouncing any former allegiance, it is well known that by the public law an alien, or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may be punished for treason or other crimes as a native-born subject might be . . . .

Id. at 693-94 (quoting 6 The Works of Daniel Webster 526 (1851)). We do not disagree that this passage expresses the view that a person who is domiciled in a country must owe at least that degree of allegiance that is owed by a person who is merely temporarily present there. We fail to see, though, how this passage thereby supports the Government's view. It instead supports the conclusion that allegiance is a function of having a presence "within the dominion[]" of the sovereign, id. at 694, not of having a domicile within the sovereign's territory, see id. (stating that temporary visitors may even "be punished for treason or other crimes as a native-born subject might be" (emphasis added)).

### iii.  Understandings at the Time of Wong Kim Ark

At times, the Government appears to argue that Wong Kim Ark must have meant its references to domicile to cabin its decision because of what "subject to the jurisdiction thereof" was understood to mean from the time of ratification up to 1898. But

disagreement with Wong Kim Ark's construction of the Citizenship Clause is not itself a basis to disregard that construction. What is more, Wong Kim Ark's construction of the phrase at issue in that Clause was hardly idiosyncratic at the time.

The debates in Congress over the proposed Fourteenth Amendment and the Civil Rights Act of 1866 were rife with statements premised on the same understanding of jurisdiction recognized in The Exchange, reflected in the common law exceptions, and endorsed later by the Court in Wong Kim Ark.[24] That is particularly true of the debates over whether children who were members of Native American tribes were "subject to the jurisdiction" of the United States.[25] That the Citizenship Clause,

---

[24] See Cong. Globe, 39th Cong., 1st Sess. 1151 (1866) (statement of Rep. Thayer) (describing the Civil Rights Act as "declaring that all men born upon the soil of the United States shall enjoy the fundamental rights of citizenship"); id. at 2891 (statement of Sen. Cowan) (describing the Fourteenth Amendment as "assert[ing] broadly that everybody who shall be born in the United States shall be taken to be a citizen"); id. at 2892 (statement of Sen. Conness) (describing the Fourteenth Amendment as "a simple declaration that . . . human beings born in the United States shall be regarded as citizens"). Notably, one Senator stated that he knew of only "one instance" in which "a person may be born here and not be a citizen" -- namely, "in the case of the children of foreign ministers" under "a fiction" of extraterritoriality. Id. at 2769 (statement of Rep. Wade).

[25] See Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (statement of Sen. Trumbull) ("Can you sue a Navajoe [sic] Indian in court? Are they in any sense subject to the complete jurisdiction of the United States? By no means. . . . If we want to control the . . . Indians . . ., how do we do it? Do we pass a law to control them? Are they subject to our jurisdiction in

unlike the Civil Rights Act of 1866, makes no express reference to Native American children does not show otherwise.[26]

Wong Kim Ark also was hardly out of step with judicial opinions, treatises, and other scholarly works of the era. The

_____

that sense?  Is it not understood that if we want to make arrangements with the Indians . . . we do it by means of a treaty?"); id. at 2895 (statement of Sen. Howard) ("The Indian who is still connected by his tribal relation with the government of his tribe is subject for crimes committed against the laws or usages of the tribe to the tribe itself, and not to any foreign or other tribunal . . . .  The United States courts have no power to punish an Indian who is connected with a tribe for a crime committed by him upon another member of the same tribe." (emphases added)); id. at 2893 (statement of Sen. Trumbull) ("Would the Senator from Wisconsin think for a moment of bringing a bill into Congress to subject these wild Indians with whom we have no treaty to [our] laws and regulations . . . ?  Would he think of punishing them for instituting among themselves their own tribal regulations?  Does the Government of the United States pretend to take jurisdiction of murders and robberies and other crimes committed by one Indian upon another?  Are they subject to our jurisdiction in any just sense?  They are not subject to our jurisdiction.  We do not exercise jurisdiction over them.  It is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens; and there can be no objection to the proposition that such persons should be citizens.").

[26] Senator Trumbull resisted the phrase "Indians not taxed" that was used in that statute out of concern that it might be interpreted literally, stating: "I am not willing to make citizenship in this country depend on taxation.  I am not willing . . . that the rich Indian residing in the State of New York shall be a citizen and the poor Indian residing in the State of New York shall not . . . ."  Cong. Globe, 39th Cong., 1st Sess. 2894 (1866) (statement of Sen. Trumbull).  For that reason, Senator Trumbull pushed for the adoption of the phrase "subject to the jurisdiction thereof," which in his view excluded Indians -- "over [whom the United States] do[es] not pretend to exercise any civil or criminal jurisdiction" -- without being susceptible of a reading which would make citizenship "depend on taxation."  Id.

case law that the Government identifies shows that domicile was considered sufficient to establish allegiance. See The Pizarro, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.) ("[A] person domiciled in a country, and enjoying the protection of its sovereign . . . owes allegiance to the country . . . ."). That case law does not establish a settled view that domicile was necessary to do so. Cf. Wong Kim Ark, 169 U.S. at 663 ("By th[e] circumstance of his birth, he is subjected to the duty of allegiance . . . and becomes reciprocally entitled to the protection of that sovereign . . . ." (quoting Gardner v. Ward, 2 Mass. 244 (1805))); id. at 685 ("His minister would owe temporary and local allegiance . . . ." (quoting The Exchange, 11 U.S. (7 Cranch.) at 139)); id. at 685-86 (describing merchants as owing "temporary and local allegiance" (quoting The Exchange, 11 U.S. (7 Cranch.) at 144)); Lynch, 1 Sand. Ch. at 638, 664. Indeed, the New Jersey Supreme Court's decision in Benny v. O'Brien, which adopted the Government's domicile-based view and on which the Government relies, 32 A. 696, 698 (N.J. 1895) (describing the Civil Rights Act and Fourteenth Amendment as intending to except persons "born in this country of foreign parents who are temporarily traveling here"), was described by the United States itself in Wong Kim Ark as an innovation, see Brief for the United States at 25-26, Wong Kim Ark, 169 U.S. 649 (acknowledging that the "element"

of "the temporary residence of the parents" had been "introduced for the first time" in that case).

The Government also invokes various treatises of the day in arguing for its reading of Wong Kim Ark. Some of those treatises, however, were relied on by the dissent in Wong Kim Ark. See Wong Kim Ark, 169 U.S. at 708 (Fuller, C.J., dissenting) (quoting 1 Travers Twiss, The Law of Nations Considered as Independent Political Communities 231 (1861); Emmerich de Vattel, The Law of Nations 101, § 212 (1797)). Others relied on arguments that the majority in Wong Kim Ark expressly rejected. Compare id. at 678 (majority opinion) (rejecting as dicta language in the Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1872)), with Hannis Taylor, A Treatise on International Public Law 218 (1901) (predicating its view that citizens or subjects of foreign states are not United States citizens on the same language in the Slaughter-House Cases); Alexander Porter Morse, A Treatise on Citizenship 248 (1881) (same). And still others relied on administrative practice that again was relied on by the dissent in Wong Kim Ark, while the majority cited favorably to contrary administrative views. See Wong Kim Ark, 169 U.S. at 691 (Fuller, C.J., dissenting) (citing opinion by Secretary of State Thomas Bayard regarding passport denial); William Edward Hall, A Treatise on International Law 237 n.1 (4th ed. 1895) (interpreting the Citizenship Clause based on an "administrative gloss" that

included the same passport denial). More generally, having reviewed the treatises cited by the Government in support of its view, we discern from them no settled view contrary to the one we understand Wong Kim Ark to have adopted as to the scope of birthright citizenship in the United States.

The Executive Branch practice of the time on which the Government relies, as we have just indicated, similarly fails to show that Wong Kim Ark's references to domicile must have been intended to cabin the ruling. It was the dissenters in that case who relied on that practice. See Wong Kim Ark, 169 U.S. at 719 (Fuller, C.J., dissenting). The majority, by contrast, favorably quoted Secretary of State Hamilton Fish's correspondence stating that "[t]he qualification[,] 'and subject to the jurisdiction thereof[,] was probably intended to exclude the children of foreign ministers, and of other persons who may be within our territory with rights of extraterritoriality.'"[27] See id. at 690 (majority opinion) (quoting Correspondence of Hamilton Fish, Sec'y of State (May 19, 1871), reprinted in 2 A Digest of the International Law of the United States 394 (Francis Wharton ed., 2d ed. 1887)). In any event, there is nothing unusual about a court declining to

---

[27] As for congressional practice, the Government points only to a bill, proposed by Representative Ebenezer Hoar six years after the Fourteenth Amendment was ratified, which stated that "a child born within the United States of parents who are not citizens, and who do not reside within the United States . . . shall not be regarded as a citizen thereof." See 2 Cong. Rec. 3279 (1874).

give weight to isolated instances of Executive Branch opinion and practice in construing the Constitution. See NLRB v. Noel Canning, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in the judgment) (explaining that "open, widespread, and unchallenged" practice has "guide[d]" courts' interpretation of "ambiguous constitutional provision[s]").[28]

### iv.   Post-Wong Kim Ark Precedents

Finally, we are not persuaded by the Government's contention that the Supreme Court adopted its domicile-based view in subsequent precedent: Chin Bak Kan v. United States, 186 U.S. 193 (1902), and Kwock Jan Fat v. White, 253 U.S. 454 (1920). Chin Bak Kan does no more than quote the language describing the facts of Wong Kim Ark that we have already addressed above. See 186 U.S. at 200. Kwock Jan Fat simply describes the status of the petitioner's parents without assigning any particular significance to the permanent nature of that status. See 253 U.S. at 457 ("It is not disputed that if petitioner . . . was born to them when they were permanently domiciled in the United States, [he] is a citizen . . . .").

---

[28] Insofar as the Government means to suggest that, because the domiciliary status of Chinese nationals in this country was relevant to legal issues in some contexts, that status must have been relevant in the citizenship context as well, the Government does not explain, nor do we see, why that would be so.

In addition, following Wong Kim Ark, the Supreme Court has itself repeatedly described U.S.-born children, even of unlawfully present individuals, as citizens. See United States ex rel. Hintopoulos v. Shaughnessy, 353 U.S. 72, 73, 75 (1957) (stating that a child, born in the United States to "alien parents illegally residing in the United States" "is, of course, an American citizen by birth"); INS v. Rios-Pineda, 471 U.S. 444, 446 (1985) (stating that a child "who, born in the United States, was a citizen of this country," even though the parents were unlawfully present and the child's father had previously been apprehended and failed to voluntarily self-deport as promised); INS v. Errico, 385 U.S. 214, 215 (1966) (noting that a child born to a parent who made a false representation in his visa application nonetheless "acquired United States citizenship at birth").

There also is Plyler v. Doe, 457 U.S. 202 (1982). In that case, the Supreme Court described Wong Kim Ark as "detail[ing] at some length the history of the Citizenship Clause, and the predominantly geographic sense in which the term 'jurisdiction' was used." Id. at 211 n.10 (emphasis added). The Court went on to explain that, "given the historical emphasis on geographic territoriality, bounded only, if at all, by principles of sovereignty and allegiance, no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and

resident aliens whose entry was unlawful." Id. (citing Bouvé, A
Treatise on the Laws Governing Aliens 425-27).[29]

This reading of Wong Kim Ark and of the Fourteenth
Amendment's jurisdictional provision as primarily focused on
territory accords with our independent analysis of Wong Kim Ark.
We would be hard-pressed to ignore the weight of this authority,
all of which accords with the plaintiffs' view.

### d.  Conclusion

When the smoke clears, what remains is the direct
statement about the purpose of the words of the Fourteenth
Amendment's Citizenship Clause that Wong Kim Ark plainly set forth.
That statement follows seamlessly from the rationale that the Court
gave for attributing that purpose to those words.  And, of course,
the words themselves -- "subject to the jurisdiction
thereof" -- easily bear such a construction.  As a result, Wong
Kim Ark on its own requires us to reject the Government's

---

[29] Indeed, the Bouvé treatise cited repeatedly by the Court
in Plyler v. Doe, see 457 U.S. 202, 212 n.10, 227 n.22 (1982),
concluded that children born to unlawfully present parents would
unequivocally be citizens of the United States, see Bouvé, A
Treatise on the Laws Governing Aliens 425-27.  Bouvé concluded
that this was so notwithstanding that such parents in theory "never
acquired a lawful domicile in the sense that they were never
entitled to enter for the purpose of establishing a home." Id. at
426.  The Plyler Court expressly endorsed Bouvé's view, stating
that "illegal entry into the country would not, under traditional
criteria, bar a person from establishing domicile within a State."
457 U.S. at 227 n.22.

contention that the plaintiffs are not likely to succeed on the merits of their claims under the Citizenship Clause. And, given that the Government does not dispute that § 1401(a) secures birthright citizenship to at least all those entitled to it under the Constitution, Wong Kim Ark thus shows that the plaintiffs are likely to succeed as to the merits of all the claims at issue.

Nor is it of any consequence that the plaintiffs are bringing a facial challenge. Any denial of citizenship on the grounds set forth in the EO would, in light of Wong Kim Ark, contravene the Citizenship Clause and § 1401(a). See United States v. Salerno, 481 U.S. 739, 745 (1987).

## V. Equitable Factors

Even though we conclude that the plaintiffs are, as the District Court concluded, "exceedingly likely" to succeed on the merits of their claims, we are not yet done with our review. The plaintiffs also "must establish," to secure preliminary injunctive relief, (1) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (2) "that the balance of equities tips in [their] favor," and (3) "that an injunction is in the public interest." Winter, 555 U.S. at 20. We cannot agree with the Government that any of the plaintiffs have failed to do so.

## A. Doe-Plaintiffs

The District Court determined that there was "a grave risk of significant and irreparable harm arising from the EO" to the Doe-Plaintiffs.  The District Court explained that "[t]he loss of birthright citizenship -- even if temporary and later restored at the conclusion of litigation -- has cascading effects" that will "very likely leav[e] permanent scars" on the child and their family.  That permanence stems from the fact that "children born without a recognized or lawful status face barriers to accessing critical healthcare, among other services, along with the threat of removal to countries they have never lived in and possible family separation."

The Government understandably makes no argument that the District Court erred on this score.  See Ortega Cabrera v. Mun. of Bayamón, 562 F.2d 91, 102 n.10 (1st Cir. 1977) (concluding that a party's failure to make an argument "on appeal" means that the party "waived any such claim").  It nonetheless argues that the balance of equities favors it because the preliminary injunction "inflicts irreparable injuries on the government and the public, whose interests 'merge' in this context," (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)), by barring the President from "carrying out his broad authority [over] and constitutional responsibility" for immigration matters.

In support, the Government cites <u>INS</u> v. <u>Legalization Assistance Project of the Los Angeles County Federation of Labor</u>, 510 U.S. 1301 (1993) (O'Connor, J., in chambers).  But there, Justice O'Connor determined that the government was likely to succeed in showing that the plaintiffs, to whom the preliminary injunction had been granted, lacked Article III standing to bring their claims.  <u>Id.</u> at 1305-06.  By contrast, the Doe-Plaintiffs both have standing and are likely to succeed on the merits in showing that the enforcement and implementation of the EO would be unlawful.

The Government is not irreparably harmed by an injunction issued to parties with Article III standing that bars enforcement of an unlawful executive order.  <u>See</u> <u>New Jersey</u>, 131 F.4th at 41.  Accordingly, we agree with the District Court that the equitable factors in this case "tip decisively toward the [Doe-Plaintiffs]."

### B.  State-Plaintiffs

The Government first argues as to the equitable factors that the State-Plaintiffs "have failed to show that any such injuries occurring between now and final judgment would be irreparable" because the State-Plaintiffs have not demonstrated that any loss of federal funds "could not be recovered through submission of claims after final judgment or through the

administrative procedures applicable to those programs." But, even assuming post-judgment payments of wrongfully withheld federal funds would remedy part of the State-Plaintiffs' harm, the District Court found that the State-Plaintiffs face "administrative upheaval."[30]

Indeed, the State-Plaintiffs point to "irreparable harms" stemming from the "intensive alterations to their eligibility verification systems for these federal programs" that they would need to undertake to determine who is eligible for benefits under the Executive Order. Without a preliminary injunction, the State-Plaintiffs claim that they would face unrecoverable costs that they would have to incur to "overhaul [their verification] systems" -- for example, the costs to modify their systems to "incorporate information about the immigration status of a child's parents," to "implement new measures for processing applications and tracking citizenship status," to "train staff . . . on new policies and procedures," and to "revise existing guidance and manuals regarding eligibility."

The Government disputes none of this in any meaningful way. We thus cannot conclude that the District Court has abused

---

[30] The Government has not advanced any argument that the irreparable harm inquiry must necessarily be tethered to the injury that gives a party standing. As such, any argument to that effect is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

its discretion in finding the State-Plaintiffs to have established irreparable harm.

The Government does again argue that the "equities and public interest" weigh in favor of denying injunctive relief because such relief "prevents the President from carrying out his broad authority [over] and constitutional responsibility" for immigration matters. But, again, the Government relies on Legalization Assistance Project of the Los Angeles County Federation of Labor, 510 U.S. at 1305-06, which, as we have explained, has no application here.

Given that the public has a substantial interest in ensuring that those entitled to be recognized as United States citizens are not unlawfully deprived of that recognition, the District Court did not abuse its discretion in finding that the public interest and balance of equities factors "tip decisively toward the [State-Plaintiffs]." Cf. New Jersey, 131 F.4th at 41 (finding the same in denying a stay of the preliminary injunction pending appeal). In fact, to say that the public has no interest in ensuring that those who deserve to be counted among its citizenry are so counted, is to misconceive the public's interest. So, we conclude that the District Court did not abuse its discretion in granting preliminary injunctive relief as to the State-Plaintiffs.

## VI.  Scope of the Relief

The final set of issues that we must address concerns the proper scope of preliminary injunctive relief.  We begin with the Doe-Plaintiffs' case.

### A.  Doe-Plaintiffs

The Government raises no issues with respect to the scope of the preliminary injunction barring the EO's enforcement against O. Doe herself.  But it does contend that the preliminary injunction issued to bar the EO's enforcement against members of the two organizations in the Doe-Plaintiffs' case is overbroad.  That is so, according to the Government, because the injunction bars the agency officials subject to it from enforcing the EO as to "any member" of those organizations.  As the Government puts it, the injunction is impermissibly broad because it purportedly covers "unidentified" and "uninjured members" of the organizations "for whom they have made no claim of standing."

To the extent that the Government means to argue that the preliminary injunction may bar enforcement of the EO as to only the two members whom the organizations identified in seeking associational standing, we cannot agree.  Both organizations set forth allegations in their complaint about the broad number of members "who are undocumented or in the United States on temporary statuses and who are either pregnant or plan to grow their families

in the future" and that "[t]hese members will experience severe and immediate harm if the EO is allowed to take effect."  After all, we are considering this case in the context of a preliminary injunction, which requires plaintiffs to show -- among other things -- only that they are "<u>likely</u> to suffer irreparable harm in the absence of preliminary relief."   <u>Winter</u>, 555 U.S. at 20 (emphasis added).

To the extent that notice to the Government about the scope of the injunction is the concern, we note that, as the plaintiffs point out, the Government did not raise the concern about unidentified members below.  That newly raised issue may be addressed on remand, as consideration may then be given to the proper procedure for ensuring that the Government has requisite notice as to whom it may not enforce the EO against under the preliminary injunction.

## B. State-Plaintiffs

As to the injunction in the State-Plaintiffs' case, the District Court did not order relief to any purported non-party. It instead issued a "universal" injunction to give "complete relief" to the State-Plaintiffs themselves.  The District Court explained that the State-Plaintiffs' harms "stem from the EO's impact on the citizenship status -- and the ability to discern or verify such status -- for any child located or seeking various

- 95 -

services within their jurisdiction." This harm, the District Court found, results not only when "children born and living [in the States] are unlawfully denied citizenship," but also whenever "a family moves to" one of the States "after welcoming a new baby" in a "state that has not joined this lawsuit."

Nothing in CASA provides that, as a categorical matter, it is improper for a district court to impose an injunction of such breadth if it is necessary to do so to provide the plaintiff with complete relief. See 606 U.S. at 853-54. Nor did CASA suggest that it would be improper for the District Court here to order such an injunction as a means of providing the State-Plaintiffs complete relief. See id.

At the same time, CASA did not hold that it would be proper in this case and under these circumstances. See id. It left that question to the "lower courts." Id. at 854.

Accordingly, following CASA, we remanded the case to the District Court for the limited purpose of determining the effects, if any, of the Supreme Court's ruling on the scope of the preliminary injunction. See Doe v. Trump, 142 F.4th at 112. The District Court began by noting that it awarded "universal or nationwide relief" originally, on February 13, 2025, because the "uncontested factual record produced by the plaintiffs" at that time demonstrated that any lesser injunction "would be 'inadequate' protection against the harms [that] the plaintiffs'

uncontested declarations described."  In other words, in issuing the preliminary injunction, the District Court found that there was no workable, narrower alternative, given the showing that the State-Plaintiffs had made and the Government's failure to explain why that was not the case.  The District Court then determined that nothing in CASA itself called its initial determination about the scope of relief into question.  It also noted that the Government, post-CASA, had not advanced any arguments or identified any evidence in the record that sufficed to do so.

Crucially, as the State-Plaintiffs point out, the ground that the Government now presses to us for concluding that the District Court erred in granting relief of this breadth was not a ground that it raised to the District Court in the preliminary injunction proceedings prior to the appeal.[31]  So, although the Government contends that we are not to look to the remand proceedings following CASA nor the accompanying record developed in those proceedings, the Government is in no position to object to the State-Plaintiffs' attempt on remand to address the workability of a narrower injunction.  That narrower injunction was not claimed by the Government to be workable before the District Court until the remand.

---

[31] The Government proposes in this regard that an injunction "requiring the federal government to determine eligibility for [the State-Plaintiffs'] programs without regard to the Executive Order" would provide complete relief to the State-Plaintiffs.

Of course, the Government is right that the defendants "need not 'write' the injunction themselves." <u>United States</u> v. <u>Zenon</u>, 711 F.2d 476, 478 (1st Cir. 1983). But the Government "must state their objections to the injunction . . . so that the district court can consider them and correct the injunction if necessary." <u>Id.</u> The conclusory, single paragraph below in the pre-<u>CASA</u> preliminary injunction proceedings that the Government now points to only argues that "nationwide relief" is not "justif[ied]." Indeed, it was not until its stay motion in this Court that the Government attempted to explain that a narrower injunction was available to provide complete relief to the State-Plaintiffs. But "a party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court." <u>Eldridge</u>, 863 F.3d at 84 (quoting <u>United States</u> v. <u>Slade</u>, 980 F.2d 27, 31 (1st Cir. 1992)).

We note as well that the Government, on remand following <u>CASA</u>, "elected not to develop . . . in [the District Court]" even the "narrower proposals" discussed in <u>CASA</u>, <u>see</u> 606 U.S. at 854. As the District Court noted, "[a]t no point ha[s] the [Government] fleshed out how any narrower injunction would work." The District Court explained that the Government has "never addressed what renders [any narrower injunction] feasible or workable, how the defendant agencies might implement [a narrower injunction] without imposing material administrative or financial burdens on the

plaintiffs, or how [any proposal would] square[] with other relevant federal statutes."

Thus, it is no surprise that, when presented with even more uncontroverted evidence by the State-Plaintiffs about the need for an injunction of the current breadth, the District Court again found that a narrower injunction would leave unremedied "administrative and financial harms."  We therefore decline to conclude that the District Court has abused its discretion in fashioning relief.  See Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 680 (1st Cir. 1998) (explaining that "[a]s a general rule, a disappointed litigant cannot surface an objection to a preliminary injunction for the first time in an appellate venue" because doing so deprives the district court of the opportunity to "consider [the objection] and correct the injunction if necessary, without the need for appeal" (quoting Zenon, 711 F.2d at 478)).

## VII.  Conclusion

Our nation's history of efforts to restrict birthright citizenship -- from Dred Scott in the decade before the Civil War to the attempted justification for the enforcement of the Chinese Exclusion Act in Wong Kim Ark -- has not been a proud one.  Indeed, those efforts each have been rejected, once by the people through constitutional amendment in 1868 and once by the Court relying on that same amendment three decades later, and at a time when

tensions over immigration also were high. Even the denial of citizenship to Native American tribal members no longer persists, thanks to a statute passed more than a century ago. See Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 (codified at 8 U.S.C. § 1401(b)).

The "lessons of history" thus give us every reason to be wary of now blessing this most recent effort to break with our established tradition of recognizing birthright citizenship and to make citizenship depend on the actions of one's parents rather than -- in all but the rarest of circumstances -- the simple fact of being born in the United States. United States v. Di Re, 332 U.S. 581, 595 (1948). Nor does the text of the Fourteenth Amendment, which countermanded our most infamous attempt to break with that tradition, permit us to bless this effort, any more than does the Supreme Court's interpretation of that amendment in Wong Kim Ark, the many related precedents that have followed it, or Congress's 1952 statute writing that amendment's words in the U.S. Code.

The District Court's order for entry of the preliminary injunctions is **affirmed** in part, **vacated** in part, and remanded for further consideration consistent with this decision.